UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JARROW FORMULAS, INC. | ) | CIVIL ACTION NO. |
| | ) | 3:01 CV 478 (AVC) |
|     Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| INTERNATIONAL NUTRITION COMPANY, | ) | |
| et al., | ) | |
| | ) | OCTOBER 23, 2003 |
|     Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION IN LIMINE TO EXCLUDE EVIDENCE**

Defendants International Nutrition Company ("INC"), Egbert Schwitters, Jack

Masquelier, Norman H. Zivin, Integrated BioCeuticals, LLC ("IBC), Primary Source, LLC

("PS"), and Primary Services, Inc. ("PSI") respectfully submit this memorandum in support of

their motion in limine to exclude at trial of this antitrust action any evidence that may be offered

by the plaintiff to prove: (1) the relevant product and geographic markets; (2) the defendants'

market shares in the relevant product and geographical markets and the likelihood that the

defendants' alleged attempt to monopolize could have been successful; or (3) that INC's patent

infringement action, which the plaintiff claims violated the antitrust laws, was "objectively

baseless" under the law as it existed at the time the patent infringement action was initiated.

Such evidence must be provided by expert witnesses, and the plaintiff has disclosed no expert

qualified to do so on any of these points.

10016

## FACTUAL BACKGROUND

### A.     The Amended Complaint

Plaintiff Jarrow Formulas, Inc. ("Jarrow") filed an Amended Complaint in this matter alleging violation by the defendants of the antitrust laws of the United States and Connecticut based on the following alleged conduct of INC:  instituting a patent infringement lawsuit in this Court (the "Connecticut action") and one in the Northern District of California (the "California action") to enforce U.S. Patent No. 4,698,360 (the "'360 patent") (Amended Complaint ¶ ¶ 20, 27); publicizing the lawsuits (Id. ¶ 22, 28, 30, 32, 38); threatening the nutritional supplement industry (Id. ¶ 22); and appealing decisions in the Connecticut and California actions (Id. ¶ 35). Plaintiff claims that as a result of such alleged anti-competitive conduct, INC and other defendants agreed to unreasonably restrain trade and were "likely to achieve" a monopoly within the alleged market, namely, "the sale and distribution of nutritional supplements comprising PACs [proanthocyanidins] and covered by the '360 patent."  (¶ 14.)

### B.     The Plaintiff's Experts

The Amended Case Management Order issued by this Court on January 18, 2002, required plaintiff to disclose all its expert witnesses on or before February 28, 2002.  The plaintiff disclosed two expert witnesses, Greg Ris and Michael Willoughby, whose testimony and reports are the subject of the defendants' Motion In Limine to Strike and Exclude dated on July 3, 2002.[1]  As explained in that motion, the methods employed by Mr. Ris and Mr. Willoughby to reach their conclusions are unreliable, speculative, and irrelevant, and, therefore, their testimony and reports should be excluded from trial.

_____

[1] The Court deferred a ruling on that motion until ten days before the start of trial.  Order dated February 24, 2003.

Even if the Court were to deny that motion, Mr. Ris' and Mr. Willoughby's "expert"

opinions utterly fail to consider or provide a market definition analysis.

In his report, Mr. Ris purported to find a causal link between the Connecticut and

California actions and a decline in the sale of one of his own employer's products, grape seed

extract.  Ris report entitled, "Effect of INC lawsuit on Grape Seed Extract Market – A Raw

Material Supplier's Perspective," a copy of which is attached as **Exhibit A [contains material**

**marked RESTRICTED CONFIDENTIAL].**[2]  In his report, he did not set forth an antitrust

analysis determining relevant product and geographic markets.  For example, the report does not:

(a) list the products within the relevant market as alleged by the plaintiff's Amended Complaint;

(b) consider the elasticity of demand of other products; (c) consider the elasticity of supply; (d)

provide market shares of any of the firms in a properly defined market; (e) consider entry of new

products or producers; or (f) provide any tangible demonstration of how INC's lawsuit could

have had any measurable consequence on any market.  This is not surprising because Mr. Ris is a

salesman with a bachelor's degree in journalism and public relations and not an antitrust

economist.  Ris. Depo. 6 – 12.

