UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JARROW FORMULAS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:01-CV-00478 (AVC) |
| v. | ) | |
| | ) | |
| INTERNATIONAL NUTRITION | ) | |
| COMPANY, INTEGRATED | ) | |
| BIOCEUTICALS, LLC, PRIMARY | ) | |
| SERVICES, INC., PRIMARY SOURCE, | ) | |
| LLC, EGBERT SCHWITTERS, NORMAN | ) | |
| H. ZIVIN, and JACK MASQUELIER, | ) | |
| | ) | |
| Defendants | ) | December 1, 2003 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE

Pursuant to Connecticut Local Rule 7(a), Plaintiff Jarrow Formulas, Inc.

("Plaintiff" or "JFI"), opposes the Motion in Limine to Exclude Evidence filed October 23, 2003

[Dkt. # 176] ("Motion") by Defendants International Nutrition Company ("INC"), Integrated

Bioceuticals, LLC ("IBC"), Primary Services, Inc. ("PSI"), Primary Source, LLC ("PS"), Egbert

Schwitters, Norman H. Zivin, and Jack Masquelier (collectively the "Defendants").[1]

This is an action by JFI for injury arising from the Defendants' violations of the

Sherman Act, 15 U.S.C. §§ 1 and 2; the Lanham Act, 15 U.S.C. § 1125(a); the Connecticut

Antitrust Act, Conn. Gen. Stat. §§ 25-24 et seq.; and the Connecticut Unfair Trade Practices Act,

Conn. Gen. Stat. §§ 42-110a et seq.; as well as the filing of a vexatious lawsuit and the tortious

interference with JFI's business expectancies. The Defendants have filed a Motion in Limine

---

[1] JFI timely files this Opposition pursuant to its Motion for Extension of Time to December 1, 2003, which was granted by the Court on November 14, 2003.

**ORAL ARGUMENT REQUESTED**

seeking to exclude broad categories of evidence.  Those categories are the admission of any

evidence as to (1) the relevant market, (2) the Defendants' share of that market, (3) the likelihood

of the Defendants' success in achieving monopoly, and (4) the propriety of the underlying patent

infringement suit.  Their reason is that "[s]uch evidence must be provided by expert witness, and

the plaintiff has disclosed no expert witness qualified to do so on any of these points."

(Memorandum in Support of Defendants Motion in Limine to Exclude Evidence, at 1

("Defendants' Memorandum").)

 Contrary to their contention, the Plaintiff has offered qualified expert witnesses.

The Plaintiff's experts are an industry professional and an economist.  Those experts define the

market, consistent with the Amended Complaint, as the United States market for oligomeric

procyanidins ("OPCs") produced pursuant to U.S. Patent No. 4,698,360 ("'360 patent").  They

testify, and the Defendants admit, that during the relevant time there were no substitute products

for OPCs produced pursuant to the '360 Patent.  Thus, the Defendants have notice of the

Plaintiff's expert testimony and expert opinions.  They also had ample opportunity to conduct

discovery as to those opinions and testimonies.

 Furthermore, not all of the issues subject to the Motion require expert testimony.

For instance, the underlying patent infringement actions were based on facts the Defendants

knew, or should have known, were false.  Three courts and the Defendants' own admissions

show that they knew they had no rights to the '360 Patent.  Thus, a determination that the

initiation and maintenance of those suits was objectively baseless is patent and needs no expert

opinion.

## I.     FACTS.

The relevant market for purposes of this lawsuit is the market for the wholesale and distribution of proanthocyanidins covered by the '360 Patent in the United States. (Amended Compl. ¶ 14.)  That market is also referred to as the market for the wholesale and distribution of OPCs in the United States, as the terms proanthocyanidins and OPCs are one in the same.[2]

The pranthocyanidins / OPC market is exclusive.  JFI's expert, Greg Ris, testified that there was no substitute product for OPCs.  (Exhibit 1 - Deposition of Mr. Greg Ris at 23-24.) This is because during the relevant time period the beneficial health effects of OPC were believed by consumers to be so specific and broad that no other nutritional supplement or drug could be considered interchangeable or fungible.

OPCs are compounds extracted from plant sources, such as the bark of pine trees, grape seeds or peanut skins.  Id.  The largest volume by far of OPC product sold in the United States was OPC product extracted from grape seeds.  Thus, references to OPC grape seed extracts is entirely proper for purposes of this litigation.

On October 6, 1987, the United States Patent and Trademark Office ("USPTO") issued the '360 Patent naming Defendant Jack Masquelier as inventor and Societe Civile d'Investigations Pharmacologiques d'Aquitaine ("SCIPA") and Horphag Overseas Ltd. (a/k/a Horphag Research Ltd. ("Horphag")) as assignees.  The '360 Patent issued with seven total claims -- including one independent and six dependent claims.  The '360 Patent claims a method

---

[2] Defining the relevant market is only an element for JFI's Federal and State antitrust claims, except for claims of conspiracy.  JFI's remaining claims for Lanham Act violations, vexatious litigation, tortious interference with business expectancies and CUTPA violations do not require market analysis.

of using a plant extract with a "proanthocyanidin" content as a therapeutic agent having "radical

scavenger effect."

