CondenseIt!™

```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - -X
JARROW FORMULAS, INC.,              :
              Plaintiff             :
                                    :
VS                                  : 3:01-CV-00478(AVC)
                                    :
INTERNATIONAL NUTRITION COMPANY,    :
NORMAN H. ZIVIN AND JACK            :
MASQUELIER,                         :
              Defendants            :
- - - - - - - - - - - - - - - - - -X
       Deposition of GARY SENECAL taken at the
     offices of Cummings & Lockwood, CityPlace,
     36th Floor, Hartford, Connecticut, before
     Audra Gulliksen, RPR, LSR, a Professional
     Shorthand Reporter and Notary Public, in and
     for the State of Connecticut on February 19,
     2002, at 10:05 a.m.
           DEL VECCHIO REPORTING SERVICES, LLC
              PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE            100 PEARL ST., 14th FL.
MADISON, CT 06443          HARTFORD, CT 06103-4506
   203 245-9583                  800 839-6867


A P P E A R A N C E S:


ON BEHALF OF THE PLAINTIFF:


ERIC W. WIECHMANN, ESQ.
ALEXANDRA B. STEVENS, ESQ.
CUMMINGS & LOCKWOOD
CityPlace, 36th Floor
Hartford, Connecticut 06103


ON BEHALF OF THE DEFENDANTS:


RICHARD S. ORDER, ESQ.
UPDIKE, KELLEY & SPELLACY
One State Street
Hartford, Connecticut 06103
```

Page 3

1  (THEREUPON, PLAINTIFF'S EXHIBIT NO. 1,
2       SUBPOENA,
3   WAS MARKED FOR IDENTIFICATION.)
4      MR. WIECHMANN: This is the deposition
5  taking place in the case Jarrow Formulas
6  versus International Nutrition Company, et
7  al. This deposition is pursuant to a
8  30(b)(6) subpoena that was served on
9  Integrated Bioceuticals, and I believe that
10 it's pursuant to federal rules. So all
11 objections except as to form are reserved to
12 the time of trial.
13    MR. ORDER: That's fine.
14    MR. WIECHMANN: That notice of the
15 deposition, there was no difficulty with
16 that.
17    MR. ORDER: None.
18    MR. WIECHMANN: And the authority of the
19 court reporter.
20    MR. ORDER: No objection.
21    MR. WIECHMANN: And does Mr. Senecal
22 want to read and sign his deposition?
23    MR. ORDER: Yes.
24    MR. WIECHMANN: And just to clear for
25 the record, because we had initially been

Page 4

1  dealing with another attorney, my
2  understanding, Mr. Order, you are
3  representing Integrated Bioceuticals and
4  Mr. Senecal at this deposition.
5     MR. ORDER: Correct.
6     MR. WIECHMANN: One last issue which is
7  probably not a stipulation. With the prior
8  counsel for Integrated Bioceuticals, we had
9  had discussions with him concerning a related
10 company, PSI or Primary Source, Inc, and the
11 issue as to whether this deposition could
12 serve as the basis for both of them because
13 representations made to my co-counsel were
14 that the person for one would be able to
15 answer all the questions for the other and
16 the documents would be basically the same.
17     I will ask questions, but I wanted to
18 have an idea now whether that's the case or
19 whether we'd have to serve a separate notice
20 for PSI.
21     MR. ORDER: I wasn't a part of the
22 conversations that you alluded to, but
23 Mr. Senecal is here today and to the extent
24 he has knowledge in his head, he's not going
25 to be separating it out and answering only

Page 5

1  for what he knows wearing an Integrated
2  Bioceuticals hat as opposed to what he knows
3  in his role as a Primary Source International
4  officer.
5      So whether he knows everything in the
6  notice that you would have sent to PSI is
7  another issue. But no, we're not going to be
8  standing on that technicality with regard to
9  what Mr. Senecal knows.
10
11      GARY SENECAL,
12 residing at 120 Eider Lane, Eastham, Massachusetts,
13 having first been duly sworn, deposed and testified as
14 follows:
15 DIRECT EXAMINATION
16 BY MR. WIECHMANN:
17  Q Mr. Senecal, my name is Eric Wiechmann from
18 Cummings & Lockwood. I represent the plaintiff in this
19 action. Along with me is Alexandra Stevens.
20      Have you ever been deposed before?
21  A I have not.
22  Q Have you ever testified at a trial before?
23  A I have not.
24  Q Have you ever been involved as a party in a
25 lawsuit before?

