Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**DISK ENCLOSED**

----------------------------------)
JARROW FORMULAS, INC.             )
      Plaintiff             )
VS                                )  Civil Action No.
                                      )  3:01 CV 478 (AVC)
INTERNATIONAL NUTRITION COMPANY   )
NORMAN H. ZIVIN, and              )
JACK MASQUELIER,                  )
      Defendants            )
----------------------------------)

DEPOSITION OF: MICHAEL G. WILLOUGHBY
DATE: MARCH 22, 2002
HELD AT: UPDIKE, KELLY & SPELLACY
ONE STATE STREET
HARTFORD, CONNECTICUT

Reporter: WENDY J. ALLEN, RPR, CRR, LSR #00221
BRANDON REPORTING SERVICE
11-A Capitol Avenue
Hartford, CT 06106
Tel (860) 549-1850

Jarrow Formula vs International Nutrition

3/22/2002                                                      Michael G. Willoughby

Page 26

1  completed the report, and I knew I needed to give this
2  deposition, I had to refresh my memory of almost
3  everything in this file.
4      Q   Did somebody provide you with those press
5  releases earlier?
6      A   No. We had one of the staff personnel in the
7  office go to that website and literally go through the
8  website and print each of the pages out of the website.
9      Q   And what happened to the hard copy of those
10 printouts?
11     A   It's in a three-ring binder.
12         MR. ORDER: I don't think, Mr. Wiechmann,
13 that that three-ring binder containing the printouts
14 from the INC website were disclosed as documents that
15 Mr. Willoughby looked at or reviewed or relied on in
16 connection with his report, and I would request
17 production of that.
18         MR. WIECHMANN: We'll take that under
19 advisement. For this deposition, though, if it helps
20 you, because I'm sure you're aware of most of what he
21 copied, you can identify which press releases or news
22 items he saw or that are in there, if that's important
23 for your examination.
24         MR. ORDER: We'll see if it is.
25 BY MR. ORDER:

Page 27

1      Q   Do you have that three-ring binder with you
2  right now?
3      A   I do.
4      Q   About how many different press releases are
5  contained in it?
6      A   Oh, I would say there's probably 20.
7      Q   Are they in chronological order?
8      A   They are listed in chronological order from
9  July 19th, 2001, to April 29th, 1997.
10     Q   So they go backward in time?
11     A   They do, because the nature of the websites is
12 typically to put the most recent information first, but
13 I'm just looking at the three pages of announcements,
14 and then behind the three pages listing each of the
15 announcements is a copy of the announcement. I would
16 say there's probably a hundred pages total.
17     Q   I'm not sure I understood what you just said.
18 You said that behind each announcement is a copy of the
19 announcement? Did I misunderstand what you said?
20     A   Well, if you go to the news flash front page
21 of the website, it lists in reverse chronological order
22 three pages of news flashes.
23     Q   And that's just a listing?
24     A   Yes. And you can click on each news flash
25 title, and then view the complete copy of the news

Page 28

1  flash. So I'm just estimating by holding this in my
2  hand that there are probably one hundred pages of news
3  flashes which consist of probably somewhere in the area
4  of about 20 separate news items.
5      Q   And you said that the dates are January 19th,
6  2001, back through April 9th, 1997?
7      A   April 29th, 1997, yes.
8      Q   Now, you said that you also in preparing for
9  today's deposition spoke to Attorney Wiechmann and
10 Attorney Stevens. When did you speak to either of them?
11     A   I'm fairly certain that I spoke to Ms. Stevens
12 perhaps last Friday, and Monday just with respect to
13 logistics for today's proceeding, but I spoke with both
14 counsel yesterday, and I spoke with Ms. Stevens the day
15 before yesterday.
16     Q   And what did you say and what did they say in
17 all these conversations?
18     A   We simply went through my report, and I
19 explained the foundation for my opinions, and I also
20 reviewed the statistical analysis with them to try and
21 make them familiar with the mechanics of the statistical
22 analysis, and my interpretation of it.
23     Q   What was the scope of your engagement?
24         MR. WIECHMANN: Object. Asked and
25 answered.

