Westlaw.

1997 WL 129400  
1997 WL 129400 (S.D.N.Y.)  
**(Cite as: 1997 WL 129400 (S.D.N.Y.))**

Page 1

▷  
Only the Westlaw citation is currently available.

United States District Court,  
S.D. New York.

GENERAL ELECTRIC COMPANY, Plaintiff,  
v.  
CIRCLE AIR FREIGHT CORPORATION, Circle Freight International, and Compagnie Nationale De Transports Aeriens (Air France), Defendants.

No. 92 Civ. 6333(KMW).

March 20, 1997.

OPINION & ORDER

WOOD, District Judge.

*1 This opinion decides (1) General Electric Company's ("GE") motion pursuant to Rule 12 of the Federal Rules of Civil Procedure for an order striking the limitation of liability defenses asserted by defendants Circle Airfreight Corporation ("CAC") and Circle Freight International ("CFI") (collectively, the "Circle Defendants"), or, alternatively, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting GE partial summary judgment on the Circle Defendants' limitation of liability defense; (2) the Circle Defendants' cross motion to limit its liability pursuant to Article 22 of the Warsaw Convention; and (3) GE's motion to amend its complaint to add a fourth defendant, Circle Freight International, Limited ("CFI Ltd.").

For the reasons set forth below, I deny GE's motion for an order striking the limitation of liability defenses asserted by the Circle Defendants, and I deny GE's motion for an order granting GE partial summary judgment on the Circle Defendants' limitation of liability defense. I grant the Circle Defendants' cross motion to limit its liability pursuant to Article 22 of the Warsaw Convention.  
I deny GE's motion to amend its complaint to add CFI Ltd. as a defendant.

*I. Background*

In September 1990, GE contracted with CAC, a "freight forwarder," to transport a shipment consisting of a towed body mine detector and related equipment owned by the plaintiff from New York to Plessey Naval Systems ("Plessey") at Portsmouth Shipyard in Portsmouth, England. The goods to be shipped did not arrive at CAC's facility in Lawrence, New York until 10:02 p.m. on September 5, 1990, at which time the "Shipper's Letter of Instruction," which accompanied the shipment, was date and time stamped by a CAC warehouseman. The contract for carriage between GE and CAC, CAC Air Waybill No. 05372972 (the "CAC Air Waybill"), was executed on September 6, 1990.

After GE contracted with CAC as the indirect carrier for the equipment, CAC contracted with Compagnie Nationale de Transport Aeriens ("Air France") to act as the direct carrier to bring the equipment to Heathrow airport in London, England. The agreement between CAC and Air France was memorialized in Air France Air Waybill No. 057-4494-6134 (the "AF Air Waybill"), which was executed on September 7, 1990. CAC delivered the equipment to Air France on or about September 7, 1990.

CAC named CFI as the consignee on the AF Air Waybill, indicating that CFI would be acting as the "breakbulk agent" [FN1] for CAC in England. In actuality, CFI Ltd. acted as the breakbulk agent.

> FN1. *Webster's International Dictionary* defines "break bulk" as "destroy the entirety of a load, package, etc., as in beginning to unload, or in transferring in

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 129400  
1997 WL 129400 (S.D.N.Y.)  
**(Cite as: 1997 WL 129400 (S.D.N.Y.))**

Page 2

detail, as from boats to cars, or otherwise removing or taking away a part of it."

GE and CAC agreed that the shipment would be routed through Paris, because no direct flights to Heathrow were available. The cargo left John F. Kennedy International Airport on September 8, 1990 on Air France flight number 3216 and arrived at Orly Airport in Paris on September 9, 1990. The cargo was subsequently transported to London's Heathrow Airport on Air France flight number 4162 on September 9, 1990.

**\*2** When the shipment arrived at Heathrow, the crate appeared to be in good condition. The crate was then placed in Air France's cargo facility at the airport. However, when CFI Ltd. delivered the equipment to Portsmouth on or about September 13, 1990, a Plessey employee noticed that the equipment was damaged.

