# Exhibit A

JARROW FORMULAS, INC.
SUPERIOR NUTRITION
AND FORMULATION

1824 South Robertson Boulevard
Los Angeles, CA 90035-4317
(310) 204-6936
Toll Free (800) 726-0886
FAX (310) 204-2520



August 28, 1996

Norman H. Zivin, Esq.                    By UPS Next Day Air
COOPER & DUNHAM LLP
1185 Avenue of the Americas
New York, New York   10036

Jonathan A. Flatow, Esq.                 By UPS Next Day Air
WAKE, SEE, DIMES & BRYNICZKA
27 Imperial Ave., P.O. Box 777
Westport, CT   06881

Re:   INC vs. Horphag, etc., et al.

1) Plaintiff's Apparent Lack of Standing to Sue

2) Market Considerations -- Damage to Plaintiff and PSI

3) Warning re Bad Faith

4) OPC-85 Trademark:
   a) OPC-95 Is Non-Infringing
   b) The OPC-85 Trademark Is Not Valid
   c) OPC-95 Has Not Damaged OPC-85
   d) False Advertising, Mislabeling and Lanham Act Violations
   e) Offer to Compromise Trademark Issue

5) 360 Patent Is Invalid and Was Obtained by Fraudulent Means

6) Experts Support Jarrow Formulas' Position on 360 Patent

7) Intent to File Petition to PTO for Re-Examination of Patent;
   Offer to Settle and Demand for Damages

8) Postword:  Potential for Damage to Masquelier's Reputation

Flatow.doc

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page two

Dear Mssrs. Zivin and Flatow:

Considering the generally recognized antioxidant role of polyphenols, I was stunned by the filing of the lawsuit in the above matter. It seemed inconceivable that anyone could obtain a patent on the free radical scavenging (FRS) effect of "proanthocyanidins," even in 1985/1987. After several months of meticulous, hard-labored study, I have concluded that my initial reaction was correct, and further, that you and your clients have committed fraud and are embarked on a meritless, wilfull and malicious litigation.

I have twenty years of experience in this industry. I studied literature and history, one year at Long Beach City College and two and one-half years at UCLA. I am literate, intelligent, articulate and capable of reading, analyzing, understanding and interpreting the scientific literature touching the issues of this case. I have presented JFI's lengthy written analysis of the 360 patent to a number of world-renowned scientists: They all concur with my conclusions and have added their own unsolicited opinion that Masquelier, Schwitters and their attorneys have twisted and distorted the science in this matter to suit their own purposes.

After careful study and deliberation, Jarrow Formulas asserts the following reasons why plaintiff cannot and should not maintain its suit against JFI and offers to compromise in lieu of asserting its counterclaims:

1. <u>Plaintiff's Highly Questionable Standing to Sue</u>

I have read the papers of movants and your oppositions'. Plaintiff may or may not have bootstrapped an argument sufficient to survive the jurisdictional challenges. However, the risk to plaintiff (and his counsel) of being sued for malicious prosecution is rather evident.

It is questionable whether your client has the standing to sue anybody. Horphag owns at least half the patent: The patent states such. There is no evidence that Horphag is an expired licensee. The argument they are is more petty than ingenious. INC must prevail against Horphag in the concurrent French action in Bordeaux before JFI should have to answer any patent infringement charge. The U.S. suit is little more than an improper marketing tool, particularly considering the conduct of Schwitters and PSI at the 1996 Natural Foods Expo in Anaheim.

It is relevant to cite at this point the July 24, 1987 letter written by E. Garraud, Manager Director of SCIPA, to Charles Haimoff stating:

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page three

"We remind you that the U.S. patent [the 360] was taken jointly by...[SCIPA] and HORPHAG....

"Therefore, no settlement can be made with a single one of co-owners, lest (sic) the transaction risk being void.

"Please keep us informed on all of the proposals which may be made to you so that we may give over consent prior to any agreement, whatever it may be."

Jarrow Formulas knows of no rejection by Horphag of the terms of the July 24 letter. Both parties do appear to be bound. There is no reason that the term of said letter is anything other than the term of the patent itself, not even the April 29, 1985 research agreement.

This letter, coupled with certain allegations in the French lawsuit, militate against your lawsuit: Article L. 613-29E of the French Code of Intellectual Property specifies that the joint owner has a right of preemption (or right of first refusal) when the patent was jointly filed. Your suit is predicated on the allegation that with the expiration of the April 29, 1985 research agreement, somehow Horphag's ownership in the fruit of the contract -- the 360 patent -- also expired. Why performance of the terms of the 1985 contract did not earned Horphag co-ownership of the 360 for its entire life is not explained either. There is no evidence that ownership of the 360 and the term of the 1985 agreement are supposed to be concurrent. Further, if ownership of the 360 expired, why hasn't Masquelier registered a reassignment of the 360 with the PTO with himself as the sole assignee? Certainly, this should have been done before filing this ridiculous suit in Connecticut.

Thus, apparently, Mssrs. Zivin and Flatow have contrived this petty suit as little more than an improper means to confound in the American courts the clear threat to INC (Schwitters) and Masquelier due to the Bordeaux action. It strongly appears to Jarrow Formulas that the suit against it is as wrongly contrived as the patent suit against Traco (which was "licensed" by PSI) and the trademark suit against New Vision for using no more than "OPC."

2. Market Considerations

Your client runs a certain risk to its reputation and business in this lawsuit. The claims certainly appear to be vainglorious for the reasons stated herein. INC is suing companies that have good reputations and attendant goodwill in the marketplace. Schwitters is not going to win any points with

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page four

consumers or retailers with his suit. It is one thing for him to compete by
marketing the "Masquelier OPC." To attack well-regarded companies, after much
expenditure of energy and resources with no chance of recovery, your client is
likely to be left presenting himself to the marketplace as a pretty petty sort if not a
con artist considering the facts contained herein.

This is a small and sometimes folksy industry. Though the lawsuits that
occur are generally ignored by the retailers, there is something about a mass suit
under the present circumstances that is going to earn negative attention. I
suspect that apprising retailers of the defenses to this suit could result in a loss of
sales to your client. The fact that the co-owner of the patent opposes  the entire
suit (probably because Horphag and MW are aware of 360's inherent invalidity)
further compromises the reputation of your client.

