Jurisdiction of Bordeaux, its ownership position in the '360 patent is strengthened and that it controls at least 50% of the patent.

15.    On May 28, 1998, the French Appellate court issued a decision respecting the afore-referenced appeals (<u>SCIPA, et al. v. Horphag</u>; Roll no.: 97003242) and upheld the District Court's decision respecting:

      (a)     that French law governed the assignment of the '360 patent; and

      (b)     that the March 18, 1994 assignment from SCIPA to INC was invalid.

16.    After the decision of the Bordeaux Court of Appeals on May 28, 1998, INC did not withdrawal its claims in the United States District Court for the District of Connecticut or the Northern District of California.

17.    On May 29, 1998, the Defendants issued a press release in which INC states that it acquired clear title to the '360 patent as a matter of law.

18.    On July 31, 1998, the Defendants issued a press release in which INC states that it is the half owner of the '360 patent, that INC acquired clear title to SCIPA's ownership of the patent as a matter of law, and that the French Higher Court held that an American Court should decide whether Dr. Masquelier's Assignment is valid or not.

19.    On December 16, 1998, the Defendants issued a press release in which INC states that it acquired clear title to the '360 patent as a matter of law and is a one half owner of the '360 patent.

20.    INC and Zivin filed an Opposition to Defendants' Summary Judgment Motions on April 29, 1999 in the District of Connecticut action.

21.    INC and Zivin prosecuted claims in the District of Connecticut until the Court granted the Defendants' Summary Judgment Motions on March 18, 2000.

22.    In 1998 and subsequent to the May 28, 1998 decision from the French Appellate Court, SCIPA merged with CEP. As a result of that merger, Masquelier became shareholder in CEP.

23.    On August 6, 1999, Horphag initiated a second lawsuit in France against eight defendants, including CEP, Schwitters, INC, and Masquelier (<u>Horphag v. CEP, et al.</u>; RG no.: 199F00237).

24.    On December 20, 1999, Defendant Zivin sent a letter to Mr. Donald R. Grice, which stated that INC controls the '360 patent and requested that he cease and desist from confusing the public with respect to use of the "Pycnogenol" Trademark.

25.     On May 8, 2000, INC appealed the District of Connecticut's March 18, 2000 decision to the United States Court of Appeals for the Federal Circuit.

26.     On September 30, 2000, INC entered into an agreement with Qualtec Labs, Inc. (f/k/a Traco Laboratories) in which Qualtec Labs, Inc. agreed to purchase quantities of OPCs from INC's United States distributor and INC agreed to dismiss its patent infringement claims against Qualtec Labs, Inc. (the "Sept. 30, 2000, Agreement").

27.     In the Sept. 30, 2000, Agreement, INC states that either INC or Centre d'Experimentation Pycnogenol ("CEP") owns at least an undivided one-half interest in the '360 patent.

28.     On November 28, 2000, Defendant Zivin sent a letter to Royal Body Care, Inc., requesting that it cease and desist from sales of products that infringe the '360 patent, in which Zivin's clients "[owned] at least a one-half interest."

29.     On April 30, 2001, Defendant Zivin sent a letter to Roex, Inc., requesting that it cease and desist from sales of products that infringe the '360 patent, in which Zivin's clients "[owned] at least a one-half interest."

30.     On March 23, 2000, the Defendants issued a press release in which INC states that, if confirmed on appeal, the Connecticut Ruling would make CEP a joint owner of the '360 patent and would make French law govern the ownership of the '360 patent.

31.     On April 3, 2000, the Defendants issued a press release in which INC states that it, along with CEP have asked the Federal Court for the impartial and consistent execution of French law against INDENA and possible other "grape seed extract" licensees of Horphag Research Ltd., and the Connecticut Court applied French law in favor of the French CEP company and granted CEP ownership in 50% of the '360 patent.

32.     On March 24, 2001, the Defendants issued a press release in the which INC states that it is a joint owner of the '360 patent.

