## DEFENDANTS' PROPOSED INSTRUCTIONS TO THE JURY

**I.     First Claim for Relief**
**Violations of §§ 1 & 2 of the Sherman Act and § 15 of the Clayton Act**

**Defendants' Proposed Jury Instruction No. 1**

**Introduction**

In this case, plaintiff Jarrow Formulas, contends that defendants INC, IBC, PSI, PS, Bert Schwitters and Prof. Jack Masquelier violated antitrust laws by bringing a lawsuit for patent and trademark infringement against Jarrow and 17 other defendants in 1996. Jarrow does not assert an antitrust claim against Attorney Norman Zivin. To evaluate plaintiff's contentions, you must know something about patents and trademarks and the relationship between the patent and trademark laws and the antitrust laws.

The U.S. Constitution gives Congress the power "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their . . . discoveries." To carry out this provision of the Constitution, Congress has enacted the patent laws. The basic policy of the patent laws is to encourage inventors to reveal new, useful, and unobvious technology to the public in exchange for the United States government's grant of a patent on their invention.

To receive a patent, an inventor pays a fee and submits an application to the U.S. Patent Office. The Patent Office reviews the application and, if it finds that the application adequately describes a new and useful invention, it grants or issues a patent to the inventor. The patent provides inventors with the right, for a specified number of years, to exclude others from making, using, offering for sale, or selling the patented invention throughout the United States without the permission of the owner or owners of the patent. How long the patent owner may

exclude others from using or selling the patented invention depends on when the patent was issued. This potential economic reward gives people an incentive to invest their time, money, and effort in research and development efforts.

A patent benefits the public as well as the patent owner. This is so because every inventor who applies for a patent must provide details of his or her invention to the Patent Office. When the Patent Office issues a patent, a full description of the invention is included in a publicly filed document that precisely defines what the patent covers. The public filing allows anyone to find out exactly what was invented and how it works. Thus, other researchers can learn from a patent owner's work and can go on to make other inventions of their own.

Using a patented invention within the life of the patent without the owner's permission is called patent infringement or infringing the patent. As mentioned above, for a specified number of years, the patent owner has the right to exclude anyone else from using the patented invention. He or she may enforce this right by bringing a lawsuit for an injunction, that is, to stop the alleged infringement, or to recover damages for the alleged infringement, or both.

An inventor who receives a patent may agree to sell, or "assign," his or her patent to someone else. The buyer of a patent acquires all of the rights that the original patent holder had, including the right to bring lawsuits to prevent others from using the patented invention without permission. Rights in a patent may be assigned to one owner or many owners, just like a piece of land or a business.

Similarly, under the trademark laws a person may obtain rights in a word, name or symbol adopted and used by that person to identify and distinguish its goods or products from those manufactured or sold by competitors and also to indicate the source of the goods. The main function of a trademark is to identify and distinguish goods as a product of a particular

manufacturer or merchant and to protect its reputation against the sale of another's products as its own. A trademark is also a merchandising symbol that helps a prospective purchaser to select the goods the purchaser wants. A trademark signifies that all goods bearing the mark derive from a single source and are equivalent in quality. There is therefore a public interest in the use of trademarks.

As with patents, the law entitles the owner of a trademark to exclude others from using that trademark. The owner of a trademark may enforce the right to exclude others in an action for trademark infringement. The owner of a trademark may transfer to another the owner's interest in the trademark, including the right to exclude others from using the trademark, or may enter into an agreement that permits another person to use the trademark.

When a manufacturer or merchant has established a trademark right with respect to a product, the right to use it becomes an exclusive right, and the trademark becomes the property of the manufacturer or merchant. No other person may then use the same or similar words, symbols or designs in any manner likely to cause consumer confusion regarding the source or origin of those goods.


(ABA Section of Antitrust Law, Sample Jury Instructions in Civil Antitrust Cases D-2 to D-6 (1999 ed.) ("ABA"))

**Defendants' Proposed Jury Instruction No. 2**

**Relation to Antitrust Laws**

The patent laws complement the antitrust laws in promoting competition. The basic purpose of both sets of laws is to promote innovation, industry, and competition. In general, the antitrust laws seek to promote competition by prohibiting the abuse of monopoly power and restraints on trade that unduly interfere with the competitive process.

The patent laws seek to promote competition by encouraging people to invest in scientific research and product development. These investments can lead to new and better products, better ways of making things, new jobs, and entirely new industries. But a patent necessarily involves a restraint of trade – the right to exclude others from using the patented invention for the duration of the patent. This right to exclude others from using a patented invention is <u>not</u> an antitrust violation. Congress has decided that the restraint of trade created by the patent is a reasonable one because it promotes innovation and long term competition. Thus, as long as the patent owner acts only to take full advantage of the right to exclude created by his or her patent, he or she does not violate the antitrust laws.

