Page 210

1  and I think it's dated -- it was dated sometime prior
2  to April 14th of 1994. It looks like March 18th. If
3  you look at the third page where it's signed by
4  Professor Michaud on March 18, 1994?
5      A    Yes.
6      Q    What is the background of this assignment?
7          MR. ORDER: Objection to the form.
8          THE WITNESS: As I have told you, INC, INC,
9      in conjunction with INC Agency, were seeking a
10     license to sell OPC extracts for the specific
11     use claimed in the 360 patent. Now, what you
12     see here as pages 1008, 1009, are the final
13     results of those discussions.
14  BY MR. WIECHMANN:
15     Q    This is not a license, is it, sir, 1008?
16     A    Well, it says assignment.
17     Q    This is not a license?
18     A    No.
19     Q    Okay. If you were seeking a license, how
20  did the results of negotiations end in an assignment of
21  all of SCIPA's interest?
22     A    At a certain point in time the SCIPA
23  partners said, if you want to have our share in
24  the patent, in the 360 patent, here it is.
25     Q    The assignment states that it was in

Page 211

1  consideration of one dollar and other good and valuable
2  consideration. How much was paid by INC to SCIPA for
3  this assignment?
4          MR. ORDER: I think we would want that to
5      be restricted confidential, and we would request
6      that Mr. Rogovin --
7          MR. WIECHMANN: Fine. I'm not sure I agree
8      with it because I don't think that has anything
9      to do with any commercial issues here.
10     It's something that I think a court actually
11     commented upon at one time or the other, so I'm
12     not sure what big secret, but --
13         MR. ORDER: That's a claim --
14         MR. WIECHMANN: -- for the time being we'll
15     argue it later. But, Mr. Rogovin, can you
16     please step out for a second?
17         MR. ORDER: And it's also a little bit past
18     6:00 o'clock, so if you could wind up this area?
19         MR. WIECHMANN: I can do it right now.
20     I'll be finished in three minutes.
21         MR. ORDER: Sure.
22         MR. WIECHMANN: I just want this and a
23     couple of other.
24         MR. ORDER: So we would like to
25     designate the following testimony as restricted

Page 212

1  confidential.
2          MR. WIECHMANN: Okay.
3
4      (BEGINS RESTRICTED CONFIDENTIAL PORTION)
5
6  BY MR. WIECHMANN:
7      Q    Mr. Schwitters, how much did you --
8      A    Yeah. In my recollection it was -- this
9  particular piece of intellectual property in the whole
10 deal that I made with the professors, I think the
11 payment was 2 or 300,000 franks, French franks, at the
12 time, which is the equivalent today in US dollars
13 40,000.
14     Q    Forty thousand. Now, you said the whole
15 deal. Just so I understand, and they'll probably
16 restrict this, does that payment also include the
17 purchase of CEP?
18     A    No.
19     Q    Okay. How much did you pay for the
20 purchase of CEP?
21     A    In my recollection, it's a little bit less.
22 Like 300,000 French franks or so.
23     Q    And you made -- was that a payment made in
24 cash or, I mean --
25     A    Yes.

Page 213

1      Q    -- a payment made at one time? One --
2      A    Well, there was -- there were installments,
3  but the payments were made.
4      Q    Okay. For both CEP and for the assignment
5  of this patent?
6      A    Yes.
7      Q    At the time that you received the
8  assignment of this patent it says, an undivided 50
9  percent interest in the right title and interest to the
10 patent. Were you aware who owned the other 50 percent?
11     A    Yes.
12     Q    In connection with your negotiations
13 leading up to this assignment, did Doctor Masquelier,
14 Mr. Barraud or Professor Michaud ever tell you or
15 explain to you any agreements that SCIPA had with
16 Horphag dealing with this -- the assignment of the
17 patent?
18     A    No.
19     Q    Did they ever show you any documents that
20 in any way reflected this, the ownership of Horphag
21 in the 360 patent other than the patent itself? Did
22 they show you the agreements they had with --
23     A    No.
24         MR. ORDER: I think we're off the
25     restricted confidential --

