Dkt. 48993

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| INTERNATIONAL NUTRITION COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> HORPHAG RESEARCH LTD., MW INTERNATIONAL, INC., KAIRE INTERNATIONAL, INC., TRACO LABS, INC., CHEMCO INDUSTRIES, INC., GREATER CONTINENTS, INC., INDENA U.S.A., TWIN LABORATORIES, INC., USANA, INC., FREE LIFE INTERNATIONAL LTD., NOW FOODS, ENZYMATIC THERAPY, INC., NUTRACEUTICAL CORPORATION, ESTEE LAUDER, INC., ARKOPHARMA, INC., JARROW FORMULAS, INC., NEW VISION INTERNATIONAL, INC., and CHANGES INTERNATIONAL OF FORT WALTON BEACH, INC., <br><br> Defendants. |  <br><br> Civil Action No. <br><br> 396CV0086 <br><br> JFGD <br><br>  |

COMPLAINT

Plaintiff, INTERNATIONAL NUTRITION COMPANY ("INC"), by its attorneys, complaining of defendants HORPHAG RESEARCH LTD. ("Horphag"), MW INTERNATIONAL, INC. ("MW"), KAIRE INTERNATIONAL, INC. ("Kaire"), TRACO LABS, INC. ("Traco Labs"), CHEMCO INDUSTRIES, INC. ("Chemco"), GREATER CONTINENTS, INC. ("Greater Continents"), INDENA U.S.A. ("Indena"), TWIN LABORATORIES, INC. ("Twin Labs"), USANA, INC. ("Usana"), FREE LIFE INTERNATIONAL LTD. ("Free Life"), ENZYMATIC THERAPY, INC. ("Enzymatic"), NOW FOODS ("Now Foods"), NUTRACEUTICAL CORPORATION ("Nutraceutical"), ESTEE LAUDER, INC. ("Estee Lauder"), ARKOPHARMA, INC. ("Arkopharma"), JARROW FORMULAS, INC. ("Jarrow"),

NEW VISIONS INTERNATIONAL, INC. ("New Vision") and CHANGES INTERNATIONAL OF FORT WALTON BEACH, INC. ("Changes"), alleges as follows:

## PARTIES

1. Plaintiff INC is a company organized and existing under the laws of Liechtenstein and has its principal place of business at Josef Rheinbergerstrasse 6, Vaduz, Liechtenstein.

2. Primary Services International LLC, a limited liability company organized and existing under the laws of the State of Connecticut and having its place of business at P.O. Box 1099, Southport, Connecticut 06490, is the plaintiff's exclusive distributor for the sale of plant extracts and products containing plant extracts with a proanthocyanidins content in the United States.

3. Upon information and belief, defendant Horphag is a company organized and existing under the laws of the United Kingdom and has its principal place of business at Maison Allaire, Smith Street, Peter's Port, Guernsey, Channel Islands. Upon information and belief, Horphag is doing business within this judicial district.

4. Upon information and belief, defendant MW is a corporation organized and existing under the laws of the State of New Jersey and has its principal place of business at 225 Long

Avenue, Hillside, New Jersey 07205. Upon information and belief, MW is doing business within this judicial district.

5. Upon information and belief, defendant Kaire is a corporation organized and existing under the laws of the State of Nevada and has its principal place of business at 380 Lashley, Longmont, Colorado 80501. Upon information and belief, Kaire is doing business within this judicial district.

6. Upon information and belief, defendant Traco is a corporation organized and existing under the laws of the State of Illinois with a principal place of business at 3102 Clark Rd., Champaign, Illinois 61826. Upon information and belief, Traco is doing business within this judicial district.

7. Upon information and belief, defendant Chemco is a division of Kenko Commerce & Co., Ltd., a corporation organized and existing under the laws of Japan, with a principal place of business at 500 Citadel Dr., Suite 120, Los Angeles, CA 90040. Upon information and belief, Chemco is doing business within this judicial district.

8. Upon information and belief, defendant Greater Continents is a corporation organized and existing under the laws of the State of California with a principal place of business at 140 Arrowood Lane, San Mateo, California 94403. Upon information and belief,

Greater Continents is doing business within this judicial district.

9.   Upon information and belief, defendant Indena U.S.A. is a division of Indena SpA, a corporation organized and existing under the laws of Italy, with a principal place of business at 1601 5th Ave., Suite 1203, Seattle, Washington 98101. Upon information and belief, Indena is doing business within this judicial district.

