UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JARROW FORMULAS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:01-CV-00478 (AVC) |
| v. | ) | |
| | ) | |
| INTERNATIONAL NUTRITION | ) | |
| COMPANY, INTEGRATED | ) | |
| BIOCEUTICALS, LLC, PRIMARY | ) | |
| SERVICES, INC., PRIMARY SOURCE, | ) | |
| LLC, EGBERT SCHWITTERS, NORMAN | ) | |
| H. ZIVIN, AND JACK MASQUELIER, | ) | |
| | ) | |
| Defendants. | ) | AUGUST 10, 2005 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Jarrow Formulas, Inc. ("JFI") submits this Memorandum of Law in

Opposition to the Motion for Summary Judgment filed by Defendants International Nutrition

Company ("INC"), Integrated Bioceuticals, LLC ("IBC"), Primary Services, Inc. ("PSI"),

Primary Source, LLC ("PS"), Egbert Schwitters ("Schwitters"), Norman H. Zivin ("Zivin"), and

Jack Masquelier ("Masquelier") on July 18, 2005 [Dkt. 234] (hereinafter referred to as

"Defendants' Summary Judgment Motion").

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

I.     PROCEDURAL HISTORY                                                    2

II.    PRELIMINARY STATEMENT                                                 3

III.   STANDARD OF REVIEW                                                    6

IV.    MATERIAL OF FACTS                                                     6

       A.    Defendants' Baseless Claims to Ownership of the '360 Patent     6

       B.    The Defendants' Withheld Information From the PTO and Made
             Misstatements During the Reexamination of the '360 Patent       11

V.     ARGUMENT                                                              16

       A.    There are Material Issues of Fact in Dispute as to Whether the
             Underlying Litigations were Baseless                            17

       B.    Fraud and Material Misrepresentations are not protected by
             *Noerr-Pennington*                                             23

       C.    The Defendants' Non-Petitioning Activity is not Protected by
             *Noerr-Pennington*                                             33

       D.    Defendants cannot rely on attorney opinions and evaluations
             which were shielded from discovery Based on the Attorney-Client
             Privilege                                                       35

       E.    JFI's Conduct is Irrelevant to Whether or Not Defendants Had
             Any Basis for Their Illegal Conduct                             36

VI.    CONCLUSION                                                            37

i

## TABLE OF AUTHORITIES

35 U.S.C. ss102/103                                                                14, 17, 31

Baltimore Scrap Corp. v. The David J. Joseph Co., 237 F. 3d 394 (4th Cir. 2001)        27

Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P., 129 F. Supp.2d 578 (W.D.N.Y.
2000)                                                                                  28

Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1376  (Fed. Cir. 2001)    15, 31

Calabrese v. CSC Holdings, Inc., 2, 2004 WL 3186787 (W.D.N.Y. 2004)                    27

California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972)              25

Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119 (3d 1999)                            27

Citation #13:
Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492  (1988)                25

Citation #27:
Laitram Mach., Inc. v. Carnitech A, 901 F.Supp. 1155 (E.D.La . 1995)                  35

Defendants, Golan v. Pingol Enterprises, Inc., 310 F.3d 1360  (Fed. Cir. 2002)        37

Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,
365 U.S. 127 (1961)                                                                    5, 25

Filmtec Corp v. Hydronautics., 67 F.3d 931 (Fed. Cir. 1995)                            24

Hydranautics v. Filmtec Corp., 70 F.3d 533 (9th Cir. 1995)                            27

In re Relafen Antitrust Litigation, 346 F.Supp.2d 349 (D. Mass. 2004)                 21, 22

Int'l Nutrition Co. v. Horphag Research Ltd., 3, 2000 WL 1863560  (D. Conn.
Apr. 14, 2000)                                                               10, 12, 19, 22

Julian v. Equifax Check Services, Inc., 178 F.R.D. 10 (D. Conn. 1998)                  5

Landmarks Holding Corp. v. Berman, 644 F.2d 891 (2nd Cir. 1981)                        24, 25

Liberty Lake Investments, Inc. v. Magnuson, 12 F.3d 155 (9th Cir. 1993)                26

Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp., 192 F.Supp2d 519
(M.D. La. 2001)                                                                              28

Molins PLC v. Textron, Inc., 48 F.3d 1172 (Fed. Cir. 1995)                                   17

New Marshall Engine Co. v. Marshall Engine Co., 223 U.S. 973                                  11

Primetime 24 Joint Venture v. NBC, Inc., 219 F.3d 92 (2d Cir. 2000)                          28

Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508
U.S. 49 (1993)                                                                           20, 25

Q-Pharma. Inc. v. Andrew Jergens Co., 360 F.3d 1295 (Fed. Cir. 2004)                     34, 38

Rasmusse, 773 F. Rd 1568 (Fed. Cir. 1984)                                                    11

Rule v. Brine, Inc., 85 F.3d 1002 (2d Cir. 1996)                                              8

Rodriquez v. City of New York, 72 F.3d 1051 (2d Cir. 1994)                                    8

United Mine Workers of America v. Pennington, 381 U.S. 657 (1965)                             5

U.S. v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991)                                              37

Walker Process Equipment, Inc. v. Food Mach. & Chem., Corp., 382 U.S. 172
(1968)                                                                                   26, 34

Whelan v. Abel, 38 F.3d 1247 (D.C.Cir. 1995)                                                  27

.

iii

## I.    PROCEDURAL HISTORY

Defendants filed the present Summary Judgment Motion after the Court denied Defendants' Motion to Bifurcate on June 10, 2005. The Court denied that Motion to Bifurcate because, at that time, the Court had "not ruled that there are no genuine issues of material fact regarding the underlying patent litigation." [Dkt # 229, at 5]. Defendants nevertheless convinced the Court to postpone trial on the promise that they could show that there were no material facts in dispute regarding the "objective baselessness" of the underlying patent infringement suit. As discussed in detail herein, Defendants cannot and have not met their burden to show they are entitled to judgment as a matter of law. Instead, Defendants have misrepresented and omitted material facts and have hidden relevant law. Defendants' motion must be denied.

At the outset of this case, Defendants Schwitters, INC, Masquelier, and Zivin filed a Motion to Dismiss for failure to state a claim [Dkt. # 12], which the Court denied on November 16, 2001 [Dkt. # 32]. Defendants Schwitters and Masquelier also filed a Motion to Dismiss based on lack of personal jurisdiction [Dkt. # 10]. The Court denied Masquelier's Motion, but dismissed Schwitters for lack of personal jurisdiction [Dkt. # 32]. However, Schwitters, along with IBC, PSI, and PS, was subsequently added to the case after the Court granted JFI's Motion to Amend Complaint on November 1, 2002 [Dkt. # 113].

A month after discovery closed on August 30, 2002, INC and Masquelier filed motions for summary judgment based on statute of limitations and res judicata defenses [Dkt. ##

89, 92]. They did not address the issue of *Noerr-Pennington* immunity. The Court denied their motions on July 9, 2003.

On July 24, 2003, Defendants IBC, PS, and PSI filed a motion for summary judgment based on the same legal theories as Defendants INC and Masquelier [Dkt. # 160], which the Court denied on March 15, 2004 [Dkt. # 192]. Zivin also filed a motion for summary judgment [Dkt. # 77]. JFI withdrew four of its claims as to Zivin and on February 27, 2005 the Court denied summary judgment as to the remaining claim of vexatious litigation. After an unsuccessful settlement conference, the parties filed their Joint Trial Memorandum of January 7, 2005 [Dkt. # 216] and began preparing for trial.

Now, almost three years after the close of discovery, after the dispositive motion deadline has long since passed, and after the Court's consideration and denial of several previous summary judgment motions, Defendants take another bite at the apple by filing another summary judgment motion. JFI respectfully points out that discovery has long since ended, the dispositive motion deadline has long since passed, the parties have been preparing for trial, no new evidence has arisen, and Defendants never offered any explanation for their significant deviation from the Court's original schedule. See, Julian v. Equifax Check Services, Inc., 178 F.R.D. 10 (D. Conn. 1998). The Defendants are merely delaying trial and are doing so through misrepresentation after misrepresentation.

## II.    PRELIMINARY STATEMENT

Defendants' Summary Judgment Motion should be denied because Defendants are not entitled to *Noerr-Pennington* immunity for four distinct reasons.[1] First, Defendants are

---

[1] The United States Supreme Court first addressed the application of the Sherman Act to petitioning activity of governmental bodies in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) and, subsequently, in United Mine Workers of America v. Pennington, 381 U.S. 657 (1965). The principles

wrong in their contention that all material facts regarding "objective baselessness" are undisputed. The snippets of facts presented by Defendants are, in many cases, disputed. Moreover, there are numerous facts which Defendants ignore which, whether disputed or undisputed, support JFI's claims. While the underlying litigation determined conclusively that Defendant INC lacked standing to bring an infringement action because INC did not own U.S. Patent No. 4,698,360 ("the '360 patent"), none of the other issues related to JFI's antitrust claim were considered or addressed by the courts in those prior actions. For example, Defendants' knowledge as it maintained those litigations was not addressed, and Defendants non-litigation conduct, such as misstatements made to the public and to the United States Patent & Trademark Office ("PTO") during the examination and reexamination of the '360 patent, were not considered.

