UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JARROW FORMULAS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:01-CV-00478 (AVC) |
| v. | ) | |
| | ) | |
| INTERNATIONAL NUTRITION | ) | |
| COMPANY, INTEGRATED | ) | |
| BIOCEUTICALS, LLC, PRIMARY | ) | |
| SERVICES, INC., PRIMARY SOURCE, | ) | |
| LLC, EGBERT SCHWITTERS, NORMAN | ) | |
| H. ZIVIN, and JACK MASQUELIER, | ) | |
| | ) | |
| Defendants | ) | August 10, 2005 |

## Local Rule 56(a)(2) Statement

Pursuant to Rule 56(a)(2) of the Local Civil Rules of the United States District

Court for the District of Connecticut, Plaintiff Jarrow Formulas, Inc. ("JFI") submits this

Statement in opposition to the Defendants' Motion for Summary Judgment, dated July 18, 2005,

and accompanying Memorandum of Law and Local Rule 56(a)(1) Statement.

This Statement is divided into two parts. The first part identifies those material

facts that are in dispute that must be decided by a trier of fact. The second part responds to the

Defendants' alleged undisputed material facts.

On July 15, 2005, the Defendants submitted a 56(a)(1) Statement, which purports

to identify at least 74 undisputed, material facts. That Statement was accompanied by a banker's

box of exhibits (authenticity for which has not been established by Affidavit or Declaration).

Nowhere in that Statement can be found <u>undisputed</u>, <u>material</u> facts necessary to determine the

issue before the Court: namely, whether the *Noerr-Pennington* doctrine should apply in this case.

Instead, the defendants submitted a pile of immaterial facts most likely hoping to hide that which is germane, but disputed, to the discrete issue before the Court.[1]

## Material Facts in Dispute

Facts that are disputed and material to the issue before the Court fall into four categories. The first category consists of facts relating to the defendants' frauds and misrepresentations to governmental bodies sitting in adjudicatory capacities. They are material because they facts strip the defendants of *Noerr-Pennington* immunity. The second category consists of those facts that were not determined in an underlying proceeding but demonstrate that the underlying petitioning of governmental bodies was objectively baseless. They are important because they show that application of the sham exception to *Noerr-Pennington* immunity cannot be decided as a matter of law. The third set is facts relating to activities that should fall wholly outside *Noerr-Pennington* immunity because they are facts without a defendable nexus to petitioning activity. The final set of material, disputed facts consists of facts to which there should be no dispute but are disputed by the defendants. The defendants, however, failed to stipulate to them in the Joint Trial Memorandum. [Dkt # 216] In some cases these disputed, material facts span more than one category.

### A. *Facts of Related to Fraud and Misrepresentations.*

Issues of fact exist as to representations the defendants made to federal courts and the United States Patent and Trademark Office. It is important to note that JFI is not asking the

---

[1] The defendants know that there are material facts in dispute. In addition to those the defendants buried in their 56(a)(1) Statement are those material facts to which the defendants refused to stipulate to the for the purposes of filing the Joint Trial Memorandum. <u>See</u> Joint Trial Memorandum [Dkt # 216] at 59-63.

Court to declare U.S. Patent No. 4,698,360 invalid for in fact that patent has expired. The task is narrower. JFI asks that the Court recognize that the defendants' conduct strips them of their *Noerr-Pennington* immunity and that the defendants conduct before the USPTO also would have had the practical consequences of rendering the '360 patent unenforceable or invalid which in turn made the federal court actions that followed objectively baseless.

The following facts are material and disputed[2]:

1.  Beginning in 1978, Endotelon, a product containing proanthocyanidins, was made and sold in France. (Whitney Decl., Ex. 20.)

2.  Beginning in 1978, Endotelon was produced pursuant to a license issued from Societe Civile d'Investigations Pharacologiques d'Aquitaine ("SCIPA").

3.  From 1978 up to 1994, defendant Masquelier had an interest in SCIPA.

4.  In 1980, the *Gazette Medicale de France* published an article entitled "Therapeutical Trial of Endotelon, a peripheral angioprotector" reporting the results of tests performed by administering Endotelon to humans at a dosage of 150 milligrams per day ("the French Endotelon prior art".) (Whitney Decl., Ex. 20.)

