Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                          Norman H. Zivin, Esq.

Page 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
 2

 3     - - - - - - - - - - - - - - x
                                    |
 4     JARROW FORMULAS, INC.
                Plaintiff,          |
 5
       VS.                          |
 6
                                            Civil Action No.
       INTERNATIONAL NUTRITION      |       3:01-CV-00478(AVC)
 7     COMPANY, NORMAN H. ZIVIN, and
       JACK MASQUELIER,             |
 8            Defendant.
       - - - - - - - - - - - - - - x
 9
10                                          COPY
11

       ----------------------------------------------------
12          DEPOSITION OF:  NORMAN H. ZIVIN, ESQ.
       ----------------------------------------------------
13
14
15
16          Taken before James A. Scally, Registered
       Professional Reporter, a Notary Public in and for the
17     State of Connecticut, pursuant to Notice and the
       Federal Rules of Civil Procedure, at the offices of
18     Cummings & Lockwood, Four Stamford Plaza, Stamford,
       Connecticut, on February 22, 2002, commencing at
19     9:57 a.m.
20
21
22
23
                    BRANDON SMITH REPORTING SERVICE
24                       (860) 549-1850
                      11-A Capitol Avenue
25              Hartford, Connecticut 06106
```

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 4

```
 1   N O R M A N   H.   Z I V I N,   E S Q.,

 2        called as a witness, having been first duly

 3        sworn by James A. Scally, R.P.R., a Notary

 4        Public in and for the State of Connecticut,

 5        was examined and testified as follows:

 6                  MR. ORDER:  Before we begin, Mr.

 7   Wiechmann, I would like to just note on the record that

 8   Mr. Zivin is an attorney; he has represented

 9   International Nutrition Company.  The basis for your

10   allegations against him are that he did certain --

11   performed certain conduct in regard to lawsuits that he

12   brought on behalf of International Nutrition Company.

13   Needless to say, we anticipate that many, if not most,

14   of the questions you're going to ask are protected from

15   disclosure and discovery by the attorney-client

16   privilege and the work product doctrine.

17                  And so I just caution you at the

18   beginning, and I caution the witness also not to

19   divulge anything that would violate the attorney-client

20   privilege which, of course, is the client's privilege,

21   not Mr. Zivin's, to waive.  And, also, that if there be

22   an inadvertent disclosure, we do not thereby waive the

23   protections of the attorney-client privilege or the

24   work product doctrine or the joint interest doctrine if

25   it applies.
```

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 5

```
 1              MR. WIECHMANN:  Well, I understand Mr.

 2    Zivin's training and position in this lawsuit.  I will

 3    say that you can take whatever position you want, but

 4    we will take the position that if the attorney-client

 5    privilege is invoked, we will move for an in limine

 6    motion with the judge to estop either Mr. Zivin or any

 7    of his clients from utilizing the "I relied on advice

 8    of counsel" as a defense or other issue in this lawsuit

 9    because you can't use it both as a shield and then a

10    sword; and on some of the things of Mr. Schwitters, or

11    anybody else, including Mr. Zivin, wants to raise the

12    issue, "I think I was allowed to because my lawyers

13    told me in France," or "I was advised that it was okay

14    to bring this or do the following thing," and they --

15    in this deposition anyone else makes the claim that

16    that's privileged information, we will move for an

17    estoppel or an in limine motion.  So it's your choice.

18    DIRECT EXAMINATION

19    BY MR. WIECHMANN:

20         Q    Mr. Zivin, could you give me your present

21    address?

22         A    My home address or my business address?

23         Q    Home.  Let's start with home.

24         A    3 Valley Lane, Chappaqua, New York.

25         Q    How long have you lived there?
```

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 73

1    concerning the use of the Pycnogenol trademark between

2    Mr. Schwitters and Mr. Haimoff?

3        A    I don't know that there was any personal

4    dispute between Mr. Schwitters and Mr. Haimoff

5    regarding the Pycnogenol trademark.

6        Q    Were you aware of any corporate disputes

7    between their corporations dealing with the INC and

8    Horphag dealing with -- at that time dealing with the

9    use of the Pycnogenol trademark?

10       A    I'm not certain on the timing.

11       Q    Okay.  Do you recall the timing of this

12   deposition when it was taken?

13       A    Six, seven years ago.

14       Q    Was it 1994?

15       A    Possible.

16       Q    Did there come a time when you were led to

17   believe -- strike that.

18           Did there come a time when you understood that

19   INC believed that its agreement with Horphag over the

20   ownership of the 360 patent was no longer effective,

21   that it had lapsed?

22               MR. ORDER:  Can I hear that read back,

23   please.

24               (Question read.)

25               MR. ORDER:  I object on the grounds to

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Page 76

