UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * *
                            *
JARROW FORMULAS, INC.,      *   CIVIL ACTION NUMBER
          PLAINTIFF,        *   3:01 CV 478 (AVC)
                            *
vs.                         *
                            *
INTERNATIONAL NUTRITION     *
COMPANY, NORMAN H. ZIVIN,   *
And JACK MASQUELIER,        *
          DEFENDANTS.       *
                            *
* * * * * * * * * * * * * *

---

DEPOSITION OF:   JARROW ROGOVIN

---

Taken before Sarah B. Najemy, Licensed Shorthand Reporter (#00069) and Notary Public in and for the State of Connecticut, pursuant to the Federal Rules of Civil Procedure, at the law offices of Updike, Kelly & Spellacy, PC, One State Street, Hartford, Connecticut, on January 29, 2002 at 10:19 a.m.

BRANDON SMITH REPORTING SERVICES
11A Capitol Avenue
Hartford, CT 06106
Tel:  (860) 549-1850
FAX:  (860) 549-1537

Brandon Smith Reporting Service

f355afcc-510f-4945-b9c8-2840cc9debd3

Page 14

1  A  I not only don't recall it. I don't see how it
2     matters.
3  Q  Well, it matters because I want to know what you
4     did after you left UCLA.
5  A  That's a different question. It doesn't matter
6     when I left actually.
7  Q  Can you answer that question, please?
8  A  I washed dishes after I left.
9  Q  Where did wash dishes?
10 A  It was a restaurant called the Health Department
11    on Santa Monica Boulevard. It was a hippy
12    restaurant. It served a lot of health food.
13    The owner was a professor from the English
14    department at UCLA. I remember his first name;
15    Barry.
16 Q  And from when to when did you wash dishes at the
17    Health Department?
18 A  I don't remember.
19 Q  How long did you wash dishes at the Health
20    Department for?
21 A  I don't remember. A number of months.
22 Q  Was it more than half a year?
23 A  I don't remember. Enjoyed the job. Nice
24    people.
25 Q  I didn't ask you that question. Can you answer

Page 15

1     my question, please. I don't want to waste
2     time.
3  A  I actually already answered. I said I don't
4     remember.
5  Q  Right. And you continued going on. I don't
6     need to have the extraneous dialogue. I'm
7     trying to move things along, Mr. Wiechmann.
8  A  The questions are extraneous. But, go ahead.
9  Q  I'm entitled to your background. Did you wash
10    dishes at the Health Department for more than a
11    year?
12 A  No.
13 Q  What did you do after you finished washing
14    dishes at the Health Department?
15 A  That may have been when I worked for Phil Blazer
16    at a Jewish tabloid.
17 Q  What was the name of the tabloid?
18 A  I can't quite remember. I worked selling
19    advertising for him. By tabloid I'm referring
20    to the format, not the content. The content was
21    news and commentary.
22 Q  Was it a community Jewish newspaper?
23 A  Yes.
24 Q  A Jewish community --
25 A  Well, I know what you mean by community.

Page 16

1     Community oriented.
2  Q  Was it for a certain particular area
3     geographically?
4  A  Los Angeles County.
5  Q  And from when to when did you sell advertising
6     for that newspaper?
7  A  I don't remember.
8  Q  How long did you sell advertising for that news?
9  A  I don't remember.
10 Q  Did you have any other job at that newspaper
11    other than selling advertising?
12 A  No.
13 Q  What was your next job after that?
14 A  At some point in there I managed a campaign for
15    the state senate in West Los Angeles,
16    Democratic primary.
17 Q  Who was the candidate that you managed the
18    campaign for?
19 A  Warren Solosky.
20 Q  Did he win?
21 A  No.
22 Q  And do you recall what year you managed the --
23    or, what time period you managed the campaign
24    for him?
25 A  '72.

Page 17

1  Q  So, you managed the campaign for him between
2     your quarters at UCLA; is that correct? Did you
3     take time off, in other words, to manage his
4     campaign?
5  A  I must have.
6  Q  Did you ever attend any other -- or, take any
7     courses at any other college other than Long
8     Beach City College or UCLA, as opposed to
9     enrolling on a full time basis?
10 A  LACC.
11 Q  Does that stand for Los Angeles City College?
12 A  Yes.
13 Q  And what courses did you take there?
14 A  Steno typing.
15 Q  How long a course was that?
16 A  A semester.
17 Q  Do you recall when you took that?
18 A  No.
19 Q  Did you take any other college courses --
20 A  I don't remember.
21 Q  -- anywhere else?
22 A  I don't think so.
23 Q  Did you ever study chemistry?
24 A  No -- oh, I had a junior high summer course, and
25    a little bit of --

Page 18

1  Q  A little bit of?
2  A  Chemistry.
3  Q  In junior high?
4  A  Yes.
5  Q  And no other chemistry courses after junior
6     high?
7  A  No.
8  Q  Did you ever study pharmacology?
9  A  No -- well, what do you mean study?
10 Q  In any type of formal educational system.
11 A  No.
12 Q  Did you ever study law?
13 A  No.
14 Q  Have you ever been deposed before?
15 A  Yes.
16 Q  How many times?
17 A  I think four.
18 Q  Do you recall the names of the cases in which
19    you were deposed?
20 A  Some.
21 Q  Can you name the cases in which you were
22    deposed?
23 A  Those that I can name. Jarrow Rogovin versus
24    Southwest Lease; and Bio-Genesis, Inc. versus
25    Natren, et al. with cross claims; and related

Page 19

1     bankruptcy.
2  Q  The bankruptcy was related to the Bio-Genesis
3     case?
4  A  Yes.
5  Q  Who was the debtor in the bankruptcy case?
6  A  Boyd O'Donnell.
7  Q  Are there any other cases that you recall you
8     were deposed in?
9  A  Yes.
10 Q  What are the names of those cases?
11 A  I don't know the name.
12 Q  How many more cases was it that you were deposed
13    in?
14 A  That's what I remember.
15 Q  No. You gave me --
16 A  If there was another deposition, I don't
17    remember one.
18 Q  I'm not clear, because you said you were deposed
19    four times before.
20 A  Correct.
21 Q  And you gave me the names of two cases. And you
22    said a related bankruptcy case. So, is that
23    three of the four?
24 A  I didn't say how many cases I was deposed in. I
25    said how many times my deposition was taken.

