Page 58

1  Q  Okay. Well, let's turn to page eight of the
2     attached complaint, which is Bates stamped D794.
3     Is that a verification that you signed that was
4     attached to the complaint?
5  A  Yes.
6  Q  And in that verification does it say, quote, "I
7     am the president of Jarrow Formulas" -- well, I
8     will have you read it. Read what the
9     verification says. Can you read that out loud,
10    please?
11 A  Yes. "Verification. State of California.
12    County of Los Angeles. I, the undersigned
13    declare, I am the president of Jarrow Formulas,
14    Inc. the Plaintiff in the above entitled action,
15    and am authorized to make this verification for
16    and on its behalf. I have read the foregoing
17    first amended verified complaint for malicious
18    prosecution and know the contents thereof. The
19    same is true of my own knowledge, except as to
20    the matters which are therein stated upon my
21    information and belief. And as to those matters
22    I believe it to be true. Executed on December
23    4, 1997 at Los Angeles, California. I declare
24    under penalty of perjury under the laws of
25    California, the State of California that the

Page 59

1     foregoing is true and correct." And my name is
2     printed, and my signature is affixed.
3  Q  Did Natren attach a verification to this
4     complaint?
5  A  I don't have the original court records in front
6     of me.
7  Q  Well, do you recall whether they did?
8  A  I do not recall.
9  Q  Did you verify this complaint from Natren also?
10 A  What?
11 Q  Well, you verified this complaint on behalf of
12    Jarrow Formulas, Inc.; correct?
13 A  Correct.
14 Q  Did you also verify it for, or on behalf of
15    Natren Inc.?
16 A  How could I do that?
17 Q  Can you just answer me yes or no?
18 A  Of course not. I'm not an officer of Natren.
19 Q  Did Natren have separate counsel?
20 A  No.
21 Q  So, both Natren and Jarrow Formulas was
22    represented by Neal Wiener in this case;
23    correct?
24 A  It's pronounced Wiener. And, correct.
25 Q  Getting back to the first page of Exhibit 1, can

Page 60

1     you read the second paragraph out loud, please?
2  A  "Enclosed is a copy of the lawsuit we filed
3     against Cynthia Harf, Esquire for malicious
4     prosecution. Harf was served on January 12.
5     She, too, considers Jarrow's threats "hollow".
6     -- that's quoting Mr. Zivin from the previous
7     paragraph -- "To quote Bob Dylan; "When will
8     they ever learn."
9  Q  Did you consider the lawsuit that Jarrow
10    Formulas was bringing against Cynthia Harf an
11    attempt to teach her a lesson?
12 A  It was an attempt to get back the considerable
13    amount of money and time that she caused to be
14    wasted. And that motion ultimately is still
15    pending.
16 Q  Well, it's not pending against Cynthia Harf, is
17    it?
18 A  Her clients.
19 Q  But not against Cynthia Harf; correct?
20 A  No.
21 Q  And when you say that motion is still pending,
22    that's in a different lawsuit, not the one that
23    is attached to your cover letter; correct?
24 A  Correct.
25 Q  Was the purpose of this letter -- was the reason

Page 61

1     that you were sending this letter to Mr. Zivin
2     to scare him and his clients into withdrawing
3     their complaint against Jarrow Formulas -- or,
4     rather International Nutrition's complaint
5     against, among others, Jarrow Formulas in the
6     District of Connecticut case?
7        MR. WIECHMANN: Object as to form.
8     You can answer.
9        THE WITNESS: I would use the verb
10    persuade.
11 BY MR. ORDER:
12 Q  Well, Mr. Zivin was saying that Jarrow Formulas
13    was making hollow threats; correct? And that's
14    what you are responding to here; correct?
15       MR. WIECHMANN: Object as to form.
16 BY MR. ORDER:
17 Q  Is that correct?
18       MR. WIECHMANN: You can answer.
19       THE WITNESS: Okay. Mr. Zivin had
20    written we were making, quote, "hollow
21    threats and spurious allegations," close
22    quote. And Jarrow Formulas responded to
23    that.
24 BY MR. ORDER:
25 Q  And had Jarrow Formulas made threats to Cynthia

Page 62

1  Harf?
2       MR. WIECHMANN: Object as to form.
3       THE WITNESS: I will stand by my
4  counsel's objection.
5       MR. WIECHMANN: No. No. I have to
6  put an objection on the record. I will
7  tell you if I think you shouldn't answer
8  you answer. But you can answer.
9       THE WITNESS: I don't know what you
10  mean by threats.
11 BY MR. ORDER:
12 Q  Well, let's use your own words. Let's look at
13    the second paragraph. Didn't you say, "She too
14    considered Jarrow's threats, quote, "hollow,"?
15 A  If you mean threat to sue? Yes. I stated
16    promise I would sue.
17 Q  Well, you used the word threats there, not
18    promise; right?
19 A  In the sense that prior to litigation people
20    threaten lawsuit, yes.
21 Q  And did you threaten Mr. Zivin and his clients
22    with a lawsuit?
23 A  Yes.
24 Q  And you made those threats before February 4th,
25    1998; isn't that true?

