```
                                                              Page 238

 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
 2
 3
 4
 5   --------------------------------)
     JARROW FORMULAS, INC.           )
 6             Plaintiff             )  Civil Action No.
     VS                              )  3:01 CV 478(AVC)
 7                                   )
     INTERNATIONAL NUTRITION COMPANY )
 8   NORMAN H. ZIVIN, and            )
     JACK MASQUELIER,                )
 9             Defendants            )
     --------------------------------)
10
11
12
13
14           DEPOSITION OF:  JARROW ROGOVIN
             DATE:  MARCH 15, 2002
15           HELD AT:  UPDIKE, KELLY & SPELLACY
             ONE STATE STREET
16           HARTFORD, CONNECTICUT
17
18
19
20
21
22
         Reporter: WENDY J. ALLEN, RPR, CRR, LSR #00221
23              BRANDON REPORTING SERVICE
                  11-A Capitol Avenue
24                Hartford, CT 06106
                  Tel (860) 549-1850
25
```

**Page 339**

1  charged by the contract manufacturer, or the bottler?
2    A  Of the capsules. Bottling costs are separate.
3    Q  Okay. Caused by the contract manufacturer.
4  And then the column that says manufacturing
5  cost, is that just number of capsules times the price
6  per thousands?
7    A  Well, the price per thousand times units of
8  thousand.
9    Q  But basically if you take the two columns, the
10 number of caps and price per thousands, and multiply
11 them together in some fashion, you get the manufacturing
12 costs.
13   A  Well, it has to be. For instance, 1,647,000
14 as a -- is one thousand point 647 units of a thousand,
15 so you multiply $6.25 cents to price per thousand times
16 one thousand point 647.
17   Q  So the manufacturing cost again is a factor of
18 a cost to Jarrow Formulas by the contract manufacturer,
19 correct?
20   A  Correct.
21   Q  And then the shipping cost for bulk, where is
22 that shipping from and to?
23   A  As I stated, Ogden, Utah, to Orange County.
24   Q  Is that the same thing as the shipping costs
25 column earlier?

**Page 340**

1    A  There's one shipping cost.
2  Oh, oh, oh, I see.
3    Q  There are two cost columns.
4    A  The first shipping cost is raw materials.
5    Q  So the shipping --
6    A  Yeah, yeah, yeah. I'm a hundred percent sure.
7  And it's quite apparent, because you've got, you know, a
8  purchase from, say, Omega Biotech, and then a bill for
9  shipping.
10   Q  So the first shipping cost column, which is
11 the seventh column, is the shipping the raw --
12   A  Yeah.
13   Q  The material source.
14   A  Correct.
15   Q  To the contract manufacturer, right?
16   A  Yes.
17 That should be clarified, again. You're
18 correct, that one's for bulk raw, the other's for bulk
19 capsules.
20   Q  And the second shipping cost, which is the
21 third to last column, is from --
22   A  Those are all from --
23   Q  From the contract manufacturer to the bottler?
24   A  Those are all from Propac in Ogden.
25   Q  Which is the contract, one --

**Page 341**

1    A  One of the contracts.
2    Q  It keeps changing. So it's from the contract
3  manufacturer to the bottling plant.
4    A  Yes, it is.
5    Q  And then the second to last column,
6  miscellaneous assays?
7    A  Those are microbial plates run by Propac.
8    Q  I'm not sure, what does that mean? Are those
9  tests that are done? By the contract manufacturer,
10 right?
11   A  Yes.
12 MR. ORDER: Okay, maybe now is a good
13 time to take a break for lunch.
14 THE VIDEOGRAPHER: Going off record at
15 1:02 p.m.
16 (Off record)
17 THE VIDEOGRAPHER: Back on record at 2:07
18 p.m.
19 BY MR. ORDER:
20   Q  Mr. Rogovin, when your firm, when your
21 company, Jarrow Formulas, returned to obtaining OPC raw
22 material supplies from Indena in June of 2001, did that
23 return to doing business with Indena have anything to do
24 with this lawsuit?
25   A  No.

**Page 342**

1    Q  Did it have anything to do with --
2    A  Well, chain of causality here, it can become a
3  very broad question. I think that --
4    Q  We don't need to get --
5    A  -- this lawsuit affected overall sales,
6  affected pricing.
7    Q  I'm talking about the lawsuit that we're in
8  right now.
9    A  Oh, this one.
10   Q  That Jarrow Formulas brought.
11   A  No. I would say the underlying lawsuit, quite
12 arguably, not this one.
13   Q  Did Jarrow Formulas' return to purchasing
14 product from Indena have anything to do with Greg Ris
15 serving as an expert witness in this case?
16   A  Oh, absolutely not. We returned, matter of
17 fact, at a time when there was no particular likelihood
18 at all of Greg becoming an expert witness.
19   Q  When was the first time you spoke to him about
20 becoming an expert witness?
21   A  I mentioned it shortly after we filed suit,
22 but his response was that it wasn't up to him, it was up
23 to Milan, and mutual expectations were that it would not
24 occur.
25   Q  That he would not be serving as an expert

Page 343

1  witness.
2      A   Correct. Because permission would have to be
3  given from Milan.
4      Q   And was permission obtained from Milan?
5      A   Apparently, because he is. That's all I can
6  say. He would not -- I do know he would not be able
7  to -- I was not party to that permission, but I do know
8  he would not be able to serve as a witness unless he had
9  been given permission.
10     Q   How did you learn that he would be willing to
11 serve as an expert witness?
12         MR. WIECHMANN: Objection.
13         THE WITNESS: Actually more through
14 Alexandra Stevens, because --
15         MR. WIECHMANN: Just yes or no.
16 BY MR. ORDER:
17     Q   You don't have to tell me what she said.
18     A   No, I wasn't telling what she was saying,
19 because I stopped, you know. I just didn't ask, she
20 told me, that's all.
21     Q   And when was it that she told you that?
22     A   Gosh, not that long ago. Within a handful of
23 months. It could have even been after the start of the
24 New Year's. It wasn't that long ago that I found out.
25         MR. ORDER: I'd like to have the reporter

