Appendix re Patent No. 3,436,407

Date: 28 August 1996

The background description and discovery claims of the 1987 360 patent are most disturbing in light of Masquelier's own 1969 U.S. patent no. 3,436,407 ("the 407 patent" or "the 407"). Basically, the 407 patent claims a method of extracting flavanols, but other statements in the 407 render the 360 no more than an illegal extension of the first patent.

First, the 407 states that the "therapeutic indications" of the patented extract are treatment of capillary fragility and abnormal capillary permeability. Various polyphenol-based preparations were already being marketed, but the 407 distinguishes between these preparations by stating that the "flavonoids" of the hydroxyflavan 3,4-diols type are preferable to other "flavonoids," i.e., anthocyanidins. (The science for this claim, however, can be traced to Lavollay and others who published in the 1940s and 1950s.) The 360, at best, can claim only to have "discovered" the mechanism of efficacy: Free radical scavenging. Not only is such a "discovery" an inadequate basis for another patent, but this mechanism was, essentially, known by 1985. (See accompanying Addendum to 360 Patent.)

Second, the 407 and the 360 differ in little other than their style and nomenclature: stylistically -- and though not without problems -- the 407 is a more specific and scientifically written document. The 360 attempts to be more persuasive, to be more concerned with justifying its existence while eluding its origins in the 407.

It is the change in nomenclature, however, that defies explanation other than a finding of fraud on the part of Masquelier: The 407 consistently, and correctly, uses the term "hydroxyflavan 3,4-diols." The 407 agrees with the definitions used in JFI's 360 Patent Addendum herein, most particularly that the flavanols should be considered as a single class for purposes of basic structure and their associated FRS function. Accordingly, JFI states (360 Addendum, *supra*.) that Masquelier's exemplar product -- pine bark -- contains a flavanol mixture ranging from monomers to PACs that are dimers and oligomers if not polymers; that these very same flavanols from monomers through oligomers share a general, common molecular structure with the hydroxylated B ring being of particular significance for free radical scavenging; and that whatever was known about the monomers (FRS and bioavailability) could be presumed true of the various polymers. Thus, the voice of the 407 becomes chillingly telling:

"The present invention has essentially as object a process of *extraction of hydroxyflavan 3,4-diols which enables these substances to be obtained undegraded*. In plants the hydroxyflavan 3,4-diols exist in the form of *complex mixtures including all degrees of polymerisation ranging from monomers to condensed polymers* of the phlobaphene type [condensed tannins], and the process according to the invention has the advantage of isolating the less polymerised forms of the hydroxyflavan 3,4-diols, *compromising in particular the monomer, the dimers, trimers, tetramers and pentamers*. (Emphasis added.)

"The hydroxyflavan 3,4-diols have the following general formula:

where *rings A and/or B are substituted with one or more hydroxy-groups. The preferred compound is tetrahydroxy 5,7,3',4'-flavan 3,4-diol, having the formula:*

(Emphasis added.) 407 Patent at 1:67-2:42.

Using scientifically correct nomenclature, the 407 treats the entire flavanolic class as sharing distinct and important features and though the dimer (5,7,3'4', etc.) is preferred, neither that PAC nor any other is distinguished from the monomer in its essential structure or function. Indeed, they are acknowledged for their commonality and the monomers are described as being part of the "advantage" afforded by the patented method.

It becomes apparent why the 360 Patent deliberately lacks precision. The more trivial, less scientific term "proanthocyanidins" -- which pragmatically encompasses the broader range of molecules than just the dimers preferred in the 407 -- in the 360 is substituted for the 407's terminology: hydroxyflavan 3,4-diols. The 407 uses the term hydroxyflavan 3,4-diols in a broad, inclusive way including diagrams such that statements regarding the functionality of the monomers would include the condensations of the monomers. (The 407 tries to elude this problem by creating a false paradigm of pragmatism: Monomers [i.e., catechins] are "unstable." But this argument merely begs the issue of what molecules one actually finds in an extract, *not* whether monomers, when found, behave differently as free radical scavengers from their condensations.)

As stated in the 360 Addendum, the 360 relies on a sleight of kitchen chemistry: turning a powder red with a little warm-acid. The 360 uses the term

proanthocyanidin (cyan means red) exclusively in an obvious effort to distract attention from what was known about monomers, etc.

The argument in the 407 is misplaced when it is repeated in the 360: That flavanols are preferrable to flavonoids.* (The issue is not which molecule is preferable but whether Masquelier discovered in 1985 that flavans/flavanols are free radical scavengers.) Regarding the role of bioflavonoids, the 407 seems to contradict itself and the 360:

> "The therapeutic indications of tetrahydroxy 5,7,3',4'-flavan 3,4-diol are those of the bioflavanoids (sic) or vitamin P factors in general, that is to say for the treatment of the under-mentioned disorders or diseases [capillary fragility and abnormal permeability]." 407 at 4:38-41.
>
> "The advantage of the utilisation of tetrahydroxy 5,7,3',4'-flavan 3,4-diol in human therapeutics, as compared with other hydroxyflavan diols, arise from the properties of the new compound used as an active product, that is to

*Lavollay and others, not Masquelier, discovered that the flavan monomer catechin had the most vascular protective effect.

leas of others as its

. More intense vascular action than that

avanoids (sic)....

m. The 407 implicitly

noids and another PAC-

ns of bioflavonoids and flavanols are the same in

1985 if flavanols were also preferred in 1969?

herapeutic indication for the dimers but not the

s were actually proven and published? At 4:73-5:7

a completely nonsensical statement: The

ared to *other* hydroxyflavan diols

uperior efficacy to...."the usual bioflavonoids"!

tement is ultimately *not* supported by the 407's

ormula [diagram omitted] where rings A and/or B

hydroxy-groups."* Whether Masquelier prefers

hat is inescapable is that Masquelier's 407 has

n his patent world and the 360 is exposed as a

es was in the literature

ners was known (and

nd the 407 recognizes

nds including the

orted to be

nstability catechin

oses. *However,*

*of vegetable*

*echin*: these are

flavan 3-ols, while

ls."

approach to the hydroxyflavans opens the door anti-radical molecules *in vivo* are the monomers :52-8 cites Lavollay on this issue), but the issue s the most potent scavenger is not dispositive of he foreknowledge of *any* radical scavenging by oids the 360. See the extensive discussion of dum at page 16 *et seq.*

"The present invention has essentially as object a process of *extraction of hydroxyflavan 3,4-diols which enables these substances to be obtained undegraded.* In plants the hydroxyflavan 3,4-diols exist in the form of *complex mixtures including all degrees of polymerisation ranging from monomers to condensed polymers* of the phlobaphene type [condensed tannins], and the process according to the invention has the advantage of isolating the less polymerised forms of the hydroxyflavan 3,4-diols, *compromising in particular the monomer, the dimers, trimers, tetramers and pentamers.* (Emphasis added.)

"The hydroxyflavan 3,4-diols have the following general formula:

where *rings A and/or B are substituted with one or more hydroxy-groups. The preferred compound is tetrahydroxy 5,7,3',4'-flavan 3,4-diol, having the formula:*

(Emphasis added.) 407 Patent at 1:67-2:42.

publications and how the 360 could be distinguished from that context. Of course, no such "distinctions" could withstand examination.

Second, the patent examiner did not write a 60-page research paper.

Respectfully submitted:

Jarrow L. Rogovin
President