# Exhibit C

Page 202

1  category at the same time, in that product
2  category.
3  Q  You mean industry-wide?
4  A  Industry-wide, yes.
5  Q  What losses are you claiming in this lawsuit?
6  A  Attorneys fees, costs and lost sales. And I
7     don't know how compensatable it is, but it cost
8     a tremendous amount of my time away from more
9     productive things.
10 Q  Such as what?
11 A  Anything other than answering -- and reading,
12    and reading, and reading, you know, and
13    writing -- you know, assisting my counsel,
14    reading all the pleadings, discussing the case
15    with my counsel, doing up papers -- that 57 page
16    paper on the fraudulent nature of the patent in
17    question. All that has been a phenomenally huge
18    waste of time and money.
19 Q  What would you have done with that time and
20    money otherwise -- let's take it this way. You
21    said it was a waste of time and money. What
22    would you have done with that time otherwise?
23 A  Worked on literature on other products. Better
24    supervise personnel. The biggest thing, better
25    supervise personnel. Written -- you know, help

Page 203

1  to write, help to draft other literature. A lot
2  of things got delayed. Things were done by
3  other people that perhaps were not done as well.
4  Maybe even visited a few accounts.
5  Q  Have you quantified all that type of loss?
6  A  Hundreds of hours. Over $300,000 in legal fees.
7  Q  I'm not talking about the attorneys fees. I'm
8     talking about just your time that you have said
9     could have been spent doing other things. You
10    said hundreds of hours; right?
11 A  Yes.
12 Q  Okay. And how did you calculate hundreds of
13    hours?
14 A  Knowing in general the huge amount of pleadings
15    that I -- the constant stream of pleadings that
16    I reviewed. And the 57 page paper on the
17    fraudulent nature of the patent took at least 20
18    hours a week for, easily, three months --
19    somewhere between three and four months; to go
20    to the library, pull all the -- find and copy
21    the references. Read them and write them up.
22    And it's 57 pages. And it took a great many
23    rewrites. A great deal of editing.
24 Q  Did you keep track of the hours that you spent
25    on -- I assume, you mean the lawsuit, the

Page 204

1  Connecticut lawsuit?
2  A  Actually, I started to. And then I just -- it
3     was just part of my growing disgust. I couldn't
4     even stomach watching the hours add up. So I
5     tossed it, and stopped it. It was turning my
6     gut.
7  Q  So, you didn't retain any copy of that record?
8  A  No. As I said, I tossed it, and stopped it. It
9     was turning my gut. Reading lie after lie was
10    making me ill.
11 Q  You said attorney fees over $300,000; is that
12    correct?
13 A  That's what I said.
14 Q  And which attorneys did you pay over $300,000
15    to, in total?
16 A  Who were the attorneys?
17 Q  Yes.
18 A  Well, as has already been stated in written
19    responses, Penny and Edmunds, McCormick, Golden
20    and Humer, Cummings and Lockwood, Neal Wiener.
21    Scott Polisky.
22 Q  And have you received bills from those lawyers
23    for payment?
24 A  Yes.
25 Q  And are those bills currently in the possession

Page 205

1  of Jarrow Formulas?
2  A  Yes.
3  Q  Have they been produced in this lawsuit?
4  A  I don't know.
5  Q  I don't believe they have. And I do request
6     them.
7  A  With the advice of counsel --
8        MR. WIECHMANN: There's no question.
9        THE WITNESS: Actually, I'm going to
10    the men's room.
11       VIDEOGRAPHER: We will go off record
12    at 4:53.
13       VIDEOGRAPHER: We are back on the
14    record at 5:05 p.m.
15       MR. ORDER: I would like to have the
16    reporter mark as Exhibit 6 documents
17    bearing Bates stamp JAR 1575 through JAR
18    1584.
19       (Exhibit 6, Bates stamped documents
20       JAR 1575 through JAR 1584, marked for
21       identification)
22
23    BY MR. ORDER:
24 Q  Mr. Rogovin, what are these documents that are
25    contained in Exhibit 6?

