A

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2
 3   - - - - - - - - - - - - - - - x
                                   |
 4   JARROW FORMULAS, INC.         |
             Plaintiff,            |
 5                                 |
     VS.                           |
 6                                 |   Civil Action No.
     INTERNATIONAL NUTRITION       |   3:01-CV-00478(AVC)
 7   COMPANY, NORMAN H. ZIVIN, and |
     JACK MASQUELIER,              |
 8           Defendant.            |
     - - - - - - - - - - - - - - - x
 9
10
11
     ---------------------------------------------------------
12           DEPOSITION OF:   NORMAN H. ZIVIN, ESQ.
     ---------------------------------------------------------
13
14
15
16          Taken before James A. Scally, Registered
     Professional Reporter, a Notary Public in and for the
17   State of Connecticut, pursuant to Notice and the
     Federal Rules of Civil Procedure, at the offices of
18   Cummings & Lockwood, Four Stamford Plaza, Stamford,
     Connecticut, on February 22, 2002, commencing at
19   9:57 a.m.
20
21
22
23
                 BRANDON SMITH REPORTING SERVICE
24                      (860) 549-1850
                      11-A Capitol Avenue
25                Hartford, Connecticut 06106
```

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                Norman H. Zivin, Esq.

Page 2

APPEARANCES:

Representing the Plaintiff

CUMMINGS & LOCKWOOD
Eric Watt Wiechmann Esq.
Alexandra B. Stevens, Esq.
CityPlace
185 Asylum Street
Hartford, Connecticut 06103-3495

Representing the Defendants
UPDIKE, KELLY & SPELLACY, P.C.
Richard S. Order, Esq.
One State Street
P.O. Box 231277
Hartford, Connecticut 06123-1277

Also Present:

Jarrow L. Rogovin

Page 3

1     MR. WIECHMANN: I don't mind having the
2  usual stipulations we had before.
3     MR. ORDER: So long as he knows what
4  they are.
5     MR. WIECHMANN: No objection as to the
6  notice; the authority of you, the court reporter, is
7  stipulated to; objections as to form are reserved
8  except -- except as to form are reserved until the time
9  of trial. We have a designation that you will probably
10 hear reference to during the course of the deposition
11 where there's two levels of confidential information,
12 and the highly restricted ones have a requirement that
13 certain things be kept separate and possibly may have
14 to be sealed and bound separately.
15    Anything else?
16    MR. ORDER: And the witness reserves the
17 right to read and sign.
18    MR. WIECHMANN: Fine. That's not a
19 stipulation. That's the witness's choice.
20    MR. ORDER: I know, but it's usually put
21 in the stipulations.
22
23
24
25

Page 4

1  NORMAN H. ZIVIN, ESQ.,
2     called as a witness, having been first duly
3     sworn by James A. Scally, R.P.R., a Notary
4     Public in and for the State of Connecticut,
5     was examined and testified as follows:
6        MR. ORDER: Before we begin, Mr.
7  Wiechmann, I would like to just note on the record that
8  Mr. Zivin is an attorney; he has represented
9  International Nutrition Company. The basis for your
10 allegations against him are that he did certain --
11 performed certain conduct in regard to lawsuits that he
12 brought on behalf of International Nutrition Company.
13 Needless to say, we anticipate that many, if not most,
14 of the questions you're going to ask are protected from
15 disclosure and discovery by the attorney-client
16 privilege and the work product doctrine.
17        And so I just caution you at the
18 beginning, and I caution the witness also not to
19 divulge anything that would violate the attorney-client
20 privilege which, of course, is the client's privilege,
21 not Mr. Zivin's, to waive. And, also, that if there be
22 an inadvertent disclosure, we do not thereby waive the
23 protections of the attorney-client privilege or the
24 work product doctrine or the joint interest doctrine if
25 it applies.

Page 5

1        MR. WIECHMANN: Well, I understand Mr.
2  Zivin's training and position in this lawsuit. I will
3  say that you can take whatever position you want, but
4  we will take the position that if the attorney-client
5  privilege is invoked, we will move for an in limine
6  motion with the judge to estop either Mr. Zivin or any
7  of his clients from utilizing the "I relied on advice
8  of counsel" as a defense or other issue in this lawsuit
9  because you can't use it both as a shield and then a
10 sword; and on some of the things of Mr. Schwitters, or
11 anybody else, including Mr. Zivin, wants to raise the
12 issue, "I think I was allowed to because my lawyers
13 told me in France," or "I was advised that it was okay
14 to bring this or do the following thing," and they --
15 in this deposition anyone else makes the claim that
16 that's privileged information, we will move for an
17 estoppel or an in limine motion. So it's your choice.
18 DIRECT EXAMINATION
19 BY MR. WIECHMANN:
20   Q  Mr. Zivin, could you give me your present
21 address?
22   A  My home address or my business address?
23   Q  Home. Let's start with home.
24   A  3 Valley Lane, Chappaqua, New York.
25   Q  How long have you lived there?

Page 6

1   A   About 24 years.
2   Q   Are you presently employed?
3   A   Yes.
4   Q   By whom?
5   A   Cooper & Dunham, LLP.
6   Q   And where is Cooper & Dunham headquartered?
7   A   1185 Avenue of the Americas, New York City.
8   Q   Is that a different address than the 30
9   Rockefeller Center address that Cooper & Dunham used to
10  have?
11  A   Yes.
12  Q   Is that around the corner?
13  A   No.
14  Q   Where is 1185 Avenue of the Americas?
15  A   It's on the Avenue of the Americas between
16  46th and 47th Streets.
17  Q   And when did Cooper & Dunham move to 1185
18  Avenue of the Americas?
19  A   About seven years ago.
20  Q   How long have you -- oh, first, does Cooper &
21  Dunham have any other offices?
22  A   No.
23  Q   How long have you worked for Cooper & Dunham?
24  A   Since 1968.
25  Q   Have you --

Page 7

1   A   Using loosely your term "worked for."
2   Q   We'll get to that.
3       Have you been employed by or partner in any
4   other law firm other than Cooper & Dunham?
5   A   Yes.
6   Q   All right. What is that?
7   A   Between my second and third years of law
8   school, I was a law clerk at a law firm in Chicago, and
9   shortly after I began practice, I also worked for a law
10  firm in Chicago for a short time.
11  Q   What was the name of the firm that employed
12  you during your summer?
13  A   It was Wolf Hubbard.
14  Q   And after you graduated from law school, you
15  said you worked for a Chicago firm?
16  A   Yes.
17  Q   And what was the name of that firm?
18  A   Anderson Leudeka.
19  Q   Was Anderson -- strike that.
20      How would you describe the practice of
21  Anderson Leudeka?
22  A   It was intellectual property.
23  Q   Mr. Zivin, have you ever been a -- have you
24  ever been deposed before?
25  A   Yes.

Page 8

1   Q   How many times?
2   A   Once that I recall.
3   Q   Do you recall the name of the lawsuit?
4   A   I believe it was Laser Pacific versus
5   Eslinger.
6   Q   In which court was that case pending?
7   A   I think it was in California, but I don't
8   recall.
9   Q   State or federal court, do you recall?
10  A   Yes, it was in California. It was in the
11  Central District of California.
12  Q   Which is Los Angeles?
13  A   Correct.
14  Q   Do you recall what year that deposition took
15  place?
16  A   Oh, sometime about 1995.
17  Q   And what was -- strike that.
18      Were you a party to that lawsuit?
19  A   No.
20  Q   Were you a witness, just solely a witness in
21  the lawsuit?
22  A   Yes.
23      MR. ORDER: Objection to the form.
24  A   Yes, as I understand your question.
25  Q   (By Mr. Wiechmann) As a factual witness?

Page 9

1   A   Yes.
2   Q   What did that lawsuit involve?
3   A   It involved a malpractice claim against a
4   former partner in our firm.
