Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 62

1    Q   Is it still pending?
2    A   Yes.
3    Q   Is that case involving claims of unfair trade
4  practice by Mr. -- by Mr. Garcia?
5    A   Yes.
6    Q   And who do you represent in that suit?
7    A   International Nutrition Company.
8    Q   And what is the current status of that
9  lawsuit?
10   A   It's on appeal.
11   Q   To which court?
12   A   Ninth Circuit Court of Appeals.
13   Q   Other than that case, any other lawsuits
14  dealing just with Horphag now?
15       MR. ORDER:  Objection to form.  With all
16  the other qualifications that you had before?
17       MR. WIECHMANN:  Yes.  I can spend ten
18  minutes, but he said he changed his answer.
19   Q   (By Mr. Wiechmann)  Is that the only -- when
20  you said yes -- the only lawsuit that you were
21  referring to?
22       MR. ORDER:  He said -- well -- did your
23  question also exclude California, the Northern District
24  of California?
25       MR. WIECHMANN:  It excluded the patent

Page 63

1  infringement case brought by INC in the Northern
2  District of California.
3       MR. ORDER:  Okay.
4    A   There's a dispute between International
5  Nutrition Company and Horphag which although not
6  brought in a federal or state court, was the subject of
7  an appeal to the Court of Appeals for the federal
8  circuit and therefore probably would fall within your
9  definition.
10   Q   (By Mr. Wiechmann)  That initially was raised
11  in the Patent Office?
12   A   Yes.
13   Q   Could you describe that dispute for the
14  record?
15   A   It was a trademark cancellation proceeding
16  brought by International Nutrition Company against
17  Horphag.
18   Q   And the trademark involved?
19   A   Pycnogenol.
20   Q   And what was the decision of the Patent
21  Office?
22   A   The trademark office granted summary judgment
23  dismissing the cancellation proceeding and it was
24  reversed on appeal by the federal circuit.
25   Q   What is the current status?

Page 64

1    A   The current status is it was remanded to the
2  Trademark Trial and Appeal Board for further
3  proceedings which are ongoing.
4    Q   Are there any other administrative
5  proceedings?  Have you represented Schwitters or his
6  corporation or corporations at his request in any other
7  administrative proceedings involving Horphag?
8    A   Yes.
9    Q   Would you describe those, please?
10   A   There was an opposition by International
11  Nutrition Company in the process of being filed against
12  Horphag Research with respect to the mark Pycno.
13   Q   How do you spell that?
14   A   P-y-c-n-o.
15   Q   And what is the status of that?
16   A   In process.
17       (Witness conferred with counsel.)
18   Q   (By Mr. Wiechmann)  Do you want to make any
19  qualification?
20   A   No.  It's a public record.
21   Q   And just so I understand, there has been a
22  filing made to date on that?
23   A   There's been a request for an extension of
24  time to oppose.
25   Q   And when was that request made?

Page 65

1    A   A few weeks ago.
2    Q   Now, going back to the first case that was in
3  front of the Trademark Office dealing with INC's case
4  against Horphag's use or cancellation of Horphag's
5  Pycnogenol trademark, when was that originally filed?
6    A   I don't know.  About 1996.
7    Q   Do you know whether it was filed before or
8  after the commencement of the District Court of
9  Connecticut's patent infringement action?
10   A   I don't recall.
11   Q   Now, the other defendants in the Connecticut
12  case, do you recall any other law -- are you
13  representing Mr. Schwitters or corporations which he
14  requested you to represent in connection with any
15  lawsuits against any of the other defendants in the
16  Connecticut action?
17   A   Not that I recall.
18   Q   Would it help you to see a list of the
19  defendants in the Connecticut action?
20   A   Probably.
21       MR. WIECHMANN:  Let me mark as Exhibit
22  33 the complaint filed in Civil Action Number 396-CV-
23  00386, International Nutrition Company versus Horphag
24  Research Limited, et al.
25       (Exhibit 33, complaint, marked.)

17 (Pages 62 to 65)

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                     Norman H. Zivin, Esq.

Page 66

1    A    All right. Now, what was your question again,
2    sir?
3    Q    (By Mr. Wiechmann) Have you represented
4    Schwitters or any of the corporations he's requested
5    you to represent in connection with any lawsuits other
6    than this lawsuit against any of the defendants -- or
7    the California patent infringement action -- in
8    connection with any of the defendants listed on page 1
9    of Plaintiff's Exhibit 33?
10    A    Other than Horphag, no.
11    Q    Have you represented Schwitters or his
12    corporations, again, taking my definition of that, in
13    any administrative actions against any of the
14    defendants listed here?
15    A    No.
16    Q    Have you ever met Mr. Schwitters personally?
17    A    Yes.
18    Q    And approximately on how many occasions?
19    A    I don't know.
20    Q    More than ten times?
21    A    I don't think so.
22    Q    How many -- have you ever met Mr. Schwitters
23    in the United States?
24    A    Yes.
25    Q    Do you recall how many times?

Page 67

1    A    No.
2    Q    Have you ever met him in the state of
3    Connecticut?
4    A    I don't think so.
5    Q    Did you ever meet him at your offices in New
6    York City?
7    A    Yes.
8    Q    On more than one occasion?
9    A    Yes.
10    Q    When did you first meet him in your offices in
11    New York City?
12    A    I don't know.
13    Q    Was it before the commencement of the patent
14    infringement action brought in March of 1996 in
15    Connecticut?
16    A    Yes.
17    Q    Do you recall how much before?
18    A    No.
19    Q    Did you meet with Mr. Schwitters in the -- in
20    New York City in connection with any of the Consac
21    lawsuits?
22    A    I don't recall.
23    Q    Did you ever meet with Mr. Schwitters dealing
24    with -- strike that.
25         Did you ever meet with Mr. Schwitters in the

Page 68

1    United States before he retained you or your law firm
2    to render legal services?
3    A    I don't think so. As I understand your
4    definitions.
5    Q    To make it clear, did you ever meet with Mr.
6    Schwitters when you believed you were not being
7    retained by him as a lawyer?
8    A    No.
9    Q    Did you ever meet with Mr. Schwitters other
10    than in New York City, any other places in the United
11    States?
12    A    No, not that I recall.
13    Q    Did you ever meet with Mr. Schwitters at any
14    dietary supplement trade show or industry show?
15    A    No.
16    Q    Did you ever meet with Mr. Schwitters in
17    Baltimore?
18    A    No.
19    Q    Have you ever visited PSI's offices in
20    Connecticut?
21    A    I don't think so.
22    Q    Have you ever met with Mr. Senecal in
23    Connecticut?
24    A    I don't think so.
25    Q    Do you know Mr. Richard LeFebvre?

Page 69

1    A    Yes.
2    Q    Have you ever met with him in Connecticut?
3    A    I don't think so.
4    Q    Did you ever meet with Mr. Senecal or LeFebvre
5    in New York City?
6    A    Yes.
7    Q    Did you ever meet with Mr. Schwitters and Mr.
8    LeFebvre together in New York City?
9    A    Yes.
10    Q    Do you recall when?
11    A    Some years ago.
12    Q    Was it during the pendency of the Connecticut
13    patent infringement action?
14    A    I don't recall.
15    Q    Did you ever meet with Mr. Senecal and Mr.
16    Schwitters at your offices in New York City?
17    A    I believe so.
18    Q    The same time that Mr. LeFebvre was there?
19    A    As best as I can recall.
20    Q    Just very generally, do you recall the purpose
21    of that meeting?
22    A    No.
23    Q    Did you ever have a telephone conference with
24    Mr. Senecal or -- and/or Mr. LeFebvre and Egbert
25    Schwitters?

18 (Pages 66 to 69)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                 Norman H. Zivin, Esq.

Page 70

1    A   I don't remember.  It's possible.
2    Q   Is it fair to say you've had numerous
3  telephone communications with Mr. Schwitters?
4    A   That's fair to say.
5    Q   Is it fair to say that at least there were
6  other people on the line in some of those telephone
7  conversations?
8    A   Yes.
9    Q   Do you recall ever having a telephone
10 conversation with Mr. Schwitters when any
11 representative of Horphag was on the telephone?
12   A   No.
13   Q   Did you ever have a conversation with Mr.
14 Schwitters where Dr. Masquelier was on the phone?
15   A   Not that I recall.
16   Q   Or any of Dr. Masquelier's partners?
17   A   Not that I recall.
18   Q   Do you recall ever having a telephone
19 conversation with Mr. Schwitters where Mr. Haimoff was
20 on the phone?
21   A   No.
22   Q   Have you ever had a telephone conversation
23 with Mr. Haimoff?
24   A   Not that I recall.
25   Q   Did you ever have a telephone conversation

Page 71

1  with anybody representing Horphag?
2    A   Of course.
3    Q   Okay.  Other than attorneys representing
4  Horphag, did you ever have a conversation with any of
5  the principals of Horphag?
6    A   Only at depositions.
7    Q   Where you were the interrogator and they were
8  the witness?
9    A   Yes.
10   Q   Any other conversations -- well, strike that.
11   A   No.  I'll expand that answer.  It's not
12 necessarily the case.
13   Q   Okay.  What else?
14   A   I recall attending a deposition where I was
15 neither the interrogator and they were not the witness.
16   Q   And what was -- and do you recall having a
17 conversation with them, first of all?
18   A   Other than hello, no.
19   Q   Who was there?
20   A   Charles Haimoff.
21   Q   And what lawsuit was this that this deposition
22 was being taken in?
23   A   In the Consac case.
24   Q   Okay.  Was Mr. Schwitters in attendance at
25 that deposition?

Page 72

1    A   Yes.
2    Q   Was he being deposed?
3    A   No.
4    Q   Did Mr. Schwitters and Mr. Haimoff have any
5  discussions?
6    A   I don't know.
7    Q   At the time of that deposition, did you have
8  an understanding as to the relationship between Mr.
9  Schwitters and Mr. Haimoff?
10   A   I don't understand your question.
11   Q   Were they -- did you think whether they were
12 friendly, had a business relationship, or had an
13 adversarial, antagonistic relationship?  From any -- at
14 that time, did you have any understanding of what the
15 relationship was between Mr. Haimoff and Mr.
16 Schwitters?
17   A   They were competitors.
18   Q   Was there any -- were you aware of any
19 personal animosity?
20   A   I don't know.
21   Q   Were you aware of any disputes at the time of
22 that deposition between the two as to the ownership of
23 the 360 patent?
24   A   I don't believe there was any.
25   Q   Were you aware of any disputes at that time

Page 73

1  concerning the use of the Pycnogenol trademark between
2  Mr. Schwitters and Mr. Haimoff?
3    A   I don't know that there was any personal
4  dispute between Mr. Schwitters and Mr. Haimoff
5  regarding the Pycnogenol trademark.
6    Q   Were you aware of any corporate disputes
7  between their corporations dealing with the INC and
8  Horphag dealing with -- at that time dealing with the
9  use of the Pycnogenol trademark?
10   A   I'm not certain on the timing.
11   Q   Okay.  Do you recall the timing of this
12 deposition when it was taken?
13   A   Six, seven years ago.
14   Q   Was it 1994?
15   A   Possible.
16   Q   Did there come a time when you were led to
17 believe -- strike that.
18       Did there come a time when you understood that
19 INC believed that its agreement with Horphag over the
20 ownership of the 360 patent was no longer effective,
21 that it had lapsed?
22       MR. ORDER:  Can I hear that read back,
23 please.
24       (Question read.)
25       MR. ORDER:  I object on the grounds to

19 (Pages 70 to 73)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                           Norman H. Zivin, Esq.