In his report, Mr. Willoughby also purported to find a link between INC's patent

infringement lawsuits and a decline in grape extract sales, and he attempted to estimate the

plaintiff's alleged damages.  Willoughby Rep. at 4-5, a copy of which is attached as **Exhibit C**

**[contains material marked RESTRICTED CONFIDENTIAL].**  Also like Mr. Ris' report,

Mr. Willoughby's report is not an antitrust analysis that determines relevant product and

---

[2] In his deposition testimony, Mr. Ris stated that the scope of his report and testimony as an
expert was "to review the situation from . . . the time when [his employer] started selling grape
seed extract to the year 2000, review sales history, and to review the impact of the INC lawsuit,
what that may have had on the industry, the sale of grape seed extract in general."  Ris Depo. 56-
57.  A copy of all cited pages in the Ris deposition is attached as **Exhibit B**.

geographic markets. Indeed, Mr. Willoughby testified in his deposition that he was not asked to determine the relevant product or geographic markets. Willoughby Dep. 30. A copy of all cited pages in the Willoughby deposition is attached as **Exhibit D**. On the contrary, Mr. Willoughby was "given specific instructions" by the plaintiff or its counsel "that the target [i.e., relevant] market was the OPC or grape extract market." Id. Accordingly, Mr. Willoughby candidly admitted that he did not perform any antitrust analysis in this case, that such an analysis would not have been routine for his firm, that an antitrust analysis would have involved other analysts besides himself, and that the fees for such work would have been "significant." Id. at 34.

Additionally, neither Mr. Ris nor Mr. Willoughby is a lawyer or an expert on patent law, and neither provided any opinion concerning whether INC's patent enforcement actions were "objectively baseless."

## ARGUMENT

### POINT I

### THE COURT SHOULD EXCLUDE ANY EVIDENCE PROFFERED BY PLAINTIFF AT TRIAL CONCERNING THE RELEVANT MARKETS

This is an antitrust case. An antitrust plaintiff alleging a violation of either § 1 or § 2 of the Sherman Act must establish both the relevant geographical and product markets. See, e.g., Pepsico, Inc. v. Coca-Cola Co., 315 F.3d 101, 105, 111 (2d Cir. 2002) ("In an antitrust case, the burden of defining the product market lies with the plaintiff."); E-Z Bowz v. Professional Product Research Co., 2003 U.S. Dist. LEXIS 15364 at *79-80 (S.D.N.Y. Sept. 5, 2003) ("The party alleging a violation of the antitrust laws has the burden of defining the relevant market and all of its relevant parts.").

The plaintiff claims that defendant INC, through patent infringement enforcement actions against the plaintiff and others, attempted to monopolize the so-called "PAC market." The heart

of an antitrust case such as this is the definition of the relevant product and geographical markets. The plaintiff, however, failed to disclose any expert testimony to define the relevant markets. Instead, the plaintiff simply assumes, without analysis, that the relevant market is "in the United States the sale and distribution of nutritional supplements comprising PACs and covered by the '360 patent." (Amended Complaint ¶ 14.) This conclusory allegation amounts to no more than drawing a bullseye around the plaintiff's arrow. Because the relevant markets cannot be proved through lay opinion and because the plaintiff has no antitrust expert to testify about the relevant markets, the Court must exclude from trial any attempt by the plaintiff to prove the relevant product and geographic markets.

## A.    The Relevant Geographic Market

The relevant geographical market is the "area of effective competition . . . in which the seller operates and to which the purchaser can practicably turn for supplies." United States v. Eastman Kodak Co., 63 F.3d 95, 104 (2d Cir. 1995) (quoting Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961) (internal quotation marks omitted)). Thus, a determination of the relevant geographic market requires an assessment of the location of manufacturers and consumers of the relevant product. Eastman Kodak, 63 F.3d at 105-06. Proof of the geographic market, moreover, must include proof not only of the location of current manufacturers, but also of firms that could supply the relevant product to consumers by shifting or increasing production. Id. at 103 (noting testimony of defendant's expert that foreign manufacturers had established market share in the U.S., those foreign manufacturers had excess capacity, and the supply of the relevant product is elastic).[3]

---

[3] Mr. Ris' own employer, Indena, is an Italian supplier. INC is also a European-based supplier. Thus, the plaintiff's naked allegation that the relevant geographic market is the United States is simplistic.