As stated in its abstract, the '360 Patent covered all therapeutic uses of

proanthocyanidins in humans.  The abstract states in its entirety:

> The invention provides a method for preventing and fighting the
> harmful biological effects of free radicals in organism of warm
> blooded animals and more especially human beings, namely
> cerebral involution, hypoxia following atherosclerosis, cardiac or
> cerebral infarction, tumor promotion, inflammation, ischaemia,
> alterations of the synovial liquid, collagen degradation, among
> others.  The method consists of administering to said animals
> especially human beings an amount, efficient against said effects,
> of a plant extract with a proanthocyanidins content which has
> radical scavenger effect, the extract being in the form of a
> medicament and coming more especially from the bark of conifers.

(Exhibit 2.)

Though the '360 Patent specifically references proanthocyanidins as coming from

the bark of conifers (commonly referred to as pine bark extract), it covers all such plant extracts.

This includes proanthocyanidins extracted from grape seeds (or grape seed extract).

Proanthocyanidins extracted from grape seed are much less expensive and have purported greater

potency.  Thus, during the relevant time period, the sale of grape seed extracts dominated the

market for '360 Patent products.

The '360 Patent does not define the term proanthocyanidin.  It is not surprising,

therefore, that over time many terms have been used synonymously with proanthocyanidin.  For

instance, Defendant Masquelier uses proanthocyanidin and procyanidins interchangeably.

(Exhibit 3 - Declaration of Jack Masquelier of 4/30/86, at 4 & 5.)  Another term used

interchangeably with proanthocyanidin is OPC or oligomeric procyanidins.  (Exhibit 4 - OPC in

Practice pgs. 21 & 134.)  The use of OPC products for therapeutic purposes in humans under any

of these terms is covered by the '360 Patent.

Claims associated with such therapeutic use of OPCs were powerful and widely

accepted by the consuming public.  In fact, no other nutrient has had so many claims made about

it.  OPCs have been referred to as "wonder nutrients", "super antioxidants" and better than any

drugs.  In the mid 1990's consumers believed OPCs were different from and clearly superior to

other plant extracts claiming antioxidant powers.  OPCs are even prescribed by physicians in

other countries.  Thus, it is not surprising that JFI's expert, Mr. Ris, stated that during the

relevant time period there were no substitute products for OPCs.

A.      Defendants Distribution of OPCs in the United States.

The Defendants distribution of OPCs in the United States was accomplished

through four entities: Primary Services International, LLC, IBC, PSI and PS.  At all relevant

times, those entities purported to market OPCs pursuant to INC's alleged interest in the '360

Patent, or an alleged interest of an affiliate of INC.  At all relevant times, those entities were

controlled by two individuals that altered their corporate form as those individuals found

convenient.

1.      *Primary Services International.*

Primary Services International was created in 1994 by Gary Senecal and Richard

LeFebvre.  (Exhibit 5 – Deposition of Gary Senecal, at 57.)  Ultimately, Primary Services

International was located at 107 Ardmore Street in Fairfield, Connecticut, in 8000 square feet of

space with just three offices.  Id., at 69.  It sold OPCs under the label Masquelier's Original

OPC's.  Id., at 57.

2.     *PSI, IBC and PS.*

Sometime after 1994, "it became prudent from a business perspective to separate Primary Services [International] into two companies:  Integrated Bioceuticals [IBC] which sells Masquelier Original OPCs raw material, and Primary Source [PS] which manufactures and sells finished product."  (Ex. 5 - Senecal Depo. at 57-58.)  Thus, the business structure that Gary Senecal and Richard LeFebvre created "was that Primary Services International became Primary Services, Inc. [PSI] and served as the management company for Primary Source, LLC selling finished product.  And IBC, Integrated Bioceuticals selling raw material."  Id., at 58.

PSI is owned by Gary Senecal and Richard LeFebvre, located at 107 Ardmore Street in Fairfield Connecticut, in the same 8000 square feet of space with the same three offices. Id., at 57 & 69.  It manages both IBC and PS.  Id., at 58.  Its files are kept in either Gary Senecal's office or Richard LeFebvre's office along with the files of IBC and PS.  Id. at 67-70, 84-87.  PSI also shares the same employees and office space with PS and IBC.  Id., at 7-11.

IBC carried forward Primary Service International's product lines of the raw form of Masquelier's Original OPCs.  Id., at 69.  IBC's members and managers are Gary Senecal and Richard LeFebvre, and it has the same employees and office space as PS and PSI.  Id. at 7-11.

"Primary Source [PS] is an evolution of Primary Services International.  It's a spin off from Primary Services International."  Id., at 86.  It carries forward Primary Services International's product lines of Masquelier's Original OPCs finished products.  Id., at 67.  Again,

it has the same offices, employees, members owners and managers as IBC and PSI.  Id., at 67-

69.  It is through these entities the Defendants marketed and sold OPCs in the United States.[3]


      B.      Defendants' Marketing and Advertising.

      The Defendants' own marketing and advertising testify to the unique properties

of, and lack of substitutes for, OPCs.  Their marketing efforts also evidence the Defendants'

perception as to the broad reach of '360 Patent and their contention that any entity seeking to

enter the market for OPCs in the United States must purchase product from either the Defendants

or Horphag.