Page 6

1  A I have not.
2  Q Let me go through a couple of rules.
3      Your testimony is under oath, as you realize,
4  and is being taken down by the court reporter. The
5  object of this is try to take it down as accurately as
6  possible. If at any time you do not fully hear or
7  understand my question, I would ask you to tell me that
8  because otherwise I will assume that you did hear and
9  understand my question and your answer is in response
10 to that. Is that fair?
11      MR. ORDER: Well, I object to any
12      assumptions that you're going to be making.
13      You ask him a question, he answers the
14      question. You can't make any assumptions as
15      to his understanding of the question.
16  Q If you don't understand it, will you tell me
17 that so I can try to rephrase it?
18  A Yes.
19  Q If at any time you want to take a break,
20 please tell me that. I might, unless it's an
21 emergency, just ask you to finish whatever answer
22 you're in the middle of, but other than that, if you
23 want to take a break, please do.
24      If at any time you can't hear what anybody is
25 saying, you want it repeated, either I will repeat the

Page 7

1  question or the court reporter will read it back. Is
2  that fair?
3   A That's clear.
4   Q Are you currently employed today?
5   A Yes.
6   Q By whom?
7   A Integrated Bioceuticals.
8   Q And what is your position there?
9   A Chief executive officer.
10  Q How long have you had that job?
11  A Seven years.
12  Q And when did you first become chief executive
13 officer of Integrated Bioceuticals?
14  A 1997.
15  Q And before that, did you hold a job with
16 Integrated Bioceuticals?
17  A No.
18  Q It may be crude math, but 1997 to today is
19 five years and you had said seven years.
20  A Prior to that it was Primary Services
21 International.
22  Q Does Primary Services International still
23 exist?
24  A Yes.
25  Q And do you have any position with Primary

Page 8

1  Services International?
2   A I am co-owner.
3   Q Are you an officer?
4   A No.
5   Q You're co-owner of Primary Services with
6  whom?
7   A Richard LeFebvre.
8   Q Could you spell that?
9   A Sure. L-e capital F-e-b-v-r-e.
10  Q Are you an owner of Integrated Bioceuticals?
11  A It is an LLC.
12  Q And who other than you are members of that
13 LLC?
14  A Richard LeFebvre.
15  Q With Primary Services, are you equal owners
16 or does one have more stock than the other?
17  A We are equal.
18  Q And the same with the LLC?
19  A Yes.
20  Q Other than you, who are the officers of
21 Integrated Bioceuticals?
22  A Just myself.
23  Q Who are the officers of Primary Services?
24  A Myself and Richard LeFebvre as chief
25 financial officer.

Page 9

1  Q  How many employees does Primary Services
2  International have?
3  A  Four.
4  Q  Does that include you and Mr. LeFebvre?
5  A  It does not. So six including.
6  Q  Who are those other four employees?
7  A  Sara LeFebvre.
8  Q  What is her job?
9  A  Bookkeeper.
10 Q  Okay.
11 A  Trisha LeFebvre.
12 Q  Okay.
13 A  Marketing assistant.
14 Q  Okay.
15 A  Dianne McGrath, customer service manager.
16 Q  Okay.
17 A  Kelly McGrath, director of marketing.
18 Q  Are Sara and Trisha LeFebvre related to
19 Richard?
20 A  Yes, they are.
21 Q  What's the relationship?
22 A  Sara is Richard's wife. Trisha is Richard's
23 sister-in-law.
24 Q  Are Dianne and Kelly McGrath related to
25 either you or Mr. LeFebvre?