Page 29

1          THE WITNESS: I'm sorry, did you have a
2  question?
3  BY MR. ORDER:
4      Q   Yes. What was the scope of your engagement?
5          MR. WIECHMANN: Object. Asked and
6  answered.
7          THE WITNESS: Well, I think I can
8  probably summarize it by saying that my understanding of
9  my engagement was that I was asked to review industry
10 literature and data in the vitamin supplement, vitamin
11 mineral supplement market, to analyze the trends and
12 relative trends in the supplement market, in order to
13 determine -- in order to assess and determine whether or
14 not there was a distinctive and separate change in the
15 trend, or pattern of sales, in the grape seed and the
16 OPC market relative to comparable supplements, at some
17 point in time, and to pinpoint that time, if I could.
18 BY MR. ORDER:
19     Q   And was there anything else you were supposed
20 to do?
21     A   And then given that I find, or not find, I
22 suppose that I find that there was a change in the
23 market for the OPCs relative to other comparable
24 supplements, to determine as best I could an estimate of
25 the lost profits that would have arisen from that change

8 (Pages 26 to 29)

Page 30

1  in the marketplace for Jarrow Formulas.
2      Q   Were you asked to determine what the relevant
3  geographic market was?
4      A   No.
5      Q   Were you asked to determine what the relevant
6  product market was?
7      A   Well, I was given specific instructions that
8  the target, and I'm using target as an interpretation of
9  your word relevant, that the target market was the OPC
10 or grape seed extract market.
11     Q   Where?
12     A   When you say where --
13     Q   Geographically. You said you were told
14 that --
15         MR. ORDER: I'm sorry, can you read back
16 his answer, please?
17         (Answer read by Court Reporter)
18 BY MR. ORDER:
19     Q   And my question is, that's the product. Were
20 you told what the geographic market was?
21     A   No, I was given no specific instructions about
22 the geographic market.
23     Q   So which geographic market did you utilize or
24 refer to?
25     A   I didn't refer to a geographic market, I

Page 31

1  simply referred to the sales within the industry, so
2  however widely the industry reports its sales would be
3  the geographic market that I utilized.
4      Q   Do you know whether the OPC or grape seed
5  extract products are sold outside the United States?
6      A   I understand it is a worldwide market, yes.
7      Q   So what did you understand the data you were
8  looking at regarding sales of grape seed extract related
9  to as far as geography was concerned?
10         MR. WIECHMANN: Object as to form.
11         THE WITNESS: I understood it related to
12 industry-wide sales.
13 BY MR. ORDER:
14     Q   Throughout the world?
15     A   I gave it no geography.
16     Q   So when you were looking at sales figures, did
17 you have a clue as to whether those were sales confined
18 just to the United States, or rather were worldwide
19 sales?
20     A   The market research that I used to underlie my
21 analysis was U.S. sales.
22     Q   And why did you focus on U.S. sales?
23     A   Because that was where the data was available.
24 Jarrow Formulas is a U.S. company. I don't presume or
25 assume that they don't do export sales, but that I can

Page 32

1  capture and measure at least the predominance of their
2  sales compared to the industry by looking at U.S. sales.
3      Q   When you said that the target market that you
4  focused on was the OPC or grape seed extract market,
5  what form of OPC or grape seed extract were you
6  analyzing?
7          MR. WIECHMANN: Object as to form, vague.
8          THE WITNESS: Well, when you say form,
9  what do you mean by form?
10 BY MR. ORDER:
11     Q   Well, what form did you think that product was
12 in that you were analyzing?
13     A   Well, I was analyzing grape seed extract
14 sales, so whatever form comprised the gross sales in the
15 U.S. market for grape seed extract was not revealed to
16 me, the data wasn't available to separate it, and my
17 focus was on the product, not on the form of the
18 product.
19     Q   When you say product, do you know what the
20 product looked like?
21     A   Well, do I have one in my hand, or did I go to
22 a store and look at it?
23     Q   Or was a photo supplied to you?
24     A   No.
25     Q   Do you know whether the data that you looked

Page 33

1  at concerning OPC or grape seed extract sales reflected
2  sales of raw material or finished product?
3          MR. WIECHMANN: Object as to form.
4          THE WITNESS: I can't answer that. I can
5  only assume that I'm looking at retail sales.
6  BY MR. ORDER:
7      Q   Are you looking at something right now?
8      A   Yes.
9      Q   What is it that you're looking at?
10     A   I'm looking at a MarkIntel research report.
11 It would be, you would have it Bates stamped number 37.
12     Q   JAR EXP 37, is that correct?
13     A   Yes.
14     Q   So when there's a reference to $15 million?
15     A   Yes.
16     Q   In 2003, you assume that meant $15 million of
17 sales of the finished product on a retail basis, is that
18 correct?
19     A   No. In my experience in working with reports,
20 industry reports on sales, what they typically represent
21 is sale of the finished product at the wholesale level.
22 In other words, the reporting unit is typically the
23 wholesaler, and that's how these research services are
24 able to put together their reports.
25     Q   So the figures -- okay, I understand.