On August 21, 1992, GE filed this action against the Circle Defendants and Air France seeking compensation for the damaged equipment. Now GE seeks to amend its complaint to add a fourth defendant, CFI Ltd.

II. *Analysis*  
A. *The Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Citizens Bank of Clearwater v. Hunt,* 927 F.2d 707, 710 (2d Cir.1991). When deciding a motion for summary judgment, a court must "resolve all ambiguities and inferences ... in the light most favorable to the party opposing the motion." *United States v. One Tintoretto,* 691 F.2d 603, 606 (2d Cir.1982) (citations omitted).

The moving party bears the initial burden of demonstrating that there exists no material factual dispute and that he or she is entitled to judgment as a matter of law. *See Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). Motions for summary judgment must be denied if reasonable minds could differ as to the importance of the evidence and if " 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn....' " *Id.* (quoting *In re Japanese Elec. Prods. Antitrust Litigation,* 723 F.2d 238, 258 (3d Cir.1983) *rev'd on other grounds sub. nom., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

B. *The Limitation of Liability Defense*

1. *The Requirements of the Warsaw Convention*

The parties agree that the Circle Defendants' liability is governed by the Convention for the Unification of Certain Rules Relating to International Travel by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* 49 U.S.C. § 40105, commonly known as the Warsaw Convention (the "Convention").

Article 22(2) of the Convention limits a carrier's liability to $20.00 per kilogram, unless the shipper declares a greater value for the shipment and pays any required extra fee. GE neither declared a higher price for the cargo nor paid any extra fees for extra insurance. The Circle Defendants have invoked Article 22(2) as their Second Complete Affirmative Defense to GE's complaint.

Article 9 of the Convention precludes any limitation of liability if the goods are accepted without the issuance of an air waybill, or if the air waybill does not contain the particulars set out in Article 8. Article 8 of the Warsaw Convention requires, *inter alia,* that an air waybill set forth:
  **\*3** (a) The place and date of its execution;
  * * *
  (c) The agreed stopping places, providing that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right the alteration shall not have the effect of depriving the transportation of its international character;
  * * *
  (e) The name and address of the first carrier.

2. *Application to the CAC Air Waybill*

GE asserts that the CAC air waybill does not

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 129400
1997 WL 129400 (S.D.N.Y.)
(Cite as: 1997 WL 129400 (S.D.N.Y.))

Page 3

comply with the Convention, because it fails to include provisions declaring the place and date of execution of the waybill, the agreed stopping place, and the address of the first carrier. CAC maintains that the required information is included on the face of the CAC Air Waybill.

The Second Circuit has held that the language in sections (a), (c), and (e) of Article 8 is clear and unambiguous. *Maritime Insurance Co., Ltd. v. Emery Air Freight Corp.,* 983 F.2d 437, 440 (2d Cir.1993). When the language of the Convention is clear and unambiguous, the Supreme Court has held that it must be strictly construed. *Chan v. Korean Airlines, Ltd.,* 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989). However, this does not mean that the actual language included in Article 8 must be used on the face of the air waybill. The Second Circuit has stated that Article 9 requires only that the air waybill "contain ... particular[s]; it does not address the problem of slight deviations in the language." *Maritime,* 983 F.2d at 440.

In *Brink's Ltd. v. South African Airways,* 93 F.3d 1022 (2d Cir.1996), the Second Circuit noted that its decisions interpreting Articles 8 and 9 of the Convention yield three rules:

> First, if an air carrier *omits* from its air waybill any of the enumerated particulars of subsections (h) and (i) of Article 8, Article 9 operates to deprive the carrier of limited liability protection if the omitted particular is of commercial significance. Second, if an air carrier *omits* any other essential particular from its air waybill, Article 9 automatically deprives the air carrier of limited liability protection regardless of commercial significance. Third, if any air carrier includes an essential particular in its air waybill, but *deviates* in language or some other respect, the question of whether or not Article 9 deprives the air carrier of limited liability may be determined with the assistance of tradition methods of interpretation.