Schwitters and his associates can only hurt their companies if they pursue
this matter. JFI is entitled to present its side to the retailers because of your
clients' conduct at Anaheim was outrageous, along with the gossip downloaded
into the internet by your cronies at V.M. Nutri/Life Plus in Arkansas. The suit has
been used non-stop as a sales promotion gimmick by your client(s) while they
disingenuously disclaim any desire to "make an issue of the lawsuit in the
marketplace." I called this contradiction to the attention of Schwitters and
LeFebvre in Anaheim as their salesgirl promoted via litigation claims: Character
assassination of their competitors. They "agreed" with me but did nothing to stop
it. Also, your client's MLM distributor, V.M. Nutri/Life Source, has jumped into the
fray with a March 1996 letter boasting of the suit, claiming sole legitimacy to
procyanidin products, and attempting to intimidate retailers with the threat of -- a
lawsuit....

V.M. Nutri and PSI have sent out letters to the industry that can only be
characterized as sleazy attacks against defendants including JFI. Under the
circumstances and given the laws protecting competition, JFI is seriously
considering sending a letter exposing Masquelier and Schwitter's defrauding of
the U.S. Patent and Trademark Office (PTO) concerning *both* the "OPC-85"
trademark and the 360 patent; the splenetic hatred between the patent holders
that has resulted in a petty, malicious suit; and the malicious conduct of plaintiff's
attorneys who *wilfully refuse* to discuss the merits of the case. Such a letter will
invite retailers to consider whether they should carry any products utilizing the so-
called OPC-85 Masquelier trademark;  that retailers can vote their dollars on the
conduct of your client(s). Certainly, this is what your own client(s) has done, but
JFI's letter would be more convincing.

Your clients' conduct is defaming Jarrow Formulas and other parties:
There is no legitimate patent to violate and JFI is not acting unethically, which is

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page five

what your clients have been telling people during and since Anaheim. JFI, in
addition to the aforesaid public letter, may have grounds for an action for
defamation against its proanthocyanidin product if not libel per se.

The most potent threat to your clients' business interest is the loss of both
the patent and trademark: Without the patent, *no one* needs Schwitters, including
PSI and V.M. Nutri. The *only* asset left will be the use of Masquelier's name.
How much of a premium will that be worth when the patent is stripped --
particularly if it is found (as it should be) that Masquelier defrauded the patent
office and Schwitters and Zivin defrauded the trademark office.

3. <u>Warning re Bad faith: Liability of Plaintiffs and Their Counsel</u>

Mr. Flatow and Mr. Zivin, read this section *carefully.* I'm not bluffing.
Call my lawyers, Mr. Neal T. Wiener, 310/276-2889 or Mr. P. Scott Polisky,
212/206-7283, and see whether I bluff about such things. In the end, I'll go
after you: Not just Rule 11 but a suit for malicious prosecution and
abuse of process. I think lawyers who act in bad faith ought to be held liable for
their conduct. It's called a *quid pro quo.* If more litigants were like me, lawyers
would be a lot more careful. And don't take this as a challenge to
ignore me and think you'll walk away afterwards: You won't: I'll sue *you* along
with Schwitters, Masquelier and probably PSI. Mr. Zivin already hung up the
phone on Mr. Polisky stating, "I won't discuss the merits of this case on the phone
with you. Just answer the complaint." I really do sue lawyers who act in bad
faith. The detail of this mailing should give you pause to consider that since I'm
willing to personally prepare such an in-depth analysis, I certainly would not
hesitate to sue both of you.

Further, the cavalier attitude and bad faith of Bert Schwitters is evident
from his testimony in deposition wherein he stated he isn't the sort of person to let
litigation disturb him. This coupled with his evasion of service and refusal to
answer Horphag's complaint in Bordeaux betray Schwitters to be a scofflaw and a
bully. If JFI sues him, he will be summoned by publication in Washington, D.C., if
necessary and then after judgement I will seek assets in the form of any shipment
or earned royalty in the U.S. Schwitters will not succeed in his gamesmanship
with Jarrow Formulas. He will pay his bills or be driven out of business in the
States.

It is hereby demanded that you respond, in writing and with specificity to
JFI's corporate counsel, Mssrs. Wiener and/or Polisky, within ten (10) days of the
date of this letter regarding the legal issues and scientific studies addressed
herein including the 360 Addendum and its 407 Appendix. Failure to do so shall
be deemed willful, deliberate, wanton and malicious conduct in that you will have

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page six

deliberately refused to do due diligence and have pursued a meritless suit for
improper purposes. You are receiving hereby sufficient detail in refutation of the
suit. It is now your responsibility to hire qualified experts to evaluate the 360
patent and then proceed in good faith according to the scientific data and its
reasonable interpretation. "Reasonable interpretation" of scientific data is not as
subjective as the two of you would like to pretend. If your response to JFI's
patent refutation is recalcitrance or flimflam and pettifoggery, the legal response
of JFI will be immediate and relentless.

    In either event, JFI is proceeding forthwith with its own Petition in the U.S.
PTO to Re-Examine the 360 and such other legal actions as we deem
appropriate and necessary to terminate this legal charade. Therefore, JFI
demands that you withdraw the complaint against it within ten (10) days of the
date hereof.

    Notwithstanding the above assertions, Jarrow Formulas turns now to the
substance—or lack of it—of this suit:

   4. OPC-85 Trademark

      a) OPC-95 Is Non-Infringing

          Jarrow Formulas' former brand name OPC-95 is different than your
client's OPC-85 and no consumer or retailer would be confused between the two,
the difference being obvious. In order to establish its case, INC would have to do
a survey and the results would be foregone: OPC-95 is a higher strength,
different potency than OPC-85 and neither name evokes an ineluctable
connotation of Masquelier: OPC-95 does not confer any secondary meaning
regarding Masquelier. The essential, recognized commodity in the marketplace
are the terms "oligomeric proanthocyanidins" and its acronym "OPC" and,
secondarily, "proanthocyanidin" without "oligomer." In commercial terms,
"Masquelier" is of minor significance. Vanities aside, "Masquelier" in the retail
marketplace is a virtual non-entity. Whatever cultish nonsense in the multi-level
marketing (MLM) arena is being bruited about "Masquelier" should be considered
only in light of its source.