33.     On July 19, 2001, the Defendants issued a press release in which INC and CEP state that the U.S. Court of Appeals decided CEP is co-owner of the '360 patent, that the U.S. Court of Appeals has now acknowledged that the French company CEP is a joint owner of the '360 patent, that the 1998 French decision annulled CEP's 1994 assignment of half of the '360 patent to INC, and that the U.S. Court's decision leaves the American consumer at the mercy of infringers.

34.     Recording of a document pursuant to 37 C.F.R. § 3.11 is a ministerial act and "not a determination by the [USPTO] of the validity of the document or the effect that document has on the title to an application, a patent, or a registration."

35.     After the Federal Circuit's decisions in <u>Ethicon, Inc.v. United States Surgical Corp.</u>, 135 F.3d 1456 (Fed Cir. 1998) and <u>Schering Corp. v. Roussel-Uclaf SA</u>, 104

F.3d 341 (Fed. Cir. 1997) were published, the Defendants did not withdraw any actions or withdraw INC's actions in the Northern District of California or the District of Connecticut.

36.    Zivin reviewed press releases issued by INC and PSI.

37.    Zivin did not ask Schwitters to stop the issuance of any press releases, neither did he take any other steps to stop their dissemination or insure that they would be truthful or accurate.

## C.  *Joint Proposed Voir Dire Questions*

1.  Are you aware of or have you had any dealings with the Plaintiff, Jarrow Formulas, Inc.?

2.  Are you aware of or have you had any dealings with Jarrow Rogovin?

3.  Are you aware of or have you had any dealings with any of the defendants -- International Nutrition Company, Egbert Schwitters, Jack Masquelier, Integrated BioCeuticals LLC, Primary Services, Inc., Primary Source, LLC, or Norman H. Zivin?

4.  Are you aware of or have you had any dealings with Gary Senecal or Richard LeFebvre?

5.  Are you aware of or have you had any dealings with any of the Plaintiff's attorneys – Eric W. Wiechmann, Mark D. Giarratana, Eric E. Grondahl, Alexandra B. Stevens, or Jason C. Welch?

6.  Are you aware of or have you had any dealings with Plaintiff's law firm, McCarter & English, LLP, or any of its partners, associates or employees?

7.  Are you aware of or have you had any dealings with the law firm of Cummings & Lockwood LLC or any of its partners, associates or employees?

8.  Are you aware of or have you had any dealings with any of the Defendants' attorneys – Richard S. Order or Eric D. Beal?

9.  Are you aware of or have you had any dealings with the Defendants' law firm, Axinn, Veltrop & Harkrider LLP, or any of its partners, associates or employees?

10. Are you aware of or have you had any dealings with the law firm of Cooper & Dunham LLP, or any of its partners, associates or employees?

11. In light of any past experiences with any of these law firms, do you feel as though you will not be able to fairly and impartially decide this matter?

12. Please state your current occupation and employer, including current position, and if married, your spouse's occupation, employer, and current position. If you are retired, please indicate your pre-retirement occupation and last position held.

13. In your employment, have you had any involvement or experience with patents?

14. If so, please describe that involvement or experience.

15. Do you know if your employer owns any patents?

16. If so, do you know if your employer has ever claimed that its patents have been infringed?

17. Have you ever been involved in obtaining any patents?

18. Do you own any patents?

19. If you own any patents, have you ever claimed that they were infringed by another?

20. Has anyone ever claimed that you or your employer infringed a patent?

21. Do you have any opinions about the patent system? If so, please describe your opinions.

22. Please state the highest level of education you have achieved.

23. Have you had any technical or engineering training?

24. If so, please describe that training.

25. Have you or your spouse, if married, ever been a party to a lawsuit?

26. If so, please describe the lawsuit and the result of the lawsuit.

27. In light of the outcome of any lawsuits in which you were a party or a witness, and your experience with our civil justice system, do you feel that you would not be able to fairly and impartially decide this matter?

28. Do you or your spouse, if married, have any legal training or have either of you worked with, consulted or assisted an attorney?