The trademark laws also promote competition by providing ready means for manufacturers and merchants to distinguish their goods from those of their competitors, and also allow consumers to choose between competing goods and be assured to the origin of a product with a given trademark.

(ABA D-7 to D-8)

**Defendants' Proposed Jury Instruction No. 3**

**Sham Litigation**

Before you consider the antitrust claims, you must first consider whether INC's patent and trademark infringement lawsuit was "sham" litigation. The First Amendment to the Constitution guarantees a party access to the courts and the opportunity to bring lawsuits. Consequently, an agreement to bring or continue one or more lawsuits cannot violate the antitrust laws unless the suit or suits were a sham. Thus, if you determine that INC's patent and trademark infringement lawsuit was not a sham, you need not consider Jarrow's antitrust claims and must find in favor of the defendants on the antitrust claims.

Jarrow contends that INC violated antitrust laws by bringing a lawsuit for patent and trademark infringement. In this case, the patent at issue is referred to as the '360 patent, which is shorthand for the seven digit number assigned to the patent by the United States Patent and Trademark Office. Jarrow contends that INC had no right to bring a patent infringement suit against it because INC did not own the '360 patent. Jarrow further contends that, even if INC had ownership rights in the '360 patent, INC could not bring a suit for patent infringement without the consent of the patent's co-owner, Horphag.

INC, on the other hand, contends that, prior to starting the infringement suit in 1996, INC had acquired 50% ownership of the '360 patent. INC further contends that, when the infringement suit was brought in 1996, the patent laws did not require a patent owner to obtain its co-owners' consent to sue an infringer. INC claims that it was just trying to protect its rights, and the rights of the licensees, under the patent laws against those companies that were infringing the '360 patent. INC further claims that Jarrow and other companies were causing

consumer confusion by infringing INC's trademark "OPC-85" and it therefore was appropriate to bring a trademark infringement claim to halt that practice.

The United States Constitution ensures the right of everybody, whether acting alone or in combination or agreement with others, to petition or appeal to the courts for judicial action, recognizing that when people do so, they will naturally seek judicial action that favors them and that also may be unfavorable to others. The law provides that the right to use the courts to seek judicial action is an important right and that the exercise of that right, even by an agreement, does not usually violate the antitrust laws.

Consistent with these principles, a patent or trademark owner is entitled to bring a patent or trademark infringement suit to protect his or her rights, and the bringing of such a suit ordinarily does not violate the antitrust laws, even where the patent or mark is later determined to be invalid or unenforceable.

To succeed on its claim that INC's patent infringement suit violated the antitrust laws and, in particular, the Sherman Act, Jarrow must prove: first, that INC's patent and trademark infringement suit was objectively baseless; and, second, that the infringement suit was an attempt to interfere directly with the business relationships of one of more competitors through the use of governmental process as opposed to the outcome of the infringement suit.

An agreement to bring or continue a lawsuit against Jarrow does not violate the antitrust laws unless the suit were a sham. Just because INC's suit was ultimately unsuccessful does not mean that it was objectively baseless. A lawsuit is objectively baseless only if it was so baseless that no reasonable litigant could realistically expect to win. In other words, if someone in INC's position could have had a reasonable belief that there was any chance of winning, the suit was not objectively baseless.

Because the determination of whether INC had probable cause to bring the infringement suit is a matter of law for the Court, the Court will decide whether the lawsuit was objectively baseless.

If the Court finds that INC's suit was objectively baseless, I will instruct you to determine whether INC's primary objective in bringing the lawsuit was to hurt Jarrow by bringing or continuing the lawsuit regardless of the ultimate outcome of the lawsuit or whether INC's primary goal was to obtain the relief sought in the infringement suit. This requires you to determine INC's good or bad faith in bringing the infringement suit. INC is entitled to a presumption of good faith. You may disregard this presumption of good faith only if you find <u>by clear and convincing evidence</u> (a standard of proof that I discuss elsewhere in these instructions) that INC's goal in pursuing the infringement suit was not to win and obtain the relief it was requesting, but was to harass a competitor and deter others from competing, by engaging in the litigation process itself, regardless of the outcome.