Page 261

1 question.
2     MR. WIECHMANN: Strike that. Could you
3     read back the answer again?
4     (Whereupon, the requested portion of the
5     testimony was read by the court reporter.)
6 BY MR. WIECHMANN:
7     Q    What was the basis for you believing that
8 they had informed the license -- the natural food
9 industry that they could sell the OPC's?
10    A    I remember that they sent out some message.
11 I wouldn't call it a press release, but they sent out
12 a letter or so to --
13    Q    And specifically what -- what did the
14 message say?
15    A    I don't know. I don't -- I don't remember
16 what it specifically said, but I do remember that it
17 said something of the nature that Indena now was able
18 to provide their grapeseed extract for use under the
19 360 patent.
20    Q    Did their communication indicate that they
21 thought they had a license from INC?
22    A    I don't remember.
23    Q    Did their communication mention Horphag?
24    A    I don't remember.
25    Q    At the time that you authorized the cease

Page 262

1 and desist letters to go out, you were aware of the
2 agreement, 1985 agreement, between SCIPA and Horphag,
3 correct?
4     A    That's correct.
5     Q    And at the time that you authorized the
6 cease and desist letters to go out, you were also aware
7 of the letter from SCIPA to Horphag saying that one
8 patent owner should not make any -- do any transaction
9 without the knowledge and permission of the other
10 patent owner, correct? The letter we just saw this
11 morning.
12    A    Yeah, that's the SCIPA letter Mr. Barraud
13 wrote to Horphag. Yeah.
14    Q    At the time that you issued these letters
15 did you consider contacting Horphag to inform them what
16 you were doing?
17    A    No.
18    Q    At the time you were negotiating licenses
19 or trying to negotiate licenses under the 360 patent
20 did you consider contacting Horphag to get their
21 permission for those agreements?
22    A    There was absolutely, absolutely no need to
23 make such a consideration.
24    Q    And why is that?
25    A    Because in my -- in my view, both the joint

Page 263

1 owners of the patent have the absolute freedom to do
2 what they wanted to do, to either assign their rights,
3 give licenses, use the patent without having the
4 obligation to get the confirmation or acknowledgement
5 or agreement of the other joint owner.
6     Q    Did you ever see a piece of paper
7 supporting that view?
8     A    Did I ever see a piece of paper? Yes, I
9 did.
10    Q    Well, what did you see?
11        MR. ORDER: To the extent your answer might
12    divulge information or advice you received from
13    your counsel --
14        THE WITNESS: No.
15        MR. ORDER: -- that's responsive to it,
16    then I would suggest you not answer. But if
17    it's something else, you can.
18        THE WITNESS: Yeah. I saw the advice from
19    Horphag's lawyers to Horphag.
20 BY MR. WIECHMANN:
21    Q    And what did that say?
22    A    Precisely what I have just said: Both the
23 owners can do what they want to do.
24    Q    Under the patent?
25    A    Yes.

Page 264

1     Q    What about under the agreement between the
2 two parties?
3         MR. ORDER: Between --
4         THE WITNESS: Yes. So the lawyers,
5     Horphag's lawyers, had reviewed the
6     SCIPA/Horphag 1985 license agreement. Their
7     lawyers had reviewed all the other agreements
8     that were in place, maybe no longer active, and
9     Horphag's lawyers in this letter explained to
10    Horphag that both the joint owners were free
11    to do as they wanted to do under US patent law.
12 BY MR. WIECHMANN:
13    Q    What about under French patent law?
14    A    The letter did not discuss French patent
15 law.
16    Q    Did the letter discuss French contract law?
17    A    I don't remember.
18    Q    So you believe then that the position taken
19 by SCIPA in their letter to Horphag was incorrect?
20    A    Yes.
21    Q    Did you have anybody analyze this position
22 for you?
23    A    I think during that period, not
24 specifically in relation with this particular letter
25 written by Mr. Barraud, what I did at the time, what