10.   Upon information and belief, defendant Twin Labs is a corporation organized and existing under the laws of the State of New York and has a principal place of business at 2120 Smithtown Ave., Ronkonkoma, New York 11779. Upon information and belief, Twin Labs is doing business within this judicial district.

11.   Upon information and belief, defendant Usana is a corporation organized and existing under the laws of the State of Utah and has a principal place of business at 4550 S. Main Street, Salt Lake City, Utah 84107. Upon information and belief, Usana is doing business within this judicial district.

12.   Upon information and belief, defendant Free Life is a partnership organized and existing under the laws of the State of Connecticut and has a principal place of business at 354 Woodmont Road, Suite 5, Milford, Connecticut 06460.

13. Upon information and belief, defendant Enzymatic is a corporation organized and existing under the laws of the State of Wisconsin and has a principal place of business at 825 Challenger Drive, Green Bay, Wisconsin 54311. Upon information and belief, Enzymatic is doing business within this judicial district.

14. Upon information and belief, defendant Now Foods is a division of The Fruitful Yield, Inc., a corporation organized and existing under the laws of the State of Illinois and has a principal place of business at 550 W. Mitchell, Glendale Heights, Illinois 60139-2581. Upon information and belief, Now Foods is doing business within this judicial district.

15. Upon information and belief, defendant Nutraceutical is a corporation organized and existing under the laws of the State of Utah and has a principal place of business at 1104 Country Hills Road, Suite 300, Ogden, Utah 84403. Upon information and belief, Nutraceutical is doing business within this judicial district.

16. Upon information and belief, defendant Estee Lauder is a corporation organized and existing under the laws of the State of New York and has a principal place of business at 767 Fifth Avenue, New York, New York 10153. Upon information and belief, Estee Lauder is doing business within this judicial district.

17. Upon information and belief, defendant Arkopharma purports to be a corporation organized and existing under the laws of the State of California and has a principal place of business at 19611 Ventura Blvd., Tarzana, California 91356. Upon information and belief, Arkopharma is doing business within this judicial district.

18. Upon information and belief, defendant Jarrow is a corporation organized and existing under the laws of the State of California and has a principal place of business at 1824 S. Robertson Blvd., Los Angeles, California 90035. Upon information and belief, Jarrow is doing business within this judicial district.

19. Upon information and belief, defendant New Vision is a corporation organized and existing under the laws of the State of Arizona and has a principal place of business at 14982 North 83rd Place, Scottsdale, Arizona 85260. Upon information and belief, New Visions is doing business within this judicial district.

20. Upon information and belief, defendant Changes is a corporation organized and existing under the laws of the State of Florida and has a principal place of business at 548 Mary Esther Cutoff, Unit 325, Fort Walton Beach, Florida 32548. Upon information and belief, Changes is doing business within this judicial district.

## NATURE OF CLAIMS, JURISDICTION AND VENUE

21. This Court has jurisdiction over this action for patent infringement, unfair competition and trademark infringement pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1338(a) and (b). The matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 (b), (c) and (d).

## FIRST CLAIM FOR RELIEF--PATENT INFRINGEMENT BY ALL DEFENDANTS

22. Plaintiff INC realleges and incorporates by reference the allegations of paragraphs 1 through 21 above.

23. Plaintiff INC is, and at all times relevant herein has been, the owner, by assignment, of at least an undivided one-half interest in U.S. Patent No. 4,698,360, issued October 6, 1987 to Dr. Jack Masquelier, entitled "Plant Extract with a Proanthocyanidins Content as Therapeutic Agent Having Radical Scavenger Effect and Use thereof" (the "'360 patent"). The patent was duly and legally issued and is valid and subsisting. A copy of the '360 patent is attached as Exhibit A.

24. Defendant Horphag claims to be, and at all times relevant herein claimed to be, the other owner, by assignment, of an undivided one-half interest in the '360 patent. Upon information and belief, Horphag no longer is an owner of any interest in the '360 patent. Nonetheless, Horphag is offerring licenses under the '360 patent.

25. Alternatively, even if defendant Horphag continues to own a one-half interest in the '360 patent, upon information and belief, Horphag will not become a voluntary plaintiff in this action. Complete relief cannot be accorded INC in the absence from this action of Horphag, the purported co-owner of the '360 patent.

26. The defendants have made, used and/or sold, and are now making, using and/or selling, plant extracts and products containing plant extracts with a purported proanthocyanidins content. The defendants have promoted and now promote their plant extracts and products as antioxidants having a radical scavenging effect.

27. On information and belief, the defendants have knowingly and actively supplied their infringing plant extracts and products to others for sale as antioxidants having a radical scavenging effect.