Second, Defendants are not immune because they made material misrepresentations to governmental bodies that were sitting in adjudicatory capacities including the court in the underlying action. When one makes such misrepresentations, one loses *Noerr-Pennington* immunity. Defendants have not even cited this body of law to the Court, much less presented undisputed evidence to allow summary judgment to be entered.

Third, much of Defendants' conduct which JFI alleges supports its claims was not petitioning activity or related to petitioning activity. Such conduct falls outside of the *Noerr-Pennington* doctrine.

Fourth, Defendants' Summary Judgment Motion is based in large part on evidence such as their attorneys' purported evaluation of the underlying suit and INC's legal

---

developed in those cases are now commonly know as, and will herein be referred to as, the *Noerr-Pennington* doctrine.

positions. None of these attorney opinions or evaluations were produced in discovery. To the contrary, Defendants shielded this information from discovery on the grounds of attorney-client privilege. Therefore, this information is not undisputed – it is unknown. For the reasons set forth in Defendants' Motions in Limine filed herewith, this evidence is inadmissible, and should not be considered by the Court in ruling on Defendants' Summary Judgment Motion.

In their Summary Judgment Motion, Defendants contend that their conduct in initiating and maintaining the underlying litigations and related actions were not objectively baseless. As set forth in detail in JFI's Local Rule 56(a)(2) statement and discussed below, when all of the facts are considered, a reasonable jury could conclude that Defendants' conduct in initiating and maintaining the underlying litigation was completely and objectively baseless. Moreover, Defendants utilized their baseless lawsuits to dominate the sale of oligomeric proanthocyanidins ("OPCs") in the United States through a coordinated campaign of threats and misrepresentations from 1996 through 2001. During that same time period, Defendants also issued press releases completely misrepresenting court decisions, cease and desist letters, undertook coerced licensing and settlement agreements to monopolize the United States OPC market, and withhold material information and made misstatement during the reexamination of the '360 patent. Many of these events took place after (1) a decision of the Bordeaux District Court on March 25, 1997, and (2) this Court's granting summary judgment in an underlying action on March 21, 2000, and denying relief in INC's Motion for Reconsideration on April 3, 2000, in which both made clear that INC did not own the '360 patent.

As demonstrated below, for all of these reasons, the *Noerr-Pennington* doctrine relied upon by Defendants in their Summary Judgment Motion does not apply in this case. The

Court should therefore deny Defendants' Summary Judgment Motion and proceed to trial in this case.

## III.    STANDARD OF REVIEW

In ruling on Defendant's Summary Judgment Motion, the Court must draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996). "On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." <u>Rodriquez v. City of New York</u>, 72 F.3d 1051, 1061 (2d Cir. 1994). To defeat a motion for summary judgment, the non-moving party must produce affidavits, depositions or other sworn evidence setting forth specific facts showing that there is an issue of material fact for trial. <u>Rule,</u> 85 F.3d at 1011. As set forth in detail below, there is ample evidence in the record in this case demonstrating the existence of issues of material fact regarding the claims in JFI's Verified Amended Complaint [Dkt. # 114] and whether Defendants' conduct was objectively baseless.

## IV.    MATERIAL FACTS

The material facts and history underlying JFI's antitrust and related claims are summarized below in order to show the tangled web woven by Defendants to pursue meritless litigation at all costs in order to obtain a monopoly and to restrain trade in the OPC market.

### A. <u>Defendants' Baseless Claims to Ownership of the '360 Patent</u>.

On April 1, 1985, Jack Masquelier, the alleged inventor of the '360 patent, executed an Assignment (the "1985 Assignment") whereby he unconditionally assigned the "entire right, title and interest in and to" the '360 patent jointly to Societe Civile d'Investigations Pharmacologiques d'Aquitaine ("SCIPA") and Horphag Overseas Ltd., the predecessor of

8

Horphag Research Ltd. ("Horphag").[2] (Declaration of Ms. Joy Whitney, dated August 10, 2005,

Ex. 1). SCIPA is a French company founded and controlled by Jack Masquelier for the purpose

of holding an interest in the '360 patent. Horphag and SCIPA recorded the 1985 Assignment in

the PTO, upon filing the application for the patent, and thereafter, were the joint owners of

record of the patent. (Whitney Decl., Ex 2.)

On April 29, 1985, several weeks after Masquelier executed the 1985

Assignment, Horphag and SCIPA entered into a joint development agreement (the 1985

Agreement") that ratified the prior assignment of the '360 patent to Horphag and SCIPA, and

otherwise governed the relationship between Horphag and SCIPA related to joint research.

Under the 1985 Agreement, the rights of the parties were governed by French law, thereby

restricting the ability of either party to transfer its interest in the patent.

In 1994, Defendants engineered a scheme with the ostensible intent of wresting

ownership of the '360 patent from Horphag. Despite the terms of the 1985 Agreement and

restrictions on the transfer of patent rights under French law, Defendants caused to be executed

on March 18, 1994, an "Assignment" purporting to assign SCIPA's 50% interest in the '360

patent to INC ("the 1994 Assignment"). (Whitney Decl., Ex. 3). To give the transaction an air

of legitimacy, Defendants recorded the 1994 Assignment in the PTO which, in turn, caused the

PTO to list INC as an owner of record of the patent.[3] (Whitney Decl., Ex. 3). At the time of the

1994 Assignment, INC was aware that SCIPA and Horphag were already embroiled in disputes

regarding ownership of the '360 patent. Indeed, the French courts and the court in the

---

[2] The '360 patent application was filed eight days later on April 9, 1985.

[3] The PTO merely records assignments that are presented to it. The PTO does not review documents purporting to be assignments for legitimacy. Manual of Patent Examining Procedure § 301.

underlying U.S. litigation all rejected as meritless INC's claim that it was a bona fide purchaser without notice of the ownership dispute. <u>Int'l Nutrition Co. v. Horphag Research Ltd.</u>, 3:96-CV-386, 2000 WL 1863560, at \*5 (D. Conn. Apr. 14, 2000) TAB A.

In October 1995, after learning of the 1994 Assignment and INC's claim to ownership of the '360 patent, Horphag brought suit in Bordeaux, France, against INC, Schwitters, SCIPA and Masquelier, seeking to void the 1994 Assignment and reach a final resolution of the ownership dispute among the parties.

On March 6, 1996, nearly six months after Horphag had initiated a suit in France against INC, SCIPA and Masquelier to void the 1994 Assignment, Defendants brought suit in Connecticut claiming, among other things, that Horphag and seventeen other companies had infringed the '360 patent. <u>International Nutrition Co. v. Horphag Research Ltd.</u>, Civil Action No. 3:96-CV-00386 (DJS) ("the 1996 District of Connecticut Action") (Whitney Decl., Ex. 4). INC -- blatantly ignoring that it had yet to resolve the question of whether it had any ownership interest in the '360 patent -- nevertheless claimed, with all evidence to the contrary, that INC was the owner of "at least an undivided one-half interest in the '360 patent" and that, "on information and belief," Horphag was no longer a co-owner of the '360 patent. (Whitney Decl., Ex. 4). Also in 1996, INC induced Masquelier to execute a so-called "Confirmatory Assignment" of his purported interest in the '360 patent ("1996 Assignment"). (Whitney Decl., Ex. 54.) Because Masquelier had no interest in the '360 patent when he executed this assignment, the document served no purpose but to further enhance the illusion that INC owned the '360 patent.

The 1996 District of Connecticut Action was filed days before the largest industry trade show in the world with close to 3,000 booths and more than 30,000 attendees. INC publicized the suit heavily at the trade show, and continually threatened to sue the competitors

and customers and to generally disrupt the OPC marketplace. (Whitney Decl., Ex. 6, Ex. 7, Ex. 8, Ex. 9, & Ex. 10).