5.  The French Endotelon article describes administration of proanthocyanidins obtained from a plant source to humans in the same dosage range described and claimed in the '360 patent. (Whitney Decl., Ex. 20.)

---

[2] Instead of acknowledging the existence of disputed, material facts, the defendants have filed motions in limine asking that the court exclude these facts from the trier of fact. Thus, the defendants concede that there are disputed facts but ask the court not to consider them and not to let them go to a jury.

6. In 1986, a product entitled Flavan™ was introduced into the French market in 1968 ("the Flavan prior art"). (Whitney Decl., Ex. 23.)

7. Defendants INC, IBC, PSI and PS offer for sale in the United States an OPC product under the trade name Flavan™. Labels on bottles of Flavan™ include the Masquelier's® trademark, owned by INC, the '360 patent number, and further state "Scientifically Defined, Patented and isolated from Natural Extracts as used in the Actual Research Since 1947." (Whitney Decl., Ex. 23.)

8. On April 9, 1985, defendant Masquelier filed the patent application with the USPTO which issued as the '360 patent. During prosecution of the patent application, neither defendant Masquelier nor those associated with prosecution of the '360 patent application disclosed to the PTO the Endotelon or the Flavan prior art. (Whitney Decl., Ex. 19.)

9. As early as July 24, 1987, the defendants knew that any action on the patent must be taken by both co-owners. (Whitney Decl., Ex. 29 - letter from E. Barraud to C. Haimoff of 7/24/87.)

10. On September 24, 1993, Horphag invited SCIPA to be a voluntary plaintiff in its action against Consac. (Whitney Decl., Ex. 28- letter from Robert Sands to SCIPA of 9/24/93)

11. As early as November 1993, the defendants knew that the '360 patent was invalid or void because of prior art. (Whitney Decl., Ex.43 - Second Amended Answer and Counterclaims, Consac Indus., Inc. v. Intern'l Nutrition Co., 1:94 CV 1886, at 5.)

12. As early as November 1993, the defendants knew that the all owners of the '360 patent are required to institute infringement litigation.  (Whitney Decl., Ex. 43 - Second Amended Answer and Counterclaims, <u>Consac Indus., Inc. v. Intern'l Nutrition Co.</u>, 1:94 CV 1886, at 7.)

13. As early as November 1993, the defendants knew of allegations that defendant Masquelier procured that the '360 patent through "fraudulent misrepresentations" made to the USPTO.  (Whitney Decl., Ex. 43 - Second Amended Answer and Counterclaims, <u>Consac Indus., Inc. v. Intn'l Nutrition Co.</u>, 1:94 CV 1886, at 11.)

14. As early as 1994, the defendants had knowledge that prior art invalidated the '360 patent.  (Whitney Decl., Ex. 44 - Complaint, <u>Consac Indus., Inc. v. Intern'l Nutrition Co.</u>, 1:94 CV 1886, at 4.)

15. On March 7, 1994, in violation of law and contract, SCIPA attempted to assign any interest it may have had in the '360 patent to INC and then it asserted to the Eastern District of New York in <u>Horphas v. Consac,</u> that the plaintiff in that action "failed to join a necessary party" because the plaintiff did not join INC.  (Whitney Decl., Ex. 45 - Answer and Cross Claims, <u>Consac Indus., Inc. v. Intern'l Nutrition Co.</u>, 1:94 CV 1886, at 5-6.)

16. In March of 1996, on the eve of the nutraceutical industry's largest trade show, the defendants initiated <u>International Nutrition Company v. Horphag Research Ltd.</u>, 3:96-cv-00386 (D.Conn.), ("1996 District of Connecticut Action") knowing that INC did not have legitimate ownership rights to the '360 patent, knowing that INC had no standing to bring such

action and knowing that the '360 patent was either invalid or unenforceable because of their

conduct before the PTO and/or prior art.

17. On October 8, 1996, in response to a reexamination of the '360 patent,

defendant Masquelier and/or those associated with prosecution of the '360 patent reexamination

submitted an Information Disclosure Statement to the USPTO citing seventy-one separate

references without any explanation of any of the references other than the titles and dates of the

references. This was an attempt to conceal from the USPTO material, prior art. (Whitney Decl.,

Ex. 46 – Information Disclosure Statement.)