```
 1      Q     (By Mr. Wiechmann)  It's "The other owner, by
 2   assignment."
 3           Do you see that sentence?
 4      A    Yes, I do.
 5      Q    What led you to believe that that was an
 6   accurate statement?
 7              MR. ORDER:  Again, I think that you're
 8   really infringing on the attorney-client privilege and
 9   the attorney work product doctrine.  First you
10   haven't -- well, you haven't established that he even
11   believed that; and, second, to the extent he did
12   believe that, you certainly wouldn't be allowed in the
13   litigation itself, the Connecticut action, the
14   underlying Connecticut action, to ask the attorney who
15   signed or who brought the action what the basis of his
16   belief was.  So I don't see why you would be entitled
17   to do that at this point.
18              MR. WIECHMANN:  Well, if his belief is
19   based on -- let's start with third-party
20   communications.  This first sentence talks about what
21   Horphag's claims are.  If he's telling me the only
22   thing he knows or if your position is the only thing he
23   knew about Horphag's claims were through his client,
24   there may be an attorney-client privilege.  If there
25   was investigation done with third parties like Horphag
```

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 83

1    and we'll file an in limine motion soon and bring Mr.

2    Zivin back, but it's going to have to be decided one

3    way or the other.

4                    (Witness conferred with counsel.)

5                    MR. ORDER:  Why don't we take a quick

6    break.

7                    MR. WIECHMANN:  In fact, it's 12:20, we

8    can take an early lunch now and you can discuss it

9    then.  We can come back by one o'clock.

10                   MR. ORDER:  I don't think we need that

11   long.  I'd rather go to -- it depends.  Up to you.

12                   THE WITNESS:  Fine with me.

13                   MR. ORDER:  Fine with you?

14                   THE WITNESS:  Yes.

15                   (Recess:  12:23 to 1:12 p.m.)

16                   MR. WIECHMANN:  This is the continuation

17   of the deposition of Norman Zivin.

18                   Prior to lunch, I had made a statement

19   concerning information that underlies the decision to

20   commence the patent infringement suit in March of 1996

21   in the United States District Court for the District of

22   Connecticut and stated that if the position of Mr.

23   Zivin or his counsel was that all of that information

24   was going to be protected or not divulged because of

25   the attorney-client privilege or the work product

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 84

1    doctrine, that we would make an in limine motion to

2    make sure it wasn't protected.

3              I think that the parties decided at

4    lunch that they would consider that position, and I

5    just wanted to know at this time what is your -- let's

6    go one at a time -- first, position as to the question

7    that is presently pending, which you probably don't

8    remember.  And if you want to --

9              MR. ORDER:  I think I remember what the

10   question is.

11             MR. WIECHMANN:  Okay.

12             MR. ORDER:  But I'd like to say that the

13   defendants really resent the plaintiff's tactic of

14   bringing a frivolous lawsuit and then arguing that

15   because they've made allegations, because the plaintiff

16   has made allegations that the Connecticut action in the

17   District Court was a sham litigation, that that

18   entitles the plaintiff to be in a position of invading

19   the attorney-client privilege and work product doctrine

20   from that lawsuit and from the Northern District of

21   California lawsuit or place the defendants at the risk

22   of not being able to defend themselves in this, as I

23   say, frivolous and baseless lawsuit that the plaintiff

24   has brought here.

25             Nevertheless, in an attempt to move

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Page 85

1    things along and without waiving any attorney-client

2    privileges or attorney work product claims, there's

3    perhaps a way that we can provide you with information

4    that you're seeking by referencing documents that are

5    in the public realm by virtue of motions that were made

6    in the Connecticut action and in the appeal to the

7    federal circuit which explain the basis for the

8    allegations in the complaint and both the factual and

9    the legal arguments.  And to that extent, I think

10    you're seeking information concerning the basis, both

11    factual and legal basis, for the commencement of the

12    action brought by INC in the District of Connecticut in

13    1996, and those documents explain the basis, both the

14    factual and the legal basis.

15            The way you worded your question,

16    however, was not seeking the basis for the lawsuit but

17    seeking to find out what step, what actually Attorney

18    Zivin and his firm undertook, what their investigation

19    undertook specifically, as opposed to, really, just

20    finding out the basis for the lawsuit.  And to that

21    extent, I think you're going too far, and that we will

22    not allow.  But I think, nevertheless, you will get the

23    essence of what you're seeking by referring to the

24    pleadings, the motions, in the District Court case and

25    the briefs and arguments in the federal circuit

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 86

1    briefs.

2              MR. WIECHMANN:   I understand your

3    position.   I also understand that there obviously were

4    certain documents, I assume, that Mr. -- I don't want

5    to use Mr. Zivin -- Mr. Zivin's law firm, the lawyers