Page 20

1  Q  Okay. So, have you told me the names of all the
2     cases in which you have been deposed?
3  A  Yes, that I remember.
4  Q  Does has mean you don't remember whether -- you
5     don't know whether there were other cases in
6     which you were deposed, or you just don't
7     remember the names of other cases in which you
8     were deposed?
9  A  That was very clear, my answer.
10 Q  Can you answer my question?
11 A  I said those are the cases I remember being
12    deposed. And I do not remember any other cases
13    that I was deposed.
14 Q  I guess my question is --
15 A  Why is there three versus four.
16 Q  No. I'm not asking you to interpret my
17    questions. I'm a little confused when you say
18    what you don't recall. So, I'm trying to figure
19    out what it is that you don't recall.
20    Is it that you don't recall whether you
21    were deposed in any other case, or you just
22    don't recall the names of any other cases, even
23    though you know you were deposed in other cases?
24       MR. WIECHMANN: I object. I believe
25    he did, the second time, clearly answer

Page 21

1     that. It was asked and answered.
2        MR. ORDER: Then I'm confused, and I
3     would just like for him to answer.
4        THE WITNESS: Perhaps you reread the
5     transcript?
6        MR. WIECHMANN: Perhaps you could just
7     answer my question.
8        THE WITNESS: Perhaps you could have
9     stipulated for the extension of time on the
10    discovery and been more cooperative.
11       MR. WIECHMANN: Let's just -- just
12    respond, with the objection.
13       MR. ORDER: Mr. Wiechmann, I've got to
14    say that if we keep going at this pace, I'm
15    going to have to make a motion to --
16       MR. WIECHMANN: Make whatever motions
17    you have to. But just ask the question.
18 BY MR. ORDER:
19 Q  I don't know from the way you have answered --
20    and I'm not blaming you. I'm just saying I'm
21    confused. I don't know whether you are saying
22    you don't remember whether you were deposed in
23    any other cases that you haven't identified
24    earlier, or whether you are saying you know that
25    you were deposed in some other cases you just

Page 22

1    don't remember the names.
2  A  I'm getting confused with the question, or is
3    there an objection?
4        MR. WIECHMANN: There is an objection.
5    But you still have to answer. He just
6    wants to know, other than the two cases you
7    named, were there any other cases, which I
8    think you said, in which you remember being
9    deposed?
10       THE WITNESS: I don't remember any
11   other depositions, for the fourth time, or
12   whatever.
13 BY MR. ORDER:
14 Q  Okay. You said you were deposed four times. So
15   when you said that, you meant there were four
16   separate days you were deposed, but it was not
17   necessarily in four separate cases; is that
18   correct?
19 A  No, it's not correct. It's not what I said.
20 Q  Were you deposed in four separate cases?
21 A  I said I was deposed in three cases.
22 Q  And those three cases are Jarrow Rogovin versus
23   Southwest Lease. The second one, Bio-Genesis
24   versus Natren. And the third was a related
25   bankruptcy where the debtor was Boyd O'Donnell;

Page 23

1    is that correct?
2  A  Okay. Actually that's five. I'm going have to
3    pause. Hold on. I'm sorry re-read the
4    question -- restate the question.
5  Q  Well, from what you have testified all I
6    understand is that you have been deposed in
7    three cases; Jarrow Rogovin versus Southwest
8    Lease, Bio-Genesis versus Natren, and a
9    bankruptcy case where Boyd O'Donnell was the
10   debtor.
11 A  Three cases, yes. But you just named two cases.
12 Q  Okay. Was there another case that you were
13   deposed in, other than the three I just
14   identified?
15 A  Again, yes.
16 Q  -- or referred to?
17 A  Yes.
18 Q  And do you recall the name of the other cases
19   that you have been deposed in?
20 A  No.
21 Q  How many other cases have you been deposed in
22   whose names you don't recall?
23 A  Again, none.
24 Q  When I'm talking about a deposition in a
25   particular case, I'm not talking about how many

Page 24

1    days you have been deposed in that case. I'm
2    considering the whole thing as one deposition.
3    Is that the source of confusion here?
4  A  I'm not confused. No. I think it's your
5    questions.
6  Q  Okay. Well --
7        MR. WIECHMANN: At the end of the day,
8    except for the -- unless any of these are
9    related to any issue here, the only
10   relevance could be his experience being
11   deposed.
12       MR. ORDER: It could also be sworn
13   testimony, which is admissible.
14       MR. WIECHMANN: If it's related. If
15   none of these are related.
16       MR. ORDER: Let's not argue.
17       MR. WIECHMANN: -- then we're spending
18   a lot of time --
19       MR. ORDER: Well, I feel like I'm not
20   getting a straight answer.
21       THE WITNESS: You're not asking the --
22 BY MR. ORDER:
23 Q  Tell me about the deposition -- or, tell me
24   about the case in Jarrow Rogovin versus
25   Southwest Lease, what was that about?