Page 63

1  A  I threatened the lawsuit before that date, yes.
2  Q  And you threatened Mr. Zivin and International
3     Nutrition Company and Egbert Schwitter and Jack
4     Masquelier with a lawsuit repeatedly before
5     February 4th, 1998; isn't that correct?
6        MR. WIECHMANN: Object as to form.
7     Compound.
8        THE WITNESS: Certainly, through
9     counsel for the underlying case the parties
10    were aware that Jarrow Formulas intended to
11    file this suit.
12 BY MR. ORDER:
13 Q  And you made those threats repeatedly before
14    February 4th, 1998; isn't that true?
15 A  They were informed repeatedly that we would file
16    this suit.
17 Q  And by this suit, you mean the suit that we are
18    currently litigating and that brings you here
19    today; is that correct?
20 A  Correct.
21 Q  And in the cc area of the letter you identify
22    Mark Giaratana, Esquire. And he was your
23    attorney in the case pending in the District of
24    Connecticut brought by International Nutrition
25    Company; correct?

Page 64

1  A  Correct.
2  Q  And who is P. Scott Polisky, Esquire?
3  A  Co-counsel. Same suit.
4  Q  And where was his office located?
5  A  He's in New York.
6  Q  And, of course, Neal Wiener you cc'ed also. And
7     he was your general counsel in Los Angeles;
8     correct?
9  A  And he also had some legal work on the
10    underlying case, as well.
11 Q  So, you were represented by counsel in the INC
12    case in the District of Connecticut; correct?
13 A  Correct.
14 Q  And why were you writing to Mr. Zivin --
15    Attorney Zivin if you were represented by
16    counsel?
17 A  Why?
18 Q  Yes.
19 A  I'm really not sure what kind of why -- what why
20    is supposed to mean.
21 Q  Well, weren't you --
22 A  It's a very, very strange question.
23 Q  Oh, it is, is it? Then let me try this
24    question.
25 A  Why did Mr. Zivin write what he did? Why did

Page 65

1     your people file this lawsuit -- the underlying
2     lawsuit?
3  Q  Are you done?
4  A  Well, can you please explain what you mean by
5     why?
6  Q  Let me ask you this question. You had contacted
7     Mr. Zivin numerous times before February 4th,
8     1998; isn't that correct?
9  A  I don't understand the word numerous.
10 Q  More than once.
11 A  Yes.
12 Q  And, in fact, you contacted him at the very
13    beginning of the case that was brought by INC in
14    the District of Connecticut in late winter early
15    spring of 1996; isn't that correct?
16 A  Yes.
17 Q  And didn't Mr. Zivin tell you that since you
18    were represented by counsel that you should not
19    be contacting him?
20 A  Not at that point.
21 Q  Well, at some point prior to February 4, 1998 he
22    told you that, didn't he?
23 A  No, I don't remember.
24 Q  Did your own counsel tell you not to contact him
25    directly?

Page 66

1    MR. WIECHMANN: Object as to form.
2    Seeks attorney-client communications. I
3    instruct him not to answer.
4  BY MR. ORDER:
5  Q   If Mr. Zivin had told you prior to February 4th,
6      1998, as you say he did, that you should not be
7      contacting him, why did --
8  A   I didn't say that.
9    MR. WIECHMANN: Let him finish.
10 BY MR. ORDER:
11 Q   Okay. Then let's go back over that. Did
12     Mr. Zivin at any time tell you not to contact
13     him?
14 A   I already told you I don't remember that.
15 Q   Well, Mr. Rogovin, you have been involved in a
16     number of litigations, as we have learned
17     today. Did you ever learn in your experience
18     that once a party is represented, a lawyer for
19     the opposing side cannot communicate with that
20     party directly without the knowledge, or outside
21     the presence of that party's attorney?
22     MR. WIECHMANN: Object as to form.
23     THE WITNESS: That opposing counsel
24     cannot contact the party, yes. That
25     doesn't prevent the counsel from responding

Page 67

1      to party's counsel, nor the party from
2      contacting the counsel.
3  BY MR. ORDER:
4  Q   And what do you base that on?
5  A   Well, that is the law. It's the -- it's what
6      the Bar regs say. The bar regs prohibit only
7      the lawyer contacting the party.
8  Q   Well, what did you mean to accomplish by
9      sending Mr. Zivin this letter?
10     MR. WIECHMANN: Object. Asked and
11     answered. You can answer.
12     THE WITNESS: Same question. Same
13     answer. To persuade him to drop a
14     malicious lawsuit.
15 BY MR. ORDER:
16 Q   You were basically telling Mr. Zivin in this
17     letter that if he didn't drop the lawsuit that
18     you would sue both him and his client; isn't
19     that correct?
20 A   Correct.
21     MR. WIECHMANN: Object as to form.
22     THE WITNESS: Correct.
23 BY MR. ORDER:
24 Q   Other than Cynthia Harf and Attorney Zivin, are
25     there any other attorneys that you have ever

Page 68

1      sued, or have -- let's leave it that way, that
2      you personally have ever sued?
3  A   No.
4  Q   Other than Attorney Zivin and Attorney Harf, are
5      there any other attorneys that Jarrow Formulas,
6      or any of its affiliated companies ever sued?
7  A   Yes.
8  Q   Who are those?
9  A   A guy named Verick, V-E-R-I-C-K. Nicholas
10     Browning and Mark Brutzkus. And William Verick.
11 Q   Was that all in the same lawsuit, or is --
12 A   No.
13 Q   - or is it three separate --
14 A   No.
15 Q   Is it three separate lawsuits?
16 A   Correct.
17 Q   And who was the plaintiff in each of those
18     lawsuits?
19 A   Jarrow Formulas, Inc.
20 Q   Let's take the lawsuit that Jarrow Formulas
21     brought against William Verick. When was that
22     brought?
23 A   '97, '98.
24 Q   And what did Jarrow Formulas claim in that case?
25 A   Verick served what is called a Prop 65 notice on