Page 344

1  mark as Exhibit 11 a judgment dated June 9th, 1999.
2          (Exhibit 11, Judgment dated 6/9/99,
3          marked for identification)
4  BY MR. ORDER:
5      Q   I'd like to show you what has now been marked
6  as Exhibit 11, and ask whether you've seen that before?
7      A   Yes.
8      Q   And that's a copy of the judgment in the case
9  that Jarrow Formulas brought against Biogenesis
10 International, Biotech U.S.A., Edward O'Donnell, Boyd J.
11 O'Donnell and --
12     A   Actually --
13     Q   Pardon me?
14     A   The document speaks for itself. JAR Formulas
15 and Nature, Inc., both companies, two companies, brought
16 this action.
17     Q   Thank you.
18         And although it's not in the captions, was
19 Attorney Cynthia Harf also a defendant in this action?
20     A   Yes.
21     Q   And in this judgment, judgment was entered in
22 favor of the defendants and against the plaintiffs,
23 correct?
24     A   Correct.
25     Q   And the defendants were awarded their costs.

Page 345

1      A   Were they?
2      Q   That's what it says. Do you recall that?
3      A   Yes. I'm not sure they were paid.
4      Q   I was going to ask you, so you don't know what
5  the amount of costs were?
6      A   No. It would have been, maybe they took my
7  deposition, maybe they didn't, I can't remember. I sort
8  of, I really can't remember if they took my depo in that
9  case or not.
10     Q   Is this a true and accurate copy of the
11 judgment in this case, in that case?
12         MR. WIECHMANN: Object as to form.
13         THE WITNESS: Well --
14         MR. WIECHMANN: It also calls for -- I'll
15 object. It calls for a legal conclusion. There's no
16 foundation he knows what a true and accurate copy of a
17 judgment under California law looks like.
18 BY MR. ORDER:
19     Q   Well, is this a true and accurate copy of a
20 piece of paper entitled Judgment that you have seen
21 before in the case of Jarrow Formulas and Natren versus
22 Biogenesis, et al?
23     A   Well, yes, including the fact that Cynthia
24 Hart's name isn't on it.
25     Q   And signing the judgment, or approving it as

Page 346

1  to form and content, was your counsel, Neil Weiner,
2  right?
3      A   Wiener.
4      Q   I was right the first time, Neil Wiener.
5      A   Yes.
6          MR. ORDER: I'd like to have marked as
7  Exhibit 12 an order dated November 13th, 2000, in the
8  case of Jarrow Formulas, Inc. versus Nutrition Now, Inc.
9          (Exhibit 12, Order dated 11/13/00,
10         marked for identification)
11 BY MR. ORDER:
12     Q   I'd like to show you what's been marked as
13 Exhibit 12.
14     A   Yes.
15     Q   And that's an order by the United States
16 District Court, Central District of California, granting
17 the defendant, Nutrition Now's motion for summary
18 judgment, correct?
19     A   Well, correct, and not correct.
20     Q   What's not correct about it?
21     A   It's been appealed, and judging from the oral
22 argument, we won the appeal.
23     Q   Oh, okay.
24     A   It's the way the judges ask their questions of
25 the other side.

Page 411

1  BY MR. ORDER:
2    Q  Now, answer the question.
3    A  85 is not 95. Of course it was a ridiculous,
4  immature lawsuit, and it was dropped under, quote
5  unquote, changed circumstances. Now, would you like to
6  explain to us finally what those changed circumstances
7  were?
8    Q  The focus is at the initiation of the lawsuit,
9  and that's the focus of your allegations.
10   A  If you damage your claim, your claim is
11 damaged.
12   Q  You're interrupting me, and I'd appreciate it
13 that you not do that.
14      In paragraph 18 you refer to anti-competitive
15 activities, including publicizing the patent
16 infringement suit at a trade show, and that was the
17 Anaheim trade show in March of 1996, is that correct?
18   A  I have to answer from --
19      MR. WIECHMANN: No, no, we'll do it
20 later. No, just --
21      THE WITNESS: -- wrote a letter to Mr.
22 Zivin about the trademark.
23      MR. WIECHMANN: Later, we can get to it.
24      THE WITNESS: No, that's it.
25      MR. WIECHMANN: Just go to 18 for now.

Page 412

1       THE WITNESS: You guys were written about
2  that. That's a -- and you refused to respond.
3  BY MR. ORDER:
4    Q  Can you please answer my question.
5    A  Actually I did. Took me a couple minutes to
6  remember this.
7       MR. WIECHMANN: Just focus on 18.
8  BY MR. ORDER:
9    Q  My question on paragraph 18 is, are you
10 referring to the Anaheim trade show in March of 1996?
11   A  That, and subsequent activity.
12   Q  And at that trade show, what was done by any
13 defendant to publicize the patent infringement lawsuit
14 brought in the District of Connecticut?
15   A  They had done press releases that were in the
16 trade magazines. They had press releases they handed
17 people, and they yacked about it non-stop.
18   Q  Who's they?
19   A  Schwitters, Senecal, and LeFebvre.
20   Q  And did any of them give you a press release
21 at the Anaheim show?
22   A  Oh, we picked up a copy of it.
23   Q  Where did you pick up a copy?
24   A  I think I sent someone over to --
25   Q  To where?