(Pages 202 to 205)

Page 455

1  THE VIDEOGRAPHER: This ends tape number
2  3, off record at 5:41 p.m.
3  THE VIDEOGRAPHER: Back on record at 5:50
4  p.m.
5  BY MR. ORDER:
6  Q  Mr. Rogovin, you attended, or appeared at the
7  beginning of a lecture that Dr. Masquelier was to
8  present in Baltimore on October 18th, 1996, isn't that
9  true?
10 A  Yes.
11 Q  And that was at the Hyatt, I believe?
12 A  Yes.
13 Q  How did you learn about that lecture?
14 A  It was very heavily advertised to the public.
15 Q  And what type of advertisement did you see?
16 A  It was mailed, it was in trade journals.
17 Q  Which trade journals?
18 A  Industry trade journals.
19 Q  Do you recall any particular one?
20 A  The Natural Foods Merchandiser for certain.
21 Q  Natural Foods Merchandiser?
22 A  Yeah. They were the sponsor of the trade
23 show, or the parent company is the sponsor of the trade
24 show.
25 Q  And did you receive an invitation to that

Page 456

1  lecture?
2  A  Did I receive mailings? Yes.
3  Q  Did you receive an invitation to that lecture?
4  MR. WIECHMANN: Object as to form.
5  BY MR. ORDER:
6  Q  Do you understand what the word invitation
7  means?
8  A  Well, in the context, no. Specifically or
9  generally, how do you mean invitation?
10 Q  Did you receive a card inviting you to attend
11 his lecture?
12 A  I was the addressee of an invitation.
13 Q  Do you have that invitation?
14 A  Or an announcement, I would say an
15 announcement.
16 Q  Was the announcement addressed to you, or to
17 Jarrow Formulas?
18 A  I don't see the difference, and I don't
19 remember.
20 Q  You received this announcement in the mail?
21 A  Yes.
22 Q  Did it have a RSVP?
23 A  No, not that I remember.
24 Q  Prior to October 18th, 1996, had you been
25 calling Dr. Masquelier a fraud?

Page 457

1  A  Prior to when?
2  Q  To October 18th, 1996, the date of the
3  lecture, had you been calling Dr. Masquelier a fraud?
4  A  I don't know what you mean by calling him a
5  fraud.
6  Q  Well, in conversations with anyone, in any
7  letters, had you been calling Dr. Masquelier a fraud
8  prior to October 18th, 1996?
9  A  It's too vague for me to answer. I need
10 specific language, a letter.
11 Q  The word, how about the word fraud, is that
12 specific enough?
13 A  Well, fraudulent patent, things like that.
14 Q  Did you call Dr. Masquelier himself a fraud at
15 any time?
16 A  I would have to see a particular letter, a
17 particular language, whatever.
18 Q  Have you ever accused Dr. Masquelier of
19 perpetrating a fraud?
20 A  Absolutely.
21 Q  And did you ever make that accusation prior to
22 October of 1996?
23 A  That I wouldn't remember. I think at the --
24 by the time I finished reviewing the prior art, I had
25 come to the well-founded conclusion that the patent was

Page 458

1  a fraud.
2  Q  And you had conducted that and completed that
3  research by the summer of 1996, correct?
4  A  In the summer, yes.
5  Q  In what?
6  A  In the summer.
7  Q  Right. Now, why did you attend this, why did
8  you show up for this lecture by Dr. Masquelier?
9  A  Because I intended to challenge his claim of
10 discovering that a molecule known to contain hydroxyls,
11 that proclaiming that a molecule that is known to
12 contain hydroxyl groups constitutes a discovery.
13 Q  In what way?
14 A  With the intention of asking him how he could
15 claim having discovered that a molecule that contains
16 hydroxyl groups is a free radical scavenger is a
17 discovery, since hydroxyl groups are known to be among
18 both, among nature's most powerful antioxidants, and
19 pro-oxidants.
20 Q  Did you attempt to write or communicate with
21 Dr. Masquelier prior to the lecture to convey those
22 ideas?
23 A  I sent his lawyer a copy of my paper, and I
24 have every reason to believe that Dr. Masquelier was
25 given a copy of it.