5   Q   Have you ever been a party to a lawsuit?
6   A   Yes.
7   Q   How many times?
8   A   I don't recall.
9   Q   More than one?
10  A   Yes.
11  Q   Did any of those lawsuits deal with
12  intellectual property?
13      MR. ORDER: Objection to form.
14  A   I don't know what you mean by "deal with."
15  Were they intellectual property cases?
16  Q   (By Mr. Wiechmann) Were they cases where
17  there were claims or defenses involving intellectual
18  property?
19      MR. ORDER: Objection to form.
20  A   No.
21  Q   (By Mr. Wiechmann) Did any of those cases
22  involve your duties or practice as a lawyer as opposed
23  to something personal?
24  A   Yes.
25  Q   Did any of them involve -- were any of them in

### Page 10

1  the 1990s?
2  A  Yes.
3  Q  More than one?
4  A  One.
5  Q  Do you remember the -- recall the name of
6  that?
7  A  I believe it was Sterling Health versus
8  myself.
9  Q  Was the law firm of Cooper & Dunham or Cooper
10 & Dunham LLP named in that also?
11 A  I don't recall.
12 Q  What was the gravamen of the complaint against
13 you?
14    MR. ORDER:  Objection to form.
15 A  It was an alleged claim of malpractice.
16 Q  (By Mr. Wiechmann) Is that suit still
17 pending?
18 A  No.
19 Q  Was it resolved?
20 A  Yes.
21 Q  By way of settlement or judgment?
22 A  By way of settlement.
23 Q  In connection with that settlement, did you
24 admit to any acts of malpractice?
25 A  Absolutely not.

### Page 11

1  Q  Did you pay any money in connection with that
2  settlement?
3  A  There was some money payment.
4  Q  That suit was pending in what court?
5  A  I think it was Southern District of New York.
6  Q  I assume, Mr. Zivin, you have taken
7  depositions in the past before on numerous occasions?
8  A  Yes.
9  Q  And you've represented parties who have been
10 deposed in the past on numerous occasions?
11 A  Yes.
12 Q  So hopefully you are as familiar or more
13 familiar with these rules, but to make sure they're
14 clear --
15 A  You don't have to go through the rules with
16 me, counsel.
17 Q  Okay. Just a couple quick questions: One, is
18 there any condition today that you have that would in
19 any way affect your ability to testify completely and
20 accurately?
21 A  No.
22 Q  You're taking no substance or medication that
23 would affect your ability to testify completely or
24 accurately?
25 A  No.

### Page 12

1  Q  Obviously, if you would like to take a break,
2  feel free to request that.
3     Did you spend any time preparing for your
4  deposition?
5  A  Yes.
6  Q  About how many hours?
7  A  One.
8  Q  Did you talk to anybody in connection with
9  your preparation for this deposition?
10 A  Yes.
11 Q  And was that your attorney?
12 A  Yes.
13 Q  Mr. Order?
14 A  Yes.
15 Q  Did you talk to anybody else?
16 A  No.
17 Q  Did you look at any documents in connection
18 with the preparation for this deposition?
19 A  No.
20    MR. ORDER:  I was going to object,
21 but --
22    THE WITNESS:  It's no anyway.
23    MR. ORDER:  -- I will let it go.
24    THE WITNESS:  I guess I should revise
25 that last answer.

### Page 13

1     MR. ORDER:  If you're going to revise
2  that last answer, then I'm going to object. He can
3  answer as to whether he looked at any documents, but I
4  object to any questions about identification of the
5  documents on the grounds that you have no -- not
6  established what you need to establish in order to get
7  that information.
8     So if you want to revise your answer.
9     THE WITNESS:  Just to cut to the chase,
10 I looked at the driving instructions as to how to get
11 to this office.
12    MR. WIECHMANN:  Okay. I'd like to show
13 you, Mr. Zivin, a document that's been marked as
14 Exhibit 32.
15    (Exhibit 32, amended notice of
16 deposition of Norman H. Zivin, marked.)
17 Q  (By Mr. Wiechmann) I show you a copy of
18 Plaintiff's Exhibit 32, Mr. Zivin. Have you seen that
19 before?
20 A  Yes.
21 Q  You received a copy of this notice in
22 connection with your deposition for today?
23 A  Yes.
24 Q  Did you have a chance to review Exhibit A
25 attached to this deposition?

Page 14

1  A   Yes.
2  Q   Did you or somebody at your --
3  A   Other than with the markings that were put on
4  it.
5  Q   Excuse me. Did I give you the --
6      MR. WIECHMANN: For the record, there is
7  some pen markings that I put on, and I'm not claiming
8  those, and they were not on the exhibit as served.
9  Q   (By Mr. Wiechmann) Did you or somebody at
10 your direction make an attempt to locate the documents
11 that are listed in paragraphs 1 through 16 on Exhibit
12 A?
13 A   For what purpose?
14 Q   To produce at this deposition.
15 A   The documents in my possession that are
16 relevant to this case were previously produced.
17 Q   Did you review -- did you make an attempt to
18 read through the 16 numbered paragraphs here?
19 A   Yes, I did.
20 Q   Are there documents that are responsive to the
21 16 paragraphs listed here that were not previously
22 produced which you are either producing today or taking
23 the position that such documents are not relevant and
24 therefore not being produced today?
25 A   I don't understand your question.

Page 15

1      MR. ORDER: Objection to form.
2  Q   (By Mr. Wiechmann) Did everything -- have you
3  produced documents prior to this, or at least
4  identified them in connection with a privilege log,
5  that are responsive to the 16 paragraphs here?
6  A   As I understand your question, the answer is
7  yes.
8  Q   Are there documents that are responsive --
9  let's go to paragraph 1 -- that have not been produced,
10 previously produced by you, or listed on the
11 defendant's privilege log?
12     MR. ORDER: I would like to just point
13 out, we did object to the documents that are requested
14 here. We did file objections. So I just wanted to
15 note that. Go ahead, you can answer the question.
16 A   Yes.
17 Q   (By Mr. Wiechmann) Let's focus on Exhibit 1
18 for a second. Do you contend --
19     MR. ORDER: Paragraph 1, do you mean?
20     MR. WIECHMANN: Exhibit A, paragraph 1.
21 Q   (By Mr. Wiechmann) Do you contend that you
22 have represented Egbert Schwitters as his lawyer at any
23 time in the past?
24     MR. ORDER: Objection as to form. What
25 do you mean by contend?

Page 16

1  A   Are you going to rephrase that?
2  Q   (By Mr. Wiechmann) No.
3  A   I don't make any contentions.
4  Q   Have you represented Egbert Schwitters
5  personally?
6  A   Probably. I'm not sure, but I think I have.
7  Q   What leads you not to be clear as to whether
8  you've represented him personally?
9  A   No. I take that back. It is clear. I have
10 represented him personally.
11 Q   When did you represent him personally?
12 A   In connection with this lawsuit during the
13 period of time that he was named as a party.
14 Q   Other than the period of time that he was
15 named a party to the present lawsuit, have you ever
16 represented him personally?
17 A   I believe I had some years ago. I don't have
18 a firm recollection of it.
19 Q   Was it in connection with the 360 patent?
20 A   No.
21 Q   Was it connected with the OPC's?
22 A   It was probably in connection with some
23 trademark matter, but I don't recall what it was.
24 Q   Do you recall when you would have represented
25 him?

Page 17

1  A   Ten years ago, perhaps.
2  Q   Have you represented International Nutrition
3  Company or any affiliated company in the past?
4  A   I have represented International Nutrition
5  Company in the past, and I continue to represent them.
6  Q   Okay. I have noticed from many of the
7  documents there are several companies that use the term
8  International Nutrition Company, or INC, owned by Mr.
9  Schwitters, one in Monaco, one in Holland, one in
10 Liechtenstein, and actually one in, I think, the
11 British Virgin Islands. Have you represented all of
12 those corporations?