Page 74

1  the extent that question asks for attorney-client
2  communications and attorney work product.
3        MR. WIECHMANN: I didn't ask for that.
4        MR. ORDER: You may not have expressly
5  asked for it, but I said my objection was to the extent
6  that the answer might be based on information that is
7  protected by the attorney-client privilege and the
8  attorney work product doctrine.
9        You are asking him for his understanding
10 of INC's belief, and it seems to me his understanding
11 is his work product, and INC's belief, the only way he
12 could understand what their belief would be based
13 on privileged communications. So I don't see how he
14 can answer the question.
15       THE WITNESS: Correct.
16       MR. WIECHMANN: So is that an objection
17 or an instruction not to answer?
18       THE WITNESS: I'm not going to answer
19 it.
20    Q    (By Mr. Wiechmann) Fine. Will you look at
21 Plaintiff's Exhibit 33, which is in front of you, the
22 complaint. Did you help draft this complaint?
23    A    What do you mean by help?
24    Q    Did you have any involvement in the drafting
25 of this complaint?

Page 75

1    A    Probably.
2    Q    Did you review the complaint before it was
3  filed?
4    A    Yes.
5    Q    Did you or any of your partners undertake a
6  due diligence process to make sure that the allegations
7  set forth in this complaint were accurate to the best
8  of your belief?
9    A    What do you mean by a due diligence process?
10 I'm not sure there is any such requirement.
11    Q    The Rule 11 requirement.
12    A    Oh, the Rule 11 requirement. Yes, we did.
13    Q    I'd like you to look at paragraph 24, please.
14       MR. ORDER: Did you say 24?
15       MR. WIECHMANN: Twenty-four, page 7.
16       MR. ORDER: I've got it. Just didn't
17 hear you.
18    Q    (By Mr. Wiechmann) First sentence of
19 paragraph 24 says, "Defendant Horphag claims to be, at
20 all times relevant herein claimed to be, the owner, by
21 assignment, of an undivided one-half interest in the
22 360 patent."
23       MR. ORDER: You misread it. It says,
24 "The other owner," not just "the owner."
25       MR. WIECHMANN: Thank you.

Page 76

1    Q    (By Mr. Wiechmann) It's "The other owner, by
2  assignment."
3        Do you see that sentence?
4    A    Yes, I do.
5    Q    What led you to believe that that was an
6  accurate statement?
7        MR. ORDER: Again, I think that you're
8  really infringing on the attorney-client privilege and
9  the attorney work product doctrine. First you
10 haven't -- well, you haven't established that he even
11 believed that; and, second, to the extent he did
12 believe that, you certainly wouldn't be allowed in the
13 litigation itself, the Connecticut action, the
14 underlying Connecticut action, to ask the attorney who
15 signed or who brought the action what the basis of his
16 belief was. So I don't see why you would be entitled
17 to do that at this point.
18       MR. WIECHMANN: Well, if his belief is
19 based on -- let's start with third-party
20 communications. This first sentence talks about what
21 Horphag's claims are. If he's telling me the only
22 thing he knows or if your position is the only thing he
23 knew about Horphag's claims were through his client,
24 there may be an attorney-client privilege. If there
25 was investigation done with third parties like Horphag

Page 77

1  or some written material, that is discoverable.
2        MR. ORDER: It would be work product.
3  How is that not work product? What he did and what led
4  him to believe that the allegation in paragraph 24 is
5  correct is certainly his work product.
6        MR. WIECHMANN: What I'm trying to
7  explore is when Mr. Zivin first became aware of, first,
8  one, the claim that Horphag owned half the patent.
9        MR. ORDER: Okay. That question I think
10 you are just asking for a time when had he learned
11 that, I think he can answer that.
12    Q    (By Mr. Wiechmann) When did you first become
13 aware of Horphag's claim they owned at least half the
14 patent?
15    A    When I saw a copy of the patent.
16    Q    Did you ever see a copy of the assignment of
17 the patent?
18    A    I did at some point.
19    Q    And did you see the assignment at about the
20 same time you saw a copy of the patent?
21    A    Probably not.
22    Q    In connection with the Consac lawsuits we've
23 just discussed, at that time were you aware that
24 Horphag claimed to own, have an ownership interest in
25 the 360 patent?

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 78

1  MR. ORDER: Objection to the form. You
2  said at the time of the Consac --
3  Q  (By Mr. Wiechmann) At the time that you first
4  became involved in the Consac lawsuits, were you aware
5  that Horphag was claiming an ownership interest in the
6  360 patent?
7  A  The answer is obviously yes because Horphag
8  filed a complaint against Consac claiming that they
9  owned rights to the patent.
10  Q  Did there come a time subsequent -- do you
11  believe that is the first time you were aware of
12  Horphag's claim in the 360 patent?
13  A  I don't know.
14  Q  Did you see a copy of the 360 patent prior to
15  you seeing a copy of Horphag's complaint?
16  A  It's possible, but I don't recall.
17  Q  So is it fair to say that it was either your
18  review of the patent, the 1985 assignment, or the
19  complaint was the first time you were aware of
20  Horphag's interest in the 360 patent?
21  MR. ORDER: Object to the form. 1985
22  assignment, did you say?
23  MR. WIECHMANN: Yes.
24  A  I don't recall.
25  Q  (By Mr. Wiechmann) The next sentence goes on

Page 79

1  in paragraph 24 to say, "Upon information and belief,
2  Horphag no longer is an owner of any interest in the
3  360 patent."
4  When do you recall the basis for this
5  allegation being made?
6  MR. ORDER: Objection to the form.
7  A  I don't understand the question. Are you
8  asking for my belief? What are you asking for?
9  Q  (By Mr. Wiechmann) I'm using this as a
10  reference that is -- let's go this way: Is it fair to
11  say that sometime prior to the filing of this
12  complaint, Exhibit 33, you had the belief that the
13  Horphag interest in the patent that we just discussed
14  was no longer in effect?
15  A  I think your question is calling for my mental
16  processes as an attorney and therefore constitutes work
17  product.
18  MR. ORDER: Just a moment.
19  A  To the extent it involves conversations I had
20  with International Nutrition Company, it involves
21  attorney-client privilege.
22  MR. ORDER: Just a moment.
23  MR. WIECHMANN: Yes.
24  (Witness conferred with counsel.)
25  THE WITNESS: Well, let me have the

Page 80

1  question read back, then.
2  MR. WIECHMANN: Could you read the
3  question back?
4  (Question read.)
5  (Witness conferred with counsel.)
6  A  My counsel obviously has a different
7  understanding of your question than I do, which
8  probably tends to reflect upon the ambiguity of the
9  question. I will answer, however, by saying that prior
10  to the filing of this complaint dated March 6, 1996,
11  the understanding was that Horphag no longer had any
12  interest in the 360 patent.
13  Q  (By Mr. Wiechmann) Other than discussions you
14  had with Mr. Schwitters or other representatives of
15  INC, first without identifying what it is, did you
16  review any material or receive any information from
17  third parties that was part of the basis of that
18  belief?
19  MR. ORDER: Objection to the form of the
20  question.
21  A  As I understand the question, yes.
22  Q  (By Mr. Wiechmann) Did you discuss your
23  belief with any people -- well, was part of the basis
24  of your belief discussions with third parties?
25  MR. ORDER: Objection to the form.

Page 81

1  A  I never said anything about my belief, and I'm
2  not going to testify about my belief because that's my
3  process as an attorney representing a client in a
4  lawsuit.
5  The answer to your question, however, is no.
6  Q  (By Mr. Wiechmann) Were any -- did anybody in
7  your firm review any documents in connection with their
8  Rule 11 duty relating to this sentence? Just yes or
9  no.
10  MR. ORDER: Objection to the form.
11  A  Yes.
12  Q  (By Mr. Wiechmann) Were any of those
13  documents received from third parties other than Mr.
14  Schwitters or representatives of INC?
15  MR. ORDER: Objection to the form.
16  A  Directly, no.
17  Q  (By Mr. Wiechmann) Does indirectly mean
18  third-party documents were forwarded through Mr.
19  Schwitters to representatives, people working in your
20  law firm?
21  A  Yes.
22  Q  Did those documents include a copy -- a copy
23  of the 1985 assignment?
24  MR. ORDER: Objection. That is asking
25  for the attorney work product involving what particular

21 (Pages 78 to 81)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                      Norman H. Zivin, Esq.

Page 82

1  documents the counsel reviewed in formulating the
2  allegation in paragraph 24, and therefore it's
3  objectionable.
4       MR. WIECHMANN: As I said early on, to
5  take that position is fine. At the end of the day, as
6  you know, obviously one of plaintiff's central claims
7  is that this lawsuit was started improperly. It was
8  what we referred to as a sham lawsuit because INC did
9  not have the legal ability to start the patent
10  infringement lawsuits. What I'm looking for is the
11  justification for starting those lawsuits, and if
12  there's going to be a claim of privilege and there's
13  going to be no ability to explore what factual basis,
14  what any basis was for that belief, at the time of
15  trial when it comes up and someone wants to explain the
16  legal theory and the factual theory that made this a
17  good faith lawsuit, we're going to file our in limine
18  motion.
19       You can't have it both ways. If you're
20  going to use anything at trial, then I'm entitled to
21  explore it. If there's documents that support this
22  claim, I'd like to know about those documents. If
23  there's legal precedent that supports this claim, I'd
24  like to know. If it's going to be attorney-client work
25  product and privilege, it will be buried for all time

Page 83

1  and we'll file an in limine motion soon and bring Mr.
2  Zivin back, but it's going to have to be decided one
3  way or the other.
4       (Witness conferred with counsel.)
5       MR. ORDER: Why don't we take a quick
6  break.
7       MR. WIECHMANN: In fact, it's 12:20, we
8  can take an early lunch now and you can discuss it
9  then. We can come back by one o'clock.
10       MR. ORDER: I don't think we need that
11  long. I'd rather go to -- it depends. Up to you.
12       THE WITNESS: Fine with me.
13       MR. ORDER: Fine with you?
14       THE WITNESS: Yes.
15       (Recess: 12:23 to 1:12 p.m.)
16       MR. WIECHMANN: This is the continuation
17  of the deposition of Norman Zivin.
18       Prior to lunch, I had made a statement
19  concerning information that underlies the decision to
20  commence the patent infringement suit in March of 1996
21  in the United States District Court for the District of
22  Connecticut and stated that if the position of Mr.
23  Zivin or his counsel was that all of that information
24  was going to be protected or not divulged because of
25  the attorney-client privilege or the work product