**B.**     **The Relevant Product Market**

A relevant product market "consists of 'products that have reasonable interchangeability

for the purposes for which they are produced – price, use and qualities considered.'" PepsiCo,

315 F.3d at 105 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404

(1956). See also United States v. Microsoft Corp., 253 F.3d 34, 81 (D.C. Cir.), cert. denied, 534

U.S. 952 (2001) ("Defining a market . . . involves . . . a detailed description of the purpose of

[the product] – what functions may be included and what are not – and an examination of the

substitutes that are part of the market and those that are not."). "Products will be considered to

be reasonably interchangeable if consumers treat them as acceptable substitutes." PepsiCo, 315

F.3d at 105 (internal quotation marks omitted). See also AD/SAT v. Associated Press, 181 F.3d

216, 227 (2d Cir. 1999) ("In economists' terms, two products or services are reasonably

interchangeable where there is sufficient cross-elasticity of demand."). Thus, "products or

services need not be identical to be part of the same market." Id.

Furthermore, "[a]lso relevant to the delineation of a relevant product market is cross-

elasticity of supply, which depends on the extent to which producers of one product would be

willing to shift their resources to producing another product in response to an increase in the

price of another product." Id. See also Kaplan v. Burroughs Corp., 611 F.2d 286, 292 (9th Cir.

1979) ("Market definition must look at all relevant sources of supply, either actual rivals or eager

potential entrants to the market.").

In the instant action, the plaintiff has offered differing definitions of the relevant market.

The Amended Complaint itself describes the market variously as "in the United States the sale

and distribution of nutritional supplements comprising PACs [proanthocyanidins] and covered

by the '360 patent" (¶ 14); "OPC markets" (¶ 26, 42); "the sale of nutritional supplements

10016                                                    6

subject to the '360 patent in the United States" (¶ 27); "sale of products covered by the '360 patent in the United States and Connecticut" (¶ 37); and "PACs in Connecticut" (¶ 47).[4]  The plaintiff's claim of harm, however, is not in any of these alleged markets, but rather, it claims harm in the "nutritional supplement" industry.  ¶ 28 ("INC . . . used their frivolous infringement claims to threaten substantially the entire nutritional supplement industry . . . and otherwise unreasonably restrict [the plaintiff's] ability to compete in the nutritional supplement industry").

To add to the confusion, the plaintiff's expert reports discuss a different product from that alleged in the Amended Complaint.  Mr. Ris' and Mr. Willoughby's reports discuss "the grape seed extract market," Ris Rep. "conclusions"; Willoughby Rep. at 4, which is a subset of the PAC market plaintiff alludes to in its Amended Complaint.  It is beyond obvious that the consumers who are buying products containing proanthocyanidins for personal consumption are not the same "consumers" as those companies that are buying large volumes of raw material, such as grape seed extract, pine bark extract, or other various plant extracts, to incorporate into finished products, such as nutritional supplements, cosmetic products, vascular protective products, circulatory-related products, skin-related products, and eye-related products.  Thus, the inputs (grape seed, pine bark and other plant extracts) would have a different elasticity of demand and supply from finished products (nutritional supplements, cosmetic products, etc.), and different firms would be producing each, just as the market for steel is not the same as the market for cars, although the former may be used to produce the latter.

The plaintiff has provided no credible evidence as to the substitutes for "nutritional supplements comprising PACs and covered by the '360 patent."  This failure is a fatal flaw in an

---

[4] It should be noted that the '360 patent does not cover, or prevent anyone from selling, all PACs, but only the specific use or method of using PACs for scavenging free oxygen radicals in humans.  See Point I(D), below.

antitrust case, and numerous courts have dismissed antitrust claims for failure to allege or offer credible evidence of product substitutes.  See, e.g., Hack v. President and Fellows of Yale College, 16 F. Supp. 2d 183, 196 (D. Conn. 1998), aff'd, 237 F.3d 81 (2d Cir. 2000) ("A complaint may be dismissed if it fails to define a relevant market by reference to the rule of reasonable interchangeability or cross-elasticity of demand.  In other words, a complaint may be dismissed if the definition of relevant market excludes any reasonably interchangeable substitute products."); Subsolutions, Inc. v. Doctor's Assocs., Inc., 62 F. Supp. 2d 616, 629 (D. Conn. 1999) (antitrust complaint dismissed because "complaint contains no allegations regarding substitute products . . . and does not include any facts regarding cross-elasticity of demand"); B.V. Optische Industrie v. Hologic, Inc., 909 F. Supp. 162, 172 (S.D.N.Y. 1995) ("plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal"); Re-Alco Indust. v. Nat'l Center for Health Ed., 812 F. Supp. 387, 391 (S.D.N.Y. 1993) ("If a complaint fails to allege facts regarding substitute products, to distinguish apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand, as the complaint here fails to do, a court may grant a Rule 12(b) (6) motion.").