      As early as 1995, Mr. Gary Senecal, then of Primary Services International, LLC,

now of Defendants IBC, PSI and PS, explained to Mr. Terry Holmes of Advanced Medical

Nutrition, Inc.:  "You see, whatever the plant source, including grape seed extract, to refer to

proanthocyanidins (OPC) and it's extraordinary antioxidant activity in your marketing would be

in violation of the patent unless the material was ours or Pycnogenol.®"  (Exhibit 6 - Letter from

Gary Senecal to Terry Holmes of 8/23/95.) [4]

      The breadth of the '360 Patent was later explained in a book co-authored by

Defendants Masquelier and Schwitters entitled OPC's in Practice: "Still, Masquelier claims

beneficial effects for OPC in his '360 patent, covering an almost full spectrum of diseases."

(Exhibit 3, at 137.)  They further claimed that all extracts containing any amount of

---

[3] The record does show that, at times, INC sold OPCs to at least one other company.

[4] Pycnogenol is a product produced pursuant to Horphag's interest in the '360 Patent.

proanthocyanidins high enough to counter the harmful biological effects of free radicals fall with in the scope of the use of this patent, regardless of the sources of the extract.

Thus, according to Schwitters and Masquelier, all plant extracts that contain proanthocyanidins in a quantity high enough to have biological advantages in humans are covered by the '360 Patent. Primary Source agrees with this conclusion. Its labels contain the statement: "This proven product can only be obtained through a specialized, proprietary extraction process." (Exhibit 7.)

The breadth of the '360 patent is significant. No nutrient, or drug for that matter, can claim to have all of the positive effects on human health as do OPCs produced pursuant to the '360 patent. Primary Source published a brochure making such a claim:

> Unlike many other antioxidants and bioflavonoids, Primary Source® OPC is fully bioavailable, highly water soluble and provides lasting healthful benefits. Primary Source® OPC provides bi-phasic activity, i.e. it can penetrate both aqueous and lipid cellular membranes – an important factor in providing more complete cellular protection to the body's tissues and organs.
>
> ….
>
> Unlike bioflavonoids, Primary Source® OPC attaches to collagen and elastin, especially those tissues rich in glycosaminoglycans. These include vascular and lymphatic membranes, stomach, gastrointestinal linings, sinus and respiratory systems and joint and vertebral support areas.
>
> ….
>
> Primary Source® OPC free radical scavenging capacity us greater than either vitamin E or vitamin C because it has more free radical quenching stations to neutralize free radicals.

(Exhibit 8 – Primary Source OPC, at BC 00389.)

IBC has made similar claims. It published Masquelier's Original OPC brochure, which states:

> With what other nutrient can a marketer present as many diversified body-specific structure and function claims? Masquelier's™ Original OPCs by itself, without requiring the synergy of other nutrients or co-factors†, supports virtually every metabolic system in the body. … So far-reaching are the influences of Masquelier's ™ Original OPCs on the body's vital support systems it is regarded by many who have studied it to be a nutritional miracle capable of transforming our entire experience of health.*
>
> ….
>
> The exact compound ratio proven to produce health benefits can only be obtained through Dr. Masquleir's precise extraction process. It is this exclusive process that enables Masquelier's™ Original OPCs to make the Structure and Function Claims contained herein.
>
> † Many nutrients, such as vitamin E and vitamin C, are dependent on other nutrient co-factors that must be present in the body for proper absorption and utilization of that vitamin. For example, a sufficient level of copper must be present for the body to efficiently utilize vitamin C.

(Exhibit 9 – Masquelier's Original OPCs, at IBC 0056.)

Unlike other antioxidants and bioflavonoids, Masquelier's™ Original OPCs can penetrate both aqueous and lipid cellular membranes; it possesses greater free radical scavenging capability than other known antioxidants such as vitamins C and E; and it effects multiple parts of the body.

This, and similar marketing drove, the consumer perception as to the uniqueness of OPCs. Consumers clearly subscribed to these claims as evidence through incredible market growth in the early to mid-1990's. (See, e.g., Exhibit A to Defendants' Memorandum, at 3, Indena USA's sales.)

C.    Testimony of Greg Ris.

The Defendants' admissions as to the uniqueness of OPCs were borne out in the testimony of JFI's market expert, Greg Ris.

Mr. Ris has been in the health food and nutritional industry for over 14 years. (Defendants' Memorandum, Exhibit A - Expert Report of 2/28/02, at 1.)  In 1989, he opened the United States branch office for Indena S.p.A, the world's largest supplier of OPCs from grape seed extract.  Indena has sold grape seed extract as a prescription product in France for more than twenty-five years.  It is also estimated that Indena's American subsidiary had 35% of the grape seed OPC market in the United States up until 1996, when INC filed its sham infringement action.

Mr. Ris testified that the market for the wholesale and distribution of proanthocyanidins covered by the '360 Patent in the United States fell as a result of the Defendants' activities.  He noted specifically that Indena's sales in America fell 65% after 1996, in direct contrast to its foreign sales.  For example, he testified that Indena's sales in France increased during that same time.  (Exhibit A to Defendants' Memorandum, at 4.)  Mr. Ris further testified that Indena produced its grape seed product through a license acquired from Horphag. Id. at 33.  He stated that during the relevant time period there were probably less than 20 suppliers of grape seed OPCs to the United States, and he listed a number of them.  Id. at 34-37.