Page 10

1  A  They are not.
2  Q  Are they related to each other?
3  A  Yes.
4  Q  What's the relationship?
5  A  Man and wife.
6  Q  Integrated Bioceuticals, other than you and
7  Mr. LeFebvre, are there any other employees?
8      MR. ORDER: Objection.
9  Q  The four people you mentioned before, the
10 LeFebvres and the McGraths, are employed by whom?
11 A  Primary Services International.
12 Q  Now, Integrated Bioceuticals, do they have
13 any employees?
14 A  Shared employees.
15 Q  Are those employees the same ones you've
16 identified?
17 A  Yes, they are.
18 Q  Do they have the same titles?
19 A  Yes, they do.
20 Q  And the same job responsibilities?
21 A  Yes, they do.
22 Q  Now, are you aware of a company called
23 Primary Source, Inc.?
24 A  Yes.
25 Q  What is that?

Page 11

1  A  They are a company under Primary Services
2  International who deals only in finished -- the sale
3  and distribution of finished product.
4  Q  For the record, what product are we referring
5  to?
6  A  The brand name is Primary Source, and they're
7  all dietary supplements.
8  Q  Are some of your products -- do some of your
9  products contain OPCs?
10 A  They do.
11 Q  Again, for the record, what is an OPC?
12 A  OPC is a very specific molecular structure
13 that is targeted and isolated in an extraction process
14 from various plant sources.
15 Q  What's the purpose of OPCs?
16     MR. ORDER: Objection to form.
17 Q  You can answer.
18 A  I'll take advice of my counsel.
19 Q  Well, he's objecting to the form, so you
20 understand that, which means he can say he does not
21 like the question. If you're able to understand it,
22 you can answer.
23     If you're telling me that somehow you don't
24 understand the question, we'll continue, but just
25 because he objects does not in any way mean you don't

Page 12

1  answer the question. Do you understand that?
2  A  I understand.
3  Q  Can you answer that question?
4  A  Would you repeat the question?
5  Q  When PSI, Primary Source, sells OPCs, they
6  sell them -- they're sold to the consuming public to do
7  what?
8      MR. ORDER: Objection to form.
9  A  Generally an antioxidant.
10 Q  What do antioxidants do?
11 A  Antioxidants scavenge free radicals which are
12 reactive cells in the body.
13 Q  Do you know what the term OPC stands for?
14 A  I do.
15 Q  What's that?
16 A  Oligomeric proanthocyanidins.
17 Q  Can you spell that for the reporter?
18 A  O-l-i-g-o-m-e-r-i-c,
19 p-r-o-a-n-t-h-o-c-y-a-n-i-d-i-n-s, proanthocyanidins.
20 Q  How long has Primary Source, Inc. been
21 selling OPCs?
22 A  Primary Source, Inc., since 1999.
23 Q  Prior to that, were you involved with another
24 company that sold OPCs?
25     MR. ORDER: Objection to the form.

Page 57

1  Q  In the late 1990s, what was Primary Services
2  function?
3      MR. ORDER: I'm sorry, what year?
4  Q  Late 1990, let's say 1996 through 1999.
5  A  During that period of time it was the sole
6  company that was co-owned by Richard LeFebvre and
7  myself.
8  Q  What business function did it carry on?
9  A  It was selling Masquelier's Original OPCs.
10  Q  Did it sell Masquelier's Original OPCs at the
11  same time that Integrated Bioceuticals was selling
12  them?
13  A  No.
14  Q  Did Integrated Bioceuticals -- maybe the best
15  thing for me is we mentioned three companies:
16  Integrated Bioceuticals, Primary Services, PSI, and
17  Primary Source, PS. If you could explain to me their
18  relationship about which ones purchased OPCs and which
19  ones sold or distributed OPCs in what form during this
20  decade in the 1990s?
21  A  Primary Services International was formed in
22  1994 for the purpose of being exclusive distributor for
23  Masquelier's Original OPCs with INC being the supplier
24  of that product. Sometime after that it became prudent
25  from a business perspective to separate Primary