Jarrow Formula vs International Nutrition
3/22/2002                                                                                       Michael G. Willoughby

Page 58

1  Q  Mr. Willoughby, I'd like to look at your
2  report.
3  A  Okay.
4  Q  Dated February 28th, 2002, which is in the
5  form of a letter from you to Alexandra Stevens, correct?
6  A  Correct.
7  Q  I'm going to mark that as Exhibit 37.
8  (Exhibit 37, expert report dated 2/28/02,
9  marked for identification)
10 Q  So this letter dated February 28th, 2002, with
11 its attachments, constitutes your expert report in this
12 lawsuit, correct?
13 A  Yes.
14 Q  Now, you mentioned earlier that there were
15 interviews that were conducted by Margaret Fischer.
16    And by the way, do you know how long Margaret
17 Fischer's been working in this field of economic, or
18 financial economic analysis?
19 A  I know that her background in valuation and
20 finance goes back about ten years.
21 Q  And you said that she interviewed Jarrow
22 Rogovin and Sid Shastri, and that you interviewed only
23 the attorneys, Wiechmann and Stevens, right?
24 A  Yes.
25 Q  What information, what oral information did

Page 59

1  you receive, did you directly receive from the
2  attorneys, and what oral information did Ms. Fischer
3  tell you she received from Mr. Rogovin and Mr. Shastri?
4  And maybe we should just break that down to make it
5  easier. Why don't we start off with the information
6  that, I assume, and correct me if I'm wrong, that Ms.
7  Fischer conveyed to you information she obtained from
8  anybody at Jarrow Formulas, is that correct?
9  A  Yes.
10 Q  Tell me the information that Ms. Fischer
11 conveyed to you that she had received from people at
12 Jarrow Formulas.
13 A  Well, that's fairly broad. Let me just start
14 out by telling you just summarizing what she conveyed to
15 me that she learned from her conversations with Sid
16 Shastri.
17 Q  Okay, good enough.
18 A  She conveyed to me that she talked to Mr.
19 Shastri about the OPC market, but specifically the
20 Jarrow Formulas sales and its profit margins, and a
21 little bit of discussion about the types of products
22 that may be comparable in terms of expectation with
23 respect to sales of the introduction of new products,
24 that there was more or less a relatively routine product
25 cycle for most of the supplement products, they're

Page 60

1  introduced, they grow at about the same rate, there are
2  target markets that are relatively similar.
3     He provided us with a little bit of
4  information and talked about the increase in the use of
5  supplements, and age, women being slightly higher
6  consumers than men. He talked about their calculation
7  of their profit margins. Helped explain one of the
8  documents to her which she then helped explain to me
9  with regard to how they accounted for packaging and
10 distribution costs relative to their other production
11 costs. The margins, the gross margins on the products
12 varied a little bit from year to year. There wasn't a
13 solid rule that we could use with respect to gross
14 margins. We understood to look at them individually.
15 Apparently they spent a good deal of time just talking
16 about the differences between OPCs and other drugs,
17 other botanical supplements.
18 Q  And what were those differences?
19 A  The differences in just the introduction and
20 the perceived efficacy between ginkgo, garlic and grape
21 seed, we didn't go into any detail, she just outlined
22 that he talked about the differences between the drugs.
23 They weren't really relevant to the direction that I was
24 thinking in terms of a damage calculation, what the
25 actual nutritional differences between the drugs were.

Page 61

1  Apparently she was educated in that.
2  Q  Is there anything else that Ms. Fischer told
3  you about her conversations with Mr. Shastri?
4  A  No, not that I recall. The focus for purposes
5  of my use was to get an understanding of the gross
6  profit margin. I think I've explained that.
7  Q  And did Ms. Fischer tell you about her
8  conversations with Jarrow Rogovin?
9  A  Not in any great detail. I know from my maybe
10 two conversations with him over the time that I've known
11 him that it's really difficult to either take notes or
12 get a systematic understanding of what he's trying to
13 say. He tends to be a bit emotive. So I think that her
14 meeting with him was more of a client management and a
15 courtesy than it was for the purposes of gathering any
16 material information for analysis.
17 Q  And what information did you learn by speaking
18 with Attorney Wiechmann or Attorney Stevens concerning
19 the background or data that you would need to consider
20 in formulating your opinion?
21 A  Well, I think I made it clear from the
22 beginning of the analysis that I would do the
23 quantitative analysis, and that I wanted to be somewhat
24 independent of most of the narratives that would come
25 from the plaintiff himself, or from the plaintiff's