*Brink's Ltd. v. South African Airways,* 93 F.3d at 1033-34 (citations omitted; emphasis added).

a. *Place and Date of Execution*

In order for the Circle Defendants to avail themselves of limited liability, Article 9 mandates that the air waybill must *contain* the information required by Article 8, including the "place ... of [the air waybill's] execution." GE's argument that the CAC Air Waybill fails to satisfy Article 8(a)'s requirement that it set forth the place of execution amounts to a contention that the air waybill must set forth the phrase "place of execution." Nothing in Article 9 or the Convention requires this conclusion.

*4 The CAC Air Waybill satisfies the place of execution requirement. Next to the signature of the "issuing agent" in a box labeled "date of execution" is the date of the execution of the document--September 6, 1990. The air waybill was executed in CAC's office in Lawrence, New York. This address appears on the CAC Air Waybill underneath the words "name and address of issuing carrier/agent" and above the space for "date of execution." A reasonable person reading the CAC Air Waybill would understand that the issuer's address was the location at which the waybill was executed. *See Martin Marietta Corp. v. Harper Group,* 950 F.Supp. 1250, 1997 WL 4570 at *2 (93 Civ. 7313) (January 7, 1997).

b. *The Name of the First Carrier*

GE contends that the CAC Air Waybill violates Article 8(e) of the Convention, which requires that the waybill include the name and address of the "first carrier." The parties agree that CAC is a carrier, but GE asserts that Air France, not CAC, is the first carrier. Because the CAC Air Waybill does not contain Air France's address, GE argues the document is deficient and the Circle Defendants should not be allowed to limit their liability pursuant to Article 9 of the Convention.

Although the Convention must be strictly construed when its language is "reasonably susceptible of only one interpretation," *Buonocore v. Trans World Airlines,* 900 F.2d 8, 9-10 (2d Cir.1990), traditional methods of interpretation may be applied when the text of the treaty is unclear. *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989). Because the Convention does not define "first carrier" or even "carrier," traditional methods of interpretation must be used in order to construe the term "first carrier." Article 30 of the Convention states that a consignor has a right of action against the "first carrier." It appears from

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 129400  
1997 WL 129400 (S.D.N.Y.)  
**(Cite as: 1997 WL 129400 (S.D.N.Y.))**

Page 4

this language that Article 8(e)'s requirement that the "first carrier" be identified is designed to provide the consignor with information regarding which party it may sue should the shipment be damaged.

Defining CAC as a carrier comports with federal aviation law, which historically has recognized two types of carriers, direct and indirect. The Federal Aviation Act includes companies providing the type of services offered by CAC in its definition of the term air carrier." 49 *U.S.C.* § 40102(a)(2) (an air carrier is "a citizen ... undertaking by any means, directly or indirectly, to provide air transportation"); *see also DHL Corp. v. C.A.B.,* 584 F.2d 914, 915 (9th Cir.1978) ("direct air carriers are those who operate aircraft, while indirect air carriers hold out a transportation service to the public under which they utilize the services of a direct carrier for the actual transportation by air"). Whether CAC constitutes a direct or indirect carrier under federal law is irrelevant for purposes of the Convention, because both types of carriers may avail themselves of the limited liability protection of the Convention. *See Royal Ins. v. Amerford Air Cargo,* 654 F.Supp. 679, 682 (S.D.N.Y.1987); *Pan American World Airways, Inc. v. C.F. Airfreight. Inc.,* No. 89 Civ. 4182, 1990 WL 240947, at *1 (S.D.N.Y. Dec. 28, 1990) (concluding that air freight forwarder was a carrier within the meaning of the Convention). Given that (1) the Convention does not define "carrier," (2) CAC would be defined as an air carrier under federal law, and (3) the parties concede that CAC is an air carrier (*see, e.g.,* Plaintiff's Mem. p. 10: "Here, CAC as freight forwarder and indirect air carrier ..."), there is no reason not to treat CAC as an air carrier under the Convention.

*5 GE initially contracted with CAC, not Air France, to arrange for the transportation of the towed body mine detector. Furthermore, CAC consolidated and transported the plaintiff's cargo from its off-airport facility to Air France for carriage to London. Thus, CAC was chronologically the first carrier, with whom GE contracted to ship the merchandise, and Air France was a subsequent carrier, with whom CAC contracted for the actual transportation of the shipment. Accordingly, I hold that CAC is the "first carrier." *See Martin Marietta,* 950 F.Supp. 1250, 1997 WL 4570 at *6 (finding CAC to be first carrier in case with analogous facts to this one).