      b) The OPC-85 Trademark Is Not Valid

          The term OPC is merely an acronym for the recognized chemical term
oligoproanthocyanidins. JFI has been informed that attorney Norman Zivin had
told Schwitters at a meeting that "OPC" by itself could not be trademarked. It is
self-evidently ridiculous to claim infringement against everything that contains the

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page seven

acronym OPC. "OPC" is essentially generic and has become crowded art. Its use in the literature is rampant. Nevertheless, INC has sued New Visions for nothing more than just using "OPC." Not only will the statements of Zivin against Schwitters be held against INC in this regard, but the very act of suing New Vision in this regard compromises the supposed uniqueness of OPC-85. Indeed, on the right panel of their bottle states: **O**ligomeric **P**roantho**C**yanidin which belies the claim to the PTO that the mark has no significance in the industry. In fact, scientific usage of both OPC and PCO was already in vogue.

Likewise, the number "85" refers to the potency of the product -- which is another reason why the trademark is invalid. The so-called mark is completely generic: OPC stands for oligoproanthocyanidin and 85 represents the putative percentage of OPCs. The fact that the product claims to be "standardized" also leads one to assume that the 85 does signify a percentage. Further, your clients distributed in Anaheim *after* filing this lawsuit a sheet which states:

The technology to extract practically pure flavanol compounds from plant materials was perfected by Masquelier over many years of hard work. The ability to isolate proanthocyanidins ("OPC") from a plant source can only be achieved through a precise scientific extraction process which automatically results in a standardized raw material potency of 85% or better of "OPC" and its precursors. "OPC-85™" is the current term coined by Masquelier to represent the "oligomeric proanthocyanidin (OPC)" potency standard.

The only blurring of the 85% as being "OPC and its precursors" rather than solely the amount of OPCs came well after filing for the trademark. When INC began to sell a higher OPC product than pine bark, i.e., grape seed, the explanation for the 85 became more convoluted (with number games going up to an equally inaccurate 98% polyphenols), but the 85 always related to the percentage of OPCs. The phrase "and its [OPC] precursors" was added only recently due to competitive analyses exposing your clients' fraudulent conduct -- and, apparently, to cover up conduct by your clients in conflict with this suit. (See section 3d *infra*.)

These facts are in contradiction to Zivin's claim to the US Patent & Trademark Office that the mark has no meaning within the industry where it would be used and the name was nothing more than INC's trade name. Such initials and numbers are typical of the industry. (See section 3d *infra*.) This misrepresentation was fraudulent and shall become one basis for JFI claiming costs, legal fees and other damages, and it is placing INC's licensees at risk of being sued by JFI.

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page eight

c) <u>Jarrow's Former Brand Name OPC-95 Has Not Damaged OPC-85 and
Plaintiff Has Unclean Hands</u>

Jarrow Formulas hereby demands that you and your client assess what
damage -- if any -- the brand name OPC-95 has done to your client. JFI asserts
absolutely none. Without damages, your client has no basis for suit. Your client
must concede that OPC-95 has a competitive advantage over "85" only because
it is a higher number which is a reflection of Jarrow's superior product quality. JFI
simply offers a higher potency product at a lower cost. Further, as aforestated,
your client's mark has secondary meaning *only* in the form of "Masquelier's OPC-
85." OPC-95 does not present itself as "Masquelier's OPC-95." The public has
no perception that OPC-95 is Masquelier's product. Jarrow Formulas is in
possession of a letter from PSI's Gary Senecal which cites Masquelier refusing to
let his product be sold to Traco Labs simply as "OPC-85" because, the letter
states, Masquelier believes OPC-85 is meaningless unless used in conjunction
with his name. Therefore, your client cannot claim confusion, nor therefore,
damages.

Your client also cannot prove damages if only because of its incompetent
marketing and distribution practices including requiring pre-payment or COD from
retailers in addition to a lack of efficient, convenient distribution and excessive
pricing. On that score, INC could be suffering loss of business due to price
gouging by demanding a premium ($1,300/kg.) for an inferior product.

Additionally, your clients sell in the U.S. almost exclusively through the
MLM channel. To claim they have been injured by the retail channel would
require substantial proofs which would not be possible. Most of the MLM
business is based on extravagant hype -- like the lawsuit itself.

Your client is also barred from claiming damages due to unclean hands. In
addition to the invalidity of the registration (section 3b, *supra.*), the mark is
fraudulent, misleading and unfair competition (section 3d following).

d) <u>False Advertising, Mislabeling and Lanham Act Violations by Plaintiff(s)</u>

In addition to the issues contained in sections 3a), 3b), and 3c) above,
during my conversation in Anaheim with Richard LeFebvre of Primary Source,
Inc., (PSI) licensee of the OPC-85 trademark, he refuted—scornfully—the alleged
95% OPC claim of Indena but he admitted that his own product was less in
strength than Indena's. (Indena's analysis actually states 95% polyphenols.) In
fact, it is PSI's own 85% claim that is untrue. Lefebvre later admitted to me on
the phone the week of April 13 that the OPC content of his product is between

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page nine

50-60%. Any claim by Schwitters of trademark damage is compromised. (Pine bark contains substantially less OPCs than does grape pip extract, but for the record, PSI's grape seed extract is still considerably less potent in OPCs -- and therefore of substantially lower value to the consumer -- than Indena's product.)

Even without blending the pine bark into the grape seed extract, PSI's lesser potency products are not true to claim. The OPC-85% issue aside, your client(s) mislabels its products in other ways as well:

1. The phrase "Elemental OPC antioxidant...50 mg" is misleading. Does it mean 50mg. of net OPCs, or 50 mg. of total extract, or 50 mg. of total polyphenols?

2. The phrase "Masquelier's OPC-85™ is 90% active principles: proanthocyanidins (OPC) and a balance of OPC precursors" is misleading because it clearly implies that the product is 85% OPCs and 5% precursors which is untrue. (In another sheet, your clients state: "The extract guarantees a minimum polyphenol activity level of 98%...."