29. Have you or your spouse, if married, ever been a witness in a lawsuit or a deposition? If so, please describe the circumstances surrounding your participation in the lawsuit.

CTDOCS:13370.1

30. Have you ever served as a juror in another case, whether it be a civil or criminal case?  If so, describe whether it was a state or federal case and what type of case it was.

31. In light of the outcome of any lawsuits in which you were a juror and your experience with our civil justice system, do you feel that you would not be able to fairly and impartially decide this matter?

32. Do you have any negative views of lawyers in general?

33. Do you have any personal knowledge about the incidents or events which provide the basis for this lawsuit?

34. Do you know any of the other potential jurors in this room?

35. Is there anything else that you can think of that has not been discussed as of yet which would compromise your ability to sit as a fair and impartial juror in this case?

36. Is there any reason of which you are aware that may prevent you from devoting your full attention to this matter and rendering a fair and impartial verdict?

37. Would you be hesitant in awarding damages if the Plaintiff proved its case?

38. Have you ever taken any of the following dietary supplements:

      (a)      Proanthocyanidins

      (b)      OPCs

      (c)      PACs

      (d)      Grape seed extract

      (e)      Pine bark extract

      (f)      Antioxidants

39. Do you believe that consumption of dietary supplements can benefit one's health?

40. Do you believe that simply because a plaintiff starts a lawsuit it is more likely than not correct in its claims?

41. Do you believe that the defendants must have done something wrong simply because they were sued?

42. Are you prepared to follow my instructions as to what the law is, even if you disagree with the law?

43. Is there anything peculiar about this case or the parties involved that would make you reluctant to sit on this jury?

44. Do you know any of the following potential witnesses:

(a) Mr. Jarrow L. Rogovin

(b) Mr. Sid Shastri

(c) Mr. Gregory Ris

(d) Dr. Michael G. Willoughby

(e) Mr. Egbert Schwitters

(f) Mr. Norman H. Zivin

(g) Mr. Gary Senecal

(h) Mr. Richard LeFebvre

(i) Dr. Jack Masquelier

(j) Mr. Mark Timon

(k) Ms. Sue Taggart

(l) Mr. Victor Ferrari

(m) Mr. Marvin S. Gittes

(n) Ms. Karen Lewis

(o) Mr. Dick Keeley

(p) Mr. Nels Pearsall

(q) Mr. Frederic Benech

(r) Mr. Philippe Lief

(s) Mr. Robert Lemon

(t) Mr. Robert Sands

(u) Horphag Research Ltd.

-66-

(v) Horphag Overseas Ltd.

(w) Peter Broadhead

(x) Don Goldberg


45. Do you speak and understand English?

46. Can you read documents in English?

47. Do you speak or read any foreign languages? If so, which ones?

48. Have you ever used an herbal or nutritional supplement?

49. How do you feel about alternative or homeopathic medicine?

50. Have you ever used one of the parties' products?

51. Have you ever used any product sold as an antioxidant?

52. Have you ever heard of any previous lawsuit brought by International Nutrition Company for patent and trademark infringement?

53. Have you ever heard of the '360 patent?

54. Do you shop at health food stores?

55. Do you read any health food magazines or periodicals?  Which ones?

56. This trial could last three to four weeks.  Will that cause you, your family, or your employer any hardship?

57. Do you have any physical limitations, such as vision or hearing, that might make it hard for you to follow the trial?  Any other physical limitations?

58. The evidence in this case may include testimony by economists.  Do you feel comfortable about your ability to sit as a juror in a case involving such testimony?

59. Have you ever been convicted of a crime, other than a traffic ticket?

60. Do you believe that foreigners are entitled to the same access to the United States courts and to the same protection of the United States laws as U.S. citizens?

61. Will you be able to keep an open mind while the plaintiff presents its case and keep from passing judgment until you have heard all the witnesses for the defendants?