The patent litigation at issue here was brought by INC under the U.S. patent laws against 17 different companies seeking an injunction prohibiting their continued infringement of the '360 patent, damages for the companies' willful and deliberate infringement of the '360 patent, reasonable attorney's fees, and a court order requiring the companies to surrender products that infringed the patent. INC also asserted a trademark infringement claim against Jarrow and others seeking damages and an injunction to make them stop using INC's trademark. INC contends that the true purpose in bringing the lawsuit was to secure this relief. Jarrow, on the other hand, maintains that INC's true purpose in bringing the patent and trademark infringement lawsuit was not to win a favorable judgment against the companies and obtain the requested relief, but rather was to harass Jarrow by the process of litigating, regardless of the outcome.

If the Court finds that no reasonable person could have realistically expected to succeed in a lawsuit such as the patent infringement lawsuit INC brought against Jarrow and other companies, **and** you, the jury, find **by clear and convincing evidence** that INC brought the infringement suit simply as an attempt to interfere with the business relationships of one or more competitors through the use of litigation and INC did not care about the outcome of the infringement suit, then you must go on to decide whether Jarrow has proved the remaining elements of a Sherman Act violation.

(ABA, G-10 to G-13; ABA D-67 to D-69; Prof. Real Estate Investors v. Columbia Pictures, Inc., 508 U.S. 49, 65 (1993); Filmtec Corp. v. Hydranautics, 67 F.3d 931, 938 (Fed. Cir. 1995))

**Defendants' Proposed Jury Instruction No. 4**

**Sherman Act - Purpose**

The purpose of the Sherman Act is to preserve and advance our system of free enterprise by encouraging, to the fullest extent practicable, free and open competition in the marketplace and by preventing unreasonable restraint or monopolization of any business or industry, so that the consuming public may receive better goods and services at a lower cost.

The plaintiff has made claims under two different parts of the Sherman Act, known as Section 1 and Section 2. Section 1 prohibits agreements that unreasonably restrain trade and Section 2 prohibits, among other practices, attempts or agreements to obtain a monopoly over a market.

(ABA, A-2)

**Defendants' Proposed Jury Instruction No. 5**

**Sherman Act - Relevant Market**

To prove its Sherman Act claims, the first thing Jarrow must prove is what the "relevant market" is. There are two aspects you must consider in determining whether Jarrow has proven the relevant market. The first is the relevant product market, and the second is the relevant geographic market. I will discuss each of these aspects in turn.

If an unreasonable restraint of trade in violation of Section 1 of the Sherman Act exists, it must be found to exist within an economically meaningful market, or what is called a relevant market.

Defining the relevant market is essential because you are required to make a judgment about whether defendant has power over prices or competition. To do so, you must be able to determine what economic forces, if any, restrain its freedom to act as it pleases. The most likely and most important restraining force will be competition from other firms and their products. This includes all firms and products that act as real and practical restraints on defendants' power to set prices as it pleases. All the firms and products that exert this restraining force are considered to be within what is called the relevant market.

**Defendants' Proposed Jury Instruction No. 6**

**Relevant Product Market**

The basic idea of a relevant product market is that the products within it are reasonable substitutes from a buyer's point of view; that is, the products compete with each other. This does not mean that products must be identical to be in the same relevant market. It means that, as a matter of practical fact and the actual behavior of buyers, the products are reasonable substitutes for the buyer's needs. In this case, Jarrow contends that the relevant product market is the sale of products containing PACs having an antioxidant effect as claimed by the '360 patent.

Here, Jarrow contends that there are no substitutes; that is, Jarrow claims that other products used as antioxidants do not compete with products containing PACs that are used as antioxidants as claimed by the '360 patent. The defendants, on the other hand, contend that numerous products used as antioxidants compete with and are substitutes for products containing PACs used as antioxidants as claimed by the '360 patent and, therefore, must be included in the relevant product market. Remember that the '360 patent is not for any product, but rather only covers the use of products containing PACs for radical scavenging of free radicals.

There are a number of factors you may consider in determining whether products are reasonable substitutes for each other. The basic test is whether changes in the price of one product cause a considerable number of customers to switch from one product to another. If so, the products are in the same market. You also may consider how people in the industry and the public at large view the products; whether the products have the same or similar characteristics of uses; whether the products have similar prices; whether changes in the price of one product are followed by changes in the price of the other product; whether the products are sold to

similar customers; and whether they are distributed and sold by the same kinds of distributors or dealers.

In sum, to determine the relevant product market, you must decide which products compete with one another. This is a practical determination. Products do not have to be identical to be in the same relevant market, but they must compete meaningfully with one another.

Consistent with these principles, a patent is not, without evidence of substitutes of demand and supply, a relevant market for antitrust purposes.[1] The relevant market, therefore, cannot be defined solely by the '360 patent.