Page 265

1  INC did at the time, is basically do what I would call
2  a legal due diligence on its position in the 360
3  patent.
4      Q    Where did you get a copy of Horphag's
5  attorneys' analysis of what the -- of co-owners could
6  do?
7      A    I don't remember.
8      Q    Do you still have a copy of it?
9      A    Yes.
10     Q    Did you give a copy of it to your
11 attorneys?
12     A    Sure.
13     Q    Mr. Zivin has a copy of that or did at
14 least?
15     A    Well, that I don't know, but I can give a
16 copy to my lawyers.
17     Q    No. No. I just want to know did you back
18 in 1995 give a -- prior -- when did you first become
19 aware of Horphag's attorneys' analysis?
20     A    It must have been during that period, not
21 much later than that.
22     Q    Did you get it in connection with the
23 Horphag/CONSAC lawsuit?
24     A    No.
25     Q    Did you get it from Horphag's lawyers

Page 266

1  directly?
2      A    No.
3      Q    Do you recall from whom you got it?
4      A    Well, I'm not sure, but I do think it came
5  from -- I mean, this is about the educated guess I
6  think, but it must have come from Mark Timmon.
7      Q    And you believe he gave it to you sometime
8  prior to the fall of 1985 when you started sending out
9  cease and desist letters?
10     A    I don't have a precise recollection of, you
11 know, whether this was before or after, but it was in
12 that period when INC reviewed, thoroughly reviewed its
13 position in the 360 patent, yeah.
14     Q    And what time was that?
15     A    Late '95, early '96.
16     Q    And other than looking at this letter, what
17 else did INC do to thoroughly review its position in
18 the patent?
19     A    I asked Mr. Zivin to assist me in this, I
20 asked Mr. Hagenaars, our Dutch intellectual property
21 lawyer, to assist me in this, and they were the two
22 major legal advisors I used.
23     Q    And they rendered opinions to you
24 concerning your rights of ownership under the 360
25 patent?

Page 267

1      A    They did.
2      Q    And did you ask any French attorney to
3  render advice concerning your rights under the 360
4  patent?
5      A    No, at the time I did not. At this
6  material time I did not.
7      Q    Did you give Mr. Zivin or Mr. Hagenaars
8  a copy of the 1985 agreement between Horphag and SCIPA?
9      A    Yes.
10     Q    Did you give them copies of the letter you
11 described, one of which I showed you today, between
12 Horphag and SCIPA concerning the respective rights of
13 the co-owners?
14     A    You mean, the -- the Barraud?
15     Q    Barraud, and then you mentioned like a
16 prior letter, too.
17     A    The Barraud letter of '87, if I recall
18 correctly, emerged in that period, so the other letter,
19 the letter from Mr. LaParra, only emerged many years
20 later in the Barraud 360 patent case; so I could not
21 have given that letter to Mr. Zivin or Mr. Hagenaars in
22 1994 or '95.
23     Q    Okay. But you did give them a copy of the
24 Garraud letter, the one we marked?
25     A    Barraud.

Page 268

1          MR. ORDER:  Barraud.
2  BY MR. WIECHMANN:
3      Q    Barraud.
4      A    Yes.
5      Q    I think the English translation uses a G,
6  so I apologize for that.
7      A    No, it's no, no big deal I mean.
8      Q    Okay. Does -- were there any other
9  documents you got from Horphag that you gave to Mr.
10 Zivin or Mr. Hagenaars?
11     A    Any other documents that I received from
12 Horphag?
13     Q    Or you either received from them or got
14 from somebody else, such as Mr. Timmon, as you said, or
15 somebody -- somebody else relating to the 360 patent or
16 Horphag?
17     A    Well, I mean, that's a very broad question.
18     Q    Well, I mean, you said you gave them a
19 couple of -- you gave them an agreement. You gave them
20 a letter to help them in their analysis. What else did
21 you give them to help them in their analysis?
22     A    Not much. I mean, I gave them the relevant
23 documents, which is basically the 1985 SCIPA/Horphag
24 Agreement, the original assignment of Doctor Masquelier
25 to SCIPA and Horphag, the patent itself, this '87