28. On information and belief, the defendants willfully and deliberately have induced others to infringe and/or have contributed to the infringement by others of the '360 patent.

29. Defendants Traco and Free Life have stated that they plan to cease their infringing acts, but neither has accounted for its unlawful gains and profits for past infringement of the '360 patent.

30. The defendants' activities, as alleged above, violate the Patent Laws of the United States, 35 U.S.C. § 271.

31. The plaintiff has given notice of its patent rights by arranging for products sold by distributors in the United States to be marked with the '360 patent, and by giving written notice of infringement to most of the defendants.

32. The defendants have made and will make unlawful gains and profits from the infringement of and inducement of infringement of plaintiff's '360 patent. The plaintiff has been and will be deprived of rights and income which it otherwise would have received but for such infringement. Thus, the defendants' actions have caused and will continue to cause irreparable injury to plaintiff INC in an amount which cannot presently be determined.

33. The plaintiff does not have an adequate remedy at law.

SECOND CLAIM FOR RELIEF --
UNFAIR COMPETITION BY DEFENDANTS HORPHAG, MW AND KAIRE

34. Plaintiff INC realleges and incorporates by reference the allegations of paragraphs 1 through 33 above.

35. Defendants Horphag, MW and Kaire have falsely represented to the public and the trade that Horphag is the owner of the '360 patent, that INC is not properly an owner of the '360 patent, and that Horphag may issue licenses under the '360 patent.

36. The defendants have used in commerce in connection with the sale of goods false or misleading descriptions and representations of fact which are likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of goods or commercial activities of the plaintiff.

37. The defendants have used in commerce in connection with the sale of goods false or misleading descriptions and representations of fact which misrepresent the nature, characteristics and qualities of goods or commercial activities of the plaintiff.

38. The defendants' activities, as alleged above, violate the Lanham Act, 15 U.S.C. § 1125a.

39. The defendants' acts have irreparably damaged plaintiff INC in an amount which cannot presently be determined.

40. The plaintiff does not have an adequate remedy at law.

### THIRD CLAIM FOR RELIEF --
### TRADEMARK INFRINGEMENT BY DEFENDANTS
### NUTRACEUTICAL, JARROW, NEW VISION AND CHANGES

41. Plaintiff INC realleges and incorporates by reference the allegations of paragraphs 1 through 40 above.

42. Plaintiff INC is, and at all times relevant herein has been, the owner of the trademarks OPC 85 and OPC 85+.

43. Plaintiff INC has permitted the use of the trademarks OPC 85 and OPC 85+ in the United States only by Primary Services International LLC and its customers for the sale of plant extracts and products containing plant extracts produced under plaintiff's authority for use as food supplements and the like.

44. Plaintiff INC is the owner of the United States trademark Registration No. 1,684,990 for the mark OPC 85, and the registration is in full force and effect, valid and subsisting. A copy of the registration is attached as Exhibit B.

45. Defendants Jarrow, Nutraceutical, New Vision and Changes have infringed plaintiff's rights in the marks OPC 85 and OPC 85+ by using the confusingly similar marks OPC 85, OPC 85+ and/or OPC 95 in connection with products containing plant extracts which are not produced under plaintiff's authority.

46. The use by defendants Jarrow, Nutraceutical, New Vision and Changes of the marks OPC 85, OPC 85+ and/or OPC 95 and other false information is likely to cause confusion, mistake and deception among the trade and the public as to the origin, sponsorship or affiliation of the defendants' products.

47. The use by the defendants of the marks OPC 85, OPC 85+ and/or OPC 95 violates the Lanham Act, 15 U.S.C. §1114(1).

48. The defendants' acts have irreparably injured plaintiff INC in an amount which cannot presently be determined.

49. The plaintiff does not have an adequate remedy at law.

WHEREFORE, plaintiff INC demands the following relief:

(a) A preliminary and permanent injunction against the continued infringement of the '360 patent by the defendants, their officers, directors, agents, employees and servants and any persons acting in concert or participation with them;

(b) A preliminary and permanent injunction against unfair competition by defendants Horphag, MW and Kaire, their officers, directors, agents, employees and servants and any persons acting in concert or participation with them;

(c) A declaratory judgment that Horphag has no ownership rights in the '360 patent;

(d) A preliminary and permanent injunction against trademark infringement by defendants Nutraceutical, Jarrow, New Vision and Changes, their officers, directors, agents, employees and servants and any persons acting in concert or participation with them;

(e) An accounting of each defendant's profits by reason of their respective infringement, an award of plaintiff's damages suffered by reason of such infringement, together with interest,

and a trebling thereof where appropriate either under 35 U.S.C. § 284 in view of defendants' willful and deliberate infringement of the '360 patent or under 15 U.S.C. §1117;

(f) An award of reasonable attorneys' fees and full costs and expenses of this action;

(g) An order requiring the defendants to surrender for destruction all infringing product and all materials for making same in their possession, custody or control; and

(h) Such other relief as this Court may deem just and proper.