In response to INC's meritless complaint, JFI filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) based on INC's lack of standing to maintain the suit.[4] In the alternative, JFI asked for a stay of the action pending resolution of the French litigation over ownership of the '360 patent. INC opposed JFI's motion to dismiss or to stay, insisting that it should be permitted to drag JFI through expensive patent litigation over a patent that it did not own. To further its ends, INC and its counsel made false representations of fact and arguments contrary to well-established law, including: (1) the false assertion that INC was a bona fide purchaser for value without notice of the 1985 Agreement and ownership dispute between Horphag and SCIPA, an assertion that the French courts and the court in the underlying litigation found meritless; (2) the false assertion that Horphag was no longer an owner of the '360 patent because the 1985 Agreement had expired, an assertion that was not supported by any language in the 1985 Agreement; and (3) in the face of clear law to the contrary, INC argued that the French action regarding ownership of the '360 patent could not be dispositive because ownership had to be determined under federal law.[5] (Whitney Decl., Ex. 6 - Memorandum In Opposition to Motion to Dismiss attachments excluded).

On January 31, 1997, Defendants initiated another baseless patent infringement suit in the United States District Court for the Northern District of California ("the 1997

---

[4]  As JFI has noted repeatedly, it never was required to file an answer to INC's meritless complaint. Shortly after JFI filed its motion to dismiss, the case was stayed. When the stay was ultimately lifted, the court instructed the parties to file summary judgment motions on the standing issue.

[5]  Indeed, since 1912 patent rights created by contract have not "arisen under" the patent laws. New Marshall Engine Co. v. Marshall Engine Co., 223 U.S. 973, 478-79 (1212). See also Beghin-Say Int'l, Inc.. v. Rasmusse, 773 F. Rd 1568, 1573 n. 5 (Fed. Cir. 1984).

Northern District of California Action"), against Horphag and five other defendants falsely

claiming that INC owned the '360 patent and asserting infringement of the patent. (Whitney

Decl., Ex. 11). The second suit was filed after this Court had stayed the Connecticut litigation

pending the outcome of the earlier-filed French litigation and a reexamination of the '360 patent

in the PTO. (Whitney Decl., Ex. 12).

On March 25, 1997 the French trial court declared the 1994 Assignment to INC

void, *ab initio*, because the 1985 Agreement between Horphag and SCIPA required the parties to

litigate in France under French law, and French law prevented SCIPA from assigning its interest

in the '360 patent to INC without offering Horphag a right of first refusal. (Whitney Decl.,

Ex. 5). Despite this ruling, Defendants did not withdraw the patent infringement Complaint and

instead continued to aggressively pursue the two U.S. infringement actions and otherwise

promote their patent ownership and infringement threats. (Whitney Decl., Ex. 13, Ex. 14, Ex. 15

& Ex. 16). Defendants added the contention that Masquelier's 1996 Assignment, in which

Masquelier purported to assign ownership rights he no longer had, conferred the requisite

ownership interest to INC. (Whitney Decl., Ex. 35).

On May 28, 1998, the French Appellate Court affirmed the decision of the French

trial court. The French Appellate Court specifically held that (1) INC was not an owner of the

'360 patent because the purported 1994 Assignment from SCIPA was void *ab initio*, and

(2) Horphag was and is a co-owner of the '360 patent. (Whitney Decl., Ex. 17).

On March 21, 2000, this Court granted summary judgment in favor of JFI and the

other patent infringement defendants based on clear documentary evidence and well established

law. Int'l Nutrition Co. v. Horphag Research Ltd. et al., No. 3:96 CV386, 2000 WL 1863560 (D.

Conn. Apr. 14, 2000) (TAB A). This Court found that (1) INC was not a co-owner of the '360

12

patent and that INC had no standing to sue for infringement of that patent; (2) INC was not a bona fide purchaser for value because at the time INC allegedly obtained an ownership interest from SCIPA, INC knew that Horphag was a co-owner and there was an ownership dispute between SCIPA and Horphag; (3) the 1996 Assignment from Masquelier to INC did not confer any ownership interest in the '360 patent to INC; and (4) even if INC had an ownership interest (which it did not), it could not bring this suit without Horphag voluntarily joining as a plaintiff. Id., at *6-7. No discovery was necessary for the Court to dismiss INC's meritless claims. The documentary evidence submitted to the Court in support of the summary judgment motions had been readily available to Defendants before they had even filed the underlying suit.

       With their array of frivolous arguments soundly rejected by two French courts and this Court, Defendants still refused to accept those decisions. On July 20, 1998, in an attempt to circumvent the judicial precedent against them and transfer SCIPA's rights in the '360 patent to INC, CEP, a subsidiary of INC, purchased SCIPA. (Whitney Decl., Ex. 18). And again, a court halted their scheme. This time it was the Commercial Court of Grasse, which found on February 5, 2001 that the merger between SCIPA and CEP was a fraudulent attempt to get around the decision of the Bordeaux Court of Appeals, that INC's exploitation of the patented product was fraudulent, and that Masquelier's 1996 Assignment of the '360 patent was void. (Whitney Decl., Ex. 18).

### B. The Defendants Withheld Information From the PTO and Made Misstatements During the Reexamination of the '360 Patent.

       While Defendants' scheme to wrest ownership of the '360 patent from Horphag was unfolding, INC, Masquelier and Zivin participated in a reexamination of the '360 patent. In that proceeding, they withheld material prior art from the PTO, and made misleading statements

13

regarding the information considered by the PTO. The material prior art was not provided to the PTO during the prosecution of the '360 patent, and was withheld during the reexamination of the '360 patent. This additional evidence of misconduct, particularly in the reexamination of the '360 patent, is relevant to JFI's claim that Defendants conspired to illegally monopolize the market for proanthocyanidins. It is also relevant to rebut the defense that defendants have raised in their summary judgment papers, and presumably intend to raise at trial, that INC's patent infringement suit was not objectively baseless because the '360 patent is presumed valid, and it survived reexamination. See Defendants International Nutrition Company, Egbert Schwitters, Norman H. Zivin, Jack Masquelier, Integrated Bioceuticals, LLC, Primary Source, LLC and Primary Services, Inc. Memorandum of Law In Support of Their Motion for Summary Judgment at 22 ("Defendants' Summary Judgment Brief").[6]

The '360 patent issued on October 6, 1987. (Whitney Decl., Ex. 19.) The patent application that matured into the '360 patent was filed on April 9, 1985. Under 35 U.S.C. § 102(b) a person is not entitled to a patent if "the invention was patented or described in a printed publication or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." Therefore, the '360 patent is invalid if the methods for administering proanthocyanidins claimed in the '360 patent were described in a printed publication before April 9, 1984 ("the Critical Date"). The '360 patent claims methods of administering proanthocyandins extracted from a plant source to reduce free radicals "in an amount effective to reduce said harmful free radical effect." (Whitney Decl., Ex. 19 col. 7, lines

---

[6] Concurrently with their Summary Judgment Motion, Defendants filed a Motion in Limine seeking to prevent the fact finder from considering this evidence which was part of the overall scheme to monopolize the United States market for proanthocyanidins. As et forth in detail in JFI's Memorandum in Opposition to Defendants' Motion in Limine filed herewith, this evidence is admissible and relevant to the claims and defenses in this case, and Defendants' Motion in Limine should be denied.

14

4-6. The '360 patent provides examples of oral administration of therapeutically effective amounts of proanthocyanidins in the range of 100 mg to 200 mg per day. (Whitney Decl., Ex. 19, col. 6, lines 48-54.)

Beginning in approximately 1978, a product containing proanthocyanidins was made and sold in France under the trade name Endotelon. (Whitney Decl., Ex. 2.) Endotelon was a product comprised of proanthocyanidins extracted from grapes. Endotelon was produced under a license from SCIPA, a French partnership in which Masquelier was a partner. In 1980, four years prior to the Critical Date, an article was published in the *Gazette Medicale de France* entitled "Therapeutical Trial of Endotelon, a peripheral angioprotector" reporting the results of tests performed by administering Endotelon to humans at a dosage of 150 milligrams per day ("the French Endotelon article"). Copies of the French article and an English translation of the article are attached to the Whitney Declaration Exhibit 20.

The French Endotelon article describes administration of proanthocyanidins obtained from a plant source to humans in the same dosage range described and claimed in the '360 patent. Administering the proanthocyanidins in Endotelon in the dosage range described in the '360 patent inherently and necessarily results in scavenging of free radicals in humans. Therefore, the French Endotelon article describes, explicitly or inherently, each and every step of the methods claimed in the '360 patent. See, e.g., Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1376 (Fed. Cir. 2001) ("Newly discovered results of known process directed to the same purpose are not patentable because such results are inherent.").