18. In response to a rejection of the claims of the '360 patent based in part on the

1993 edition of <u>OPC in Practice</u>, the patentees made the following statements in an Office Action

response dated March 17, 1997:

> Patentee respectfully points out that the Examiner's use of <u>OPC In
> Practice</u> as a secondary reference in the 35 U.S.C. §§102/103
> rejection of the claims is improper. <u>OPC In Practice</u> was published
> in 1993, which is long subsequent to the April 9, 1985 filing date
> of the '360 patent. Therefore, <u>OPC In Practice</u> is not a proper
> basis for the Examiner to establish a 35 U.S.C. §§102/103
> rejection. . .

This was another attempt to mislead the USPTO. (Whitney Decl., Ex. 26 – Office
Action Response.)

19. At pages 111-117 of the 3rd edition <u>OPC in Practice</u>, which was published in

1995, can be found information regarding the testing of Endotelon in 1980 and 1981. (Whitney

Decl., Ex. 22.)

20. Defendants Masquelier, Schwitters and Zivin did not cite in the Information

Disclosure Statement or otherwise provide the Examiner with the French Endotelon article, the

3rd edition of <u>OPC in Practice</u>, or any of the articles regarding testing of OPCs cited at pages 111-117 of the 3rd edition of <u>OPC in Practice</u>.  (Whitney Decl., Ex. 22.)

21. In January of 1997, the defendants initiated <u>International Nutrition Company v. Interhealth Nutrition</u>, 3:97-cv-00377 (N.D.Cal.), ("1997 Northern District of California Action") knowing that INC did not have legitimate ownership rights to the '360 patent, knowing that INC had no standing to bring such action and knowing that the '360 patent was either invalid or unenforceable because of their conduct before the USPTO and/or prior art.

22. The defendants maintained both the 1996 District of Connecticut Action and the 1997 Northern District of California Action despite knowing that INC did not have legitimate ownership rights to the '360 patent, knowing that INC had no standing to bring such action and knowing that the '360 patent was either invalid or unenforceable because of their conduct before the USPTO and/or prior art.

23. On April 24, 2003, the defendants acknowledged that Horphag had an undivided one-half interest in the '360 patent.  (Whitney Decl., Ex. 47 - Patent Ownership Confirmatory Agreement.)

24. On September 4, 2003, the defendants threatened to sue JFI for infringement again. (Whitney Decl., Ex. 31 - letter from Richard Order to Eric Wiechmann of 9/4/03.)

25. On September 4, 2003, the defendants acknowledged that they had no standing to initiate infringement actions in the District of Connecticut and the Northern District of California as their counsel stated, "Now that Horphag is required to join any infringement action, <u>our clients have the ability to establish standing by joining as plaintiffs in the same action</u>

all the parties owning any interest in the patent." (Whitney Decl., Ex. 31 - letter from Richard

Order to Eric Wiechmann of 9/4/03 (emphasis added.))

### B.  Facts Not Previously decided.

The underlying litigations in the District of Connecticut and the Northern District

of California were limited.  That is because the courts stayed discovery and based their

judgments against the defendants on awarding comity to a French court decision based on the

sole issue that INC did not have standing to sue because it did not own the patent.

Consistent with the defendants' propensity to make misrepresentations when

petitioning governmental bodies, the defendants claim that all predicate facts necessary to

determine whether the underlying litigations were objectively baseless are not in dispute.  That is

not true.  Indeed, the following are conclusions that a trier of fact could reach when considering

the facts herein and are material to a finding that those actions were objectively baseless.  They

underlying actions never addressed these issues.

1. The defendants knew when they filed the civil action entitled 1996 District of

Connecticut Action that INC did not have a good faith basis to claim ownership of the '360

patent, yet they misrepresented that fact to the court.

2. The defendants knew when they filed the civil action entitled 1997 Northern

District of California Action that INC did not have a good faith basis to claim ownership of the

'360 patent, yet they misrepresented that fact to the court.

3. The defendants knew as they maintained the 1996 District of Connecticut Action that INC did not have a good faith basis to claim ownership of the '360 patent, yet they misrepresented that fact to the court.

4. The defendants knew as they maintained the 1997 Northern District of California Action that INC did not have a good faith basis to claim ownership of the '360 patent, yet they misrepresented that fact to the court.