6    representing, claim or support or basis, as you used

7    it, for the law firm.   Some of them were actually

8    appended to declarations by one of Mr. Zivin's

9    partners, and therefore when anybody starts a lawsuit

10   to prosecute, to survive summary judgment or anything

11   else, you have to have some factual basis and then some

12   legal basis, and that's what I was trying to get at.

13   So if you would like me to ask it again --

14             MR. ORDER:   Well, again, the way you

15   were asking, it went more towards their mental

16   processes and things of that sort.   But if you're

17   asking what the basis for the lawsuit -- for the claim

18   is in a particular paragraph without reference to when

19   necessarily they knew that or -- I think Attorney Zivin

20   can respond to the extent he has already responded in

21   the briefs that have already been filed.

22             MR. WIECHMANN:   Well, I understand there

23   are certain briefs.   One issue is that certain briefs

24   were filed at certain times, and the timing is -- would

25   be important to us because if part of the basis of a

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 91

1    Q     Is there any other basis other than your

2    understanding or knowledge that Horphag was offering

3    licenses in 1995 and '96 under the patent?

4    A     Without going through my mental processes and

5    trying to figure out exactly what you're parsing this

6    sentence to mean, Horphag had also brought a lawsuit

7    against Consac claiming that they had ownership rights

8    in the patent.

9    Q     Was there any other information that you were

10   aware of?

11   A     No.  At least none that I recall now.

12   Q     Okay.  Going to paragraph 8 -- I mean

13   paragraph 25 on page 8, the first sentence basically

14   reads, "Alternatively, even if defendant Horphag

15   continues to own a one-half interest in the 360 patent,

16   upon information and belief, Horphag will not become a

17   voluntary plaintiff in this action."

18         First, what was the basis for the allegation

19   that defendant Horphag continues to own a one-half

20   interest in the patent?

21         MR. ORDER:  Objection to the form.

22   A     Without waiving any attorney-client or work

23   product privileges, I refer to the responses to the

24   summary judgment motion and the briefs on appeal, and I

25   refer to the 360 patent which on its face states that

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                      Norman H. Zivin, Esq.

Page 92

1    there are joint owners, Horphag and SCIPA.

2       Q     (By Mr. Wiechmann)  Why did INC not bring

3    Horphag in as an involuntary plaintiff?

4               MR. ORDER:  Objection.  Objection.  Goes

5    to attorney-client privilege and work product

6    doctrine.

7               MR. WIECHMANN:  That objection, then, is

8    an obstruction not to answer?

9               MR. ORDER:  Not an obstruction.

10              MR. WIECHMANN:  An instruction not to

11   answer?

12              MR. ORDER:  Yes.

13              MR. WIECHMANN:  Okay.

14      Q     (By Mr. Wiechmann)  Why did INC -- what was

15   the basis for the allegation that Horphag would not

16   become a voluntary plaintiff in this action?

17      A     It says, "Upon information and belief."

18      Q     Okay.  Did you or anyone in your law firm

19   contact Horphag concerning becoming a plaintiff in this

20   lawsuit?

21      A     Not to my knowledge.

22      Q     Were you informed or were you aware of anybody

23   else who contacted Horphag to see whether they would

24   become a plaintiff in this action?

25      A     I'm not aware of it.

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 99

1    lawsuit brought in Connecticut?

2        A    Yes.

3        Q    When you reviewed it, what was your

4    understanding of the effect and purpose of that

5    document?

6                    MR. ORDER:  Objection.  It calls for

7    attorney work product.  Instruct him not to answer.

8                    MR. WIECHMANN:  In what way does it call

9    for attorney work product?

10                   MR. ORDER:  You just asked him what was

11   his understanding of what the confirmatory assignment

12   meant.  It's clearly asking for his mental processes as

13   a lawyer reading a legal document and coming to some

14   conclusion as to its import and effect.

15                   MR. WIECHMANN:  And you're instructing

16   him not to answer that?

17                   MR. ORDER:  Yes.

18       Q    (By Mr. Wiechmann)  Did you or your law firm

19   ever set forth your understanding of the purpose of

20   this document in any papers filed in connection with

21   the motions filed by defendants in the underlying

22   Connecticut patent infringement suit?

23       A    I believe so.

24       Q    And would you please tell me what that

25   position was, as to how this document affected the

3ffcee8d-4e65-4cfa-8136-110b42b54c64

2/22/2002                                                    Norman H. Zivin, Esq.

Page 103

1    think, characterize as the essence of the agreement?

2        A    "The parties have agreed to unite their

3    efforts," top of page 2.

4        Q    Any other language?

5        A    I don't see any right now.  Doesn't mean that

6    there isn't any.

7        Q    It's my understanding -- it's my understanding

8    that it was INC's position in the lawsuit that it --

9    that the rights under this agreement, the rights that

10   SCIPA, S-c-i-p-a, had under this agreement were

11   assigned to INC at some time, correct?

12       A    I don't believe they ever took that position.