Page 25

1  A  Breach of contract and class action.
2  Q  You were the plaintiff personally?
3  A  Yes.
4  Q  Did you bring the class action?
5  A  Yes.
6  Q  On behalf of what class?
7        MR. WIECHMANN: Let's get --
8        THE WITNESS: Well, it was a breach of
9    contract against an auto lease company. I
10   think that's all I want to say about it.
11 BY MR. ORDER:
12 Q  Is that case still pending?
13 A  No.
14 Q  Were you represented by counsel?
15       MR. WIECHMANN: Yes or no.
16       THE WITNESS: Yes.
17 BY MR. ORDER:
18 Q  Who was the counsel?
19       MR. WIECHMANN: I'm going to impose an
20   objection here. The issue of who his
21   counsel were, or the details, is going to
22   have nothing to do with his sworn testimony
23   or its relevance at this stage.
24       MR. ORDER: I understood Mr. Wiechmann
25   that we had stipulated at the beginning of

Page 26

1  this deposition that all objections except
2  as to form would be reserved until the time
3  of trial. And an objection as to relevance
4  is an objection that was reserved expressly
5  by you at the beginning.
6       MR. WIECHMANN: You're right. I
7  mistook. It's an objection as to the scope
8  -- a question outside of the scope of
9  discovery. And I'm just saying on
10 preliminary I'm trying to let it go. But
11 if you get down to details, which is
12 nothing except for -- I don't understand
13 why you need to know the name of his
14 counsel. It's outside the scope of
15 discovery. You can't contact the counsel,
16 obviously.
17      MR. ORDER: Of course I can, if I need
18 to.
19      MR. WIECHMANN: And violate
20 attorney-client privilege.
21 BY MR. ORDER:
22 Q  Well, let me ask this; Mr. Rogovin, do you have
23    a copy of the transcript of your deposition in
24    the Rogovin versus Southwest Lease case?
25      MR. WIECHMANN: You can say yes or no.

Page 27

1       THE WITNESS: Of course not.
2  BY MR. ORDER:
3  Q  And does your counsel -- well let me ask you
4     this -- let me strike that and ask you this
5     question. What is the name of your counsel in
6     that case then?
7  A  I think that was responded to by my counsel.
8       MR. ORDER: Well, Mr. Wiechmann, the
9  point is that if Mr. Rogovin doesn't have a
10 copy of the transcript and we need to get a
11 copy of the transcript because it's a prior
12 sworn statement of this witness, then the
13 most logical place to start with is his
14 counsel. And that's why I'm asking him to
15 identify his counsel.
16      MR. WIECHMANN: And his counsel is not
17 going to turn over a copy of a deposition
18 that is basically owned by Mr. Rogovin. He
19 paid for it. It's his files. I don't
20 think I can go to Mr. Zivin and ask for all
21 of his -- as long as you understand that I
22 can go and ask Mr. Zivin for all copies of
23 sworn statements in cases or depositions of
24 his clients, and there is going to be no
25 problem with that, I will talk to

Page 28

1     Mr. Rogovin and reconsider.
2       MR. ORDER: So, you are directing him
3  not to answer; is that correct?
4       MR. WIECHMANN: We will take a break
5  and consider it. And at the next break I
6  will talk to Mr. Rogovin.
7  BY MR. ORDER:
8  Q  You said the case -- Mr. Rogovin?
9  A  Yes.
10 Q  You said that the Rogovin versus Southwest Lease
11    case is no longer pending. How did it get
12    resolved?
13      MR. WIECHMANN: You can answer.
14      THE WITNESS: It's 11 years ago.
15 BY MR. ORDER:
16 Q  That doesn't answer my question. How did it get
17    resolved?
18 A  I'm going to demur.
19 Q  There are no --
20 A  It's rather complicated.
21 Q  -- demurs anymore.
22 A  It's rather -- well, --
23 Q  Was the case settled, or did it go to trial?
24 A  It's rather complicated. Number one, it's 11
25    years ago. And I don't wish to talk about it.

Page 29

1  Q  Did the case settle?
2  A  I'm not going to answer. It's not relevant.
3     I'm not going to answer.
4  Q  Did the case go to trial?
5  A  I'm not answering.
6  Q  What court was the case pending in?
7  A  I'm not answering. I don't see the relevance of
8     an auto lease contract case.
9  Q  The Bio-Genesis versus Natren case, what was
10    that case about?
11 A  Trade libel, false advertising, unfair
12    competition, bankruptcy, bankruptcy fraud --
13 Q  And how were --
14 A  -- ultimately.
15 Q  -- were you, or one of your companies, a party
16    to that case?
17 A  Jarrow Formulas, Inc.
18 Q  Was a what, defendant?
19 A  We were defendant and cross complainant.
20 Q  Cross complainant counter claim?
21 A  I should say defendant cross complainant and
22    bankruptcy intervener. And, I guess, basically
23    the deep pockets for the special counsel to the
24    bankruptcy trustee. In other words, I funded
25    the special counsel to the bankruptcy trustee.