Page 69

1      Jarrow Formulas with no evidence. And loudly
2      threatened in the press to sue us for violating
3      California Prop 65 statute and that we were
4      selling contam -- pesticide -- chemical --
5      chemically contaminated fish oils. And he had
6      performed no tests on our product at all. And
7      we did two and a half thousand dollars worth of
8      the tests, additional to the tests we had from
9      the supplier, showing there were no
10     contaminants. And asked that we would be
11     reimbursed our fees -- lab fees and a little bit
12     of legal fees. He refused. I sued in small
13     claims. The small claims court commissioner
14     ruled in Jarrow Formulas' favor, stating that
15     Mr. Verick was unprofessional, immature,
16     unethical, and that it was unconscionable that
17     he had not voluntarily reimbursed the cost he
18     had cost us. He appealed. He took it to -- in
19     effect, trial de novo municipal court. We took
20     the position that a Prop 65 notice is a
21     functional equivalent of a lawsuit. We perhaps
22     should have had an abuse of process. But,
23     anyway, the court ruled that since it was not an
24     actual lawsuit, the judge wrote on his ruling,
25     "An unfortunate result, but judgment for the

Page 70

1    appellant."
2  Q  For Attorney Verick; right?
3  A  Right. But I found it interesting that the
4     judge wrote on the judgment, "An unfortunate
5     result."
6  Q  And again, how much was at stake; you said
7     $2,500?
8  A  Actually $5,000 was the total.
9  Q  That's including attorneys fees?
10 A  Yes. There was a lot of noise in the press
11    about his bringing the suit.
12 Q  Well, serving the notice; right?
13 A  Well, it caused attorneys fees.
14 Q  Okay. Let's take the suit that Jarrow Formulas
15    brought against Nicholas Browning. When was
16    that commenced?
17 A  Last year. Small claims. $5,000.
18 Q  And what small claims court is this?
19 A  In Los Angeles.
20 Q  Is there only one small claims court in Los
21    Angeles?
22 A  Maybe West LA.
23 Q  By the way, where was the small claims brought
24    in --
25 A  West LA.

Page 71

1  Q  -- the William Verick case?
2  A  Um-hum.
3  Q  Is that a yes?
4  A  Yes.
5  Q  And then it went up to the superior court in Los
6     Angeles?
7  A  What?
8  Q  The Verick case.
9  A  I already said it did.
10 Q  I'm just trying to --
11        MR. WIECHMANN: You said municipal
12    court.
13 BY MR. ORDER:
14 Q  Municipal. Okay. That's why I asked. To
15    clarify. I had it wrong. And let's get back to
16    the Browning case, the small claims matter was
17    brought last year, the year 2001?
18 A  Yes.
19 Q  Is that still pending?
20 A  No.
21 Q  What happened in that case?
22 A  They sued for patent infringement. We had been
23    their customer. They refused to tell us why
24    they sued us. We refused to answer the
25    complaint. The federal court issued an OSC race

Page 72

1     sanctions against Nutrition 21 for failure to
2     prosecute. They filed a request for dismissal
3     -- volunteer dismissal. And I demanded the
4     $5,000 in attorney fees it had cost. They
5     refused. I sued.
6  Q  Before you go on, who was the client that Mr.
7     Browning was representing?
8  A  Nutrition 21.
9  Q  And what is it that they claimed Jarrow Formulas
10    was infringing?
11 A  They have a patent.
12 Q  Regarding what?
13 A  Chromium picolinate.
14 Q  I can't hear you.
15 A  Chromium picolinate.
16 Q  And you said that Jarrow Formulas was Nutrition
17    21's customer. What did you buy from Nutrition
18    21?
19 A  Chromium picolinate.
20 Q  And what is chromium picolinate?
21 A  You know, time is ticking. It's a --
22 Q  Can you answer my question?
23 A  It's a mineral. It's a mineral form. It's a
24    mineral salt.
25 Q  Did you just resell that mineral salt, or did

Page 73

1     you use it to formulate a different product.
2        MR. WIECHMANN: It's his time.
3        THE WITNESS: You know, we --
4        MR. WIECHMANN: Just answer his
5     question.
6        THE WITNESS: We put it -- we put it
7     into various -- we put it into, as a matter
8     of fact, various products forms.
9     Basically, we sold it as a stand-alone
10    chromium picolinate product.
11 BY MR. ORDER:
12 Q  And what court was the original suit brought in
13    by Nutrition 21?
14 A  In federal court, Santa Anna.
15 Q  Do you know where Nicholas Browning's office is
16    located?
17 A  Torrance.
18 Q  California? Torrance, California?
19 A  Yes.
20 Q  Did you stop being -- did Jarrow Formulas stop
21    being Nutrition 21's customer at any time?
22 A  After they filed a suit against their own
23    customer, of course.
24 Q  Had you been buying the same product from a
25    different supplier prior to that lawsuit?