Page 413

1    A  Their booth. Also had customers coming up and
2  saying hey, you know, they're --
3    Q  They're what?
4    A  Talking away. They're talking about how
5  they're suing the whole industry, and so on. And then I
6  went over there and talked to Mr. Schwitters myself.
7    Q  And what did he say and what did you say?
8    A  I asked him how somebody could really discover
9  that a flavonoid is a radical scavenger in the 1980's,
10 and I asked him if he really owned the patent.
11   Q  And what did he say?
12   A  Confirmed both.
13   Q  Did you say anything else to him at that time?
14   A  I said I'd be seeing him in court.
15   Q  Anything else?
16   A  That was about it.
17   Q  At the end of paragraph 18 --
18   A  Oh, yeah, there was something else I remember.
19   Q  What?
20   A  I said why did Masquelier in the forward to
21 Schwitters book write that he was not going to market at
22 the point of a gun, but then turn around and cause the
23 industry to be sued, I said that didn't seem to make
24 much sense.
25   Q  And what did Mr. Schwitters say?

Page 414

1    A  Well, we have a patent, more or less.
2    Q  And --
3    A  Didn't answer the question.
4    Q  At the end of paragraph 18, you allude to
5  threats to sue Jarrow Formulas' customers. What
6  customers were threatened? What Jarrow Formulas' were
7  questioned?
8    A  We've been through that, and I'm not going to
9  go over it again. Door closed.
10   Q  You mean --
11   A  Door closed.
12   Q  A door doesn't close. Can you answer the
13 question?
14   A  Yes, it does. You've been through that ad
15 nauseam.
16      MR. WIECHMANN: We're taking a break
17 right now.
18      THE VIDEOGRAPHER: Off record at 4:19
19 p.m.
20      (Off record)
21      THE VIDEOGRAPHER: Back on record at 4:25
22 p.m.
23 BY MR. ORDER:
24   Q  Mr. Rogovin, who do you allege in paragraph 18
25 that the defendants threatened to sue among your

Page 435

1 requirement that we prevailed on the underlying suit,
2 and it is in response to the underlying suit.
3  Q   Did you threaten to sue Primary Source for
4 mislabeling after the Connecticut lawsuit was brought?
5  A   What I do remember without seeing a document
6 is that their OPC-85 was actually misleading, and
7 mislabeling, and I think I intimated that there could be
8 a lawsuit in response to my company being sued for
9 OPC-95.
10      MR. ORDER: I'd like to have the reporter
11 mark as Exhibit 22 a letter dated April 9th, 1996, from
12 Jarrow Rogovin to Richard LeFebvre bearing Bates number
13 JAR 2790 to 91.
14      (Exhibit 22, letter dated 4/9/96,
15      marked for identification)
16 BY MR. ORDER:
17  Q   I'd like to show you what's now been marked as
18 Exhibit 22 and ask whether you wrote that letter.
19      Did you write this letter?
20  A   Yes.
21  Q   And the second to last paragraph says,
22 "Failure to comply with the terms of this letter within
23 ten days of the date hereof shall result in Jarrow
24 Formulas filing suit against Primary Source, Life Plus,
25 and all related vendors who so mislabel their products."

Page 436

1      Did you file suit against Primary Source, Life
2 Plus, or all related vendors on mislabeling grounds?
3  A   Actually Mark Timon contacted me and said hey,
4 I'm Green Vibrance, or something, and I said okay. So I
5 wasn't going the sue Mark.
6  Q   Okay. Did you sue Primary -- at that point
7 was Mark Timon still affiliated with Primary Source?
8  A   Yes. Yeah. Yes.
9  Q   But you knew --
10  A   Well --
11  Q   You knew that when you wrote the letter.
12  A   No, not exactly. Actually I don't know
13 whether he was so affiliated with him or not. Green
14 Vibrance, however, is Mark's product, so whether they
15 were distributing for him, he was still affiliated, I
16 don't know, but it would have meant naming, in effect,
17 Mark.
18  Q   So after you wrote this letter, Mark Timon
19 contacted you, and you decided not to sue.
20  A   Somehow or another we got in contact with each
21 other.
22  Q   And you decided not to sue because Mark Timon
23 was a friend of yours.
24  A   Oh, that's part of it. Also I think that I
25 was, in effect, letting them know that they should

Page 437

1 behave themselves because people who live in glass
2 houses shouldn't throw stones.
3  Q   So was this really a serious threat that you
4 were making, or was it an empty threat?
5      MR. WIECHMANN: Object as to form.
6      THE WITNESS: Well, I think you want to
7 characterize it a certain way one way or the other. I
8 think that it was getting a point across, and it was
9 effective.
10 BY MR. ORDER:
11  Q   Well, what happened as a result of this
12 letter?
13  A   I'd say in terms of PSI, I don't know if as a
14 result of this letter, but PSI got quieter, because this
15 was sometime around their customer Life Plus sending out
16 their threatening letter.
17  Q   Did PSI change its label after April of 1996?
18  A   I don't know that that was their product
19 anymore. It may have been Vibrant Health, and being
20 distributed by PSI. And as far as OPCs go, yes, the
21 OPC-95 was changed to Masquelier's true OPCs.
22  Q   And when did that occur?
23  A   Don't know.
24  Q   I'd like to talk about the re-examination of
25 the 360 patent. You're familiar with that proceeding in

Page 438

1 general, correct?
2  A   Incorrect. Well, what do you mean that
3 proceeding? That particular proceeding, or the
4 re-examination.
5  Q   Yes.
6  A   As a procedure.
7  Q   Process.
8  A   The process.
9  Q   Well, you're familiar that -- well, you're
10 aware that there was a re-examination of the 360 patent.
11  A   Correct.
12  Q   Starting sometime in 1996, or early 1997,
13 correct?
14  A   Correct.
15  Q   Do you know how that re-examination was
16 initiated?
17  A   A law firm representing an anonymous party did
18 what was basically a survey of pre-existing patents, not
19 limited to, but primarily, and wrote it up and sent it
20 into the patent office, and a re-examination,
21 certificate of re-examination, was granted.
22  Q   What was the law firm?
23  A   Don't remember.
24  Q   How did you learn of the law firm's name? Did
25 you know at one point the law firm's name?