13     MR. ORDER: Objection to the form.
14 A   I don't know who owns any of those companies.
15 Some of those companies I have never heard of. So the
16 answer to your question is no.
17 Q   (By Mr. Wiechmann) Have you ever represented
18 any company, any affiliated company to International
19 Nutrition Company, that was headquartered in a place or
20 legally domiciled in a place other than Liechtenstein?
21 A   I cannot answer your question because I do not
22 know what you mean by affiliated.
23 Q   A company that, one, has the same or similar
24 name, two, was sometime controlled by Mr. Schwitters or
25 any of his companies, and, three, did business relating

Page 18

1  to the sale of OPC's anywhere in the world.
2       MR. ORDER: I'm sorry, can you read that
3  question back, please?
4   A   I don't understand it anyways.
5   Q   (By Mr. Wiechmann) International Nutrition --
6       MR. ORDER: Wait.
7       MR. WIECHMANN: If he doesn't
8  understand, he can't answer it.
9       MR. ORDER: Fine.
10  Q   (By Mr. Wiechmann) International Nutrition
11 Company, where is it domiciled?
12  A   As far as I know --
13      MR. ORDER: Objection.
14  A   -- it's a Liechtenstein company.
15  Q   (By Mr. Wiechmann) Are you aware of any other
16 companies using the term International Nutrition
17 Company that is domiciled in any countries other than
18 Liechtenstein?
19  A   No.
20      MR. ORDER: Objection to form.
21  Q   (By Mr. Wiechmann) Have you ever represented
22 any other companies that were owned or controlled by
23 Egbert Schwitters other than International Nutrition
24 Company?
25  A   I can't answer that question.

Page 19

1   Q   And why can't you answer it?
2   A   Because I don't know what companies he owns or
3  controls.
4   Q   Do you know any companies other than
5  International Nutrition Company that over the last 15
6  years Egbert Schwitters has owned or controlled?
7   A   I believe that at one time Mr. Schwitters
8  owned a company called INC Agency, Bv.
9   Q   Did you ever represent that company?
10  A   Yes.
11  Q   Was that company headquartered in the
12 Netherlands?
13  A   Insofar as I am aware, yes.
14  Q   Have you ever heard of a company International
15 Nutrition Company Establishment?
16  A   That's the same as International Nutrition
17 Company.
18  Q   Does International Nutrition Company -- is
19 International Nutrition Company Establishment located
20 in Monte Carlo?
21      MR. ORDER: Objection to form.
22  A   International Nutrition Company, which is
23 sometimes called International Nutrition Company
24 Establishment, has an administrative office in Monaco.
25  Q   (By Mr. Wiechmann) Okay. Have you ever

Page 20

1  represented a company called Holland Health?
2   A   I think so.
3   Q   In connection with what?
4       MR. ORDER: Without -- I object to the
5  extent the question asks for the disclosure of any
6  attorney-client privilege information.
7   A   There may have been a trademark matter.
8   Q   (By Mr. Wiechmann) Do you recall when?
9   A   Maybe ten years ago.
10  Q   Have you ever heard of a company INC
11 Administrative Management LLC?
12  A   No.
13  Q   Are you aware of any companies owned or
14 controlled by Mr. Schwitters that are located in
15 Tortola, British Virgin Islands?
16  A   No.
17  Q   Have you ever represented any of the directors
18 or officers of INC other than Mr. Schwitters, Egbert
19 Schwitters?
20      MR. ORDER: Objection to the form.
21  A   Only in the connection with representation of
22 the corporation.
23  Q   (By Mr. Wiechmann) Never represented -- did
24 you ever represent Arno Scalet individually?
25  A   No.

Page 21

1   Q   Or Margot Weiss individually?
2   A   No.
3   Q   Or Kim Schwitters?
4   A   Individually, no.
5   Q   Individually. Do you have a written
6  engagement or retainer agreement with INC?
7   A   No.
8   Q   Did you ever have a written engagement or
9  retainer agreement with INC?
10  A   No.
11  Q   Did you ever have one with Mr. Schwitters
12 individually?
13  A   No.
14  Q   Or any of his -- the other companies we've
15 just gone through that are INC-related companies such
16 as the one in Holland or Holland Health?
17      MR. ORDER: Objection to form.
18  A   Without agreeing that any of those are related
19 companies, I have no retainer agreements with them, to
20 the extent I may have represented them.
21  Q   (By Mr. Wiechmann) Have you ever represented
22 Jack Masquelier other than this lawsuit?
23  A   Personally? Are you asking about personally?
24  Q   Well, first start with personally.
25  A   I don't think so.

### Page 22

1  Q   Did you ever represent any company owned or
2  controlled by Mr. Masquelier?
3       MR. ORDER:  Objection to form.
4  A   I have represented a company in which he was
5  an owner.
6  Q   (By Mr. Wiechmann)  What company was that?
7  A   I wouldn't say he owned or controlled it.
8  Q   What company was that?
9  A   SCERPA.
10 Q   Will you first give the initials for the court
11 reporter?
12 A   S-c-e-r-p-a.
13 Q   And do you know what SCERPA represents?
14      MR. ORDER:  What the acronym stands
15 for?
16      MR. WIECHMANN:  I'm not sure it's an
17 acronym.
18      MR. ORDER:  Objection to form.
19 A   It's a long French term which I'm not very
20 good at pronouncing.
21 Q   (By Mr. Wiechmann)  And when did you represent
22 SCERPA?
23 A   About ten years ago.
24 Q   In connection with what?
25 A   A trademark matter, or perhaps matters.

### Page 23

1  Q   Did that trademark deal with OPC's?
2  A   You're using the term "OPC's."  Are you using
3  that as some sort of descriptive term?  I'm not sure
4  what you mean.
5  Q   Tell me the name of the trademark.
6  A   Pycnogenol.
7  Q   You mentioned you represented the Holland --
8  the INC company that is located in Holland at one time
9  in connection with a -- strike that.
10     You mentioned that you represented Egbert
11 Schwitters personally at one time in connection with a
12 trademark matter.  What was that trademark?
13 A   I don't recall.
14 Q   Was it Pycnogenol?
15 A   I don't think so.
16 Q   You're aware of the patent that was referred
17 to in the 1996 United States District Court for the
18 District of Connecticut case known as Patent 360?  I
19 assume you're familiar with that patent?
20 A   If you're using that as an abbreviation for
21 the patent that was at suit --
22 Q   Yes.
23 A   -- then I am familiar with it.
24 Q   And that patent basically involves what, sir?
25 A   It involves the use of a specific material for

### Page 24

1  the purpose of scavenging free oxygen radicals.
2  Q   And that material is a plant extract?
3  A   Yes.
4  Q   Just for the record, the patent we're
5  referring to is U.S. Patent No. 4,698,360?
6  A   I believe that's the number.
7  Q   And when I used the term "OPC's," I was
8  referring to something sometimes referred to as
9  oligomeric proanthocyanidins?
10 A   Oligomeric proanthocyanidins?
11 Q   Yes.
12 A   If you wish to use that, I will take that as
13 your understanding.
14 Q   Okay.  And OPC's had something to do with
15 Patent 360?
16 A   The materials described in the patent are
17 oligomeric proanthocyanidins.
18 Q   Going back to my initial question, which is
19 did the representation of Mr. Schwitters individually
20 in connection with the trademark matter have anything
21 to do with OPC's or relate in any way to OPC's?
22 A   I don't recall.
23 Q   Have you ever represented -- in connection
24 with SCERPA, did you have a written retainer agreement?