Page 84

1  doctrine, that we would make an in limine motion to
2  make sure it wasn't protected.
3       I think that the parties decided at
4  lunch that they would consider that position, and I
5  just wanted to know at this time what is your -- let's
6  go one at a time -- first, position as to the question
7  that is presently pending, which you probably don't
8  remember. And if you want to --
9       MR. ORDER: I think I remember what the
10  question is.
11       MR. WIECHMANN: Okay.
12       MR. ORDER: But I'd like to say that the
13  defendants really resent the plaintiff's tactic of
14  bringing a frivolous lawsuit and then arguing that
15  because they've made allegations, because the plaintiff
16  has made allegations that the Connecticut action in the
17  District Court was a sham litigation, that that
18  entitles the plaintiff to be in a position of invading
19  the attorney-client privilege and work product doctrine
20  from that lawsuit and from the Northern District of
21  California lawsuit or place the defendants at the risk
22  of not being able to defend themselves in this, as I
23  say, frivolous and baseless lawsuit that the plaintiff
24  has brought here.
25       Nevertheless, in an attempt to move

Page 85

1  things along and without waiving any attorney-client
2  privileges or attorney work product claims, there's
3  perhaps a way that we can provide you with information
4  that you're seeking by referencing documents that are
5  in the public realm by virtue of motions that were made
6  in the Connecticut action and in the appeal to the
7  federal circuit which explain the basis for the
8  allegations in the complaint and both the factual and
9  the legal arguments. And to that extent, I think
10  you're seeking information concerning the basis, both
11  factual and legal basis, for the commencement of the
12  action brought by INC in the District of Connecticut in
13  1996, and those documents explain the basis, both the
14  factual and the legal basis.
15       The way you worded your question,
16  however, was not seeking the basis for the lawsuit but
17  seeking to find out what step, what actually Attorney
18  Zivin and his firm undertook, what their investigation
19  undertook specifically, as opposed to, really, just
20  finding out the basis for the lawsuit. And to that
21  extent, I think you're going too far, and that we will
22  not allow. But I think, nevertheless, you will get the
23  essence of what you're seeking by referring to the
24  pleadings, the motions, in the District Court case and
25  the briefs and arguments in the federal circuit

22 (Pages 82 to 85)

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 86

1  briefs.
2          MR. WIECHMANN: I understand your
3  position. I also understand that there obviously were
4  certain documents, I assume, that Mr. -- I don't want
5  to use Mr. Zivin -- Mr. Zivin's law firm, the lawyers
6  representing, claim or support or basis, as you used
7  it, for the law firm. Some of them were actually
8  appended to declarations by one of Mr. Zivin's
9  partners, and therefore when anybody starts a lawsuit
10  to prosecute, to survive summary judgment or anything
11  else, you have to have some factual basis and then some
12  legal basis, and that's what I was trying to get at.
13  So if you would like me to ask it again --
14          MR. ORDER: Well, again, the way you
15  were asking, it went more towards their mental
16  processes and things of that sort. But if you're
17  asking what the basis for the lawsuit -- for the claim
18  is in a particular paragraph without reference to when
19  necessarily they knew that or -- I think Attorney Zivin
20  can respond to the extent he has already responded in
21  the briefs that have already been filed.
22          MR. WIECHMANN: Well, I understand there
23  are certain briefs. One issue is that certain briefs
24  were filed at certain times, and the timing is -- would
25  be important to us because if part of the basis of a

Page 87

1  brief or a fact was something that came into existence
2  in 1999, that may be fine in the ultimate resolution of
3  a lawsuit, but may not in 1996 be used as a basis for
4  any good faith belief that the suit should have been
5  started, should have started. But that's for arguments
6  among the attorneys. So I will withdraw the prior
7  questions and go this way:
8      Q   (By Mr. Wiechmann) Mr. Zivin, going back to
9  paragraph 24, what was INC's basis for contending that
10  as of some time prior to March of 1996, that Horphag no
11  longer had an interest in the 360 patent?
12          MR. ORDER: Just objection as to form.
13  I'm not sure when you put that time frame in which part
14  of the sentence it relates to. Can we just have it
15  read back, because I got a little confused there.
16          (Question read.)
17      A   As explained in INC's responses to the
18  defendant's summary judgment motions in the underlying
19  lawsuit, and in the briefs on appeal to the federal
20  circuit from the District Court's decision, INC's basis
21  at the time was that there was an April 1985 agreement
22  between SCIPA and Horphag which controlled the
23  ownership of the 360 patent; that that agreement was
24  for a term of five plus five years and therefore
25  expired in April of 1995; that upon expiration of the

Page 88

1  interests of the parties in that patent, the rights
2  reverted to the inventor, Dr. Masquelier.
3      Q   (By Mr. Wiechmann) Was there specific
4  language -- was that -- was the basis of that belief --
5  strike that.
6          Did the basis of that belief come from
7  language of any specific document?
8      A   I'm not sure what belief you're referring to,
9  but the basis for the statement came from a specific
10  document.
11      Q   And that document was?
12      A   An agreement dated April 1985 between SCIPA
13  and Horphag.
14      Q   Are you aware of any other documents that you
15  believe were relevant to the construction or effect of
16  the April 1985 assignment other than that document
17  itself?
18          MR. ORDER: Well, I object to the extent
19  you are asking for his belief.
20          MR. WIECHMANN: His knowledge. I want
21  knowledge.
22          MR. ORDER: Unless you're going to
23  rephrase it, I would like to hear it back, but if
24  you're going to rephrase it, that's fine.
25      Q   (By Mr. Wiechmann) To save time, are you

Page 89

1  aware of any other document other than the assignment
2  itself that bears upon your interpretation of that
3  assignment that you just testified to on the record?
4      A   First of all, I did not testify about an
5  assignment on the record. Secondly, I am aware of
6  documents.
7      Q   Are you aware of any -- are any of these
8  documents of a public nature?
9      A   I believe they were produced.
10      Q   Can you describe these documents to me?
11      A   As I described in reference to my answer a few
12  moments ago, and as stated in the summary judgment
13  briefs and the appellate briefs, the document
14  principally referred to is an agreement of April 1985
15  between SCIPA and Horphag, and there is in addition a
16  side letter stating that agreement covers the 360
17  patent, which at the time was a patent application.
18      Q   In March of 1996, were you aware of Horphag's
19  position as to INC's contention that the -- that
20  Horphag no longer had an ownership interest in the 360
21  patent?
22      A   As I understand your question, no.
23      Q   In March of 1996, were you aware that Horphag
24  contested that it had lost its interest, ownership
25  interest, in the 360 patent?

23 (Pages 86 to 89)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 90

1  A  As I understand --
2      MR. ORDER: That Horphag?
3      MR. WIECHMANN: Yes. In March of 1996,
4  was he aware that Horphag was contesting INC's position
5  that Horphag no longer had an ownership interest in the
6  patent.
7  A  As I understand your question, no.
8  Q  (By Mr. Wiechmann)  When did you first become
9  aware of Horphag's disagreement with INC's position?
10  A  I believe when Horphag filed a motion to
11  dismiss the complaint.
12  Q  Looking at, again, paragraph 24 of Exhibit 33,
13  first sentence again says, "Defendant Horphag," in the
14  present, "claims to be the owner."
15  A  Yes.
16      MR. ORDER: "The other" --
17      MR. WIECHMANN: No.
18  Q  (By Mr. Wiechmann)  "Claims to be the other
19  owner." That's present.  What was the basis for
20  your -- for that allegation as of March 1996, if you
21  were unaware of Horphag's position as to the lapse of
22  the patent?
23  A  I think if you read the third sentence of that
24  paragraph, it says, "Horphag is offering licenses under
25  the patent."

Page 91

1  Q  Is there any other basis other than your
2  understanding or knowledge that Horphag was offering
3  licenses in 1995 and '96 under the patent?
4  A  Without going through my mental processes and
5  trying to figure out exactly what you're parsing this
6  sentence to mean, Horphag had also brought a lawsuit
7  against Consac claiming that they had ownership rights
8  in the patent.
9  Q  Was there any other information that you were
10  aware of?
11  A  No. At least none that I recall now.
12  Q  Okay. Going to paragraph 8 -- I mean
13  paragraph 25 on page 8, the first sentence basically
14  reads, "Alternatively, even if defendant Horphag
15  continues to own a one-half interest in the 360 patent,
16  upon information and belief, Horphag will not become a
17  voluntary plaintiff in this action."
18      First, what was the basis for the allegation
19  that defendant Horphag continues to own a one-half
20  interest in the patent?
21      MR. ORDER: Objection to the form.
22  A  Without waiving any attorney-client or work
23  product privileges, I refer to the responses to the
24  summary judgment motion and the briefs on appeal, and I
25  refer to the 360 patent which on its face states that

Page 92

1  there are joint owners, Horphag and SCIPA.
2  Q  (By Mr. Wiechmann)  Why did INC not bring
3  Horphag in as an involuntary plaintiff?
4      MR. ORDER: Objection. Objection. Goes
5  to attorney-client privilege and work product
6  doctrine.
7      MR. WIECHMANN: That objection, then, is
8  an obstruction not to answer?
9      MR. ORDER: Not an obstruction.
10      MR. WIECHMANN: An instruction not to
11  answer?
12      MR. ORDER: Yes.
13      MR. WIECHMANN: Okay.
14  Q  (By Mr. Wiechmann)  Why did INC -- what was
15  the basis for the allegation that Horphag would not
16  become a voluntary plaintiff in this action?
17  A  It says, "Upon information and belief."
18  Q  Okay. Did you or anyone in your law firm
19  contact Horphag concerning becoming a plaintiff in this
20  lawsuit?
21  A  Not to my knowledge.
22  Q  Were you informed or were you aware of anybody
23  else who contacted Horphag to see whether they would
24  become a plaintiff in this action?
25  A  I'm not aware of it.

Page 93

1  Q  Going back for a second, paragraph 31 on page
2  9, paragraph 31, you mention that you notified
3  defendants of their patent rights in the last part of
4  the sentence "by giving written notice of the
5  infringement to most of the defendants." What was the
6  basis of that allegation?
7  A  That written notice was sent to most of the
8  defendants.
9  Q  Were you aware of specifically any defendants
10  who did not receive any written notice?
11  A  I don't recall which ones did and which ones
12  did not.
13  Q  Was there a conscious decision not to inform
14  some of the defendants, give them written notice?
15  A  No.
16  Q  At the time that you put together the list of
17  defendants, was there an effort made to see whether
18  each one of them had received written notice?
19      MR. ORDER: I think that's getting to
20  work product. You are asking him what they did, what
21  the attorneys did prior to bringing the lawsuit while
22  contemplating bringing the lawsuit. Can I take a
23  moment?
24      (Witness conferred with counsel.)
25      MR. ORDER: Go ahead and answer.