The plaintiff's pleadings and experts simply have failed to consider the extent to which other widely available products that have similar radical scavenging effect in humans, such as vitamin C, vitamin E, selenium, beta-carotene, zinc, lycopene, and CoQ10, are viewed by consumers as substitutes for products containing PACs.[5]  Hack v. President and Fellows of Yale College, 16 F. Supp. 2d at 197 ("A legally sufficient definition of a relevant market is . . .

_____

[5] Although Mr. Ris has no background in antitrust econometrics and would not be qualified to define the relevant market in this case, he testified that, based on his sales experience in the

defined . . . by reference to services or commodities that are reasonably interchangeable . . . and must be defined by reference to the commodities or services purchased by general consumers . . . .").

**C.     Plaintiff's Responses to Document Requests**

The plaintiffs have produced ten pages of documents in response to the defendants' discovery requests regarding the relevant geographic and product markets.  In Request Nos. 8 and 9 of Defendants' First Request for the Production of Documents and Things dated August 16, 2001, the defendants requested "[a]ll documents and things which define the 'PAC' market and 'OPC' market as those terms are used in the Verified Complaint" and "[a]ll documents and things, which refer or relate to the market shares of each defendant of the PAC and OPC markets."  In response, the plaintiffs objected to those requests in part on the grounds that they "prematurely seek[] expert opinion," (see Plaintiff's Response to Defendants' First Request for the Production of Documents and Things dated September 18, 2001, a copy of which is attached as **Exhibit E**), but produced ten pages of documents, a copy of which is attached as **Exhibit F [contains material marked RESTRICTED CONFIDENTIAL]**.  These documents say nothing about the products within the relevant market as alleged in plaintiff's Amended Complaint, the elasticity of demand of other products, the elasticity of supply, the market shares of any of the firms in the alleged market, or the entry of new products or producers.  Instead, they appear simply to be Jarrow sales data for nutritional supplements containing OPCs.  The plaintiff never supplemented its response to these documents requests with an expert opinion or additional documents.

---

nutritional supplement industry, substitution of non-OPC products for products containing OPCs has "possibly" occurred.  Ris Depo. 24.

In response to the defendants' Request Nos. 28 and 29 for "[a]ll documents or things concerning or comprising reports, analyses or surveys concerning" the "geographic market" and "product market relevant to Plaintiff's Complaint," the plaintiff again objected to the requests because they "prematurely seek[] expert opinions" and stated that it was "not presently aware of any such documents." Pl. Response to First Request Nos. 28-29. In a letter from plaintiff's counsel, in response to these requests, the plaintiff maintained that it had "produced the responsive documents within its possession and stands by its objections." Letter dated Dec. 7, 2001, from Alexandra B. Stevens, Esq., to Richard S. Order, a copy of which is attached as **Exhibit G**. None of the documents produced, however, address the complex issues involved in defining the relevant market in this case. Again, the plaintiff never supplemented its response to these documents requests with an expert opinion or additional documents. Thus, the plaintiff should be foreclosed from attempting to provide such documents at this late hour.

**D.** **Inadequacy of Defining Relevant Markets as a Patent**

Plaintiff's naked allegation of the relevant product market is improperly focused on the '360 patent. A patent is not, without evidence of substitutes of demand and supply, a relevant market for antitrust purposes, and its holder, therefore, is not presumed to have market power. See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177 (1965) ("To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition."); Jefferson Parrish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 37 n.7 (1984) (O'Connor, J., concurring) ("A common misconception has been that a patent . . . or unique

product that competitors are not able to offer suffices to demonstrate market power.  While each of these . . . factors might help to give market power to a seller, it is also possible that a seller in those situations will have no market power:  for example, a patent holder has no market power in any relevant sense if there are close substitutes for the patented product."); Virginia Panel Corp. v. MAC Panel Co., 133 F.3d 860, 872 (Fed. Cir. 1997) ("Violation of the antitrust laws always requires . . . market power in a defined relevant market (which may be broader than that defined by the patent)"); Abbott Laboratories v. Brennan, 952 F.2d 1346, 1354 (Fed. Cir. 1991) ("A patent does not of itself establish a presumption of market power in the antitrust sense."); Orion Electric Co. v. Funai Electric Co., 2002 U.S. Dist. LEXIS 3928 at *20 (S.D.N.Y. March 11, 2002) ("To demonstrate market power flowing from a patent, a plaintiff must show that, within the relevant market, there are no acceptable substitutes for the patented product and that the patent, therefore, enables the patentee to exclude competition."); Independent Ink, Inc. v. Trident, Inc., 210 F. Supp. 2d 1155, 1163 (C.D. Cal. 2002) (rejecting argument that "a patent, standing alone, with no consideration of the products at issue, their substitutes, or a definition of the relevant market, establishes market power" and citing cases); B.V. Optische Industrie v. Hologic, Inc., 909 F. Supp. 162, 172 (S.D.N.Y. 1995) ("it is obvious that merely obtaining a patent for a product does not create a product market for antitrust purposes").  The relevant market, therefore, cannot be defined by the '360 patent.