Mr. Ris unequivocally remarked that during the relevant time period there were no substitutes for OPCs.  No product was either interchangeable or fungible.  (Ex. 1 - Ris Depo. at 24.)  Other than garlic, the Defendants did not ask Mr. Ris whether specific nutritional products were viable substitutes.  Mr. Ris further stated that in his opinion the effected

geographic market was the United States.  Id. at 57.  The Defendants did not question him as to how he reached that conclusion either.  Further, they did not contest that the incredible growth experienced by the OPC market at the relevant time had to do with any other factor than consumer demand for this unique product.  Likewise, they did not challenge that the incredible growth was irrespective of price.

The Defendants had the opportunity to test Mr. Ris' opinion when they deposed him on March 19, 2002.  In addition, the Defendants have not retained an industry expert to refute Mr. Ris' market and industry opinions.

D.      Testimony of Michael Willoughby

Michael Willoughby is an appropriate witness to testify as to the economic damages JFI suffered as a result of the Defendants' conduct.  Mr. Willoughby is a financial economist with over twenty-one years of experience in economics.  He has worked as an economist with various firms and has taught economics at Columbia Business School, Rutgers University, Barnard College, and the University of California at San Diego.  He has a B.A. and M.A. in Economics and a Ph.D. in Financial & Industrial Economics from Columbia University, as well as a P.C.A. and a C.F.A.  (Defendants' Memorandum, Ex. C).  In addition to his numerous publications and presentations on economic theory, Mr. Willoughby is a member of the American Economic Association, the National Association of Forensic Economists, and a former President of the Financial Analysts Society of San Diego, Inc.  Numerous Federal and States Courts in California, Arizona, and Colorado have found him qualified as an expert and he has testified on numerous occasions.  Id.

JFI did not retain Mr. Willoughby to opine as to the characteristics of the OPC market. He was retained purely to undertake an economic analysis of the profits that JFI lost as a result of the Defendants' bad acts. As the Defendants are aware, Mr. Willoughby is not an expert in the nutritional supplement market and must therefore rely on other people who are familiar with that market, and the subset OPC market. Consequently, Mr. Willoughby relied on the testimony and opinion of JFI's market expert, Mr. Ris, as well as reviewed the Defendants' press releases and other OPC press, and spoke with OPC market participants. (Exhibit 10 – Deposition of Michael Willoughby, pgs. 29, 33, 60.)

Mr. Willoughby has the appropriate academic credentials and the appropriate experience to undertake an economic analysis. He further spent time investigating the OPC market to gain a greater understanding of the relevant market. He then issued his report. The Defendants deposed Mr. Willoughby and presented their own economic expert who raised issues with Mr. Willoughby's report but offered no independent economic analysis. The Defendants had ample time to investigate Mr. Willoughby's opinion.

Mr. Willoughby's economic analysis, as well as his credentials and expertise, are subject to cross-examination: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" to attack evidence that is admissible but viewed by the Defendants as incorrect. Albert v. Warner-Lambert Co., Civ.A. 99-11700-RGS, 2002 WL 745822, at *2 (Apr. 24, 2002 D. Mass.) citing Daubert v. Merrell Do Pharms., 509 U.S. 579, 596 (1993). The Defendants had an opportunity to inquire into Mr. Willoughby's investigations and opinions during the discovery period. They

will have further opportunity to do so at trial.  However, they have not demonstrated that Mr. Willoughby is not an economic expert competent to render opinions.

     E.        <u>Testimony of Other Marketers and Scientists</u>

          The claims as to OPCs uniqueness are echoed by other marketers and industry pundits.  Chris Kilham, author educator and researcher, referred to OPCs as the miracle antioxidant.  (Exhibit 11.)  Dr. Morton Walker has exclaimed that "[i]t works better than any drug!" and that "[t]hey are fifty times more potent than vitamin C and twenty times more active than the gamma tocopherol of vitamin E."  (Exhibit 12 - Comparison Between OPCs, the World's Most Powerful Antioxidants, and Grape Seed Extract, Dr. Morton Walker, 8:6 Explore! 30 (1998.))  Thus, there was a consensus that OPCs produced pursuant to the '360 Patent had no substitute product.  It was a product market unto itself.  This is confirmed by the Defendants' admissions, JFI's industry expert, and JFI's fact witnesses.

## II.      STANDARD.

          A motion in limine is to allow the Court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence.  <u>See</u> <u>Luce v. United States</u>, 469 U.S. 38, 41 n.4 (1984) (noting that in limine rulings have developed pursuant to the district court's inherent authority to manage the course of trials); <u>Palmieri v. Defaria</u>, 88 F.3d 136, 141 (2d Cir.1996).  Evidence should be excluded on a motion in limine <u>only</u> when the evidence is clearly inadmissible on all potential grounds. <u>See</u> <u>Baxter Diagnostics, Inc. v. Novatek Medical, Inc.</u>, No. 94 Civ. 5520, 1998 WL 665138, at * 3 (S.D.N.Y. Sept. 25, 1998) (denying a motion in limine to preclude presentation of evidence regarding a potential punitive damages claim because the

motion was too sweeping in scope to be considered prior to trial) (Tab A).  "[O]rders *in limine* which exclude broad categories of evidence should rarely be employed." Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975).