Page 58

1  Services into two companies: Integrated Bioceuticals
2  which sells the Masquelier Original OPCs raw material,
3  and Primary Source which manufactures and sells
4  finished product.
5      So the business structure that we created was
6  that Primary Services International became Primary
7  Services, Incorporated, and served as the management
8  company for Primary Source, LLC, selling finished
9  product. And IBC, Integrated Bioceuticals selling raw
10  material.
11  Q  Did both of them buy product, the OPCs from
12  INC? Meaning Primary Source was selling a finished
13  product. Did they buy their raw material separately
14  from Integrated Bioceuticals or did they just have some
15  sort of transfer between the two companies?
16  A  Primary Source was a customer of Integrated
17  Bioceuticals.
18  Q  So all of the purchase functions of these
19  OPCs from INC were done by Integrated Bioceuticals?
20  A  Correct.
21  Q  Now, immediately before our break, I had
22  mentioned whether you were aware of a company called
23  Centre d'Experimentation Pycnogenol SAR. Are you aware
24  of that company?
25  A  Yes.

Page 59

1  Q  When did you first become aware of it?
2  A  I honestly don't remember exactly when I
3  became aware of it, but at some point I became aware
4  that it was a company owned by Masquelier.
5  Q  And has IBC, PSI or PS had a business
6  relationship with CEP or Centre d'Experimentation
7  Pycnogenol?
8      MR. ORDER: What was the first part of
9      the question?
10  Q  Did any of the three companies have a
11  business relationship with CEP?
12  A  Currently IBC is purchasing the Masquelier
13  Original OPCs from CEP as the distributor of Masquelier
14  Original OPCs.
15  Q  How long has that been going on?
16  A  I don't remember exactly, but less than a
17  year.
18  Q  And do you have an understanding of why IBC
19  stopped purchasing from INC and started purchasing from
20  CEP?
21  A  Only a cursory understanding in that it had
22  something to do with a lawsuit or a case, a legal case
23  in France.
24  Q  Did you ever talk to Mr. Schwitters as to why
25  the purchase was going to be transferred from INC to

Page 60

1  CEP?
2  A  I was only told that as a result of a
3  decision made in France that INC would no longer be
4  supplying IBC with raw material. The supplier would be
5  CEP.
6  Q  Did you enter into a new agreement, "you"
7  being IBC, enter into a new agreement with CEP?
8  A  I did not.
9  Q  As we sit here today, do you believe that
10  your license agreement you have with INC is still in
11  full force and effect?
12  A  I do.
13  Q  Do you have a license agreement from CEP?
14  A  No, I do not.
15  Q  What I'd like to show you is a series of
16  invoices from CEP to Integrated Bioceuticals. We'll
17  mark this as Plaintiff's Exhibit No. 2. And then a
18  series of invoices from INC to Integrated Bioceuticals
19  which has been marked as Plaintiff's Exhibit 3.
20      (THEREUPON, PLAINTIFF'S EXHIBIT NO. 2 AND 3,
21          GROUPS OF INVOICES,
22          WAS MARKED FOR IDENTIFICATION.)
23  BY MR. WIECHMANN:
24  Q  Will you review Exhibits 2 and 3, please.
25  A  (Witness reviewed.)