The CAC Air Waybill contains both the name and the address of CAC. Therefore, the CAC Air Waybill satisfies the requirements of Article 8(e) of the Convention, and the Circle Defendants are not barred from availing themselves of the Convention's limited liability provision on this ground. [FN2]

> FN2. I note that even if I were to find that Air France, and not CAC, was the first carrier, I would find that the incorporation by reference of the AF Air Waybill, which sets forth Air France's address, satisfies the place of execution requirement of Article 8(e) of the Convention.

c. *The Agreed Stopping Place*

GE contends that because the agreed stopping place, Paris, was omitted from the CAC Air Waybill, the Circle Defendants are barred from asserting a limitation of liability defense. Initially, I note that the parties dispute whether there were one or two separate Air France flight numbers listed on the copy of the CAC Air Waybill with which GE was presented. Two different versions of the CAC Air Waybill have been submitted to the court. One lists only one Air France flight number--"AF 3215/7 Sept." The other version of the CAC Air Waybill submitted to the court lists that Air France flight number and an additional Air France flight number that has been added by hand--"AF 4156." However, I find that in light of the Second Circuit's decision in *The Tai Ping Insurance Company. et al. v. Northwest Airlines, Inc.,* 94 F.3d 29 (2d Cir.1996), even if both flight numbers were listed, the listing of these flight numbers alone would not satisfy the requirement of Article 8(c) of the Convention, because (1) the CAC Air Waybill did not contain an explicit reference to Air France timetables, and (2) even if the CAC Air Waybill did include an explicit incorporation by reference of Air France timetables, the reference would have been ineffective in so much as it would not have led the shipper to the correct information because the Air France flights listed were not the actual flights on which the cargo was transported. *See The Tai Ping Insurance Company,* 94 F.3d at 32 (holding that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 129400
1997 WL 129400 (S.D.N.Y.)
(Cite as: 1997 WL 129400 (S.D.N.Y.))

Page 5

"incorporation by reference to readily available timetables satisfies Article 8(c)'s requirement ... only if the incorporation effectively reveals the agreed stopping places" and that "effective incorporation depends on the accuracy of other information in the waybill").

However, despite the fact that the listing of the flight numbers alone fails to satisfy the requirement of Article 8(c), I hold that the incorporation by reference of the AF Air Waybill, which listed the agreed stopping place, effectively satisfied the Article 8(c) requirement. Just beneath the flight numbers appears the line "MAWB 057-44946134." This reference to the AF Air Waybill on the CAC Air Waybill incorporates the AF Air Waybill by reference. The AF Air Waybill listed the airport of departure as "JFK INT., N.Y." Directly underneath this information is a box marked "to CDG," and beside that a box marked "to LHR." Finally, beneath that is a box that list the airport of destination as "LONDON." "CDG" and "LHR" are the internationally recognized symbols for Charles de Gaulle Airport in Paris and Heathrow Airport in London, respectively. Reference to the AF Air Waybill is a reasonable way to convey the information that cargo would stop in Paris. The AF Air Waybill provided GE with enough information to ascertain that the flight would stop in Paris and end at Heathrow Airport in London. The use of the initials "CDG" is an adequate indication of Paris as the agreed stopping place. See *Brink's Limited,* 93 F.3d at 1035 (holding that "JSA"--the international designation for Jan Smuts Airport--is sufficient indication of address of first carrier in satisfaction of Article 8(e) of the Convention). The fact that the cargo actually stopped at Orly Airport in Paris and not Charles De Gaulle Airport is irrelevant in light of the purpose of requiring that the agreed stopping places be listed on the air waybill. "[T]he participants to the Convention included the requirement that the waybill contain the contemplated stopping places so that the waybill itself would notify the shipper of the international character of the flight and, thus, the applicability of the Warsaw Convention." *The Tai Ping Insurance Company, Ltd.,* 94 F.3d at 32. Article 8(c) does not require that an air waybill indicate the specific airport at which the cargo would be stopping. It is sufficient that the initials "CDG" indicate that the agreed stopping place is Paris. [FN3]