I informed LeFebvre that the OPC-85 claim is misleading to the consumer and retailer, is mislabeled, falsely advertised and should be barred from use, registered or not. I informed Mr. LeFebvre that I could—and would—sue PSI under the Lanham Act if compelled to do so. Mr. LeFebvre insisted I call his attorney, Mr. Zivin, and hung up the phone. (It was comical to hear Mr. LeFebvre defend his use of a misleading trade name by asserting its registered status. Novel idea that one: Register fraud and it's legal!). See exhibit 1 hereto, an analysis of one of "Masquelier's OPC-85" products showing a net proanthocyanidin content of only 51.2%.

Enclosed as exhibit 2 is copy of ad from PSI. Note the language:

"OPC-85/grape seed extract and OPC-85/pine bark extract are standardized at the minimum of 92% and 85% proanthocyanidin content respectively for maximum antioxidant activity."

Enclosed as exhibit 3 is copy of a February 20, 1996 analysis from Plant Bioactives of PSI's blended grape seed plus pine bark and grapeseed only products showing a proanthocyanidin content of 56.5% and 60.6% respectively. The OPC-85 mark is clearly intended to deceive the consumer. Mr. LeFebvre's subsequent letter to me asserting his born-again repudiation of the 85 as referring to a percentage is self-serving and born out of pure panic that JFI will sue his company. His claim that OPC-85 refers to "nothing" will not be borne out in discovery.

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page ten

As would be proven through discovery and at trial, it is the custom and trade in the industry to use numbers in product names to be representative of a milligrammage (e.g., E-400 [international units of activity]; C-1,000 [1,000 mg.]; Amino 1,000 [1 gm. tablets]; Carnitine 500 [500 mg.]; etc.), or of a percentage of the active's potency (e.g., PC-55 [55% phosphatidylcholine]; or OPC-85.... Though the former use is more prevalent, the latter form has substantial precedent. What is *not* typical of the industry are numbers without specific correlation or meaning other than a sound effect. The products in the industry typically have a scientific basis -- as Masquelier himself would agree -- and even the "fanciful" term Pycnogenol is rooted in specific Greek words to allude to the condensed molecules being so clepped. It is incredulous for plaintiff to claim that OPC-85 is "trivial," that is without any significance other than an artful descriptor. The 85 is as fraught with meaning as the well-freighted OPC. To claim OPC itself as platintiff's own is pure hubris.

Another false ad claim of your clients* is that Masquelier "discovered" or "found" OPCs.

The historical first extraction by Rosenheim in 1920 (*Biochem J*, 14:821 *et seq.*) is significant because your client's literature falsely implies, if not states, that Masquelier discovered OPCs:

> "In 1947, while working on his Ph.D. thesis, Jack Masquelier found the colorless OPCs, while studying the red pigments in peanut skins."

Apparently, Masquelier discovered Spanish peanut skins contain proantho-cyanidins — already known substances — but he certainly did not discover PACs. PSI and Life Source are falsely claiming in their advertisements that Masquelier made this discovery. Masquelier did not characterize these molecules, nor analyze their biosynthetic pathway, nor is he responsible for any of the scientific nomenclature. ("Pycnogenol" is not a recognized scientific term by IUPAC.) Masquelier did not "develop the science" of proanthocyanidins as much as he has plagarized at worst and popularized at best. Said false claims are unfair trade practices and violate the federal Lanham Act and other laws.

---

*Zivin's position that PSI is not his client is likewise questionable: There is at least an agency relationship between INC and PSI, and Zivin's latter day disavowal of PSI as a client will do little more than help fuel a malicious prosecution suit against him.

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page eleven

The book written by Schwitters "OPCs in Practice" also constitutes unfair
trade practices.  It has been widely distributed by INC and PSI without charge and
the book contains false claims, particularly on behalf of Masquelier, all of which
constitute unfair competition.

Another example of your client's false advertising -- and Masquelier's
plagarism combined with slipshod science -- is the claim that pine bark OPCs are
50 times more powerful antioxidants than Vitamin E.  The study was Japanese
(not Masquelier's), and the materials used were from green tea and persimmons,
not pine bark.  Also, only one of six OPCs studied had this effect and only against
one type of free radical.  (Uchida S *et al.*, 1987 *Med Sci Res*, 15:831-2).

Additionally, the patent itself is fraudulent and will constitute the basis of an
additional claim for unfair competition, particularly against Jack Masquelier.

The counterclaims available to JFI will negate any trademark infringement
alleged by INC:  There is no basis for damages in connection with your illegally
labeled product.  I am quite serious about filing such a counterclaim.  As far as
the market is concerned, JFI will be credited for solving the problem while
Schwitters, PSI and Life Plus will appear malicious and dishonest.  If plaintiff fails
to withdraw its trademark claim against Jarrow Formulas, then JFI will be
compelled to take the appropriate action.

In the meantime, Jarrow Formulas demands that your clients and their
licensees, each and all of them, immediately cease and permanently desist from
using, advertising, labeling or selling the OPC-85 mark as being false, misleading,
deceptive and unfair competition under the Lanham Act and other applicable law.

e)  Offer of Compromise re Trademark Issue

Notwithstanding the above sections 3a, 3b, 3c, and 3d, JFI is causing
its labeling to be changed.  See enclosed exhibit 4.  JFI would have done this
without the impetus of suit if counsel for INC had, as claimed in paragraph 31 of
the suit, actually written to JFI.  The issue is easily remedied and so petty as to
be unworthy of suit, particularly when INC and its licensees cannot prove
damages and are falsely advertising and mislabeling.  If, however, the trademark
action is not dropped JFI will proceed with legal action in addition to the present
counterclaim for invalidity.

The bottom line on your trademark claim (OPC-85 vs. OPC-95) is that it is
so supercilious as to be embarassing.  Don't you people have better things to do
than act like spoiled children?  Have you no sense of shame?  No perspective on

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page twelve

life? Life is too short for such bathetic behavior. Gentlemen, Yom Kippur is around the corner and this is what you're going to tell G-d? You are redeeming the world with drivel? The money, the time could go to tz'dakah. It could even go to Vegas for what the trademark complaint is worth. Please, gentlemen...get a life. I don't want to have to countersue over such utter rot. Talk to a rabbi, a priest, a therapist. Anyone. Just get a grip.