-67-

62. Will you be willing to deny the plaintiff any money if it fails to prove its case?

63. Are you a technician in any field?

64. Are you an engineer?

65. Have you had any medical training? If so what kind?


### D.  Plaintiff's Proposed Jury Instructions

SHAM LITIGATION

Plaintiff Jarrow Formulas has claimed in this case that the defendants violated the federal and state antitrust laws by conspiring to restrain trade and attempting to monopolize the market for dietary supplements containing proanthocyanidins, referred to also as OPCs, by bringing a frivolous and vexatious lawsuit for infringement of the '360 patent when they did not have the right to do so.

The patent laws seek to promote competition by encouraging people to invest in scientific research and product development.  These investments can lead to new and better products, better ways of making things, new jobs and entirely new industries.  But a patent necessarily involves a restraint of trade – the right to exclude others from using the patented invention for the duration of the patent.  This right to exclude by itself is not an antitrust violation.  Congress has decided that the restraint of trade created by a patent is a reasonable one because it promotes innovation and long-term competition.

Thus, the owner of a patent who acts only to take full advantage of the right to exclude created by the patent does not violate the antitrust laws.  A patent may only be enforced by the

-68-

owners of the patent. If, on the other hand, a person seeks to restrain trade beyond the right to exclude conferred by the patent, or seeks to enforce a patent they know to be invalid, the enforcement may be an antitrust violation.

Plaintiff Jarrow Formulas claims that the defendants improperly sought to enforce the '360 patent because, at the time of the lawsuit, the defendants did not own any interest in the '360 patent, and the defendants knew that the '360 patent was invalid.

An agreement to bring or to continue one or more lawsuits does not violate the antitrust laws unless the suit or suits were a sham. In determining whether the litigation brought by the defendants to enforce the '360 patent was a sham, you must decide: (1) that the defendants' suit to enforce the '360 patent was objectively baseless; and (2) the baseless suit must have been an attempt to harass or interfere directly with the business relationships of one or more competitors through the use of the judicial process.

You must first determine whether the defendants' lawsuit to enforce the '360 patent was objectively baseless. A lawsuit is objectively baseless if it was so baseless that no reasonable litigant could expect to win.

If you find that the defendants' lawsuit to enforce the '360 patent was objectively baseless, you must then determine whether the defendants' primary objective in bringing the lawsuit was to hurt Jarrow Formulas and/or other competitors by bringing or continuing the lawsuit regardless of the ultimate outcome of the lawsuit, or whether the defendants' primary objective was to obtain the relief sought in the suit.

-69-

If you find that a reasonable person could not have realistically expected to succeed in a suit such as the one brought by the defendants against Jarrow Formulas, and that the defendants' primary purpose in bringing or continuing the suit was to inflict harm on Jarrow Formulas and/or other competitors caused by the suit itself, as opposed to the relief sought, then you must consider whether the defendants' actions in bringing and continuing the suit constitute an illegal restraint of trade or attempt to monopolize the relevant market.

The litigation at issue here sought to enjoin Jarrow Formulas from further sales of dietary supplements containing proanthocyanidins in the United States until the expiration of the '360 patent, and money damages for infringement of the '360 patent. The defendants contend that the true purpose in bringing the lawsuit was to secure this relief. Jarrow Formulas, on the other hand, maintains that the defendants' true purpose in bringing the lawsuit was not to win a favorable judgment against Jarrow Formulas, but to harass Jarrow Formulas and other competitors by the process of litigating, regardless of the outcome.

In determining the defendants' purpose, you may consider whatever direct evidence of the defendants' motivation for bringing the lawsuit is available to you. Of course, you also may consider circumstantial evidence of the defendants' true purpose, such as whether the defendants engaged in any improper conduct during the prosecution of the lawsuit. If the defendants engaged in misconduct in a judicial proceeding, you may consider that to be evidence of an improper purpose.

### SHERMAN/CLAYTON ANTITRUST ACT

-70-

In the First Count of its Complaint, plaintiff Jarrow Formulas claims that the defendants have violated the federal antitrust laws by unreasonably restraining trade, attempting to monopolize and conspiring to restrain trade and to monopolize the United States market for dietary supplements containing proanthocyanidins.