(ABA, C-7 to C-8)

---

[1] See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177 (1965) ("To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition."); Jefferson Parrish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 37 n.7 (1984) (O'Connor, J., concurring) ("A common misconception has been that a patent . . . or unique product that competitors are not able to offer suffices to demonstrate market power. While each of these . . . factors might help to give market power to a seller, it is also possible that a seller in those situations will have no market power: for example, a patent holder has no market power in any relevant sense if there are close substitutes for the patented product."); Virginia Panel Corp. v. MAC Panel Co., 133 F.3d 860, 872 (Fed. Cir. 1997) ("Violation of the antitrust laws always requires . . . market power in a defined relevant market (which may be broader than that defined by the patent)"); Abbott Laboratories v. Brennan, 952 F.2d 1346, 1354 (Fed. Cir. 1991) ("A patent does not of itself establish a presumption of market power in the antitrust sense."); Orion Electric Co. v. Funai Electric Co., 2002 U.S. Dist. LEXIS 3928 at *20 (S.D.N.Y. March 11, 2002) ("To demonstrate market power flowing from a patent, a plaintiff must show that, within the relevant market, there are no acceptable substitutes for the patented product and that the patent, therefore, enables the patentee to exclude competition."); Independent Ink, Inc. v. Trident, Inc., 210 F. Supp. 2d 1155, 1163 (C.D. Cal. 2002) (rejecting argument that "a patent, standing alone, with no consideration of the products at issue, their substitutes, or a definition of the relevant market, establishes market power" and citing cases); B.V. Optische Industrie v. Hologic, Inc., 909 F. Supp. 162, 172 (S.D.N.Y. 1995) ("it is obvious that merely obtaining a patent for a product does not create a product market for antitrust purposes").

**Defendants' Proposed Jury Instruction No. 7**

**Relevant Geographic Market**

The other aspect of relevant market to be considered is the geographic area within which the products compete. This relevant geographic market can be as large as the entire world or the United States or as small as a single community. Plaintiff contends that the relevant geographic market is the United States.

The relevant geographic market is the area in which defendants face competition from suppliers that are in the relevant product market and to whom a buyer can practicably turn for the relevant product.

To determine the proper geographic market, you may consider if changes in prices at one location have fairly direct substantial effects on prices or sales at other locations, and if the people in the industry and the public at large view sellers in the different locations as being in competition with each other. Such evidence would tend to prove that the different locations are in the same relevant geographic market.

You also may consider how readily sellers can and do shift from selling in one location to selling in another. Evidence that sellers shift readily among different locations in response to price changes would tend to indicate that the different locations are in the same geographic market.

In addition, you may consider where purchasers, as a practical matter, can and do buy the product; that is, whether buyers residing in one area buy from the same sources as buyers residing in another area or if they buy from local sources rather than more distant sources because they find it more convenient or practical to do so. In this regard, you may consider whether an increase in prices charged by suppliers in one location would cause a substantial

number of purchasers to turn to more remote sources of supply. If so, the two locations are part of the same geographic market.

(ABA, C-11 to C-12)

**Defendants' Proposed Jury Instruction No. 8**

**Relevant Market - Supply Substitutability**

In some cases, it may be appropriate to take into account in defining the relevant market the makers of products that are not reasonable substitutes from the buyer's point of view. This is true where firms other than the defendant can readily use the production facilities, raw materials, and technology which they had been using to make a product that is not interchangeable with the defendant's product to, instead, manufacture and sell a product that is identical to or readily interchangeable with the defendant's product. In such cases, the capacity being used to produce products that are not substitutes from the buyer's point of view but which could easily be shifted to the production of products that would be reasonable substitutes acts as a constraint on the competitors' ability to raise prices. In other words, if a seller of a product raises prices high enough, a seller of a noncompeting product may begin selling a competing product. The same is true for the geographic market: if there are manufacturers that currently do not make reasonable substitutes, but who have the capacity to do so within a reasonable timeframe, those firms should be considered part of the geographic area in which a buyer can practicably turn for supplies.

Evidence has been offered in this case that certain manufacturers had the capability to shift readily from their manufacture of products that were not interchangeable with defendants' product to the manufacture of products that buyers could substitute for defendants' product. If you find that an increase in the price of defendants' product would have caused other manufacturers to shift into the manufacture of products that were interchangeable with defendants' product, then you should include in the relevant market the probable quantity of products that were or could have been offered to buyers as a result of such a shift.