Page 269

1  Barraud letter. There was not really -- there weren't
2  any more relevant documents.
3      Q   Okay. Yesterday we saw a copy of the
4  Bordeaux Trial Court decision that I asked you to read
5  the first paragraph, which said that that suit was
6  started in October of 1995. Do you recall that?
7      A   (Nodding.)
8      Q   You have to say yes or no for the record.
9      A   Oh, sorry. Yeah. Yeah, I do. Yeah.
10     Q   Was the advice you got from Mr. Zivin or
11 Mr. Hagenaars before or after the institution of that
12 lawsuit?
13     A   Which advice?
14     Q   About your respective rights with Horphag
15 on the 360 patent.
16     A   It was during that period, but whether
17 it was, you know, the day before or the day after, I
18 don't know, but --
19     Q   I just wanted to know --
20     A   That was --
21     Q   I apologize. Please finish. But you're
22 not sure whether exactly if it was in November or
23 October?
24     A   When I got that advice?
25     Q   Yes.

Page 270

1      A   No. No.
2      Q   Do you recall whether you sent copies of
3  Horphag's complaints filed in the Bordeaux court to
4  Hagenaars and Mr. Zivin to aid them in rendering you
5  advice?
6      A   By then Mr. Hagenaars no longer played a
7  role in this, but --
8         MR. ORDER: Before you continue, I just got
9  to say that you really are bordering on
10 attorney/client privilege communications. I let
11 you go to a certain extent, but I just want to
12 again warn the witness not to divulge or
13 give him advice not to divulge privileged
14 communication with his counsel.
15        Your question this time was a little
16 bit closer to getting to legal advice as opposed
17 to just providing documents, so that's why I
18 think that we are bordering on that.
19        I will let him answer that question, but I
20 -- if the questions can be more factual and
21 objective rather than for, you know, to elicit
22 purposes behind the presentation or production
23 of documents to counsel, I think it's probably
24 more acceptable.
25        MR. WIECHMANN: All I asked was: Did he

Page 271

1  send copies of the complaints in the Bordeaux
2  court to Mr. Zivin and Mr. Hagenaars, and I
3  assume he just told me he didn't to Mr.
4  Hagenaars.
5         MR. ORDER: No, you added for the purpose
6  of assisting them in giving you legal advice,
7  and that's where I'm thinking it's time --
8         MR. WIECHMANN: Okay. I didn't mean giving
9  legal advice. What I meant was he said -- for
10 all these, he had, I had Mr. Zivin, I had Mr.
11 Hagenaars help me do my -- INC's analysis of
12 their rights under the 360 patent. What I meant
13 was, he said I gave them certain documents. I
14 just wanted to know if in addition to those
15 documents he gave them the Complaint, so it's
16 really no --
17        MR. ORDER: No, I understand the question,
18 but all I'm saying is you went a little farther
19 with that question.
20        THE WITNESS: Well, I did not give the
21 French, the Horphag Complaint filed in the 360
22 patent case in Bordeaux. I did not present that
23 to -- immediately to Mr. Zivin for evaluating
24 INC's position in the -- in the 360 patent
25 because I gave -- or that Complaint was

Page 272

1  initially handled by the Paris lawyer, Mr.
2  Luchtenburg, who was INC's French lawyer, and
3  what I do remember is that Mr. Luchtenburg and
4  Mr. Zivin communicated about this particular
5  French case that had been started by Horphag.
6  BY MR. WIECHMANN:
7      Q   But I believe you also said that Mr.
8  Hagenaars was no longer working for INC at the time
9  this suit was started?
10     A   That's correct.
11     Q   So then Mr. Hagenaars' advice was obviously
12 rendered to you prior to the institution of the
13 lawsuit?
14     A   Yes.
15        MR. WIECHMANN: This may be a good time to
16 take a break. It's -- also I want to get things
17 marked off the record, so we can speed up some
18 of this testimony.
19        THE VIDEOGRAPHER: Going off the record at
20 11:02.
21        (There was a break from 11:02 A.M. to 11:29
22 A.M.)
23        (Plaintiff's Exhibit 87, Letter dated
24 8/21/95, was marked for identification.)
25