Respectfully,

WAKE, SEE, DIMES & BRYNICZKA

Dated: March 6 , 1996

By: _____
Jonathan A. Flatow (ct 03115)
27 Imperial Avenue
P.O. Box 777
Westport, Connecticut 06881
Attorneys for Plaintiff
International Nutrition Company

Of Counsel:

Norman H. Zivin  (ct 08103)
Donna A. Tobin   (ct 14698)
COOPER & DUNHAM LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

13

# United States Patent [19]

**Masquelier**

[11] Patent Number: 4,698,360

[45] Date of Patent: Oct. 6, 1987

[54] **PLANT EXTRACT WITH A PROANTHOCYANIDINS CONTENT AS THERAPEUTIC AGENT HAVING RADICAL SCAVENGER EFFECT AND USE THEREOF**

[75] Inventor: Jack Masquelier, Parc des Tourelles, France

[73] Assignees: Societe Civile d'Investigations Pharmacologiques d'Aquitaine, Bordeaux, France; Horphag Overseas Ltd., St. Peter Port, Guernsey, Great Britain

[21] Appl. No.: 721,434

[22] Filed: Apr. 9, 1985

[51] Int. Cl.$^4$ .................................................. A61K 31/35
[52] U.S. Cl. .................................................. 514/456
[58] Field of Search ........................ 424/195.1; 514/456

[56] **References Cited**

U.S. PATENT DOCUMENTS

3,436,407   4/1969   Masquelier ........................ 549/400

FOREIGN PATENT DOCUMENTS

1300869   7/1982   France .

OTHER PUBLICATIONS

Fartas et al. "Flavonids and Bioflavonoids, 1981, Studies in Organic Chem. Amsterdam, 1982.
Munro. Organization Mondicals de la Sante, Anthocyanins, 1977.
Masqueliner et al, Int. J. Vit. Nat. Res. 49:307-311, 1979.
Maridonneau et al, Chem. Abst. 97: 160662y, 1982.

Primary Examiner—Johnnie R. Brown
Assistant Examiner—John W. Rollins, Jr.

[57] **ABSTRACT**

The invention provides a method for preventing and fighting the harmful biological effects of free radicals in the organism of warm blooded animals and more especially human beings, namely cerebral involution, hypoxia following atherosclerosis, cardiac or cerebral infarction, tumour promotion, inflammation, ischaemia, alterations of the synovial liquid, collagen degradation, among others. The method consists in administering to said animals and especially to human beings an amount, efficient against said effects, of a plant extract with a proanthocyanidins content which has a radical scavenger effect, the extract being in the form of a medicament and coming more especially from the bark of conifers.

**7 Claims, No Drawings**

Exhibit A

# PLANT EXTRACT WITH A PROANTHOCYANIDINS CONTENT AS THERAPEUTIC AGENT HAVING RADICAL SCAVENGER EFFECT AND USE THEREOF

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to the use of a plant extract with a proanthocyanidins content as therapeutic agent with radical scavenger effect. It also relates to the use of pharmaceutical compositions containing this extract as active ingredient.

The medicaments of the present invention are obtained by extracting raw plant materials complying with different criteria:

1. A proanthocyanidins content.
2. Easy and permanent raw material supplies at low cost.
3. Absence of natural or artificial toxic constituents.

The bark of conifers, in particular pine bark such as that of the maritime pine (Pinus maritima), forms a first class material in this respect. Other conifers (refer to Jack Masquelier and Pierre Claveau, Naturaliste Can., 1966, 93, 345-348), such as the Canadian spruce (Tsuga canadensis), and many other arborescent or herbaceous plant species, contain proanthocyanidins and may then be used as raw material, if the criteria mentioned are complied with (Bate-Smith, E.C., Biochem. J., 1954, 58, 122-126; Bate-Smith, E.C., Lerner, N.H., Biochem.J., 1954, 58, 126-132). It will be essentially a question hereafter of a pine bark extract, but this expression should be considered as covering "any plant extract with a proanthocyanidins content". This content will vary with the plant material used to obtain the extract.