In addition to the French Endotelon article, there were several other articles published prior to 1984 which describe administration of proanthocyanidins derived from plant sources to humans at dosages within the range claimed in the '360 patent ("the prior art"). For

15

example, in the book <u>OPC in Practice</u> published in 1993 by Defendant Schwitters (at the time a Director of INC) in collaboration with Defendant Masquelier, several studies of "the OPC-based product 'Endotelon' (Sanofi/Labaz)" are summarized at pages 57-61. Copies of these pages are attached to the Whitney Declaration as Exhibit 21. In the studies described in Exhibit 21, which took place 1980 and 1981, Endotelon was administered to human subjects at dosages within the dosage ranges claimed in the '360 patent. None of the papers described in <u>OPC in Practice</u> were provided to the PTO during prosecution of the '360 patent application.

In the 3rd edition of <u>OPC in Practice</u> published in 1995, at pages 111-117, additional information regarding testing of Endotelon in 1980 and 1981 is provided, including citations to references describing in detail the tests previously summarized in the 1993 edition of the book. Copies of pages 111-117 of the 3rd edition of <u>OPC in Practice</u> are attached to the Whitney Declaration as Exhibit 22.

In addition to the published articles on Endotelon, INC's marketing materials in the United States state that products containing proanthocyanidins had been sold overseas for years, demonstrating that INC was aware of Endotelon. INC offers for sale in the United States an OPC product under the trade name Flavay™. A photograph of a bottle of Flavay™ offered through a distributor is shown in Exhibit 23 to the Whitney Declaration. The label on the bottle of Flavay™ shown in Exhibit E includes the Masqulier's® trademark owned by INC, includes the '360 patent number, and further states "Scientifically Defined, Patented and isolated from Natural Extracts as used in the Actual Research Since 1947." Product literature regarding Flavay™ is attached as Exhibit 24 to the Whitney Declaration. As shown in the underlined passages in Exhibit 24, the product literature states that Flavay™ "is proven fully bioavailable, safe and effective by numerous human studies, manufactured in France and used worldwide

16

since 1950." The product literature for Flavay™ further states that Resivit™, Flavan™ and Endotelon™ are the early French brand names for Flavay™.

On April 17, 1996, a Request for Reexamination of the '360 patent was filed with the PTO. During prosecution of the reexamination of the '360 patent, Zivin, on behalf of INC and Masquelier submitted an Information Disclosure Statement citing seventy-one separate references without any explanation of any of the references other than the titles and dates of the references.[7] A copy of the Information Disclosure Statement is provided to the Whitey Declaration at Exhibit 25. The Information Disclosure Statement does not cite or provide the Examiner with the French Endotelon article or any of the articles regarding testing of OPCs cited at pages 111-117 of the 3rd edition of OPC in Practice.

In addition to failing to cite material prior art during the reexamination, INC and Zivin made misleading statements to the Examiner during prosecution of the '360 reexamination. Following a rejection of the claims of the '360 patent based in part on pages 57-61 of the 1993 edition OPC in Practice, INC submitted the following statement in the Office Action response filed by Zivin on behalf of INC and Masquelier on March 17, 1997 (Whitney Decl., Ex 26):

> Patentee respectfully points out that the Examiner's use of OPC In Practice as a secondary reference in the 35 U.S.C. §§102/103 rejection of the claims is improper. OPC In Practice was published in 1993, which is long subsequent to the April 9, 1985 filing date of the '360 patent. Therefore, OPC In Practice is not a proper basis for the Examiner to establish a 35 U.S.C. §§102/103 rejection. . .

---

[7] In August 1996, Jarrow Rogovin, President of JFI, had provided INC with a letter containing a detailed analysis of the seventy-one references INC cited, including why the references rendered the '360 patent invalid. Although INC was in possession of a detailed analysis of these references prepared by Mr. Rogovin, INC did not provide to the Examiner *any* explanation of the relevance or significance of any of the publications. INC's failure to point out the relevance of any of the numerous references dumped on the Examiner is itself evidence of misconduct in the reexamination. See Molins PLC v. Textron, Inc., 48 F.3d 1172, 1184 (Fed. Cir. 1995)("'[B]urying' a particularly material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith.").

This statement in the March 17, 1997 Office Action response was misleading at least because INC, Masquelier and Zivin knew that <u>OPC In Practice</u> included information regarding published papers reporting tests of Endotelon conducted in 1980 and 1981 within the dosage ranges claimed in the '360 patent. INC, Masquelier and Zivin argued that <u>OPC in Practice</u> itself was not prior art, but failed to direct the Examiner to the published articles referred to in the book which they knew were material prior art.

## V.    ARGUMENT

Defendants' Summary Judgment Motion should be denied because Defendants are not entitled to *Noerr-Pennington* immunity for four reasons. First, issues of fact exist as to the Defendants' knowledge while they pursued the underlying litigations. Without factual determinations as to what the Defendants knew with respect to their rights to the '360 patent and the results of their conduct relating to the '360 patent, the Court cannot determine that the underlying actions were objectively baseless. Second, the Defendants material misrepresentations to governmental bodies that were sitting in adjudicatory capacities, including the court in the underlying action strip, them of immunity. Third, the Defendants engaged in non-petitioning activity. Such activity falls outside of *Noerr-Pennington*. Fourth, Defendants' Summary Judgment Motion is based in large part on evidence such as the attorneys' purported evaluation of the underlying suit and INC's legal positions. None of these attorney evaluations were produced in discovery. Thus, this information cannot be a basis for granting summary judgment.

### A.    <u>There are Material Issues of Fact in Dispute as to Whether the Underlying Litigations were Baseless.</u>

In their Summary Judgment Motion, Defendants argue that the Court should grant summary judgment on the objective prong of the sham litigation test in their favor. (Defs.

18

Memo. at 1). As set forth below, summary judgment is not appropriate on this issue because material issues of fact are disputed. These facts relate to the Defendants' knowledge as they pursued sham litigations, but these facts were not before the district courts in the underlying actions. Without a factual determination as to what the Defendants knew while they maintained the sham litigations, it is impossible to rule whether a litigant in their position should have known that the suits were objectively baseless.

Predicate facts that must be determined are as follows:

1. Defendants knew when they filed the civil action entitled <u>International Nutrition Company v. Horphag Research Ltd.</u>, 3:96-cv-00386 (D.Conn.), ("1996 District of Connecticut Action") that INC did not have a good faith basis to claim ownership of the '360 patent, yet they misrepresented that fact to the court.

2. Defendants knew when they filed the civil action entitled <u>International Nutrition Company v. Interhealth Nutrition</u>, 3:97-cv-00377 (N.D.Cal.), ("1997 Northern District of California Action") that INC did not have a good faith basis to claim ownership of the '360 patent, yet they misrepresented that fact to the court.

3. Defendants knew as they maintained the 1996 District of Connecticut Action that INC did not have a good faith basis to claim ownership of the '360 patent, yet they misrepresented that fact to the court.

4. Defendants knew as they maintained the 1997 Northern District of California Action that INC did not have a good faith basis to claim ownership of the '360 patent, yet they misrepresented that fact to the court.

5. Defendants knew when they filed, and/or as they maintained, the 1996 District of Connecticut Action that the '360 patent was invalid and/or unenforceable, yet they misrepresented that fact to the court.

6. Defendants knew when they filed, and/or as they maintained, the 1997 Northern District of California Action that the '360 patent was invalid and/or unenforceable, yet they misrepresented that fact to the court.

7. Defendants knew when they filed the 1996 District of Connecticut Action that they did not have a good faith basis to assert that others were

19

infringing the purported trademark "OPC-85", yet they misrepresented that fact to the court.

8. Defendants knew of prior art during the initiation and maintenance of the 1996 District of Connecticut Action and the 1997 Northern District of California Action, yet they hid those facts from the court.

9. Defendants knew that they had no standing to initiate and maintain the 1996 District of Connecticut Action and the 1997 Northern District of California Action, yet they did so anyways.

10. Defendants made material misrepresentations and withheld material information to the PTO regarding the '360 patent during prosecution of the '360 patent and during the reexamination of the '360 patent.

These facts alone require that a summary judgment motion based on *Noerr-Pennington* be denied. If these facts are undisputed, then as a matter of law Defendants cannot be immune from antitrust activity because they have made material misrepresentations to governmental bodies sitting in their adjudicative capacities. As discussed in the next section, such conduct falls outside of *Noerr-Pennington*. If these facts are disputed, then there are predicate facts in dispute that must be decided by a trier of fact before any legal determination may be made.

### 1. Defendants' filing and maintenance of the 1996 District of Connecticut Action and the 1997 Northern District of California Action was objectively baseless.

Any of the facts referenced thus far, if proven or stipulated to, demonstrate beyond doubt that Defendants' initiation and maintenance of the underlying district court actions was objectively baseless. Even applying the Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49 (1993) ("PRE") test for the sham exception, the trier of fact is left with one conclusion: that Defendants' initiation and maintenance of the underlying district court actions was a sham. But that is a question left for the trier of fact.