5. The defendants knew when they filed, and/or as they maintained, the 1996 District of Connecticut Action that the '360 patent was invalid and/or unenforceable, yet they misrepresented that fact to the court.

6. The defendants knew when they filed, and/or as they maintained, the 1997 Northern District of California Action that the '360 patent was invalid and/or unenforceable, yet they misrepresented that fact to the court.

7. The defendants knew when they filed the 1996 District of Connecticut Action that they did not have a good faith basis to assert that others were infringing the purported trademark "OPC-85", yet they misrepresented that fact to the court.

8. The defendants knew of prior art during the initiation and maintenance of the 1996 District of Connecticut Action and the 1997 Northern District of California Action, yet they hid those facts from the court.

9. The defendants knew that they had no standing to initiate and maintain the 1996 District of Connecticut Action and the 1997 Northern District of California Action, yet they did so anyways.

10.    The defendants made material misrepresentations and withheld material information to the United States Patent and Trademark Office ("PTO") regarding the '360 patent.

## C.  Facts non-petitioning, anti-competitive activity.

The defendants also misrepresent to the Court that all anti-competitive activity is covered by the *Noerr-Pennington*. That is not true. Potentially anti-competitive activity is protected only to the extent that it is related to the petitioning activity. But even that is not always the case. Laitram Machinery, inc. v. Carnitech A/S, 901 F.Supp. 1155, 1160-61 (E.D.La 1995). The following facts demonstrate such misrepresentations of the truth that they cannot possibly relate to petitioning activity.

1.  Defendant Masquelier executed a confirmatory assignment concerning the '360 patent, which Defendant Zivin recorded in the USPTO. On March 27, 1997, defendant INC issued a press release stating that its ownership position in the '360 patent is now strengthened based on this assignment. (Whitney Decl., Ex. 38)  A French Court ruled days before that INC had no interest in the '360 patent.

2.  The March 27, 1997 press release also indicated that, despite a March 25, 1997, decision issued by the Court of Primary General Jurisdiction of Bordeaux, its ownership position in the '360 patent is now strengthened and that it controls at least 50% of the patent. (Whitney Decl., Ex. 38)

3.  On August 27, 1997, INC issued a press release in which it stated that it is one of the owners of the '360 patent and that is position is now stronger than ever and that USPTO Primary Examiner totally acknowledged INC's work despite the fact that INC purposefully misled the examiner regarding prior art.  (Whitney Decl., Ex. 39).

4.  On December 16, 1998, INC issued a press release in which it stated that it acquired clear title to the '360 patent as a matter of law and is a one half owner of the '360 patent.  (Whitney Decl., Ex. 35)

5.  On May 29, 1998, INC issued a press release in which it stated that it acquired clear title to the '360 patent as a matter of law.  (Whitney Decl., Ex. 33).

6.  On July 31, 1998, INC issued a press release in which it stated that it is the half owner of the '360 patent, that INC acquired clear title to SCIPA's ownership of the patent as a matter of law, and that the French Higher Court held that an American Court should decide whether Dr. Masquelier's Assignment is valid or not.  (Whitney Decl., Ex. 34).

7.  On March 23, 2000, INC issued a press release in which it stated that, if confirmed on appeal, the Connecticut Ruling would make CEP a joint owner of the '360 patent and would make French law govern the ownership of the '360 patent.  (Whitney Decl., Ex. 36).

8.  On April 3, 2000, INC issued a press release in which it stated that it, along with CEP have asked the Federal Court for the impartial and consistent execution of French law against INDENA and possible other "grape seed extract" licensees of Horphag Research Ltd., and the Connecticut Court applied French law in favor of the French CEP company and granted CEP ownership in 50% of the '360 patent.  (Whitney Decl., Ex. 40).

9. On March 24, 2001, INC issued a press release in which it stated that it is a joint owner of the '360 patent. (Whitney Decl., Ex. 37). and

10. On July 19, 2001, INC and CEP issued a press release in which they stated that the U.S. Court of Appeals decided CEP is co-owner of the '360 patent, that the U.S. Court of Appeals has now acknowledged that the French company CEP is a joint owner of the '360 patent, that the 1998 French decision annulled CEP's 1994 assignment of half of the '360 patent to INC, and that the U.S. Court's decision leaves the American consumer at the mercy of infringers. (Whitney Decl., Ex.41)

### D. Facts not stipulated to in the Joint Trial Memorandum.

The following are material facts that the defendants refused to stipulate to for the purposes of trial. They can also be found on pages 59-63 of the Joint Trial Memorandum. Given that many of theses facts are material to the issue before the Court it is disingenuous that the defendants claim that there are no disputed, material facts.