13       Q    Do you believe that SCIPA assigned its

14   patent -- the rights -- its rights to the 360 patent

15   reflected in this agreement to INC?

16       A    I don't understand your question.

17       Q    Paragraph 23 on page 7 says that, "Plaintiff

18   is, and, at all times relevant herein, has been the

19   owner, by assignment, of at least an undivided one-half

20   interest in U.S. Patent No. 4,698,360."

21            Do you see that?

22       A    Yes.

23       Q    What was the basis for INC's allegation that

24   it was the owner of at least one-half interest by

25   assignment?

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 104

1       A       Without waiving attorney-client or work

2    product privileges, one could read the document

3    entitled "U.S. Patent Assignment" which is attached as

4    Exhibit A to the Tobin declaration which you've marked

5    Exhibit 34.

6       Q       And is it your understanding that this

7    assignment was made -- SCIPA received good and valuable

8    consideration for that assignment?

9       A       Are you asking me a fact or are you asking me

10   my understanding?

11      Q       If you have -- if you know the fact because

12   you've read some document or seen something, obviously

13   the fact.  But I assume that it was your understanding

14   unless you were involved in the actual assignment.

15   Strike that.

16              Were you involved in the actual assignment

17   between SCIPA and INC?

18      A       Do you mean --

19              MR. ORDER:  Objection.

20      A       -- did I negotiate the assignment?  What do

21   you mean?

22      Q       (By Mr. Wiechmann)  Were you acting as a

23   lawyer to either party in connection with the

24   assignment?

25      A       I don't understand your question.  I clearly

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 108

1      Q      Did you represent INC in connection with that?

2      A      Yes.

3      Q      And what were your general duties in

4   connection with representation of INC as it related to

5   the confirmatory assignment?

6      A      I was involved in the drafting of it, and I

7   sent it for recording.

8      Q      Did Mr. Schwitters ask you to assist in the

9   drafting?

10     A      Did he assist?  I don't know.

11     Q      Did Mr. -- were you -- strike that.

12            Do you know why this confirmatory assignment

13   was created?

14     A      Yes.

15     Q      Why?

16     A      That's my legal mental processes --

17            MR. ORDER:  Objection.

18     A      -- as an attorney.  And it involves

19   attorney-client privileged communications.

20     Q      (By Mr. Wiechmann)  Just yes or no:  Did you

21   have discussions with Mr. Schwitters concerning the

22   assignment prior to him contacting Dr. Masquelier about

23   an assignment?

24     A      I believe so.

25     Q      Did you deal with an attorney on the other

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 110

1      A      No, I don't.

2      Q      Do you know when it was signed?  I mean --

3      when -- do you know where it was signed?

4      A      Only what it says on page 2, "Dated at

5      Bordeaux, 3/2/00, France."

6      Q      Do you know if there was anybody with Dr.

7      Masquelier when he signed this?

8      A      Nothing other than what it says.  It has a

9      witness's name and signature.

10     Q      Do you have any basis to believe that Dr.

11     Masquelier understood what this document -- what the

12     effect in terms of this document were?

13     A      Do I have any basis?

14     Q      Yes.

15     A      Yes.

16     Q      And what's that?

17     A      I think that's work product and attorney-

18     client privilege.

19     Q      Did Dr. Masquelier receive any, to your

20     knowledge, any consideration over a dollar that is

21     recited in here?

22     A      I believe he did.

23     Q      Do you know how much?

24     A      I don't recall.

25     Q      Did you ever see a document that indicated how

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 111

1     much he received?

2          A     I believe I did.

3          Q     Can you describe to me what that document was?

4          A     A letter.

5          Q     A letter from whom to whom?

6          A     I don't remember.

7          Q     Was it a letter to you or somebody at your

8     firm?

9          A     No.

10          Q     Was it a letter that was either to or from Mr.

11     Schwitters?

12          A     I don't recall.

13          Q     Was it a letter that was dated sometime in

14     October of 1987 contemporaneous with this confirmatory

15     assignment?  Excuse me.

16                    MR. ORDER:  When?

17                    MR. WIECHMANN:  Excuse me.

18          Q     (By Mr. Wiechmann)  Sometime in October of

19     1996.

20          A     As I recall, it was something in 1996.

21          Q     Before or after the date of the confirmatory

22     assignment?

23          A     I don't recall.

24                    MR. ORDER:  Can we take a break?

25                    MR. WIECHMANN:  Yes.  Let me ask one

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                          Norman H. Zivin, Esq.

Page 112

1   quick question.

2                    MR. ORDER:  Sure.

3                    MR. WIECHMANN:  Maybe two.

4                    MR. ORDER:  You can finish the line.

5                    MR. WIECHMANN:  No, no.

6        Q     (By Mr. Wiechmann)  Mr. Zivin, do you read

7   French?

8        A     Very -- very little.

9        Q     Do you speak French?

10       A     No.

11       Q     I assume, then, you would not be comfortable

12   reviewing or editing documents in French?