8 (Pages 26 to 29)

Page 30

1  Q  You say that Jarrow Formulas was a cross
2     complainant. Against whom did it assert a cross
3     complaint?
4  A  Bio-Genesis. Which later became International
5     Bio-Tech -- let's see. International IBTU.
6     International Bio-Tech --
7  Q  Okay. I'm --
8  A  Why did they have the U there? I can't remember
9     the reason for U. But anyway, IBTU, Inc., Boyd
10    O'Donnell, Ed O'Donnell, North County Micro Bio
11    Lab, something sort of like Agrodynamics,
12    something like that. And there was another
13    entity. It was a shipping distribution company
14    related to all that. It was another sham
15    corporation of the same group. The name is
16    escaping me for the moment.
17 Q  And you brought a complaint against all of
18    those companies and individuals you just
19    identified?
20 A  That misstates my testimony.
21 Q  You brought claims against them; correct?
22 A  I brought a cross complaint.
23 Q  Were they -- all the parties that you just
24    identified, were they all co-defendants --
25 A  Yes.

Page 31

1  Q  -- of Jarrow Formulas?
2  A  Yes -- no. Co-defendants?
3  Q  Yes. A cross complaint is brought against
4     co-defendants. Were you counter claiming
5     against the plaintiff?
6  A  I was counter claiming, yes.
7  Q  So, were all the parties that you just
8     identified all plaintiffs?
9  A  No.
10 Q  Were some plaintiffs and --
11 A  I already said --
12 Q  -- and some co-defendants?
13       MR. WIECHMANN: Let him finish the
14    question.
15 BY MR. ORDER:
16 Q  Right. You said Bio-Genesis was the plaintiff.
17    Were there any other plaintiffs in the case
18    other than Bio-Genesis?
19 A  No.
20 Q  And was Boyd and Ed O'Donnell, were they
21    co-defendants of yours in that case?
22 A  No.
23 Q  Did you bring them in as third parties?
24 A  You can put it that way.
25 Q  And what about Micro Bio Lab, was that a

Page 32

1     defendant in the case, or a plaintiff in the
2     case?
3  A  Neither.
4  Q  You brought them in also for your counter claim
5     as counter claim defendants?
6  A  Yes.
7  Q  The same with, was it North Company -- North
8     County --
9  A  North County Micro Bio Lab.
10 Q  Okay.
11 A  And then this distribution company. It's funny
12    I can't remember the name of the company.
13       MR. WIECHMANN: I want to pose an
14    objection here. I don't believe this is
15    foundation. Obviously, the terms that you
16    may be using, Mr. Order, I'm not sure Mr.
17    Rogovin understands. And you do also have
18    two different -- he mentioned both a
19    lawsuit and a bankruptcy claim. So, the
20    use of your terms, there may be no
21    foundation that he may understand them in
22    the technically correct legal sense.
23 BY MR. ORDER:
24 Q  Do you know what a counter claim is?
25 A  Well in federal court, typically, I think you

Page 33

1     have a counter claim. In California State Court
2     you would have a cross claim.
3  Q  What I'm referring to as a counter claim is a
4     claim brought by a defendant against a plaintiff
5     and maybe some other parties that the counter
6     claimant brings in. Is that how you understood
7     my question to mean?
8  A  I'm in California.
9  Q  Yes.
10 A  So, I'm using the terms as used in California.
11 Q  Okay. Was the Bio-Genesis case in California
12    State Court?
13 A  Partly.
14 Q  What courts was -- well, how many courts --
15    okay. So, you are saying the bankruptcy was in
16    the United States Bankruptcy Court; correct?
17 A  Partly.
18 Q  What court was the Bio-Genesis case started in?
19 A  Depending on how one views it historically, it
20    was an UC San Diego Southern District Federal
21    Court.
22 Q  So, is that the southern district of
23    California?
24 A  Yes. Did I say UC San Diego?
25 Q  Yes. I didn't know what you meant by that.

Page 34

1  A  Sorry about that. I'm thinking of La Jolla.
2  Q  And was there another court that that case
3     either got transferred to or had related
4     litigation in?
5        MR. WIECHMANN: If you understand it
6     to be able to answer it.
7        THE WITNESS: I mean, that's sort of a
8     confused context for the question,
9     considering what happened. Would you ask
10    it again?
11 BY MR. ORDER:
12 Q  Was there another court in which that
13    litigation, or related litigation, occurred?
14 A  When you say that litigation, are you referring
15    to the San Diego case?
16 Q  Yes.
17 A  Or the Bio-Genesis case in general?
18 Q  You said the Bio Genesis case started in San
19    Diego Federal District Court; correct?
20 A  Yes. So, when you say that case, which case are
21    you talking about?
22 Q  How many cases have you been a party to, or
23    Jarrow Formulas, or any of your companies, been
24    a party to, involving Bio-Genesis?
25 A  Three.

Page 35

1  Q  You have already identified one that started in
2     the federal court in San Diego?
3  A  Correct.
4  Q  Can you tell me what other courts the other two
5     cases were in?
6  A  I wouldn't necess -- well, okay. Call them
7     other two, because I did say three. Federal
8     bankruptcy in UC Riverside -- well, bankruptcy
9     is federal. And North County San Diego Superior
10    Court, State of California.
11 Q  You said bankruptcy court in UC Riverside. Do
12    you mean just Riverside?
13       MR. WIECHMANN: He withdrew the UC.
14       THE WITNESS: I'm sorry. Did I say
15    UC?
16       MR. WIECHMANN: He said drop the
17    Riverside --
18       THE WITNESS: Yes. Riverside --
19    federal bankruptcy -- bankruptcy court in
20    Riverside. And the North County San Diego
21    State Superior.
22 BY MR. ORDER:
23 Q  And was Jarrow Formulas a defendant in the
24    North County San Diego Superior Court action?
25 A  Yes. We were also a defendant in the bankruptcy