Page 74

1  A  No.
2  Q  When was the federal court action brought by
3     Nutrition 21?
4  A  2001 -- 2000.
5  Q  And getting back to William Verick, do you know
6     where his office is located?
7  A  Either one side or the other of the border of
8     Northern California and Oregon. As far as he
9     can get from any pollution. From which he files
10    Prop 65 lawsuits. I'm not sure if he's right in
11    Portland, or just below. Somewhere up there.
12 Q  Well, Portland is not really near the border of
13    California and Oregon, is it?
14       MR. WIECHMANN: You don't know where
15    he is.
16 BY MR. ORDER:
17 Q  Is he in Portland?
18 A  He flew down to Portland when he had to fly down
19    for the hearings. There's no airport at the
20    Northern California, basically, that's going to
21    get you to LA.
22 Q  What happened to this small claims court case
23    that you brought against Nicholas Browning?
24 A  I guess we brought two causes of action;
25    malicious prosecution and abuse of process. On

Page 75

1     malicious prosecution the court found that since
2     we had not answered, and they had filed a
3     voluntary dismissal, we had not met the element
4     of prevailing in the underlying suit.
5        On the abuse of process, the court found
6     that the ads that they had taken out -- it gets
7     a little involved here -- but, the ads that they
8     taken out to promote the lawsuit.
9  Q  Nutrition 21, you mean?
10 A  Um-hum. Coupled with the press release naming
11    my company. That I had failed to establish that
12    the press release was -- or excuse me, the press
13    report was actually a result of their press
14    release. That if I had shown where that press
15    report had come from -- that not having shown
16    where the press report had come from, albeit it
17    was -- well, anyway. That account was denied
18    also.
19 Q  So, that small claims case is over?
20 A  Um-hum.
21 Q  I'm sorry. You have to say yes or no.
22 A  Yes.
23 Q  And I'm sorry about the timing. I didn't
24    realize you were taking some water.
25 A  That's okay.

Page 76

1  Q  Now, the lawsuit against Mark Brutzkus, when --
2     how do you spell his last name?
3  A  B-R-U-T-Z-K-U-S.
4  Q  When did Jarrow Formulas bring that suit?
5  A  Maybe six months ago.
6  Q  So, sometime in mid 2001?
7  A  Yes.
8  Q  And what court did Jarrow Formulas bring that
9     suit in?
10 A  Superior court, Santa Monica.
11 Q  And how much are you claiming in that lawsuit?
12 A  According to proof.
13 Q  Is there a jurisdictional minimum to file in
14    superior court in Santa Monica?
15 A  Over $25,000.
16 Q  And had Attorney Brutzkus brought a lawsuit
17    against Jarrow Formulas?
18 A  Yes.
19 Q  Who were his clients in that lawsuit?
20 A  Sandra Hogan-LaMarche. Hogan hyphen
21    L-A-M-A-R-C-H-E.
22 Q  Was that his only client in that case?
23 A  Yes.
24 Q  And she brought a suit against Jarrow Formulas?
25 A  Yes.

Page 77

1  Q  Any other defendants in that case?
2  A  No.
3  Q  And what was the nature of the suit she brought
4     against Jarrow Formulas?
5  A  Supposedly called slander of title. In effect,
6     interference with business relation -- with a
7     business relation, or relationship.
8     Interference with a business relationship.
9  Q  Was there a particular product involved in that
10    lawsuit?
11 A  Art work.
12 Q  Art work?
13 A  Graphic arts -- well, hold on. In that lawsuit?
14    Actually, it was a videotape. She's a graphic
15    artist. But she was claiming loss of a
16    videotape deal.
17 Q  And what happened in the Sandra -- in the case
18    that Sandra Hogan-LaMarche brought against
19    Jarrow Formulas, Inc.?
20 A  The president for the company that she claimed
21    to have lost business from gave a deposition
22    stating that she never had the business. He
23    never had any interest in the business. And it
24    wasn't true in any respect; her claim that I had
25    caused her to lose business with him. We filed

20 (Pages 74 to 77)

Page 78

1  a motion for summary judgment. It was granted.
2  And we brought an action against her and her
3  lawyer.
4  Q  When did she bring the lawsuit?
5  A  It may have been several years ago.
6  Q  1998, 1997?
7  A  Perhaps '97.
8  Q  What claims have you made in the lawsuit against
9     Mark Brutzkus?
10 A  Malicious prosecution.
11 Q  Is Sandra Hogan-LaMarche a defendant in that
12    lawsuit also?
13 A  Yes.
14 Q  Have you made any other claims besides malicious
15    prosecution in that case?
16 A  No.
17 Q  Is that case still pending?
18 A  Yes. I will say they made a motion for
19    dismissal that was denied.
20 Q  So, with respect to attorneys, you have sued
21    Cynthia Harf, William Verick -- I'm sorry, you
22    or -- let me restate the question.
23       With respect to attorneys, Jarrow Formulas,
24    Inc. has sued Cynthia Harf, William Verick,
25    Nicholas Browning, Mark Brutzkus and Norman

Page 79

1  Zivin; is that correct?
2       MR. WIECHMANN: Object as to form.
3  Confusing as to what you mean by attorneys.
4  The first ones you mentioned were acting in
5  their capacity as attorneys. The last one
6  was not. I want to make it clear on the
7  record. This case --
8       MR. ORDER: I have no clue what you
9  are talking about.
10      MR. WIECHMANN: Mr. Zivin is not being
11 sued as an attorney. He is being sued as a
12 part -- an extra attorney conduct as a part
13 of the conduct that leads to this lawsuit,
14 on the monopolization of the market.
15      MR. ORDER: Well, as far as I'm
16 concerned, the question was very clear.
17 Mr. Zivin is an attorney. That was my
18 question.
19 BY MR. ORDER:
20 Q  And these are attorneys that Jarrow Formulas has
21    sued; isn't that correct?
22 A  In the context of your restated question, yes.
23 Q  Are there any other attorneys, people who are
24    attorneys, admitted to practice at law, that
25    Jarrow Formulas has sued that you have not