Page 439

1    A   I don't know that I ever knew it.
2    Q   How did you know that it was a law firm that
3  had sent this survey in?
4    A   As far as I know, all the defendants got a
5  copy of it.
6    Q   So you had a copy of the survey?
7    A   As far as I know, all the defendants and all
8  their counsel got a copy of it.
9    Q   And by defendants you mean the defendants in
10 the Connecticut action, right?
11   A   And possibly San Francisco.
12   Q   Was the law firm that performed that survey
13 representing any of the defendants in either the
14 Connecticut action or the California action?
15   A   I don't know.  They never identified their
16 client to anyone that I know.
17   Q   That's not my question.  I'm asking you
18 whether the law firm that performed the survey appeared
19 as counsel of record for anybody in either the
20 Connecticut action or the California action?
21   A   No.
22   Q   No, or you don't know?
23   A   No.
24   Q   Did the defendants in the Connecticut action
25 or the California action commission that law firm to

Page 440

1  perform the survey?
2    A   That I already said.  Nobody knows.  I don't
3  know, and I don't know anybody who does know.  I
4  shouldn't say that.  Somebody knows.
5    Q   Do you know whether you paid for that law firm
6  to, or paid a portion of the fees for that law firm to
7  perform the survey?
8    A   No.
9    Q   Did you have any involvement in the
10 re-examination of the 360 patent?
11   A   No.
12   Q   Did you submit any documents to the Patent and
13 Trademark Office in connection with the re-examination
14 of the 360 patent?
15   A   No.
16   Q   Was there any particular reason why you did
17 not submit any documents for the re-examination?
18   A   Because I was not a party to the
19 re-examination, number one.  Number two, I did call the
20 examiner's supervisor after the examination and spoke
21 with him.
22   Q   Who was that?
23   A   I don't remember his name.  I did remember the
24 examiner's name, but not his supervisor's name.
25   Q   And what did you say to the examiner's

Page 441

1  supervisor?
2    A   Said that the 33 pieces of art that were put
3  in by Mr. Zivin had actually come with and accompanied a
4  57 page detailed examination of the import of those
5  pieces of prior art that Mr. Zivin was in possession of
6  it, and though he submitted the art, he did not -- he
7  neither submitted the 57 page review, nor pointed out
8  the import of those particular studies, and he says it
9  sounds to me, it sounded to him, that misconduct had
10 occurred on the part of Mr. Zivin, that he wasn't quite
11 certain of it, but he said it sounded like misconduct.
12   Q   Did you file any type of complaint with the
13 Patent and Trademark Office concerning the
14 re-examination?
15   A   No.
16   Q   Did you have any follow-up discussions with
17 the supervisor?
18   A   I think there was one more conversation.  He
19 told me that Mr. Rollins, who is the examiner, had been
20 transferred out of that section, not to imply that there
21 was necessarily a connection, but that had occurred.
22   Q   How did you learn about the re-examination?
23   A   It was a mailing list.
24   Q   Of what?
25   A   All the papers.

Page 442

1    Q   Pardon me?
2    A   All the papers involved, I mean all the
3  parties involved and their lawyers.
4    Q   You said that you were not, that Jarrow
5  Formulas was not a party to the re-examination.
6    A   Correct.
7    Q   So what part --
8    A   Obviously the law firm who filed the petition
9  had a mailing list.
10   Q   So you first found out about the
11 re-examination when you received the survey that was
12 filed to initiate the re-examination, is that correct?
13   A   Along with everyone else.
14       MR. ORDER:  I'd like to have the reporter
15 mark as Exhibit 23 a press release dated January 28th,
16 1997, from Jarrow Formulas, Inc., bearing Bates stamp
17 D-769 through 71.
18       (Exhibit 23, press release dated 1/28/97,
19       marked for identification)
20 BY MR. ORDER:
21   Q   I'd like to show you what has now been marked
22 as Exhibit 23, and ask whether that, whether you wrote
23 this press release?
24   A   Yes.
25   Q   Did anyone help you write this press release?

Page 443

1   A   No.
2   Q   Did anybody review this press release before
3   you issued it?
4   A   No.
5   Q   Do you see at the top, or near the top of the
6   press release, it says draft. Is this the final version
7   of the press release?
8   A   I don't know if it ever went out. I don't
9   know.
10  Q   To whom did you -- go ahead. Are you done?
11  A   Midway. I have a feel it was Lynn Hinderliter
12  who may have had a question about what was going on, and
13  I sent this.
14  Q   Well, to whom did you distribute this press
15  release?
16      MR. WIECHMANN: Object as to form.
17      THE WITNESS: I don't know that I did.
18  BY MR. ORDER:
19  Q   Did you distribute this press release?
20  A   I don't know that I did.
21  Q   Did you say you sent a copy to Lynn
22  Hinderliter?
23  A   I think so, judging by the phone number, seems
24  to be her. I believe it's her, I'm not certain.
25  Q   Which phone number?

Page 444

1   A   847.
2   Q   The fax information at the top, is that what
3   you're referring to?
4   A   Yes.
5   Q   847-364-7365, is that the, does that sound
6   like her fax number?
7   A   I think it is.
8   Q   It says from Midway, and then it's partially
9   cut off. Is she affiliated with some company named
10  Midway?
11  A   I think it's holistic or something, I think
12  so.
13  Q   And why did you send it to her?
14  A   I don't remember.
15  Q   Do you recall whether you distributed or
16  issued a final version of this press release?
17  A   Already said, I don't remember.
18  Q   I just wanted to be clear. So you weren't
19  saying you weren't distinguishing between the draft and
20  the final.
21  A   Don't remember that there was a final. And
22  that that went any further than this. It was written in
23  response to the initial granting of the petition to
24  review. I later found out that that grant is not a
25  cancellation.