25 A   No.

### Page 25

1  Q   In connection with your representation of Mr.
2  Masquelier in this present lawsuit, do you have a
3  written retainer agreement?
4  A   No.
5  Q   Have you ever represented a French company
6  with the initials SCIPA?
7  A   Probably.
8  Q   What leads you to qualify that answer?
9  A   That company merged with another company
10 called CEP, and I have authority to act on its behalf.
11 Q   Authority to act on behalf of CEP?
12 A   Yes.
13 Q   Prior to the merger of SCIPA into CEP, did
14 you, did you represent S-C-I-P-A, or SCIPA?
15 A   I think I did, actually.
16 Q   And in what connection?
17 A   I think in connection with the re-examination
18 of the 360 patent in the Patent Office, I may have had
19 a power of attorney from SCIPA.
20 Q   Other than representing SCIPA in connection
21 with the re-examination of the 360 patent, have you
22 ever done any other legal work, you or your firm,
23 with -- not with -- for SCIPA?
24 A   I don't think so, but I don't recall.
25 Q   Did you represent CEP in connection with the

Page 26

1  re-examination of the 360 patent?
2      A   I don't think CEP was involved with that, no.
3      Q   Did you represent INC in connection with the
4  re-examination of the 360 patent?
5      A   Yes.
6      Q   Other than SCIPA and INC, did you represent
7  anybody else in connection with the re-examination of
8  the 360 patent?
9      A   I don't recall whether there was a power of
10 attorney from Dr. Masquelier as well, but it's possible
11 there was. I just don't remember.
12     Q   You said before that you had a power to
13 represent CEP. What was the extent of the power
14 granted to you to represent CEP?
15         MR. ORDER: Objection to form. I
16 believe he said power of attorney.
17         MR. WIECHMANN: I don't think he used
18 that term.
19     A   I believe I had authorization to bring them
20 into a lawsuit in the district of Connecticut if the
21 court would allow the complaint to be amended, which
22 the court did not allow. So they in fact did not
23 appear in the lawsuit.
24     Q   (By Mr. Wiechmann) Other than representing
25 CEP in connection with the possible involvement with

Page 27

1  the District of Connecticut lawsuit, have you or your
2  firm done any other legal work for C-E-P, or CEP?
3      A   Not that I recall.
4      Q   Did you ever have a written retainer or
5  retention agreement between your firm and CEP?
6      A   Only to the extent there was a power of
7  attorney that was filed --
8      Q   Did you ever --
9      A   -- in connection with the court action.
10     Q   Have you ever represented either Primary
11 Source, Inc., Primary Services, Inc., or Integrated
12 BioCeuticals, LLC?
13     A   Yes.
14     Q   You represented all of those companies or just
15 some of them?
16     A   I represented Primary Services, Inc.
17     Q   In connection with what?
18     A   A variety of matters.
19     Q   Other than -- well, Mr. Senecal the other day
20 mentioned that you represented him in connection with a
21 trademark action that was unrelated to the 360 patent.
22 Do you recall that?
23     A   I don't recall what Mr. Senecal said the other
24 day because I wasn't there.
25     Q   Do you recall representing Mr. Senecal's

Page 28

1  corporation in connection with Primary Services in
2  connection with a trademark that did not deal with the
3  360 patent or OPC's?
4      A   Yes, I do recall that.
5      Q   Other than that matter, what other matters did
6  you represent PSI or Integrated BioCeuticals or PSI,
7  which would be -- well, I think you just said you
8  represented Primary Sources, Inc.
9          MR. ORDER: Objection.
10         MR. WIECHMANN: Strike that.
11         MR. ORDER: I think he said Primary
12 Services.
13     Q   (By Mr. Wiechmann) Primary Services?
14         MR. ORDER: I think it's international.
15     Q   (By Mr. Wiechmann) -- International which was
16 referred to, without using any letters, Primary
17 Services, what other matters did you represent Primary
18 Services other than with this unrelated trademark
19 matter?
20     A   I represented them in connection with various
21 patent and trademark matters.
22     Q   Did you represent them in connection with the
23 United States District Court case that was brought by
24 INC relating to infringement claims of the 360 patent?
25         MR. ORDER: Objection to the form. Do

Page 29

1  you mean the Connecticut case? Which case?
2          MR. WIECHMANN: The Connecticut case.
3          MR. ORDER: You just said District
4  Court. You didn't say which district.
5          MR. WIECHMANN: District Court of
6  Connecticut.
7      A   They were not a party to that case, but they
8  had a joint interest with INC. So to that extent, I
9  provided some legal advice to them.
10     Q   (By Mr. Wiechmann) Did you have a written
11 retainer or agreement with Primary Services?
12     A   No.
13     Q   Were you or your law firm involved in any way
14 in any of the suits that were brought in France
15 concerning ownership of the 360 patent?
16     A   Yes.
17     Q   Did you represent any parties to those suits?
18         MR. ORDER: Objection to the form.
19     A   Since I am not a French attorney, I did not.
20         MR. ORDER: By your question, did you
21 mean was he counsel of record or did he provide legal
22 advice as an advisor?
23         MR. WIECHMANN: I assume he was not,
24 because he is not a French attorney, he was not counsel
25 of record.

Page 30

1   MR. ORDER: I think that's the way he
2   understood the question.
3   Q   (By Mr. Wiechmann) Well, were you retained to
4   render legal advice to, let's start with INC, in
5   connection with the French lawsuits?
6       MR. ORDER: Objection to the form.
7   A   As I understand the question, yes.
8   Q   (By Mr. Wiechmann) Were you retained to
9   provide legal advice to Mr. Schwitters individually in
10  connection with the lawsuit in which he was named as an
11  individual party?
12  A   In France?
13  Q   In France.
14  A   I don't believe so.
15  Q   Can you describe to me your role just
16  generally without getting into any of the substantive
17  areas relating to --
18      MR. WIECHMANN: Well, strike that.
19      (Mr. Rogovin arrived at the deposition.)
20  Q   (By Mr. Wiechmann) What legal services did
21  you provide to INC in connection with the French
22  lawsuits?
23      MR. ORDER: Are you asking him to tell
24  you what legal advice he provided to INC?
25      MR. WIECHMANN: No. I said without

Page 31

1   being specific, what legal -- I want him to
2   characterize it such as did he help draft pleadings,
3   without telling me the substance, did he give opinions
4   concerning any certain legal issues, did he give advice
5   concerning how those suits related to Connecticut
6   suits. I don't want the specific advice or services
7   rendered, but I'd like to know a characterization of
8   what type of legal services were rendered.
9       MR. ORDER: I'm going to object to the
10  extent that question calls for the disclosure of
11  attorney-client communications or attorney work
12  product. To the extent in some of your examples I
13  think it would be okay, for example, whether he drafted
14  pleadings, but one of your examples was whether he gave
15  advice about the impact of the French litigation on the
16  Connecticut lawsuit, and to that extent, I do object to
17  the question.
18      I also want to note that Mr. Jarrow
19  Rogovin just entered the deposition room, so it's clear
20  on the record that he came in about 10:40 a.m. And I
21  would also like to note that in trying to reschedule
22  the resumption of or to schedule the resumption of Mr.
23  Rogovin's deposition, I had suggested that we do it in
24  tandem with a visit to the East Coast to attend Mr.
25  Zivin's deposition, and I was told by either your

Page 32

1   office -- by either you or your associate, Alexandra
2   Stevens, that he was not going to be attending this
3   deposition and therefore we would not be able to
4   schedule the resumption of his deposition in tandem
5   with this deposition.
6       MR. WIECHMANN: I don't want to get in
7   an argument what was said to whom. It was my
8   understanding what was said, that in the visit with us,
9   he would not be able to have two days free to attend
10  this and to come here, and Mr. Rogovin doesn't even
11  have this full day free. He came in late anyway. It
12  was not whether he could attend, whether he could make
13  any time free for his schedule, two days were
14  impossible.