24 (Pages 90 to 93)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                 Norman H. Zivin, Esq.

Page 94

1        THE WITNESS:  What?
2        (Witness conferred with counsel.)
3    A    What was the question again, please?
4        (Question read.)
5    A    Since written notice is not required before
6    bringing a patent infringement action, there was no
7    special effort in that regard.
8    Q    (By Mr. Wiechmann)  You did send cease-and-
9    desist letters to many of the defendants?
10   A    Some of them were sent cease-and-desist
11   letters.
12   Q    Was there a reason why some of them were sent
13   cease-and-desist letters?
14   A    Yes.
15   Q    What was that reason?
16   A    To ask them to cease and desist.
17   Q    Was there a reason why the others were not
18   sent cease-and-desist letters?
19   A    Yes.
20   Q    And what was that?
21   A    They were added to the complaint at the last
22   moment.
23   Q    Why were they -- was Jarrow Foods, Inc., did
24   International send them a cease-and-desist letter?
25   Excuse me, was Jarrow Formulas, Inc., sent a cease-and-

Page 95

1    desist letter?
2    A    I believe not.
3    Q    Were they added at the last minute?
4    A    I believe so.
5    Q    What was the basis for adding them at the last
6    minute?
7    A    I believe they came on to the market shortly
8    before the complaint was filed and they were not of
9    particular consequence, so they were just added to the
10   complaint.
11   Q    Was INC, in addition to making patent
12   infringement claims, also making claims dealing with
13   the OPC '85 trademark against Jarrow?
14   A    Did they?  The complaint says they did.
15   Q    Just to make the record clear, was a cease-
16   and-desist letter sent to Jarrow Formulas dealing with
17   the alleged violations or infringement on the OPC '85
18   trademark?
19   A    I don't believe so.
20   Q    When did INC first become aware of the
21   trademark violations alleged in the complaint by Jarrow
22   Formulas?
23   A    Shortly before the complaint was filed.
24        MR. WIECHMANN:  I'd like to mark, if I
25   could, as Exhibit 34 a document that appears to be the

Page 96

1    second declaration of Donna A. Tobin.
2        (Exhibit 34, second declaration of Donna
3    A. Tobin, marked.)
4    Q    (By Mr. Wiechmann)  I'd like to show you
5    Plaintiff's Exhibit 34.  Obviously take your time to
6    look through it if you need to, but just initially,
7    have you seen this document before?
8    A    Probably.
9    Q    Do you recall whether this document was
10   prepared in connection with motions filed in the
11   underlying Connecticut patent infringement action?
12   A    That's the caption on the document.
13   Q    I understand.  I'm not asking you what the
14   document reads.  Do you recall the circumstances in
15   preparing this document by Ms. Tobin?
16   A    Sir, you've just handed me a 200-page document
17   and you asked me the circumstances.  I don't know off
18   the top of my head.
19   Q    Do you -- if you look at page 2 and 3, and
20   look, there appears to be a, starting on page 2, a list
21   of attachments to the declaration, including the patent
22   assignment dated March 1994, and then it goes down to
23   stipulation of an order of settlement and dismissal in
24   that Consac Industry case we talked about.  Then it
25   talks about the, it has Exhibit C is U.S. Patent

Page 97

1    assignment dated April 1st, 1985, and then there is
2    further exhibits.
3        Do you recall why these documents were
4    being -- for what purpose these documents were being
5    filed other than generically that they were being filed
6    in opposition to the motions filed by the defendants?
7    Do you recall the specific purpose for gathering these
8    documents?
9        MR. ORDER:  Objection to form.
10   A    Looks like a typical attorney's declaration
11   attaching exhibits likely to some motion on file in the
12   case.
13   Q    (By Mr. Wiechmann)  Could you turn to Exhibit
14   C which appears to be, again, the patent assignment.
15   Do you see it?
16   A    Yes.
17   Q    Have you seen this document before?
18   A    Yes.
19   Q    Is this a document that you had previously
20   referred to, being the 1985 assignment that ran for ten
21   years?
22   A    No.
23   Q    What document is this?
24   A    This is a document entitled "Assignment."
25   Q    Is there another assignment you were referring

25 (Pages 94 to 97)

Brandon Smith Reporting Service

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                Norman H. Zivin, Esq.

Page 98

1    to in your basis for the allegations in paragraph 24?
2    A    I don't think I referred to an assignment.
3    You kept referring to it as an assignment. I said an
4    agreement.
5    Q    Is this the agreement you were referring to?
6    A    No.
7    Q    What -- is this a translation of the agreement
8    that you were referring to?
9    A    No.
10   Q    Going to Exhibit D, there is a confirmatory
11   assignment. Was that a document you referred to?
12   A    What did you describe this as?
13   Q    Which?
14   A    Exhibit D.
15   Q    No. I'm sorry. Exhibit E.
16   A    Exhibit E?
17   A    Yes. Just after the decision.
18   Q    What was your question about Exhibit E?
19   Exhibit E is entitled "Confirmatory Assignment."
20   Q    Do you know what the document is?
21   A    It says "Confirmatory Assignment."
22   Q    I know what it is. Have you ever seen it
23   prior to today?
24   A    Yes.
25   Q    Did you ever review it in connection with the

Page 99

1    lawsuit brought in Connecticut?
2    A    Yes.
3    Q    When you reviewed it, what was your
4    understanding of the effect and purpose of that
5    document?
6            MR. ORDER: Objection. It calls for
7    attorney work product. Instruct him not to answer.
8            MR. WIECHMANN: In what way does it call
9    for attorney work product?
10           MR. ORDER: You just asked him what was
11   his understanding of what the confirmatory assignment
12   meant. It's clearly asking for his mental processes as
13   a lawyer reading a legal document and coming to some
14   conclusion as to its import and effect.
15           MR. WIECHMANN: And you're instructing
16   him not to answer that?
17           MR. ORDER: Yes.
18   Q    (By Mr. Wiechmann) Did you or your law firm
19   ever set forth your understanding of the purpose of
20   this document in any papers filed in connection with
21   the motions filed by defendants in the underlying
22   Connecticut patent infringement suit?
23   A    I believe so.
24   Q    And would you please tell me what that
25   position was, as to how this document affected the

Page 100

1    basis for INC's claims that Horphag no longer owned the
2    patent?
3    A    As I understand your question, no such claim
4    was made.
5    Q    Is it your position that in the Connecticut
6    infringement lawsuit started in March of 1996, INC was
7    not taking the position that Horphag had no -- Horphag
8    no longer had an ownership interest in the 360 patent?
9            MR. ORDER: Can I hear that question
10   back?
11   A    As I understand that question, no.
12   Q    (By Mr. Wiechmann) In the complaint filed in
13   March of 1996, what was INC's position about Horphag's
14   ownership of the 360 patent as of the date the suit was
15   filed?
16   A    As stated in paragraphs 24 and 25 of the
17   complaint.
18   Q    And what was that? What was your
19   understanding of what 24 and 25 said?
20   A    I don't think I have to --
21           MR. ORDER: Objection.
22   A    -- my understanding of what legal documents
23   say.
24   Q    (By Mr. Wiechmann) Did you ever or your firm
25   ever argue to the court what you -- what INC's

Page 101

1    understanding was of what 24 and 25 meant?
2    A    I'm sure it's stated in perhaps not so many
3    words, in the responses to the summary judgment motions
4    and in the appeal briefs.
5    Q    Okay. And what was that position?
6    A    As stated in paragraphs 24 and 25, there were
7    two alternative positions: One, Horphag no longer is
8    an owner of any interest in the patent; and, two,
9    alternatively, Horphag is an owner of a one-half
10   interest in the patent.
11   Q    On the second alternative, if that were to be
12   the alternative found by the court, what was INC's
13   position as to its right to prosecute the patent
14   infringement action without permission of Horphag?
15   A    As stated in the responses to the summary
16   judgment motion and in the appeal briefs, there were
17   two positions: One is that Horphag could be
18   involuntarily joined as a party under Rule 19 of the
19   Federal Rules of Civil Procedure, and, two, that
20   Horphag in fact had consented by its actions to the
21   bringing of the lawsuit.
22   Q    And specifically what actions of Horphag did
23   INC believe exhibited consent by Horphag to the
24   initiation of the Connecticut and California
25   prosecution of patent infringement actions?

26 (Pages 98 to 101)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                Norman H. Zivin, Esq.

Page 102

1  A   Without waiving the attorney-client or work
2  product privileges and with reference to the briefs
3  filed on the summary judgment motions and in the Court
4  of Appeals, there were two positions: One position was
5  that Horphag had written several letters agreeing that
6  either party could proceed with the patent infringement
7  action.
8        In fact, there were three positions. A second
9  position was that Horphag itself had brought an action
10 against Consac without seeking any permission of the
11 joint owner.
12       And the third position -- give me a moment
13 here. (Pause.) Was that in Exhibit D to the Tobin
14 declaration which you have marked Exhibit 34, the
15 essence of this agreement was that the parties would
16 cooperate in order to protect the invention.
17 Q   Looking at Exhibit D, when you say the essence
18 of the agreement, can you point to any specific
19 language?
20 A   I'm looking at it. I'm not certain that I'm
21 familiar with this exact translation. (Pause.) I think
22 it's in the, what I'll call the whereas clauses,
23 although they don't use the word "whereas."
24 Q   Can you point specifically to where in the
25 introductory clauses you see the language that you, I

Page 103

1  think, characterize as the essence of the agreement?
2  A   "The parties have agreed to unite their
3  efforts," top of page 2.
4  Q   Any other language?
5  A   I don't see any right now. Doesn't mean that
6  there isn't any.
7  Q   It's my understanding -- it's my understanding
8  that it was INC's position in the lawsuit that it --
9  that the rights under this agreement, the rights that
10 SCIPA, S-c-i-p-a, had under this agreement were
11 assigned to INC at some time, correct?
12 A   I don't believe they ever took that position.
13 Q   Do you believe that SCIPA assigned its
14 patent -- the rights -- its rights to the 360 patent
15 reflected in this agreement to INC?
16 A   I don't understand your question.
17 Q   Paragraph 23 on page 7 says that, "Plaintiff
18 is, and, at all times relevant herein, has been the
19 owner, by assignment, of at least an undivided one-half
20 interest in U.S. Patent No. 4,698,360."
21       Do you see that?
22 A   Yes.
23 Q   What was the basis for INC's allegation that
24 it was the owner of at least one-half interest by
25 assignment?