## E.    Requirement of Expert Testimony to Define Relevant Markets

Given the specialized knowledge required to properly define relevant geographic and product markets, it is not surprising that courts have concluded that "construction of a relevant economic market or a showing of monopoly power in that market cannot . . . be based upon lay opinion testimony."  Colsa Corp. v. Martin Marietta Serv., Inc., 133 F.3d 853, 855 n.4 (11th Cir.

1998) (quoting <u>American Key Corp. v. Cole Nat'l Corp.</u>, 762 F.2d 1569, 1579 (11th Cir. 1985)

(internal quotation marks omitted)).  <u>See also</u> <u>Forro Precision, Inc. v. IBM</u>, 673 F.2d 1045, 1059

(9th Cir. 1982) ("Without the benefit of expert testimony or other credible evidence to support an

inference of market power . . . any such inference would be sheer speculation."); <u>Independent</u>

<u>Ink, Inc. v. Trident, Inc.</u>, 210 F. Supp. at 1175 ("[m]arket definition cannot rely entirely upon

bald assertions or lay opinion"); <u>Steuer v. National Medical Ent., Inc.</u>, 672 F. Supp. 1489, 1512

(D.S.C. 1987) ("Failure to adduce expert testimony on competitive issues such as market

definition augurs strongly in favor of granting summary judgment against an antitrust plaintiff.");

<u>United States v. Manufacturers Hanover Trust Co.</u>, 240 F. Supp. 867, 910-912 (S.D.N.Y. 1965)

(rejecting testimony of non-antitrust experts as "superfluous lay opinion on a complex economic-

legal problem").

      These cases, moreover, are consistent with the language and policy of Rule 701 of the

Federal Rules of Evidence.  Rule 701 provides in relevant part that a lay witness may not offer

an opinion or inference that is "based on scientific, technical, or other specialized knowledge

within the scope of Rule 702."  The committee notes to the 2000 amendment that added this

language to Rule 701 state that the amended rule draws a distinction between lay testimony,

which "results from a process of reasoning familiar to everyday life," and expert testimony,

which "results from a process that can be mastered only by specialists in the field."  Calculating

demand and supply elasticity under various assumptions about price and competition in an

industry is not something that "results from a process of reasoning familiar to everyday life,"

and, therefore, expert testimony is required to define relevant product and geographic markets.

As the First Circuit noted in <u>Healthcare, Inc. v. Healthsource, Inc.</u>, 986 F.2d 589, 598-99 (1st Cir.

1993), "[t]here is no subject in antitrust law more confusing than market definition. . . . [T]he

frustrating but routine question how to define the market is answered in antitrust cases by asking expert economists to testify . . . . Usage patterns, customer surveys, actual profit levels, comparison of features, ease of entry and many other facts are pertinent in answering the question." See also Monsanto v. Trantham, 156 F. Supp. 2d 855, 863 n.3 (D. Tenn. 2001) ("expert proof is required to prove antitrust claims merely because the knowledge of the markets required to prove such a claim is generally beyond that of a lay person and the level of analysis needed to assist the Court in determining the relevant market is outside the reach of most lay persons.")

In the present action, as discussed above, the plaintiff has failed to disclose or otherwise provide any antitrust expert testimony or report to prove its alleged relevant markets. The plaintiff also has provided no other evidence in response to the defendants' discovery requests regarding the market definition or market share. Because it has no expert evidence, any evidence that plaintiff might proffer at trial to prove the relevant geographic and product markets must be excluded.