## III.    ARGUMENT.

In a motion of unusual breadth and scope, the Defendants ask the Court to exclude "any evidence that may be offered" on (1) relevant product and geographic markets; (2) Defendants' market share and attempt to monopolize; and (3) whether INC's patent infringement lawsuit is objectively baseless.  In short, the Defendants ask the Court to preclude JFI from putting on its antitrust case.  They make this request without reference to admissibility, relevance or claims of prejudice.  Thus, they ignore the premise that the primary purpose of a motion in limine is to prevent prejudice at trial.  Instead, the Defendants simply argue that "[s]uch evidence must be provided by expert witnesses, and the plaintiff has disclosed no expert witness qualified to do so on any of these points."  (Defendants' Memorandum at 1.)  But, that is not true. Although expert testimony is not necessarily required, JFI has disclosed expert witnesses -- Mr. Greg Ris, an industry expert, and Mr. Michael Willoughby, an economist.  Furthermore, JFI has an arsenal of facts supporting its claims.

A.    Opposition to Point 1:  JFI has, in a clear and consistent manner, defined the relevant market and has offered an expert witness that will testify to that definition.

JFI has defined the relevant market which is affected by the Defendants' anticompetitive behavior.  That market is the market for the wholesale and distribution of proanthocyanidins (or OPCs) covered by the '360 Patent in the United States.  (Amended Compl.

¶ 14.)  Further, JFI has expert and fact testimony, as well as admissions from the Defendants, which define the market.  The Defendants entire argument seems to rest on the false premise that an "antitrust" expert must define the market; the law, however, is to the contrary.

### 1.     *Market definition:  Product and Geographic.*

JFI does not contest that, at trial, it must prove both the relevant product and geographic markets.  Thus, JFI has alleged that the relevant market for purposes of this lawsuit is the market for the wholesale and distribution of proanthocyanidins covered by the '360 Patent in the United States.  (Amended Compl. ¶ 14.)  JFI has also put the Defendants on notice of the evidence upon which it intends to rely to prove its claims.  That evidence consists of sales figures of market participants, the testimony of fact witness who are market participants, industry marketing, the Defendants' admissions and the expert testimony of Mr. Greg Ris.[5]

Relevant product market is defined as "those commodities reasonably interchangeable by consumers for the same purposes."  Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir.1991), citing United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 1007 (1956).  Practical indicia of the boundaries of the product market may also be examined, such as "industry public recognition of the submarket as a separate

---

[5]     JFI's allegations of the relevant product and geographic market distinguishes this case from those cases relied upon by the Defendants.  Ironically, the cases relied upon by the Defendants are rulings on the sufficiency of pleadings, not motions in limine.  See, e.g., Subsolutions, Inc., v. Doctor's Assoc., Inc., 62 F. Supp. 2d 616, 619 (D.Conn. 1999) (ruling pursuant to 12(b)(6) of the Federal Rules of Civil Procedure); Hack v. President and Fellows of Yale College, 6 F. Supp. 2d 183, 184 (D. Conn. 1998) (ruling pursuant to 12(b)(6) of the Federal Rules of Civil Procedure); B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F. Supp. 162, 166 (S.D.N.Y 1996) (ruling pursuant to 12(b)(6) of the Federal Rules of Civil Procedure); Re-Alco Indus., Inc., v. Nat'l Center for Health and Educ., 812 F. Supp. 387, 390 (S.D.N.Y. 1993) (ruling pursuant to 12(b)(6) of the Federal Rules of Civil Procedure).  In fact, conspicuously absent from the Defendants' Memorandum is authority where a Court has granted a similarly broad request to exclude evidence.  The pleadings in this case are closed, and the Defendant ability to test the sufficiency of JFI's allegation is foregone.

economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 325, 82 S.Ct. 1502 (1962).

   JFI has retained Mr. Ris, an industry expert, who will testify that there are no substitute products for OPCs.  In fact, the Defendants asked Mr. Ris if any other products were interchangeable or fungible with OPCs; he answered no.  Other than asking if garlic was interchangeable, the Defendants did not pursue a line of questioning that would explore further the basis for Mr. Ris' opinion.  (Ex. 1 – Ris Depo., at 23-24.)  Neither did they give any basis or present any evidence garlic was interchangeable.

   The Defendants' own marketing gives insight as to why they did not challenge Mr. Ris' opinion.  The Defendants acknowledge the uniqueness of OPCs.  It is the only antioxidant that needs no other co-factor to affect animal cells.  It has more beneficial properties than any other herb or drug.  (See Exs. 8 & 9.)  In short, it is a super nutrient, and in some countries available by prescription.