**Page 65**

1  purchased by Mr. Schwitters?
2  A  No. I was not part of those discussions.
3  Q  Did you ever have a discussion with
4  Mr. Schwitters as to how your license agreement and
5  distribution agreement from INC would be impacted by
6  his purchase of CEP?
7  A  No, not by the purchase of CEP.
8  Q  Now, could we turn to Exhibit 3. Looking at
9  the first page, again, these are documents with number
10 IBC 0348 through 0353. Are these invoices from INC
11 received in the ordinary course of business by --
12 strike that.
13      Are these invoices received from INC by
14 Integrated Bioceuticals in the ordinary course of their
15 business?
16 A  Yes.
17 Q  And do these invoices represent the purchase
18 of OPCs from INC?
19 A  Yes.
20 Q  And I notice on the first page, it talks
21 about 10 kilograms of Masquelier's Original OPCs, pinus
22 maritima. Is that the pine bark extract?
23 A  It is.
24 Q  Referred to as Pycnogenol?
25 A  Not referred to as Pycnogenol.

**Page 66**

1  Q  Is that what -- when your companies sell it,
2  do they sell it under the pinus maritima or under
3  the Pycnogenol name?
4  A  Under the pinus maritima.
5  Q  Have they ever sold it under the Pycnogenol
6  name?
7  A  Integrated Bioceuticals, never.
8  Q  Primary Services?
9  A  Never.
10 Q  Primary Source?
11 A  Never.
12 Q  It was only sold -- did you ever have a
13 company that you were involved with who sold pinus
14 maritima OPCs under the Pycnogenol name?
15 A  As a raw material or finished product?
16 Q  Either one?
17 A  Yes, raw material. That was --
18 Q  What company was that?
19 A  Merchant International and Crossover
20 Marketing.
21 Q  And that was product purchased from Horphag?
22 A  That's correct.
23 Q  I notice the dollars are in HFLs instead of
24 DFLs. Is there any difference between an HFL and a
25 DFL?

**Page 67**

1  A  To the best of my knowledge, no, there is no
2  difference.
3  Q  And again, there appears to be writing on
4  various of the pages of these invoices. Are those all
5  the writings of Mr. Rick LeFebvre?
6  A  It appears to be, yes.
7  Q  Now, when PSI or PS purchased product, the
8  raw material from Integrated Bioceuticals, did you
9  generate a paper trail of those purchases?
10 A  Yes.
11 Q  Do you know whether those were produced?
12 A  Where they were produced?
13 Q  Whether those documents showing the internal
14 purchase of those product were produced in connection
15 with this subpoena?
16 A  I don't know.
17     (THEREUPON, PLAINTIFF'S EXHIBIT NO. 4,
18          SUBPOENA,
19          WAS MARKED FOR IDENTIFICATION.)
20 BY MR. WIECHMANN:
21 Q  Here's a document that's been marked as
22 Plaintiff's Exhibit 4. Have you ever seen this
23 document before, Mr. Senecal?
24 A  (Witness reviewed.)
25     Yes, I have.

**Page 68**

1  Q  Do you recognize this as a subpoena served on
2  IBC, Integrated Bioceuticals, for the production of
3  documents at this deposition?
4  A  Yes.
5  Q  Were you involved in the search for and
6  production of documents that were responsive to this
7  subpoena?
8  A  Yes.
9  Q  Was anybody else at Integrated Bioceuticals,
10 PSI or PS involved in the search for and production of
11 documents?
12 A  Yes.
13 Q  Who else?
14 A  Richard LeFebvre.
15 Q  Will you, please, describe to me what your
16 role was in the search for documents and the production
17 of documents?
18 A  I don't understand what you mean by my role.
19 Q  What did you do?
20 A  I searched my files for documents as outlined
21 in the subpoena.
22 Q  When you mean "my files," what are you
23 referring to?
24 A  The files in my office, my current files.
25 Q  It may help me, Integrated Bioceuticals