FN3. *See also Arkwright Mutual Insurance Company v. KLM Royal Dutch Airlines,* No. 94 Civ. 0174, 1995 WL 491490, *5 (S.D.N.Y. Aug.17, 1995) (holding that drafters of the Convention did not intend incorrectness of particulars required by Article 8 to be basis for barring application of Article 22 liability limitation) (citing Elmar Giemulla et al., Warsaw Convention Article 9 ¶ 16 (Oct.1994) ("it must be noted that Article 9 only provides sanctions for the absence of certain particulars but disregards the correctness or incorrectness of the indications made")).

d. *The Timeliness of the Execution of the Air Waybill*

*6 GE also argues that the Circle Defendants should not be allowed to avail themselves of the Convention's provisions of limited liability because they accepted the shipment before the CAC Air Waybill was issued. GE relies on Article 9 of the Convention, which states that, "if the carrier accepts goods without an air waybill having been made out ... the carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability." GE contends that this provision requires that an air waybill be issued at or before the acceptance of the goods.

However, the facts of this case bring into question GE's definition of "accept," as used in Article 9. When GE delivered the goods to the CAC warehouse, at 10:02 p.m. on September 5, 1990, the warehouseman, who date-and time-stamped the Shipper's Letter of Instruction ("SLI"), failed to issue an air waybill that night. Instead, CAC agent Joan Varney issued the CAC Air Waybill the next morning when she came into work, after checking the cargo against the SLI. GE contends that the acceptance of the goods occurred when the CAC warehouseman date- and time-stamped the SLI (at 10:02 p.m. on September 5, 1990). CAC argues, however, that acceptance could not occur until someone had reviewed the SIL and verified the shipment's weight, dimensions, number of boxes, and conditions. [FN4]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 129400      Page 6
1997 WL 129400 (S.D.N.Y.)
**(Cite as: 1997 WL 129400 (S.D.N.Y.))**

> FN4. I note that CAC's interpretation would be in line with the procedure followed by an ocean carrier that takes in goods against a mate's receipt, comparable to an SLI, and subsequently issues a bill of lading before departure.

Although the court in *Maritime* wrote that the language of Article 9 is "clear," it also wrote that it is still permissible to look at the intentions behind the Convention when "Article 9 offers no clear guidance." *Maritime,* 983 F.2d. at 440. Additionally, when interpreting language of an article that is unclear, Courts should refrain from considering the article in isolation. Rather, they should read the article "in light of the other Articles and the overall purposes of the Convention." *Lisi v. Alitalia-Linee Aeree Italiane, S.p.A.,* 370 F.2d 508, 512 (2d Cir.) (rejecting a literal reading of Article 3(2)'s requirement of mere delivery of a ticket in favor of a reading consistent with the other Articles and the overall purpose of the Convention) *aff'd without opinion,* 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27 (1968).

The purpose of the provision at issue is to notify the shipper of the applicability of the Convention and its limited liability provisions. *See. e.g.,* Article 8(q). Whether GE received the CAC Air Waybill the night of September 6 or the morning of September 7, 1990 would not significantly affect its notice of the Convention's applicability. Either way, it had notice of the Convention's limited liability provision before the goods were transported. Furthermore, GE's long term Corporate Transportation Agreement with CAC specifically stated that liability was limited to $20.00 per kilo, which is consistent with Article 22(2) of the Convention.

When I consider Article 9 in light of the other articles in the Convention, I find that the drafters of the Convention did not include anywhere else in the Convention a requirement concerning the time of the execution of the air waybill. Article 5(2) of the Convention provides for sanctions when the document is absent, lost, or irregular, but does not specify the time requirements of its execution. To read an instantaneous time requirement into Article 9 would, therefore, go against the grain of other articles of the Convention.