5. Claim of Plaintiff re 360 Patent Is Invalid and Was Obtained by Fraudulent Means

See "Patent Addendum re 360 Patent" and "Appendix re Patent No. 3,436,407," both attached hereto and made a part hereof by reference along with selected exhibits.

The substantial addendum and appendix to this letter speak for themselves. For brevity, however, the following is redacted.

To summarize what was known about flavanols by 1985:

1. OPCs were discovered in 1920 by Rosenheim.

2. The structure of OPCs was elucidated by Weinge (Germany) by 1962.

3. By the 1960s if not before, it was understood that PACs are condensations of flavan-3-ols (catechin, epicatechin) and flavan-3,4-diols (leucoanthocyanidins), though the latter were also known to be PACs as well.

4. Masquelier's 1969 407 patent uses the term hydroxyflavan 3,4-diols to describe the entire class of flavanols from monomers and PACs through condensed tannins. The 407 identifies the molecules of interest to be "in particular" the monomers up to the pentamers. 16 years before filing the 360, the 407 in 1969, describes flavanols as a single class with a basically common structure, particularly hydroxylated B rings.

5. The commonality of structure and function of the hydroxy-flavan 3,4-diols (from monomers through *all* polymer linkages)

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page thirteen

described in the 407 in 1969 is abandoned in the 1987 360 patent when the term "proanthocyanidin" is used exclusively to deflect attention from the monomers and to avoid the well-proven activity of FRS by the monomers. This is particularly significant because the 407 describes the monomers and proanthocyanidins as having a "close chemical link."

6. The 407 patent claims a method to extract hydroxyflavan 3,4-diols and their use, particularly "PACs" to treat abnormal capillary fragility and permeability, which use was known by 1942 (Lavollay). The 1987 360 patent constitutes a fraudulent extension of the 1969 407 patent in that the 360 merely claims discovery of an already-known mechanism: free radical scavenging by PACs (and monomers) and otherwise duplicates the 407.

7. It was reiterated in 1962 (Weinge) and 1977 (Pratt) from still earlier work that hydroxylation of the B ring determines the antioxidant activity including FRS of flavans and flavanols. It was published in Russia (Medovar; 1967) that the antioxidant activity of *any* flavonoid, which nomenclature includes the flavanols, could be predicted from it molecular structure.

8. It was known that flavans and flavanols have a hydroxylated B ring which has FRS activity. It is also stated in Masquelier's 1969 407 patent that *all* hydroxyflavan 3,4-diols have B rings.

9. It was known that monomers were free radical scavengers due to their B rings and that the condensation of monomers *increases* hydroxylation of the B ring. Therefore, PACs were known to have multiple OH groups on their B rings and would be expected to maintain FRS activity.

10. PACs were identified as the active component in hawthorn products already on the market. Hawthorn was and is used to treat circulatory problems.

11. Nozaki (1984) specifically demonstrated FRS effects against lipoperoxides by PACs from grape seeds. The 360 references "lipid peroxidation" in relation to carcinogenesis at 5:51.

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page fourteen

12. The monomers and PACs were known to be bioavailable.

13. PACs were known to be cardioprotective and suspected to have anti-tumor effects.

14. Masquelier failed to disclose to the Patent Office -- if not consciously concealed -- all of the above.

Plaintiff's counsel Zivin claims in his opposition to the motions to dismiss on the grounds of lack of jurisdiction that the preceding proceeding in New York had entered a *judgment* validating the 360 patent. Zivin's claim is *patently* untrue as Judge Platt had merely approved a settlement agreement between Consac (County Life Vitamins) and MW/Horphag wherein Consac acknowledges -- for its own reasons -- the validity of the patent. Consac's acknowledgement of the 360 patent was no more than a settlement niceity necessitated by Consac's counterclaim against the patent and the truth of which counterclaim the supervising court had *no* proprietory knowledge nor any abiding interest at the time. Zivin's misrepresentation of the court's approval of a settlement as being an adjudication of and judgment on the issue would be raised in any action for abuse of process.

6. Experts Support Jarrow Formulas' Position on 360 Patent

We have already engaged Chithan Kandaswami, Ph.D., as an expert witness. He is a recognized authority in the field. I have also reviewed the 360 claims and a draft of the accompanying 360 Addendum and 407 Appendix with several of the world's leading authorities in the field:

Pierre Braquet, Ph.D. (Paris)
Wolf Bors, Ph.D. (Munich)
Piergiogio Pietta, Ph.D. (Milan)

All three experts agree without reservation that the claims of the 360 are utterly without merit, and further, they are all willing to be affiants, if not witnesses, against Masquelier. I visited all three gentlemen in Europe in May. Interestingly, Dr. Braquet is a former student of Masquelier -- and one of the seminal researchers in the field of radical scavenging by polyphenols. You, Masquelier and Schwitters are in no position to refute such highly esteemed scientists. Your position is hopeless. Litigation will only drag out a foregone conclusion.

You are no longer in a position to claim that you or Schwitters should be permitted to rely on Masquelier and be considered to have acted in good faith for the following reasons:

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page fifteen

1) The pending (anonymous) petition to re-examine the 360
   has been accepted by the PTO;

2) The contents of the accompanying 360 Addendum, 407
   Appendix and related exhibits;

3) The representations in this letter that Dr. Kandaswami and
   other experts are either engaged or willing to be so engaged;
   and

4) Masquelier himself stands accused of inequitable conduct in
   that it is herein alleged he defrauded the PTO.

For these reasons you and Schwitters should not be complacent; rather, it is your due diligence duty to engage *independent* expertise to evaluate the materials herewith as well as the pending PTO reexamination. Failure to do so shall surely constitute grounds for suit.

    Masquelier, Schwitters, Zivin and PSI are deemed by Jarrow Formulas to have conspired to file a meritless and malicious suit while your clients have conspired to violate the Lanham Act if not RICO as well. Flatow's exposure, if he continues to participate in this farce, will be abuse of process.