The federal statutes that plaintiff Jarrow Formulas claims are violated are known as the Sherman-Clayton Antitrust Act. Section 1 of the Act declares that:

> Every contract, combination in the form of a trust or
> otherwise, or conspiracy, in restraint of trade or commerce
> among the several States . . . is hereby declared to be
> illegal.

Section 2 of the Act declares that:

> Every person who shall monopolize, or attempt to
> monopolize, … or conspire with any other person … to
> monopolize any part of the trade or commerce shall be …
> guilty of a … [violation of the antitrust laws].

The purpose of the federal antitrust laws is to promote competition by encouraging companies to compete vigorously with one another while discouraging the use of unreasonable restraints on that competition. The law is not designed to protect a competitor from the effects of lawful competition, but to protect the public interest in vigorous competition in general by

-71-

ensuring for every business concern the right to compete on fair and equal terms with its competitors for so much of the market as it can acquire by legitimate business methods.

Any unreasonable interference with the ordinary, usual, and freely-competitive pricing and distribution system of the open market in interstate trade and commerce, constitutes an unreasonable restraint of interstate trade, and is a violation of the federal antitrust laws.

Plaintiff Jarrow Formulas claims that the defendants, with the exception of Defendant Zivin, have violated the federal anti-trust laws by attempting and conspiring to monopolize and to unreasonably restrain interstate trade and commerce in the sale of proanthocyanidins in dietary supplements in the United States.  I will provide you with instructions on the law regarding attempting to monopolize a market, unreasonable restraint of trade and conspiracy.

RESTRAINT OF TRADE

Section 1 of the Sherman Act prohibits contracts, combinations or conspiracies that unreasonably restrain trade, and makes it illegal for any person to enter into any such contract, combination or conspiracy.  The term "person" includes individuals, corporations, partnerships, and every other association or organization of every kind and character.  Jarrow Formulas claims that the defendants violated this statute by combining or conspiring to restrain trade in the United States for dietary supplements containing proanthocyanidins (also referred to during the trial as OPCs) through their conduct in bringing a frivolous and vexatious lawsuit for infringement of the '360 patent, and through false advertising and misrepresentations regarding the ownership of the '360 patent, the validity of the '360 patent, and Jarrow Formulas.  To win on this claim, Jarrow Formulas must show that these actions were an unreasonable restraint on trade.

-72-

In determining whether the restraint on trade was reasonable, you must decide whether the restraint helped competition or harmed competition. Your task is to balance any aspects of the restraint that were helpful to competition against any aspects that were harmful to it. In doing so, you should consider such factors as the particular business of the defendant; the condition of the market before and after the restraint was imposed; the nature of the restraint and its effect on competition; the history of the restraint; the reason for adopting the restraint; and the defendants' purpose or intent.

To show that the restraint was unreasonable, plaintiff must prove that the defendants' activities substantially harmed competition in a relevant market. To show this, plaintiff must prove the following three elements by a preponderance of the evidence.

First, what the relevant market is;

Second, that defendants' restraint or practice had a substantially harmful effect on competition in that relevant market; and

Third, that the harmful effect on competition outweighs any beneficial effect on competition.

The first element that plaintiff must prove is that the relevant market in this case is the sale in the United States of dietary supplements containing proanthocyanidins during the time period 1997 through 2001. In determining the relevant market, the "area of effective competition" must be determined by reference to: (1) a product market and (2) a geographic market. In this case, there is no dispute that the geographic scope of the relevant market is the

-73-

United States. Therefore, you must determine only whether the product market in this case is the market for dietary supplements containing proanthocyanidins.

In determining the product market, you must determine the products that make up the relevant market. Products are in the same relevant market when they are interchangeable as a practical matter from the buyer's point of view. Two products do not have to be identical to be in the same relevant market. However, two products are not in the same relevant market unless, from the actual behavior of consumers, it is determined that consumers view the products as substantially or reasonably interchangeable to fill the consumer's needs and purposes. If consumers perceive that a product, such as OPCs, has unique properties from other products available, and the other products are not perceived by consumers as reasonably interchangeable for the purpose for which they are offered, then the product comprises its own relevant market.