(ABA, C-9 to C-10)

**Defendants' Proposed Jury Instruction No. 9**

**Relevant Market - Necessity of Proof**

If after considering all the evidence you find that plaintiff has proved both a relevant product market and a relevant geographic market, then you must consider the remaining elements of the plaintiff's Sherman Act claims. If you find that plaintiff has not proved either a relevant product market or a relevant geographic market, then you must find for defendants and against plaintiff on the antitrust claims.


(ABA, C-13)

**Defendants' Proposed Jury Instruction No. 10**

**Sherman Act - Section 1**

First, I will discuss Section 1 of the Sherman Act. I do so not because it is more important that Section 2, but because of convention. I could just as easily have chosen to address the Section 2 claims first.

Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies that unreasonably restrain trade and makes it illegal for any person to enter into any such contract, combination or conspiracy. Section 1 deals only with conduct between two or more persons and does not deal with unilateral conduct. The term "person" includes individuals, corporations, partnerships, and every other association or organization of every kind and character.

Jarrow claims that INC, IBC, PS, PSI, Mr. Schwitters and Professor Masquelier conspired to restrain trade by bringing through INC a patent and trademark infringement lawsuit against Jarrow and 17 other companies and making representations. To win on this claim, Jarrow must show:

*First:* an agreement to commit an unlawful anticompetitive act;

*Second:* that the patent and trademark infringement lawsuit was an unreasonable restraint of trade; and

*Third:* that such an agreement was the proximate cause of damage to the business or property of Jarrow, by causing Jarrow to lose sales on which it would have made a profit.


(ABA, A-3)  (3A O'Malley, Grenig & Lee, Federal Jury Practice & Instructions (Fifth Ed) § 150.40) ("FJPI") )

**Defendants' Proposed Jury Instruction No. 11**

**Sherman Act Section 1 - Definition, Existence and Evidence of Conspiracy**

Plaintiff alleges that defendants conspired to restrain trade by bringing a lawsuit for patent and trademark infringement. A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means.

Thus, plaintiff must prove both of the following elements by a preponderance of the evidence:

*First:* that the alleged conspiracy existed; and

*Second:* that each antitrust defendant (that is, INC, IBC, PSI, PS, Mr. Schwitters and Prof. Masquelier, but not Attorney Zivin) knowingly became a member of that conspiracy. "Knowingly" means voluntarily and intentionally, but not because of mistake or accident or other innocent reason.

A conspiracy is a kind of "partnership" in which each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy. To create such a relationship, two or more persons must enter into an agreement that they will act together for some unlawful purpose or to achieve a lawful purpose by unlawful means.

Direct proof of an agreement may not be available. A conspiracy may, however, be disclosed by the circumstances or by the acts of the members. Therefore, you may infer the existence of an agreement from what you find the alleged members actually did, as well as from the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together and discussed common aims and interests, does not establish the existence of a conspiracy unless it

tends to exclude the possibility that the persons were acting independently. If they acted similarly but independently of one another, without any agreement among them, then there would be no conspiracy.

The evidence must show that the alleged conspiracy of two or more persons existed, that one or more of the means or methods alleged was used to carry out is purpose, and that defendants knowingly became members of the conspiracy.

In determining whether an agreement has been proved, you must view the evidence as a whole and not piecemeal. In considering the evidence, you first should determine whether or not the alleged conspiracy existed. If you conclude that the conspiracy did exist, you should next determine whether INC, IBC, PSI, PS, Mr. Schwitters and Prof. Masquelier each knowingly became a member of that conspiracy with the intent to further its purposes.

(ABA, B-2 to B-5)

**Defendants' Proposed Jury Instruction No. 12**

**Sherman Act Section 1 - Corporations**

As a general rule, whatever any person is legally capable of doing himself or herself can also be done through another person as agent. If the acts of an employee or other agent are voluntarily and intentionally ordered or directed, or authorized or consented to by a person, then the law holds that person responsible for such acts, the same as if the acts had in fact been done by that person.

A corporation is in law a person, but, of course, it cannot act otherwise than through its directors, or officers, or employees, or other agents. The law therefore holds a corporation responsible for all unlawful acts of its directors, officers, employees, or other agents, provided such unlawful acts are done within the scope of their authority, as would usually be the case if done in the ordinary course of their employment, or in the ordinary course of the corporation's business.

Authority to act for a corporation in a particular matter, or in a particular way or manner, may be inferred from the surrounding facts and circumstances shown by the evidence in the case. That is to say, authority to act for a corporation, like any other act in issue in a civil case, need not be established by direct evidence, but may be established by indirect or circumstantial evidence.

Every act of any director, officer, employee, or other agent, on behalf of, or in the name of a corporation, if done within the scope of the person's authority, is by law the act of the corporation itself.