Page 273

1    (Plaintiff's Exhibit 88, Letter
2    dated 8/7/95, was marked for identification.
3    (Plaintiff's Exhibit 89, Letter
4    dated 8/17/95, was marked for identification.
5    (Plaintiff's Exhibit 90, Letter
6    dated 9/8/95, was marked for identification.
7    (Plaintiff's Exhibit 91, Letter
8    dated 9/29/95, was marked for identification.
9    (Plaintiff's Exhibit 92, Letter
10   dated 10/27/95, was marked for identification.)
11   (Plaintiff's Exhibit 93, Letter
12   dated 10/27/95, was marked for identification.)
13   (Plaintiff's Exhibit 94, Letter
14   dated 11/9/95, was marked for identification.
15   (Plaintiff's Exhibit 95, Letter
16   dated 12/20/99, was marked for identification.)
17   (Plaintiff's Exhibit 96, Letter
18   dated 11/28/00, was marked for identification.
19   (Plaintiff's Exhibit 97, Letter dated
20   8/7/95, was marked for identification.)
21   (Plaintiff's Exhibit 98, Agreement dated
22   11/2/96, was marked for identification.)
23   (Plaintiff's Exhibit 99, 1996 Confirmatory
24   Assignment, was marked for identification.)
25       THE VIDEOGRAPHER: Back on record at 11:29

Page 274

1    a.m.
2    BY MR. WIECHMANN:
3    Q   Mr. Schwitters, before our break we had
4    discussed cease and desist letters that you had
5    authorized your attorney to send to various sellers of
6    OPC extract products in the United States. Do you
7    recall that testimony?
8    A   Yes.
9    Q   I would like to show you a few of the
10   letters that we had received in connection -- from
11   defendants in connection with our response, in
12   connection with Defendant's Response for Request to
13   Produce, and I ask you first, at the time that these
14   letters were being sent out on INC's behalf, did you
15   get a chance to first see the letter before they went
16   out?
17   A   You're referring to the --
18   Q   Cease and desist letters.
19   A   Cooper and Dunham cease and desist letters?
20   Q   Yes.
21   A   Yeah. In my recollection of things, I saw
22   these letters before they were sent, at least one
23   draft.
24   Q   Okay. Did you assist in the language that
25   was ultimately -- assist in drafting the language that

Page 275

1    was ultimately used in the cease and desist letters?
2    A   No.
3    Q   I'd like to show you Exhibit 87 --
4    A   Yes.
5    Q   -- which appears to be on INC Agency, BV,
6    letterhead. Is that a letter you sent to Nutraceutical
7    Corporation, Mr. Bill Logan, in August of 1995?
8    A   That's correct.
9    Q   Okay. I would like to know why you decided
10   to send this one directly as opposed to have -- and
11   copy your attorney as opposed to, like most of the
12   other claimed infringers, have your attorney send the
13   letter out?
14   A   Because I knew Mr. Logan very well, so I
15   didn't want him to receive an attorney letter. I
16   wanted to contact it -- contact him personally.
17   Q   Were you aware -- when did you become aware
18   that Mr. Logan was selling OPC products from grapeseed
19   extract?
20   A   Well, when I look at this '95 letter,
21   August, during the month before.
22   Q   Do you know where Nutraceutical Corporation
23   was receiving their raw material?
24   A   No.
25   Q   Okay. Did you ever -- the second page you

Page 276

1    suggest to Mr. Logan that you could resolve this issue
2    amicably. Do you recall ever reaching a resolution
3    with Mr. Logan?
4    A   No.
5    Q   Did you ultimately sue him or his company?
6        MR. ORDER: Did INC sue him you mean?
7        MR. WIECHMANN: Yes.
8        THE WITNESS: I don't recall whether
9    Nutraceutical was included in the Connecticut
10   lawsuit. Could be. I don't know.
11   BY MR. WIECHMANN:
12   Q   Did -- were you involved in any way in the
13   decision as to which companies would be sued and which
14   weren't?
15   A   Yeah.
16   Q   Do you recall having an opinion as to
17   whether Nutraceutical should be sued or not?
18   A   Myself?
19   Q   Yes.
20       MR. ORDER: Are you talking about the
21   Connecticut lawsuit?
22       THE WITNESS: I don't remember. I don't
23   really remember.
24   BY MR. WIECHMANN:
25   Q   I notice this letter talks about Kal,