### 2. Prior Art

The use of maritime pine bark (Pinus Maritima), as raw material for extracting medicaments is described in patents by the same inventor (French Pat. Nos. 1 427 100 and 4482 M and the corresponding U.S. Pat. No. 3,456,407, which is included in the present description by reference).

Using an extraction process described in these patents, from pine bark can be obtained extracts which are used therapeutically for their action in the vascular field. Such properties place these medicaments among the vitamin P factors whose effect is to increase the resistance of small blood vessels and lower their permeability, so that hemorrhagic phenomena an oedema due to vascular fragility form the major uses for the products coming from pine bark.

## DESCRIPTION OF THE INVENTION

Since these old patents were filed, scientific progress has led to a better knowledge of the chemical nature of the constituents which confer this therapeutic potential on pine bark extract. These substances are at present known under the name of "proanthocyanidins". It is under this new name, and whatever the original plant, that the substances responsible for the new medicinal activity claimed will be designated, which substances are identifiable by a specific test, which will be given hereafter.

The present invention relates in fact to a new therapeutic use of proanthocyanidins. This new use is the protection of warm blooded animals and in particular human beings with respect to the harmful biological effects caused by the release in the organism, more especially with aging, of free radicals, in particular those containing oxygen, that will be called hereinafter oxygen radicals. The protective effect is obtained because of the "radical scavenger effect" proper to the medicament.

In pine bark it is the proanthocyanidins which show the radical scavenger effect (R.S.E.). The proanthocyanidins form a class of natural polyphenols, defined by an exclusive property, namely the production of a red pigment (anthocyanidin) by the Bate-Smith reaction (Bate-Smith, E.C. Swain, T., Chemistry and Industry, 1953, pp. 377-378).

The Bate-Smith reaction, because of its specificity, is one of the processes used for detecting proanthocyanidins in a plant extract, and possibly for assessing the content thereof.

I.

## RADICAL SCAVENGER EFFECT (R.S.E.) OF PROANTHOCYANIDINS

The R.S.E. has never been claimed in favor of proanthocyanidins. Although proanthocyanidins are polyphenols, it was not at all evident that they are endowed with R.S.E., whose intensity varies within wide limits depending on the molecular structure. The lag of knowledge in this connection is due to the difficulty in preparing chromatographically pure proanthocyanidins for use as standards during quantity determination. Only a few laboratories are at present capable of preparing such standards and they are not necessarily interested in the medical problems which these substances may resolve, which explains the lack of prior art in this field.

The R.S.E. of the pine bark extract may be demonstrated in vitro by different known tests, in particular by the TNB test (Nishikimi, M., Rav, N.A., Yagi, K., Biochem. Biophys. Res. Commun., 1972, 46, 849-854), according to which the oxygen radicals (particularly superoxide ions $O_2^-$) have the property of reducing tetrazolium nitroblue (TNB) into formazan blue, whose quantity may be colorimetrically determined at 560 nm. In the presence of proanthocyanidins operating as $O_2^-$ scavengers, reduction of the TNB is inhibited, which is demonstrated by a reduction of absorption at 560 nm.

With the TNB test, the pine bark extract shows an R.S.E. about 20 times higher than that of ascorbic acid used as reference.

Using a chicken embryo vascular tissue culture, the R.S.E. of the pine bark extract was also checked. Under certain conditions, these cultures degenerate rapidly and show in particular destruction of the membrane phospholipids under the action of the oxygen radicals (O.R.). The pine bark extract added to the medium maintains these cultures in a normal histologic condition. The same favorable result was observed on a human umbilical cord tissue culture.

Finally, the pine bark extract inhibits the tumour promotion process on the epiderm of mice. It is here also a question of an R.S.E., for the process brings into play the oxygen radicals as mentioned by Kensler, T. W., Bush, D. M., Kozumbo, W. J. in Science, 1983, 221, 75-77.

3

# BIOAVAILIBILITY OF PROANTHOCYANIDINS

Proanthocyanidins are included in the pycnogenols, a plant polyphenol chemical group, whose physical, chemical and biological properties have been studied in numerous works (see more especially J. Masquelier, J. Michaud, J. Laparra, and M. C. Dumon, Internat. J. Vit. Nutr. Res. 1979, 49, 307–311).