20

The holding of <u>PRE</u> is narrow. The Court held that a court may decide probable cause as a matter of law when "<u>there is no dispute over the predicate facts of the underlying legal proceeding</u>." 508 U.S. at 64 (emphasis added); <u>see also</u> <u>In re Relafen Antitrust Litigation</u>, 346 F.Supp.2d 349, 360-61 (D. Mass. 2004). Though Defendants are partially correct in that there are many facts not in dispute, most of which support JFI's claims, as shown above, the material facts are disputed. What Defendants knew when they took the steps they did is material and was never adjudicated in the underlying actions. Indeed, the underlying actions were extremely limited in scope.

In the 1997 District of Connecticut Action, Judge Squatrito did not determine whether Defendants' actions in initiating and maintaining the lawsuit was objectively baseless. The Court simply extended comity to decision by a foreign court. Moreover, Judge Squatrito's decision on JFI's motion for attorneys' fees discussed at pages 31-32 of Defendants' Memorandum was decided based upon a very abbreviated record. The Court's decision was entered without the benefit of discovery or hearings because the Court stayed the action pending a decision from French Court of Appeals. (Whitney Decl. Ex. 27 - Order dated April 16, 1997). Thus, there was no discovery to support JFI's request for attorneys' fees in the 1996 District of Connecticut Action. Since the Court determined that comity applied, there were no hearings on evidentiary issues and thus many facts were never before the Court.

For example, when entering Judgment and deciding JFI's request for attorneys' fees, the Court, did not have or rule on any of the following facts:

- Defendants knew that Horphag Research Ltd. ("Horphag") was an owner of the '360 patent before INC initiated the district court actions;

- Defendants were clearly aware of material prior art invalidating the '360 patent before they initiated the district court actions;

- Defendants intentionally withheld from the PTO material prior art both before INC initiated the 1996 District of Connecticut Action and afterwards while it continued to prosecute the district court actions;

- That in 1999, Horphag sued Defendants INC, Schwitters and Masquelier for their attempts to misuse the '360 patent.

- Defendants' marketplace activities, such as press releases misrepresenting court decisions.

None of these, or many other, facts were before the Court when it reached its conclusions on JFI's motion for attorneys' fees in the 1996 District of Connecticut Action. Yet these facts are appropriate for the trier of fact to consider when determining the objective prong of the *Noerr-Pennington* test. See, In re Relafen Antitrust Litigation, 346 F. Supp. 2d at 360-364.[8]

The United States District Court for the District of Massachusetts was faced with a case similar to this one in In re Relafen Antitrust Litigation. There, an underlying patent infringement action did not dispose of all factual issues. Thus, in a subsequent antitrust action, the court could not determine that the party seeking to enforce a patent lacked probable cause as a matter of law. Id. at 362. Issues pertaining to the defendant's knowledge while it prosecuted the underlying patent infringement actions were factual issues that needed to be determined. Id.

The Defendant's claim that there are no material facts in dispute is simply false. On pages 2-4 of their memorandum, the Defendants contend that their actions in federal court were not objectively baseless based on alleged undisputed facts. As set forth above, there ate numerous factual issues to be determined regarding Defendants' actions in bringing and maintaining the underlying lawsuit. Moreover, as set forth in detail in the Plaintiff's 56(a)(2)

---

[8] Even without all of these facts the Court considered JFI's motion for attorneys' fees a "close case," and did sanction Defendant INC for filing its Motion for Reconsideration. International Nutrition Company v. Horphag Research Ltd., Ruling on the Defendants' Motions for Attorney Fees [Dkt. # 392, at 8 -10].

Statement and summarized in TAB B, the allegedly undisputed facts relied upon by Defendants are either disputed or immaterial.

### 2. Defendants' lack of standing to bring the district court actions precludes them from *Noerr-Pennington* immunity.

Beyond the factual disputes, the Defendants are not entitled to summary judgment because they knew they lacked standing to sue. Defendants pled in the alternative in Paragraph 25 of the complaint in the 1996 District of Connecticut Action that "even if defendant Horphag continues to own a one-half interest … complete relief cannot be accorded INC in the absence from this action of Horphag …." This is an admission that INC did not have standing to sue, which alone deprives Defendants of immunity. Indeed, absent Horphag's participation as a co-plaintiff in either of the district court actions, INC, or anyone else for that matter, could not bring an action for infringement of the '360 patent. Int'l Nutrition Co. v. Horphag Research Ltd., 257 F.3d 1324, 1331 (Fed. Cir. 2001). As is evidenced by the way in which the Complaint was drafted, Defendants knew this.

As early as July 24, 1987, Defendants acknowledged that they were powerless to enforce rights to the '360 patent without the participation of the other owner. At that time, E. Garraud, a partner of Masquelier's in SCIPA, wrote on behalf of SCIPA to the predecessor in interest of Horphag Overseas Research, Ltd. stating, "We remind you that the U.S. patent was taken jointly by [SCIPA] and Horphag Overseas Ltd …. Therefore, no settlement can be made with a single one of the co-owners, lest the transaction risk being void." (Whitney Decl., 29 - letter from E. Garraud to Mr. Haimoff of 7/24/87 (emphasis added)).

Moreover, in the suit in the Eastern District of New York between Horpag and Consac in 1994, Defendant Zivin admitted that both patent co-owners were indispensable to a cause of action. There, Consac attempted to join INC in a declaratory judgment counterclaim

23

seeking to invalidate the '360. Defendant Zivin stated in response to Consac's attempt: "My

client, International Nutrition, as the other co-owner is probably an indispensable party. They

can't join this indispensable party. This case really should be dismissed. There shouldn't be any

litigation here. (Whitney, Decl., Ex. 30, at 18.) Notwithstanding this admission, Defendants

attempted to assign SCIPA's interest in the '360 patent to INC and then not only brought a patent

infringement action in INC's name without Horphag's consent, but also sued Horphag for patent

infringement.

        Initiating a lawsuit when one knows it has no standing to do so is sham litigation.

Landmarks Holding Corp. v. Berman, 644 F.2d 891, 986-97 (2nd Cir. 1981). In Landmark

Holding Corp., the Second Circuit reversed the District of Connecticut's summary judgment for

the defendant based on *Noerr-Pennington* and held that the filing of appeals when the defendant

knew it lacked standing to do so is activity unprotected by *Noerr-Pennington*. The Defendants

reliance on Filmtec Corp v. Hydronautics., 67 F.3d 931,936-40 (Fed. Cir. 1995) is misplaced. In

Filmtec, the district court had ruled in favor of Filmtec on the issue of ownership of the patent at

issue, a ruling the Federal Circuit reversed. The Federal Circuit held that Filmtec's claim of

ownership could not have been objectively baseless in view of the district court's ruling in favor

of Filmtec. In this case, every court in France and the United States that has considered the

matter has ruled against INC, characterizing their arguments as "futile" and "meritless", finding

that INC had engaged in a fraudulent attempt to circumvent the court, and, finally, sanctioning

INC. Int'l Nutrition Co. v. Horphag Research Ltd., 257 F.3d 1324, 1331 (Fed. Cir. 2001);

International Nutrition Company v. Horphag Research Ltd., Ruling on the Defendants' Motions

for Attorney Fees [Dkt. # 392]; (Whitney Decl., Ex. 18).

Though <u>Landmarks Holding Corp.</u> was decided before <u>PRE</u>, <u>PRE</u> does not change the holding of <u>Landmarks Holding Corp.</u> that filing litigation when one knows it has no standing to do falls within the sham exception to *Noerr-Pennington*. Indeed the same principles that underlying the fraud / misrepresentation exception to the doctrine apply to cases filed by plaintiffs that know they have no standing to do so.

**B.    <u>Fraud and Material Misrepresentations are not protected by *Noerr-Pennington*.</u>**

*Noerr-Pennington* immunity is narrow. The *Noerr-Pennington* doctrine shields only efforts to influence the government to take anticompetitive action, not anticompetitive private activity, from antitrust liability. <u>See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.</u>, 486 U.S. 492, 500-01 (1988). Furthermore, the doctrine does not protect illegitimate petitioning activity of courts based on fraud and misrepresentations, <u>see, e.g., California Motor Transport Co. v. Trucking Unlimited</u>, 404 U.S. 508, 513 (1972) or, ostensibly legitimate petitioning activity that is objectively baseless litigation, <u>see, e.g., Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.</u>, 508 U.S. 49, 60 (1993) ("<u>PRE</u>").[9] Thus, the Court has established real confines for *Noerr-Pennington* immunity, and Defendants' conduct in this case falls outside those confines.