1. In filing its March 6, 1996 Complaint in the District of Connecticut, INC did not name Horphag Research, Ltd. as a voluntary plaintiff.

2. In filing its March 6, 1996 Complaint in the District of Connecticut, INC did not request a declaratory judgment as to the ownership rights in the '360 patent as to INC or Horphag Research, Ltd.

3. In filing its January 31, 1997 Complaint in the Northern District of California, INC did not name Horphag Research, Ltd. as a voluntary plaintiff.

4. In filing its January 31, 1997 Complaint in the Northern District of California, INC did not request a declaratory judgment as to the ownership rights in the '360 patent as to INC or Horphag Research, Ltd.

5. On March 25, 1997, the District Court of Bordeaux, France entered judgment in the afore-referenced action an adjudged, among other things, the following:

> that French law governed the assignment of the '360 patent;
>
> that the March 18, 1994 assignment from SCIPA to INC was invalid; and
>
> that SCIPA and Masquelier were to jointly and severally pay Horphag 200,000 F for damage to its reputation.

6. After the March 27, 1997, decision of the District Court of Bordeaux France, INC did not withdraw its claims in the United States District Court for the District of Connecticut or the Northern District of California.

7. Masquelier submitted a declaration to the Patent Office in connection with the reexamination.

8. In 1996, Defendant Masquelier assigned to INC the right to use his name, and for this was compensated 50,000 Francs.

9. Neither INC, Schwitters, nor any other company, has used Masquelier's name or likeness in a manner in which Masquelier did not approve.

10.    Masquelier granted Schwitters for compensation the right to personally own the "Masquelier's" trademark.

11.    Masquelier and Schwitters never had a disagreement or dispute over the '360 patent in any way.

12.    Masquelier receives 110,000.00 French Francs per year from INC for agreements relating to the '360 patent, the use of Masquelier's name and other consideration.

13.    On March 27, 1997, the Defendants issued a press release in which INC indicates that, despite the March 25, 1997, decision issued by the Court of Primary General Jurisdiction of Bordeaux, its ownership position in the '360 patent is strengthened and that it controls at least 50% of the patent.

14.    On May 28, 1998, the French Appellate court issued a decision respecting the afore-referenced appeals (SCIPA, et al. v. Horphag; Roll no.: 97003242) and upheld the District Court's decision respecting:

        that French law governed the assignment of the '360 patent; and

        that the March 18, 1994 assignment from SCIPA to INC was invalid.

15.    After the decision of the Bordeaux Court of Appeals on May 28, 1998, INC did not withdraw its claims in the United States District Court for the District of Connecticut or the Northern District of California.

16.     On May 29, 1998, the Defendants issued a press release in which INC states that it acquired clear title to the '360 patent as a matter of law.

17.     On July 31, 1998, the Defendants issued a press release in which INC states that it is the half owner of the '360 patent, that INC acquired clear title to SCIPA's ownership of the patent as a matter of law, and that the French Higher Court held that an American Court should decide whether Dr. Masquelier's Assignment is valid or not.

18.     On December 16, 1998, the Defendants issued a press release in which INC states that it acquired clear title to the '360 patent as a matter of law and is a one half owner of the '360 patent.

19.     INC and Zivin filed an Opposition to Defendants' Summary Judgment Motions on April 29, 1999 in the District of Connecticut action.

20.     INC and Zivin prosecuted claims in the District of Connecticut until the Court granted the Defendants' Summary Judgment Motions on March 18, 2000.

21.     In 1998 and subsequent to the May 28, 1998 decision from the French Appellate Court, SCIPA merged with CEP.  As a result of that merger, Masquelier became shareholder in CEP.

22.     On August 6, 1999, Horphag initiated a second lawsuit in France against eight defendants, including CEP, Schwitters, INC, and Masquelier (Horphag v. CEP, et al.; RG no.: 199F00237).