13       A     I don't edit documents in French, no.

14                   MR. WIECHMANN:  We can take a break.

15                   (Recess:  2:09 to 2:20 p.m.)

16       Q     (By Mr. Wiechmann)  We were discussing before

17   the break the confirmatory assignment that you had

18   pointed out.  Do you know what the term "confirmatory"

19   means?

20       A     Do I know?  I know what I understand that it

21   means.

22       Q     Well, you helped draft this document, so what

23   was your understanding of what it meant?

24       A     I don't think I have to reveal my mental

25   processes in drafting documents.

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 115

1      Q     You stated that you recorded this document.

2   Why did you record this document?

3      A     I think that goes to my mental processes

4   and/or attorney work product, attorney-client

5   communications.

6      Q     Do you believe the fact that you recorded this

7   document had any legal effect on INC's position that it

8   was an owner, at least a one-half owner, of the 360

9   patent?

10              MR. ORDER:  Objection.

11     A     I don't think I have to give you legal

12  opinions.

13     Q     (By Mr. Wiechmann)  Was INC required by law to

14  record this assignment?

15     A     Again, you're asking me for a legal opinion.

16     Q     Did INC in connection with any of its lawsuits

17  take a position as to whether -- let's just strike

18  that.

19              In connection with your legal representation

20  of INC, did Mr. Schwitters ask you to review various

21  press releases that he wanted to issue in the United

22  States?

23     A     Sometimes.

24     Q     Did he ask you to review press releases

25  involving the various lawsuits that were pending in

Brandon Smith Reporting Service

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 117

1       A    Yes.

2       Q    Did you have an understanding what was meant

3    by the reference that INC remained on record at the

4    U.S. Patent Office as a joint owner of 50 percent of

5    the U.S. Patent 360?

6       A    You're asking me what I interpret that to

7    mean?

8                 MR. ORDER:  Today?

9       Q    (By Mr. Wiechmann)  I said did you have an

10   understanding, yes or no, back in March of last year.

11      A    I don't recall today what understanding I had

12   in March of last year.

13      Q    As a patent attorney, do you believe that the

14   recording of this assignment has any legal effect as to

15   the ownership interest referred to in the assignment

16   itself?

17                MR. ORDER:  Which assignment?

18                MR. WIECHMANN:  The one referred to in

19   the second paragraph, the paragraph I just read.

20                MR. ORDER:  That's not an assignment.

21      A    If you're asking me for a legal opinion, I

22   don't think that I have to give you one.

23      Q    (By Mr. Wiechmann)  Is it fair to say that you

24   just told me before you did register for INC the

25   confirmatory assignment?

Brandon Smith Reporting Service

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 118

1      A     That's correct.

2      Q     You also registered for INC the underlying

3    1994 assignment between SCIPA and INC?

4      A     That is correct.

5            MR. ORDER:  Objection to form.

6      Q    (By Mr. Wiechmann)  Did the recordation of

7    those assignments have any legal effect, in any way

8    strengthen INC's claims that it was owner of at least a

9    one-half interest in the 360 patent?

10           MR. ORDER:  Objection.  Direct the

11   witness not to answer on the grounds of attorney work

12   product and perhaps attorney-client.

13           MR. WIECHMANN:  I may be mixed up.  I am

14   not asking for attorney work product of your client.

15   I'm asking as a lawyer who might -- tell me if he's not

16   going to; again, it might simplify -- give an opinion

17   at trial as to what the basis was for bringing a

18   lawsuit; there are numerous documents that seem to

19   refer to the recording of all these assignments, and I

20   would like to know what legal effect --

21     Q    (By Mr. Wiechmann)  Put it this way:  Did INC

22   ever in any of its papers filed in any lawsuit ever

23   refer to the recording of any of these documents as the

24   basis for its position in the lawsuit?

25     A     I don't recall.

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 125

1    trial --

2        A    That's right.  That's exactly what I'd -- I'd

3    do.  If you asked me that question at trial, I would

4    pull out a copy of the patent statute and read it into

5    the record.  It says what it says.

6        Q    And whatever it says, you don't believe

7    there's any interpretation that's been given by courts

8    or administrative agencies that would aid me in reading

9    that statute?

10       A    Sir, I'm not here --

11           MR. ORDER:  Objection.

12       A    -- as a patent expert.  I'm here as a witness

13   because you insisted I be here.  You can't take my

14   deposition for the purpose of knowing what my legal

15   opinions are.  I didn't appear here to be examined as

16   an expert witness.

17       Q    (By Mr. Wiechmann)  But you appeared here to

18   explain some of your prior actions, and since some of

19   your prior actions include statements made in these

20   letters, which don't refer Mr. Morico to the statute

21   and repeated statements where the, quote, recording of

22   certain documents, including assignments, seem to be

23   given some sort of importance, I was just interested in

24   what importance either you or your client thought

25   attached to the recording of these documents.