Page 36

1     phase.
2  Q  By we, you mean Jarrow Formulas, Inc., or some
3     other --
4  A  Natren and Jarrow Formulas.
5  Q  What is your relationship with Natren?
6  A  They are a competitor.
7  Q  And did you bring counter claims in the North
8     County San Diego Superior Court action?
9  A  Yes.
10 Q  And those counter claims were brought against
11    Bio-Genesis?
12 A  Et al.
13 Q  And others. Now, in which of those three cases
14    involving Bio-Genesis were you deposed?
15 A  The bankruptcy case and the San Diego County
16    Superior Court case.
17 Q  And what was the general topic of your
18    deposition in the bankruptcy case?
19       MR. WIECHMANN: Object as to form.
20 BY MR. ORDER:
21 Q  Can you answer the question, please?
22       MR. WIECHMANN: Object as to form.
23    It's a confusing question. I mean, I'm not
24    sure what you mean by general topic.
25       MR. ORDER: Well, instead of telling

Page 37

1     me every single question that was asked if
2     he can just summarize in general the topics
3     that he was asked questions about.
4        MR. WIECHMANN: I object. And I also
5     question the scope of this, going beyond --
6     it's a bankruptcy case. I don't care if
7     it's sworn. There are a lot of sworn
8     statements. But if it has nothing to do
9     with any issue here then I'm not sure of
10    the relevance of this at all. Especially,
11    since -- you know, whatever the time is.
12    Seven and a half hours, if you're going to
13    explore every written sworn statement he
14    has in the past, and then later on say you
15    don't have enough time for finishing the
16    subject matters of this case, then we're
17    going to take the position that your time
18    was not used properly.
19       MR. ORDER: Are you done?
20       MR. WIECHMANN: Yes.
21       MR. ORDER: Thank you.
22 BY MR. ORDER:
23 Q  You said the Bio-Genesis case was about trade
24    libel, false advertising, unfair competition,
25    bankruptcy, and bankruptcy fraud claims. Did it

Page 38

1  involve any particular products?
2  A  Yes.
3  Q  What were the products?
4  A  The product was one sold by Bio-Genesis called
5     Florabalance containing a -- allegedly
6     containing a bacteria -- well, labeled for --
7     even that gets complicated. But bacillus
8     laterosporus, L-A-T-E-R-O-S-P-O-R-U-S.
9  Q  I'm sorry. I had trouble understanding what you
10    said. It was a Bio-Genesis, what did you say
11    flor --
12 A  They called it Florabalance. And it was labeled
13    for a bacteria called bacillus laterosporus.
14 Q  And Bio-Genesis was suing Jarrow Formulas for
15    trade libel, false advertising, unfair
16    competition; is that correct?
17 A  I didn't say that at all. That wasn't your
18    question.
19 Q  Well, what did they sue you for?
20 A  Okay. I can answer that question. They sued me
21    for trade libel and, you know, more or less
22    related claims. Loss of business. But,
23    basically, they sued for trade libel.
24 Q  Did they claim that Jarrow Formulas, or you, had
25    said untruthful things about their product?

Page 39

1  A  That's what they sued for, yes.
2  Q  Did you have a competing product that Jarrow
3     Formulas was selling?
4  A  Scientifically or commercially?
5  Q  Commercially.
6  A  In the sense that they positioned their product
7     against probiotics, yes. In the sense that
8     their product is not a probiotic, no.
9  Q  What was the probiotic product that Jarrow
10    Formulas sold that competed with Bio-Genesis, or
11    at least in Bio-Genesis's view competed with it?
12 A  Primarily a product called Jarrow-Dophilus.
13    Which is spelled J-A-R-R-O-W hyphen
14    D-O-P-H-I-L-U-S.
15 Q  And can you describe what that product is?
16 A  It is a lactobacilli and bifidobacteria. And so
17    you're not confused, it does not contain a
18    bacillus organism.
19 Q  And is that product sold in a capsule form?
20 A  Yes.
21 Q  And what were the properties of that product?
22 A  Physical properties of the product, or you mean
23    pharmacology, or what? I mean, that's a vague
24    question.
25 Q  I assume, and correct me if I'm wrong, this is a

Page 40

1  product that was to be ingested by humans?
2  A  The congressional definition of a dietary
3     supplement is set forth in the 1994 Dietary
4     Supplement Health and Education Act, DSHEA,
5     which requires that the --
6  Q  Excuse me, are you saying that this is a dietary
7     supplement; is that your point?
8  A  -- which requires that it be ingested.
9  Q  So, that's a long way of saying yes to my
10    question; right?
11 A  I said dietary supplement, yes.
12 Q  And was Bio-Genesis Florabalance a dietary
13    supplement?
14 A  It's actually an unapproved -- what's called by
15    the FDA an unapproved new drug masquerading as a
16    dietary supplement. It was a question for the
17    litigation as such.
18 Q  Now, you were deposed in the bankruptcy case and
19    the superior court case. What did you testify
20    about in those two depositions?
21 A  In the bankruptcy case I was asked the basis for
22    our theory that the cross defendant corporations
23    were sham corporations, the racketeering, tax
24    evasion, deliberate sale of -- well, no. For
25    the bankruptcy. Okay. Sham corporations,