Page 80

1  already testified about?
2  A  No.
3  Q  Do you know where Attorney Brutzkus's office is
4     located?
5  A  In Encino, I think.
6  Q  Encino, California?
7  A  Yes.
8  Q  Do you know whether he is with a firm, or is he
9     a solo practitioner?
10 A  I don't know.
11 Q  Now, before Jarrow Formulas sued Cynthia Harf,
12    did you write any letters to her threatening her
13    with a lawsuit?
14 A  I'm not going to go into that.
15 Q  Yes you are. Can you answer it, please?
16      MR. WIECHMANN: I would like to take a
17 break at this stage.
18      MR. ORDER: There's a pending --
19      MR. WIECHMAN: And he doesn't want
20 answer. And we are taking a break.
21      MR. ORDER: I object to that.
22      THE WITNESS: Well, we can have an
23 minute.
24      (Off record at 12:31 p.m.)
25      VIDEOGRAPHER: We are back on the

Page 81

1  record at 12:40 p.m.
2       MR. WIECHMANN: There was a question
3  pending when we took a break. I would ask
4  the court reporter to read back that
5  question, please.
6       (* Question: "Before Jarrow Formulas
7  sued Cynthia Harf, did you write any
8  letters to her threatening her with a
9  lawsuit?")
10      THE WITNESS: Yes.
11 BY MR. ORDER:
12 Q  Before Jarrow Formulas sued William Verick did
13    you write letters to him threatening a lawsuit?
14 A  I demanded that he reimburse us. Actually, I
15    would say both letters contained demands for
16    reimbursement for attorneys fees.
17 Q  And coupled with those demands for
18    reimbursements, did you also state that if your
19    demands were not met that you, or Jarrow
20    Formulas, would bring a lawsuit against those
21    attorneys?
22 A  Yes.
23 Q  Did you write to Nicholas Browning before
24    bringing a lawsuit against him?
25 A  I can't remember.

Page 82

1  Q  Did you call Nicholas Browning before suing him?
2  A  With my attorney we called to find out why we
3     had been -- my company had been sued. He
4     couldn't answer.
5  Q  And do you recall -- do you now recall whether
6     you wrote to him following up on that phone
7     call?
8  A  I tend to think not. I think Mr. Wiener,
9     certainly, wrote a number of letters trying to
10    find out why his client had been sued.
11 Q  Well, do you definitely remember not writing to
12    Mr. Browning?
13 A  I think I have answered it to the best of my
14    ability.
15 Q  Well, you said that you don't recall whether you
16    did write to him. What I'm asking is, whether
17    you feel confident that you did not write to
18    him?
19        MR. WIECHMANN: Object as to form.
20 BY MR. ORDER:
21 Q  There is a slight nuance there. And I would
22    like to have my second question answered.
23 A  I gave as nuanced an answer as I feel honestly
24    comfortable in giving. I'm under oath.
25 Q  So, your testimony is you have no idea whether

Page 83

1     you wrote to him -- wrote to Nicholas Browning
2     before suing him; is that correct?
3  A  It's what my company was -- it's what my
4     testimony was.
5  Q  What I'm asking you is --
6  A  If that's what I said, yes.
7  Q  -- you have no idea --
8  A  I said I have no recollection. Third or fourth
9     time.
10 Q  Did you write to Mark Brutzkus before suing him?
11 A  I don't remember. I don't think so.
12 Q  Why don't you think so?
13 A  I don't remember doing one.
14 Q  Did you communicate with Attorney Brutzkus in
15    any way before suing him?
16 A  In any way?
17 Q  Yes. You said that you don't recall writing a
18    letter to him.
19 A  Well, what --
20 Q  But did you communicate with him other than in
21    writing before suing him? In other words, did
22    you speak to him orally before suing him?
23 A  Well, there was, for instance, mediation.
24 Q  Did you speak to Attorney Brutzkus -- there was
25    mediation, what, of the underlying lawsuit?

Page 84

1  A  Yes.
2  Q  You didn't try to mediate the malicious
3     prosecution action that you eventually brought
4     against him before bringing it against him, did
5     you?
6  A  No.
7  Q  So, did you speak --
8  A  Well, no. That kind of came up -- well, I can't
9     get into it. The mediation is confidential. I
10    can't get into it.
11 Q  Did you --
12 A  There was communication and mediation.
13 Q  Before suing Attorney Brutzkus did you tell him
14    that you were going to sue him if he did not do
15    something?
16 A  He was told he was going to get sued for the
17    underlying suit.
18 Q  Did you tell him that?
19 A  By me.
20 Q  Was that in person or over the telephone?
21 A  In person.
22 Q  And you told him that he -- did you tell him
23    that you or Jarrow Formulas would sue him if he
24    did not drop his lawsuit?
25        MR. WIECHMANN: Object as to form.