Page 445

1   Q   Do you recall whether you distributed this
2   press release to anyone, to any trade periodicals?
3   A   Don't remember.
4   Q   Did you speak to any trade periodicals
5   concerning the re-examination?
6   A   Yes.
7   Q   Which ones did you speak to?
8   A   Whole Foods.
9   Q   Any others?
10  A   Not that I know of.
11  Q   Just so there's no confusion, when you say
12  Whole Foods, you meant the magazine, not --
13  A   You asked a periodical.
14  Q   Right. I just want to make sure the record's
15  clear we're not talking about Whole Foods the retail
16  chain, right, correct?
17  A   You asked a magazine, I gave you a magazine.
18      MR. ORDER: I'd like to have the reporter
19  mark as Exhibit 24 an article from Whole Feeds, April
20  1997, or at least it appears to be from that, bearing
21  Bates number D-829 through 830.
22      (Exhibit 24, article dated 4/97,
23      marked for identification)
24  BY MR. ORDER:
25  Q   I'd like to show you what has been marked as

Page 446

1   Exhibit 24, and down at the bottom, in the right corner
2   column there's an article entitled Masquelier Patent
3   Dispute Rages on. Do you see that?
4   A   Yes.
5   Q   At the bottom of the first column it says,
6   quote, "Following issuance of the Rollins decision,
7   Jarrow L. Rogovin, president of Jarrow Formulas, Los
8   Angeles, California, a defendant in and outspoken critic
9   of the INC lawsuit, claimed vindication against what he
10  termed a 'meritless and malicious legal action.'
11  Rogovin stated, this proves Jarrow Formulas was right,
12  that the so-called 360 patent is a fraud."
13      Now, let's look again at Exhibit 23, which was
14  the press release. The very first line of Exhibit 23
15  says, claiming vindication in the lawsuit filed by
16  International Nutrition Company, and then comparing that
17  to Exhibit 24, that also said that you claimed
18  vindication. Then on page, on the second page of
19  Exhibit 23, the first full paragraph, you're quoted as
20  saying, this not only proves Jarrow Formulas was right,
21  that the so-called 360 patent is a fraud, and in Exhibit
22  24, the second page, it says, this proves Jarrow
23  Formulas was right, that the so-called 360 patent is a
24  fraud, virtually verbatim quotation. Does this lead you
25  to believe that perhaps you did distribute or issued the

Page 447

1  press release in Exhibit 23 to Whole Foods?
2    A   I hope so.
3        MR. ORDER: Okay. I'd like to have the
4  reporter mark as Exhibit 25 an article from the spring
5  1997 issue of SIE, Bates number JAR 1341 to 1343. I'd
6  like to show you now what's been marked as Exhibit 25.
7        (Exhibit 25, article from SIE,
8        marked for identification)
9  BY MR. ORDER:
10   Q   What is SIE, if you know?
11   A   It's an acronym for the name of the journal.
12   Q   Do you know what the full name of the journal
13 is?
14   A   Not with certainty. I'm not seven sure
15 they're still in business.
16   Q   Was this a dietary supplement trade industry
17 periodical?
18   A   Probably.
19   Q   And I'd like to direct your attention to page
20 8, which is the second page of the exhibit, page 8 of
21 the magazine. Page 8 at the end of the first column it
22 says, "In a related development, Jarrow Formulas reports
23 a milestone victory has occurred for defendants against
24 INC in the OPC patent lawsuit." Then, quote, "claiming
25 vindication in the lawsuit filed by INC Jarrow cited a

Page 448

1  January 13th, 1997 office action in re-examination by
2  Rollins of the U.S. Patent and Trademark Office, PTO,
3  rejecting the patent claim of Jack Masquelier," and do
4  you see that that's virtually verbatim a quotation from
5  the press release in Exhibit 23?
6    A   Doesn't mean they received the press release.
7  They could have received a shortened version. They may
8  have received, they may not have, I don't know.
9    Q   And then at the end of that same page going
10 onto the next page it says, "Rogovin continues, 'this
11 not only proves Jarrow Formulas was right, but that the
12 so-called 360 patent is a fraud.'"
13       Is that another sound bite from your press
14 release in Exhibit 23?
15       MR. WIECHMANN: Object as to form.
16       THE WITNESS: It is a conclusion drawn
17 from the statements of Dr. Rollins.
18 BY MR. ORDER:
19   Q   Does this --
20   A   When he issued the certificate of
21 re-examination.
22   Q   Does this lead you to believe that you had
23 sent the press release marked as Exhibit 23 to SIE?
24   A   That, or something like it.
25       MR. ORDER: I'd like to have the reporter

Page 449

1  mark as Exhibit 26 a press release dated February 7th,
2  1997, from INC which bears the Bates stamp JAR 41 to 42.
3        (Exhibit 26, press release dated 2/7/97,
4        marked for identification)
5  BY MR. ORDER:
6    Q   And direct your attention, this is the press
7  release from INC, and you referred to in the complaint
8  where INC referred to you as a sellout, correct?
9        MR. WIECHMANN: Distorted sellout, I
10 believe.
11       THE WITNESS: He made a number of
12 comments. That was one of them.
13 BY MR. ORDER:
14   Q   Yes, I understand, but that was one. That was
15 the -- so this is the press release that you were
16 referring to in the complaint, correct?
17   A   Correct.
18   Q   On page 2, just before the heading of Comment,
19 the paragraph says, paragraph just before that says, "In
20 the majority of re-examination cases, the examiner's
21 initial rejection to claims does not result in a final
22 rejection of the patent."
23       Do you see that?
24   A   Yes.
25   Q   And that's what eventually happened in the