15      MR. ORDER: We could have spent one day
16  doing his deposition. But go ahead.
17  Q   (By Mr. Wiechmann) Well, do you recall the
18  question?
19  A   Generally.
20  Q   Okay. What I'm looking for is the general
21  nature of the legal services you rendered INC in
22  connection with the French lawsuits.
23      MR. ORDER: Same objection.
24  A   I consulted with INC, I consulted with INC's
25  French attorneys, I prepared and/or submitted certain

Page 33

1   affidavits requested for use in the proceeding, and I
2   advised regarding American law and what its impact
3   might be.
4   Q   (By Mr. Wiechmann) In connection with --
5   well, first, do you recall the name of the French
6   attorneys that INC used in the lawsuits pending in
7   France?
8   A   The original attorney was named Jeroen
9   Luchtenberg, and then there was an attorney whose name
10  was, I believe, Pierre Cousin, and then there was an
11  attorney whose name was Frederic Benech.
12  Q   Did you consult with all three of these
13  attorneys?
14  A   Yes.
15  Q   You mentioned that you supplied affidavits to
16  these attorneys in connection with the various
17  lawsuits, correct?
18      MR. ORDER: Objection to form.
19  A   I did supply affidavits, that's correct.
20  Q   (By Mr. Wiechmann) Were they used, to your
21  knowledge, in the lawsuit?
22  A   I have no knowledge of whether they were used
23  or not.
24  Q   Do you still have copies of those affidavits?
25  A   Likely.

Page 34

1   Q   In connection with either the request for
2   production from plaintiff or notice of deposition that
3   has been marked as Exhibit 32, Plaintiff's Exhibit 32,
4   did you produce copies of those affidavits?
5   A   I don't recall.
6        MR. WIECHMANN: I would ask that those
7   documents be produced.
8        MR. ORDER: In response to which
9   request?
10       MR. WIECHMANN: To either the initial
11  request or these. It's responsive to both.
12       MR. ORDER: Show me which request it
13  would be responsive to.
14       MR. WIECHMANN: Well, since I have
15  limited time, at the breaks, we will --
16       MR. ORDER: Okay.
17       MR. WIECHMANN: -- designate, but we
18  have limited time today.
19  Q   (By Mr. Wiechmann) When, Mr. Zivin, did you
20  first become aware of the lawsuit brought by Horphag in
21  Bordeaux?
22  A   I assume shortly after it was brought.
23  Q   Were you aware before it was being brought
24  that the lawsuit was being threatened by Horphag?
25  A   Not that I recall.

Page 35

1   Q   Did you see any correspondence between
2   Horphag's attorneys and INC's attorneys prior to the
3   lawsuit being brought discussing the issues that were
4   raised in the lawsuit in Bordeaux?
5   A   Not that I recall.
6   Q   Have you ever seen any correspondence between
7   the attorneys representing Horphag and the attorneys
8   representing INC and Mr. Schwitters relating to the
9   Bordeaux lawsuit?
10  A   The way your question is phrased, I think the
11  answer is yes.
12  Q   Do you have in your files or your firm's files
13  a copy of correspondence between the parties or the
14  representatives in the Bordeaux lawsuit?
15  A   Can you repeat that question, please?
16       (Question read.)
17       MR. ORDER: Objection to form.
18  A   As I understand the question, no.
19  Q   (By Mr. Wiechmann) Do you have copies of any
20  correspondence between Mr. Schwitters and
21  representatives of Horphag pertaining to the issues
22  raised in the Bordeaux lawsuit?
23  A   As I understand the question, no.
24  Q   Breaking it down first to the Bordeaux
25  lawsuit, were you provided, in connection with your

Page 36

1   legal representation of INC, with pleadings filed by
2   all the parties in that lawsuit?
3        MR. ORDER: Objection to the form.
4   A   As I understand the question, no.
5   Q   (By Mr. Wiechmann) Were you supplied with
6   translations of pleadings?
7   A   As I understand the question, no. There may
8   have been some isolated passage that I was sent
9   something on, but that was about it.
10  Q   Were you supplied with any briefs filed by any
11  of the parties in the Bordeaux lawsuit?
12  A   I don't believe so.
13  Q   Were you asked to review and comment upon any
14  of the briefs filed in the Bordeaux lawsuit?
15  A   Not that I recall.
16  Q   Were you provided with any of the rulings or
17  decisions by the court in the Bordeaux lawsuit?
18  A   Yes.
19  Q   Were you provided with any of the briefs filed
20  in connection with the appeal from the Bordeaux
21  decision?
22  A   Not that I recall.
23  Q   Were you provided with any documents that were
24  exchanged between the parties in connection with the
25  Bordeaux lawsuit, be it discovery or letters back and

Page 37

1   forth?
2        MR. ORDER: Objection to form.
3   A   As I understand the procedure in France, there
4   is no discovery, and so the answer is no.
5   Q   (By Mr. Wiechmann) Were you provided with any
6   declarations, affidavits, or similar documents filed by
7   any of the parties in connection with the lawsuit?
8   A   I may have some, yes.
9   Q   Do you know whether those were produced in
10  connection with this lawsuit?
11  A   I don't. I don't recall.
12  Q   Was the first time prior -- were you aware of
13  the dispute between Horphag and INC that was the
14  gravamen of the complaint in the Bordeaux lawsuit prior
15  to the initiation of this lawsuit?
16       MR. ORDER: Objection to form.
17  A   No.
18  Q   (By Mr. Wiechmann) Now, the same questions,
19  there was another lawsuit brought in the Commercial
20  Court of Grasse. Are you aware of that lawsuit?
21  A   There are many lawsuits in France, and I'm not
22  sure which one you're referring to.
23  Q   Are you aware of a suit that is currently on
24  appeal between Horphag and INC and CEP that initiated
25  at the Commercial Court of Grasse, which resulted in an

Page 38

1  opinion rendered sometime in 2001?
2  A   I believe I am, yes.
3  Q   Okay. Were you asked to render any legal
4  advice to INC or to Mr. Schwitters in connection with
5  that lawsuit?
6  A   Probably.
7  Q   What leads you to hesitate or qualify your
8  answer?
9  A   INC sends me many pieces of paper and, just
10 for general information, and asks if I have any
11 comment.
12 Q   Did you ever consult directly with the lawyers
13 representing Mr. Schwitters and INC and CEP in
14 connection with that lawsuit?
15 A   Probably.
16 Q   Do you recall their names?
17 A   Probably Frederic Benech.
18 Q   Anybody else other than Monsieur Benech?
19 A   Not that I can recall.
20 Q   Did you ever receive copies of any of the
21 pleadings filed in connection with that lawsuit?
22 A   I don't think so. It's possible, but I don't
23 recall.
24 Q   Did you ever receive copies of any affidavits
25 or declarations or certifications or similar documents

Page 39

1  filed in connection with that lawsuit?
2  A   Not that I recall.
3  Q   Did you receive -- ever receive copies of any
4  correspondence or communications between the parties or
5  their attorneys arising out of that lawsuit?
6  A   Not that I recall.
7  Q   Did you ever receive a copy of the decision
8  that was rendered by the trial court in that lawsuit?
9  A   Are you referring to the decision which was
10 eventually stayed by the Court of Appeals?
11 Q   Yes.
12 A   Yes, then I did get a copy of that.
13 Q   And you received a copy of the Court of
14 Appeals decision on the motion to stay?
15 A   Yes.
16 Q   Have you seen any other -- did you receive
17 those in original form or in translation, translatable
18 form?
19 A   I don't recall whether I received a French
20 version and had it translated or whether I received a
21 French version and the translation or whether I simply
22 received the translation.