Page 104

1  A   Without waiving attorney-client or work
2  product privileges, one could read the document
3  entitled "U.S. Patent Assignment" which is attached as
4  Exhibit A to the Tobin declaration which you've marked
5  Exhibit 34.
6  Q   And is it your understanding that this
7  assignment was made -- SCIPA received good and valuable
8  consideration for that assignment?
9  A   Are you asking me a fact or are you asking me
10 my understanding?
11 Q   If you have -- if you know the fact because
12 you've read some document or seen something, obviously
13 the fact. But I assume that it was your understanding
14 unless you were involved in the actual assignment.
15 Strike that.
16       Were you involved in the actual assignment
17 between SCIPA and INC?
18 A   Do you mean --
19       MR. ORDER: Objection.
20 A   -- did I negotiate the assignment? What do
21 you mean?
22 Q   (By Mr. Wiechmann) Were you acting as a
23 lawyer to either party in connection with the
24 assignment?
25 A   I don't understand your question. I clearly

Page 105

1  recorded the assignment, as you will see from the cover
2  page. It's got my signature on it.
3  Q   That's a recordation, but the actual drafting
4  of the assignment language, were you involved in any
5  way in either the drafting or review of that language?
6  A   I was involved in a way, yes.
7  Q   In what way?
8  A   I prepared a draft of an assignment.
9  Q   In connection with your representation -- and
10 this was on behalf of INC?
11       MR. ORDER: Objection to the form.
12 Q   (By Mr. Wiechmann) Were you -- in preparing
13 the draft of the assignment, were you doing it as legal
14 counsel representing INC?
15 A   Yes.
16       (Confidential portion filed under
17 separate binder.)
18       MR. WIECHMANN: I would like to mark as
19 Plaintiff's Exhibit 35 --
20       MR. ORDER: Are we off the restricted?
21       MR. WIECHMANN: No longer on the
22 restricted confidential.
23       Please mark this as Plaintiff's Exhibit
24 35.
25       (Exhibit 35, declaration of Donna A.

27 (Pages 102 to 105)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                    Norman H. Zivin, Esq.

---

Page 106

1  Tobin, marked.)
2      Q  (By Mr. Wiechmann) I show you Plaintiff's
3  Exhibit 35, and I apologize I had it marked in this
4  order. This appears to be the first affidavit or
5  declaration by Ms. Tobin. I assume Ms. Tobin is a
6  partner of yours at Cooper Dunham?
7      A  Yes, she is.
8      Q  The only reason it occurred is somehow the
9  folder with this one got lost in the transit from
10  Hartford to Stamford. But I wanted you to look through
11  the documents appended thereto between both -- appended
12  to both the Exhibit 34 and 35, and ask you if you can
13  identify the document that you earlier referred to as
14  the assignment or agreement, I'm not sure which one,
15  that was the basis -- one of the bases for your
16  argument, or INC's argument, excuse me, that Horphag no
17  longer had an ownership interest as of 1996 in the 360
18  patent.
19          (Mr. Rogovin returned to the deposition
20  room.)
21      A  The document referenced is marked as Exhibit D
22  to the Tobin declaration which you've marked Exhibit
23  34.
24      Q  (By Mr. Wiechmann) Are there any other
25  documents in either of 34 or 35 that were factually

---

Page 107

1  part of the basis for the claim that the agreement had
2  lapsed prior to March of 1996 between SCIPA and
3  Horphag?
4      A  Exhibit E to Exhibit 34 refers to it.
5      Q  And Exhibit E is what, for the record?
6      A  Document entitled "Confirmatory Assignment."
7      Q  And other than referring to the fact that
8  there was an assignment in 1985, is there any specific
9  language that you are referring to?
10          MR. ORDER: For what?
11      A  Are you asking me if any document relates to
12  it?
13      Q  (By Mr. Wiechmann) Okay.
14      A  So I'm answering your question.
15      Q  Is there any specific part of this document --
16      A  The document entitled "Confirmatory
17  Assignment," in the third whereas clause, it says, "The
18  SCIPA and Horphag agreement dated 29 April 1985 expired
19  by its terms on 29 April 1995."
20      Q  And this confirmatory assignment was between
21  Dr. Jack Masquelier and INC?
22      A  That's what it says.
23      Q  Were you in any way involved in the drafting
24  of this assignment called "Confirmatory Assignment"?
25      A  I believe I was.

---

Page 108

1      Q  Did you represent INC in connection with that?
2      A  Yes.
3      Q  And what were your general duties in
4  connection with representation of INC as it related to
5  the confirmatory assignment?
6      A  I was involved in the drafting of it, and I
7  sent it for recording.
8      Q  Did Mr. Schwitters ask you to assist in the
9  drafting?
10      A  Did he assist? I don't know.
11      Q  Did Mr. -- were you -- strike that.
12          Do you know why this confirmatory assignment
13  was created?
14      A  Yes.
15      Q  Why?
16      A  That's my legal mental processes --
17          MR. ORDER: Objection.
18      A  -- as an attorney. And it involves
19  attorney-client privileged communications.
20      Q  (By Mr. Wiechmann) Just yes or no: Did you
21  have discussions with Mr. Schwitters concerning the
22  assignment prior to him contacting Dr. Masquelier about
23  an assignment?
24      A  I believe so.
25      Q  Did you deal with an attorney on the other

---

Page 109

1  side concerning the drafting of this assignment?
2      A  Of the confirmatory assignment?
3      Q  Yes.
4      A  I don't recall.
5      Q  Did you deal with anybody other than -- did
6  you ever deal with Dr. Masquelier concerning this
7  confirmatory assignment?
8      A  I don't recall.
9      Q  Did you ever see a copy of the confirmatory
10  assignment in French?
11      A  I don't recall.
12      Q  Did anyone ever tell you that this assignment
13  was ever translated into French?
14      A  I don't know. I don't recall that.
15      Q  Are you aware of whether Dr. Masquelier reads
16  English?
17      A  I believe he does.
18      Q  What do you base your belief on?
19      A  I have observed him reading documents.
20      Q  Is he fluent speaking English?
21      A  As far as I know, he doesn't speak English.
22  Perhaps he says yes or no the way you would say "oui"
23  or "non" in French.
24      Q  Do you know whether Dr. Masquelier ever read
25  this confirmatory assignment before he signed it?

---

28 (Pages 106 to 109)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Page 110

1    A    No, I don't.
2    Q    Do you know when it was signed? I mean --
3    when -- do you know where it was signed?
4    A    Only what it says on page 2, "Dated at
5    Bordeaux, 3/2/00, France."
6    Q    Do you know if there was anybody with Dr.
7    Masqulier when he signed this?
8    A    Nothing other than what it says. It has a
9    witness's name and signature.
10    Q    Do you have any basis to believe that Dr.
11    Masquelier understood what this document -- what the
12    effect in terms of this document were?
13    A    Do I have any basis?
14    Q    Yes.
15    A    Yes.
16    Q    And what's that?
17    A    I think that's work product and attorney-
18    client privilege.
19    Q    Did Dr. Masquelier receive any, to your
20    knowledge, any consideration over a dollar that is
21    recited in here?
22    A    I believe he did.
23    Q    Do you know how much?
24    A    I don't recall.
25    Q    Did you ever see a document that indicated how

Page 111

1    much he received?
2    A    I believe I did.
3    Q    Can you describe to me what that document was?
4    A    A letter.
5    Q    A letter from whom to whom?
6    A    I don't remember.
7    Q    Was it a letter to you or somebody at your
8    firm?
9    A    No.
10    Q    Was it a letter that was either to or from Mr.
11    Schwitters?
12    A    I don't recall.
13    Q    Was it a letter that was dated sometime in
14    October of 1987 contemporaneous with this confirmatory
15    assignment? Excuse me.
16    MR. ORDER: When?
17    MR. WIECHMANN: Excuse me.
18    Q    (By Mr. Wiechmann) Sometime in October of
19    1996.
20    A    As I recall, it was something in 1996.
21    Q    Before or after the date of the confirmatory
22    assignment?
23    A    I don't recall.
24    MR. ORDER: Can we take a break?
25    MR. WIECHMANN: Yes. Let me ask one

Page 112

1    quick question.
2    MR. ORDER: Sure.
3    MR. WIECHMANN: Maybe two.
4    MR. ORDER: You can finish the line.
5    MR. WIECHMANN: No, no.
6    Q    (By Mr. Wiechmann) Mr. Zivin, do you read
7    French?
8    A    Very -- very little.
9    Q    Do you speak French?
10    A    No.
11    Q    I assume, then, you would not be comfortable
12    reviewing or editing documents in French?
13    A    I don't edit documents in French, no.
14    MR. WIECHMANN: We can take a break.
15    (Recess: 2:09 to 2:20 p.m.)
16    Q    (By Mr. Wiechmann) We were discussing before
17    the break the confirmatory assignment that you had
18    pointed out. Do you know what the term "confirmatory"
19    means?
20    A    Do I know? I know what I understand that it
21    means.
22    Q    Well, you helped draft this document, so what
23    was your understanding of what it meant?
24    A    I don't think I have to reveal my mental
25    processes in drafting documents.

Page 113

1    Q    Do you know if the other side knew what the
2    term "confirmatory" meant?
3    A    I wouldn't know what they knew.
4    Q    Do you know as we sit here today -- well, let
5    me ask you, does the term "confirmatory" have any
6    additional meaning other than the fact that the
7    document was an assignment?
8    MR. ORDER: Objection to form.
9    A    I think I will refer you to the dictionary as
10    to the meaning of confirmatory.
11    Q    (By Mr. Wiechmann) Are you stating that the
12    term meant nothing more than you see in Webster's
13    dictionary?
14    A    Without looking it up in Webster's dictionary,
15    I don't know what it says.
16    Q    Why would you refer me to the dictionary?
17    A    That's normally where one would find a
18    definition of a word.
19    Q    Yes. But as long as the word in drafting the
20    assignment had no special meaning, legal documents have
21    a tendency when you put a term in there to have a
22    meaning more than what you'd find in a normal
23    dictionary. I just want to know, because you were a
24    participant in drafting this document, whether the term
25    "confirmatory" had any special meaning other than the

29 (Pages 110 to 113)

Jarrow Formulas vs International Nutrition Co.

Norman H. Zivin, Esq.

---

Page 114

1  fact that this was an assignment.
2      MR. ORDER: Objection to form.
3      A   What you have never established, counselor, is
4  whether this was a document that I drafted.
5      Q   (By Mr. Wiechmann) Did you draft this
6  document?
7      A   This document, no.
8      Q   Was this document given to you to review
9  before it was signed?
10     A   This document was given to me to record.
11     Q   After it had been signed?
12     A   Correct.
13     Q   Did you see a draft of this document at any
14  time prior to you receiving the executed version?
15     A   I believe I testified that I was involved in
16  drafting a document.
17     Q   And what document did you draft?
18     A   A draft of this document.
19     Q   Did the draft of the document you were
20  involved with have the term "confirmatory"?
21     A   I don't recall.
22     Q   Do you still have copies of the drafts of this
23  document?
24     A   If I did, it was produced; but I don't -- I do
25  not normally retain drafts.