### POINT II

### THE COURT SHOULD EXCLUDE ANY EVIDENCE THAT PLAINTIFF MAY PROFFER TO PROVE MARKET SHARE OR THE DANGEROUS PROBABILITY THAT THE DEFENDANTS' ALLEGED ATTEMPT TO MONOPOLIZE COULD HAVE BEEN SUCCESSFUL

Without properly defined relevant markets, there is no way to establish the defendants' individual shares of such a market, which is necessary for determining the likelihood that one of the defendants came dangerously close to achieving a monopoly, an essential element of the plaintiff's attempted monopolization claim. The Court, therefore, should exclude from trial any evidence from plaintiff concerning the defendants' market shares and the alleged likelihood that any of the defendants could have monopolized a properly defined market.

10016                                             13

In <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 459 (1993), the United States

Supreme Court held that a defendant "may not be liable for attempted monopolization under § 2

of the Sherman Act absent proof of a dangerous probability that they would monopolize a

relevant market and specific intent to monopolize." The Court reasoned that: "[I]n order to

determine whether there is a dangerous probability of monopolization, courts have found it

necessary to consider the relevant market and the defendant's ability to lessen or destroy

competition in that market." <u>Id.</u> at 456.

Assessing the probability of monopolization usually requires proof of the defendant's

market share. <u>See, e.g.</u>, <u>Spectrum Sports</u>, 506 U.S. at 459 ("demonstrating the dangerous

probability or monopolization in an attempt case . . . requires inquiry into the relevant product

and geographic market and the defendant's economic power in that market"); <u>United States v.</u>

<u>Microsoft Corp.</u>, 253 F.3d 34, 81 (D.C. Cir.) <u>cert. denied</u>, 122 S. Ct. 350 (2001) (no dangerous

probability because plaintiff failed to prove the relevant market); <u>AD/SAT v. Associated Press</u>,

181 F.3d 216, 226 (2d Cir. 1999) ("A threshold showing for a successful attempted

monopolization claim is sufficient market share by the defendant because a defendant's market

share is the primary indicator of the existence of a dangerous probability of success") (internal

quotation marks omitted); <u>Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.</u>, 201 F. Supp. 2d 236,

271 (S.D.N.Y. 2002) (market shares of between 11% and 24% "cannot support a claim for

monopolization or attempted monopolization" and market share of 8% "is insufficient as a

matter of law to create a dangerous probability that [the defendant] would achieve monopoly

power in the applicable market").[6]

---

[6] As shown in the defendant's first Motion in Limine, INC's market share does not even come
close to the shares found insufficient. Indeed, INC does not even sell PACs in the United States
except to its distributor in bulk.

In the instant case, as an initial matter, the plaintiff's theory regarding the "dangerous probability" element of an attempt to monopolize under § 2 of the Sherman Act is incorrect as a matter of law. In Paragraph 42 of the Amended Complaint, the plaintiff alleges that "INC, IBC, PSI, PS, Schwitters and Masquelier were likely to achieve a monopoly within the OPC market." IBC, PSI, and PS are alleged to be distributors of products containing PACs produced by INC and Masquelier. (Amended Compl. ¶¶ 8, 9.) Based on this allegation, the plaintiff's theory is that, together, INC, Schwitters, Masquelier, and the three distributors were dangerously close to sharing a monopoly of the OPC market. In other words, the plaintiff claims that "[a]s a direct and proximate result of Defendants' anti-competitive course of conduct," INC, Schwitters, Masquelier, IBC, PSI and PS together attempted to monopolize "the OPC market."

First, the plaintiff's shared monopoly theory has been considered and rejected in the Second Circuit. A § 2 attempt claim, and the dangerous probability element of that claim, apply only to single firm conduct, not six firms or entities as alleged by the plaintiff. See H.L. Hayden Co. v. Schein Dental Equip., 879 F.2d 1005, 1018 (2d Cir. 1989) (affirming district court's conclusion that "the market shares of [the two defendants] could not be aggregated to establish an attempt to monopolize in violation of Sherman Act section two"); Kramer v. The Pollock-Krasner Foundation, 890 F. Supp. 250, 256 (S.D.N.Y. 1995) ("the offense of monopolization under Section 2 refers to market dominance by a 'single firm'") (quoting Spectrum Sports, 113 S. Ct. at 889); Consolidated Terminal Sys., Inc., v. ITT World Comm., Inc., 535 F. Supp. 225, (S.D.N.Y. 1982) (rejecting attempt theory based on combined market shares of five defendants because "in order to sustain a charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a particular defendant"); H.L. Hayden Co. v. Schein Dental Equip., 672 F. Supp. 724, 741 (S.D.N.Y. 1987), aff'd, 879 F.2d 1005, 1018 (2d

Cir. 1989) ("The section 2 offense of attempted monopolization is directed at unilateral conduct,

and plaintiffs' theory of combining market shares must fail for that reason."). Because the

plaintiff failed to allege a dangerous probability of monopolization, its § 2 claim must fail as a

matter of law.  See, e.g., Consolidated Terminal Sys., Inc., v. ITT World Comm., Inc., 535 F.