   Markets may be defined by products without substitutes.  This can especially be the case with medical or pharmaceutical products.  <u>See</u>, <u>e.g.</u>, <u>Mutual Pharmaceutical Co. v. Hoechst Marion Roussel</u>, No. Civ.A. 96-1409, 1997 WL 805261, at *3 (E.D. Pa. 1997) ("In the present case, Mutual has provided evidence which establishes that terfenadine is a unique chemical compound with particular effectiveness and possibly a distinct set of consumer users.") (Tab B).  Furthermore, evidence and testimony from non-antitrust experts on such matters is entirely appropriate.  <u>See</u>, <u>e.g.</u>, <u>SmithKline Corp. v. Eli Lilly and Co.</u>, 575 F.2d 1056, 1064 (3rd Cir. 1978) ("Lilly placed great emphasis on a Hospital Disease Therapeutic Index (HDTI), a

nationwide study of hospital based physicians, describing actual use of antibiotics in treating hospital patients."). JFI should be allowed to present product market evidence to a trier of fact.

Relevant geographic market is "the area in which a potential buyer may rationally look for the goods or services he or she seeks." Tunis Bros. Co., Inc., at 726, citing Pa. Dental Ass'n v. Medical Serv. Ass'n of Pa., 745 F.2d 248, 260 (3d Cir. 1984). Mr. Ris testified that the relevant geographic market was the United States. He also identified market participants in the United States market. (Ex. 1 - Ris Depo., at 33-34.) His testimony is consistent with the facts. If anyone is to purchase OPCs in the United States, and the '360 Patent is valid, they must purchase those OPCs from an owner of the patent or one of its licensees. Everyone else is barred from legally entering the market. To define the market more narrowly overlooks the fact that the two entities claiming ownership of the '360 patent, INC and its distributor IBC, as well as Horphag, distribute nationally and control such national distribution. Furthermore, the Defendants published their claims on a national level and the evidence demonstrates that they never treated the market in a regional or local fashion. They also initiated lawsuits in California and Connecticut against defendants throughout the country. Defining the market more broadly extends the suit beyond the reach of the '360 patent. Furthermore, rights to the distribution and market of OPCs in other countries are already the subject of numerous foreign lawsuits.

2.    *Mr. Ris is qualified to testify to market definition.*

On page 13, the Defendants claim that "the plaintiff has failed to disclose or otherwise provide any antitrust expert testimony or report to prove its alleged relevant markets." (emphasis added.) The Defendants then conclude that such a failure requires the Court to exclude "any evidence that plaintiff might proffer at trial to prove the relevant geographic and

product markets." This is a great leap in logic, a myopic view of expert testimony and contrary to authority cited by the Defendants.

For instance, the Defendants claim that in <u>United States v. Manufacturers Hanover Trust Co.</u>, 240 F. Supp. 867, 910-12 (S.D.N.Y. 1965) the court "reject[ed] testimony of non-antitrust experts as 'superfluous lay opinion on a complex economic-legal problem.'" (Defendants' Memorandum at 12.) This contention is incorrect. <u>Manufacturers Hanover Trust Co.</u> was an antitrust action pertaining to a bank merger. The court stated that "definition of the market is a typical antitrust problem which requires not the expertness of bankers, economists, or banking agencies but that of the court." <u>Manufacturers Hanover Trust Co.</u>, 240 F. Supp. at 911. The court further stated that it rejected "all 'expert' <u>conclusions</u> defining relevant geographic market for wholesale accounts." <u>Id.</u> (emphasis added.) Thus, inapposite the Defendants' reading, the court rejected the so-called antitrust expert conclusions as to the market reserving such conclusion for itself. To reach its conclusion, the court relied upon the expert testimony of industry professionals, not antitrust experts. It stated that "[e]xpert opinion on facts about the banking business, however, is a different matter. Experts in the banking field are manifestly competent to express an opinion on the competitive realities of the industry." <u>Id.</u> at 912.

Expert opinion as to the realities of the OPC market is exactly the testimony JFI seeks to admit through its industry expert Mr. Ris. Mr. Ris' testimony, not the testimony of an "antitrust expert" as the Defendants aver, is the proper expert testimony to define the market. His expert opinion is supplemented by other industry fact witnesses, such as Jarrow Rogovin, Mark Timon and Robert Lemon, that have been disclosed and deposed. That an "antitrust

expert" is not needed to define the market is underscored by the fact that the Defendants have not disclosed one to counter the Plaintiff's definition.

3.      *Patents can Define Markets*

The Defendants contention beginning on Page 10 of their Memorandum that patents cannot define markets is in error.  As the cases they cite state, market power can flow from a patent if the plaintiff demonstrates there are no substitutes for the product produced pursuant to the patent.  See Indep. Ink., Inc., v. Trident, Inc., 210 F. Supp. 2d 1155, 1163 (C.D. Cal. 2003); Orion Electric Co. v. Funai Electric Co., 01 CV 3501, 2002 WL 377541, at *6 (S.D.N.Y 2002).  Mr. Ris will testify that there were no substitute products for '360 patent products during the relevant time period.  Thus, the '360 patent has market power, and JFI should be entitled to demonstrate that at trial.

B.      Opposition to Point 2: expert testimony is not required to prove Section 2 Sherman Act claims.

Three types of claims may be made pursuant to Section 2 of the Sherman Act: monopolization, attempted monopolization and conspiracy.  JFI has alleged the latter two. (Amended Complaint ¶¶ 38, 42 & 44.)  Contrary to the Defendants contentions, these claims do not require expert testimony.