**Page 69**

1  business is located where?
2     A   At 107 Ardmore Street in Fairfield,
3  Connecticut.
4     Q   Is that the same business --
5     A   Corporate.
6     Q   -- corporate headquarters for PSI and PS?
7     A   It is.
8     Q   Describe the offices to me. How many rooms?
9     A   It's about 8,000 square feet total.
10 Approximately half of that is warehouse space, and
11 there are three main offices in the space occupied by
12 PSI, PS and Integrated Bioceuticals. There are three
13 main offices and a large common area where the rest of
14 the employees have their desks.
15    Q   And you occupy one of the main offices?
16    A   I do.
17    Q   And Mr. Richard LeFebvre occupies another?
18    A   Yes.
19    Q   Who occupies the third?
20    A   Kelly McGrath, the director of marketing.
21    Q   And the documents that are asked for here
22 dealing with contracts and agreements with Masquelier,
23 documents dealing with OPC 85, documents dealing with
24 marketing, documents dealing with the assignments and
25 licenses, where would those be located?

**Page 70**

1     A   In either my office or Richard LeFebvre's.
2     Q   Are there any corporate files located other
3  than in your two offices?
4     A   No.
5     Q   Does the company have a document retention or
6  document destruction policy?
7     A   It has basically been our policy, unwritten,
8  that we clean our file cabinets out at the end of every
9  year, sometime between the last week of December and
10 the beginning weeks of January, to ready them for the
11 new year.
12    Q   What type of documents would you clean out?
13    A   Correspondence that has no relevance to
14 ongoing business at the time, historical.
15    Q   Other than correspondence, would you keep
16 documents such as license agreements and assignments
17 from INC or other corporations?
18    A   Yes.
19    Q   Would you keep your historical sales records?
20    A   Yes.
21    Q   Are you keeping your -- strike that.
22        Does IBC produce a marketing plan?
23           MR. ORDER: Objection to the form.
24    A   No, we do not produce a formal marketing plan
25 each year.

**Page 71**

1     Q   Does PSI or PS, have they in the past
2  produced a marketing plan?
3     A   No, not a formal marketing plan.
4     Q   Did IBC ever produce a formal marketing plan?
5     A   No.
6     Q   Did IBC, PSI or PS ever send to INC a
7  marketing plan?
8     A   Not a formal marketing plan, but conceptual
9  ideas perhaps for marketing.
10    Q   Did you keep copies of those conceptual
11 ideas?
12    A   Not historical references, no.
13    Q   Over the last ten years, how many times would
14 IBC, PSI or PS have sent conceptual marketing plans or
15 ideas to INC?
16    A   Not very often. Sales projections, yes, but
17 marketing plans not very often.
18    Q   How often would you send sales projections?
19    A   Generally at the end of every year for the
20 ensuing year.
21    Q   Did you -- did IBC, PSI or PS ever receive
22 any marketing ideas, plans or suggestions from INC over
23 the last ten years?
24    A   Yes, ideas.
25    Q   And would those be received in written form?

**Page 72**

1     A   Sometimes and sometimes verbal over the
2  phone.
3     Q   Did IBC, PSI or PS keep that correspondence?
4     A   Unless they were instituted, no.
5     Q   If they were instituted, how would they be
6  kept?
7     A   As part of the correspondence file.
8     Q   Do you recall when you first received a copy
9  of the subpoena that has been marked as Exhibit 4?
10    A   Do I recall? Yes.
11    Q   It was in October of last year?
12    A   Yes.
13    Q   Any time between October of last year when
14 you received this subpoena and today has IBC, PSI or PS
15 undertaken any document destruction?
16    A   No.
17    Q   When the new year came this year, was there
18 any attempt to clean out old files?
19    A   Yes.
20    Q   And was there an attempt to make sure that
21 the documents that were cleaned out were not in any way
22 responsive to the subpoena served on IBC or PSI?
23    A   Yes.
24    Q   And who made that attempt to make sure,
25 ensure that the documents that were thrown out were not