*7 Additionally, defendants have pointed out that if the Convention delegates had intended "accepts" to mean "at the time when the package was handed over to the carrier," the delegates would have used that explicit language in Article 9 as they did in other articles of the Convention. Article 22(c), for example, provides that the consignor must make a special declaration of the package's value "at the time when the package was handed over to the carrier."

Lastly, GE's position on what constitutes acceptance for purposes of Article 9 does not comport with the practical realities of making and receiving deliveries, as demonstrated by the facts in this case. If I were to allow GE to evade the limited liability provisions of the Convention because of the time difference between the drop off of the goods and the issuance of the CAC Air Waybill, then the transactions between carriers and consignors would have to change. Specifically, in order for consignors not to have an improper incentive to deliver their goods at off-hours, carriers would be required to significantly increase their staffing or simply refuse shipments after working hours.

Accordingly, I find that, for purposes of Article 9, acceptance of the goods did not occur until the CAC agent arrived at work on September 6, 1990, checked the goods, and issued the Air Waybill. Any other holding would place commercially unfeasible restrictions on the behavior of shippers and carriers that, I think, neither would desire.

C. *GE's Motion to Amend the Complaint*

GE moves pursuant to Rule 15 of the Federal Rules of Civil Procedure for leave to amend the complaint to add a fourth defendant, CFI Ltd. Rule 15(a) states that "leave shall be freely given when justice so requires." In general, courts freely grant leave to amend where there is no undue delay, bad faith, failure to cure deficiencies or undue prejudice to the opposing party. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In this case, the Circle Defendants have not presented any evidence of bad faith, prejudice or delay on the part of the plaintiff. However, in deciding whether or

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 129400  
1997 WL 129400 (S.D.N.Y.)  
**(Cite as: 1997 WL 129400 (S.D.N.Y.))**

Page 7

not a plaintiff can be granted leave to amend, a court must also decide whether the amended pleading would survive a motion to dismiss.

Before I can grant GE's motion to amend its complaint, GE must make a prima facie showing that it could defeat a motion to dismiss based on lack of personal jurisdiction over CFI Ltd. *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). Given that discovery has been completed, the plaintiff's prima facie showing "must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.* Pleadings and affidavits, relied on in the absence of an evidentiary hearing, should be construed in favor of the plaintiff, and if there are any doubts, they should be resolved in favor of the plaintiff. *Deem v. Lockheed Corp.,* 749 F.Supp. 1230, 1233 (S.D.N.Y.1989).

*8 Under Article 28(2) of the Warsaw Convention, questions of procedure are "governed by the law of the court to which the case is submitted." GE asserts jurisdiction over CFI Ltd. on the basis of Section 301 of the New York Civil Practice Law and Rules, which has been construed to authorize the exercise of jurisdiction over a foreign corporation that "does business" in New York. *Ball,* 902 F.2d at 198.

It is uncontroverted that CAC and CFI do business in New York, and there is evidence to suggest that CFI Ltd. is closely affiliated with CAC and CFI as a subsidiary or in a similar capacity. A court may exercise jurisdiction over a foreign subsidiary or an incorporated arm because of the parent's actions in the forum. *See Palmieri v. Estefan,* 793 F.Supp. 1182, 1193 (S.D.N.Y.1992); *Ross v. Colorado Outward Bound School, Inc.,* 603 F.Supp. 306, 309 n. 2 (W.D.N.Y.1985).

However, the mere existence of a parent-subsidiary relationship is not enough to establish personal jurisdiction over CFI Ltd. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Co.,* 751 F.2d 117, 120 (2d Cir.1984). There has to be a strong connection between the two parties such that finding jurisdiction over one party is sufficient to find jurisdiction over the other. *See Ross,* 603 F.Supp. at 310. A court may assert personal jurisdiction over the subsidiary, (1) if the subsidiary is a local department of its parent, *Taca International Airlines, S.A. v. Rolls Royce of England, Ltd.,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1967); or (2) its New York parent corporation acts as its agent, *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). The overriding principle governing both the department and the agency theories is that of the fairness of requiring a foreign corporation to defend itself in New York when it derives some benefit from its affiliate's in-state activities. *Bulova Watch Co. v. K. Hatorri & Co.,* 508 F.Supp. 1322, 1334 (E.D.N.Y.1981).

i. *Mere Department*

Jurisdiction can be asserted over a foreign corporation if the parent's control over the subsidiary is "so complete that the subsidiary is, in fact, merely a department of the parent." *Lawford v. New York Life Ins. Co.,* 739 F.Supp. 906, 916 (S.D.N.Y.1990); *see also Palmieri,* 793 F.Supp. at 1187; *Ross,* 603 F.Supp. at 309-310.