   7. <u>Offer to Settle and Demand for Damages</u>

    Having authored "OPCs in Practice," it is impossible to believe that Schwitters is unaware of both the mislabeling issue that renders the OPC-85 mark a moot issue or the 360 patent's prior art problems. Certainly, Schwitters understands the points raised herein. He, too, in Anaheim discussed with me the actual OPC contents of his products and that they are approximately 30% lower than claim. The fact that he did so somewhat nervously is because he understands the implications of "unclean hands." The perfidy and science charlatanism of Jack Masquelier is self-evident. As for plaintiff's (singular?!) counsel, they have overly artfully bootstrapped a petty, nasty piece of business. With a shameless disregard for their duty to do due diligence; a cynical disdain for intellectual integrity; and a coarse rejection of truth, fairplay or ethics, plaintiff's counsel have ruthlessly refused to discuss the merits -- or lack thereof -- of this case.

    Though JFI would prefer to avoid further litigation, we will not shrink from taking rigorous action. The length, vigor and detail of this presentation should convince you of Jarrow Formula's earnestness in following through. Genericness and prior art as to the trademark and patent, labeling fraud, false advertising,

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page sixteen

fraud against the U.S. PTO, double-patenting, Sherman Act and RICO violations, and other conspiracy charges are powerful defenses and *counterclaims* for your clients to overcome. Your clients would better benefit from good marketing rather than the rigors of an ugly lawsuit that they will lose.

Bear in mind that there are a number of other law firms that will follow our lead in these areas.

I look forward to a more thoughtful response. If that response is to continue the suit, I will think your clients to have been poorly counselled or their own conclusions venal and rash. JFI hopes that you and your clients will wisely reconsider further engaging JFI as a litigant and turn to a more productive enterprise.

You and your clients have wasted well in excess of 250 hours of my time at the reasonable rate of $200 per hour for a corporate CEO of my caliber. Having extensively researched the patent and documented its fraudulent nature, Jarrow Formulas hereby demands immediate dismissal of the suit against this corporation and reimbursement of all its legal fees. If JFI is not dismissed within ten (10) days of the date hereof, JFI will sue INC and its cohorts for Lanham Act violations, file motions for summary judgment to invalidate the patent and trademark, and then sue at the conclusion all parties involved -- including plaintiff's lawyers and Jack Masquelier -- for conspiracy, malicious prosecution and abuse of process. In addition, the issue of Sherman Act violations is self-evident. The fraudulent obtaining of the 360 in order to extend the temporary monopoly granted by the 407 chilled entry into the marketplace by competitors and thus damaged them, including JFI. Masquelier, Schwitters and their patent and litigation counsel could be subject to treble damages.

As it is, you have wasted in excess of $50,000 worth of my time as CEO of JFI. I will not tolerate any further nonsense.

8. Postword: Potential for Damage to Masquelier's Reputation.

Some closing thoughts: Not one single recognized expert in polyphenols other than Masquelier is likely to testify on plaintiff's behalf. The expert opinions I have obtained so far agree that Masquelier's patent misrepresents to the U.S. PTO the state of the science in 1985. The lack of scientific experts for plaintiff's position will burden his case, but it will also reflect rather poorly on Dr. Masquelier.

Masquelier is an older gentleman who might want to preserve his fame and dignity (however earned). In these cynical times, he is more likely to be

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page seventeen

remembered as the man who failed to disclose prior art on monomers, dimers, oligomers, existing OPC-containing preparations, the state-of-the art on molecular structure and its effect on FRS -- all in favor of a red herring argument against bioflavonoids. He will be remembered as the man who scammed the U.S. Patent Office with a phony study using an expired bioflavonoid product while absenting reams of data on flavanol compounds including Nozaki's 1984 study demonstrating FRS by grapeseed PACs. He will be remembered as the man who allowed others to give him undue credit for Roseheim's work in discovering OPCs in 1920 when Masquelier had been just born and credit for the work of Weinges and others. He will be remembered as the man who let his name be used in connection with "OPC-85" when the product is not at all 85%. He will be remembered as the man who, in an act of hubris, set in motion a malicious, meritless action which brought down his own reputation.

And Mr. Schwitters will be remembered as the undoing of his own mentor.

Don't push me, gentlemen. I push back.

Sincerely,

Jarrow L. Rogovin
President

JLR:hi

cc:    Neal T. Wiener, Esq., corporate counsel for JFI,
              9100 Wilshire, 700 West, Beverly Hills, CA  90212
       P. Scott Polisky, Esq., corporate counsel for JFI,
              450 W. 24th St., #2F, New York, NY  10011
       Brian Poissant, Esq., Pennie & Edmonds
       Tom Rowan, Esq., Pennie & Edmonds
       Indena, U.S.A, Inc.; Indena, S.P.A.
       Traco Labs, Inc.
       Richard LeFebvre, Gary Senecal Primary Source, Inc.
       Life Plus/VM Nutri, Inc.
       M.W. International, Inc.
       Jack Masquelier, Ph.D.
       All defendants' counsel

Section 5:  PATENT ADDENDUM

Date:  28 August 1996

Claims re U.S. Patent No. 4,698,360 ("the 360 Patent")


Introduction

The 360 patent makes certain background statements and asserts thereon its claim of discovery of free radical scavaging by proanthocyanidins (PACs).  The essential statements are:


Title:  "Plant Extract with a Proanthocyanidins Content as Therapeutic

Agent Having Radical Scavenger Effect and Use Thereof."

It will be essentially a question hereafter of a pine bark extract, but

this expression should be considered as covering "any plant extract

with a proanthocyanidins content."

See Patent 1.31-35


I.      Radical Scavenger Effect (R.S.E.) of Proanthocyanidins.  **The

R.S.E. has never been claimed in favor of proanthocyanidins.

Although proanthocyanidins are polyphenols, it was not at all

evident that they are endowed with R.S.E., whose intensity varies

within wide limits depending on the molecular structure.**

See Patent 2.20-27.  (Emphasis added.)

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page two

IV.  A Therapeutical Indication

On this [R.S.E] are based the new indication claimed for such

plant extracts.

1.  Cerebral involution troubles in aged people...ALZHEIMER's....

2.  Hypoxia following atherosclerosis....

3.  Tumor promotion process....

4.  Any illness generated by free radicals....

See Patent 5.1-61.


The patent then claims:

1.  A method for preventing and fighting the harmful biological

effects of free radicals in a warm blood animals (sic), including

a human being, comprising administering the extracted

proanthocyanidin content from a plant containing same, said

extract having a bioavailable radical scavenger effect, to an

animal exposed to said free radical in an amount effective

to reduce said harmful free radical effect, said extracted

proanthocyanidin content being incorporated into a

pharmaceutically acceptable medicament.