Plaintiff claims that dietary supplements containing proanthocyanidins constitute their own relevant market and are not part of a broader market of all dietary supplements or dietary supplements that may contain other free radical scavengers. A single brand or type of product may constitute a relevant market or submarket. If plaintiff has shown that consumers during the 1996 through 2001 time period believed that grape seed extract containing OPCs had unique qualities to scavenge free radicals in the body and prevent the harmful biological effects of free radicals in the body, and that consumers would not purchase another dietary supplement even if there was a price differential compared to the dietary supplements containing OPCs, then the dietary supplements containing OPCs would be a discrete product market that is not interchangeable with and does not include other dietary supplements generally or other dietary supplements containing other free radical scavengers.

-74-

If you find that Jarrow Formulas has proved the relevant market, you must then consider whether Jarrow Formulas has proved that defendants' restraint had a harmful effect on competition in that market.

In this case, Jarrow Formulas claims that defendants restrained competition by bringing a frivolous and vexatious lawsuit for infringement of the '360 patent. Evidence that defendants' conduct has harmed plaintiff's business is not enough by itself, although that is a relevant factor for you to consider. Jarrow Formulas must show that the restraint harmed overall competition in the relevant market, for example, by raising prices or reducing output, not just that it harmed plaintiff or plaintiff's business.

In determining whether defendants' restraint had a harmful effect on competition in the relevant market, you should consider the nature of the restraint, the history of the restraint, the structure of the market, and the defendants' position in the market. You should look at such factors as the number of companies or firms in the market, the reasons and the way in which the restraint was imposed, and the nature of the market before and after the restraint was imposed.

If you find that the restraint did not harm competition in the relevant market, you must then consider the extent to which competition was harmed. A restraint is unreasonable only if it substantially harms competition. A restraint that has only a slight or insubstantial impact on competition is not unreasonable or unlawful.

In determining if the restraint substantially harmed competition, you should consider the market power that defendants' attempted to obtain through the patent monopoly they attempted to enforce, and how much of the relevant market was harmed by defendants' restraint. You

-75-

should also consider whether the restraint influenced or affected the price, output or product quality in the relevant market.

If you find that plaintiff has proved relevant market and that defendants' restraint had a substantially harmful effect on competition in that market, then you must weigh any effects of the restraint that are helpful to competition against any harmful effects. If the beneficial effects outweigh the harmful effects, or if the net effect is harmful but insubstantial, then the restraint is not unreasonable or unlawful.

In determining whether the restraint was unreasonable, you also may consider the defendants' purpose in imposing the restraint. A purpose or intent to harm competition by itself is not sufficient to establish that a restraint of trade was unreasonable. Effect on the relevant market, not intent, is the ultimate test. However, consideration of the purpose of the restraint may help you determine if it likely would have a harmful effect on competition. You may consider, for example, whether defendants intended the lawsuits and advertising campaigns to achieve a legitimate business purpose and, if so, whether the restraint was tailored to achieve that legitimate business purpose or, rather, was broader than necessary.

## ATTEMPT TO MONOPOLIZE

There are five essential elements that plaintiff Jarrow Formulas must prove in order to establish its claim that defendants are liable for attempted monopolization within the meaning of the antitrust laws:

-76-

First, that the relevant market applicable to this claim is what Jarrow Formulas claims it to be, that is, the sale of dietary supplements containing proanthocyanidins in the United States;

Second, that the defendants had a specific intent to monopolize the relevant market;

Third, that one or more of the acts alleged by Jarrow Formulas was done by the defendants, and was in furtherance of the intent to monopolize the relevant market, even if the acts were insufficient actually to produce the intended monopoly;

Fourth, that defendants' intent and acts must together result in a reasonable probability that monopolization would sooner or later occur; and

Fifth, that the attempted monopolization was the proximate cause of damage to the business of plaintiff Jarrow Formulas, by causing Jarrow Formulas to lose sales on which it would have made a profit.