15 (Pages 273 to 276)

Page 265

1  INC did at the time, is basically do what I would call
2  a legal due diligence on its position in the 360
3  patent.
4      Q    Where did you get a copy of Horphag's
5  attorneys' analysis of what the -- of co-owners could
6  do?
7      A    I don't remember.
8      Q    Do you still have a copy of it?
9      A    Yes.
10     Q    Did you give a copy of it to your
11 attorneys?
12     A    Sure.
13     Q    Mr. Zivin has a copy of that or did at
14 least?
15     A    Well, that I don't know, but I can give a
16 copy to my lawyers.
17     Q    No. No. I just want to know did you back
18 in 1995 give a -- prior -- when did you first become
19 aware of Horphag's attorneys' analysis?
20     A    It must have been during that period, not
21 much later than that.
22     Q    Did you get it in connection with the
23 Horphag/CONSAC lawsuit?
24     A    No.
25     Q    Did you get it from Horphag's lawyers

Page 266

1  directly?
2      A    No.
3      Q    Do you recall from whom you got it?
4      A    Well, I'm not sure, but I do think it came
5  from -- I mean, this is about the educated guess I
6  think, but it must have come from Mark Timmon.
7      Q    And you believe he gave it to you sometime
8  prior to the fall of 1985 when you started sending out
9  cease and desist letters?
10     A    I don't have a precise recollection of, you
11 know, whether this was before or after, but it was in
12 that period when INC reviewed, thoroughly reviewed its
13 position in the 360 patent, yeah.
14     Q    And what time was that?
15     A    Late '95, early '96.
16     Q    And other than looking at this letter, what
17 else did INC do to thoroughly review its position in
18 the patent?
19     A    I asked Mr. Zivin to assist me in this, I
20 asked Mr. Hagenaars, our Dutch intellectual property
21 lawyer, to assist me in this, and they were the two
22 major legal advisors I used.
23     Q    And they rendered opinions to you
24 concerning your rights of ownership under the 360
25 patent?

Page 267

1      A    They did.
2      Q    And did you ask any French attorney to
3  render advice concerning your rights under the 360
4  patent?
5      A    No, at the time I did not. At this
6  material time I did not.
7      Q    Did you give Mr. Zivin or Mr. Hagenaars
8  a copy of the 1985 agreement between Horphag and SCIPA?
9      A    Yes.
10     Q    Did you give them copies of the letter you
11 described, one of which I showed you today, between
12 Horphag and SCIPA concerning the respective rights of
13 the co-owners?
14     A    You mean, the -- the Barraud?
15     Q    Barraud, and then you mentioned like a
16 prior letter, too.
17     A    The Barraud letter of '87, if I recall
18 correctly, emerged in that period, so the other letter,
19 the letter from Mr. LaParra, only emerged many years
20 later in the Barraud 360 patent case; so I could not
21 have given that letter to Mr. Zivin or Mr. Hagenaars in
22 1994 or '95.
23     Q    Okay. But you did give them a copy of the
24 Garraud letter, the one we marked?
25     A    Barraud.

Page 268

1          MR. ORDER:  Barraud.
2  BY MR. WIECHMANN:
3      Q    Barraud.
4      A    Yes.
5      Q    I think the English translation uses a G,
6  so I apologize for that.
7      A    No, it's no, no big deal I mean.
8      Q    Okay. Does -- were there any other
9  documents you got from Horphag that you gave to Mr.
10 Zivin or Mr. Hagenaars?
11     A    Any other documents that I received from
12 Horphag?
13     Q    Or you either received from them or got
14 from somebody else, such as Mr. Timmon, as you said, or
15 somebody -- somebody else relating to the 360 patent or
16 Horphag?
17     A    Well, I mean, that's a very broad question.
18     Q    Well, I mean, you said you gave them a
19 couple of -- you gave them an agreement. You gave them
20 a letter to help them in their analysis. What else did
21 you give them to help them in their analysis?
22     A    Not much. I mean, I gave them the relevant
23 documents, which is basically the 1985 SCIPA/Horphag
24 Agreement, the original assignment of Doctor Masquelier
25 to SCIPA and Horphag, the patent itself, this '87