From the biological point of view, proanthocyanidins are characterized among the plant polyphenols by their lack of toxicity (see the above mentioned U.S. Pat. No. 3,436,407 which indicates an LD 50 of 3 g per kg per os, which excludes any risk of acute or chronic intoxication, the therapuetic doses being much smaller); used in therapeutical treatment for 30 years they have never given rise to any intoxication whatever. Non teratogenic, non mutagenic, they are also no nantigenic per se, which excludes any allergizing effect. In addition, they are stable (above mentioned US patent).

The bioavailability in warm blooded animals, which is related to the solubility in water, has been demonstrated by the oral administration of $^{14}C$ marked radioactive proanthocyanidins to rats and mice (J. Laparra, J. Michaud and J. Masquelier, Plantes médicin. et Phytoth. 1977, 11, 133).

Thus the fixing rate, the plasmatic half life and the nature of the privileged sites where the proanthocyanidins are fixed in the organism can be defined. It is the intact molecules which are involved during these measurements, since no rejection of $^{14}CO_2$ is detected in the air expired at the time when the animals are sacrificed.

In man, after the ingestion of 150 mg of pine bark extract in the form of capsules, in the following hour the presence of proanthocyanidins can be found in the saliva. The saliva gives in fact a positive Bate-Smith reaction which implies the secretion of non modified proanthocyanidins. This passing into the saliva thus proves the bioavailibility of proanthocyanidins in the human species.

Non antigenic, proanthocyanidins may however be detected also in the biological liquids and tissues by an immunological reaction. For that, a foreign molecule is grafted in a known way by hemisynthesis on the proanthocyanidins: the assembly acquires antigenic power. From that, using a known process, an antibody can be obtained which forms the most specific and most sensitive reagent which may be imagined for studying the development of proanthocyanidins in the animal organism and in particular in humans, by qualititive and quantitive determination in vivo, for example in the saliva, the blood, the urine, the cephalo-rachidian liquid, various secretions and excreta, as well as the tissues and organs.

## PREFERRED EMBODIMENT

### III.

Practical implementation of the invention. Example of pine bark.

The aim is to prepare a dry extract containing the proanthocyanidins of the raw material, to the exclusion of the condensed tannins which accompany them.

Whereas the extraction of chromatographically pure proanthocyanidins requires great know how and high performing equipment, the preparation of a dry titrated

4

proanthocyanidtract is within the scope of industry.

### Extraction

A 100 kg of maritime pine bark reduced to a coarse powder are extracted with boiling water so as to collect 250 liters of liquid after having squeezed out the marc. The liquid cooled to 20° C. is filtered. To the filtrate sodium chloride is added up to saturation; instead of NaCl, 20% (weight/volume) of ammonium sulphate may also be added. The precipitate formed is eliminated by filtration. The filtrate is extracted thrice with ethyl acetate which is used each time at the rate of 1/10 of the volume of the aqueous phase. The ethyl acetate collected is dried on anhydrous $Na_2SO_4$ and brought back to 1/5 of its volume by distillition under reduced pressure. It is then poured into three volumes of chloroform, while stirring mechanically. The proanthocyadins are precipitated. They are collected by filtration. They may be purified by redissolution in ethyl acetate and a new precipitation in chloroform. They are finally washed with chloroform and dried at reduced pressure in a heating chamber not exceeding 50° C.

### General characteristics of the extract

A light beige colored powder, with astringent taste, very soluble in water and ethyl alcohol, insoluble in $CHCl_3$, $C_6H_6$, petroleum ether, ethyl ether. Can be kept indefinitely in a dry bottle at normal temperature. Identification: by the conventional Bate-Smith test: formation of an intense red coloration by heating to boiling point of an aqueous solution acidifed by 10% (volume/volume) of HCl. This solution stirred with isoamylic alcohol gives a supernatant layer having the physical and chemical properties of anthocyanidins.

### Quantitative determination

To assess the proanthocyanidins content of pine bark extract, the specific affinity of these substances for collagen is used, no other constituent of the extract having the same affinity for the collagen of the hide. The method recommended in the leather industry (method of dosing tannins with hide powder) can be transposed to pine extracts. The principle is the following: an aqueous solution of known titre is prepared by dissolving a given weight of extract in water. This solution is placed in contact with the hide powder and this mixture is filtered, under well standardized conditions. With an aliquot volume of the filtrate, the residual dry extract is determined. The difference between the titre of the prepared solution and the dry extract rate represents the proantocyanidins content, which have remained fixed on the collagen of the hide powder. Bate-Smith (Phytochemistry, 1975, 14, 1107–1113) recommends this kind of technique for titrating the proanthocyanidins as a whole in a natural plant medium. Quantitative determinations based on spectral measurements or colored reactions come up against the presence of certain impurities giving false positive results.