---

[9] In <u>California Motor Transport Co.</u>, the Court took care to distinguish instances where petitioning activity is before a governmental body in its legislative capacity, as was the case in <u>Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.</u>, and where the activity takes place before a governmental body in its adjudicative capacity, as is the case here. 404 U.S. 508, 512-13 (1972). Indeed, the <u>California Motor Transport</u> Court stated that "unethical conduct in the setting of the adjudicatory process often results in sanctions", citing three such occasions where wrongful petitioning activity violated antitrust laws. <u>Id</u>. The Court continued: "There are many other forms of illegal and reprehensible practices which may corrupt the administrative or judicial processes and which may result in antitrust violations. <u>Misrepresentations condoned in the political arena, are not immunized when used in the adjudicatory process.</u>" <u>Id.</u> (emphasis added).

### 1.Defendants' frauds and misrepresentations in an adjudicatory setting preclude them from immunity.

The *Noerr-Pennington* doctrine does not provide antitrust immunity for a litigant's fraud or misrepresentations. Thus, as is the case here, when a litigant makes misrepresentations to a United States District Court or to the PTO, *Noerr-Pennington* immunity does not apply.

On pages 12 and 13, Defendants cite PRE, and claim that the Court must determine as a matter of law whether or not the underlying district court actions were objectively baseless. Defendants are wrong, for PRE does not apply in this case where the defendants made knowing misrepresentations to multiple courts and other governmental bodies. Indeed, the Court in PRE recognized that a litigant's fraud and misrepresentations might preclude the application of *Noerr-Pennington* immunity and the necessity to apply the sham exception test, but declined to decide "whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentation." PRE, 508 U.S. at 62 n.6. Thus, PRE is not the standard.

A number of Circuit Courts have addressed the issue of whether a litigant's fraud or misrepresentations strip a litigant of *Noerr-Pennington* immunity.[10] The Second Circuit, however, has yet to weigh in. In Liberty Lake Investments, Inc. v. Magnuson, 12 F.3d 155, (9th Cir. 1993), for example, the Ninth Circuit, after reconciling PRE with Walker Process Equipment, Inc. v. Food Mach. & Chem., Corp., 382 U.S. 172 (1968) and Rule 60(b)(3) of the Federal Rules of Civil Procedure, suggested that PRE's two-part sham test was not warranted

---

[10] There is some issue as to whether fraud or misrepresentations constitutes unprotected conduct or constitutes *de facto* sham litigation of the PRE kind. According to *Areeda and Hovenkamp*, Antitrust Law ¶ 203f "in most cases it makes little difference whether we say that the provision of false information is unprotected by *Noerr* to begin with or that it falls into the sham exception to *Noerr*."

where there was evidence "that a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." <u>Liberty Lake Investments</u>, 12 F.3d at 159. Two years latter, the Ninth Circuit made that dictum law with respect to patents procured through intentional fraud. <u>Hydranautics v. Filmtec Corp.</u>, 70 F.3d 533, 537-39 (9th Cir. 1995).

Similar rationale was embraced by the District of Columbia Circuit, the Third Circuit and the Fourth Circuit. In <u>Whelan v. Abel</u>, 38 F.3d 1247 (D.C.Cir. 1995), the District of Columbia Circuit reversed the district court and held that "neither *Noerr-Pennington* or the First Amendment protects the conduct plaintiffs have alleged—namely, knowing misrepresentations to state securities administrators and a federal court … ." <u>Whelan</u>, 38 F.3d at 1249, 1255-57. Likewise, the Fourth Circuit acknowledged in <u>Baltimore Scrap Corp. v. The David J. Joseph Co.</u>, 237 F. 3d 394 (4th Cir. 2001) that frauds and misrepresentations that infect the core of a case might not receive *Noerr-Pennington* immunity. <u>Baltimore Scrap Corp.</u>, 237 F. 3d at 402. Finally, the Third Circuit in <u>Cheminor Drugs, Ltd. v. Ethyl Corp.</u>, 168 F.3d 119 (3d 1999), embraced the rule that material misrepresentations bar *Noerr-Pennington* immunity. <u>Cheminor Drugs, Ltd.</u>, 168 F.3d at 124 n.12.

Though the Second Circuit has not decided the issue, district courts within the Second Circuit have recognized that *Noerr-Pennington* immunity does not apply to fraud, the deliberate submission of misleading information, or material misrepresentations. <u>See Calabrese v. CSC Holdings, Inc.</u>, 2:02-CV-5171, 2004 WL 3186787, at *2-3 (W.D.N.Y. 2004) ("For all of the reasons stated above, execution of fraud and deliberate submission of misleading information do not enjoy immunity under the Noerr-Pennington anti-trust immunity doctrine."); (TAB B)

27

Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P., 129 F. Supp.2d 578, 592 (W.D.N.Y. 2000).

Further, the instant case is based on Defendants initiation of multiple proceedings and PRE applies only to situations where there is an allegation of a single sham lawsuit. When Defendants are accused of "bringing a whole series of legal proceedings, the test is not retrospective but prospective" and the focus of the inquiry is the intent in initiating those proceedings. Primetime 24 Joint Venture v. NBC, Inc., 219 F.3d 92, 101 (2d Cir. 2000) (citations omitted). In such situations, the relevant issue is whether or not the legal challenges are initiated pursuant to a policy of starting legal proceedings without regard to their merits for the purpose of injuring a market rival. Id. See also, Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp., 192 F.Supp2d 519, 537 (M.D. La. 2001) (noting that the filing of a series of frivolous lawsuits signifies a form of anticompetitive conduct that differs not merely in degree, but also in kind, from the filing of a single, baseless action). As set forth herein, JFI alleges that Defendants initiated and maintained a series of legal proceedings based on repetitive and groundless claims to enable them to mischaracterize their alleged ownership in the '360 patent to the market. Id., at 538.

a. Defendants cannot claim *Noerr-Pennington* immunity because they misrepresented facts to at least two United States District Courts.

Defendants initiation of the 1996 District of Connecticut Action and the 1997 Northern District of California Action were based on either fraud or misrepresentations, which infected the core of those proceedings. As such, they do not provide a basis to claim *Noerr-Pennington* immunity. Moreover, Defendants maintained those actions through perpetuating those initial misrepresentations even as those misrepresentations were being exposed.

28

      i.   Defendants misrepresented INC's ownership interests in the '360
         patent.

Paragraph 23 of the complaint in the 1996 District of Connecticut Action and

Paragraph 12 of the complaint in 1997 Northern District of California Action state: "Plaintiff

INC, is and at all times relevant herein has been, the owner, by assignment, of at least an

undivided one-half interest in U.S. Patent No. 4,698,360, issued October 6, 1987 to Dr. Jack

Masquelier, entitled "Plant Extract with a Proanthocyanidins Content as Therapeutic Agent

having Radical Scavenger Effect and Use thereof" (the "'360 patent.")"  When those complaints

were filed, Defendants knew or should have known that INC did not own <u>any</u> interest in the '360

patent for at least two reasons.  First, Defendants knew that purported assignment to INC of the

interest of SCIPA was void pursuant to French Law and agreements with Horphag Research Ltd.

Second, Defendants knew that the patent was invalid or unenforceable .

      ii.   Defendants misrepresented validity of the '360 patent and even
         procured the patent though misrepresentations.

With their Summary Judgment Motion, Defendants filed a Motion in Limine

asking the Court to prevent JFI from evidence seeking to prove that the '360 patent is invalid,

evidence seeking to prove that the '360 patent is unenforceable due to fraud or inequitable

conduct and evidence seeking to prove that any Defendant committed fraud or inequitable

conduct before the Defendant [Dkt. # 236].  Defendants further claim at pages 25-26 of their

Memorandum that JFI is estopped from claiming that the '360 patent is invalid.  JFI, however, is

not asking this Court to declare the '360 patent invalid.  Instead, JFI demonstrates that the

invalidity of the '360 patent strips Defendants of their *Noerr-Pennington* immunity and that

Defendants' conduct before the PTO had the practical consequences of rendering the '360 patent

29

unenforceable or invalid, which therefore made the 1996 District of Connecticut Action and the

1997 Northern District of California Action, and subsequent appeal objectively baseless.

Defendants' conduct before the PTO is also relevant to demonstrate Defendants' continued

misrepresentations to the marketplace.[11]

Paragraph 23 of the Complaint in the 1996 District of Connecticut Action and

Paragraph 12 of the Complaint in 1997 Northern District of California Action also state: "The

patent was duly and legally issued and is valid and subsisting." Yet Defendants knew this was

not true because they knew of existing prior art. For example:

1. Beginning in approximately 1978, a product containing proanthocyanidins was
   made and sold in France under the trade name Endotelon. Endotelon was a
   product comprised of proanthocyanidins extracted from grapes. Endotelon was
   produced under a license from Societe Civile d'Investigations Pharmaceutiques
   d'Aquitaine (SCIPA), a French partnership in which Masquelier was a partner.
   (Whitney Decl., Ex. 24.)