23.     On December 20, 1999, Defendant Zivin sent a letter to Mr. Donald R. Grice, which stated that INC controls the '360 patent and requested that he cease and desist from confusing the public with respect to use of the "Pycnogenol" Trademark.

24.     On May 8, 2000, INC appealed the District of Connecticut's March 18, 2000 decision to the United States Court of Appeals for the Federal Circuit.

25.     On September 30, 2000, INC entered into an agreement with Qualtec Labs, Inc. (f/k/a Traco Laboratories) in which Qualtec Labs, Inc. agreed to purchase quantities of OPCs from INC's United States distributor and INC agreed to dismiss its patent infringement claims against Qualtec Labs, Inc. (the "Sept. 30, 2000, Agreement").

26.     In the Sept. 30, 2000, Agreement, INC states that either INC or Centre d'Experimentation Pycnogenol ("CEP") owns at least an undivided one-half interest in the '360 patent.

27.     On November 28, 2000, Defendant Zivin sent a letter to Royal Body Care, Inc., requesting that it cease and desist from sales of products that infringe the '360 patent, in which Zivin's clients "[owned] at least a one-half interest."

28.     On April 30, 2001, Defendant Zivin sent a letter to Roex, Inc., requesting that it cease and desist from sales of products that infringe the '360 patent, in which Zivin's clients "[owned] at least a one-half interest."

29.    On March 23, 2000, the Defendants issued a press release in which INC states that, if confirmed on appeal, the Connecticut Ruling would make CEP a joint owner of the '360 patent and would make French law govern the ownership of the '360 patent.

30.    On April 3, 2000, the Defendants issued a press release in which INC states that it, along with CEP have asked the Federal Court for the impartial and consistent execution of French law against INDENA and possible other "grape seed extract" licensees of Horphag Research Ltd., and the Connecticut Court applied French law in favor of the French CEP company and granted CEP ownership in 50% of the '360 patent.

31.    On March 24, 2001, the Defendants issued a press release in the which INC states that it is a joint owner of the '360 patent.

32.    On July 19, 2001, the Defendants issued a press release in which INC and CEP state that the U.S. Court of Appeals decided CEP is co-owner of the '360 patent, that the U.S. Court of Appeals has now acknowledged that the French company CEP is a joint owner of the '360 patent, that the 1998 French decision annulled CEP's 1994 assignment of half of the '360 patent to INC, and that the U.S. Court's decision leaves the American consumer at the mercy of infringers.

33.    Recording of a document pursuant to 37 C.F.R. § 3.11 is a ministerial act and "not a determination by the [USPTO] of the validity of the document or the effect that document has on the title to an application, a patent, or a registration."

34.    After the Federal Circuit's decisions in Ethicon, Inc.v. United States Surgical Corp., 135 F.3d 1456 (Fed Cir. 1998) and Schering Corp. v. Roussel-Uclaf SA, 104

F.3d 341 (Fed. Cir. 1997) were published, the Defendants did not withdraw any actions or withdraw INC's actions in the Northern District of California or the District of Connecticut.

35.    Zivin reviewed press releases issued by INC and PSI.

36.    Zivin did not ask Schwitters to stop the issuance of any press releases, neither did he take any other steps to stop their dissemination.

## Response to 56(a)(1) Statements of Fact

One is hard pressed to believe that there are no undisputed material facts when the defendants present the Court with 74 compound statements and a box of exhibits.  Indeed, buried in the defendants' submission are disputed, material facts.  This section identifies those.  It also identifies the defendants' misrepresentations about those disputed issues of fact.

The following is JFI's statement by statement response to the defendants' statements.

1.    Admitted, but irrelevant to the limited question before the Court.

2.    Admitted, but irrelevant to the limited question before the Court.

3.    Admitted, but irrelevant to the limited question before the Court.

4.    Admitted, but irrelevant to the limited question before the Court.

5.    Admitted, but irrelevant to the limited question before the Court.

6.      Admitted, but irrelevant to the limited question before the Court.

7.      Admitted, but irrelevant to the limited question before the Court.

8.      Admitted, but irrelevant to the limited question before the Court.

9.      Admitted.  CEP, however, is now owned by INC.  Moreover, CEP purchased SCIPA.  Thus, all of defendant Masquelier's knowledge of the French Endotelon Prior art, which was produced by SCIPA, may be imputed to defendants INC and Schwitters. Moreover, defendant Masquelier's misrepresentations to the USPTO in the patent application and during the reexamine may be imputed to defendants Schwitters and INC as well.  Thus, INC's representations to the Court in both the 1996 District of Connecticut Action and the 1997 Northern District of California Actions were knowing misrepresentations.