3ffcee8d-4e65-4cfa-8136-110b42b54c64

2/22/2002                                                         Norman H. Zivin, Esq.

Page 136

1    several.

2        Q    (By Mr. Wiechmann)   37 CFR, Section 3.54,

3    effect of recording.

4        A    I'm sure I've seen it before.

5        Q    Is this the section you said you would have

6    read to me in court if I asked you the effect of you

7    recording those two assignments?

8        A    I don't know if this is the only section.

9        Q    This would have been one of the sections?

10       A    It's titled "Effect of Recording."

11       Q    I know what it's entitled, but in your belief,

12   do you believe this section directly relates to the --

13   strike that.

14            In 1994 and 1996, when you were recording the

15   two assignments we discussed, did you believe that this

16   section of the Code of Federal Regulations basically

17   controlled the recording of those two assignments?

18            MR. ORDER:   Objection to form.

19       A    I can't answer that question.

20       Q    (By Mr. Wiechmann)   And when you effect -- in

21   fact, is it fair to say that when you recorded those

22   two assignments under Section 3.54, those recordations

23   had no legal effect on the validity of INC's claims

24   that it was a partial owner of the 360 patent?

25            MR. ORDER:   Objection to the form.

Jarrow Formulas vs International Nutrition Co.

2/22/2002
Norman H. Zivin, Esq.

Page 137

1      A     I disagree with you, sir, but I'm not going to

2    debate the effect of the patent laws.  You can read

3    them and write your own brief on the subject.

4      Q     (By Mr. Wiechmann)  Pursuant to Section 3.54,

5    did you ever ask the Patent Office to determine the

6    effect that those assignments would have?

7               MR. ORDER:  Objection to form.

8      A     The answer to your question is no.

9      Q     (By Mr. Wiechmann)  Have you ever, in

10   recording a document and assignment -- a document in

11   the Patent Office for a client -- ever asked, pursuant

12   to Section 3.54, the office to make a determination of

13   the effect of that recordation?

14              MR. ORDER:  Objection to form.

15     A     Your question can be interpreted in several

16   different ways, and perhaps my answer no to the prior

17   question is not quite correct.  And I'll clarify that

18   answer as well as answer your current question.

19              And that is, in connection with the

20   re-examination of the 360 patent, the Patent Office

21   examiners did in fact make a determination as to who

22   had the right to appear on behalf of the patent owners,

23   and the determination that was made was that INC,

24   Horphag, and SCIPA should all appear, and it was agreed

25   that I would be the principal attorney on behalf of all

Page 151

1      A    No.

2                MR. ORDER:  Objection.

3      Q    (By Mr. Wiechmann)  Do you recall discussing

4    with ADinfinitum the effect of this notice of intent to

5    issue re-examination certificate?

6      A    I don't recall discussing anything with them.

7      Q    I'd like to show you a document that's already

8    been marked as Plaintiff's Exhibit 30 in connection

9    with the PSI deposition.

10               MR. WIECHMANN:  Here it is if you want a

11   copy of it.

12               MR. ORDER:  Thank you.

13     Q    (By Mr. Wiechmann)  do you recall if you

14   received a copy of this press release prior to its

15   dissemination?

16     A    I don't recall.

17     Q    Do you recall ever discussing with Mr.

18   Schwitters the content of a press release announcing

19   the institution of your lawsuit in Connecticut?

20     A    I don't recall.

21     Q    Do you recall ever reviewing a proposed press

22   release discussing why Horphag had been sued as a

23   defendant?

24     A    I don't recall.

25     Q    Did you ever discuss with Mr. Schwitters his

2/22/2002                                                    Norman H. Zivin, Esq.

Page 152

1    use in the press releases of the term "INC is a

2    rightful owner" without qualifying the percentage of

3    ownership he had?

4                MR. ORDER:  Objection to form.

5        A    I think the answer to that question invokes

6    the attorney-client privilege.

7                MR. ORDER:  Right.

8        A    So I will not answer.

9        Q    (By Mr. Wiechmann)  I'd like to show you a

10   document, an exhibit that is being marked as Exhibit

11   45.

12               (Exhibit 45, 3/26/97 press release,

13   marked.)

14       A    (Pause.)  All right.

15       Q    (By Mr. Wiechmann)  Do you recall seeing this

16   prior to its release?

17       A    I don't know.

18       Q    Do you recall discussing or reviewing any sort

19   of release or document that commented on the effect of

20   the U.S. case on the French case?

21       A    I'm sure I did at some point.

22       Q    But you don't recall one way or the other

23   whether you were involved in the review or drafting

24   this press release?

25       A    I certainly recall that I was not involved in

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 153

1    drafting any press release.  My activity was limited to

2    review of selected press releases.

3        Q    Did you ever request that Mr. Schwitters show

4    you all press releases that involved a characterization

5    of either the French or U.S. lawsuits?

6              MR. ORDER:  I think it calls for

7    attorney-client privileged communication.

8        Q    (By Mr. Wiechmann)  Did you ever see after the

9    fact press releases issued by INC commenting on or

10   characterizing the effect of litigations in France or