Page 41

1  alterego, tax evasion, bankruptcy fraud,
2  transfers, and fraud of creditors.
3  Q  And in the superior court case, what was the
4     nature of your testimony in that deposition?
5  A  Knowingly selling pathogen laced swill to the
6     public, marketing specifically to immune
7     suppressed cancer and AIDS patients, FDA raid,
8     publicity, unapproved new drug claims, unfair
9     competition, false advertising. More or less.
10 Q  You just gave me a bunch of phrases. Were you
11    referring to conduct by Bio-Genesis or by Jarrow
12    Formulas?
13 A  Bio-Genesis. We were the cross complainant.
14 Q  I understand. And was the deposition taken by
15    Bio-Genesis' attorney in the superior court
16    case?
17 A  Yes.
18 Q  And did that attorney ask you any questions that
19    related to Bio-Genesis' claims against Jarrow
20    Formulas?
21 A  No.
22 Q  The attorney just asked you questions about
23    your -- about Jarrow Formulas' cross complaint,
24    as you call it?
25 A  Correct. I will volunteer that Natren made a

Page 42

1  motion for summary judgment in the consolidated
2  bankruptcy case, and prevailed. And at the
3  eleventh hour before the second hearing, which
4  was to be on Jarrow Formulas' motion for summary
5  judgment to dismiss the original complaint, they
6  filed a request for dismissal with prejudice.
7  Q  Who --
8  A  Leaving only -- well, Bio-Genesis. Leaving only
9     the claims of Jarrow Formulas in both the
10    bankruptcy -- well, regarding both bankruptcy
11    issues and the various violations of state and
12    federal law that we brought in state court,
13    including ancillary jurisdiction for the federal
14    matters.
15 Q  So you are saying Bio-Genesis voluntarily --
16 A  Federal matters such as unapproved new drug
17    claim.
18 Q  -- moved to withdraw its bankruptcy case?
19 A  They did not move -- oh, no. The bankruptcy
20    case? No. I said their --
21 Q  You said Natren won a summary judgment motion in
22    the bankruptcy case.
23 A  No.
24 Q  You didn't say that?
25 A  No. I said in the consolidated bankruptcy case.

Page 43

1  It was removed to the bankruptcy court so it
2  would all be under one roof at that point.
3  Q  What was removed, the superior court case?
4  A  The superior court case, yes.
5  Q  What about the initial federal court action that
6     Bio-Genesis started in San Diego Federal
7     District Court, was consolidated into the
8     bankruptcy court case also?
9  A  No.
10       MR. WIECHMANN: Again, I would only
11    object because I'm not sure there is
12    foundation as to terminology. Normally, as
13    you know, Richard, in bankruptcy you stay
14    certain actions. And then any claims go
15    into the federal bankruptcy court. That
16    may not be considered consolidation. I
17    just want to make sure --
18       MR. ORDER: I'm just using the term
19    that Mr. Rogovin used.
20       MR. WIECHMANN: And I understand. But
21    I don't know that we have a foundation that
22    Mr. Rogovin may be using the terms the way
23    a bankruptcy practitioner might. And that
24    may be part of this confusion.
25       THE WITNESS: It was removed -- you're

Page 44

1  correct, counsel. I apologize. It was --
2  on the initiative of the bankruptcy judge
3  it was removed to -- at that point it was
4  removed to the bankruptcy case court.
5  BY MR. ORDER:
6  Q  And by it, you mean the superior court case?
7  A  The superior court case was removed. Sorry for
8     the "it". And then in answer to San Diego, we
9     made a motion to dismiss and for sanctions. It
10    was dismissed and sanctions were granted.
11 Q  Sanctions against whom?
12 A  Boyd O'Donnell.
13 Q  I'm sorry. You said San Diego case. You mean
14    the federal court case?
15 A  Yes. Sorry. There were two San Diego County
16    cases.
17 Q  Two cases in San Diego. One was in the state
18    court. One was in federal court. So, the San
19    Diego federal court case was dismissed?
20 A  With sanctions against Mr. O'Donnell.
21 Q  And what was Mr. O'Donnell's --
22 A  And he put --
23 Q  Can I --
24 A  -- the sanctions in bankruptcy.
25 Q  Was Mr. O'Donnell affiliated with Bio-Genesis?

Page 45

1  A  He was the alter ego of Bio-Genesis, and its
2     president, mascarading as a consultant, using
3     his brother as a sham owner.
4  Q  Who was the lawyer representing Bio-Genesis in
5     any of these three cases?
6  A  There were a lot of them.
7  Q  Do you recall any in particular?
8  A  Yes. But I think --
9  Q  Who are they?
10 A  -- I want to ask you to leave this already.
11       MR. WIECHMANN: I think it may be time
12    to take a break, if we could.
13       MR. ORDER: Sure. After we finish
14    with this line of questioning.
15       MR. WIECHMANN: Fine. At this time
16    then, he said he did not want to answer.
17 BY MR. ORDER:
18 Q  So, you are refusing to answer the question?
19 A  Yes. Those cases are public record, if you
20    really need to go into them.
21 Q  Right. And that's why I need to find out who
22    the attorney was for Bio-Genesis.
23 A  You want to. I don't know that you need to.
24    And I'm going to decline. I think that we are
25    going a bit far afield with the clock ticking.