Page 85

1     It's multiple. If you just meant Jarrow
2     Formulas, that's fine. But you keep saying
3     you or Jarrow Formulas.
4        MR. ORDER: Yes. So, what is the
5     problem?
6        MR. WIECHMANN: That's two different
7     questions. If he says yes and it was only
8     to one of them it's an unclear question.
9        MR. ORDER: Then I will follow up and
10    make it clear.
11 BY MR. ORDER:
12 Q  Go ahead.
13        MR. WIECHMANN: Object.
14        THE WITNESS: Please ask the question.
15 BY MR. ORDER:
16 Q  Did you tell Attorney Brutzkus that Jarrow
17    Formulas would sue him if he did not drop the
18    lawsuit he had brought on behalf of Sandra
19    Hogan-LaMarche?
20 A  No. Mr. Brutzkus was told he was going to be
21    sued, period.
22 Q  And was he told that he was going to be sued if
23    he did not drop the lawsuit that he had brought
24    against Jarrow Formulas, Inc.?
25        MR. WIECHMANN: Object. Asked and

Page 86

```
 1        answered.
 2             THE WITNESS:  I just answered that.
 3   BY MR. ORDER:
 4   Q  Well, I think it was a different question.
 5   A  Well, you will have to point out what the
 6      difference is.  I didn't hear it.
 7   Q  So, all you did is tell Attorney Brutzkus that
 8      he was going to get sued; right?
 9   A  Correct.
10   Q  And you didn't do that in combination with a
11      request that he do anything?
12   A  One more time; no.
13   Q  Did you have this conversation with Attorney
14      Brutzkus before or after summary judgment was
15      granted in the underlying case?
16   A  Both.
17   Q  And when you spoke to Attorney Brutzkus before
18      summary judgment was granted and the case he had
19      brought was still pending, did you at that time
20      tell him that you or that Jarrow Formulas -- or,
21      he was going to get sued if something didn't
22      happen?
23   A  Again fifth, sixth time, no.
24   Q  So, you just said to him -- why were you telling
25      him that?
```

Page 87

```
 1   A  I can't answer why -- why?  Because he was going
 2      to get sued.  I mean, it was a promise.
 3   Q  And did you explain to him --
 4   A  I mean, he knew his client was lying.  He was
 5      lying.  I mean he made statements like, "I will
 6      do anything for my client," in such a way, in
 7      such a context, to my attorney, it was very
 8      clear that he had no concern about the truth or
 9      validity of what he was doing.
10   Q  So, prior to the grant of summary judgment in
11      the Sandra Hogan-LaMarche case, was it your
12      intention to sue Attorney Brutzkus regardless of
13      whether he withdraw that case?
14   A  There was never a question of him withdrawing
15      the case.  He absolutely would never have done
16      so.
17   Q  So, you never asked him to do so; is that
18      correct?
19   A  That was not the purpose of his filing that
20      case.  He had no interest in whether there was
21      any legitimacy to the case.  He was not going to
22      withdraw it.
23   Q  Did you ever write to --
24   A  It's all so speculative.
25   Q  Did you also write to any other attorneys, other
```

Page 88

```
 1      than the five that you have sued, or that Jarrow
 2      Formulas has sued, demanding that they withdraw
 3      a lawsuit against Jarrow Formulas?
 4   A  Yes.
 5   Q  Name those lawyers.
 6   A  I don't necessarily remember.  But there are
 7      times that's happened.
 8   Q  How many attorneys did you write to demanding
 9      that they drop the lawsuit other than the five
10      that have already been identified?
11   A  I don't remember.
12   Q  Do you recall approximately?
13   A  No.
14   Q  Was it more than one?
15   A  Yes.
16   Q  Was it more than half a dozen?
17   A  Probably not.
18   Q  So somewhere between one and six lawyers you
19      wrote -- actually, somewhere between two and six
20      lawyers you wrote to threatening to sue them
21      other than the five you have identified?
22   A  I wouldn't say necessarily threatening to sue.
23      They have been written by me to resolve legal
24      disputes.  May have even been over six.  I'm 26
25      years in business.
```

Page 89

```
 1   Q  And in those instances in which you wrote to
 2      attorneys demanding that they resolve pending
 3      lawsuits and in which you did not ultimately --
 4      or, Jarrow Formulas did not ultimately end up
 5      suing them, in those instances were those cases
 6      resolved?
 7   A  It's really open-ended.  I can't say answer
 8      that.
 9   Q  It's not open-ended at all.  You just told me
10      that there were lawyers other than the five that
11      you have already testified about --
12   A  Um-hum.
13   Q  -- whom you had sent letters to demanding
14      resolution of pending lawsuits.  My question is,
15      in those instances were those lawsuits resolved?
16   A  Or legal disputes.
17   Q  Or legal disputes.  Were they resolved to your
18      satisfaction?
19   A  It would require my going through a 26 year
20      career -- some things extremely minor, some
21      things less minor -- and trying to recall what
22      happened.  I will say that Jarrow Formulas has
23      never paid a judgment.
24   Q  That wasn't my question.
25   A  Jarrow Formulas has never had a judgment against
```

Page 90

1  it. Well, you say were they resolved? Yes. I
2  mean, this is a way of answering your question,
3  sir. There have been tr -- you know,
4  intellectual property challenges going both
5  ways; disputes over bills; potential product
6  liability. I mean, all kinds of things. This
7  is 26 years.
8  Q  Well, --
9  A  And the answer is, yeah, most of it just goes
10    away.
11 Q  Instead of focusing on instances where you wrote
12    to attorneys seeking just to settle or resolve a
13    case, let's focus on letters that you wrote to
14    attorneys, other than the five you have already
15    testified about, where you told them that you
16    would sue them. How many times -- in how many
17    instances --
18 A  I can think of one other -- at this time I can
19    think of one other.
20 Q  Okay. Who was that attorney?
21 A  Don't remember his name. I remember the --
22    actually, did I? I don't know if I wrote him,
23    or my attorney. I can't remember. There were
24    letters.
25 Q  And by your attorney, do you mean Neal Wiener?