Page 450

1  re-examination, isn't it, that the initial rejection did
2  not result in a final rejection of the patent, correct?
3    A   Information was concealed from the patent
4  office, correct. And it was ex parte, and new patents
5  are not ex parte. It's out of context, but yeah, it
6  says that, but it's so what? It's out of context.
7  Statistically it's --
8    Q   Do you believe that you yourself personally
9  have a reputation within the dietary supplement
10 industry?
11       MR. WIECHMANN: Object as to form.
12       THE WITNESS: It's a little vague.
13 BY MR. ORDER:
14   Q   Do you?
15   A   It'll a little vague.
16   Q   Do you believe that people know you in the
17 dietary supplement industry?
18   A   Many people do.
19   Q   And do you believe that you have a certain
20 reputation within the dietary supplement industry?
21   A   What do you mean by a certain reputation?
22   Q   Any type of reputation.
23       MR. WIECHMANN: Object.
24       THE WITNESS: Different people have
25 different views.

Page 451

1  BY MR. ORDER:
2      Q   So you're not going to answer my question I
3  guess, right?
4          MR. WIECHMANN: Object to form. To begin
5  with, it's an improper question because you can't create
6  a basis for cross-examination by asking questions unless
7  the witness himself raises as an issue reputation. It's
8  not an issue at this stage.
9  BY MR. ORDER:
10     Q   Has anybody ever told you that you have a
11 reputation within the dietary supplement industry?
12     A   Absolutely.
13     Q   And what has that person told you your
14 reputation in the dietary supplement industry is?
15         MR. WIECHMANN: I --
16         THE WITNESS: I don't --
17         MR. WIECHMANN: I don't care if you don't
18 mind for a second. Object as to form because this
19 happens to be the deposition of Jarrow Formulas, Inc.
20 If you're going to ask what the reputation as a company
21 is, that's fine. Reputation of him individually I
22 believe is outside the scope of this deposition, and
23 hasn't been raised as part of any answer yet, so it's
24 beyond the scope.
25         It was very specifically done, and I

Page 452

1  don't why, to be the deposition of Jarrow Formulas,
2  Inc., and that's it, and that's what the deposition's
3  for. So I don't see, forget relevancy, within the scope
4  of this discovery what his personal reputation has to do
5  with this deposition.
6          MR. ORDER: Are you directing him not to
7  answer?
8          MR. WIECHMANN: Yeah, I am directing him
9  not to answer.
10         MR. ORDER: First, the notice of the
11 deposition was of Jarrow Formulas, Inc., through its
12 president or its officer, Jarrow Rogovin, and there was
13 no listing of particular topics for the deposition, but
14 if you're going to direct him not to answer, I don't
15 think that's proper, but I'll see if I can get the
16 information some other way.
17         MR. WIECHMANN: Sure.
18         THE WITNESS: Whatever that means.
19 BY MR. ORDER:
20     Q   Does Jarrow Formulas have a reputation within
21 the dietary supplement industry?
22     A   Yes.
23     Q   And do you know what that is?
24     A   Honesty, quality, avant-garde, someone that
25 can be trusted in the product, legal issues,

Page 453

1  information, a champion of the industry on its right to
2  sell supplements. It has a sterling reputation.
3      Q   And who has told you that that's what the
4  reputation of Jarrow Formulas is?
5      A   Hundreds if not thousands of people. You go
6  to a trade show and major companies, their booths are
7  almost empty, and ours is mobbed, and we are heavily
8  visited.
9      Q   Now, when the California action was started in
10 early 1997, you contacted INC's local counsel in San
11 Francisco and threatened to sue him for bringing the
12 lawsuit, isn't that true?
13     A   Done remember.
14     Q   You don't remember?
15     A   No.
16         MR. ORDER: I'll have the reporter mark
17 as Exhibit 27 a letter from Jarrow Rogovin dated
18 February 5th, 1997, to Neil Smith. This bears Bates
19 stamp JAR 1567 to 68.
20         (Exhibit 27, letter dated 2/5/97,
21         marked for identification)
22 BY MR. ORDER:
23     Q   And I'd like to direct your attention, first
24 to the second page. Did you sign this document?
25     A   Yes.

Page 454

1      Q   Did you write this letter?
2      A   Yes.
3      Q   And at the bottom of the first page, the
4  paragraph at the bottom of the first page, doesn't it
5  say that, "Please take notice that Jarrow Formulas,
6  Inc., a California corporation and defendant in the
7  Connecticut action, hereby gives notice to you that you
8  are on inquiry notice and shall be held legally liable
9  for malicious prosecution based upon indifference and
10 such other grounds as shall be proven if in any manner
11 you tortiously litigate the legal action against JFI,
12 which you have been given good cause to know and believe
13 are meritless, groundless, and malicious."
14         Did you consider that to be a threat to
15 Attorney Smith?
16     A   I was telling him not to add my company's name
17 to the California suit.
18     Q   Well, in fact didn't you ask him to cooperate
19 in transferring from Connecticut to San Francisco the
20 Connecticut action on the second page, second paragraph?
21     A   Well --
22     Q   Yes or no, did you or did you not?
23     A   Yes, two different issues there.
24     Q   We're running out of tape, so we're going to
25 change tapes and then wrap up, I hope, by 6 o'clock.