23 Q   Did you ever consult with Mr. Benech about the
24 meaning of the trial court's decision in the Commercial
25 Court of Grasse after you received it?

Page 40

1  A   I believe so.
2  Q   Did you ever consult with any other attorneys
3  as to the meaning and/or effect of that decision after
4  you received it?
5  A   Not that I recall.
6  Q   Did you ever consult with any attorney
7  representing Mr. Schwitters or INC as to the meaning or
8  effect of the Bordeaux trial court decision in 1997?
9  A   Yes.
10 Q   Which of the three attorneys?
11 A   Mr. Benech.
12 Q   Did you ever consult with any other attorney
13 concerning the meaning or effect of that decision?
14 A   Yes.
15 Q   Who else?
16 A   Neil Smith, Jonathan Flatow, various partners
17 in my firm. That's all that I recall right now.
18 Q   Did you ever consult with Mr. Benech
19 concerning the appellate decision from the Bordeaux
20 decision?
21 A   Yes, I'm sure I did.
22 Q   Did you ever consult with any other attorneys
23 other than Mr. Benech concerning the effect or meaning
24 of that decision?
25 A   Yes. The various persons I mentioned.

Page 41

1  Q   Just for the record, who is Neil Smith?
2  A   He is an attorney in San Francisco.
3  Q   And who does he work for?
4  A   Today he works for the Howard, Rice firm.
5  Q   And who did he work for in 1997?
6  A   Limbach & Limbach.
7  Q   Did he represent -- in connection with your
8  consultation, was he representing any specific company
9  or party?
10 A   International Nutrition Company.
11 Q   And Jonathan Flatow, who is he?
12 A   He's an attorney in Connecticut.
13 Q   And was he your local counsel in connection
14 with the District of Connecticut patent infringement
15 lawsuit?
16 A   That's correct.
17 Q   And does he still work for Wake, See & Dimes?
18 A   No.
19 Q   Where is he presently?
20 A   The last I knew, he was with a company called
21 Greenfield.
22 Q   And where is Greenfield located?
23 A   Someplace in -- someplace within 20 miles of
24 this office.
25 Q   Other than Mr. Schwitters' attorneys, did you

Page 42

1  ever consult with attorneys representing Mr.
2  Masquelier, Dr. Masquelier, excuse me, and/or his
3  partners in connection with any of the French lawsuits
4  we've discussed?
5      MR. ORDER: Objection to form.
6  A   I don't recall.
7  Q   (By Mr. Wiechmann) Were you aware of the
8  names of any of Dr. Masquelier's attorneys who
9  represented him in connection with either the Bordeaux
10 lawsuit or the Commercial Court of Grasse lawsuit?
11 A   He's generally represented by a lawyer named
12 Philipe Lief.
13 Q   Are you aware of whether Mr. Lief was counsel
14 of record for Mr. Masquelier in either of those two
15 lawsuits?
16 A   I don't know.
17 Q   Are you aware of any other lawyers who were
18 counsel of record for Dr. Masquelier in those lawsuits?
19 A   I don't know.
20 Q   Have you ever talked directly with any of Dr.
21 Masquelier's partners, Mr. Michaud, Laparra, or
22 Barraud, in connection with either of the two lawsuits
23 pending in France?
24 A   No.
25 Q   Did you ever deal directly with any of those

Page 43

1  partners in connection with the assignment of SCIPA's
2  interest into CEP?
3  A   Could I have that question read back?
4      (Question read.)
5  A   No.
6  Q   (By Mr. Wiechmann) How long have you
7  represented INC?
8  A   I'm not sure.
9      MR. ORDER: Yes. Objection to the
10 form.
11 Q   (By Mr. Wiechmann) When was the first time
12 you represented INC?
13 A   Probably sometime in the early '90s.
14 Q   Do you recall in what connection you first
15 represented them?
16 A   Probably a trademark matter.
17 Q   Was that trademark Pycnogenol?
18 A   I don't think so.
19 Q   Do you recall the name of the trademark?
20 A   No.
21 Q   When was the first time you represented INC in
22 connection with a matter that involved Horphag?
23 A   As I understand your question, probably early
24 1994.
25 Q   Could you describe to me the general nature of

Page 44

1  that representation?
2  A   I represented International Nutrition Company
3  in a lawsuit filed by a company called Consac.
4  Q   Who were the parties to that lawsuit?
5  A   Consac and International Nutrition Company.
6  Q   What were the claims -- and what did the
7  claims raised by Consac involve in that lawsuit?
8  A   Consac brought a declaratory judgment action
9  and then sought against some other -- against some
10 other parties, and then sought to substitute
11 International Nutrition Company as a party.
12 Q   And what was the gravamen of Consac's
13 declaratory judgment?
14     MR. ORDER: Objection.
15 A   To the extent that anyone could understand
16 what they were trying to claim in that case, I believe
17 they were claiming that the 360 patent was invalid and
18 not infringed.
19 Q   (By Mr. Wiechmann) Was Horphag a party to
20 that suit?
21 A   No.
22 Q   Was anybody -- was SCIPA a party to the suit?
23 A   Yes.
24 Q   Were you representing SCIPA?
25 A   No.

Page 45

1  Q   Who was representing SCIPA?
2  A   As I recall, a lawyer named Joe Davis.
3  Q   From what law firm?
4  A   Lacher & Lovell-Taylor.
5  Q   What city are they headquartered in?
6  A   I'm sorry?
7  Q   What city are they located in?
8  A   New York.
9  Q   Was Mr. Schwitters a party to the lawsuit?
10 A   No.
11 Q   Was PSI, Primary Services, a party to the
12 lawsuit?
13 A   No.
14 Q   What was the outcome of that lawsuit?
15 A   Consac voluntarily dismissed the case before
16 an answer was filed.
17 Q   Were you aware at that time in 1994 of any
18 other suits involving Consac that related to the 360
19 patent?
20 A   Yes.
21 Q   And what suit was that?
22 A   A lawsuit brought by Horphag against Consac
23 for infringement of the 360 patent.
24 Q   And how did you become aware of that suit?
25 A   I don't recall.

Case 3:01-cv-00478-AVC   Document 256-2   Filed 08/31/2005   Page 14 of 17

Jarrow Formulas vs International Nutrition Co.
2/22/2002
Norman H. Zivin, Esq.

Page 46

1  Q  Did you communicate with any attorneys
2  relating -- any attorneys defending -- strike that.
3    Did you communicate with any Horphag attorneys
4  in connection with their lawsuit against Consac?
5  A  Yes.
6  Q  And who was that attorney?
7  A  Marvin Gittes. I'm sorry. What was that
8  question?
9  Q  I said did you communicate --
10 A  I want to have him read it back.
11   MR. WIECHMANN: Okay.
12   (Record read.)
13 A  Marvin Gittes.
14 Q  (By Mr. Wiechmann) Okay. Now, just for the
15 record, the 1994 case brought by Consac against INC
16 seeking declaratory judgment, did that relate solely to
17 the 360 patent?
18   MR. ORDER: Objection to form.
19 A  No. I think it also related to the trademark
20 Pycnogenol.
21 Q  (By Mr. Wiechmann) And what were the claims
22 involving the trademark Pycnogenol?
23 A  As best as I can recall, Consac claimed that
24 the trademark was invalid and unenforceable. But that
25 claim was not against International Nutrition Company.

Page 47

1  Q  That claim was against whom?
2  A  Consac's pleadings were so convoluted that no
3  one knew what their claims were against anybody.
4  Q  Okay. And I assume, because you said their
5  complaint was withdrawn, there was no decision rendered
6  on any issue by the court; is that a fair statement?
7  A  No, it's not a fair statement.
8  Q  Okay. Did the court rule, make any
9  substantive rulings in connection with the Consac
10 versus INC case?