Page 115

1      Q   You stated that you recorded this document.
2  Why did you record this document?
3      A   I think that goes to my mental processes
4  and/or attorney work product, attorney-client
5  communications.
6      Q   Do you believe the fact that you recorded this
7  document had any legal effect on INC's position that it
8  was an owner, at least a one-half owner, of the 360
9  patent?
10         MR. ORDER: Objection.
11     A   I don't think I have to give you legal
12  opinions.
13     Q   (By Mr. Wiechmann) Was INC required by law to
14  record this assignment?
15     A   Again, you're asking me for a legal opinion.
16     Q   Did INC in connection with any of its lawsuits
17  take a position as to whether -- let's just strike
18  that.
19         In connection with your legal representation
20  of INC, did Mr. Schwitters ask you to review various
21  press releases that he wanted to issue in the United
22  States?
23     A   Sometimes.
24     Q   Did he ask you to review press releases
25  involving the various lawsuits that were pending in

Page 116

1  either the United States or France involving the 360
2  patent?
3      A   Sometimes.
4      Q   I'd like to show you Plaintiff's Exhibit 36.
5         (Exhibit 36, joint announcement,
6  marked.)
7      Q   (By Mr. Wiechmann) Have you had a chance to
8  look at that?
9      A   I've skimmed through it.
10     Q   Have you ever seen this document before?
11         MR. ORDER: It's two documents.
12     Q   (By Mr. Wiechmann) Let's start with the first
13  one, which is pages 5559 through 5562.
14     A   I would say yes, I have.
15     Q   Did you review a draft of this announcement
16  before it was issued by INC?
17     A   I don't know.
18     Q   I direct your attention to page 5561, the
19  second paragraph under the heading "U.S. Patent
20  4,698,360" which reads, "Until the Court of Appeals for
21  the federal circuit will have taken a conclusive and
22  final decision in this appeal, INC remains on record at
23  the U.S. Patent Office as a joint owner of 50 percent
24  of U.S. Patent 360."
25         Do you see that?

Page 117

1      A   Yes.
2      Q   Did you have an understanding what was meant
3  by the reference that INC remained on record at the
4  U.S. Patent Office as a joint owner of 50 percent of
5  the U.S. Patent 360?
6      A   You're asking me what I interpret that to
7  mean?
8         MR. ORDER: Today?
9      Q   (By Mr. Wiechmann) I said did you have an
10  understanding, yes or no, back in March of last year.
11     A   I don't recall today what understanding I had
12  in March of last year.
13     Q   As a patent attorney, do you believe that the
14  recording of this assignment has any legal effect as to
15  the ownership interest referred to in the assignment
16  itself?
17         MR. ORDER: Which assignment?
18         MR. WIECHMANN: The one referred to in
19  the second paragraph, the paragraph I just read.
20         MR. ORDER: That's not an assignment.
21     A   If you're asking me for a legal opinion, I
22  don't think that I have to give you one.
23     Q   (By Mr. Wiechmann) Is it fair to say that you
24  just told me before you did register for INC the
25  confirmatory assignment?

30 (Pages 114 to 117)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 118

1    A   That's correct.
2    Q   You also registered for INC the underlying
3 1994 assignment between SCIPA and INC?
4    A   That is correct.
5        MR. ORDER: Objection to form.
6    Q   (By Mr. Wiechmann) Did the recordation of
7 those assignments have any legal effect, in any way
8 strengthen INC's claims that it was owner of at least a
9 one-half interest in the 360 patent?
10        MR. ORDER: Objection. Direct the
11 witness not to answer on the grounds of attorney work
12 product and perhaps attorney-client.
13        MR. WIECHMANN: I may be mixed up. I am
14 not asking for attorney work product of your client.
15 I'm asking as a lawyer who might -- tell me if he's not
16 going to; again, it might simplify -- give an opinion
17 at trial as to what the basis was for bringing a
18 lawsuit; there are numerous documents that seem to
19 refer to the recording of all these assignments, and I
20 would like to know what legal effect --
21    Q   (By Mr. Wiechmann) Put it this way: Did INC
22 ever in any of its papers filed in any lawsuit ever
23 refer to the recording of any of these documents as the
24 basis for its position in the lawsuit?
25    A   I don't recall.

Page 119

1    Q   Were you aware of INC ever -- in France ever
2 referring to the fact that the recording -- that there
3 was a legal effect to the recording of the documents in
4 the U.S. Patent office on the ownership issue?
5    A   I don't recall, but I didn't see most of the
6 papers filed in France, and to the extent that they
7 were filed, they were filed in French and I couldn't
8 read them anyway.
9    Q   So you never received a translation of those
10 documents other than the decision?
11    A   As I believe I testified earlier, I might have
12 seen snippets of things.
13    Q   I'd like to show you Plaintiff's Exhibit 37.
14        (Exhibit 37, 10/27/95 letter to
15 president, Barbara Mulgrum Corp., from Mr. Zivin,
16 marked.)
17    Q   (By Mr. Wiechmann) Do you recognize that
18 document, Mr. Zivin?
19    A   No, but it has my signature on it.
20    Q   Did you send out in 1995 this letter -- a
21 cease-and-desist letter to Barbara Mulgrum Corporation?
22    A   It has my signature, but I do not recall it.
23    Q   Is it your normal procedure or your
24 secretary's normal procedure that when you dictate the
25 letter, your capital initials appear at the end of the

Page 120

1 letter in the left-hand margin?
2    A   No.
3    Q   What does that represent, the NHZ/MN?
4    A   First of all, I don't dictate letters.
5 Secondly, as far as I know, my initials appear even if
6 someone else writes the letter.
7    Q   There is no policy in your firm as when the
8 initials should appear in that corner?
9    A   No, not that I'm aware of.
10    Q   Do you have a practice as to -- I assume
11 you've written many letters, one way or the other, over
12 the course of your legal career?
13    A   That's a reasonable assumption.
14    Q   Are you aware of any letters that you have
15 written where somebody else's initials appear other
16 than yours?
17    A   I'm certain that's the case.
18    Q   Where you have written it, not it was written
19 for your signature.
20    A   Then I don't understand your question. The
21 question is a letter that I wrote but somebody else
22 signed it?
23    Q   No. You wrote and somehow instead of having
24 the initials NHZ, it had another set of initials.
25    A   That's probably the case.

Page 121

1    Q   Have you ever seen one?
2    A   I don't recall any. It's possible.
3    Q   MN stands for who?
4    A   I don't know.
5    Q   As we sit here today, do you --
6    A   Likely a secretary.
7    Q   What's the name of your present secretary?
8    A   One is named Erin and one is named Stacey.
9    Q   Did you have a secretary with the initials MN
10 in 1995?
11    A   I believe that I had a secretary for a short
12 while perhaps with those initials. And then she worked
13 for Donna Tobin. So I don't know whether that was '95
14 or some other time frame.
15    Q   But you don't deny that's your signature?
16    A   No. That's my signature.
17    Q   Do you recall reviewing the letter before it
18 was sent out?
19    A   No, I don't.
20    Q   Do you normally review letters before they're
21 sent out under your signature?
22    A   Of course.
23    Q   Would you deny that this was a cease-and-
24 desist letter sent to Barbara Mulgrum Corporation on
25 behalf of International Nutrition Company?

31 (Pages 118 to 121)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                              Norman H. Zivin, Esq.

---

Page 122

1   A   No.
2   Q   Do you recall what attorneys represented
3   Barbara Mulgrum Corporation in response to your cease-
4   and-desist letter?
5        MR. ORDER: Objection to form.
6   A   No.
7   Q   (By Mr. Wiechmann) I'd like to show you
8   Plaintiff's Exhibit 38.
9        (Exhibit 38, 1/10/96 letter to Paul
10  Morico from Mr. Zivin, marked.)
11  Q   (By Mr. Wiechmann) Is that your signature?
12  A   It looks like it.
13  Q   Do you remember communicating with a Paul
14  Morico, attorney for Arnold, White & Durkee?
15  A   No.
16  Q   Would you please read the letter to yourself.
17  A   (Pause.) All right. I've read it.
18  Q   In the second paragraph, the second sentence
19  after you've enclosed a copy of the assignment granting
20  INC a 50 percent interest in Patent 360, you say, "The
21  assignment is duly recorded in the U.S. Patent and
22  Trademark Office."
23        Do you read that?
24  A   I certainly see it.
25  Q   What did you mean by that sentence when you

---

Page 123

1   wrote it to Mr. Morico?
2   A   Since I've already testified I don't recall
3   sending the letter, I don't know what I meant at that
4   time. If you're asking me what I understand it to mean
5   today, that's a different question.
6   Q   If you don't understand then, what do you
7   believe you meant by it?
8   A   That the 1994 assignment was recorded in the
9   Patent and Trademark Office. Seems like English to me.
10  Q   What -- why did you put that sentence in
11  there?
12  A   It was obviously in response to a letter that
13  he apparently sent to me. Since you haven't seen fit
14  to show it to me, I'm not sure why I was writing it, if
15  I wrote it at all.
16  Q   I'll show it to you in a second. The only
17  copy I have now has writing on it, and I do not want to
18  show it to you at this stage. It is my writing and not
19  part of the original.
20        I want to read you the sentence that I believe
21  relates to this, "Accordingly, my client is only
22  interested in dealing with the party who is the proper
23  owner or exclusive licensee of the 360 patent, as only
24  such a party can agree not to sue my client. My client
25  therefore requests that you provide it with sufficient

---

Page 124

1   information to assure it that the International
2   Nutrition Company is indeed a proper owner of the 360
3   patent and that Horphag's claims in the French
4   litigation are without merit."
5        I will give you a copy as soon as Ms. Stevens
6   returns.
7        Assuming that is what the letter says, why --
8   in addition to including the assignment in the letter
9   to Mr. Morico, did you tell him that this assignment
10  was duly recorded in the U.S. Patent and Trademark
11  Office?
12        MR. ORDER: Objection.
13  A   I have no idea.
14  Q   (By Mr. Wiechmann) Did you think that the
15  record -- at that time did you think that the
16  recordation of that assignment in any way had any legal
17  effect on your patent infringement claim?
18        MR. ORDER: Objection.
19  A   The legal effect of recording assignments is
20  stated in the patent law. You can read it as well as I
21  can. I'm not going to give you legal opinions about
22  what my thought processes are or were with respect to
23  why I did certain things. It's in English. It says
24  what it says.
25  Q   (By Mr. Wiechmann) Fine. Now we're at

---

Page 125

1   trial --
2   A   That's right. That's exactly what I'd -- I'd
3   do. If you asked me that question at trial, I would
4   pull out a copy of the patent statute and read it into
5   the record. It says what it says.
6   Q   And whatever it says, you don't believe
7   there's any interpretation that's been given by courts
8   or administrative agencies that would aid me in reading
9   that statute?
10  A   Sir, I'm not here --
11        MR. ORDER: Objection.
12  A   -- as a patent expert. I'm here as a witness
13  because you insisted I be here. You can't take my
14  deposition for the purpose of knowing what my legal
15  opinions are. I didn't appear here to be examined as
16  an expert witness.
17  Q   (By Mr. Wiechmann) But you appeared here to
18  explain some of your prior actions, and since some of
19  your prior actions include statements made in these
20  letters, which don't refer Mr. Morico to the statute
21  and repeated statements where the, quote, recording of
22  certain documents, including assignments, seem to be
23  given some sort of importance, I was just interested in
24  what importance either you or your client thought
25  attached to the recording of these documents.