Supp. at 229.

Second, the plaintiff's attempt to monopolize claim also defies common sense as it is

premised on the idea that an infringement lawsuit that plaintiff alleges was "objectively baseless"

(because there were multiple owners of the '360 patent) allowed INC, Schwitters, Masquelier,

and the three distributors to come dangerously close to achieving a monopoly.  It is

fundamentally inconsistent to say that there was a "dangerous probability" that INC would

monopolize the alleged '360 patent product market via INC's patent infringement litigation and

at the same time maintain that the infringement litigation was "objectively baseless" because

INC was never the sole owner of the patent.  The weakness in this argument has been

acknowledged in a respected treatise on intellectual property and antitrust:  "the attempt (to

monopolize) is likely to be successful only if the exclusionary threat posed by the intellectual

property right is credible in the market. This in turn is unlikely to be true if any effort to enforce

the claim would be objectively baseless." I Hovenkamp et al., IP and Antitrust § 11.4, at 11-34.1

(2003 supp.).

Third, the plaintiff has neither alleged nor produced any proof of any of the defendants'

market shares under any of its absurdly narrow market definitions.  To do so, of course, it would

actually have to properly define the relevant market, which must include consideration of

product and supply substitutes.  As discussed above in Point I, the plaintiff has no way to

properly delineate the relevant market.  Therefore, any evidence plaintiff may proffer at trial of

the defendants' market share and the alleged likelihood that the defendants could have monopolized a properly defined market should be excluded.

**POINT III**

**THE COURT SHOULD EXCLUDE ANY EVIDENCE PROFFERED BY
PLAINTIFF TO PROVE THAT INC'S PATENT INFRINGEMENT
ACTIONS WERE "OBJECTIVELY BASELESS"**

Finally, the plaintiff has failed to provide an expert witness to testify that defendant INC's patent infringement actions, which the plaintiff claims constituted a violation of the antitrust laws, were objectively baseless. Proof that a patent infringement claim was "objectively baseless" under the law as it existed at the time the patent infringement action was initiated involves technical, specialized legal knowledge that is beyond the scope of lay opinion testimony permitted by Federal Rule of Evidence 701. The Court should, therefore, exclude from trial any evidence proffered by plaintiff of alleged "objective baselessness" of the underlying patent infringement actions.

In a sham litigation case such as the instant action, the plaintiff must prove that the alleged sham litigation "constitute[d] the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief." Professional Real Estate Investors, Inc. v. Columbia Pictures Indust., 508 U.S. 49, 62 (1993). A determination of whether an action was objectively baseless involves a detailed analysis of the substantive law governing the subject matter of the lawsuit at the time it was filed. Id. at 64-65. In Professional Real Estate Investors, the Court looked to the standards set forth under Fed. R. Civ. P. 11 in concluding that the alleged sham action in that case "was arguably warranted by existing law or at the very least was based on an objectively good faith argument for the extension, modification, or reversal of existing law." 508 U.S. at 65 (internal quotation marks omitted.).

In the present case, determination of the plaintiff's allegation that INC's pursuit of its patent claims was "so baseless that no reasonable litigant could realistically expect to secure favorable relief" requires an understanding of patent law in the United States and laws governing assignment of patent rights at the time the Connecticut and California actions were filed. Like the relevant market determination discussed above in Point I, determination of whether INC's infringement actions were objectively baseless requires expert testimony that "results from a process that can be mastered only by specialists in the field." As Professors Areeda & Hovenkamp point out in their highly regarded treatise on antitrust law, "the question whether a lawsuit has an objectively unreasonable basis in law is hardly suitable for submission to the jury. Only someone with legal training can rationally determine whether the pleading of a particular legal theory is justified by or a reasonable extension of existing law." I Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 207c at 253 (2d ed. 2000) (emphasis added) (suggesting that legal specialists should serve as expert witnesses and concluding that a "jury is not qualified" to determine "what the law is"). Because the plaintiff has no expert to testify with respect to the complex legal issues involved in the underlying patent actions, it has no admissible evidence to offer on that issue and, therefore, any evidence plaintiff may proffer at trial regarding the legal sufficiency of those actions should be excluded.