With respect a claim for conspiracy, courts have routinely stated that

Conspiring to monopolize is a separate offense under section 2, requiring less in the way of proof than the other section 2 offenses. In this context, a plaintiff need show defendants specific intent to monopolize "any part" of interstate commerce.  The power in a relevant market need not be proved.

Perington Wholesale, Inc. v. Burger King Corp., 631 F.2d 1369, 1376 (10th Cir. 1979) (citation omitted). Thus, in a conspiracy claim market information is irrelevant, and no expert need testify to define the market, the Defendants' share of that market or a dangerous probability of monopolization.

In an attempted monopolization claim, JFI does need to define the market and does need to prove a dangerous probability of monopolization. JFI does not need an expert to do that though. Plaintiffs can establish relevant market share by lay testimony. See, e.g., Bacchus Indus., Inc. v. Arvin Indust., 939 F.2d 887, 894 (10th Cir. 1991) (establishing market share by lay witness testimony); General Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795 (8th Cir. 1987) (establishing relevant market without expert testimony).

The Defendants also raise the issue that market power may not be determined by aggregating market share of more than one company. That the Defendants raise this "defense" is perplexing. In the past, they have asserted the intracorporate conspiracy defense, contending that there could be no conspiracy to monopolize because Schwitters was INC's principal and Zivin was INC's attorney. Now they assert that there can be no attempted monopoly because the Defendants market share, as separate entities, cannot be combined. Their position is irreconcilable.

Notwithstanding the law cited by the Defendants the market share of INC, IBC, PSI and PS should be considered as a whole. This is because IBC, PSI and PS are supplied by INC and, for all intents and purposes, fungible shells. They are controlled by Schwitters, Gary Senecal and Rick LeFebvre and exist for the purposes of frustrating JFI's claims and avoiding

liability.  Thus, the instant case is not square with <u>H.L. Hayden Co. v. Schein Dental Equip.</u>, 879

F.2d 1005 (2d Cir. 1989).


       C.       <u>Opposition to Point 3: Determination of whether underlying patent infringement suits were baseless does not require expert testimony.</u>

JFI's claims are based, in part, on the premise that two underlying patent

infringement actions brought by Defendants INC and Zivin, and maintained by the acts of all

Defendants, were sham lawsuits and part of the Defendants' attempts to monopolize the market

for the wholesale and distribution of proanthocyanidins (or OPCs) covered by the '360 Patent in

the United States.  Beginning on Page 17 of the Defendants' Memorandum, they contend that

"[p]roof that a patent infringement claim was 'objectively baseless' under the law as it existed at

the time the patent infringement action was initiated involves technical, specialized legal

knowledge that is beyond the scope of lay opinion testimony permitted by the Federal Rules of

Evidence 701."  This contention is without basis in law and fact.

The case relied upon by the Defendants, <u>Professional Real Estate Investors, Inc. v.

Columbia Pictures Indus.</u>, 508 U.S. 49 (1993), does not set forth a requirement of expert

testimony to determine whether litigation was objectively baseless.  Thus, it is not authority for

the Defendants' contrived standard.  Similarly, the treatise relied upon by the Defendants,

Areeda & Hovenkamp, undermines the Defendants' claim.  In the paragraph following the one

cited by the Defendants, Professors Areeda & Hovenkamp state:  "By contrast, other cases of

'sham' involve lawsuits based on facts that the complainant knew or should have known to be

false; in such cases jury inquiry into the antitrust defendant's actual knowledge might be quite

appropriate."  I Philip E. Areeda & Herbert Hovenkamp, Antitrust Law, § 207c, at 253 (2d ed.

2000).  JFI claims that the Defendants' sham lawsuits were based on false facts pertaining to

ownership of the '360 Patent.  Thus, the Defendants have no legal basis for their contention that

because the plaintiff has no expert to testify as to the objective baselessness of the infringement

actions that any evidence on that matter should be excluded.

This is especially so in this case.  The Defendants, though embroiled in litigation

with its competitor Horphag over whether INC had any rights to the '360 patent, on March 6,

1996, filed suit in this Court and claimed, with all evidence to the contrary, that INC was the

owner of "at least an undivided one-half interest in the '360 Patent" and that, "on information

and belief," Horphag was no longer a co-owner of the '360 Patent.  Plaintiff contends that the

Defendants clearly knew that Horphag had a one-half interest in the '360 Patent, and further

knew that INC could not bring suit for patent infringement without Horphag.

On March 25, 1997, a French trial court declared a 1994 Assignment, by which

INC alleged to have rights to the '360 patent, void *ab initio*.  (Exhibit 13.)  Nonetheless, the

Defendants continued to aggressively pursue two U.S. infringement actions and otherwise

promote their patent ownership and infringement threats.