Page 81

1   A   He's a litigator. Basically he was civil.
2   Q   Did he and Mr. Fitzpatrick work on the same
3   matter?
4   A   No, they did not.
5   Q   What did Mr. Bologna represent the IBC, PSI,
6   PS family of companies?
7   A   As I recall, Mr. Bologna represented PSI in a
8   lawsuit involving Richard LeFebvre and a former
9   business associate in a store formerly owned by
10  Richard LeFebvre which was called Sweet Water.
11  Q   And Mr. Bologna never represented any of the
12  companies or you in any manner involving OPCs?
13  A   No.
14  Q   And Bill Fitzpatrick?
15  A   Only real estate.
16  Q   And Mr. Zivin?
17  A   Mr. Zivin's firm represented us in a
18  trademark infringement case with a company called
19  Nutricology.
20  Q   What did that trademark involve?
21  A   The trademark was Green Vibrance. It was a
22  trademark for a dietary supplement, food supplement
23  that was made and marketed by Primary Source, and the
24  lawsuit was against Nutricology because their name came
25  dangerously close to our name for a very similar

Page 82

1   product.
2   Q   What was your name?
3   A   Green Vibrance, that was our name for the
4   product, Green Vibrance.
5   Q   And other than that matter, has Cooper &
6   Dunham or Mr. Zivin represented IBC, PSI or PS?
7   A   He has not.
8   Q   Has there been a final decision or resolution
9   of the Green Vibrance trademark dispute?
10  A   Yes, there has.
11  Q   What was it?
12      MR. ORDER: Before you answer, is it
13      subject to any confidentiality agreement,
14      settlement agreement?
15  A   It may be. I don't know.
16  Q   Is the suit still active?
17  A   No.
18  Q   Is your company entitled to use the term
19  Green Vibrance?
20  A   We have since sold that product, rights to
21  that product.
22  Q   Again, just for the record, the Green
23  Vibrance product has no relationship to OPCs?
24  A   None whatsoever.
25  Q   Did you ever retain a lawyer in connection

Page 83

1   with your license or distribution agreements with INC?
2   A   Yes.
3   Q   Who was that?
4   A   That was Mike Bologna where he reviewed the
5   contract. At our request, he reviewed the contract.
6   Q   Were either you or any of your companies
7   involved with the action in Connecticut brought by INC
8   against various distributors of OPC products?
9       MR. ORDER: Objection to the form.
10  A   We were not involved.
11  Q   Did you ever file any declarations or
12  affidavits in connection with that lawsuit?
13  A   We did not.
14  Q   Did you ever file, you or your companies file
15  any declarations in connection with any lawsuit?
16      MR. ORDER: Objection to form.
17  A   We did not.
18  Q   Let me show you an exhibit that's been marked
19  as Number 5, Plaintiff's No. 5.
20      (THEREUPON, PLAINTIFF'S EXHIBIT NO. 5,
21          SUBPOENA,
22      WAS MARKED FOR IDENTIFICATION.)
23  BY MR. WIECHMANN:
24  Q   Have you seen this document before?
25  A   I have.

Page 84

1   Q   And is this a subpoena that was served on
2   Primary Source, Inc.?
3   A   Yes.
4   Q   Now, I would ask, just because I now have a
5   better understanding of the relationship between
6   Primary Services and Primary Source, that in
7   responding -- first, were you involved in responding to
8   this subpoena?
9   A   I was not.
10  Q   Do you recall who was involved?
11  A   Richard LeFebvre.
12  Q   Did you discuss with Mr. LeFebvre how he
13  responded to the subpoena?
14  A   No, I did not.
15  Q   Are you aware of whether Mr. LeFebvre in
16  responding to the subpoena made any distinction between
17  Primary Source and Primary Services?
18  A   I believe he did make that distinction, yes.
19  Q   So to the best of your knowledge as we sit
20  here today, is it possible that there are certain
21  documents involving Primary Services that would be
22  responsive to the -- that fall within the paragraphs
23  contained in this subpoena that were not produced
24  because this subpoena is only directed at Primary
25  Source?