The Second Circuit has used a four factor test to determine whether a subsidiary is a mere department of its parent: 1) common ownership, 2) financial dependency, 3) the degree to which the parent interferes with the subsidiary's selection and assignment of personnel and the extent to which there is a failure to observe corporate formalities; and 4) the parent's control of subsidiaries' marketing and operational policies. *Volkswagenwerk Aktiengesellschaft,* 751 F.2d at 120-2.

In this case, GE has presented no evidence regarding these factors and, accordingly, has failed to make a prima facie case showing that CFI Ltd. is a department of the Circle Defendants. I turn, therefore, to whether the Circle Defendants act as CFI Ltd's agent.

ii. *Agency*

*9 A court can assert jurisdiction over the foreign affiliate of a New York entity when the New York representative renders services on behalf of the foreign corporation that go beyond "mere

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 129400                                                                                         Page 8
1997 WL 129400 (S.D.N.Y.)
**(Cite as: 1997 WL 129400 (S.D.N.Y.))**

solicitation" and when those services are so important to the foreign entity, that if there were no New York representative, the foreign corporations would have to perform the equivalent services. *Gelfand v. Tanner Motor Tours. Ltd.,* 385 F.2d 116, 121 (2d Cir.1967) (interpreting a test established in *Frummer;* agent made and confirmed reservations, and performed other services), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968). Among the considerations that give rise to an inference of agency have been an express agency agreement and binding actions with respect to third parties on the foreign entity by the New York based entity. *Ball,* 902 F.2d at 194. However, GE need not show that there was a formal agency agreement between the Circle Defendants and CFI Ltd., *N.Y. Marine Managers, Inc. v. M.V. Topor-1,* 716 F.Supp. 783, 785 (S.D.N.Y.1989) or that the Circle Defendants exercised control over CFI Ltd., *Palmieri,* 793 F.Supp. at 1194.

GE has produced little evidence to suggest that the services CAC and CFI provided for CFI Ltd. were so important to CFI Ltd. that if CAC and CFI were not providing them, CFI Ltd. would have to perform these services itself. GE has not provided any evidence showing that CAC had the authority to make any commitments on CFI Ltd.'s behalf, except for designating CFI Ltd. as the "breakbulk agent" on the CAC Air Waybill. GE has also not shown that this agency designation occurred frequently, or that the breakbulk services were a significant portion of CFI Ltd.'s business.

Finally, GE has not asserted that the Circle Defendants' contracts with any third parties would be binding on CFI Ltd. Even if they had made such assertions, mere allegations are insufficient to make the necessary prima facie showing, after discovery has been conducted, to defeat a 12(b)(6) motion to dismiss for lack of personal jurisdiction. *Ball,* 902 F.2d at 199.

Because I find that GE has not made a prima facie showing that it could defeat a motion to dismiss the proposed amended complaint with respect to CFI Ltd. for lack of personal jurisdiction, I need not consider the Circle Defendants' other arguments in opposition to the proposed amendment.

### III. *Conclusion*

For the reasons set forth above, I deny GE's motion for an order striking the limitation of liability defenses asserted by the Circle Defendants, or alternatively for an order granting GE partial summary judgment on the Circle Defendants' limitation of liability defense; I grant the Circle Defendants' cross motion to limit its liability pursuant to Article 22 of the Warsaw Convention; and I deny GE's motion to amend its complaint to add CFI Ltd. as a defendant.

The parties should submit a proposed scheduling order by April 10, 1997 that provides for a ready trial date no later than August 1, 1997.

**\*10** SO ORDERED.

1997 WL 129400 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Exhibit B