See Patent 6.66-7.7.

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page three

None of said claims was novel nor discovered by Masquelier.  The

360 suffers from prior art and obviousness.


There are three basic claims made in the patent:

a) FRS by PACs,

b) bioavailability of PACs, and

c) using a bioavailable FRS, i.e., PACs, to treat diseases.

The refutations to the patents claims lie in five categories:

a) The free radical scavenging effect was known to be a

   function predictable from the molecular structure of the

   polyphenol, and the structure of PACs had already

   been elucidated.

b) Catechins, the monomeric flavan building blocks of

   proanthocyanidolic flavanols, were already demonstrated

   to be FRSs, thus substantiating the functionality of the

   molecular structure of this class of compounds.  The conden-

   sation of monomers -- which creates PACs -- increases the

   hydroxylation (and thereby increases the FRS capacity)

   of the PAC.  The enhancement of FRS due to condensation and

   increased hydroxylation is an expected result.

c) Flavanols yielding red on a Bate-Smith reaction had

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page four

            demonstrated lipophilic radical quenching capability which

            constitutes FRS by a PAC.

d)  The extant bioavailability studies were indicative of FRS

       due to the modes of efficacy that were described.

e)  The 360 Patent is an unlawful reiteration of the claims made in

       U.S. Patent 3,436,407.  (See 407 Appendix hereto.)

The patent claims are analyzed and refuted as follows:

1.  Re:  Claim That Proanthocyanidins (PACs) Are Antioxidants Like
    Other Polyphenols but Uniquely Endowed with Free Radical
    Scavenging Activity

       To repeat, the 360 states:

            **The R.S.E. has never been claimed in favor of**

            **proanthocyanidins.  Although proanthocyanidins are**

            **polyphenols, it was not at all evident that they**

            **[PACs] are endowed with R.S.E., whose [polyphenols?]**

            **intensity varies within wide limits depending on the**

            **molecular structure.**

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page five

The tortured language of the above sentence seems contrived to create confusion. If Masquelier's "whose intensity varies" means PACs, the entire claim for FRS by PACs is internally contradicted. By default, then, the twisted syntax of "whose intensity varies" means it is polyphenols that vary in FRS intensity. Not only the sentence begs clarification: So does the status of the FRS "intensity" of the various polyphenols -- and *that* clarification Masquelier assiduously eschews throughout the entire patent file.

Masquelier alludes in the above quote to the seeming "chaos" of polyphenols -- a class composed of hundreds of thousands of greatly diversified structures. While polyphenols represent a wide variety of structures, flavanols -- the class of polyphenols to which PACs belong -- are characterized by their distinct uniformity in possessing a radical scavenging structure: the hydroxylated B ring. Masquelier cleverly acknowledges that RSE is structure-dependent and correctly describes *polyphenols* as widely divergent in the "intensity" of their radical scavenging, but he clearly evades the issue of the flavanolic structure itself. Masquelier makes two fundamental errors: He omits any discussion of prior art on the FRS function of flavanolic structures, and second, makes a statement defective on its face: That RSE had never been claimed for proanthocyanidins: The claim *had* been made and it was simply a matter of

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page six

nomenclature, i.e., whether a synonym, in effect, had been used, or, in the
alternative, that the art was otherwise obvious to the well-versed.

As will be seen later, Masquelier used an error by the patent office to
further distract any discussion away from flavanolic structure and scavenging in
favor of a less relevant comparison to bilberry flavonoids, or anthothocyanidins.

    a. <u>Nomenclature and certain characteristics of the flavanols and
antioxidants</u>

      I. <u>Antioxidants and FRS Are Virtually Synonymous</u>

        All of the antioxidant (AOX) functions -- hydrophilic free radical
scavenging antilipidperoxidation, quenching singlet oxygen, and the redox
function (reducing oxidized antioxidants) -- were known in 1985. Masquelier was
disingenuous to distinguish between general antioxidant (AOX) effects and
specific free radical scavenging (FRS) activities in order to deny pre-patent
attribution of FRS to PACs. (As will be discussed *infra*. (Nozaki *et al.*, 1984),
there exists specific early literature on a lipophilic FRS effects by a molecule that
yields red on a Bate-Smith challenge.) The patent fails to specify whether a
hydrophilic (e.g., $O_2^-$, OH•) or lipophilic (ROO•) effect is exclusively intended or
both. In either case, both categories constitute FRS function. Further, the known
bioavailability establishes FRS activity for both lipid and aqueous milieus.

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page seven

What is painfully absent from Masquelier's patent is disclosure of the history of the structure-dependent nature of AOX effects of flavanol compounds. Masquelier's later discussion of the reputed non-bioavailability of bioflavonoids was little more than an opportunistic subterfuge to avoid a proper description of the molecular structure of flavanols which would have led to disclosure of prior publication of their bioavailability as well as free radical scavenging effect. Indeed, the 360 patent is more notable for what it omits than what it includes.

Interestingly, INC's own logo obliterates the overly nice distinction in the patent made between general antioxidant activity (which Masquelier's concedes is typical of polyphenols) and supposedly more specifically radical scavenging. As can be seen from the logo on the lower left of exhibit 1 hereto, Masquelier's associates represent the "free radical scavenging effect" to be identical with an "antioxidant." The logo states: "Antioxidant -- OPC 85 -- U.S. Patent 4,698,360." Therefore, it is evident that plaintiff cannot claim a distinction between a "free radical scavenging effect" and an "antioxidant," and since the 360 admits that polyphenols are generally antioxidants, plaintiff's suit should not stand.

ii. PACs may be called "flavonolic compounds" to demonstrate the overly selective choice of terms by Masquelier

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page eight

The basic flavan unit, flavan-3-ol monomers (the catechins and epicatechins), are not at all procyanidins:  Their condensed versions as dimers and trimers, etc., are referred to as condensed proanthocyanidins.  The flavan-3,4-diols monomers are another matter.  (See *infra*.)  (For further information of flavanol nomenclature, see Weinges (1972, *Arz Forsch*, 22(1):166-8), which gives a general OPC structure of 5,7,3,4-tetrahydroxy-flavanol-3.) The modifier "oligo" before proanthocyanidins is a minor convenience to refer to molecules starting at the configuration of tetramers if not trimers.  The following outlines the relevant categories of flavanols:

Monomers:  Flavan-3-ols - Catechins

- Epicatechins (stereo isomers, or mirro image,

of catechins.)