I will now provide you with specific instructions regarding each of these elements.

The relevant market for a claim of attempted monopolization has the same meaning as I described previously for Jarrow Formulas' claim of restraint of trade.  You must determine whether the relevant market is, as Jarrow Formulas claims, the market in the United States for dietary supplements containing proanthocyanidins.

The second element that the plaintiff must prove is that the defendants, by their actions related to the '360 patent, had a specific intent to monopolize the market in the United States for dietary supplements containing proanthocyanidins.  The term "monopolize" as used in the anti-

-77-

trust laws means the power to obtain, or to maintain, the power to exclude or remove competitors from the field of competition in the relevant market. Intent ordinarily may not be proved directly because there is no way of understanding or scrutinizing the operations of the human mind. But you may infer a person's intent from surrounding circumstances. You may consider any statement made or act done or omitted by a party whose intent is in issue, and all other facts and circumstances that indicate the party's state of mind. Plaintiffs claim that defendants' lawsuit claiming that that they were the only parties who could sell dietary supplements containing OPCs, and defendants' related threats and advertising campaign, clearly demonstrated such an intent.

The proof need not show that the defendants knew that their actions related to the '360 patent were a violation of the federal antitrust laws. If you should find by a preponderance of the evidence in the case that the conspiracy by the defendants alleged in Jarrow Formula's complaint was knowingly formed, and that the defendants, or any of them, knowingly became members of the conspiracy, then the fact that a defendant may have believed, in good faith, that what was done was not unlawful would not be a defense in this case.

You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is for you to decide what facts have been proven by the evidence.

The third element that plaintiff must prove by a preponderance of the evidence is that one or more of the acts alleged was done by the defendants, and that the acts were done in furtherance of the defendants' intent to monopolize the relevant market.

-78-

The fourth element that the plaintiff must prove is that the defendants' acts and intent created a reasonable probability that monopolization would sooner or later occur. The plaintiff is not required to prove that the defendants actually produced the intended monopoly, but that the defendants' actions created a reasonable probability that monopolization of the market for dietary supplements containing proanthocyanidins would occur.

Finally, if you determine that the defendants' actions violated the federal antitrust laws, you must determine whether the defendants' attempts to monopolize the United States market for dietary supplements containing proanthocyanidins was the proximate cause of the injuries that Jarrow Formulas alleged that it has suffered. An injury or damage is proximately caused by an act, or failure to act, whenever it appears that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.

CONSPIRACY

In this case, plaintiff Jarrow Formulas has alleged that two or more of the defendants participated in a conspiracy to violate the federal antitrust laws by unreasonably restraining trade or attempting to monopolize the relevant market. Jarrow Formulas claims that the defendants conspired in bringing and continuing the lawsuit for infringement of the '360 patent, and the false advertising and product disparagement undertaken by the defendants. A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means. To prove that the defendants conspired to violate the antitrust laws, Jarrow Formulas must prove the following elements:

-79-

First, Jarrow Formulas must prove that there was a conspiracy among the defendants to monopolize an appreciable amount of interstate commerce in the United States, which Jarrow Formulas claims is the market for dietary supplements containing proanthocyanidins.

Second, Jarrow Formulas must prove that the defendant knowingly became a member of the conspiracy; knowingly means voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

A conspiracy is a kind of "partnership" in which each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy.  To create such a relationship, two or more persons must enter into an agreement that they will act together for some unlawful purpose or to achieve a lawful purpose by unlawful means.

To establish the existence of a conspiracy, however, the evidence need not show that its members entered into any express, formal, or written agreement; or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose.  The agreement itself may have been entirely unspoken.  What the evidence must show to prove that a conspiracy existed is that the alleged members of the conspiracy in some way came to an agreement to accomplish a common purpose.  It is the agreement to act together that constitutes the offense.  Whether the agreement actually is carried out or whether it succeeds or fails does not matter.

A conspiracy may be formed without all parties coming to an agreement at the same time. The unlawful agreement may be shown if the proof establishes that the parties knowingly

-80-