**Page 297**

1   A   On the agreement.
2   Q   And that's just solely your reading the
3   agreement without asking anybody else as to what they
4   thought the agreement meant or how long it was in
5   existence for?
6   A   I asked, of course, Mr. Zivin, INC's
7   lawyer, for his viewpoint.
8   Q   Okay. So your understanding was partially
9   based on Mr. Zivin's viewpoint?
10  A   Yes.
11  Q   Was it based on the viewpoint of your Dutch
12  intellectual property counsel?
13  A   No.
14  Q   Was it based on the viewpoint of Mr.
15  Luchtenburg?
16  A   Yes.
17  Q   At the time that you started this suit in
18  March of 1996 was Mr. Luchtenburg still your attorney
19  in the Bordeaux action brought by Horphag against INC?
20  A   I don't remember.
21  Q   Why did you replace Mr. Luchtenburg with
22  Mr. Benech --
23  A   There was --
24  Q   -- in that lawsuit?
25      MR. ORDER: I think that really goes to --

**Page 298**

1       MR. WIECHMANN: Do you want to confer? Do
2   you know what it is?
3       MR. ORDER: Well, I think first the tape is
4   just about ending.
5       MR. WIECHMANN: We've got five minutes.
6       MR. ORDER: Oh, I thought it was one minute
7   I saw. Okay.
8       THE WITNESS: Well, I don't think there is
9   a problem answering.
10      MR. ORDER: Okay. Go ahead. Answer then.
11      THE WITNESS: There was a conflict of
12  interest came out so that Mr. Luchtenburg's law
13  firm could no longer represent INC in France.
14  That's what they told me, so I just looked. Mr.
15  Luchtenburg advised another attorney, and this
16  is what we did.
17  BY MR. WIECHMANN:
18  Q   Do you recall what that conflict of
19  interest involved, what other party was involved in
20  that conflict?
21      MR. ORDER: Is that really relevant?
22      THE WITNESS: I think it's really, you
23  know --
24      MR. ORDER: I think that's getting a little
25  too close.

**Page 299**

1   BY MR. WIECHMANN:
2   Q   Well, did Mr. Luchtenburg's firm in any way
3   represent Horphag that --
4       MR. ORDER: Object--
5   BY MR. WIECHMANN:
6   Q   -- that created the conflict?
7   A   I don't know.
8   Q   But that was -- they did not tell you that
9   was the part of their conflict that they had some sort
10  of relationship, either past or present, with Horphag
11  or any of their affiliated companies?
12  A   It was made -- they explained to me, Mr.
13  Luchtenburg's law firm, they explained to me that there
14  was a conflict of interest here, and that they were not
15  representing Horphag. But still there was a conflict
16  of interest, and they advised me, you know, to seek
17  legal advice elsewhere in France. That's what they
18  said.
19  Q   But they didn't --
20  A   And they did not tell me precisely what the
21  conflict of interest was.
22  Q   Did you ask them?
23  A   Yes.
24  Q   And they refused to tell you what the basis
25  of their conflict was?

**Page 300**

1   A   Yes.
2   Q   Did Mr. Benech ever find out what the basis
3   of the conflict was?
4       MR. ORDER: Objection to the form of the
5   question.
6       THE WITNESS: I don't think --
7       MR. ORDER: If Mr. Benech had found out and
8   had communicated that to Mr. Schwitters, then
9   clearly that's an attorney/client privilege
10  communication.
11      MR. WIECHMANN: The substance, yeah, but the
12  fact that he communicated is not privileged.
13      MR. ORDER: Well, that wasn't your
14  question.
15      MR. WIECHMANN: I just -- did he ever find
16  out?
17      MR. ORDER: Your question was whether Mr.
18  -- Attorney Benech found out, not whether
19  Attorney Benech told him whether he had found
20  out.
21      THE WITNESS: Well, if the question was
22  whether Benech ever found out, then my answer is
23  I don't know.
24      MR. WIECHMANN: We have so little left of
25  the tape, I think it's appropriate time just to