### Other analytical checks

These are routine techniques used for all medicinary extracts: search for pesticides, heavy metals, residual organic solvents, ash rates, chloride, sulphate, etc rates.

| 5 | 6 |

## IV.

### A Therapeutical indication

The proanthocyanidins titrated vegetable extracts are endowed with the "radical scavenger effect" (R.S.E.).

The R.S.E. does not overcome aging, which is a biological process programmed in the genes, but it may prevent, attenuate or inhibit different harmful effects of aging caused by an excess of free radicals. On this are based the new indications claimed for such plant extracts.

1. Cerebral involution troubles in aged people.

With aged people, hypoxia of the tissues causes psychic and somatic troubles which are manifested in particular by ALZHEIMER's illness. Hypoxia produces an accumulation of reduced substrates (flavins, coenzymes, etc), whose autoxidation generates free radicals. These latter, if they go beyond the limits of the normal purifying mechanisms which bring enzymes into play, damage the cellular walls of the nervous tissue and lead to cerebral involution. To prevent the failure which is always possible of the purifying enzymes, it is then indicated to administrer a medicament with radical scavenger effect, provided that it is bioavailable. Proanthocyanadins fulfil the conditions. It has been discovered that they overcome the blood - brain barrier (J. Cahn and M. G. Borzeix, Sem. Hop. Paris, 1983, 59, No. 27-28, 2031-2034).

2. Hypoxia following atherosclerosis

The atheromatous illness, which does not occur only in old people, well represents however the picture of vascular aging and causes progressive hypoxia of the adjacent tissues. This hypoxia, through the free raicals which it generates, increases the lipid peroxidation, itself implied in the the pathogenesis of atherosclerosis. Through an identical mechanism, a modification of the platelet functions promoted by the free radicals causes the formation of thrombi which are at the basis of infarction. Proanthocyanidins are therefore indicated both for preventing the harmful effects of hypoxia following atheromatosis and also as agents for preventing cardiac or cerebral infarction.

3. Tumour promotion process

Oxygen radicals play an essential role in the tumour promotion process (in the promotion stage of carcinogenesis). Superoxide dismutase, tried as a protector, is a failure in this field for it is destroyed by the digestive enzymes and in any case it does not clear the cellular barrier very well (above mentioned article by KENSLER, T. W. et coll., SCIENCE, 1983, 221, 75-77). Similarly lipid peroxidation is implied in the transformation of the aromatic hydrocarbons into carcinogens (in the metabolism of polycyclic aromatic hydrocarbon derivatives to ultimate carcinogens) (DIX, T. A., MARNETT, L. J., SCIENCE, 1983, 221, 77-79). By their high R.S.E. combined with their rapid diffusion in the connective tissue, proanthocyanidins are therefore indicated as protectors against risks of cancerization by chemical, or physical (ionizing radiations), or biological (oncogens) agents).

4. Any illness generated by free radicals

The three preceding examples are in no wise limitative. Since the therapeutic effect is based on the scavenging of the free radicals, any pathology resulting from the direct or indirect action of these free radicals, or else following the temporary or definitive inefficiency of the normal enzymatic defense systems (peroxidase, catalase, superoxide-dismutase etc.) forms an indication for the therapeutic use of proanthocyanidins titrated extracts.

Cellular death forms the final step in aging on the cytologic scale. The free radicals, when they escape from the biological systems provided for eliminating them, attack first of all the fragile architecture of the membrane. The alterations thus produced accelerate cellular aging, characterized by the collapse of the primordial functions of the membrane system. Inflammation and ischaemia bring such a mechanism into play and so treatment by proanthocyanidins is indicated.

Similarly, alterations of the synovial liquid by depolymerization of hyaluronic acid during articular diseases as well as collagen degradation during so-called collagen diseases (for instance multilple sclerosis) spring from the action of free radicals and so enter into the therapeutic indications of proanthocyanidins.

## V.

### Posology, methods of administration and pharmaceutical forms

The proanthocyanidins may be administered by the digestive tract (orally or using suppositories), or parenterally (more especially intravenously), or cutaneously. For oral administration, the medicament is in the form of tablets, sugar coated pills, pellets, pill, capsules, cachets, drinkable ampoules. Intravenously, the unit dose of powder proanthocyanidins is dissolved, preferably at the time of use for better conservation of the efficiency of the medicament, in a separate ampoule of solvent (preferably physiological serum) and it must be injected slowly, because of a rapid reaction. Cutaneously, it may be used in the form of an ointment containing for example 0.5% by weight of proanthocyanidins in a non aqueous greasy excipient such as vaseline or lanolin.