2. In 1980, an article was published in the *Gazette Medicale de France* entitled
   "Therapeutical Trial of Endotelon, a peripheral angioprotector" reporting the
   results of tests performed by administering Endotelon to humans at a dosage of
   150 milligrams per day ("the French Endotelon article"). The French Endotelon
   article describes administration of proanthocyanidins obtained from a plant source
   to humans in the same dosage range described and claimed in the '360 patent.
   The French Endotelon article describes, explicitly or inherently, each and every
   step of the methods claimed in the '360 patent. (Whitney Decl., Ex. 20.)

3. In addition to the French Endotelon article, there are other references published
   prior to 1984 which describe administration to humans of proanthocyanidins
   derived from plant sources at dosages within the range claimed in the '360 patent.

The Bordeaux Court, in reviewing numerous contracts before making its

determination that INC had no rights to the '360 patent, even acknowledged the existence of

prior art. The court noted that SCIPA, Masquelier and INC agreed that certain prior art was the

same product produced pursuant to the '360 patent. "The contract of the month of February,

---

[11] See also, JFI's Opposition to Defendants' Motion in Limine, filed herewith.

1971, entered into for 10 years … granted to INTERHORPHAG exclusivity in the right to sell …
<u>a product which, it is undisputed, is of the same character as that which was ultimately to be
called PYCNOGENOL</u>." (Whitney Decl., Ex. 5 (emphasis added.)) But even this judicial
recognition of Defendants' admission to the existence of prior art did not cause Defendants to
cease their misrepresentations.

There can be no question that Defendants knew about this prior art. For example,
in the book <u>OPC in Practice</u>, published in 1993 by Schwitters in collaboration with Masquelier,
they referenced several studies of "the OPC-based product 'Endotelon' (Sanofi/Labaz)."
(Whitney Decl., Ex. 2, at 57-68.) Moreover, in the 3rd edition of <u>OPC in Practice</u> published in
1995, at pages 111-117, additional information regarding testing of Endotelon in 1980 and 1981
is provided, including citations to references describing in detail the tests previously summarized
in the 1993 edition of the book. (Whitney Decl., Ex. 22.) Indeed INC even offers for sale in the
United States an OPC product under the trade name Flavay™ and states on its packaging
"Scientifically Defined, Patented and isolated from Natural Extracts as used in the Actual
Research Since 1947." (Whitney Dec., Ex. 24.)[12]

Thus, the '360 patent is invalid for failing to satisfy the criteria for patentability
under 35 U.S.C. § 102 in view of the prior art describing administration of proanthocyanidins to
humans within the ranges claimed in the '360 patent, including without limitation the French
Endotelon article, the references cited in <u>OPC in Practice</u> and the literature regarding the French
counterparts to Flavay™. <u>See, e.g.</u>, <u>Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.</u>, 246
F.3d 1376 (Fed. Cir. 2001). Defendants knew this prior to initiating the 1996 District of
Connecticut Action and the 1997 Northern District of California Action.

To make matters worse, Defendants, during prosecution of the '360 patent, committed inequitable conduct or fraud by failing to bring to the attention of the PTO prior art that was material to patentability. Moreover, after a April 17, 1996 Request for Reexamination of the '360 patent, Defendant Masquelier and those associated with prosecution of the '360 patent, including Zivin, INC, and Schwitters, submitted an Information Disclosure Statement citing seventy-one separate references without any explanation of any of the references other than the titles and dates of the references and did not disclose the 3rd edition of OPC in Practice, or any of the articles regarding testing of OPCs cited at pages 111-117 of the 3rd edition of OPC in Practice.

Instead, Masquelier and those associated with prosecution of the '360 patent mislead the Examiner during prosecution of the '360 reexamination by statements such as the following:

> Patentee respectfully points out that the Examiner's use of OPC In Practice as a secondary reference in the 35 U.S.C. §§102/103 rejection of the claims is improper. OPC In Practice was published in 1993, which is long subsequent to the April 9, 1985 filing date of the '360 patent. Therefore, OPC In Practice is not a proper basis for the Examiner to establish a 35 U.S.C. §§102/103 rejection. . . .

Defendants obtained and maintained the '360 patent through misrepresentations and fraud. Such conduct before the PTO in and of itself precludes Defendants from claiming immunity from antitrust laws. See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172 (1965). Just as important are Defendants' misrepresentations as to validity before the district courts, which strip them of immunity as well.

---

[12] Product literature regarding Flavay™ states that Flavay™ "is proven fully bioavailable, safe and effective by numerous human studies, manufactured in France and used worldwide since 1950."

iii.     Defendants misrepresented Horphag's interest in the '360 patent.

Paragraph 24 of the complaint in 1996 District of Connecticut Action and

Paragraph 13 of the complaint in the 1997 Northern District of California Action state: "Upon

information and belief, Horphag no longer is an owner of any interest in the '360 patent."

Moreover, Paragraph 35 of the complaint in the 1996 District Court Action further states:

"Defendants Horphag, MW and Kaire have falsely represented to the public and trade that

Horphag is the owner of the '360 patent, that INC is not properly an owner of the '360 patent and

that Horphag may issue licenses under the '360 patent." These were misrepresentations to the

court as to Horphag's confirmed one-half interest in the '360 patent, pursuant to which, at times,

JFI would purchase '360 patent product.

On March 23, 1997, not only did the Bordeaux Court hold that INC had no

interest '360 patent, it affirmed Horphag's interest. (Whitney Decl., Ex. 25.) Nonetheless,

Defendants continued with these misrepresentations, issuing a number of press releases over the

next four years, including the following:

- A May 29, 1998 press release in which INC states that it acquired clear title to the '360 patent as a matter of law and that its ownership in the '360 patent is now strengthened. (Whitney Decl., Ex. 33).

- A July 31, 1998 press release in which INC states that it is the half owner of the '360 patent, had acquired clear title to SCIPA's ownership of the patent as a matter of law, and that the French Higher Court held that an American Court should decide whether Dr. Masquieler's Assignment is valid or not. (Whitney Decl., Ex. 34).

- A December 16, 1998 press release in which INC states that it acquired clear title to the '360 patent as a matter of law and is a one half owner of the '360 patent. (Whitney Decl., Ex. 35).

- A March 23, 2000 press release in which INC states that, if confirmed on appeal, the Connecticut Ruling would make CEP a joint owner of the '360 patent and would make French law govern the ownership of the '360 patent. (Whitney Decl., Ex. 36).

- A March 24, 2001 press release in which INC states that it is a joint owner of the '360 patent. (Whitney Decl., Ex. 37).

These misrepresentations go to the core of the 1996 District of Connecticut Action and the 1997 Northern District of California Action. Without making these misrepresentations, Defendants could not have prosecuted those actions as far as they did nor continue their misleading campaign to purchases of OPC product (though even without making those misrepresentations, Defendants actions were objectively baseless). Thus, Defendants cannot claim *Noerr-Pennington* immunity to prevent this case from going to trial.

**2. Defendants' frauds on the PTO preclude them from *Noerr-Pennington* immunity as well.**

As discussed above, there is more than one exception to the *Noerr-Pennington* doctrine. "The accused infringer may show that the asserted patent was obtained through knowing and willful fraud." Q-Pharma. Inc. v. Andrew Jergens Co., 360 F.3d 1295, 1305 (Fed. Cir. 2004) (citing Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068 (Fed. Cir. 1998)). Indeed, this exception was specifically enumerated in Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. at 175-77, as it pertained to frauds committed on the PTO. Because Defendants procured and maintained "rights" to the '360 patent through misrepresentations made to the PTO their subsequent petitioning of district courts is not immune.

As set forth more fully above, Defendant Masquelier applied for the '360 patent in 1985 without disclosing to the PTO material, prior art of which he had knowledge. Moreover, Defendant Masquelier did not disclose to the PTO material, prior art during a 1996 re-examination of the '360 patent notwithstanding that such prior art was discussed in a book written by Defendants Masquelier and Schwitters published in 1993. These facts on their own strip Defendants of *Noerr-Pennington* immunity. That Defendants misrepresented the effects of

34

such conduct on the validity of the '360 patent is another reason why Defendants cannot be afforded *Noerr-Pennington* immunity.

C.    **The Defendants' Non-Petitioning Activity is not Protected by *Noerr-Pennington*.**

Defendants' non-petitioning activity is not protected.  Unlike cases in which defendants write letters or issue statements in advance of its petitioning activity, in this case Defendants intentionally misrepresented to the public the petitioning activity and the results of the petitioning activity.  Neither the First Amendment nor justice can reconcile affording *Noerr-Pennington* immunity for such anticompetitive private activity.  Laitram Mach., Inc. v. Carnitech A/S, 901 F.Supp. 1155, 1160-61 (E.D.La .1995).