10.     Admitted.  Thus, as a partner in SCIPA, defendant Masquelier knew of the French Endotelon prior art before he filed for the '360 patent in 1985 and before the 1996 re-examination, thereby defrauding the USPTO.  Moreover, because INC owns SCIPA there can be no question that INC misrepresented the validity of the patent to the district courts in its filling and maintenance of the 1996 District of Connecticut Action and the 1997 Northern District of California Action.

11.     The execution of the April 1, 1985 Assignment, as defined by the defendants, and its filing in the USPTO are not disputed.  The significance of that filing is disputed.  **Moreover, the significance of the filing of the patent assignment is a disputed material fact.**

12.    Admitted.  That the agreement referred to itself in one instance as a "joint research contract" is immaterial.  **What is material is that this contract has no bearing on the ownership of the '360 patent, which JFI presumes the defendants will dispute.**

13.    Admitted.  The '360 patent, however, was issued under false pretenses. **Moreover, that the patent claims a "method of use" demonstrates that the material, prior art that the defendants so desperately are trying to keep from a jury would have invalidated the patent.**

14.    Denied.  The letter speaks for it self and makes no express statement as to Horphag's "understanding regarding ownership."  It does state that "a clear understanding has been signed"; "that both parties will inform and take steps to protect the other of any infringement"; and that "licensing of the patent to third parties requires consent of both co-owners."  **But these are characterizations of a separate agreement create factual issues related to what the defendants knew when they sued JFI in 1996.**  Those issues were not determined in the underlying action, which had no discovery and was decided against INC solely on the issue of standing.

15.    JFI admits that INC registered the trademark, but denies that the trademark is valid.  For example, defendant Schwitters has all but admitted that the mark is descriptive. (Whitney Decl., Ex. 48 - letter from Bert Schwitters to Gary Senecal of 2/7/91.)  Thus, facts related to the filing for "OPC-85" are disputed and material to whether the defendants can claim *Noerr-Pennington* immunity.

16.    JFI admits that on March 28, 1994 an Assignment from SCIPA to INC was recorded at the PTO, but JFI specifically denies: (1) the validity of the assignment, (2) the defendants' knowledge with respect to the validity of the assignment, (3) the effect of recording the assignment, and (4) the defendants' intent when they recorded the assignment.

17.    Denied. INC did not get any interest in the '360 patent from this assignment. There is no evidence that the 200,000 FFR were ever returned to INC, and there is no evidence of consideration provided SCIPA for the 200,000. (Whitney Decl., Ex. 5 - Decision of the Court of First Instance, Bordeaux, France of 3/25/97).

18.    It is admitted that Horphag commenced such action. The defendants' contention that "Horphag did not ask INC or any previous co-owner of the '360 patent to join" is denied. In fact on September 21, 1993, Horphag wrote to SCIPA "to invite [SCIPA] to voluntarily join this lawsuit as a party plaintiff." (Whitney Decl. Ex. 42 - letter from Robert Simpson to SCIPA of 9/24/93 (emphasis added.)) The statement of Horphag's attorney is admitted. It is noted, however, that that statement was made in response to a challenge that both co-owners of the patent needed to be parties in an action for patent infringement. Since the defendant had this correspondence, they were well aware of the standing requirements for patent infringement actions.

19.    It is admitted that Consac brought such action against INC. It is admitted that the Eastern District of New York "vouched" INC into that action. **What the defendants fail to mention and what is disputed is that INC contested the court's personal and subject matter jurisdiction over INC and moved to dismiss the complaint.** (Whitney Decl., Ex. 54 - Brief in Support of Motion to Dismiss.) The defendants also fail to mention that Consac sought

a declaratory judgment against SCIPA and Horphag asking that the '360 patent be declared invalid or unenforceable. Only after that these claims were made, SCIPA attempted to assign the '360 patent to INC and then sought to have the declaratory judgment claims dismissed for failure to join a necessary party, namely INC. Indeed, defendant Zivin stated to the Eastern District of New York "My client, International Nutrition, as the other co-owner, is probably an indispensable party." (Whitney Decl., Ex. 30 - Transcript of Motion dated 10/28/94 at 18.)