11   the United States that you had not had the chance to

12   review?

13             MR. ORDER:  Prior to their publication?

14             MR. WIECHMANN:  Yes.

15       A    I believe that's correct.

16       Q    (By Mr. Wiechmann)  How many times?

17       A    I don't know.

18       Q    More than once?

19       A    I don't recall.

20       Q    Would it be fair to say that you saw more than

21   50 percent of the press releases commenting on or

22   characterizing U.S. or French court actions or less

23   than 50 percent?

24       A    I can't quantify it.  I don't know.

25       Q    And it's fair to state that because you can't

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 154

1    recall, that you do not know what INC, whoever drafted

2    this for INC, meant by their characterizations of the

3    French lawsuit?

4        A    I don't know that I can answer that question.

5        Q    Yes or no, did you have any discussions, be it

6    this press release or something similar, where you

7    discussed with Mr. Schwitters, in connection with a

8    press release or marketing piece he wanted to put out,

9    the effect of the 1997 decision by the Bordeaux court?

10       A    As I understand the question, yes.

11       Q    On more than one occasion?

12       A    I don't know.

13       Q    Was it in connection with this?

14       A    I don't know.

15       Q    Did your discussions have the effect of having

16    Mr. Schwitters or INC change their characterization of

17    the effect of the French lawsuit?

18           MR. ORDER:  Objection to form.

19       A    Since I don't know which ones we're talking

20    about, I can't answer that question.  I don't know.

21       Q    (By Mr. Wiechmann)  As we sit here today, do

22    you believe this is an accurate characterization of --

23    a complete and accurate characterization of the French

24    court's decision?

25           MR. ORDER:  I --

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 161

1    you believed that these press releases were, one, fully

2    accurate characterizations of the French court's

3    decisions?

4                    MR. ORDER:  Objection to the form.  To

5    the extent he may have discussed something of that sort

6    with any of his law partners or associates, I believe

7    that that is also protected.

8                    MR. WIECHMANN:  I exclude anybody

9    working for Cooper Dunham.

10        A    I don't recall doing that.

11        Q    (By Mr. Wiechmann)  Do you ever recall

12    discussing with anybody that you thought any parts of

13    these characterizations were misleading or confusing?

14        A    If you're asking about conversations with INC,

15    that's privileged.  If you're asking about

16    conversations with my partners, that's work product.

17        Q    Anybody else.

18        A    Anybody other than that, I don't recall ever

19    having had such discussions.

20        Q    Can you look at 49 which is, I believe, the

21    March 2000 press release.  It says, "360 patent jointly

22    owned by CEP and Horphag."

23        A    Yes.

24        Q    The second-to-the-last paragraph, it reads,

25    "The 18 March 2000 ruling will not affect the patented

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                          Norman H. Zivin, Esq.

Page 162

1    status of Masquelier's original OPC's and the

2    availability of this unique product."

3        A    I see that.

4        Q    Do you know what INC and CEP meant by that

5    paragraph?

6        A    I don't know except in my own work product.

7        Q    Do you believe that the District Court's,

8    District of Connecticut's, ruling had any effect on the

9    patent status of Masquelier's original OPC's?

10            MR. ORDER:  I think that's work product.

11       A    I think that's my mental process.

12       Q    (By Mr. Wiechmann)  Did you ever discuss with

13   your client the U.S. Surgical case dealing with the

14   rights of co-owners of a patent?

15       A    Are you talking about the Ethicon case?

16       Q    Yes.

17       A    Yes.

18       Q    Do you recall what you discussed with him?

19            MR. ORDER:  Just what you recall.

20       A    Yes.

21       Q    (By Mr. Wiechmann)  What did you discuss with

22   him?

23       A    Attorney-client privilege.

24            MR. ORDER:  Objection.

25       A    I'm not going to answer that.

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                    Norman H. Zivin, Esq.

Page 203

1        A        I believe so.

2        Q        If someone asked you to comment upon did Mr.

3    Swit -- did Mr. Schwitters ask you to comment upon the

4    material contained in the package?

5        A        I don't -- I don't recall whether he did or he

6    didn't.

7        Q        The next document appears to be a letter from

8    you back to Mr. Ullman.

9        A        Yes.

10        Q        Do you recall drafting this letter and sending

11    it to Mr. Ullman?

12        A        Not specifically.

13        Q        The last page there is an AI after your

14    initials.   Is that the name of one of your -- the

15    initials for one of your current secretaries?

16        A        No.

17        Q        Do you recall the name of that secretary?

18        A        Actually, I believe we have two secretaries

19    with the same initials.

20        Q        Who are they?

21        A        Adrian and Alifia (phon sp).

22        Q        And their both last names begin with I?

23        A        Yes, I believe so.   They sit next to each

24    other.

25        Q        And you don't know which one this is?

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

Page 204