12 (Pages 42 to 45)

Page 46

1  Q  Well, did you ever sue any of the lawyers
2     representing Bio-Genesis?
3  A  At what point?
4  Q  Ever.
5  A  Yes.
6  Q  Who did you sue?
7  A  It's very complicated. Again, it gets a little
8     detailed.
9  Q  I'm just asking who you sued?
10 A  Cynthia Harf.
11 Q  And was she one of Bio-Genesis' lawyers?
12 A  One of about seven or eight. I lost count.
13 Q  Did you sue any other Bio-Genesis lawyers?
14 A  No.
15 Q  Why did you sue her?
16 A  She brought what was called -- what is called
17    today a slap suit. She brought a case that was
18    thrown out on summary judgment, one half of it.
19    And the other half, as I said, voluntarily
20    dismissed with prejudice. She brought a case
21    following a very serious FDA raid against her
22    client, where, basically, the entire company was
23    seized and shut down for many months, for
24    contaminated products. And with no connection,
25    no basis at all for me or Natren -- or, rather,

Page 47

1     I should say my company or Natren, made a lot of
2     allegations that were simply marketing on behalf
3     of her client to try and recover his reputation
4     in the marketplace after the FDA raid. And
5     today we would call that a slap suit. And that
6     strategic lawsuit against public participation,
7     which was my free speech about the FDA raid,
8     would have been dismissed and Bio-Genesis would
9     have had to have paid my attorneys fees.
10    Unfortunately, back then there was no provision
11    for slap suit for that type of litigation as
12    there is today. So, that's why I sued her.
13 Q  Which of the three lawsuits that you identified
14    earlier did she bring?
15 A  She brought the one in North County San Diego
16    Superior State Court. And she resigned from the
17    case after her client committed perjury -- his
18    second conviction for perjury -- in another case
19    she was representing him.
20 Q  And by client you mean Boyd O'Donnell?
21 A  Yes.
22 Q  When did she bring the case in San Diego State
23    Court?
24 A  It may have been '94.
25 Q  And when did you sue her?

Page 48

1  A  It may have been '95. I mean, I can't remember.
2     This has been struggling on for seven years with
3     these people.
4  Q  When you say it may have been '95, which
5     question are you answering?
6  A  When she brought the original case, the
7     underlying case.
8  Q  My question now is, when did you sue Cynthia
9     Harf?
10 A  '96, '97 -- maybe -- '96, '97.
11 Q  And what were your claims against her? Let me
12    retract that. Who sued whom in that lawsuit?
13 A  Jarrow Formulas, Inc. and Natren sued her and
14    her clients for malicious prosecution.
15 Q  Were there any other claims asserted other than
16    malicious prosecution?
17 A  No.
18 Q  Did you assert any antitrust claims against her
19    and her clients?
20 A  No.
21 Q  Did you assert any unfair competition claims
22    against them?
23 A  In which case?
24 Q  How many cases did you sue Ms. Harf in?
25 A  That one. But you said "them."

Page 49

1  Q  Them meaning Ms. Harf and her clients.
2  A  Well, I had -- I have, whatever, unfair
3     competition claims against her clients in
4     another case.
5     MR. WIECHMANN: Just in the northern
6     San Diego case.
7  BY MR. ORDER:
8  Q  We were talking about a case where you sued
9     Ms. Harf -- where Jarrow Formulas and Natren
10    sued Cynthia Harf and her clients. So, my
11    question is, did you have any other claims in
12    that case other than malicious prosecution?
13 A  I already said no. I said malicious
14    prosecution.
15 Q  Were there any counter claims in that case
16    brought by the defendants against you -- or,
17    against Jarrow Formulas or Natren?
18 A  No.
19 Q  And where was that lawsuit brought?
20 A  North County San Diego Superior Court.
21 Q  Is that case still pending?
22 A  No.
23 Q  What happened?
24 A  The judge gave a very peculiar instruction to
25    the jury. Then he changed the instruction. And

13 (Pages 46 to 49)

Page 50

1  when he delivered the changed instruction, the
2  jury responded, "Too late. We already made up
3  our mind." So, the jury came back with no
4  liability for the defendants.
5  Q   And when was that trial?
6  A   In '97, '98. I think '98.
7  Q   Did you -- did anybody appeal that trial -- from
8      that trial?
9  A   No. I think Ms. Harf learned her lesson. And
10     the other defendants were still defendants in
11     the other matters, and still face a very
12     substantial liability.
13 Q   And do you have a lawsuit against the other
14     defendants in another case?
15 A   I already said I did.
16 Q   Who sued whom in that other case?
17 A   No. I already told you about this case. This
18     is the counter claims.
19 Q   Oh. So you were just referring to the earlier
20     cases that you had testified, to the San Diego
21     Superior Court case, and the bankruptcy case; is
22     that what you are referring to?
23 A   Well, the San Diego Superior Court case still
24     has certain matters pending. Some are
25     completed. Some are not.

Page 51

1  Q   Were you deposed in the lawsuit Jarrow Formulas
2      brought against Cynthia Harf?
3  A   I don't think so, oddly enough. I have no
4      memory of it at all.
5  Q   Did you testify at trial in that case?
6  A   Yes.
7  Q   Who was your attorney in that case?
8  A   My general counsel.
9  Q   What was his name?
10 A   Neal, N-E-A-L, T. Wiener, W-I-E-N-E-R.
11 Q   Does he work -- is he on Jarrow Formulas'
12     payroll?
13 A   No.
14 Q   So, is he outside general counsel?
15 A   Yes.
16 Q   So he has his own law practice apart from Jarrow
17     Formulas; is that correct?
18 A   Yes, it's correct.
19 Q   Do you recall who represented Ms. Harf?
20 A   No.
21         MR. ORDER: Did you want to take a
22     break, Mr. Wiechmann?
23         MR. WIECHMANN: Yes.
24         MR. ORDER: This is a good time.
25         VIDEOGRAPHER: We will go off record

Page 52

1      at 11:24.
2          VIDEOGRAPHER: We are back on the
3      record at 11:51.
4          MR. WIECHMANN: Before we begin,
5      Mr. Order, during the break, while
6      Mr. Rogovin does believe that the breach of
7      contract case, which is 11 years old, deals
8      with him personally is irrelevant, he is
9      willing to answer at least some of the
10     limited questions you propounded concerning
11     his attorney, and what was the ultimate
12     resolution of the suit.
13 BY MR. ORDER:
14 Q   Okay. So, as I recall, that class action that
15     you brought was named Jarrow Rogovin versus
16     Southwest Lease; correct?
17 A   More or less.
18 Q   And who was the attorney representing you?
19 A   Neal Wiener.
20 Q   What was the resolution of that case?
21 A   They changed their contracts. And the case was
22     ultimately dismissed.
23 Q   Was that a settlement?
24 A   No.
25 Q   Well, who won?