Page 91

1  A  Yes. And by my attorney I mean our
2    corporation's attorney.
3  Q  And why did you threaten to sue that attorney?
4  A  They had filed suit against us and done a press
5    release.
6  Q  By us, do you mean Jarrow Formulas?
7  A  Against Jarrow Formulas. Corporate us, yes.
8  Q  And what were the claims in the lawsuit?
9  A  Patent infringement.
10 Q  And what was the product -- what was the patent
11    that was involved?
12 A  Combining inositol with IP6, or phytic acid.
13    P-H-Y-T-I-C.
14 Q  And who was the plaintiff in the lawsuit?
15 A  Enzomatic Therapy, and a fellow named
16    Shamsuddin, S-H-A-M-S-U-D-D-I-N. A professor at
17    the University of Maryland.
18 Q  And that was his last name, Shamsuddin?
19 A  Um-hum.
20 Q  Was that a yes? You have to say yes or no for
21    the court reporter.
22 A  Yes.
23 Q  And he was a co-plaintiff in the case?
24 A  I said and.
25 Q  And who else was sued - was anybody else sued

Page 92

1    besides Jarrow Formulas?
2  A  Yes.
3  Q  Who else?
4  A  I don't remember.
5  Q  Were you personally sued?
6  A  No.
7  Q  What court was that brought in?
8  A  Federal court in Maryland.
9  Q  Do you recall the city?
10 A  I would guess Baltimore. I wouldn't be sure.
11 Q  What year was that suit initiated?
12 A  A couple years ago.
13 Q  So, 1998, 1999?
14 A  I can't remember. '98, '99. '97. '98, '99, I
15    think.
16 Q  Is that case still pending?
17 A  No.
18 Q  How was it resolved?
19 A  They dismissed and paid me.
20 Q  The plaintiffs --
21 A  I'm sorry. They dismissed and paid Jarrow
22    Formulas a settlement.
23 Q  And was their lawyer located in Maryland?
24 A  I believe Washington D.C.
25 Q  Was he with a law firm?

Page 93

1  A  You know, that flurry was over in about two
2    weeks. There's not a lot of detail available.
3  Q  Okay. But my question is, was he with a law
4    firm?
5  A  I don't know.
6  Q  Okay. Did you have an attorney in that case?
7  A  Yes. Neal Wiener.
8  Q  Did you have local counsel in that case?
9  A  We filed no appearance. As I said, we were
10    dismissed. They paid us.
11 Q  And the dismissal occurred within two weeks of
12    the filing?
13 A  About that, yes. It was pretty fast.
14 Q  How much did they pay you?
15 A  Confidential.
16 Q  Is it confidential because the settlement
17    was --
18 A  It's in the --
19 Q  -- one of the attorneys --
20 A  Yes. It's covered by a confidentiality
21    agreement.
22 Q  Do you now remember the name of the attorney --
23 A  No.
24 Q  -- that represented Enzomatic Therapy?
25    MR. WIECHMANN: Let him finish his

24 (Pages 90 to 93)

Page 94

```
 1        question.
 2            THE WITNESS: No.
 3   BY MR. ORDER:
 4   Q   Do you recall any other instance in which you
 5       wrote a letter or communicated -- or, otherwise
 6       communicated with an attorney who had brought a
 7       lawsuit against Jarrow Formulas in which you
 8       demanded that the attorney drop the lawsuit?
 9   A   No. I mean were there other -- you mean --
10       well, --
11            MR. WIECHMANN: If you --
12            THE WITNESS: -- actually, there's one
13       other.
14            MR. WIECHMANN: Okay.
15   BY MR. ORDER:
16   Q   Who was the attorney?
17   A   Absolutely no memory at all.
18   Q   But you recall writing to the attorney?
19   A   Yes.
20   Q   Was it a male or female attorney?
21   A   Male.
22   Q   And do you recall who the attorney represented?
23   A   It may have been a very large class of people.
24   Q   Meaning what?
25   A   Large number of people.
```

Page 95

```
 1   Q   Do you remember, was there any type of
 2       commonality among that class of people?
 3   A   These are people that had been injured by
 4       tryptophan produced by Showa Denko, S-H-O-W-A,
 5       D-E-N-K-O, two words -- two names.
 6   Q   So was this a class action?
 7   A   I don't remember.
 8   Q   Was Jarrow Formulas a defendant?
 9   A   We were named.
10   Q   Was there more than one defendant?
11   A   Numerous, as I remember it.
12   Q   Where was that case brought?
13   A   Somewhere back east. It --
14   Q   Do you know --
15   A   Somewhere back east. We were dismissed. Okay,
16       to cut to the chase, we were dismissed. And we
17       had not sold Showa Denko tryptophan. Basically,
18       that had to be established by Showa Denko. We
19       had far more problems with Showa Denko than we
20       did with opposing counsel. Because it was
21       getting Showa Denko to produce records. I
22       should say I. Because, basically, I handled it.
23       There was no counsel needed. It was we had been
24       selling tryptophan from Aginomoto,
25       A-G-I-N-O-M-O-T-O. So having established we did
```