55 (Pages 451 to 454)

### Page 455

1    THE VIDEOGRAPHER: This ends tape number
2 3, off record at 5:41 p.m.
3    THE VIDEOGRAPHER: Back on record at 5:50
4 p.m.
5 BY MR. ORDER:
6    Q  Mr. Rogovin, you attended, or appeared at the
7 beginning of a lecture that Dr. Masquelier was to
8 present in Baltimore on October 18th, 1996, isn't that
9 true?
10   A  Yes.
11   Q  And that was at the Hyatt, I believe?
12   A  Yes.
13   Q  How did you learn about that lecture?
14   A  It was very heavily advertised to the public.
15   Q  And what type of advertisement did you see?
16   A  It was mailed, it was in trade journals.
17   Q  Which trade journals?
18   A  Industry trade journals.
19   Q  Do you recall any particular one?
20   A  The Natural Foods Merchandiser for certain.
21   Q  Natural Foods Merchandiser?
22   A  Yeah. They were the sponsor of the trade
23 show, or the parent company is the sponsor of the trade
24 show.
25   Q  And did you receive an invitation to that

### Page 456

1 lecture?
2    A  Did I receive mailings? Yes.
3    Q  Did you receive an invitation to that lecture?
4       MR. WIECHMANN: Object as to form.
5 BY MR. ORDER:
6    Q  Do you understand what the word invitation
7 means?
8    A  Well, in the context, no. Specifically or
9 generally, how do you mean invitation?
10   Q  Did you receive a card inviting you to attend
11 his lecture?
12   A  I was the addressee of an invitation.
13   Q  Do you have that invitation?
14   A  Or an announcement, I would say an
15 announcement.
16   Q  Was the announcement addressed to you, or to
17 Jarrow Formulas?
18   A  I don't see the difference, and I don't
19 remember.
20   Q  You received this announcement in the mail?
21   A  Yes.
22   Q  Did it have a RSVP?
23   A  No, not that I remember.
24   Q  Prior to October 18th, 1996, had you been
25 calling Dr. Masquelier a fraud?

### Page 457

1    A  Prior to when?
2    Q  To October 18th, 1996, the date of the
3 lecture, had you been calling Dr. Masquelier a fraud?
4    A  I don't know what you mean by calling him a
5 fraud.
6    Q  Well, in conversations with anyone, in any
7 letters, had you been calling Dr. Masquelier a fraud
8 prior to October 18th, 1996?
9    A  It's too vague for me to answer. I need
10 specific language, a letter.
11   Q  The word, how about the word fraud, is that
12 specific enough?
13   A  Well, fraudulent patent, things like that.
14   Q  Did you call Dr. Masquelier himself a fraud at
15 any time?
16   A  I would have to see a particular letter, a
17 particular language, whatever.
18   Q  Have you ever accused Dr. Masquelier of
19 perpetrating a fraud?
20   A  Absolutely.
21   Q  And did you ever make that accusation prior to
22 October of 1996?
23   A  That I wouldn't remember. I think at the --
24 by the time I finished reviewing the prior art, I had
25 come to the well-founded conclusion that the patent was

### Page 458

1 a fraud.
2    Q  And you had conducted that and completed that
3 research by the summer of 1996, correct?
4    A  In the summer, yes.
5    Q  In what?
6    A  In the summer.
7    Q  Right. Now, why did you attend this, why did
8 you show up for this lecture by Dr. Masquelier?
9    A  Because I intended to challenge his claim of
10 discovering that a molecule known to contain hydroxyls,
11 that proclaiming that a molecule that is known to
12 contain hydroxyl groups constitutes a discovery.
13   Q  In what way?
14   A  With the intention of asking him how he could
15 claim having discovered that a molecule that contains
16 hydroxyl groups is a free radical scavenger is a
17 discovery, since hydroxyl groups are known to be among
18 both, among nature's most powerful antioxidants, and
19 pro-oxidants.
20   Q  Did you attempt to write or communicate with
21 Dr. Masquelier prior to the lecture to convey those
22 ideas?
23   A  I sent his lawyer a copy of my paper, and I
24 have every reason to believe that Dr. Masquelier was
25 given a copy of it.

Page 459

1  Q   What lawyer are you referring to?
2  A   Norman Zivin.
3  Q   And you believe that Attorney Zivin
4  represented Dr. Masquelier at that time, in 1996?
5  A   One way or the other, he conspired with him.
6  Q   At the time that you sent Attorney Zivin your
7  analysis, as you call it, did you believe that Attorney
8  Zivin represented Dr. Masquelier?
9  A   As I said, I was aware that he was a
10 coconspirator.
11 Q   That's not my question. Did you believe that
12 Attorney Zivin represented Dr. Masquelier in any legal
13 matter prior to Dr. Masquelier's lecture?
14 A   He was working with Masquelier one way or the
15 other, so what that, you know, how that gets
16 characterized.
17 Q   Well, what was the basis for your belief that
18 Attorney Zivin was working with Dr. Masquelier one way
19 or the other?
20 A   Couldn't pull off this whole scam lawsuit
21 without working with him. Too much going on.
22 Q   Well, did you have any --
23 A   Like scam assignments, you know, scam, well,
24 registration with the patent office.
25 Q   And you --

Page 460

1  A   All this scamming, there had to be
2  communications.
3  Q   And you knew about all of that prior to the
4  lecture?
5  A   How much of the conspiracy at that point was
6  clear to me I don't remember. What was very clear to me
7  at that point was that Masquelier had defrauded the
8  patent office.
9  Q   Did you show up at the lecture in order to
10 harass Dr. Masquelier?
11 A   Of course not.
12 Q   Did you show up at the lecture in order to
13 embarrass him?
14 A   I showed up at the lecture to convey the truth
15 to the dietary supplement industry in the same way at
16 any scientific symposium a scientist with not just an
17 opposing view, but contrary data, will stand up at the
18 microphone and challenge the speaker, including even, if
19 it gets to it, and I've been in the room when this has
20 occurred, identifying falsified data, and that
21 scientist, that speaker, does not get manhandled and
22 thrown out of the room.
23 Q   What happened when you showed up at the
24 lecture?
25 A   I took my seat next to a worker of mine.