11 A  A magistrate made a ruling that there was
12 jurisdiction in New York over International Nutrition
13 Company; an appeal was filed to the district judge.
14 The case was voluntarily withdrawn before the district
15 judge could rule on the appeal.
16 Q  Do you recall the names of the magistrate or
17 the district judge?
18 A  I don't recall the magistrate. I think the
19 district judge was Platt.
20 Q  That would be Eastern District of New York?
21 A  Correct.
22 Q  And the second case, the case brought by
23 Horphag against Consac, that was pending where?
24 A  The same court.
25 Q  And did that involve simply the 360 patent or

Page 48

1  did it have trademark issues?
2  A  I believe it had trademark issues as well.
3  Q  Involving the same trademark Pycnogenol?
4  A  Yes.
5  Q  Were there any substantive rulings made by the
6  court, either the magistrate or the judge, Platt,
7  Thomas Platt, in that case?
8  A  The judge entered a consent judgment. I
9  assume that's a substantive ruling.
10 Q  Other than the consent judgment, were there
11 any rulings or decisions made by the court?
12 A  Not during the original pendency of the case.
13 Q  Just to clarify it for me, what do you mean by
14 the original pendency?
15 A  It was a very convoluted case, but in order to
16 be helpful, I will explain what I mean.
17 Q  Thank you.
18 A  After a judgment was entered, Horphag made a
19 motion before Judge Platt to join International
20 Nutrition Company as a party to the judgment. Judge
21 Platt granted the motion, and it was reversed on appeal
22 by the Federal Circuit Court of Appeals.
23 Q  What was the title of the appeal to the
24 federal circuit?
25 A  Horphag Research versus International

Page 49

1  Nutrition Company or the reverse of that.
2  Q  And do you recall the year of the federal
3  circuit's decision?
4  A  About 1998.
5  Q  And the year that -- do you recall when
6  Horphag made the motion to join INC as the party to the
7  consent judgment?
8  A  About 1997.
9  Q  In connection with your representation of INC
10 in either of these two cases, either as counsel of
11 record or advising INC, did you ever become aware of
12 the dispute between Horphag and its principals and INC
13 or SCIPA and its principals over the ownership of the
14 360 patent?
15 A  As I understand your question, not until
16 Horphag filed a lawsuit in France.
17 Q  That was the first time you were aware of the
18 dispute over ownership of the 360 patent?
19 A  Yes.
20   MR. ORDER: Would now be a good time to
21 take a break?
22   MR. WIECHMANN: That's fine. It's
23 11:12.
24   (Recess: 11:15 to 11:28 a.m.)
25 Q  (By Mr. Wiechmann) Going back for a second,

Case 3:01-cv-00478-AVC   Document 256-2   Filed 08/31/2005   Page 15 of 17

Jarrow Formulas vs International Nutrition Co.
2/22/2002                                                                                          Norman H. Zivin, Esq.

Page 50

1  Mr. Zivin, in connection with your work for SCERPA, who
2  paid for your or your firm's services?
3       A    I don't think that's relevant to this case.
4  I'm not going to answer that.
5       Q    Well, did Mr. -- did INC pay for your
6  representations of SCERPA?
7       A    I'm not going to answer that.
8       Q    Did INC pay for your representation of PSI?
9       A    Where?  When?
10      Q    You earlier told us on the record that you did
11 render legal services to PSI.
12      A    Yes.
13      Q    One of them -- one of the representations
14 supposedly was unrelated to the 360 patent or OPC's,
15 but in connection with your representation of PSI
16 relating to the 360 patent and OPC's, did INC pay for
17 your legal services on behalf of PSI?
18           MR. ORDER:  Mr. Wiechmann, I really
19 don't see the relevance to these questions.  I do think
20 it's bordering on information that is -- well, that is
21 really none of the plaintiff's business because it has
22 nothing to do with this case.  You even pointed out
23 that you were asking about a matter that had nothing to
24 do with the 360 patent.  Can you make an offer of proof
25 as to what you're getting at here?

Page 51

1            MR. WIECHMANN:  No.
2            MR. ORDER:  Otherwise, we'll have to,
3  you know, either the witness will not answer or we
4  should call the judge and find out whether he has to
5  answer.
6            MR. WIECHMANN:  I'm not asking him for
7  the services relating to the trademark matter unrelated
8  to the 360 patent.  I'm just talking about legal
9  services involving the 360 patent or the sale of
10 OPC's.  And I believe this is relevant.  I don't
11 believe I have to make a showing.  It usually goes the
12 other way, but just to make the record so it's easier
13 when we go to the court, there are allegations about
14 Mr. Zivin's involvement in this lawsuit, his
15 involvement, excuse me, in the prior lawsuit, his
16 involvement dealing -- and his knowledge, dealing with
17 actions relating to the ownership of the 360 patent,
18 and one of the claims you made was that he represented
19 a lot of these companies and their legal relationships,
20 and part of what we claim is both Mr. Zivin's
21 relationship to these parties and his relationship to
22 Mr. Schwitters is going to deal with basically who he
23 really was representing.
24           You've talked about joint interest
25 representation, and if his joint interest was because

Page 52

1  he was representing other people at the behest or at
2  least the funding of Mr. Schwitters or his company,
3  INC, we believe that that is a relevant or could lead
4  to admissible evidence concerning the total
5  relationship between INC, PSI, Jack Masquelier, and the
6  conspiracy that we have claimed involving the monopoly
7  of the 360 patent and the sale of OPC's in the United
8  States.  And if someone says, "I'm independently
9  representing these people," that's one thing.  If he's
10 representing these people at the request of or at the
11 behest of Egbert Schwitters, I believe that is another
12 thing, and that's relevant, and that's why I'm asking
13 who was funding his representation of all these other
14 parties.
15           MR. ORDER:  Well, first, your allegation
16 against Mr. Zivin in this lawsuit goes to -- basically
17 is arguing that he was acting beyond his role as a
18 legal advisor.  So I don't see that the allegations in
19 the complaint have anything to do with who paid for
20 legal services on various matters for entities other
21 than INC.  The lawsuit that was brought that you're
22 complaining of, or the two lawsuits, were brought only
23 by INC, not by PSI, not by SCERPA.  So I don't see that
24 who paid for the legal fees for those particular
25 clients has anything to do with this lawsuit.

Page 53

1            MR. WIECHMANN:  Just because one party
2  brings a lawsuit doesn't mean that there are not other
3  people involved in it.  In fact, if you recall the
4  deposition of Mr. Senecal, he very specifically said
5  that he did not believe that Mr. Zivin represented or
6  his law firm represented PSI in connection with the
7  Connecticut lawsuit.  And now Mr. Zivin is saying he
8  is.  And I'm entitled to explore a little of the
9  background of that.
10           He may think Mr. Zivin wasn't
11 representing him because he wasn't paying for the
12 representation, and his understanding of the
13 representation is very important to see whether there's
14 attorney-client relationship existing.  Just because
15 someone pays for you to be the lawyer errant and go
16 around and give advice does not necessarily mean there
17 is an appropriate attorney-client privilege.  And I'm
18 basing this on Mr. Senecal's testimony.
19           MR. ORDER:  Well, I think you're
20 mischaracterizing his testimony.  Why don't you give me
21 one moment.
22           MR. WIECHMANN:  Sure.
23           (Discussion off the record.)
24      A    All right.  I'll answer that question in
25 part.

Case 3:01-cv-00478-AVC   Document 256-2   Filed 08/31/2005   Page 16 of 17

Jarrow Formulas vs International Nutrition Co.
2/22/2002                                                                                              Norman H. Zivin, Esq.

Page 54

1      Some fees for representation of PSI were
2  charged to PSI and some fees were charged to INC.