---

32 (Pages 122 to 125)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                                           Norman H. Zivin, Esq.

Page 126

1    MR. ORDER: Once again, this is not a
2  document that has anything to do with Jarrow Formulas,
3  and to the extent you're seeking to find out what
4  Attorney Zivin or his client intended to convey in this
5  letter dated January 10th, 1996, to the extent it's not
6  obvious on its face, he's not obligated to divulge his
7  attorney work product. This is in the context of
8  litigation. I don't see why you would think it's not
9  work product.
10    MR. WIECHMANN: Very simply because work
11  product is internal investigations kept confidential
12  just like attorney-client. I am entitled to find out
13  what he meant in a communication with a third party,
14  with a co-defendant in the lawsuit. If I had a
15  letter -- if Mr. Jarrow had been given warning, which
16  he wasn't, I would probably use Mr. Jarrow's letter,
17  but we didn't get one in this lawsuit. So I'm using
18  next best thing, another co-defendant.
19    I've got several others I'll use in
20  connection with this. It is an action dealing with the
21  360 patent, the ownership of the 360 patent, and since
22  it was sent to a third party, antagonistic third party,
23  I think I'm entitled to the interpretation going -- of
24  the letter. I mean if all we're going to say is, "The
25  document speaks for itself, and of course I had no

Page 127

1  meaning in saying what I said," that's fine, keep that
2  position, and we'll use it later. But I disagree that
3  this is an attorney work product. You can take it only
4  so far.
5    MR. ORDER: No, no. The letter itself
6  obviously was disclosed to someone who is not part of
7  the privilege or part of the work product protection.
8  But your question goes beyond what is contained in the
9  letter to what his purpose was in writing the letter,
10  to what his belief was in writing the letter, and to
11  that extent, you're going too far with your question.
12    MR. WIECHMANN: I wanted to know what he
13  meant by that sentence, why he put that sentence in
14  there.
15    MR. ORDER: Again, we produced the
16  document because the document was not privileged. That
17  did not mean that we opened the door to every thought
18  process that Attorney Zivin had in connection with
19  writing this letter.
20    MR. WIECHMANN: We'll let the court
21  decide, but I think I'm entitled to know his
22  interpretation of what he sent to Mr. Morico.
23    MR. ORDER: Objection stands.
24    MR. WIECHMANN: Are you directing him
25  not to answer?

Page 128

1    MR. ORDER: Yes.
2    Q  (By Mr. Wiechmann) Did you ever express an
3  opinion to any party other than your client as it
4  related to an -- as it related to the ownership of the
5  360 patent or the infringement of the 360 patent as to
6  what the legal effect was of INC recording various
7  documents with the U.S. Patent and Trademark Office,
8  including the assignments we have previously discussed?
9    A  I don't recall doing that.
10    Q  Did you ever take the position in front of any
11  court as to the legal effect, if any, of recording
12  these assignments in the Patent Office, Patent and
13  Trademark Office?
14    A  I think you previously asked me that, and I
15  said I didn't recall.
16    MR. WIECHMANN: When she comes back, I
17  will give you the other letter, if you think it's
18  helpful.
19    Q  (By Mr. Wiechmann) I'd like to show you
20  Plaintiff's Exhibit 40, which appears to be a two-page
21  announcement on International Nutrition Company
22  Establishment letterhead with the numbers INC0544 and
23  45.
24    (Exhibit 40, two-page announcement,
25  marked.)

Page 129

1    Q  (By Mr. Wiechmann) Have you ever seen this
2  document before?
3    A  It looks familiar.
4    Q  Did Mr. Schwitters give you a draft of this to
5  review prior to its dissemination or release?
6    A  I don't recall.
7    Q  Do you recall reviewing press releases dealing
8  with the Bordeaux decision, the Court of Appeals
9  decision dated May 28, 1998?
10    A  I don't recall.
11    Q  Go down to the third paragraph. Do you recall
12  receiving -- in any way reviewing a statement in the
13  draft or decision dealing with a French court has no
14  jurisdiction to change records in the U.S. Patent
15  Office, that statement?
16    MR. ORDER: Objection to the form.
17    A  I don't recall whether I reviewed that
18  sentence or not.
19    Q  (By Mr. Wiechmann) Did you ever tell anybody
20  that you thought that sentence, going all the way to
21  the end, "patent," period, whether you thought that was
22  an accurate summary of U.S. patent law?
23    A  I don't recall that.
24    Q  Do you believe that sentence is an accurate
25  summary of U.S. patent law?

33 (Pages 126 to 129)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                      Norman H. Zivin, Esq.

Page 130

1      MR. ORDER: Objection.
2      A   I don't think I have to give you my legal
3  opinions.
4      Q   (By Mr. Wiechmann) Are you refusing to
5  testify?
6      A   Yes.
7      Q   Next sentence, "Under U.S. patent law, INC
8  acquired clear title to SCIPA's ownership in the 360
9  patent as a matter of law," do you recall reviewing
10  that sentence?
11      A   I don't recall.
12      Q   Do you recall, yes or no, discussing that with
13  Mr. Schwitters?
14      A   I don't recall.
15      Q   Do you have an understanding as to where Mr.
16  Schwitters got his understanding of U.S. patent law?
17      MR. ORDER: Objection to form.
18      A   First, I'm not sure that this was Mr.
19  Schwitters' understanding. Second, I don't know where
20  he gets all of his understandings to the extent that he
21  does have them. He certainly gets some understandings
22  from me.
23      Q   (By Mr. Wiechmann) Are you aware of anybody
24  else from whom he receives, he has received
25  interpretation of U.S. patent law?

Page 131

1      A   Yes.
2      Q   Who?
3      A   Bill Sapone.
4      Q   For the record, would you identify who Bill
5  Sapone was?
6      A   He is a patent lawyer in Connecticut.
7      Q   He represents whom?
8      A   At the moment, I don't know who he represents.
9      Q   At the time that he gave Mr. Schwitters
10  advice, who was he representing?
11      A   I don't know that he gave Mr. Schwitters
12  advice.
13      Q   At the time that he rendered -- gave
14  information to Mr. Schwitters which formed the partial
15  basis for his understanding of U.S. patent law, what
16  was Mr. Sapone's relationship to either INC, Mr.
17  Schwitters, or anybody else?
18      MR. ORDER: Objection to the form.
19      A   As I understand your question, Mr. Sapone was
20  an attorney representing PSI. Whether he still
21  represents them or not, I do not know.
22      Q   (By Mr. Wiechmann) How do you know that Mr.
23  Sapone gave Mr. Schwitters information dealing with
24  U.S. patent law?
25      A   It was alluded to in conversations.

Page 132

1      Q   Conversations between you and Mr. Schwitters?
2      A   Correct.
3      Q   What did Mr. Schwitters tell you Mr. Sapone
4  told him?
5      MR. ORDER: Objection. Attorney-client
6  privilege.
7      MR. WIECHMANN: The reference of a fact
8  from a third party.
9      MR. ORDER: So?
10      MR. WIECHMANN: It does not make it
11  privileged. Not everything that an attorney and client
12  discuss with each other is privileged. If I go and
13  talk to Mr. Rogovin and tell him the Yankees won last
14  night, that does not make it a privileged
15  conversation.
16      MR. ORDER: However, your question went
17  to a discussion about U.S. patent law, and I think
18  that's close enough to legal advice or the solicitation
19  of legal advice to constitute an attorney-client
20  privileged communication.
21      MR. WIECHMANN: Is this a general
22  statement or are you aware of what Mr. Sapone -- Mr.
23  Schwitters told to your client?
24      MR. ORDER: I don't have to answer that
25  question.

Page 133

1      MR. WIECHMANN: But you're making an
2  instruction not to answer based on the fact that you
3  are guessing it was solicitation of legal advice. We
4  haven't even set that up with your client at this
5  stage.
6      MR. ORDER: I don't think your question
7  was proper. I stand on the objection.
8      MR. WIECHMANN: Which is an instruction
9  not to answer?
10      MR. ORDER: And the instruction, yes.
11      Q   (By Mr. Wiechmann) When Mr. Schwitters told
12  you about Mr. Sapone's statements or advice concerning
13  U.S. patent law, was he seeking your legal opinion as
14  to those statements?
15      A   As I recall, yes.
16      Q   Other than Mr. Sapone, is there anybody else
17  you are aware of anybody who gave Mr. Schwitters advice
18  concerning the effect of the U.S. patent law on his
19  claim of ownership of the 360 U.S. Patent?
20      A   Yes.
21      Q   Who else?
22      A   Mark Giarratana, Marvin Gittes, and other
23  attorneys representing defendants in the various
24  lawsuits.
25      Q   Other than the attorneys representing the

34 (Pages 130 to 133)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                                    Norman H. Zivin, Esq.

---

Page 134

1  defendants in the other lawsuits and Mr. Sapone,
2  anybody else?
3      A   Not that I know of.
4      Q   Just so the record is clear, the information
5  that Mr. Schwitters received from Mr. Giarratana, who,
6  for the record, is a partner of mine, Marvin Gittes,
7  and the other lawyers representing the defendants in
8  the Connecticut and California infringement actions,
9  that was through Mr. Schwitters receiving copies of
10  briefs and pleadings filed in the underlying actions?
11     A   Correct.
12     Q   I assume Mr. Schwitters had no direct
13  communication with any of those attorneys?
14     A   Not to my knowledge.
15     Q   Just for the record, I would like to show you
16  Plaintiff's Exhibit 39 which is, I believe, the letter
17  that is -- seeks the information concerning the
18  assignment of the patent which was marked as Exhibit
19  38.
20          (Exhibit 39, 1/9/96 letter to Mr. Zivin
21  from Mr. Morico, marked.)
22     Q   (By Mr. Wiechmann)  Do you recall receiving a
23  copy of this letter?
24     A   No.
25     Q   Do you know who Raymond Faltinski is?