**POINT IV**

**BECAUSE PLAINTIFF LACKS EXPERT TESTIMONY ON MARKET DEFINITION, MARKET SHARE, DANGEROUS PROBABILITY OF ACHIEVING A MONOPOLY, AND THE OBJECTIVE BASELESSNESS OF INC'S PATENT INFRINGEMENT ACTIONS, THE COURT SHOULD EXCLUDE ALL PROFFERS BY PLAINTIFF OF SUCH EVIDENCE AND SHOULD DISMISS THIS ACTION IN ITS ENTIRETY**

After the Court excludes all proffers by plaintiff of evidence concerning market definition, market share, dangerous probability of achieving a monopoly, and the objective baselessness of INC's patent infringement actions, there is nothing left in this action to be tried.

Specifically, as discussed above in Points I and II, the plaintiff has no way to prove the essential elements of its antitrust claims against the defendants under the Sherman Act. In addition, because the plaintiff's claims under the Connecticut Antitrust Act are the same as its Sherman Act claims, it cannot prove the Connecticut Antitrust Act claims either. See CDC Technologies v. IDEXX Labs., 7 F. Supp. 2d 119, 122 (D. Conn. 1998), aff'd, 186 F.3d 74 (2d Cir. 1999) ("the elements of Conn. Gen. Stat. 35-27 are substantially similar to the elements under § 2 of the Sherman Act, and thus fail with [the plaintiff's] federal claim"); Westport Taxi Service v. Westport Transit Dist., 235 Conn. 1, 15-16 (1995) ("we follow federal precedent when we interpret the act unless the text of our statutes, or other pertinent law, requires us to interpret it differently"). Plaintiff's CUTPA claim fails for the same reason. Subsolutions, Inc. v. Doctor's Assocs., Inc., 62 F. Supp. 2d 616, 629 (D. Conn. 1999) ("the fact that the plaintiffs have failed to state an antitrust claim against CRA . . . requires that the CUTPA claim be dismissed with respect to this defendant"); CDC Technologies v. IDEXX Labs., 7 F. Supp. 2d 119, 132 (report of Magistrate Judge Garfinkel adopted by Arterton, J.) ("Claims of unfair trade practices fail if no underlying antitrust violation is found."). Plaintiff's claim for tortious interference with business relations, which is based on the alleged antitrust and CUTPA violations, fails a fortiori.

The plaintiff's remaining claims under the Lanham Act and Connecticut General Statutes § 52-568 for vexatious litigation depend upon the plaintiff proving that INC's patent enforcement actions were "objectively baseless." Because the Court should exclude such evidence from trial, as demonstrated in Point III, they must fail also.

## CONCLUSION

For the foregoing reasons, the Court should exclude any evidence at trial that plaintiff may proffer concerning market definition, market share, dangerous probability of achieving a monopoly, and the objective baselessness of INC's patent infringement actions, and, after making such a determination, should further decide that there is nothing left in this action to be tried and should dismiss this action with prejudice.

DEFENDANTS,
INTERNATIONAL NUTRITION CO.,
EGBERT SCHWITTERS, NORMAN H.
ZIVIN, JACK MASQUELIER,
INTEGRATED BIOCEUTICALS, LLC,
PRIMARY SOURCE, LLC, AND
PRIMARY SERVICES, INC.


By: /s/ Richard S. Order
    RICHARD S. ORDER, ESQ.
    Federal Bar No. ct02761
    E-mail: rso@avhlaw.com
    ERIC D. BEAL, ESQ.
    Federal Bar No. ct23167
    E-mail: exb@avhlaw.com
    Axinn, Veltrop & Harkrider LLP
    90 State House Square
    Hartford, CT 06103-3702
    Telephone:    860-275-8100
    Facsimile:    860-275-8101

10016

<u>CERTIFICATION</u>

THIS IS TO CERTIFY that a copy of the foregoing has been served by first class U.S.

mail this 23rd day of October, 2003 to:

Eric W. Wiechmann Esq.
Mark D. Giarratana, Esq.
Eric E. Grondahl, Esq.
Alexandra B. Stevens, Esq.
McCarter & English
CityPlace I
185 Asylum Street
Hartford, CT 06103


/s/ Eric D. Beal
Eric D. Beal
AXINN, VELTROP & HARKRIDER LLP