On May 28, 1998, the French Appellate Court affirmed the decision of the French

trial court.  The French Appellate Court specifically held that (1) INC was not an owner of the

'360 patent because the purported Assignment was void *ab initio*, and (2) Horphag was and is a

co-owner of the '360 patent.  (Exhibit 14.)  That decision was followed by this Court's granting

summary judgment in favor of JFI and the other patent infringement defendants based on clear

documentary evidence and well established law.[6]  Int'l Nutrition Co. v. Horphag Research Ltd. et al., No. 3:96 CV386, 2000 WL 1863560 (D. Conn. Apr. 14, 2000) (Exhibit 14).  This Court found that (1) INC was not a co-owner of the '360 patent and that INC had no standing to sue for infringement of that patent; (2) INC was not a bona fide purchaser for value because at the time INC allegedly obtained an ownership interest from SCIPA, INC knew that Horphag was a co-owner and there was an ownership dispute between SCIPA and Horphag; (3) a 1996 Assignment from Masquelier to INC did not confer any ownership interest in the '360 patent to INC; and (4) even if INC had an ownership interest (which it did not), it could not bring this suit without Horphag voluntarily joining as a plaintiff.  Id., at *6-7.

      With their array of frivolous arguments soundly rejected by two French courts and this Court, the Defendants still pressed the sham litigation through numerous motions and appeals.  No expert is needed to opine that the sham litigations were objectively baseless.  JFI has alleged that the lawsuits were based on facts that the Defendants knew, or should have known, to be false.  The rest is for the trier of fact.

    D.    Opposition to Point Four:  Even if the Court were to exclude JFI's expert witnesses, there is sufficient evidence to try JFI's CUTPA, Lanham Act, and common law claims.

      If the Court were to exclude the testimony proffered by Mr. Ris or Mr. Willoughby, there is ample evidence to support JFI's CUTPA, Lanham Act, and common law claims.  Further, expert testimony is not needed for JFI to proceed to trial on these claims.

---

[6]  No discovery was necessary for the Court to dismiss INC's meritless claims.  The documentary evidence submitted to the Court in support of the summary judgment motions had been readily available to Defendants before they had even filed the underlying suit.

The cases Defendants' cite in their Motion in Limine are distinguishable from the case at hand.  Unlike in the cases upon which Defendants' rely to contend that JFI's CUTPA claim fails if its antitrust claim fails, JFI has brought a Lanham Act claim against Defendants in this action.  "Violation of the Lanham Act establishes liability under CUTPA."  World Championship Wrestling v. Titan Sports, Inc., 46 F. Supp. 2d 118, 124 (D. Conn. 1999).  In fact, "a violation of he Lanham Act is a *per se* violation of CUTPA."  Pfizer, Inc. v. Miles, Inc., 868 F.Supp. 437, 442 (D. Conn. 1994) (defendants should be held automatically to violate CUTPA to the extent their actions violated the Lanham Act).

In Count IV of its Amended Complaint, JFI alleges that the Defendants "used in commerce false or misleading descriptions of fact and false or misleading representations of fact which have cause and continue to cause confusion, deception, and mistake among consumers as to the rightful owner of the '360 patent and JFI's right to sell OPC's without being subjected to suit by the Defendants, and have disparaged JFI's commercial activities."  Through their actions, Defendants violated Section 42(a) of the Lanham Act, a per se violation of CUTPA.  There is significant documentary evidence and testimony supporting JFI's contention that Defendants' misled and deceived consumers by claiming that it owned a patent to which it had no rights. Similarly, the documents and testimony of market expert, Greg Ris, and other market participants such as Jarrow Rogovin and Robert Lemon reinforce the confusion and deception that Defendants' caused in the marketplace.

Further, Defendants' conduct can certainly stand on its own as a violation of CUTPA.  Acts are consider unfair and violate CUTPA when they (1) offend public policy as it has been established by statutes, the common law, or otherwise; (2) are immoral, unethical,

oppressive, or unscrupulous; and (3) cause substantial injury to consumers (competitors or other businessmen). <u>World Championship Wrestling</u>, 26 F.Supp.2d at 123 (citing <u>Boulevard Assocs. v. Sovereign Hotels, Inc</u>., 72 F.3d 1029, 1038 (2d Cir. 1995) (citations and internal quotations omitted). Certainly, in its Oppositions to Defendants' numerous Summary Judgment Motions, which this Court denied, JFI has proffered substantial evidence of Defendants' offending conduct and the significant injury it caused consumers and competitors in the marketplace.

## IV.    CONCLUSION.

For these reasons, Defendants' Motion in Limine to Exclude Evidence should be denied.

THE PLAINTIFF,
JARROW FORMULAS, INC.
BY MCCARTER & ENGLISH, LLP
ITS ATTORNEYS


By_____
    ERIC WATT WIECHMANN (CT 04331)
    ewiechmann@mccarter.com
    JASON C. WELCH (CT 23418)
    jwelch@mccarter.com
    CityPlace I
    185 Asylum Street
    Hartford, CT  06103
    (860) 275-6700
    (860) 724-3397 (fax)
          -and-
    ALEXANDRA B. STEVENS (CT 20300)
    Four Stamford Plaza
    107 Elm Street
    Stamford, CT  06901
    (203) 965-0823
    (203) 323-6513 (fax)
    astevens@mccarter.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing PLAINTIFF'S MEMORANDUM

OF LAW IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE has been mailed,

postage prepaid, this 1st day of December 2003, to

RICHARD S. ORDER, ESQ.
ERIC D. BEAL, ESQ.
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT  06103


_____
JASON C. WELCH

HARTFORD: 602494.01