**Page 85**

1  MR. ORDER: Can you read that question
2  back?
3  MR. WIECHMANN: I'll restate it.
4  MR. ORDER: I wasn't objecting.
5  MR. WIECHMANN: No, but I want to make
6  sure.
7  BY MR. WIECHMANN:
8  Q We now know that there is a Primary Source
9  and Primary Services and there was sort of a
10 metamorphosis between the original PSI into two
11 separate companies. This subpoena is obviously
12 directed at Primary Source. Some of the documents that
13 were requested, if you look at the paragraphs which are
14 very similar to the IBC one you were involved, would
15 involve possibly documents that Primary Services was
16 the main party on.
17 A Yes.
18 Q Do you know whether Mr. LeFebvre made the
19 call that because it said Primary Services instead of
20 Primary Source those documents were not produced?
21   MR. ORDER: I want to just object
22   because, and I think it will help clarify, on
23   page three in the definition of "you" and
24   "yours," your question may be misleading as a
25   result.

**Page 86**

1    MR. WIECHMANN: I understand how it's
2    defined. I just want to know if there was a
3    discussion, because he immediately said --
4    well, first he said he wasn't involved. So
5    it may be unfair. But he then indicated
6    there might have been some reason that there
7    was a distinction made by Mr. LeFebvre, and I
8    was wondering why because there was a
9    definition of it.
10 A What the definition of that distinction would
11 be?
12 BY MR. WIECHMANN:
13 Q Yes.
14 A Primary Services really or Primary Source is
15 really an evolution of -- Primary Sources is an
16 evolution of Primary Services International. It's a
17 spin off from Primary Services International. And I
18 don't know, but I would assume that in the discovery
19 process Mr. LeFebvre would have combined the two,
20 Primary Services and Primary Source.
21 Q Okay. All I would just like to do is confirm
22 on the record, you can do it through your attorney,
23 that there was -- in the response to these documents
24 there was no attempt made to segregate or not produce
25 certain documents because the subpoena on its face is

**Page 87**

1  directed towards Primary Source, even though the
2  definition refers to the other corporate entities.
3  A To the best of my knowledge, that's true.
4  Q So it would be difficult for me -- it would
5  not be productive for me to ask you whether all
6  documents that were in the possession of Primary Source
7  or Primary Services were produced if responsive because
8  you were not involved in that production. Correct?
9  A Correct.
10 Q Did you ever review the documents that were
11 actually produced?
12 A I did.
13 Q After you reviewed the documents produced in
14 connection with the subpoena, were there any documents
15 that came to mind that you knew were in existence that
16 were not in the pile of documents produced or
17 identified as privileged?
18   MR. ORDER: Objection to form.
19 A No.
20 Q I'd like to show you Exhibit 6.
21   (THEREUPON, PLAINTIFF'S EXHIBIT NO. 6,
22         PURCHASE ORDERS,
23    WAS MARKED FOR IDENTIFICATION.)
24 BY MR. WIECHMANN:
25 Q Can you identify those documents for me?

**Page 88**

1  A (Witness reviewed.)
2    MR. ORDER: Again, these documents, this
3    exhibit was marked as restricted
4    confidential, and we'll designate this
5    portion of the transcript as restricted
6    confidential.
7  A Yes. These are purchase orders generated by
8  Integrated Bioceuticals to INC for the purchase of
9  Masquelier's Original OPCs in both grape seed and pine
10 bark form.
11 Q Well, just to go through quickly, the first
12 three pages appear to be -- or four pages appear to be
13 to INC Establishment?
14 A Uh-huh.
15 Q What does "Establishment" mean?
16 A I assume it's the --
17   MR. ORDER: Don't assume.
18 A I don't know what Establishment means.
19 Q Have you ever dealt with an INC related
20 company referred to as INC Establishment?
21   Obviously, this is a purchase order. I mean
22 separate from this, did you ever communicate or receive
23 letterhead that used the term INC Establishment as one
24 of the Schwitters companies?
25 A I don't remember. All I remember is INC.