Flavan-3,4-diols - also called Leucoanthocyanidins

Flavan-4-ols - also called Leucoanthocyanidins

The monomers are also called simply flavans.

Condensed Monomers (Proanthocyanidins):

Dimers

Trimers (These are perhaps oligomers)

Oligomers (Tetramers to Nonamers)

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page nine

The condensed monomers (flavans) are called flavanols.

(The flavanolic tannins are longer chained condensations and are not pertinent to the 360. They are considered to be weaker antioxidants though there are substantial physiological differences between hydrolyzable and non-hydrolyzable tannins. The metabolites of the hydrolyzable tannins are bioavailable and provide an FRS effect.)

As monomers, leucoanthocyanidins differ from catechins in that the former will yield anthocyanidins (red color) upon heating in mineral acid in the same manner as PACs, the condensed catechin molecules beginning with dimers. (See *infra*.) These leucoanthocyanidins (flavan-3,4-diols), however, are unstable and are merely metabolic synthesis intermediaries in that they readily condense into more typical PAC configurations.

Masquelier's 1979 publication (*Int. J. Vitamin Res.*) proposed the term "pycnogenol" as a generic name intended to avoid the confusion of the multiple sound-alike flavonoid names (flavan, flavanone, flavone, flavanal, flavanol, flavananol) as well as to indicate that *any* condensation of *any* of the flavan monomers, i.e., dimers as well as oligomers, are condensed flavanols and thereby qualify as a "pycnogenol." Masquelier, however, did not disclose in the 360 that his exemplar product -- pine bark -- contains a mixture of flavanols that

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page ten

includes catechin *monomers*. (This disclosure was made, however in the 407 but the implications are absent from the 360.) The monomers, therefore, are correctly part of the compounds referred to as "pycnogenols" (otherwise meaning "that which is condensed") even though the monomers are not condensations. Catechins were already known to be FRSs, bioavailable, and to comprise the most basic structure of the very class "patented" by Masquelier. The fact that the 360 refers to the pine bark product as "exemplar" means that the 360's FRS claims must include the FRS activity of the monomers, and catechins had already been heavily published on as free radical scavengers.

The structure and stereochemistry of one type of flavanols, once referred to as leucocyanidins (the OPCs in grape seeds), was fully elucidated by Weinges *et al.* (1969), Clark-Lewis (1968), Clark-Lewis *et al.* (1969), Drewes (1968), Bate-Smith (1954). Previous studies by Bate-Smith (1962) demonstrated three classes of phenol compounds in vascular leaves: hydroxycinnamic acids, the glycosylated flavonols and the proanthocyanidins. OPCs are predominant in woody tissue and primitive vascular plants such as ferns and gymnosperms. For discussion of nomenclature see "The Flavonoids: Advances in Research," Harborne JB and Mabry TJ, eds, 1982, Chapman and Hall, pp 418-447.

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page eleven

Jack Masquelier published on procyanidin biosynthesis in 1973 (Michaud, Masquelier and Roudge. "Synthese des procyanidines naturelles," *Annales Pharmaceutiques francaise*, 31(5): 385-95.) The paper is less original research than a review citing research from 1935 (Appel and Robinson using flavanol monomers), the classic procyanidin studies of Bate-Smith (Bate-Smith EC and Swain T, April 18, 1953, "Identification of leuco-anthocyanins as 'tannins' in food," *Chemistry and Industry*, 377-8; and 1957), whose heated acid reaction is still the standard for determining the presence of PACs; Weinges (1967, 1968, 1969, 1970 and 1971) and Lavollay (1943, studying monomers). Rosenheim (1920 *Biochem J*, 14:178-88) is cited as having first employed the term leucocyanidol, designating a substance which transformed into a cyanidol (a reddish flavonoid or anthocyanidin) when mixed with heated hydrochloric acid. Thus, the first proanthocyanidin extraction was had from grape material (leaves), not pine bark. The basic science on PAC biosynthesis was actually done by Geissman and Yoshimura (1966, *Tetrahedron Letters*, 2669) and Weinges *et al.*, (1968 *Liebigs Ann*, 711:184). (One begins to sense that Masquelier's claim in the 360 to have "developed the science" of proanthocyanidins barely rises to the level of commercial hype.)

In sum, and as will continue to be made clear, it is inappropriate to create any too great a distinction between red-yielding PACs and their non-cyanidolic monomer building blocks: In their most fundamental respects -- with their B ring catechols and *their* attendant AOX and FRS functions -- these compounds are all

INC vs. Horphag, etc., et al.
Patent Addendum
28 August 1996 -- page twelve

of the same class and essentially same structure and functionality.  In the final

analysis, one must conclude that the 360 patent is not really based on FRS

because there was substantial literature on these co-existing and closely related

molecules -- the monomers and their condensations; rather the 360 patent seems

to be based on almost a kitchen chemist's trick:  turning a plant extract red with a

little warm acid.  There is no other way to discard the substantial body of scientific

literature on hydroxylated B ring-containing flavonolic polyphenols.


   b.  <u>The AOX effects of Proanthocyanidins were well-established prior

       art on both a theoretical and practical basis.</u>

       I.  <u>Masquelier's Patent was rejected twice and succeeded only

           by a failure to disclose and a fortuitous clever ruse.</u>

           If Masquelier had disclosed prior art, he would have had to deal

with two intimately connected considerations:  (a) flavanols, from monomers to

oligomers, should be considered a single class due to the consistent pattern of

the structure and radical scavenging functions of their B rings,* and (b) that the

proven FRS by monomeric catechins render obvious FRS by the rest of the class'

_____

        *Haslam (see *infra*:  E Haslam in "The Flavanoids:  Advances in
Research," 1982, Harborne and Mabry, editors) states:

            "The fundamental flavan structural units of proanthocyanidin
            oligomers are defined in terms of the familiar monomeric
            flavan-3-ols."