The medicaments to be administered by the digestive tract or parenterally are in the form of doses containing an amount of the active proanthocyanidin substance corresponding to the daily dose or to a fraction thereof, depending on whether the medicament is to be administered once or several times per day.

Generally, for the preparation of the differnt pharmaceutical forms corresponding to the different possible methods of administration, the usual pharmaceutically acceptable carriers, excipients, envelopes, coatings, solvents and diluents may be used.

The posology, for oral administration, is generally from 1.5 to 3 mg per day per kilogram of body weight for warm blooded animals, which represents for an adult man weighing 70 kg a daily dose of about 100 to 200 mg of proanthocyanidins to be administered by unit doses for example of 50 to 100 mg so as to obtain R.S.E. in the above mentioned therapeutic indications.

For intravenous application in man, 5 mg of active substance (proanthocyanidins) to be dissolved in two milliliters of an injectable isotonic solvent at the time of use, is an efficient unit dose, to be injected once or twice per day, generally, which represents a daily dose of about 5 to 10 mg for an adult male.

The ointment with 0.5% of active substance, which is used for preventing and fighting certain tumours, may be applied once or several times per day on the regions to be treated.

I claim:

1. A method for preventing and fighting the harmful biological effect of free radicals in a warm blooded animals, including a human being, comprising adminis-

...tering the extracted proanthocyanidin content from a plant containing same, said extract having a bioavailable radical scavenger effect, to an animal exposed to said free radicals in an amount effective to reduce said harmful free radical effect, said extracted proanthocyanidin content being incorporated into a pharmaceutically acceptable medicament.

2. A method as claimed in claim 1, wherein the plant extract with a proanthocyanidin content is extracted from a proanthocyanidin-containing plant selected from the group consisting of arborescent and herbaceous plant species.

3. A method as claimed in claim 2, wherein the plant extract with a proanthocyanidin content comes from a conifer.

4. A method as claimed in claim 3, wherein the plant extract with a proanthocyanidin content comes from pine bark.

5. A method as claimed in claim 1, wherein said plant extract with a proanthocyanidin content is administered orally in an amount of about 1.5 to 3 mg per kilogram of body weight per day representing an amount of about 100 to 200 mg per day for an adult male weighing 70 kg, by slow intravenous administration in man in an amount of about 5 to 10 mg per day; and cutaneously in the form of an ointment containing about 0.5% by weight of proanthocyanidin applied at least once per day.

6. A method as claimed in claim 5, wherein said plant extract comes from conifer bark.

7. A method as claimed in claim 6, wherein said plant extract comes from pine bark.

* * * * *

Int. Cls.: 3, 5 and 32

Prior U.S. Cls.: 18, 45, 46, 51 and 52

Reg. No. 1,684,990

# United States Patent and Trademark Office
Registered May 5, 1992

## TRADEMARK
### PRINCIPAL REGISTER

### OPC 85

INTERNATIONAL NUTRITION COMPANY (LIECHTENSTEIN CORPORATION)
RHEINBERGERSTRASSE 6
9490 VADUZ, LIECHTENSTEIN

FOR: TOILET SOAP, PERFUME AND COLOGNE, ESSENTAIL OILS FOR PERSONAL USE, FACIAL CREAM, NON-MEDICATED HAIR LOTIONS, DENTIFRICES, IN CLASS 3 (U.S. CLS. 51 AND 52).

FOR: DIETETIC FOOD SUPPLEMENTS ADAPTED FOR MEDICAL USE, FOOD FOR BABIES, AND VITAMIN AND MINERAL SUPPLEMENTS, HERBAL EXTRACTS AND HERB TEAS FOR MEDICINAL PURPOSES, IN CLASS 5 (U.S. CLS. 18 AND 46).

FOR: MINERAL AND AERATED WATERS, CARBONATED SOFT DRINKS, FRUIT DRINKS AND FRUIT JUICES; SYRUPS FOR MAKING SOFT DRINKS, IN CLASS 32 (U.S. CLS. 45 AND 46).

PRIORITY CLAIMED UNDER SEC. 44(D) ON BENELUX CONV APPLICATION NO. 738359, FILED 12-8-1989, REG. NO. 471590, DATED 12-8-1989, EXPIRES 12-8-1999.

SER. NO. 74-068,133, FILED 6-4-1990.

HOWARD B. LEVINE, EXAMINING ATTORNEY

Exhibit B