The following examples demonstrate how Defendants misrepresented the district court lawsuits, French lawsuits, and a reexamination in the PTO is not petitioning activity:

- Defendant Masquelier executed a confirmatory assignment concerning the '360 patent, which Defendant Zivin recorded in the PTO.  Defendant INC issues a press release on March 27, 1997 stated that its ownership position in the '360 patent is now strengthened based on this assignment.  (Whitney Decl. Ex. 38)  A French Court ruled days before that INC had no interest in the '360 patent.

- The March 27, 1997 press release also indicates that, despite a March 25, 1997, decision issued by the Court of Primary General Jurisdiction of Bordeaux, INC's ownership position in the '360 patent is now strengthened and that it controls at least 50% of the patent.  (Whitney Decl., Ex. 38).

- An August 27, 1997 press release in which INC states that it is one of the owners of the '360 patent and that is position is now stronger than ever and that PTO Primary Examiner totally acknowledged INC's work despite the fact that INC purposefully misled the examiner regarding prior art.  (Whitney Decl., Ex. 39).

35

- A December 16, 1998 press release in which INC states that it acquired clear title to the '360 patent as a matter of law and is a one half owner of the '360 patent. (Whitney Decl., Ex. 35)

- A May 29, 1998 press release in which INC states that it acquired clear title to the '360 patent as a matter of law. (Whitney Decl., Ex. 33).

- A July 31, 1998 press release in which INC states that it is the half owner of the '360 patent, that INC acquired clear title to SCIPA's ownership of the patent as a matter of law, and that the French Higher Court held that an American Court should decide whether Dr. Masquelier's Assignment is valid or not. (Whitney Decl., Ex. 34).

- A March 23, 2000 press release in which INC states that, if confirmed on appeal, the Connecticut Ruling would make CEP a joint owner of the '360 patent and would make French law govern the ownership of the '360 patent. (Whitney Decl., Ex. 36).

- An April 3, 2000, press release in which INC states that it, along with CEP have asked the Federal Court for the impartial and consistent execution of French law against INDENA and possible other "grape seed extract" licensees of Horphag Research Ltd., and the Connecticut Court applied French law in favor of the French CEP company and granted CEP ownership in 50% of the '360 patent. (Whitney Decl., Ex. 40).

- A March 24, 2001 press release in the which INC states that it is a joint owner of the '360 patent. (Whitney Decl., Ex. 37). and

- A July 19, 2001, press release in which INC and CEP state that the U.S. Court of Appeals decided CEP is co-owner of the '360 patent, that the U.S. Court of Appeals has now acknowledged that the French company CEP is a joint owner of the '360 patent, that the 1998 French decision annulled CEP's 1994 assignment of half of the '360 patent to INC, and that the U.S. Court's decision leaves the American consumer at the mercy of infringers. (Whitney Decl., Ex. 41.)

These statements and others, which were distributed authored and distributed by Defendants, are not merely public spin. They are bold-faced lies made to the public and have no factual relationship to the "petitioning" activity they reference other than timing.

For all of these reasons a summary judgment motion by Defendants based on *Noerr-Pennington* should be denied.

36

**D. Defendants cannot rely on attorney opinions and evaluations which were shielded from discovery Based on the Attorney-Client Privilege.**

At pages 22-24 of their Summary Judgment Brief, Defendants argue that their actions were not objectively baseless because Zivin and other attorneys had reviewed the matter prior to filing suit. Defendants did not produce a single opinion or evaluation made by any attorney during discovery. Moreover, as set forth in detail in JFI's Motions in Limine filed herewith, during Zivin's deposition, Defendants repeatedly invoked the attorney-client privilege and the attorney work product doctrine when Zivin was questioned on topics, such as the validity of the assignments of the '360 patent, that necessarily would have been part of any such analysis.

By relying on undisclosed attorney opinions and evaluations, Defendants ask the Court to enter summary judgment not on undisputed facts, but on unknown facts. Defendants made a choice to shield Zivin's and other attorney opinions and communications from discovery. As a result, JFI could not inquire into any attorney evaluations or communications regarding the underlying litigation, press releases or other matters. Defendants cannot now rely on those undisclosed and unknown opinions and communications to obtain summary judgment.[13] See U.S. v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) (attorney-client privilege cannot be used at once as a shield and a sword.) For the reasons set forth in detail in JFI's Motions in Limine filed herewith, the Court should disregard all references to those undisclosed attorney analyses and opinions and deny Defendants summary judgment motion.

---

[13] In one of the cases relied upon by Defendants, Golan v. Pingol Enterprises, Inc., 310 F.3d 1360 (Fed. Cir. 2002), the court dismissed Golan's antitrust claims for bringing suit on an expired patent based on issues unrelated to "objective baselessness." As to Golan's federal and state unfair competition claims, the court found that Pingel did not act in bad faith based in part on attorney opinions and communications to Pingel that were in evidence.

37

**E.**    **JFI'S Conduct is Irrelevant to Whether or Not Defendants Had Any Basis for Their Illegal Conduct.**

In support of their Summary Judgment Motion, Defendants spend considerable effort on issues that are irrelevant to the determination of whether or not Defendants decision to bring, then maintain, patent infringement actions when they did not own the allegedly infringed patent was objectively baseless, as well as Defendants use of those litigations in their marketing campaigns. For example: JFI's alleged infringement of the '360 patent is irrelevant to the Court's analysis in this case. The issue here is whether or not Defendants could bring and maintain patent infringement actions when they knew or should have known that they did not own the '360 patent. Thus, Defendants' reliance on Q-Pharma, Inc. v. Jergens Co., 360 F.3d 1295 (Fed. Cir. 2004) at pages 23-24 of their Opposition is misplaced. In Q-Pharma, the Federal Court set out the minimum requirements for a sufficient pre-infringement analysis that counsel for a party claiming infringement of its patent should utilize. Whether Defendant Zivin met the minimum requirements to determine if his client could initiate an infringement action against JFI and the other seventeen defendants in the 1996 District of Connecticut Action based on their allegedly infringing conduct is completely irrelevant to this case and the issues raised in Defendants' Summary Judgment Motion. Unlike in Q-Pharma, Defendants in this action did not own the patent and thus did not have standing to bring an infringement action, let alone maintain such actions for five years.

Similarly, whether or not JFI committed trademark infringement is irrelevant to this case. The alleged trademark violations were never used in Defendants' marketing campaign

---

No such conclusion can be drawn in this case, as Defendants here chose to hide attorney opinions and communications.

38

and were minor issues in the 1996 District of Connection Action that were never litigated or

adjudicated. These issues are irrelevant to the Court's determination of whether or not

Defendants' conduct in maintaining patent infringement actions when they did not own the

patent at issue and using those actions to intimidate the marketplace was objectively baseless.

## VI.    CONCLUSION

Defendants' Summary Judgment Motion should be denied. Contrary to the

Defendants' contention predicate facts must be determined before the Court can decide that the

underlying actions were objectively baseless. Moreover, the Defendants are not entitled to

*Noerr-Pennington* immunity. The Defendants' material misrepresentations to governmental

bodies that were sitting in adjudicatory capacities, including the court in the underlying action

strip, them of immunity. In addition, the Defendants engaged in non-petitioning activity that

falls outside of *Noerr-Pennington*. Thus, the Defendants' Summary Judgment Motion should be

denied.

The Defendants' Summary Judgment Motion should also be denied because it is based in large part on evidence never produced or disclosed, such as alleged attorney opinions. Thus, this information cannot be a basis for granting summary judgment.

> THE PLAINTIFF,
> JARROW FORMULAS, INC.
> BY MCCARTER & ENGLISH, LLP
> ITS ATTORNEYS
>
>
> By _____
> ERIC WATT WIECHMANN (CT 04331)
> ERIC E. GRONDAHL (CT 08988)
> JASON C. WELCH (CT 23418)
> CityPlace I
> 185 Asylum Street
> Hartford, CT  06103
> (860) 275-6700
> (860) 724-3397 (fax)
>           -and-
> ALEXANDRA B. STEVENS (CT 20300)
> Four Stamford Plaza
> 107 Elm Street
> Stamford, CT  06901
> (203) 965-0823
> (203) 323-6513 (fax)
> astevens@mccarter.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing PLAINTIFF'S MEMORANDUM

OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

has been hand delivered, this 10th day of August, 2005 to:


RICHARD S. ORDER, ESQ.
ERIC D. BEAL, ESQ.
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103


JASON C. WELCH


HARTFORD: 645166.03

41