The remainder of this statement is denied. Though a stipulation was entered, the settlement agreement underlying that stipulation was **never produced in discovery**. Moreover, the statement made regarding patent validity is found in a recital to the stipulation, not the stipulation itself. Thus, the defendants and JFI for that matter have no idea what Consac actually agreed to.

20.    Admitted.

21.    Admitted.

22.    Denied. Mr. Schwitters testified that Horphag's lawyers reviewed a 1985 agreement, that INC's lawyers "reviewed its position in the '360 patent" in "late '95 and early '96". Moreover, though Mr. Schwitters testified that Mr. Hagenaars and Mr. Zivin rendered legal opinions as to ownership under the '360 patent, **those opinions were never disclosed or produced during discovery**. (Whitney Decl., Ex. 49 - Schwitters depo. of 3/13/02 at 264-267.)

23.    Admitted.

31.     JFI admits that Masquelier executed the "Confirmatory Assignment," but JFI denies that this assignment had any legal effect on ownership.

32.     Admitted.

33.     Admitted.

34.     Admitted.

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Admitted.  However, as set forth in JFI's Memorandum of Law, the issuance of that certificate was based on misrepresentation and inequitable conduct.

39.     Admitted.

40.     Admitted.  However, this merger was deemed by the French courts to be a fraudulent attempt to circumvent prior court decisions (Whitney Decl., Ex. 18 - Decision of the Commercial Court of Grasse)

41.     Admitted.

42.     Admitted.

43.     Admitted.

44.     Admitted.

45.     Admitted.

46.     Admitted.

47.     Admitted.

48.     Admitted.

49.     Admitted.

50.     Admitted.

51.     Admitted.

52.     Admitted.

53.     Admitted.

54.     Admitted.

55.     Admitted.

56.     Admitted.

57.     Admitted.

58.     Admitted.

59.     Admitted.

60.    Admitted.

61.    Admitted.

62.    Admitted.

63.    Admitted.

64.    Admitted.

65.    Admitted.

66.    Admitted.

67.    Admitted.

68.    Admitted.

69.    Admitted.  However, the Court did not have before it material facts pertaining to the defendant's knowledge and misrepresentations.  Even so, the Court considered the matter a close case.

70.    Admitted.

71.    Admitted.

72.    Admitted.

73.    Admitted.  However, as discussed in JFI's Memorandum of Law, that action was limited in scope.

74.     JFI admits that the quoted statement was made before discovery was conducted in this case.  For the reasons set forth in JFI's Memorandum of Law in Opposition to Defendants' Motion In Limine to Exclude Evidence of Patent Invalidity Inequitable Conduct, or fraud, JFI denies that the statement precludes JFI from introducing evidence as to invalidity, inequitable conduct or fraud.

75.     JFI admits that the quoted statement was made before discovery was conducted in this case.  For the reasons set forth in JFI's Memorandum of Law in Opposition to Defendants' Motion In Limine to Exclude Evidence of Patent Invalidity Inequitable Conduct, or fraud, JFI denies that the statement precludes JFI from introducing evidence as to invalidity, inequitable conduct or fraud.

76.     Admitted.


THE PLAINTIFF,
JARROW FORMULAS, INC.
BY MCCARTER & ENGLISH, LLP
ITS ATTORNEYS


By_____
ERIC WATT WIECHMANN (CT 04331)
ERIC E. GRONDAHL (CT 08988)
JASON C. WELCH (CT 23418)
CityPlace I
185 Asylum Street
Hartford, CT  06103
(860) 275-6700
(860) 724-3397 (fax)
        -and-

ALEXANDRA B. STEVENS (CT 20300)
Four Stamford Plaza
107 Elm Street
Stamford, CT  06901
(203) 965-0823
(203) 323-6513 (fax)
astevens@mccarter.com

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing has been mailed, postage prepaid, this 10th day of August, 2005, to

      RICHARD S. ORDER, ESQ.
      ERIC D. BEAL, ESQ.
      Axinn, Veltrop & Harkrider LLP
      90 State House Square
      Hartford, CT  06103

JASON C. WELCH