```
1      A      No.

2      Q      In the first page, there is a paragraph where

3  you say, "The U.S. patent law," and you cite 35 USC

4  Section 262, "clearly states in the absence of any

5  agreement to the contrary, each of the joint owners may

6  sell the invention without consent of and without

7  accounting to the other joint owner."

8             In April of 2001, isn't it a fact that the

9  French courts had, one, found that French law applied

10 to the agreement between Horphag and SCIPA, and, two,

11 there was an agreement to the contrary, as you referred

12 to it in this letter?

13     A      If you're asking me to interpret the French

14 court decision, I'm not going to do it.  I disagree

15 with your characterization.

16     Q      In 2001, is it your position when you wrote

17 this letter that you believed there was no agreement to

18 the contrary that made Section 262 irrelevant?

19     A      Yes.

20            MR. ORDER:  Objection.

21     A      I said what I said.

22     Q      (By Mr. Wiechmann)  I know what you said, but

23 at the time you said it when you wrote to Mr. Ullman,

24 isn't it a fact that you knew that the French court had

25 found there was an agreement to the contrary between
```

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 205

1    Horphag and SCIPA?

2         A    The answer is no.

3         Q    And you refuse to tell me what you then think

4    the French court found in 1998?

5         A    I have my interpretation of what the French

6    court decided, which is not entirely clear.  You

7    undoubtedly have your own interpretation.  I don't

8    think you have the right to ask me what in my mind is

9    my interpretation of it.

10        Q    And in 19 -- well, let me ask you this:  At

11   the time of this letter, isn't it a fact that the

12   United States District Court for the District of

13   Connecticut had given comity to the French court's

14   decision and had found that such an agreement existed?

15        A    I think the answer to the first part of your

16   question is they gave comity to the French court

17   decision.  If you can point me to any agreement to the

18   contrary, I'd like to see it.

19        Q    Agreement to the contrary on what?

20        A    The one you're talking about.

21        Q    The District Court of Connecticut believed in

22   its ruling that there was an agreement to the contrary,

23   correct?

24        A    I don't know what the District Court

25   believed.  The District Court said what it said.  It

Brandon Smith Reporting Service

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

Page 206

1    gave comity to the French decision.

2        Q    The next paragraph, you state that "INC was a

3    bona fide purchaser for valuable consideration of the

4    interest and had no knowledge of any impediment upon

5    SCIPA's right to transfer its interest."

6            On what do you base your statement that INC

7    had no knowledge of SCIPA's -- of the impediment upon

8    SCIPA's right to transfer its interest?

9        A    I think that's attorney-client privileged

10   information.

11       Q    Were you aware -- are you saying that you had

12   no information -- you received no information on this

13   issue other than what you received directly from Mr.

14   Schwitters?

15           MR. ORDER:  No.  To the extent he may

16   have had other information, it's probably work

17   product.

18       Q    (By Mr. Wiechmann)  Was there any lawsuit

19   pending in 1994?

20       A    Yes.

21           MR. ORDER:  You're not asking him

22   about --

23       Q    (By Mr. Wiechmann)  That was a Horphag-Consac

24   case?

25       A    Yes.

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 207

1     Q     Were you aware in 1994 for how many years Mr.

2   Schwitters had worked with Horphag in one role or

3   another?

4     A     I don't understand your question.

5     Q     In 1994 -- was 1994 the first year that you

6   represented Mr. Schwitters or his companies?

7     A     Without knowing what you're referring to by

8   his companies, I represented International Nutrition

9   Company prior to 1994.

10    Q     In 1992?

11    A     I can't tell you exactly when.

12    Q     Okay.  Did there ever come a time when you had

13  an understanding as to the history of Mr. Schwitters'

14  relationship with Mr. Haimoff and Horphag?

15    A     Yes.

16    Q     Do you know how far back Mr. Schwitters and

17  Mr. Haimoff had worked together?

18    A     No.

19    Q     Do you know that they had done deals together

20  in the 1980s?

21    A     I'm not aware of any.

22    Q     Are you aware of any actions taken by INC or

23  anyone representing INC to determine whether SCIPA had

24  the right to transfer its interest to INC?

25    A     Can I have that question read back?

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

Page 208

```
 1                  (Question read.)

 2        A    Yes.

 3        Q    (By Mr. Wiechmann)  And how did you learn of

 4   those actions?

 5        A    I think that's attorney work product.

 6        Q    Well, that's what I want to know.  Did you

 7   learn it -- at the time -- okay.

 8             Did you learn of those actions after the suit

 9   was brought, started, by you in Connecticut?

10        A    No.

11        Q    In what context did you learn of what INC did

12   to ensure itself that SCIPA could transfer those rights

13   to INC?

14        A    Are you asking me when?

15        Q    Now I'm asking you, when's part of it, but in

16   what context?  Was it after the fact in 1998; was it at

17   that time in 1994 when the -- when the transfer was

18   made?

19        A    Yes.  It was in 1994.

20        Q    When the transfer was made?

21        A    Yes.

22        Q    Now, the transfer -- did the transfer have

23   anything to do with the Horphag-Consac suit?

24        A    Yes.

25        Q    How did the Horphag-Consac suit relate to the
```

Brandon Smith Reporting Service

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 209

1    transfer from SCIPA to INC?

2       A     The information I have is protected by the

3    attorney-client privilege.

4       Q     But just to be clear, for any claim made of

5    work product, there would only be a work product claim

6    if the information you were discovering you were doing

7    in connection with defending the, or prosecuting, the

8    Horphag-SCIPA suit.  You can't have work product if you

9    don't have anticipation of an action or suit to be

10   filed or action or suit quickly to be filed.  Your

11   attorney mentioned it also violated work product.  I

12   just wanted to find out the foundation about whether

13   your knowledge this suit --

14      A     I don't recall him saying anything.

15      Q     He objected on the grounds of work product.

16            THE WITNESS:  Did you?  I didn't hear

17   it.

18            MR. ORDER:  No.  I think you did.

19            THE WITNESS:  I said it was attorney-

20   client.

21            MR. WIECHMANN:  No.  That was the last

22   one.

23      Q     (By Mr. Wiechmann)  Did INC receive any

24   written warranties or representations from SCIPA that

25   it, SCIPA, had the authority to transfer its rights to