Page 53

1          MR. WIECHMANN: Object as to form.
2          THE WITNESS: In a sense, nobody. The
3      ultimate issue was never litigated.
4  BY MR. ORDER:
5  Q   Did you receive any money as a result of the
6      dismissal of that case?
7  A   Yes -- I think I -- I will answer that. But I
8      want to cut it off after that. I answered the
9      contracts were changed. The case was ultimately
10     dismissed. No, I didn't receive money. Again,
11     this was a personal matter, not corporate. And
12     I think this is really far afield. And I think
13     it's very inappropriate to go into a personal
14     case 11, 12 years old.
15 Q   You just said I can ask questions about --
16 A   About my automobile sir. It's enough.
17 Q   So, you had leased an automobile from Southwest
18     Lease, is that correct?
19 A   I don't think there is any more to be said.
20         MR. ORDER: Well, then I don't know
21     why we just wasted this time,
22     Mr. Wiechmann.
23         THE WITNESS: I think, actually, it's
24     implied in --
25         MR. ORDER: Let's move on.

14 (Pages 50 to 53)

Page 54

1    MR. WIECHMANN: Just --
2    MR. ORDER: Let's move on if you're
3    not going to answer the questions.
4    MR. WIECHMANN: Just for the
5    foundation. It was based on a lease for a
6    car that you got from Southwest Lease;
7    right, the case?
8    THE WITNESS: Yes.
9    MR. WIECHMANN: Fine. Then move on.
10   THE WITNESS: And they changed their
11   contracts. I think that's enough.
12   MR. ORDER: I would mike to have the
13   reporter mark as Exhibit Number 1 a
14   document bearing the Bates stamp of D786
15   through D800 the first page of which is
16   letter dated February 4th, 1998 from Jarrow
17   Rogovin to Norman H. Zivin.
18       (Exhibit 1, letter, February 4, 1998,
         marked for identification)
19
20   BY MR. ORDER:
21   Q  Mr. Rogovin, I would like to show what has been
22      marked as Exhibit 1 and ask that you review it,
23      please.
24   A  Yes.
25   Q  Did you write the first page of Exhibit 1?

Page 55

1    A  Yes.
2    Q  Did you write it in the regular course of
3       business?
4    A  Yes.
5    Q  Was the regular course of your business to write
6       a letter of this nature?
7        MR. WIECHMANN: If you can't answer it
8        and you don't understand it, you can't. If
9        you can, try.
10       THE WITNESS: I think your prior
11       question answered the question
12       appropriately.
13   BY MR. ORDER:
14   Q  So, is your answer to the second question yes
15      also?
16   A  I think the second is trying to characterize
17      whatever. I don't know. I don't understand the
18      point of the second question.
19       MR. WIECHMANN: He's trying to
20       establish whether this a business record;
21       whether you wrote this in connection --
22       MR. ORDER: Mr. Wiechmann, really. Is
23       that an objection?
24       MR. WIECHMANN: I object. It's
25       confusing. He does not understand it

Page 56

1    because the way he just asked the question
2    to you, which you did not answer. I
3    apologize. I tried to answer it.
4    BY MR. ORDER:
5    Q  Did you write this document on or about February
6       4th, 1998?
7    A  Yes.
8    Q  Did you sign this letter?
9    A  Yes.
10   Q  Attached to this letter is there the
11      complaint -- a copy of the complaint in the case
12      that you brought on behalf of Jarrow Formulas
13      against Cynthia Harf?
14   A  Incorrect.
15   Q  What is attached to this letter that you sent to
16      Mr. Zivin?
17   A  A copy of complaint Jarrow Formulas brought.
18   Q  Okay. Against Cynthia Harf; right?
19   A  Correct.
20       MR. WIECHMANN: I object. The
21       document speaks for itself. Cynthia Harf
22       and several other people.
23       MR. ORDER: I didn't say exclusively
24       Cynthia Harf. If you want to object as to
25       form, please just state your objection and

Page 57

1    we will move on.
2        THE WITNESS: It states that --
3        MR. ORDER: Let's move on. There is
4        no pending question, Mr. Rogovin. May I
5        continue?
6        MR. WIECHMANN: May I have my
7        objection as to form. No foundation.
8        THE WITNESS: And it's also --
9    BY MR. ORDER:
10   Q  Are you familiar --
11   A  Excuse me. I need to correct my answer.
12   Q  No. There is no pending question.
13       MR. WIECHMANN: There is no question
14       now.
15   BY MR. ORDER:
16   Q  Did you say you have to correct some of your
17      testimony?
18   A  Yes.
19   Q  Okay. What do you have to correct?
20   A  It states Jarrow Formulas Inc. and Natren Inc.
21      brought this lawsuit. I did not bring this on
22      behalf of my corporation as I understand the
23      term -- as I would understand the phrase. My
24      corporation brought it. And Natren Inc. brought
25      it.

15 (Pages 54 to 57)