Page 96

```
 1       not have Showa Denko tryptophan, it was
 2       dismissed. And this was many years ago.
 3   Q   So, the 1980's?
 4   A   I would think so.
 5   Q   And so you wrote to the lawyer representing the
 6       plaintiffs and ultimately the plaintiffs
 7       withdrew their action against -- or, dismissed
 8       their action against Jarrow Formulas; is that
 9       what happened?
10   A   Yeah. Basically, what happened is that
11       everybody that sold tryptophan was sued. But
12       not everybody had sold Showa Denko tryptophan,
13       so. And we had not sold Showa Denko tryptophan.
14   Q   Are there any other lawsuits in which you or
15       Jarrow Formulas was a party that you have not
16       already testified about?
17   A   Well, I wouldn't talk about me personally. I
18       don't think it's appropriate. And Jarrow
19       Formulas lawsuits?
20   Q   Yes. Either as a plaintiff or a defendant.
21            MR. WIECHMANN: Object as to form.
22            THE WITNESS: Can we go outside?
23            MR. WIECHMANN: It's almost 1:00.
24            THE WITNESS: Two minutes.
25            MR. WIECHMANN: Can you recall any?
```

Page 97

```
 1            THE WITNESS: I can recall, you know,
 2       another case or two, whatever.
 3            MR. WIECHMANN: Just say yes or no.
 4            THE WITNESS: Yes.
 5            MR. WIECHMANN: I may object if it's
 6       -- I mean if it has nothing whatsoever to
 7       do with any issue here, I may object.
 8            THE WITNESS: It doesn't.
 9   BY MR. ORDER:
10   Q   What are the names of the other cases that you
11       recall Jarrow Formulas was a party to?
12   A   I'm not going to get into that. I think there's
13       a certain amount of confidentiality of privacy,
14       even though we are a corporation, we are
15       entitled to. It has nothing to do with patents
16       or other intellectual property matters. And I
17       think that -- you know, I don't want to lay bare
18       for ready public access --
19   Q   Well, it's already public access.
20   A   Well, they got old, they get buried. And I
21       think that's enough.
22   Q   Well, there is a confidentiality order issued in
23       this case. If you have those concerns we can
24       designate this portion of the transcript as
25       confidential pursuant to that stipulation.
```

Page 98

1    MR. WIECHMANN: Well, at the end there
2    are going to be a whole bunch of sections
3    that we are going to designate as just
4    normally confidential. Because I don't
5    think any lawsuits or activities by
6    officers of the corporation should go
7    beyond the confidential area. The highly
8    restricted we might. But at this stage
9    you've gotten beyond this theme of what he
10   did personally. And just any other
11   lawsuit, period, I don't think is
12   acceptable. I mean, I don't think I can go
13   and sue GM and ask for every lawsuit
14   they've ever had. It has nothing to do
15   with anything.
16       MR. ORDER: I'm not having an argument
17   on the record. Is there - are you
18   directing him not to answer?
19       MR. WIECHMANN: Yes. At this stage I
20   will. Because there is not enough
21   foundation to show that this goes way
22   beyond the scope of discovery under rule
23   26.
24       MR. ORDER: Well, you know it's
25   awfully hard to lay a foundation if you

Page 99

1    don't let the man answer any questions.
2        MR. WIECHMANN: You can ask him if
3    cases, as you said, deal with anything
4    dealing with --
5        MR. ORDER: I don't need suggestions.
6        MR. WIECHMANN: Okay. Fine. Then
7    there's no foundation. I think you can ask
8    questions, which you haven't done.
9    Anti-trust --
10       MR. ORDER: I can't even begin to ask
11   questions intelligently if I don't have a
12   reference. So, I ask at least that he
13   could identify the parties to those other
14   two cases so I can refer to them.
15       THE WITNESS: Or more. It's a long
16   business career.
17   BY MR. ORDER:
18   Q   In those two cases that you seem to recall now,
19       was Jarrow Formulas a plaintiff or a defendant?
20   A   I will decline --
21       MR. WIECHMANN: No. Just --
22       THE WITNESS: Physically it's an
23   almost frozen position.
24   BY MR. ORDER:
25   Q   Let's move on.

Page 100

1    A   We have had unfair competition matters we've
2        been involved in. And Prop 65. I'll say that
3        much. And I don't -- and without a very good
4        showing that convinces my counsel that this has
5        any relevance at all, I sincerely ask that we
6        move on.
7    Q   What is Prop 65?
8    A   It's a statute enacted by the voters of
9        California creating two categories of chemicals.
10       One, teratogenic. The other carcinogenic. And
11       the statute provides for warnings -- mandates
12       warnings to the public if exposures of these
13       chemical over certain limits occur. And
14       companies that fail to provide warnings to the
15       public are subject to suit by a private
16       enforcer, or the Attorney General.
17   Q   Have you or Jarrow Formulas been involved in any
18       patent and trademark office proceedings?
19   A   That's very open-ended.
20       MR. WIECHMANN: Again, just object to
21       the term proceeding. So he understands, if
22       you mean apply for patents, challenge
23       patents, file something. Just so he
24       understands.
25   BY MR. ORDER:

Page 101

1    Q   I'm not talking about actually filing for a
2        patent or a trademark. I'm talking about any
3        type of contested proceeding in front of the
4        patent and trademark office?
5    A   Yes.
6    Q   How many of those proceedings have you or Jarrow
7        Formulas been involved in?
8    A   Contested?
9    Q   Yes.
10   A   Two, that I can remember.
11   Q   Can you describe --
12   A   Trademark office.
13   Q   Can you describe those two? Let's take the
14       earliest one time-wise; what was the earliest
15       one that you were involved in?
16   A   It was in the '90's, post '95. They're both
17       post '95. Both had to do with -- one company
18       had obtained a trademark which we had prior
19       common law rights to -- yeah, actually, it was
20       going to go to the trademark office. And they
21       surrendered the mark. And then we registered
22       it.
23           The second one we asked the party to
24       respond to us because they were using a mark --
25       yes, they had registered a mark that we had also

26 (Pages 98 to 101)