Page 461

1  Q   Who was that?
2  A   Karen Palese.
3  Q   Karen what?
4  A   Palese, P-A-L-E-S-E.
5  Q   Okay. And then --
6  A   Scott may have been there, Puliski, I don't
7  remember.
8  Q   And Scott Puliski might have been there, is
9  that what you said?
10 A   He may have been, I don't remember.
11 Q   Does Karen Palese still work at Jarrow
12 Formulas?
13 A   Yes.
14 Q   Okay. And then what happened?
15 A   I was suddenly accosted from behind, while
16 seated.
17 Q   Accosted by whom?
18 A   Two security guards.
19 Q   And in what manner did they accost you?
20 A   They grabbed me, and were guiding me, shall we
21 say, out of my seat. At that point I stood up, and I
22 announced to them who I was, and that I was being
23 escorted, or thrown out of the room.
24 Q   Now, who were you addressing at this point?
25 A   The room full of people.

Page 462

1  Q   And how many people were in the room at that
2  time?
3  A   30 to 50. Maybe 30.
4  Q   And then, go ahead, I'm sorry. You announced
5  to them who you were, and then you were being escorted
6  out of the room.
7  A   No, no, no, thrown out of the room.
8  Q   Thrown out of the room. Well, did the
9  security guard say anything to you?
10 A   Yeah. They said come with me, come with us.
11 Q   Okay.
12 A   And they laid hands on me immediately.
13 Q   And then you announced to the room that you
14 were being thrown out?
15 A   Who I was, I was being thrown out because they
16 did not want me asking questions about Masquelier's
17 patent, and at that point they became quite forceful
18 with me.
19 Q   In what manner?
20 A   Including virtually all the way out the hotel.
21 And matter of fact, Greg Ris was in the foyer area,
22 outside, approaching the conference rooms, and he saw
23 how I was being manhandled. Zivin then put out a
24 declaration for no reason at all saying that I had stood
25 up on a chair and was screaming to the room, another

Page 463

1  instance of your people saying something that absolutely
2  never happened.
3      Q   What floor was the lecture on?
4      A   Second or third.
5      Q   And how --
6      A   Probably second floor.
7      Q   How far did the security guards escort you,
8  entirely out of the hotel, or just out, off that floor?
9      A   It may have been off that floor. I can't
10 remember if it was off the room. I went back and
11 complained to the management, with Karen as my witness,
12 and when the guards was called into the office, and he
13 lied about my being manhandled, and Karen was there to
14 say oh, no, he was. They tried to claim they never laid
15 a hand on me.
16     Q   And then what did you do?
17     A   Left. Let the hotel decide what they were
18 going to do.
19     Q   And what did they do?
20     A   I have no idea. I didn't follow up. I didn't
21 get involved in that issue again until your Mr. Zivin
22 filed that vicious, disgusting, nasty little declaration
23 that I had stood up on a chair and yelled to a room, and
24 then there were a number of declarations filed that
25 never happened.

Page 464

1          MR. ORDER: I'd like to have the reporter
2  mark as Exhibit 28 a document bearing Bates stamp D-506
3  to 508.
4          (Exhibit 28, document stamped D-506 to 508,
5          marked for identification).
6          MR. WIECHMANN: Let this be the last
7  exhibit. It's five after 6.
8  BY MR. ORDER:
9      Q   I'd lake to show you what has been marked
10 as -- this is the last exhibit.
11         MR. WIECHMANN: Just identify this and
12 we'll go home.
13 BY MR. ORDER:
14     Q   I obviously have a lot more questions, but I
15 had agreed we would go to 6 tonight. And I'd like to
16 have you read this document to yourself, and let me know
17 when you've finished.
18     A   Okay.
19     Q   Did you call and leave several voice mail
20 messages on Norman Zivin's voice mail on April 5th,
21 1996?
22     A   Several?
23     Q   Is that a question, or an answer?
24     A   Actually I called him at one point with Mr.
25 Puliski, and he hung up on us, wouldn't answer any

Page 465

1  questions.
2      Q   That wasn't my question.
3      A   I know.
4      Q   I'm asking about --
5      A   But we're trying to color events here.
6      Q   You may be trying to color, I'm trying to ask
7  you questions.
8      A   No, you're leaving out the fact that, actually
9  tried to have one of my lawyers speak with him. That's
10 what we were trying to cover it, color and cover.
11     Q   My question is, did you call and leave several
12 voice mail messages on Attorney Zivin's voice mail in
13 the evening of Friday, April 5th, 1996?
14     A   I don't think it was several.
15     Q   How about three?
16     A   Two. Three? Okay. If you say so.
17     Q   And --
18         MR. WIECHMANN: It appears that it
19 doesn't appear from these that the tape ended. It's a
20 voice mail that got disconnected because of the tape
21 running out twice.
22         MR. ORDER: Well --
23         MR. WIECHMANN: If you notice, every two
24 and half minutes.
25 BY MR. ORDER:

Page 466

1      Q   That's what I meant, okay. They seem to be
2  continuous voice mails that you made. You left a
3  message, you got to the end of the allotted time, and
4  called back to continue.
5      A   Yes.
6      Q   And then ran out of space again, and called
7  back and continued, is that, does that sound correct?
8      A   Yes.
9      Q   Does Exhibit 28 look to you to be an accurate
10 transcript of what you said on those voice mails?
11     A   I won't dispute it.
12         MR. ORDER: Okay. We had agreed to this
13 extra day of testimony beyond the normal one day of
14 seven hours that are accorded by the Federal Rules of
15 Civil Procedure. I do have more questions, but I'm
16 going to abide by our agreement to confine the extra
17 deposition time to a single day, so thank you very much.
18         Did you have any questions you wanted to
19 ask, Mr. Wiechmann?
20         MR. WIECHMANN: No. Mr. Rogovin I don't
21 think is in shape to TEN right now.
22         THE VIDEOGRAPHER: This ends the
23 deposition. We are off record at 6:07 p.m.
24         (Deposition concluded)
25

58 (Pages 463 to 466)