3      Q  (By Mr. Wiechmann) Was there a guideline or
4  reason as to which fees were charged to INC and which
5  fees to PSI?
6      A  If it was services requested by PSI, they were
7  charged. If it was services requested by INC, they
8  were charged.
9      Q  Do you remember which services were requested
10 by INC?
11     A  No.
12     Q  Do you have, obviously, billing records to
13 indicate which services were paid for by INC? Just yes
14 or no.
15     A  I don't know if they still exist.
16     Q  Does your firm have a document retention
17 pattern -- policy concerning the retention of clients'
18 documents?
19     A  What kind of client documents?
20     Q  Well, first, do they have a policy? Then we
21 will get to the specifics.
22     A  No.
23     Q  Does your firm have a policy concerning the
24 retention of fee statements?
25     A  Fee statements. I'm not sure what you mean by

Page 55

1  that term.
2      Q  Fee statements, the term I use, it's maybe
3  colloquial, to mean the bill or statement sent to a
4  client charging them for services rendered.
5      A  I believe we keep records in accordance with
6  IRS requirements.
7      Q  I assume during the 1990s, your bills or fee
8  statements were generated through a firm computer or a
9  local area network?
10     A  There was a computer system, correct.
11     Q  And that computer system is still in
12 existence, correct?
13     A  Wrong.
14     Q  Is there a new computer system in existence?
15     A  Yes.
16     Q  And when did that come into effect?
17     A  Approximately January 1, 2000.
18     Q  Do you know whether the records from the old
19 computer system were backed up or transferred to the
20 new computer system?
21     A  I believe only accounts receivable.
22     Q  Do you still retain your files in connection
23 with the matters that you represented -- strike that.
24        Do you still have the files that your firm
25 generated in connection with the Connecticut patent

Page 56

1  infringement lawsuit?
2         MR. ORDER: Objection to form.
3      A  Yes.
4      Q  (By Mr. Wiechmann) Do you still have the
5  files your firm generated in connection with the
6  California patent infringement lawsuit?
7         MR. ORDER: Objection to form.
8      A  The one that's referenced in the complaint,
9  yes.
10     Q  (By Mr. Wiechmann) Yes. Do you still have
11 the files that your firm generated in connection with
12 your advice to INC in relationship to the French
13 lawsuits we discussed this morning?
14     A  Yes.
15     Q  Do you still have the files in connection with
16 the lawsuits we discussed right before the break
17 involving Consac?
18     A  Yes.
19     Q  Do you still have the files that your firm
20 generated in connection with your representation of INC
21 and SCIPA relating to the patent re-examination of the
22 360 patent?
23     A  As I understand your question, yes.
24     Q  Do you still have your files that the firm
25 generated in connection with the assignment of SCIPA's

Page 57

1  interest to CEP?
2         MR. ORDER: Objection to the form.
3      A  I don't believe our firm ever generated such
4  files, nor do we have one.
5      Q  (By Mr. Wiechmann) Did your firm open a
6  separate matter for representation of INC in the
7  transfer of the patent rights and other assets from
8  SCIPA to CEP?
9      A  No. Incidentally, counselor, I would
10 appreciate it if you call it C-E-P. You're confusing
11 me when you call it "sep."
12     Q  Okay.
13     A  It keeps ringing a different bell in my head.
14     Q  C-E-P is fine. But to date, even though it's
15 a different bell, when I used the term "CEP," you
16 understood it to be CEP, right?
17     A  I am trying to do that, but unfortunately,
18 because it has a similar sound, although different
19 appearance, in my head it's sometimes causing me to
20 rethink the situation.
21     Q  I will try to use the term "C-E-P." I just
22 want to make sure there is no answer you want to change
23 to date --
24     A  No.
25     Q  -- because I used "sep" prior to this.

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                                          Norman H. Zivin, Esq.

Page 58

1  A  No, I don't want to change any.
2  Q  Approximately how many separate matters has
3  your firm opened for Mr. Schwitters or his
4  corporations?
5  A  I don't know what you mean by his
6  corporations, and I don't know what the answer is to
7  the question.
8  Q  What I mean by his corporations, I
9  specifically mean any matter where he has asked you to
10 work on a corporate matter at his request, meaning he
11 may be an officer of the corporation, an owner, for
12 whatever reason he says work on INC, work on INC, Bv,
13 Holland Health, whatever it is, it's a corporate matter
14 that your firm was requested by Mr. Schwitters to work
15 on.
16 A  With that definition, I do not know the
17 answer.
18 Q  Is it more than ten?
19 A  Probably.
20 Q  Other than the matters we discussed this
21 morning, has there been other legal representation
22 rendered by you or your firm in connection with Mr.
23 Schwitters or corporations he's requested you to
24 provide legal services for?
25 A  Yes.

Page 59

1  Q  Can you give me the general description of
2  those legal representations?
3  A  Various trademark matters in the U.S. and in
4  foreign countries, various disputes with third parties.
5  Q  Just to make the record clear, the trademark
6  matters we are talking about are unrelated to the
7  Pycnogenol trademark or the OPC '85 trademark?
8  A  Some are and some are not.
9  Q  Are some -- are there any trademark matters
10 that you have represented Mr. Schwitters in that do not
11 involve in one way or the other OPC's, 360 patent, or
12 Pycnogenol?
13      MR. ORDER:  Objection to the form.
14 A  Disagreeing with your characterization of
15 representing Mr. Schwitters, but using the definition
16 you provided a few moments ago, there are such
17 matters.
18 Q  (By Mr. Wiechmann)  And you mentioned
19 disputes.  Have you represented Mr. Schwitters or
20 corporations which he's requested you represent in
21 disputes unrelated to OPC's Patent 360 or Pycnogenol?
22 A  Yes.
23 Q  Have any of those disputes ended up being
24 filed as a claim in a federal or state court in the
25 United States?

Page 60

1  A  I don't think so.
2  Q  Any of those disputes involve any of the
3  defendants in the Connecticut patent infringement
4  action other than, obviously, the patent infringement
5  action itself?
6  A  I don't understand your question.
7  Q  Did any of those disputes involve parties that
8  had been named as defendants in the Connecticut patent
9  infringement action between Mr. Schwitters or his
10 corporations and the corporations named in the patent
11 infringement action?
12 A  But were not the subject of that action?  Is
13 that your question?
14 Q  Yes.
15 A  Yes.
16 Q  Okay.  And which parties are we talking about?
17 A  Horphag for one.
18 Q  What was the general nature of the dispute
19 with Horphag separate and apart from the patent
20 infringement action?
21 A  There have been disputes with Horphag.
22 Q  Any of those disputes involve something other
23 than the Pycnogenol trademark?
24 A  Are you asking about actions that took place
25 in federal or state court?

Page 61

1  Q  No.  Just actions where there may have been a
2  claim or a threat, because I think you said none of
3  them ended up in federal or state court before.
4  A  So your question now is were there disputes
5  with Horphag that did not end up in federal or state
6  court?  I don't understand your question.
7  Q  To be clear, let's start, other than the cases
8  we talked about so far, the Connecticut case, the
9  Consac cases, has INC -- have you represented INC --
10 have you represented Mr. Schwitters or any corporate
11 entity that he's requested you -- that he has requested
12 that you represent in connection with a dispute with
13 Horphag that ended up in a federal or state court?
14 A  No, not that I recall.
15 Q  Any disputes that ended up in resulting in
16 arbitration?
17 A  The answer to that is yes.
18     Can I have that prior question read back,
19 please?
20     (Record read.)
21 A  I'll change the answer to that question to
22 yes.
23 Q  (By Mr. Wiechmann)  In what matters?
24 A  There was a case entitled Horphag versus
25 Garcia, in the Central District of California.

16 (Pages 58 to 61)