---

Page 135

1      A   No.
2      Q   Patricia Kammerer?
3      A   I don't know her.
4      Q   Does the patent statutes and regulations -- do
5  you recall what sections of the patent statute and/or
6  regulations address the effect of your recordation of
7  the two assignments in the U.S. Patent Office?
8          MR. ORDER: Objection.
9      A   I can't give you the numbers off the top of my
10  head.
11     Q   (By Mr. Wiechmann)  Without telling me the
12  specific change, do you believe that that language is
13  clear on its face or there have been judicial
14  interpretations of what the effect of recordation is?
15     A   There probably have been judicial
16  interpretations of every single word in the patent
17  statute.  I do not profess to have knowledge of the
18  entire contents of the U.S. Code Annotated.
19     Q   Do you believe that -- let me ask you to look
20  at Plaintiff's Exhibit 41.
21          (Exhibit 41, photocopy of page 226 of 37
22  CFR, marked.)
23     Q   (By Mr. Wiechmann)  I assume you've seen a
24  version of this section of the regulations before?
25          MR. ORDER: Which section? There are

---

Page 136

1  several.
2      Q   (By Mr. Wiechmann)  37 CFR, Section 3.54,
3  effect of recording.
4      A   I'm sure I've seen it before.
5      Q   Is this the section you said you would have
6  read to me in court if I asked you the effect of your
7  recording those two assignments?
8      A   I don't know if this is the only section.
9      Q   This would have been one of the sections?
10     A   It's titled "Effect of Recording."
11     Q   I know what it's entitled, but in your belief,
12  do you believe this section directly relates to the --
13  strike that.
14          In 1994 and 1996, when you were recording the
15  two assignments we discussed, did you believe that this
16  section of the Code of Federal Regulations basically
17  controlled the recording of those two assignments?
18          MR. ORDER: Objection to form.
19     A   I can't answer that question.
20     Q   (By Mr. Wiechmann)  And when you effect -- in
21  fact, is it fair to say that when you recorded those
22  two assignments under Section 3.54, those recordations
23  had no legal effect on the validity of INC's claims
24  that it was a partial owner of the 360 patent?
25          MR. ORDER: Objection to the form.

---

Page 137

1      A   I disagree with you, sir, but I'm not going to
2  debate the effect of the patent laws.  You can read
3  them and write your own brief on the subject.
4      Q   (By Mr. Wiechmann)  Pursuant to Section 3.54,
5  did you ever ask the Patent Office to determine the
6  effect that those assignments would have?
7          MR. ORDER: Objection to form.
8      A   The answer to your question is no.
9      Q   (By Mr. Wiechmann)  Have you ever, in
10  recording a document and assignment -- a document in
11  the Patent Office for a client -- ever asked, pursuant
12  to Section 3.54, the office to make a determination of
13  the effect of that recordation?
14          MR. ORDER: Objection to form.
15     A   Your question can be interpreted in several
16  different ways, and perhaps my answer no to the prior
17  question is not quite correct.  And I'll clarify that
18  answer as well as answer your current question.
19          And that is, in connection with the
20  re-examination of the 360 patent, the Patent Office
21  examiners did in fact make a determination as to who
22  had the right to appear on behalf of the patent owners,
23  and the determination that was made was that INC,
24  Horphag, and SCIPA should all appear, and it was agreed
25  that I would be the principal attorney on behalf of all

---

35 (Pages 134 to 137)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 138

1  three. So I think that clarifies my prior answer to
2  your question or perhaps changes it slightly.
3  Q   (By Mr. Wiechmann) And that's also the only
4  time that you asked the Patent Office --
5  A   I didn't in fact ask the Patent Office to do
6  it. They made their own determination.
7  Q   But you've never asked the Patent Office to do
8  that?
9  A   No, I have not, not that I recall, anyway.
10  Q   Do you believe that the regulations in Chapter
11  37 of the Code of Federal Regulations require an
12  attorney to withdraw a recordation of a document when
13  that attorney believes such document is -- is either
14  incomplete or misleading?
15  A   I'm not aware of any such obligation.
16  Q   Have you ever withdrawn or modified a
17  recordation because it has become incomplete,
18  inaccurate, or misleading?
19  A   Not that I recall.
20  Q   When you became aware of the French court's,
21  appellate court's ruling that we discussed earlier
22  today that INC did not own the patent because the
23  assignment from SCIPA was invalid, did you make an
24  attempt to withdraw recordation of that assignment?
25  A   The answer to your question is no.

Page 139

1  Q   Did you make an attempt to modify that
2  recordation in any way?
3  A   Nope.
4  Q   They are still on record today as they were
5  filed in 1994 and 1996?
6  A   The record will reflect what's on file. I
7  haven't looked at it.
8  Q   Are you aware of anybody else who tried to
9  withdraw or modify those filings?
10  A   Yes.
11  Q   And who is that?
12  A   Horphag.
13  Q   When did they do that?
14  A   I don't recall when.
15  Q   Was it within the last two years?
16  A   I don't think so. I think it was earlier.
17  Q   Do you recall what the resolution of that
18  attempt was?
19  A   I believe that Horphag recorded the French
20  court decisions and perhaps other decisions so that the
21  record would indicate what they believed to be the
22  case.
23  Q   Do you recall ever reviewing prior to release
24  any INC announcement or release that dealt with an
25  interpretation of a decision by either a French or

Page 140

1  United States court involved with the ownership of the
2  360 patent?
3  A   I'm sure I did.
4  Q   You don't recall which one?
5  A   No.
6  Q   Let me show you Exhibit 42 and 43.
7       (Plaintiff's Exhibits 42 and 43, news
8  releases, marked.)
9  Q   (By Mr. Wiechmann) Would you review Exhibits
10  42 and 43.
11  A   (Pause.) All right.
12  Q   I believe these are different versions of the
13  same announcement, and, for the record, the first one I
14  gave you, 42, came from the files of Integrated
15  BioCeuticals and PSI, and the other one came from
16  defendants, and because of your counsel's position, I
17  don't know which, either from yours or Dr. Masquelier's
18  or INC's files.
19       Have you seen these prior to today?
20  A   Looks vaguely familiar.
21  Q   Do you recall whether you reviewed a draft of
22  this announcement prior to the date it was released on
23  May 29th, 1998?
24  A   No.
25  Q   Do you recall ever having to review a

Page 141

1  translation of the Bordeaux Higher Court of Appeals
2  decision in connection with your review of any press
3  release proposed by Mr. Schwitters or INC?
4  A   I don't recall doing that, no.
5  Q   Do you recall ever having to review any
6  decision to assist you in reviewing the press releases
7  given to you by Mr. Schwitters?
8  A   Concurrently?
9  Q   Yes.
10  A   With the review of the press release?
11  Q   Yes.
12  A   I don't recall.
13  Q   Why did Mr. Schwitters -- what did you believe
14  your function was in reviewing the press releases Mr.
15  Schwitters gave you?
16  A   To give him legal advice regarding the
17  descriptions of matters that were contained in the
18  press releases that INC sent to me.
19  Q   Did you comment on matters other than legally
20  related descriptions?
21  A   Yes. If there was improper spellings or
22  punctuation, I would comment on those as well.
23  Q   Did Mr. Schwitters ever send you press
24  releases dealing with what I call technical marketing
25  press releases dealing with the technical aspects of

36 (Pages 138 to 141)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                            Norman H. Zivin, Esq.

Page 142

1   his OPC's as opposed to the various lawsuits and
2   disputes in which he was involved?
3        A   I'm not sure I can answer that question.  I
4   don't know what you're referring to.
5        Q   Do you ever recall reviewing prior to its
6   dissemination a press release that did not in some way
7   mention one of the legal disputes that INC was involved
8   with?
9        A   I don't recall.
10       Q   One way or the other?
11       A   No.
12       Q   Do you recall when you first started reviewing
13  press releases?
14           MR. ORDER:  INC press releases?
15           MR. WIECHMANN:  Yes.
16       A   I believe it was sometime after the lawsuit
17  had started.
18       Q   (By Mr. Wiechmann)  Do you recall the first
19  press release that you reviewed was one announcing the
20  commencement of the Connecticut lawsuit?
21       A   No, I don't.
22       Q   Do you recall first or last reviewing a press
23  release announcing the commencement of the Connecticut
24  action?
25       A   I don't recall.

Page 143

1            MR. ORDER:  Objection to the question.
2        Q   (By Mr. Wiechmann)  Before we get to there,
3   looking at 42 and 43, there are certain statements
4   involving what the effect of the Bordeaux Court of
5   Appeals decision was such as in paragraph 3, "The
6   Bordeaux court now rejects Horphag's claim to exert a
7   right of preemption on Masquelier's preemptory
8   assignment of these rights to INC," and then going to
9   the next page where there are statements about what the
10  Court of Appeals concluded, that SCIPA should not have
11  assigned its half of the 360 patent to INC, and the top
12  paragraph, basically all of the paragraphs in the
13  second page other than the last one, do you have any
14  understanding of where Mr. Schwitters got the
15  information for this press release?
16           MR. ORDER:  Objection to the form.
17       A   A, I do not know whether Mr. Schwitters in
18  fact wrote the press release; B, I do not know where he
19  got his understanding other than reading the decisions
20  themselves; and, C, I note that these two documents do
21  not have the identical text, even though you
22  represented that they did.  In particular, at the end
23  of the third paragraph on the first page, one document
24  refers to Masquelier's provisory assignment, and the
25  other one refers to Masquelier's conditional

Page 144

1   assignment.
2        Q   (By Mr. Wiechmann)  Do you recall that change
3   being made between one and the other?
4        A   I do not recall, although the document you
5   showed me earlier referred to a collateral assignment
6   and then referred to provisory or conditional, et al --
7        Q   Did you ever discuss --
8        A   -- so that leads me to believe that I did not
9   review these documents before they were sent out
10  because that would have been an incorrect description
11  of the document that's obviously referred to.
12       Q   Do you believe there are any other statements
13  in 42 or 43 that are an incorrect description of either
14  the actions of the French court or the effect of those
15  decisions on the United States court?
16       A   I don't think I need to comment upon the
17  accuracy of that because that goes to my mental
18  processes as to whether something is correct or not.  I
19  simply commented on that word not being the title of
20  the document referred to in either case.
21       Q   And commented that you would have -- would you
22  have allowed, if you reviewed the document, do you
23  recall ever reviewing a document given to you by Mr.
24  Schwitters as a press release where there was a
25  statement that you believed was incorrect that you

Page 145

1   allowed to be disseminated?
2        A   First of all --
3            MR. ORDER:  Objection.
4        A   Yes.  First of all, I am not in the position
5   of allowing or permitting anything.  I am simply a
6   lawyer who is asked for advice.  My client can take it
7   or leave it.  Secondly, I'm sure I did review press
8   releases where I did suggest changes in language.
9        Q   (By Mr. Wiechmann)  Are you aware of any times
10  you suggested a change to Mr. Schwitters where he did
11  not follow your advice and make the change?
12       A   I do not know that because I do not always see
13  the final press releases as they go out.
14       Q   Did you ever see a press release from INC or
15  Mr. Schwitters where you noticed that your changes were
16  not adopted by him?
17       A   I don't recall that.
18       Q   Other than Mr. Schwitters, did you ever
19  discuss with anybody at ADinfinitum or PSI your
20  comments concerning the press releases that were
21  forwarded to you for review?
22           MR. ORDER:  Objection to form.
23       A   I don't recall doing so.
24       Q   (By Mr. Wiechmann)  Did anyone at ADinfinitum
25  ever call you up for input, your input, into any press

37 (Pages 142 to 145)