Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                                                        Norman H. Zivin, Esq.

Page 146

1  release they were preparing for INC?
2   A   Not that I recall.
3   Q   Did anyone from PSI ever call you up to ask
4  your input on a press release that they were working
5  with INC on?
6   A   I believe they did.
7   Q   Do you recall who at PSI?
8   A   Likely would have been Rick LeFebvre.
9   Q   Do you recall when that was?
10  A   Five, six years ago, seven years.
11  Q   Do you recall in connection with which
12 release?
13  A   I don't recall which particular release or
14 releases, but I did review press releases for that
15 company.
16  Q   Maybe to save a little time, I'd like to show
17 you a package of documents which have been marked as a
18 group, which is marked as Exhibit 44.
19         (Exhibit 44, packet of documents,
20 marked.)
21         MR. ORDER: I'm not aware of Mr. Rogovin
22 signing the declaration in connection with the
23 protective order in this case, and this document's been
24 marked as confidential. I assume these are documents
25 produced by ADinfinitum. So I don't think -- I haven't

Page 147

1  seen it. If he has, I haven't seen it.
2         MR. ROGOVIN: I haven't looked at it,
3  but I signed it absolutely.
4         MR. ORDER: I don't recall it being
5  forwarded to me.
6         MR. WIECHMANN: Well, my understanding
7  is you'll get a signed version, but as a party, he --
8  as a party to this, he is subject to the
9  confidentiality, and I know my understanding --
10         MR. ORDER: I thought we ought to have
11 the parties designate up to two individuals by signing
12 a declaration. That's the way the protective order
13 works.
14         MR. WIECHMANN: I believe he did.
15         MR. ORDER: I looked the other day and I
16 didn't see it.
17         MR. WIECHMANN: If you want, my forms
18 are up in Hartford. I would have him sign one now.
19         MR. ORDER: Let me just suggest that he
20 be excused for this portion.
21         MR. WIECHMANN: It's very simple, on the
22 record, because it's on the record, Mr. Rogovin, are
23 you subject -- you've read the confidentiality order.
24 Have you signed it or are you subject to the terms of
25 that confidentiality?

Page 148

1         MR. ROGOVIN: Absolutely. I have read
2  it and absolutely I am subject to it.
3         MR. ORDER: He's also -- well, first we
4  are entitled to ten days' notice of that, and second --
5         MR. ROGOVIN: I believe that's to third
6  parties.
7         MR. ORDER: I believe you're wrong.
8         MR. WIECHMANN: Ten days' notice or not,
9  I can't believe you didn't think that Mr. Rogovin was
10 going to be one of the parties subject to this thing.
11 He sat through this whole deposition so far. To begin
12 with, every one of these things is a cover letter.
13 It's not even a stupid draft of it.
14         MR. ORDER: They are marked
15 confidential. What can I tell you? Obviously
16 ADinfinitum thought to mark them confidential. I've
17 got the objection on the record. Let's just move on.
18         MR. WIECHMANN: Okay.
19  Q   (By Mr. Wiechmann) Have you had a chance to
20 look through these letters quickly?
21  A   I see them. Do you want to ask me something
22 specific about them?
23         MR. WIECHMANN: I think that's a fair
24 point. My understanding is ADinfinitum, I'm not sure
25 has seen this protective order.

Page 149

1         MR. ORDER: Well, the protective order
2  on its face does apply to nonparties and allows them to
3  designate documents as confidential.
4         MR. WIECHMANN: I understand. All I'm
5  saying is I'm not sure they understood what they were
6  doing by stating that protection.
7         MR. ORDER: I don't know.
8         MR. WIECHMANN: It doesn't matter.
9         MR. ORDER: Go ahead.
10  Q   (By Mr. Wiechmann) The first letter of this
11 package is copied to you. Do you recall receiving this
12 letter?
13  A   No.
14  Q   Do you recall receiving any letters from INC
15 to ADinfinitum where there was reference to the fact
16 that you had reviewed or scrutinized the draft
17 announcement?
18  A   I don't recall.
19  Q   Is there anything in any of these documents
20 which leads you to believe that the references by Mr.
21 Schwitters in the first four letters that you had
22 reviewed the press release that had been appended to
23 these documents or was referred to in these documents
24 was not reviewed by you?
25  A   I can't answer that question.

38 (Pages 146 to 149)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                          Norman H. Zivin, Esq.

Page 150

1  Q   I mean the timing or anything else.
2  A   Document number 2 is not copied to me.
3  Document number 3 is not copied to me. Document number
4  4 is not copied to me. So I likely never saw them. So
5  how would I know what they're referring to?
6  Q   Sometimes you know by the dates.
7  A   Good luck if you can remember six or seven
8  years later what pieces of paper you saw. I can't.
9  Q   The last document here with -- that is your --
10 your signature?
11 A   Are you talking about the fifth page?
12       MR. ORDER: Where?
13 A   If you are talking about the fifth page, the
14 answer is yes.
15 Q   (By Mr. Wiechmann) And is the document that
16 is attached what you would call the notice of intent
17 referred to in the cover letter?
18 A   Certainly appears to be the case.
19 Q   Okay. Do you recall why you sent the notice
20 of intent to issue a re-examination certificate to Mrs.
21 Sue Taggert?
22 A   I do not recall now. The letter speaks for
23 itself, I think.
24 Q   Do you recall why Mr. Schwitters asked you to
25 send a copy to ADinfinitum?

Page 151

1  A   No.
2       MR. ORDER: Objection.
3  Q   (By Mr. Wiechmann) Do you recall discussing
4  with ADinfinitum the effect of this notice of intent to
5  issue re-examination certificate?
6  A   I don't recall discussing anything with them.
7  Q   I'd like to show you a document that's already
8  been marked as Plaintiff's Exhibit 30 in connection
9  with the PSI deposition.
10      MR. WIECHMANN: Here it is if you want a
11 copy of it.
12      MR. ORDER: Thank you.
13 Q   (By Mr. Wiechmann) do you recall if you
14 received a copy of this press release prior to its
15 dissemination?
16 A   I don't recall.
17 Q   Do you recall ever discussing with Mr.
18 Schwitters the content of a press release announcing
19 the institution of your lawsuit in Connecticut?
20 A   I don't recall.
21 Q   Do you recall ever reviewing a proposed press
22 release discussing why Horphag had been sued as a
23 defendant?
24 A   I don't recall.
25 Q   Did you ever discuss with Mr. Schwitters his

Page 152

1  use in the press releases of the term "INC is a
2  rightful owner" without qualifying the percentage of
3  ownership he had?
4       MR. ORDER: Objection to form.
5  A   I think the answer to that question invokes
6  the attorney-client privilege.
7       MR. ORDER: Right.
8  A   So I will not answer.
9  Q   (By Mr. Wiechmann) I'd like to show you a
10 document, an exhibit that is being marked as Exhibit
11 45.
12      (Exhibit 45, 3/26/97 press release,
13 marked.)
14 A   (Pause.) All right.
15 Q   (By Mr. Wiechmann) Do you recall seeing this
16 prior to its release?
17 A   I don't know.
18 Q   Do you recall discussing or reviewing any sort
19 of release or document that commented on the effect of
20 the U.S. case on the French case?
21 A   I'm sure I did at some point.
22 Q   But you don't recall one way or the other
23 whether you were involved in the review or drafting
24 this press release?
25 A   I certainly recall that I was not involved in

Page 153

1  drafting any press release. My activity was limited to
2  review of selected press releases.
3  Q   Did you ever request that Mr. Schwitters show
4  you all press releases that involved a characterization
5  of either the French or U.S. lawsuits?
6       MR. ORDER: I think it calls for
7  attorney-client privileged communication.
8  Q   (By Mr. Wiechmann) Did you ever see after the
9  fact press releases issued by INC commenting on or
10 characterizing the effect of litigations in France or
11 the United States that you had not had the chance to
12 review?
13      MR. ORDER: Prior to their publication?
14      MR. WIECHMANN: Yes.
15 A   I believe that's correct.
16 Q   (By Mr. Wiechmann) How many times?
17 A   I don't know.
18 Q   More than once?
19 A   I don't recall.
20 Q   Would it be fair to say that you saw more than
21 50 percent of the press releases commenting on or
22 characterizing U.S. or French court actions or less
23 than 50 percent?
24 A   I can't quantify it. I don't know.
25 Q   And it's fair to state that because you can't

39 (Pages 150 to 153)

Brandon Smith Reporting Service

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                                    Norman H. Zivin, Esq.

Page 154

1  recall, that you do not know what INC, whoever drafted
2  this for INC, meant by their characterizations of the
3  French lawsuit?
4      A   I don't know that I can answer that question.
5      Q   Yes or no, did you have any discussions, be it
6  this press release or something similar, where you
7  discussed with Mr. Schwitters, in connection with a
8  press release or marketing piece he wanted to put out,
9  the effect of the 1997 decision by the Bordeaux court?
10     A   As I understand the question, yes.
11     Q   On more than one occasion?
12     A   I don't know.
13     Q   Was it in connection with this?
14     A   I don't know.
15     Q   Did your discussions have the effect of having
16 Mr. Schwitters or INC change their characterization of
17 the effect of the French lawsuit?
18         MR. ORDER:  Objection to form.
19     A   Since I don't know which ones we're talking
20 about, I can't answer that question.  I don't know.
21     Q   (By Mr. Wiechmann)  As we sit here today, do
22 you believe this is an accurate characterization of --
23 a complete and accurate characterization of the French
24 court's decision?
25         MR. ORDER:  I --

Page 155

1      A   I don't think I have to give that kind of an
2  opinion.  You can read the decision and determine
3  yourself whether it's accurate or not.  It's about 50
4  pages long.
5          MR. ORDER:  Just to clarify, I want to
6  object on the grounds of attorney work product.
7      Q   (By Mr. Wiechmann)  Did you ever see -- did
8  you ever review a translated version of the trial
9  court, Bordeaux's trial court decision as opposed to
10 the appellate court decision in 1998?
11     A   Yes.
12     Q   Did you have a copy of that in your files?
13     A   Yes.
14     Q   And if you do have a copy of it, you assume it
15 was produced to us?
16     A   Yes.  I'm sure your files contain at least 20
17 copies of it.
18     Q   Do you recall whether your copy had -- do you
19 recall whether you had a French version of that too?
20     A   Yes.
21     Q   Do you recall whether that was done by you
22 after you received it or -- my confusion may be that
23 you mentioned that you thought the decision was 50
24 pages long.
25     A   I believe so.

Page 156

1      Q   At the break I can show you.  On the record,
2  the Court of Appeals translation was 55 pages long.
3  The one I have, which is a translation of the trial
4  court, is only 27, 28 pages long, and I don't know if
5  you saw something different than I have.
6      A   I believe you'll find that there are two
7  translations floating around in the files of the
8  Connecticut underlying action, one supplied by
9  Horphag's counsel and one obtained by INC, and one was
10 double-spaced and one was single-spaced.  The double-
11 spaced version is probably twice the length of the
12 single-spaced version.
13     Q   Okay.
14     A   If you're looking at 27 single-spaced pages,
15 it's probably 50 pages double-spaced.
16     Q   Did you ever discuss with Mr. Schwitters the
17 purpose of all of the press releases he was issuing
18 concerning, relating to the U.S. lawsuits and the
19 French lawsuits?
20         MR. ORDER:  You know, I have got to say
21 even though you're going to say you are just asking for
22 a yes-or-no answer, I don't see where that leads us,
23 and, in fact, I am concerned when you describe a
24 certain topic that even a yes-or-no answer,
25 particularly a yes answer, does disclose to a certain

Page 157

1  extent the conversation between Mr. Schwitters and
2  Attorney Zivin.  So I really don't understand why you
3  keep asking him questions about his conversations with
4  Mr. Schwitters other than to just sort of waste all our
5  time or to harass Attorney Zivin.
6          I've tried to let it go, but I don't see
7  that it gets us anywhere when all you do is get a yes
8  or no and then there is -- is no real follow-up because
9  you're then trying to invade the attorney-client
10 privilege.
11         MR. WIECHMANN:  First, I would like to
12 make sure that I have a basis between both Mr. Zivin
13 and Mr. Schwitters as to what conversations were held,
14 just for a basis of claims of privilege and the fact of
15 sometimes notice.  There are numerous -- these lawsuits
16 have become public relations press vehicles, and I just
17 wanted to know whether -- we already have discussions
18 whether these were reviewed in content by Mr. Zivin,
19 and he said he can't remember specifically which ones,
20 but he did review the language and content of various
21 of these press releases.  And that was fine.
22         I'm now asking if he had discussions, I
23 just want a yes or no, of the purpose of these, if that
24 was also part of -- the purpose of these press
25 releases.

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 158

1    MR. ORDER: Which one in particular?
2    MR. WIECHMANN: Right now, since he
3  doesn't seem to recall numerous times any of these
4  press releases, I wanted to know if he specifically
5  recalls discussing with Mr. Schwitters the purpose for
6  any of the press releases. And then we can get more
7  specific. But it seems every time I held up one, he
8  said, "I don't remember this one," and we just end up,
9  as you say, wasting time, so I'm trying to create a
10  basis for this.
11    MR. ORDER: The point I'm making is even
12  if he said yes, he had a discussion about the purposes
13  of press releases in general, that's not going to lead
14  you anywhere because he is not going to expound on
15  that. He is not going to explain what the conversation
16  was because the conversation is attorney-client
17  privileged. So why are we even asking that? Why are
18  you even asking him that?
19    MR. WIECHMANN: It might -- it will show
20  the state of mind of at least one of the other
21  defendants, that he had a discussion and he had
22  knowledge about something, I don't know what it is, but
23  at least these press releases.
24    MR. ORDER: About the general purpose of
25  issuing press releases?

Page 159

1    MR. WIECHMANN: Yes.
2    MR. ORDER: That's going to impact some
3  type of claim in this case?
4    MR. WIECHMANN: Maybe you know what the
5  specific conversations are and I don't. I just wanted
6  to know whether they had them anyway because if he
7  doesn't recall them, we're not going anywhere with it.
8    MR. ORDER: I'll let him answer this one
9  again. But, again, I am concerned that just by even
10  asking the question, you're invading the attorney-
11  client privilege. I'm trying to cooperate to give you
12  information and trying to judiciously assert objections
13  regarding attorney-client privilege and attorney work
14  product, but in the interest of moving this along and
15  without waiving any of those, you can answer that
16  question yes or no.
17    MR. WIECHMANN: That's fine.
18  A    The answer is I don't recall.
19  Q    (By Mr. Wiechmann) I'd like to show you
20  Exhibits 46, 47, 48, and 49 which appear to be press
21  releases dated March 23rd, 2000, July -- let me strike
22  that -- which appear to be, 46, July 31st, 1998; 47,
23  December 16th, 1998; 48, another December 16th, '98;
24  and 49, a March 23rd, 2000 press release.
25    (Exhibits 46 through 49, press releases,

Page 160

1  marked.)
2    Q    (By Mr. Wiechmann) Do you recall reviewing
3  any of these four press releases prior to their
4  dissemination?
5    MR. ORDER: Take a moment and review
6  them, please.
7    MR. WIECHMANN: Yes.
8    (Recess: 3:44 to 4:02 p.m.)
9    Q    (By Mr. Wiechmann) Have you had a chance to
10  review 46, 47, 48, and 49?
11  A    Briefly.
12  Q    Do you recall reviewing a draft of any of
13  these exhibits prior to their dissemination by INC?
14  A    I don't recall.
15  Q    One way or the other?
16  A    No.
17  Q    Do you recall discussing the subject matter
18  contained in any of these announcements or press
19  releases with your client prior to his disseminating
20  these releases?
21  A    The answer generally is yes, we did discuss
22  the lawsuits and the patent which are the subject
23  matter of these press releases.
24  Q    Did you ever tell anybody other than your
25  client, Mr. Schwitters or anybody else from INC, that

Page 161

1  you believed that these press releases were, one, fully
2  accurate characterizations of the French court's
3  decisions?
4    MR. ORDER: Objection to the form. To
5  the extent he may have discussed something of that sort
6  with any of his law partners or associates, I believe
7  that that is also protected.
8    MR. WIECHMANN: I exclude anybody
9  working for Cooper Dunham.
10  A    I don't recall doing that.
11  Q    (By Mr. Wiechmann) Do you ever recall
12  discussing with anybody that you thought any parts of
13  these characterizations were misleading or confusing?
14  A    If you're asking about conversations with INC,
15  that's privileged. If you're asking about
16  conversations with my partners, that's work product.
17  Q    Anybody else.
18  A    Anybody other than that, I don't recall ever
19  having had such discussions.
20  Q    Can you look at 49 which is, I believe, the
21  March 2000 press release. It says, "360 patent jointly
22  owned by CEP and Horphag."
23  A    Yes.
24  Q    The second-to-the-last paragraph, it reads,
25  "The 18 March 2000 ruling will not affect the patented

41 (Pages 158 to 161)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                          Norman H. Zivin, Esq.

Page 162

1 status of Masquelier's original OPC's and the
2 availability of this unique product."
3     A  I see that.
4     Q  Do you know what INC and CEP meant by that
5 paragraph?
6     A  I don't know except in my own work product.
7     Q  Do you believe that the District Court's,
8 District of Connecticut's, ruling had any effect on the
9 patent status of Masquelier's original OPC's?
10        MR. ORDER:  I think that's work product.
11    A  I think that's my mental process.
12    Q  (By Mr. Wiechmann)  Did you ever discuss with
13 your client the U.S. Surgical case dealing with the
14 rights of co-owners of a patent?
15    A  Are you talking about the Ethicon case?
16    Q  Yes.
17    A  Yes.
18    Q  Do you recall what you discussed with him?
19        MR. ORDER:  Just what you recall.
20    A  Yes.
21    Q  (By Mr. Wiechmann)  What did you discuss with
22 him?
23    A  Attorney-client privilege.
24        MR. ORDER:  Objection.
25    A  I'm not going to answer that.

Page 163

1     Q  (By Mr. Wiechmann)  Did you ever have a
2 discussion with an attorney or any other party in the
3 nutriceutical industry or dietary supplement industry
4 concerning any of the statements made by INC in the
5 various press releases you have seen today?
6     A  May have been conversations with attorneys for
7 the defendants in the lawsuit.  I don't specifically
8 recall any.
9     Q  Do you recall anybody who was not a defendant
10 in the lawsuit, a representative or attorney from other
11 distributors or manufacturers or sellers of OPC's, ever
12 calling you concerning statements made in these various
13 press releases dealing with the effect of the various
14 lawsuits?
15    A  I don't recall it.
16    Q  If you could go back to Plaintiff's Exhibit
17 35, which is the original declaration of Donna Tobin in
18 the District of Connecticut case.  Could you turn to
19 attachment A.
20    A  Yes, I have it.
21    Q  Were you aware of this case prior to it being
22 filed by Ms. Tobin in connection with her declaration?
23        MR. ORDER:  Objection to form.
24    A  Do you mean was I aware that the case existed
25 before it was attached as an exhibit to this

Page 164

1 declaration?
2     Q  (By Mr. Wiechmann)  Yes.
3     A  Yes.
4     Q  Did you represent any of the parties in this
5 action?
6     A  Yes.
7     Q  Which ones?
8     A  The defendants.
9     Q  All of the defendants?
10    A  Yes, I believe so.
11    Q  Earlier today you mentioned that you had been
12 a party to a lawsuit brought by Sterling Health against
13 you alleging malpractice on your part.  Did the alleged
14 malpractice come out of your representation of Sterling
15 Health in this lawsuit?
16    A  So it was alleged.
17    Q  What specifically did they allege was the
18 basis for your malpractice?
19    A  As I recall, they alleged that they did not
20 know that I also represented INC.
21    Q  So was the malpractice based on an ethical
22 conflict of issues claim?
23    A  That was the allegation.
24    Q  What was the ultimate outcome of this case,
25 the one that's appended as Exhibit A?

Page 165

1     A  I don't know.  It was settled after we
2 withdrew as counsel for the defendants.
3     Q  At what stage in the case did you withdraw as
4 counsel for the defendants?
5     A  I think during discovery.
6     Q  Had answers been filed?
7     A  Yes.
8     Q  Had dispositive motions been filed?
9     A  I don't recall.
10    Q  Did anybody ever tell you what the ultimate
11 resolution of this case was after your firm withdrew?
12    A  No.
13    Q  In connection with the malpractice claim
14 against you, did you learn in connection with that case
15 what the result of the lawsuit filed in 1994 was on
16 Spires Duran and Sterling Health Marketing Group?
17    A  I don't understand your question.
18    Q  When you were sued by Sterling Health -- by
19 the way, was it just Sterling Health or was it all the
20 defendants here in the malpractice case?
21    A  I think it was Sterling Health and Spires.
22    Q  Okay.  When they sued you in connection with
23 the lawsuit, did they provide you information as to how
24 they thought your conflict of interest had injured
25 them?

42 (Pages 162 to 165)

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                Norman H. Zivin, Esq.

Page 166

1    A    I don't recall.
2    Q    Did they tell you -- well, did they ever tell
3    you whether they had to pay any money in connection
4    with the underlying lawsuit?
5    A    I don't recall.  They may have, but I don't
6    recall.
7    Q    Do you recall a general number of what they
8    considered their damages to be?
9    A    In what?
10   Q    In connection with your malpractice.
11   A    No.  It was settled for a nominal amount.
12   Q    Other than the fact that they claimed an
13   undisclosed conflict on you or your firm's part, were
14   there any allegations that there were certain actions
15   taken by you or not taken by you that injured Spires or
16   Sterling Health Marketing Group?
17   A    I don't recall.
18   Q    Did they claim that you had failed to inform
19   them of various decisions that the Eastern District
20   of New York case involving Horphag relating to the
21   Pycnogenol trademark?
22   A    I don't recall.
23   Q    Did they claim that you had wrongly advised
24   them to continue to use the trademark Pycnogenol when
25   you shouldn't have?

Page 167

1    A    I never advised them to use any trademark.
2    So --
3    Q    Did anyone in your firm ever render an opinion
4    that Spires could continue to use the Pycnogenol
5    trademark?
6    A    No.
7    Q    I believe you mentioned earlier today that the
8    case was settled by a payment in a nominal amount of
9    damages.  Do you have an idea how much that payment
10   was?
11   A    I don't recall, but I remember it was less
12   than the deductible on our insurance policy.
13   Q    Was that over $10,000?
14   A    Probably over ten.
15   Q    Over 100?
16   A    I don't think so.  I don't recall.
17   Q    I would like to show you an exhibit that's
18   already been marked as Exhibit 15 and an exhibit that's
19   already been marked as Exhibit 16.  Have you ever seen
20   these documents before today?
21   A    They look generally familiar.
22   Q    Do you recall whether you or anybody at your
23   firm assisted Mr. Senecal in the preparation of this
24   declaration?
25   A    I would suspect that that is the case.

Page 168

1    Q    Do you recall who -- do you recall whether
2    your firm prepared this for Mr. Senecal's signature?
3    A    Do I recall?
4    Q    Would it surprise you?
5    A    No, because it has our number on the upper
6    right-hand corner.  So I would assume that it was.
7    Q    The number you're referring to is Dkt. 48993?
8    A    Correct.
9    Q    And that refers to a specific lawsuit?
10   A    Yes.
11   Q    Would it surprise you if you heard that Mr.
12   Senecal had not seen this document prior to him signing
13   it?
14   A    I don't know whether that's true or not, but
15   it wouldn't surprise me.
16   Q    Would it surprise you to learn that Mr.
17   Senecal doesn't even recall signing or preparing this
18   document?
19        MR. ORDER:  Objection.
20   A    I don't know whether that's true or not, but
21   it wouldn't surprise me.
22   Q    (By Mr. Wiechmann)  Same with Mr. LeFebvre.
23   Is it your understanding that somebody in your firm
24   prepared this document for Mr. LeFebvre's signature?
25   A    It wouldn't surprise me if that was the case.

Page 169

1    It looks like it might be.
2    Q    Do you recall why these were prepared?
3        MR. ORDER:  Objection to the extent that
4    calls for disclosure of attorney work product.
5        MR. WIECHMANN:  These were documents
6    filed with the court, and there was a reason why they
7    were filed with the court.  I assume it does not, at
8    least the answer can be done without disclosing
9    attorney work product.
10       MR. ORDER:  So is your question more
11   like in connection with any particular motion?  Is that
12   what you're seeking?
13       MR. WIECHMANN:  That's what it was
14   filed, filed in connection with a motion or opposition
15   to a motion.  I'm not sure.
16   A    That's what it appears to be.
17   Q    (By Mr. Wiechmann)  Did you ever talk to Mr.
18   Senecal or Mr. LeFebvre about their declarations?
19   A    I don't recall.
20   Q    I think you mentioned before that you were
21   authorized to represent INC and other companies in
22   connection with the patent re-examination of the 360
23   patent?
24   A    Correct.
25   Q    And is it fair to say -- well, could you

43 (Pages 166 to 169)

Brandon Smith Reporting Service

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                    Norman H. Zivin, Esq.

Page 170

1  describe to me briefly what you did on behalf of INC
2  and the other companies in connection with the patent
3  re-examination? And I'm not asking for the details of
4  your conversations with your client which might be
5  attorney-client privileged, but what actions did you
6  take with the Patent Office or with the other parties
7  in connection with the re-examination?
8     A   Various responses to office actions were filed
9  in the Patent and Trademark Office, and I recall
10 attending an interview with the examiner.
11    Q   Did you submit any written materials to the
12 examiner?
13    A   Yes.
14    Q   Do you recall what you submitted?
15    A   Responses to office actions.
16    Q   Did you --
17    A   And other documents.
18    Q   In connection with the re-examination, had you
19 received any documents, either directly or indirectly,
20 from Mr. Rogovin?
21    A   Yes.
22    Q   Did you receive a multipage analysis prepared
23 by him?
24    A   If you mean a multipage diatribe, the answer
25 is yes.

Page 171

1     Q   Multipage written document, however you wanted
2  to characterize it, you received something from him?
3     A   Correct.
4     Q   And attached to it were numerous references?
5     A   There was a large pile of references, correct.
6     Q   Now, did you submit any of those references to
7  the patent examiner's office?
8     A   Me personally?
9     Q   Whoever was working with you in connection
10 with this.
11    A   I believe they were all submitted.
12    Q   Did you submit all or any part of Mr.
13 Jarrow -- Mr. Rogovin's document explaining these
14 various references to the patent examiner's office?
15    A   No.
16    Q   Why did you decide not to submit the document
17 containing Mr. Rogovin's analysis of the other prior
18 art references?
19    A   That's attorney work product.
20    Q   Did you discuss your decision not to do that
21 with anybody other than your client?
22    A   Yes.
23        MR. ORDER: Or attorneys at his firm?
24    Q   (By Mr. Wiechmann) When I say "you," I'm
25 excluding, obviously, internal discussions in your own

Page 172

1  law firm.
2     A   I don't think so.
3     Q   Did you supplement your submission to the
4  patent examiner with any of the documents from the
5  Bordeaux court?
6     A   I don't recall. I'm not sure what you're
7  referring to.
8     Q   In connection with your representation of INC
9  and others, you submitted a power of attorney on May
10 20th, 1997; do you recall that?
11    A   No. I have no idea what the date was.
12    Q   But you do recall submitting a power of
13 attorney, correct?
14    A   I'm sure I did.
15    Q   And you're not going to dispute -- whatever
16 the date on that power of attorney is, you're not going
17 to dispute it, are you?
18    A   Show it to me and I'll confirm it.
19    Q   I would like to show you Exhibit 50.
20        (Plaintiff's Exhibit 50, communication
21 in response to office action, marked.)
22    Q   (By Mr. Wiechmann) I assume you've seen these
23 documents before?
24    A   Yes.
25    Q   The first three pages, would you describe for

Page 173

1  the record what those represent?
2     A   Communication in response to office action.
3     Q   And what is that?
4     A   I don't know what to say other than what it
5  says. It's a communication in response to an office
6  action.
7     Q   And what was the purpose of this
8  communication?
9     A   You get an office action from the Patent and
10 Trademark Office; you respond to it.
11    Q   And the -- I understand that. For the record,
12 would you explain what office action you were
13 responding -- to which you were responding?
14    A   I was responding to an office action dated May
15 1, 1997, which you have chosen not to show me, so I
16 do not remember it off the top of my head.
17    Q   Would that have been the office action you
18 described to me earlier today where you said the office
19 had a question about whether all of the appropriate
20 parties were before it in re-examination and asked that
21 there be either a determination or clarification of
22 that fact?
23    A   I don't think it's what I described earlier.
24    Q   Does this appear to be the -- a new
25 appointment of powers of attorney for you and Mr.

44 (Pages 170 to 173)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                           Norman H. Zivin, Esq.

---

Page 174

1   Simpson whereby both INC and Horphag are being
2   represented in connection with the re-examination?
3       A   The second half of this exhibit is a new power
4   of attorney which appoints me as attorney for
5   International Nutrition Company and SCIPA and Mr.
6   Simpson as attorney for Horphag.
7       Q   And those power of attorneys were meant to be
8   used in connection with the re-examination, correct?
9       A   Yes.
10      Q   Now, it specifically says that there's a
11  revocation of the power of attorney to Jack Frank
12  Kramer. Do you know who he is?
13      A   No, I don't.
14      Q   Do you know why there was a revocation being
15  filed addressed specifically to him?
16      A   Yes.
17      Q   Why?
18          MR. ORDER:  Is that privileged?
19          THE WITNESS:  No.
20      A   I believe that Mr. Kramer obtained the
21  original 360 patent and therefore the Patent Office
22  records reflected that he was the attorney of record.
23  In the meanwhile, I believe he had retired from the
24  practice of law.
25      Q   (By Mr. Wiechmann)  Is it fair to say that

---

Page 175

1   these documents reflected in Exhibit 50 were filed with
2   the re-examination by the examiner's office on or about
3   May 28th of 1997?
4       A   Yes.
5       Q   Do you recall the date of the decision by the
6   Bordeaux commercial court?
7       A   No.
8       Q   Do you recall that it was March of 1997?
9       A   No.
10      Q   Do you recall when you received a translation
11  of that decision?
12      A   No.
13      Q   Did you ever consider whether all or any part
14  of that decision should be submitted to the examiner's
15  office in connection with the patent re-examination?
16      A   I don't recall.
17      Q   Do you recall whether there was consideration
18  as to all or any of the declarations or affidavits
19  filed in connection with that case be submitted to the
20  re-examiner in connection with the examination,
21  re-examination?
22      A   I don't recall, nor do I know whether there
23  were declarations and affidavits in that case in
24  Bordeaux, except the ones which would have no reference
25  whatsoever or relevance whatsoever to this examiner.

---

Page 176

1       Q   If you don't know what was submitted, how
2   would you know whether they were relevant or not to
3   this examination?
4       A   Because it was obvious that the Bordeaux case
5   dealt only with excess of ownership and had nothing to
6   do with whether the patent was valid.
7       Q   So you were fully aware of all the issues that
8   were raised by the parties in the Bordeaux case?
9       A   I'm just telling you what I understood.
10          (Recess:  4:33 to 4:39 p.m.)
11          MR. WIECHMANN:  Let me mark 51 and 52.
12          (Exhibits 51 and 52, declarations,
13  marked.)
14          MR. WIECHMANN:  Unfortunately on 52, I
15  seem to be short one.  I don't know why.
16          (Discussion off the record.)
17      Q   (By Mr. Wiechmann)  Have you seen these
18  declarations before?
19          MR. ORDER:  Do you have both of them?
20          THE WITNESS:  I only have one.
21      Q   (By Mr. Wiechmann)  Do you recognize Exhibit
22  51?
23      A   It looks familiar.
24      Q   Did you or somebody in your office prepare
25  this for the signature of Dr. Masquelier?

---

Page 177

1       A   It appears to be the case.
2       Q   Did you -- do you know where or when Dr.
3   Masquelier signed this document?
4       A   I believe he signed it in New York.
5       Q   Was he at your offices?
6       A   I'm not sure.
7       Q   Do you recall discussing with him the contents
8   of this declaration before he signed it?
9       A   I don't think so.
10      Q   Were you aware of anybody discussing with him
11  in English -- were you aware of anybody else discussing
12  with him the contents of this declaration?
13      A   Yes.
14      Q   And who was that?
15      A   I believe Mark Cohen.
16      Q   And who is Mark Cohen?
17      A   An associate in our firm.
18      Q   Is Mark fluent in French?
19      A   I don't know.
20      Q   Did Mark or anybody else indicate to you
21  whether Dr. Masquelier understood what was contained in
22  this declaration?
23      A   I don't recall.
24      Q   Other than Dr. Masquelier signing this --
25  well, strike that.

---

45 (Pages 174 to 177)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                                    Norman H. Zivin, Esq.

Page 178

1    When Dr. Masquelier was in New York to sign
2  this at the time -- strike that.
3        At the time that Dr. Masquelier was in New
4  York to sign this declaration, did you have a chance to
5  discuss with him the 360 patent?
6        MR. ORDER:  Objection to form.
7    A  I think so.
8    Q  (By Mr. Wiechmann)  Was he, Dr. Masquelier,
9  accompanied by anybody else when he visited New York at
10 this time other than his wife, if she came?
11   A  I think his wife was there.
12   Q  Did he have any business associates there?
13   A  I believe Mr. Schwitters was there.
14   Q  Were there any French lawyers or avocats
15 there?
16   A  No.
17   Q  At this time were you representing Dr.
18 Masquelier?
19   A  Yes, in connection with this re-examination
20 proceeding.
21   Q  But not in connection with anything else?
22   A  I don't believe so.
23   Q  I would like you to look, then, at Exhibit 52,
24 which is the declaration of Egbert Schwitters.
25      (Discussion off the record.)

Page 179

1    Q  (By Mr. Wiechmann)  Did you prepare this
2  declaration for Mr. Schwitters' signature?
3    A  I don't think so.
4    Q  Do you recall who did?
5    A  I think Mark Cohen.
6    Q  Did you discuss the contents of this document
7  with Mr. Schwitters?
8    A  I don't recall.
9    Q  Paragraph 3 on page 2, the second part of
10 paragraph 3 which appears on page 2, talks about
11 licensee, there is a licensee Canandaigua Wine Company
12 that sells Yanok (phon sp) and other products and then
13 another, Horphag Research, markets and sells under the
14 trademark Pycnogenol, an antioxidant, which contains
15 oligomeric proanthocyanidins, and then you mentioned or
16 Mr. Schwitters mentions various infringers also sell
17 competing antioxidant products.
18      Do you know why Horphag Research was not
19 referred to as an infringer in this application?
20   A  No.
21   Q  At the time this application was filed, INC
22 was prosecuting Horphag as an infringer in the District
23 of Connecticut, correct?
24   A  As an alternative, yes.
25   Q  Did you ever review copies of INC's press

Page 180

1  releases relating to the examiner's decision on the
2  re-examination prior to their dissemination?
3    A  I don't recall.
4    Q  Going back to something I did not finish this
5  morning, you mentioned the times you met Mr. Schwitters
6  in New York or -- in New York, and I believe you said
7  the only place you recall meeting with him in the
8  United States was New York City; is that a correct
9  recollection?
10   A  I believe that's what I said.
11   Q  Did you meet with Mr. Schwitters outside the
12 United States?
13   A  Yes.
14   Q  Where?
15   A  I met him in Bordeaux.
16   Q  How many times?
17   A  Once, I believe.
18   Q  Do you recall when?
19   A  Oh, about six, seven years ago.
20   Q  Was it before or after the institution of the
21 Connecticut lawsuit, which is March of 1996?
22   A  I believe before that time.
23   Q  Was it before or after the institution of the
24 Bordeaux lawsuit?
25   A  I believe before that time.

Page 181

1    Q  Do you recall where in Bordeaux?
2    A  Where I met him?
3    Q  Yes.
4    A  At a number of different locations.
5    Q  Okay.  Do you recall the towns?
6    A  I was there for a week, and we met each day.
7    Q  Did you meet at the Berekinfekt (phon sp)
8  facility?
9    A  No.
10   Q  Other than -- when you met with Mr.
11 Schwitters, did you meet with anybody else?
12   A  Yes.
13   Q  Was Dr. Masquelier at any of the meetings?
14   A  Yes.
15   Q  How many of the meetings?
16   A  Most of them.
17   Q  Was there anybody else other than Masquelier
18 and Schwitters at these meetings?
19   A  Yes.
20   Q  Who else?
21   A  Marvin Gittes, Charles Haimoff, Tom Firth, and
22 a woman whose name I'm trying to recall.
23   Q  Okay.  Who is Tom Firth?
24   A  He is a lawyer in New York who represented
25 Consac.

46 (Pages 178 to 181)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                          Norman H. Zivin, Esq.

Page 182

1    Q    And Mr. Gittes is a lawyer in New York who
2  represents Horphag?
3    A    Correct.
4    Q    And Mr. Haimoff is principal of Horphag?
5    A    He was.
6    Q    At that time?
7    A    Yes.
8    Q    And what were the purposes of these meetings?
9    A    We were attending a deposition.
10   Q    A deposition of Dr. Masquelier?
11   A    Yes, and also a deposition of Mr. Schwitters.
12   Q    Were there any other depositions taken with
13  Mr. Haimoff's deposition taking?
14   A    No.
15   Q    Was it taken at any time in connection with
16  the Consac case?
17   A    I believe so.
18   Q    Do you know -- did you at one time have a copy
19  of his deposition transcript, Haimoff's?
20   A    I think so.
21   Q    Did you -- did you take the deposition of Mr.
22  Haimoff?
23   A    I -- I don't think so.
24   Q    Do you recall who did?
25   A    I believe Consac took the deposition.

Page 183

1    Q    That was Mr. Firth?
2    A    Yes.
3    Q    And that deposition was taken in France at
4  another time?
5    A    No.  I believe that deposition was taken in
6  New York.
7    Q    Other than attending the depositions of Mr.
8  Schwitters and Mr. -- and Dr. Masquelier, were there
9  any other meetings you had with Mr. Schwitters or
10  Masquelier while you were in Bordeaux during that week?
11   A    Yes.
12   Q    Was anybody else at the meetings other than
13  either Mr. Schwitters or Dr. Masquelier?
14   A    Yes.  My wife.
15   Q    Were the meetings with Mr. Schwitters and Dr.
16  Masquelier when your wife attended social or business
17  meetings or both?
18   A    We went out to dinner.
19   Q    And I assume -- well, I shouldn't assume.
20  Would we characterize that dinner as a social dinner?
21   A    Yes.
22   Q    Was there any business or legal advice being
23  rendered at that dinner?
24   A    Not that I recall.
25   Q    The depositions -- the deposition of Mr.

Page 184

1  Schwitters that was taken in the Consac case, was that
2  taken in English or French or some other language?
3    A    I'd like to say it was taken in
4  Liechtensteinese, but it was taken in English.
5    Q    Was the deposition of Dr. Masquelier done in
6  French or English?
7    A    The questions were asked in English, they were
8  translated into French; his answers were given in
9  French and translated back into English.
10   Q    So he testified in his native tongue and it
11  was translated both ways?
12   A    Yes.
13   Q    Mr. Haimoff, was his deposition in English or
14  French?
15   A    Are you talking about the one in New York?
16   Q    Yes.
17   A    In English.
18   Q    Other than the testimony, the deposition in
19  the Consac case, are you aware of Dr. Masquelier being
20  deposed in any other cases?
21   A    No.
22   Q    Are you aware of Mr. Schwitters being deposed
23  in any other cases?
24   A    No, I'm not.
25   Q    To your knowledge, did either Mr. Schwitters

Page 185

1  or Dr. Masquelier testify, as we in the United States
2  would consider testimony, in either the two French
3  cases, the Commercial Court of Grasse or Bordeaux?
4    A    Not that I am aware of.
5    Q    Are you aware of whether they submitted
6  declarations or affidavits in connection with those
7  actions?
8    A    I do not know.
9    Q    Which I assume means you were never given a
10  copy of anything they submitted in connection with
11  those actions?
12   A    Insofar as I recall, that is correct.
13   Q    The 1996 action started in Connecticut in
14  March of 1996, do you recall why that patent
15  infringement action was started in March of that year?
16   A    I don't understand your question.
17   Q    You commenced a patent infringement action in
18  the District of Connecticut in March of 1996.
19   A    All right.
20   Q    Do you disagree with whether you started on
21  March 6th, 1996?
22   A    Sounds about right.
23   Q    Did you ever have any -- did anybody ever tell
24  you that they wanted that suit started prior to the
25  middle of March of that year?

47 (Pages 182 to 185)

Brandon Smith Reporting Service

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                             Norman H. Zivin, Esq.

Page 194

1    Q    Do you recall a dispute with Traco Labs over
2  their claim that a white paper prepared by Mr.
3  Schwitters was misleading?
4    A    No.
5         MR. WIECHMANN:  See if we can save some
6  time by marking this as a group.
7         (Plaintiff's Exhibit 53, packet of
8  documents, marked.)
9         (Discussion off the record.)
10   Q    (By Mr. Wiechmann)  To go through on Exhibit
11 53, the first two-page letter, was that the cease-and-
12 desist letter you sent to Traco prior to the
13 institution of the lawsuit against them?
14   A    It appears to be the case, yes.
15   Q    On the first page, you say that you write to
16 Mr. Sid Tracy, "Our client is the owner of an undivided
17 interest in U.S. Patent No. 4,698,360."
18        What did you mean by that sentence?
19   A    It means our client is an owner of an
20 undivided interest in the 360 patent.
21   Q    Does that mean 100 percent, 2 percent, what?
22   A    It doesn't say.
23   Q    In 1995, was it your understanding an owner in
24 any interest in the patent, any owner of any interest
25 in the patent, however minuscule in the patent, could

Page 195

1  institute an infringement action?
2    A    Yes.
3    Q    And that was based on what?
4    A    On the patent law.
5    Q    Any specific section of the patent statute or
6  regulations?
7    A    I don't have it in front of me.
8    Q    Was it a specific section of the patent law or
9  was it judicial interpretation of that law that was the
10 basis for your interpretation?
11   A    Without waiving any attorney-client privilege
12 or attorney work product, I think if you look at the
13 patent law, you will find it.  I believe it's Section
14 271 or 272.
15   Q    Was that the belief or argument that was
16 rejected in the Connecticut case by the federal
17 circuit?
18   A    No.
19   Q    Did the federal circuit specifically state --
20 strike that.
21        Was that the position that was rejected in the
22 Ethicon case?
23   A    No.
24   Q    Do you believe the Ethicon case allows any
25 owner, no matter what interest, of a patent to

Page 196

1  institute a lawsuit?
2    A    I don't think I have to be in a position of
3  reading cases and interpreting them for you.
4    Q    You started this line, and I was just
5  interested --
6    A    No.  You started it by asking me questions.
7    Q    And then you responded.  I'm just exploring
8  that.  Because you told me -- you cited a section of
9  the statute, and I wanted to know what the basis of
10 your reading of that section that way was based on.
11   A    I think if you read the section of the
12 statute, you will see that it gives any owner of a
13 patent the right to commence an action.
14   Q    Without bringing the other owners in?
15   A    That's not what you asked me, sir.
16   Q    But now I'm asking you, does it give them the
17 right to commence it without bringing other owners in?
18   A    I think you have to interpret the statute and
19 the applicable case law.
20   Q    And was that statute and applicable case law
21 interpreted by the federal circuit?
22        MR. ORDER:  When?
23        MR. WIECHMANN:  In 2001.
24   A    Yes.
25   Q    (By Mr. Wiechmann)  And they disagreed with

Page 197

1  your position?
2    A    They disagreed with my position, but not the
3  way you stated it.
4    Q    But they -- did they cite -- was the basis of
5  their ruling case law that's been around for almost a
6  century?
7    A    No.  And I think this line of questioning is
8  really trying to get into my mental processes, and I'm
9  not going to go any further except to say you can read
10 the case, I can read the case, and the court can read
11 the case, and we can all determine what it means.
12   Q    Page 2, do you recall receiving from Mr.
13 Ullman this letter?
14   A    Page 2 or page 3?
15   Q    The second document which is dated February
16 7th, 1996, with the number 5829.
17   A    I do not recall.
18   Q    Do you recall dealing with Mr. Ullman?  Do you
19 know who Mr. Ullman is?
20   A    Yes.
21   Q    Have you dealt with him other than this case
22 before?
23        MR. ORDER:  Which case?
24        THE WITNESS:  The Connecticut case, I
25 assume.

50 (Pages 194 to 197)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                              Norman H. Zivin, Esq.

Page 198

1          MR. WIECHMANN: The Connecticut case.
2     A    Yes.
3     Q    (By Mr. Wiechmann) Do you remember dealing
4  with him specifically in connection with the
5  Connecticut case?
6     A    Well, I remember discussions with him from
7  time to time, yes.
8     Q    The next page, it appears to be a letter, a
9  fax, from Sid Tracy to PSI. Do you see that?
10    A    That's what it says.
11    Q    Do you recall ever seeing a copy of this fax?
12    A    I don't recall.
13    Q    Do you recall a dispute where Traco believed
14  that INC was or PSI were making these representations
15  concerning their license to sell this patent -- to sell
16  this product?
17    A    No, I don't recall that.
18    Q    If you could look at the next two pages which
19  appears to be a letter from you to Mr. Tracy --
20    A    Yes.
21    Q    -- directly. One is -- is that your signature
22  on page 2?
23    A    Yes. We can move this along by stipulating if
24  it has my signature, it's my signature.
25    Q    That's fine. Does -- do you know who the

Page 199

1  gentlemen referred to in the cc other Mr. Schwitters
2  are: Robert Sands, Jacob Laufer, and Eric Daniels?
3     A    Some of them.
4     Q    Who is Mr. Sands?
5     A    At the time he was general counsel of
6  Canandaigua Wines.
7     Q    And Mr. Laufer?
8     A    Mr. Laufer, I believe, was a partner of Mr.
9  Ullman.
10    Q    Eric Daniels?
11    A    That doesn't ring a bell.
12    Q    Was he Traco's local counsel in the
13  Connecticut action?
14    A    I don't know.
15    Q    Do you know why you wrote to Mr. Tracy
16  directly as opposed to going through his lawyers?
17    A    First, his lawyer was copied.
18    Q    Was copied, but --
19    A    Secondly -- well, that -- and secondly, this
20  was a different matter than previous matters. So it
21  was unclear that they were representing him in
22  connection with additional matters.
23    Q    Did you make an attempt to contact Mr. Ullman
24  or Mr. Laufer to see whether they were representing Mr.
25  Tracy in this matter?

Page 200

1     A    I don't recall.
2     Q    Do you recall sending this letter?
3     A    No.
4     Q    I assume, then, the next one you don't recall
5  receiving, the letter from Traco Labs?
6     A    No.
7     Q    Dated November 19th, 1996.
8     A    I don't recall receiving it, no.
9     Q    And do you recall discussing with Mr. -- do
10  you recall sending a copy of this letter to Mr.
11  Schwitters?
12    A    Which letter? The one I sent?
13    Q    No. The one that you received from Mr. Tracy.
14    A    I don't remember doing that.
15    Q    Do you recall reviewing a press release being
16  drafted by Mr. Schwitters dealing with this letter?
17    A    I have some vague recollection of that.
18    Q    Do you recall what was discussed?
19    A    Discussed with who?
20    Q    With Schwitters.
21    A    I don't recall discussing it.
22    Q    And jumping ahead to 2001, do you recall a new
23  dispute arising between Traco, Horphag, and INC?
24         MR. ORDER: I'm sorry, what page are we
25  on, Bates number page?

Page 201

1          MR. WIECHMANN: 5840, letter from Bert
2  Schwitters, copied to Cooper & Dunham, Mr. Norman
3  Zivin, and Gary Senecal, Integrated BioCeuticals, and
4  Larry Ullman.
5     Q    (By Mr. Wiechmann) Do you recall receiving a
6  copy of this letter?
7     A    No, but I probably did.
8     Q    Do you recall talking to Mr. Ullman sometime
9  in March or April of 2001 arising out of the
10  information forwarded to Mr. Ullman?
11    A    Yes, do I remember that.
12    Q    And the next letter, March 29th, 2001, do you
13  recall receiving that letter?
14    A    No.
15    Q    The first paragraph of the letter, there's a
16  mention, "I am enclosing herewith a copy of the March
17  14th, 2000 letter, an enclosure I received from Marvin
18  Gittes regarding his perception of the Horphag
19  ownership rights."
20         Do you recall receiving those documents?
21    A    I think I did.
22    Q    Do you still have a copy of that in your
23  records?
24    A    If I received them, I probably do.
25    Q    And would you have produced that to us?

51 (Pages 198 to 201)

Brandon Smith Reporting Service

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 202

1   A   I don't know. If you asked for it.
2   Q   I would gather, since it was enclosed with
3   this letter and dealt with the ownership of the patent,
4   it would be responsive to numerous requests.
5   A   Maybe it was produced. I don't recall.
6   Q   I don't recall seeing it. There's also a
7   reference to a five-page rebuttal to the Gittes letter
8   supposedly prepared by Mr. Schwitters. Did you ever
9   see a copy of that letter at the bottom of the first
10  page?
11  A   I believe so.
12  Q   The last paragraph or second-to-the-last
13  paragraph, last page, talks about a 200-page notebook
14  which Mr. Schwitters put together, referred to as brief
15  and exhibits. Did you ever see a 200-page packet of
16  the various pleadings put together in March of 2001 by
17  Mr. Schwitters that he gave to various people?
18  A   I believe so. I don't know who he gave it to.
19  Q   Did you help him put together, that package of
20  documents?
21  A   Not that I recall.
22  Q   Anybody in your firm help to put that
23  together?
24  A   I don't think so.
25  Q   Did you ever review that package of documents?

Page 203

1   A   I believe so.
2   Q   If someone asked you to comment upon did Mr.
3   Swit -- did Mr. Schwitters ask you to comment upon the
4   material contained in the package?
5   A   I don't -- I don't recall whether he did or he
6   didn't.
7   Q   The next document appears to be a letter from
8   you back to Mr. Ullman.
9   A   Yes.
10  Q   Do you recall drafting this letter and sending
11  it to Mr. Ullman?
12  A   Not specifically.
13  Q   The last page there is an AI after your
14  initials. Is that the name of one of your -- the
15  initials for one of your current secretaries?
16  A   No.
17  Q   Do you recall the name of that secretary?
18  A   Actually, I believe we have two secretaries
19  with the same initials.
20  Q   Who are they?
21  A   Adrian and Alifia (phon sp).
22  Q   And their both last names begin with I?
23  A   Yes, I believe so. They sit next to each
24  other.
25  Q   And you don't know which one this is?

Page 204

1   A   No.
2   Q   In the first page, there is a paragraph where
3   you say, "The U.S. patent law," and you cite 35 USC
4   Section 262, "clearly states in the absence of any
5   agreement to the contrary, each of the joint owners may
6   sell the invention without consent of and without
7   accounting to the other joint owner."
8       In April of 2001, isn't it a fact that the
9   French courts had, one, found that French law applied
10  to the agreement between Horphag and SCIPA, and, two,
11  there was an agreement to the contrary, as you referred
12  to it in this letter?
13  A   If you're asking me to interpret the French
14  court decision, I'm not going to do it. I disagree
15  with your characterization.
16  Q   In 2001, is it your position when you wrote
17  this letter that you believed there was no agreement to
18  the contrary that made Section 262 irrelevant?
19  A   Yes.
20      MR. ORDER: Objection.
21  A   I said what I said.
22  Q   (By Mr. Wiechmann) I know what you said, but
23  at the time you said it when you wrote to Mr. Ullman,
24  isn't it a fact that you knew that the French court had
25  found there was an agreement to the contrary between

Page 205

1   Horphag and SCIPA?
2   A   The answer is no.
3   Q   And you refuse to tell me what you then found
4   the French court found in 1998?
5   A   I have my interpretation of what the French
6   court decided, which is not entirely clear. You
7   undoubtedly have your own interpretation. I don't
8   think you have the right to ask me what in my mind is
9   my interpretation of it.
10  Q   And in 19 -- well, let me ask you this: At
11  the time of this letter, isn't it a fact that the
12  United States District Court for the District of
13  Connecticut had given comity to the French court's
14  decision and had found that such an agreement existed?
15  A   I think the answer to the first part of your
16  question is they gave comity to the French court
17  decision. If you can point me to any agreement to the
18  contrary, I'd like to see it.
19  Q   Agreement to the contrary on what?
20  A   The one you're talking about.
21  Q   The District Court of Connecticut believed in
22  its ruling that there was an agreement to the contrary,
23  correct?
24  A   I don't know what the District Court
25  believed. The District Court said what it said. It

52 (Pages 202 to 205)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                    Norman H. Zivin, Esq.

---

Page 206

1  gave comity to the French decision.
2    Q    The next paragraph, you state that "INC was a
3  bona fide purchaser for valuable consideration of the
4  interest and had no knowledge of any impediment upon
5  SCIPA's right to transfer its interest."
6         On what do you base your statement that INC
7  had no knowledge of SCIPA's -- of the impediment upon
8  SCIPA's right to transfer its interest?
9    A    I think that's attorney-client privileged
10  information.
11    Q    Were you aware -- are you saying that you had
12  no information -- you received no information on this
13  issue other than what you received directly from Mr.
14  Schwitters?
15         MR. ORDER:  No.  To the extent he may
16  have had other information, it's probably work
17  product.
18    Q    (By Mr. Wiechmann)  Was there any lawsuit
19  pending in 1994?
20    A    Yes.
21         MR. ORDER:  You're not asking him
22  about --
23    Q    (By Mr. Wiechmann)  That was a Horphag-Consac
24  case?
25    A    Yes.

---

Page 207

1    Q    Were you aware in 1994 for how many years Mr.
2  Schwitters had worked with Horphag in one role or
3  another?
4    A    I don't understand your question.
5    Q    In 1994 -- was 1994 the first year that you
6  represented Mr. Schwitters or his companies?
7    A    Without knowing what you're referring to by
8  his companies, I represented International Nutrition
9  Company prior to 1994.
10    Q    In 1992?
11    A    I can't tell you exactly when.
12    Q    Okay.  Did there ever come a time when you had
13  an understanding as to the history of Mr. Schwitters'
14  relationship with Mr. Haimoff and Horphag?
15    A    Yes.
16    Q    Do you know how far back Mr. Schwitters and
17  Mr. Haimoff had worked together?
18    A    No.
19    Q    Do you know that they had done deals together
20  in the 1980s?
21    A    I'm not aware of any.
22    Q    Are you aware of any actions taken by INC or
23  anyone representing INC to determine whether SCIPA had
24  the right to transfer its interest to INC?
25    A    Can I have that question read back?

---

Page 208

1         (Question read.)
2    A    Yes.
3    Q    (By Mr. Wiechmann)  And how did you learn of
4  those actions?
5    A    I think that's attorney work product.
6    Q    Well, that's what I want to know.  Did you
7  learn it -- at the time -- okay.
8         Did you learn of those actions after the suit
9  was brought, started, by you in Connecticut?
10    A    No.
11    Q    In what context did you learn of what INC did
12  to ensure itself that SCIPA could transfer those rights
13  to INC?
14    A    Are you asking me when?
15    Q    Now I'm asking you, when's part of it, but in
16  what context?  Was it after the fact in 1998; was it at
17  that time in 1994 when the -- when the transfer was
18  made?
19    A    Yes.  It was in 1994.
20    Q    When the transfer was made?
21    A    Yes.
22    Q    Now, the transfer -- did the transfer have
23  anything to do with the Horphag-Consac suit?
24    A    Yes.
25    Q    How did the Horphag-Consac suit relate to the

---

Page 209

1  transfer from SCIPA to INC?
2    A    The information I have is protected by the
3  attorney-client privilege.
4    Q    But just to be clear, for any claim made of
5  work product, there would only be a work product claim
6  if the information you were discovering you were doing
7  in connection with defending the, or prosecuting, the
8  Horphag-SCIPA suit.  You can't have work product if you
9  don't have anticipation of an action or suit to be
10  filed or action or suit quickly to be filed.  Your
11  attorney mentioned it also violated work product.  I
12  just wanted to find out the foundation about whether
13  your knowledge this suit --
14    A    I don't recall him saying anything.
15    Q    He objected on the grounds of work product.
16         THE WITNESS:  Did you?  I didn't hear
17  it.
18         MR. ORDER:  No.  I think you did.
19         THE WITNESS:  I said it was attorney-
20  client.
21         MR. WIECHMANN:  No.  That was the last
22  one.
23    Q    (By Mr. Wiechmann)  Did INC receive any
24  written warranties or representations from SCIPA that
25  it, SCIPA, had the authority to transfer its rights to

---

53 (Pages 206 to 209)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                                    Norman H. Zivin, Esq.

Page 210

1    INC without the knowledge or permission of Horphag?
2        A    I believe so.
3        Q    Were those representations or warranties
4    actually received by INC?
5            MR. ORDER:  Is that the same question?
6    Is that a different question?
7        A    Yes.
8        Q    (By Mr. Wiechmann)  Which page of Ms. Tobin's
9    exhibit are you looking, Exhibit 34, are you looking
10   at?
11       A    Exhibit A.
12       Q    And what are you referring to specifically?
13       A    The first whereas clause of the assignment
14   states that "SCIPA is the owner of the undivided 50
15   percent of the right, title, and interest for the
16   United States in and to," et cetera, et cetera, "the
17   360 patent."
18       Q    Does this assignment in any way say that SCIPA
19   has the power to transfer that interest?
20       A    Well, I think if you read the patent law, sir,
21   you will see that.
22       Q    Are you talking about the French patent law
23   now?
24       A    No.  I'm talking about the United States
25   patent law.

Page 211

1        Q    This was an assignment between two French
2    companies, correct?
3        A    No.
4        Q    Do you know -- were you aware -- I'm sorry.
5            Assignment between one French company and one
6    Liechtenstein company?
7        A    Correct.
8        Q    And that Liechtenstein company had an
9    administrative office also in Monaco?
10       A    Correct, which is not part of France.
11       Q    I don't think anyone said it was.
12           MR. ORDER:  Well, it was an
13   implication.  Go ahead.
14           (Discussion off the record.)
15       Q    (By Mr. Wiechmann)  At the time of the 1994
16   assignment, at the time you registered or recorded,
17   excuse me, the 1994 assignment, were you aware of the
18   1985 agreement?
19       A    I don't believe so.
20       Q    When was the first time you saw, first became
21   aware of that agreement?
22       A    I don't remember.
23       Q    When was the first time you saw a copy of that
24   agreement?
25       A    I said I don't remember.

Page 212

1        Q    The first question was when you became aware
2    of it.  That's different than when you saw it.  It's
3    both of them, you don't remember?
4        A    I don't remember in either case.
5        Q    Was it in either case before or after March of
6    1996?
7        A    I don't remember.
8        Q    I'd like to show you Plaintiff's Exhibit 54,
9    which appears to be a privilege log that was given to
10   us by defendants in connection with productions in this
11   lawsuit.
12           (Plaintiff's Exhibit 54, privilege log,
13   marked.)
14       Q    (By Mr. Wiechmann)  Did you help prepare this
15   privilege log?
16       A    Well, the second half of it appears to have
17   something to do with the Connecticut Bar Association
18   meeting.
19           MS. STEVENS:  Whoops.
20       A    So I didn't have anything to do with that.
21   Something has to do with will executions also.
22           MS. STEVENS:  That's why I'm an attorney
23   and not a secretary.
24           MR. WIECHMANN:  This was, unfortunately,
25   when she was putting it together, she was putting it

Page 213

1    together on the desk of an estates and trusts
2    attorney.
3            MR. ORDER:  I guess we are taking that
4    part out.
5            MR. WIECHMANN:  Yes.  I will on the
6    record clear it up.
7        A    Your question was was I involved with this,
8    the privilege log?
9        Q    (By Mr. Wiechmann)  Yes.
10       A    Yes, I reviewed it.
11           MR. WIECHMANN:  Just for the record,
12   there have been pages removed, and the exhibit which
13   we're referring to, 54, comprises basically 27 pages.
14   There is a cover sheet which lists various people,
15   names, and then there's 26 pages of documents.
16       Q    (By Mr. Wiechmann)  Can you tell from this
17   exhibit which documents were contained in yours or
18   Cooper & Dunham's files?
19       A    Most of them.
20       Q    Maybe it's easier to go the other way:  Can
21   you tell from this exhibit which documents would have
22   been in INC's files?
23           MR. ORDER:  Well, objection to the form
24   of the question because -- you may want to try to do
25   this by time frame -- because ultimately we are now in

54 (Pages 210 to 213)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 214

1    Cooper & Dunham's files. They're all in Cooper &
2    Dunham's files.
3           THE WITNESS: Correct.
4           MR. ORDER: Is your question are there
5    any documents on this privilege log that were just
6    recently --
7           MR. WIECHMANN: At the time of the
8    service of the request for -- at the document request.
9    I'm asking which documents at that time were in INC's
10   files as opposed to Cooper & Dunham's.
11     A   I can't answer what was in INC's files at that
12   time.
13     Q   (By Mr. Wiechmann) Do you know whether any
14   privilege documents, whether the files of INC's French
15   attorneys were reviewed for documents that are
16   responsive and privileged or not?
17     A   I think the answer is there were documents
18   produced from French attorneys. I did not review the
19   filings of any French attorneys.
20     Q   And the documents were produced by French
21   attorneys, can you tell which ones? Were some of those
22   listed on the privilege log?
23     A   If the document does not indicate that I sent
24   or received a copy, then it likely was not in the files
25   of my office.

Page 215

1    Q    I believe you mentioned before that you said
2    you might have received certain documents dealing with
3    some of the French lawsuits. Would all of them have
4    had a letter, cover letter, or something indicating you
5    received that?
6    A    Probably.
7    Q    After reviewing this list, are you aware of
8    any documents dealing with the French lawsuits that
9    were not in your -- in Cooper & Dunham's files that
10   were not produced in connection with either the
11   deposition notice given to you today or the request for
12   production of documents that was served several months
13   ago?
14           MR. ORDER: Could you read back that
15   question?
16           THE WITNESS: I think he said in Cooper
17   & Dunham's files, and the answer -- better read it
18   back.
19   Q    (By Mr. Wiechmann) I'll rephrase it. We will
20   break it down in small pieces.
21           One is: Are you aware of any documents
22   dealing with the French lawsuit that are in Cooper &
23   Dunham's files today that were not produced in
24   connection with a discovery request in this action?
25   A    Yes.

Page 216

1    Q    Are you aware, of those documents not
2    produced, are all of them denominated on this privilege
3    log?
4    A    No.
5    Q    What type of documents were not produced or
6    denominated on the privilege log?
7    A    Documents dated after March 6, 1996.
8    Q    Are there documents dealing with the
9    California patent infringement action in your firm's
10   files that were not either produced or denominated on
11   the privilege log?
12   A    Yes.
13   Q    Are those documents dated after March 6, 1996?
14   A    I'm not certain whether that was the cutoff,
15   but I believe that's correct.
16   Q    I believe earlier today you made the reference
17   as to we were talking about various actions, and I'm
18   aware of the California patent action. You mentioned
19   there was another lawsuit brought by a gentleman
20   dealing with claims of unfair trade practices in
21   California? Do you recall that reference?
22   A    No.
23   Q    A gentleman, Mr. Ramirez?
24   A    Are you talking about Garcia?
25   Q    Yes.

Page 217

1    A    It wasn't brought by him. It was brought
2    against him.
3    Q    And then he had counterclaims of unfair trade
4    practices?
5    A    That may be true.
6    Q    Are you aware of any documents relating to
7    that lawsuit being produced or denominated?
8    A    In this case?
9    Q    Yes.
10   A    No. It has nothing to do with this case.
11   Q    Does that -- does that case have anything to
12   do with the 360 patent?
13   A    No.
14   Q    Does it have anything to do with the OPC '85
15   trademark?
16   A    No.
17   Q    Or the Pycnogenol trademark?
18   A    Yes.
19   Q    Other than those two lawsuits, are you aware
20   of any other lawsuits in California dealing with the
21   360 patent?
22   A    Well, the Garcia case does not deal with the
23   360 patent. I'm only aware of one case involving that
24   patent.
25   Q    Is that the one that you commenced in

55 (Pages 214 to 217)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 218

1   California?
2       A   INC brought a case in California, yes.
3       Q   You commenced on behalf of INC?
4       A   I was an attorney for INC. I did not commence
5   the action because I am not admitted in California.
6       Q   Did you enter an appearance pro hac vice in
7   that case?
8       A   Probably.
9       Q   The Garcia lawsuit was brought in what year?
10      A   About two years ago.
11      Q   Do you recall the court in which it was
12  brought?
13      A   I think you asked me. It was the Central
14  District of California.
15      Q   Do you recall the judge?
16      A   No.
17      Q   Are you aware of any other lawsuits in which
18  INC is a party that were pending after March 6, 1996,
19  that involved the 360 patent?
20      A   Nothing other than what has been described
21  here today.
22      Q   Are you aware of any lawsuits brought after
23  March 6, 1996, dealing with the sale of OPC's in
24  America, other than what's been described today?
25      A   Yes.

Page 219

1       Q   In which matters?
2       A   I believe Horphag has brought several suits.
3       Q   Has INC been a party to any of those?
4       A   No.
5       Q   Were the Horphag suits trademark suits?
6       A   I'm not certain what they were.
7       Q   Have you ever seen copies of the pleadings in
8   those suits?
9       A   I've seen some complaints.
10      Q   Are those complaints in Cooper & Dunham's
11  files?
12      A   They might be.
13      Q   Were those complaints brought after March
14  1996?
15      A   I don't recall.
16      Q   Were those complaints produced in this suit or
17  denominated in the privilege log?
18      A   I doubt it. Nothing to do with INC.
19      Q   Did any of those complaints in their
20  allegations or counterclaims or answers have anything
21  to do with the ownership of the patents by Horphag?
22      A   I don't think so.
23      Q   I show you Exhibit 55.
24          (Exhibit 55, 4/30/01 letter to Mr. Rod
25  Burreson from Mr. Zivin, marked.)

Page 220

1       Q   (By Mr. Wiechmann) Please review Exhibit 55.
2   Do you remember sending this letter to Roex?
3       A   Not particularly.
4       Q   Was this dispute between INC and Roex ever
5   resolved?
6       A   I don't believe so.
7       Q   Was a lawsuit ever brought in connection with
8   this?
9       A   No. Not to my knowledge.
10      Q   I notice that this -- if you look at the third
11  page, do you recall receiving from Mr. Geller that
12  letter the day after you sent yours?
13      A   No, not specifically.
14      Q   You don't recall specifically?
15      A   No.
16      Q   Did you every send Mr. Geller proof that INC
17  had rights in all or part or all of the patent and that
18  Horphag did not have any such rights?
19      A   I don't think there was any further
20  correspondence.
21      Q   Did you ever undertake a patent infringement
22  action against Roex?
23      A   I think I already answered. The answer was
24  no.
25      Q   Was there a reason why in this letter you made

Page 221

1   no threat of patent infringement and only unfair trade
2   practice?
3       A   Isn't that obvious, counsel?
4       Q   Well, if it's obvious, put it on the record.
5       A   Once the federal circuit decided that INC
6   could not bring an action in its own name without
7   joining Horphag, then I couldn't bring such a case,
8   could I?
9          MR. WIECHMANN: This is the last area,
10  and then we will stop for the day.
11          (Further testimony found in confidential
12  binder.)
13
14
15
16
17
18
19
20
21
22
23
24
25

56 (Pages 218 to 221)

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

---

**Page 222**

1                CERTIFICATE OF DEPONENT
2
3       I, NORMAN H. ZIVIN, ESQ., do hereby certify
4    that the foregoing testimony taken on February 22, 2002
5    is true and accurate to the best of my knowledge and
6    belief.
7
8
9
10
11    DATE              NORMAN H. ZIVIN, ESQ.
12    At              in said county of
13          , this      day of      , 2002,
14    personally appeared NORMAN H. ZIVIN, ESQ., and he made
15    oath to the truth of the foregoing answers by him
16    subscribed.
17
18
19    Before me,            , Notary Public.
20    My commission expires:
21
22
23
24
25

---

**Page 223**

1                CORRECTION SHEET
2       I,            , do hereby certify
    that the following corrections and additions of the
3    transcript taken on February 22, 2002, are true and
    accurate to the best of my knowledge and belief.
4
    CORRECTION      PAGE    LINE      REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19    DATE              NORMAN H. ZIVIN, ESQ.
20    At         in said County of
          , this      day of
21          , 2002, personally appeared NORMAN H.
    ZIVIN, ESQ., and he made oath to the truth of the
22    foregoing corrections by him subscribed.
23       Before me,           , Notary Public.
24       My commission expires:
25    (JAS)

---

**Page 224**

1            INDEX OF EXAMINATION
2    Direct Examination by        4
      Mr. Wiechmann
3
4            INDEX OF EXHIBITS
5    32 Amended notice of deposition of Norman H.
      Zivin              13
6
      33 Complaint              65
7
      34 Second declaration of Donna A. Tobin  96
8
      35 Declaration of Donna A. Tobin    105
9
      36 Joint announcement      116
10
      37 10/27/95 letter to president, Barbara
11    Mulgrum Corp. from Mr. Zivin     119
12    38 1/10/96 letter to Paul Morico from
        Mr. Zivin          122
13
      39 1/9/96 letter to Mr. Zivin from
14    Mr. Morico          134
15    40 Two-page announcement      128
16    41 Photocopy of page 226 of 37 CFR    135
17    42 29 May 1998 news release      140
18    43 29 May 1998 news flashes      140
19    44 Packet of documents      146
20    45 26 March 1997 press release    152
21    46 - 49 Press releases      159
22    50 Communication in response to office
        action          172
23
      51 Declaration of Masquelier      176
24
      52 Declaration of Schwitters      176
25
      53 Group of documents        194

---

**Page 225**

1            INDEX OF EXHIBITS
2    54 Privilege log        212
3    55 4/30/01 letter to Mr. Rod Burreson from
        Mr. Zivin        219
4
      56 License agreement (confidential binder)   5
5
      57 7/12/96 letter to Mr. Zivin from
6    Mr. Sands (confidential binder)      8
7    58 7/12/96 letter to Mr. Sands from
        Mr. Zivin (confidential binder)    8
8
      59 8/1/96 letter to Mr. Lee from Mr. Zivin
9    (confidential binder)        8
10    60 7/22/97 letter to Mr. Schwitters from
        Mr. Sands (confidential binder)    8
11
12    Reporter's Note:
13    Exhibits Retained by Attorney Wiechmann
14
15
16
17
18
19
20
21
22
23
24
25

---

Brandon Smith Reporting Service

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002                                                    Norman H. Zivin, Esq.

Page 226

```
1           CERTIFICATE OF REPORTER
2       I, James A. Scally, RPR, a Notary Public duly
3    commissioned and qualified in and for the State of
4    Connecticut, do hereby certify that pursuant to Notice,
5    there came before me, on the 22nd day of February,
6    2002, at 9:57 a.m., the following named person, to wit:
7    NORMAN H. ZIVIN, ESQ., who was by me duly sworn to
8    testify to the truth and nothing but the truth; that he
9    was thereupon carefully examined upon his oath and his
10   examination reduced to writing under my supervision;
11   that this deposition is a true record of the testimony
12   given by the witness.
13       I further certify that I am neither attorney nor
14   counsel for, nor related to, nor employed by any of the
15   parties to the action in which this deposition is
16   taken, and further, that I am not a relative or
17   employee of any attorney or counsel employed by the
18   parties hereto, or financially interested in the
19   action.
20       IN WITNESS THEREOF, I have hereunto set my hand and
21   affixed my seal this       day of        , 2002.
22
23   James A. Scally, RPR
24   Notary Public
25   My commission expires:  5/31/04
```

Page 227

```
1        James A. Scally, RPR
         Brandon Smith Reporting Service
2        11-A Capitol Avenue
         Hartford, CT 06106
3
4
5
     March 1, 2002
6
7
     Richard S. Order, Esq.
8    Updike, Kelly & Spellacy, P.C.
     One State Street
9    P.O. Box 231277
     Hartford, Connecticut 06123-1277
10
     Dear Mr. Order:
11
     Enclosed please find your copy of the deposition of
12   Norman H. Zivin, Esq., taken on February 22, 2002.
13   The original jurat and errata sheets are also enclosed.
     Please note that the witness is allowed 30 days to read
14   and sign the deposition as the rules provide.
15   Please return only the original notarized jurat and
     errata sheets to Attorney Wiechmann for filing, along
16   with a copy to all counsel present. Thank you for your
     prompt attention to this matter.
17
     If you have any questions, please call me.
18
19   Sincerely yours,
20
21   James A. Scally, RPR, LSR #80
     Court Reporter
22
23
24
25
```

Brandon Smith Reporting Service

3ffcee8d-4e65-4cfa-8136-110b42b54c64

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 1

**A**

abbreviation 23:20
ability 11:19,23 82:9,13
able 32:3,9,84:22
about 6:1,19 8:16 12:6
  13:4 21:23 22:23
  31:15,20 36:9 39:23
  49:4,8 50:23 51:8,13
  51:24 59:6 60:16,24
  61:8 65:6 76:20,23
  77:19 81:1,2 82:22
  89:4 96:24,25 98:18
  100:13 108:22 124:21
  132:17 133:12 143:9
  148:22 150:11,13
  154:20 155:3 157:3
  158:12,22,24 161:14
  161:15 162:15 169:18
  173:19 175:2 179:10
  180:19 184:15 185:22
  187:11 191:13 193:8
  202:13 205:20 206:22
  209:12 210:22,24
  216:17,24 218:10
absence 204:4
absolutely 10:25 147:3
  148:1,2
accompanied 178:9
accompany 188:6,8
accordance 55:5
Accordingly 123:21
accounting 204:7
accounts 55:21
accuracy 144:17
accurate 75:7 76:6
  129:22,24 154:22,23
  155:3 161:2 222:5
  223:3
accurately 11:20,24
acquired 130:8
acronym 22:14,17
act 25:10,11
acting 52:17 104:22
action 1:6 27:9,21 44:8
  60:4,5,9,11,12,20
  65:9,16,19,22 66:7
  67:14 69:13 76:13,14
  76:15 84:16 85:6,12
  91:17 92:16,24 94:6
  96:11 101:14 102:7,9
  126:20 142:24 156:8
  164:5 172:21 173:2,6
  173:9,12,14,17
  185:13,15,17 188:17
  190:24 191:3 195:1
  196:13 199:13 209:9

209:10 215:24 216:9
  216:18 218:5 220:22
  221:6 224:22 226:15
  226:19
actions 51:17 60:24
  61:1 66:13 101:20,22
  101:25 125:18,19
  134:8,10 144:14
  153:22 166:14 170:5
  170:8,15 185:7,11
  207:22 208:4,8
  216:17
activity 153:1
acts 10:24
actual 104:14,16 105:3
actually 17:10 25:15
  85:17 86:7 203:18
  210:4
added 94:21 95:3,9
adding 95:5
addition 89:15 95:11
  124:8
additional 113:6
  199:22
additions 223:2
address 5:21,22,22 6:8
  6:9 135:6
addressed 174:15
ADinfinitum 145:19,24
  146:25 148:16,24
  149:15 150:25 151:4
  187:4
administrative 19:24
  20:11 64:4,7 66:13
  125:8 211:9
admissible 52:4
admit 10:24
admitted 218:5
adopted 145:16
Adrian 203:21
adversarial 72:13
advice 5:7 29:9,22 30:4
  30:9,24 31:4,6,15
  38:4 53:16 56:12
  131:10,12 132:18,19
  133:3,12,17 141:16
  145:6,11 183:22
  186:5
advised 5:13 33:2
  166:23 167:1
advising 49:11
advisor 29:22 52:18
affect 11:19,23 161:25
affected 99:25
affidavit 106:4
affidavits 33:1,15,19,24

34:4 37:6 38:24
  175:18,23 185:6
affiliated 17:3,18,22
affixed 226:21
after 7:9,14 34:22
  39:25 40:3 48:18
  65:8 98:17 111:21
  114:11 122:19 142:16
  153:8 155:22 165:1
  165:11 180:20,23
  193:11 203:13 208:8
  208:16 212:5 215:7
  216:7,13 218:18,22
  219:13 220:12
again 66:1,12 76:7
  86:13,14 90:12,13
  94:3 97:14 115:15
  118:16 126:1 127:15
  159:9,9
against 4:10 9:3 10:12
  44:9,9 45:22 46:4,15
  46:25 47:1,3,23 52:16
  63:16 64:11 65:4,15
  66:6,13 78:8 91:7
  95:13 102:10 164:12
  165:14 193:23 194:13
  217:2 220:22
agencies 125:8
Agency 19:8
ago 6:19 16:17 17:1
  20:9 22:23 59:16
  65:1 69:11 73:13
  89:12 146:10 180:19
  215:13 218:10
agree 123:24
agreed 103:2 137:24
agreeing 21:18 102:5
agreement 21:6,9 24:24
  25:3 27:5 29:11
  73:19 87:21,23 88:12
  89:14,16 98:4,5,7
  102:15,18 103:1,9,10
  103:15 106:14 107:1
  107:18 189:2 204:5
  204:10,11,17,25
  205:14,17,19,22
  211:18,21,24 225:4
agreements 21:19
ahead 15:15 32:16
  93:25 149:9 200:22
  211:13
AI 203:13
aid 125:8
al 65:24 144:6
Alexandra 2:6 32:1
Alifia 203:21

allegation 52:15 77:4
  79:5 82:2 90:20
  91:18 92:15 93:6
  103:23 164:23
allegations 4:10 51:13
  52:18 75:6 84:15,16
  85:8 98:1 166:14
  219:20
allege 164:17
alleged 10:15 95:17,21
  164:13,16,19
alleging 164:13
allow 26:21,22 85:22
  144:22 145:1 227:13
allowing 145:5
allows 149:2 195:24
alluded 131:25
almost 197:5
along 85:1 159:14
  198:23 227:15
already 86:20,21 123:2
  151:7 157:17 167:18
  167:19 220:23
alternative 101:7,11,12
  179:24
alternatively 91:14
  101:9
although 57:18 63:5
  102:23 144:4
always 145:12
ambiguity 80:8
amended 13:15 26:21
  224:5
America 218:24
American 33:2
Americas 6:7,14,15,18
among 87:6
amount 166:11 167:8
  191:10
Anaheim 186:18,25
  187:5,8,19,21
analysis 170:22 171:17
Anderson 7:18,19,21
and-desist 95:16 122:4
and/or 32:25 40:3 42:2
  69:24 115:4 135:5
Angeles 8:12
animosity 72:19
Annotated 135:18
announced 186:24
  187:19
announcement 116:5
  116:15 128:21,24
  139:24 140:13,22
  149:17 224:9,15

announcements 160:18
announcing 142:19,23
  151:18
another 25:9 37:19
  52:11 97:25 120:24
  126:18 159:23 179:13
  183:4 207:3 216:19
answer 12:25 13:2,3,8
  15:6,15 17:16,21 18:8
  18:25 19:1 25:8
  35:11 37:4 38:8
  45:16 50:4,7 51:3,5
  53:24 57:22 58:6,17
  61:17,21 62:18 71:11
  74:6,14,17,18 77:11
  78:7 80:9 81:5 89:11
  92:8,11 93:25 99:7,16
  118:11 127:25 132:24
  133:2,9 136:19 137:8
  137:16,18,18 138:11
  138:25 142:3 149:25
  150:14 152:5,8 154:4
  154:20 156:22,24,25
  159:8,15,18 160:21
  162:25 169:8 170:24
  205:2,15 214:11,17
  215:17 220:23
answered 220:23
answering 107:14
answers 165:6 184:8
  219:20 222:15
antagonistic 72:13
  126:22
anticipate 4:13
anticipation 209:9
antioxidant 179:14,17
anybody 5:11 12:8,15
  26:7 38:18 44:22
  47:3 71:1 81:6 86:9
  92:22 109:5 110:6
  129:19 130:23 131:17
  133:16,17 134:2
  139:8 145:19 160:24
  160:25 161:8,12,17
  161:18 163:9 165:10
  167:22 171:21 177:10
  177:11,20 178:9
  181:11,17 183:12
  185:23 186:22 202:22
anyone 5:15 44:15
  92:18 109:12 145:24
  146:3 167:3 207:23
  211:11
anything 3:15 4:19
  24:20 52:19,25 81:1
  82:20 86:10 126:2

Jarrow Formulas vs International Nutrition Co.

2/22/2002

Norman H. Zivin, Esq.

Page 2

| | | | | |
|---|---|---|---|---|
| 145:5 149:19 150:1<br>151:6 178:21 185:10<br>208:23 209:14 212:20<br>217:11,14 219:20<br>**anyway** 12:22 32:11<br>119:8 138:9 159:6<br>**anyways** 18:4<br>**anywhere** 18:1 157:7<br>158:14 159:7 187:16<br>**apart** 60:19<br>**apologize** 106:3<br>**apparently** 123:13<br>**appeal** 36:20 37:24<br>47:13,15 48:21,23<br>62:10 63:7,24 64:2<br>85:6 87:19 91:24<br>101:4,16 116:22<br>**Appeals** 39:10,14 48:22<br>62:12 63:17 102:4<br>116:20 129:8 141:1<br>143:5,10 156:2<br>**appear** 26:23 119:25<br>120:5,8,15 125:15<br>137:22,24 159:20,22<br>173:24<br>**appearance** 57:19<br>218:6<br>**APPEARANCES** 2:2<br>**appeared** 125:17<br>190:22 222:14 223:21<br>**appears** 95:25 96:20<br>97:14 106:4 128:20<br>150:18 169:16 177:1<br>179:10 194:14 198:8<br>198:19 203:7 212:9<br>212:16<br>**appellate** 40:19 89:13<br>138:21 155:10<br>**appended** 86:8 106:11<br>106:11 149:22 164:25<br>**applicable** 196:19,20<br>**application** 89:17<br>179:19,21<br>**applied** 204:9<br>**applies** 4:25<br>**apply** 149:2<br>**appointment** 173:25<br>**appoints** 174:4<br>**appreciate** 57:10<br>**appropriate** 53:17<br>173:19<br>**approximately** 55:17<br>58:2 66:18<br>**April** 87:21,25 88:12<br>88:16 89:14 97:1<br>107:18,19 201:9 | 204:8<br>**arbitration** 61:16<br>**area** 55:9 221:9<br>**areas** 30:17<br>**argue** 100:25<br>**arguing** 52:17 84:14<br>**argument** 32:7 106:16<br>106:16 195:15<br>**arguments** 85:9,25<br>87:5<br>**arising** 39:5 200:23<br>201:9<br>**Arno** 20:24<br>**Arnold** 122:14<br>**around** 6:12 53:16<br>156:7 197:5<br>**arrived** 30:19<br>**art** 171:18<br>**aside** 193:7<br>**asked** 36:13 38:3 58:9<br>74:5 96:17 99:10<br>125:3 128:14 136:6<br>137:11 138:4,7 145:6<br>150:24 173:20 184:7<br>196:15 202:1 203:2<br>218:13<br>**asking** 21:23 30:23<br>50:23 51:6 52:12<br>60:24 74:9 77:10<br>79:8,8 81:24 86:15,17<br>88:19 93:20 96:13<br>99:12 104:9,9 107:11<br>115:15 117:6,21<br>118:14,15 123:4<br>156:21 157:3,22<br>158:17,18 159:10<br>161:14,15 170:3<br>196:6,16 204:13<br>206:21 208:14,15<br>214:9<br>**asks** 20:5 38:10 74:1<br>**aspects** 141:25<br>**assert** 159:12<br>**assets** 57:7<br>**assigned** 103:11,13<br>143:11<br>**assignment** 43:1 56:25<br>75:21 76:2 77:16,19<br>78:18,22 81:23 88:16<br>89:1,3,5 96:22 97:1<br>97:14,20,24,25 98:2,3<br>98:11,19,21 99:11<br>103:19,25 104:3,7,8<br>104:14,16,20,24<br>105:1,4,8,13 106:14<br>107:6,8,17,20,24,24 | 108:5,12,22,23 109:1<br>109:2,7,10,12,25<br>111:15,22 112:17<br>113:7,20 114:1<br>115:14 117:14,15,17<br>117:20,25 118:3<br>122:19,21 123:8<br>124:8,9,16 134:18<br>137:10 138:23,24<br>143:8,24 144:1,5<br>210:13,18 211:1,5,16<br>211:17<br>**assignments** 118:7,19<br>124:19 125:22 128:8<br>128:12 135:7 136:7<br>136:15,17,22 137:6<br>**assist** 108:8,10 141:6<br>**assisted** 167:23<br>**associate** 32:1 177:17<br>**associates** 161:6 178:12<br>188:5<br>**Association** 212:17<br>**assume** 11:6 23:19<br>29:23 34:22 47:4<br>48:9 55:7 86:4<br>104:13 106:5 112:11<br>120:10 134:12 135:23<br>146:24 155:14 168:6<br>169:7 172:22 183:19<br>183:19 185:9 197:25<br>200:4<br>**assumed** 193:13<br>**Assuming** 124:7<br>**assumption** 120:13<br>**assure** 124:1<br>**Asylum** 2:7<br>**attached** 13:25 104:3<br>125:25 150:16 163:25<br>171:4<br>**attaching** 97:11<br>**attachment** 163:19<br>**attachments** 96:21<br>**attempt** 14:10,17 84:25<br>138:24 139:1,18<br>189:23 199:23<br>**attend** 31:24 32:9,12<br>188:2<br>**attendance** 71:24<br>**attended** 183:16 187:24<br>**attending** 32:2 71:14<br>170:10 182:9 183:7<br>**attention** 116:18<br>227:16<br>**attorney** 4:8 12:11<br>25:19 26:10,16 27:7<br>29:19,24 31:11 33:8,9 | 33:11 40:6,12 41:2,12<br>46:6 74:2,8 76:9,14<br>79:16 81:3,25 85:2,17<br>86:19 99:7,9 108:18<br>108:25 110:17 115:4<br>117:13 118:11,14<br>122:14 126:4,7 127:3<br>127:18 131:20 132:11<br>137:25 138:12,13<br>155:6 157:2,5 159:10<br>159:13 163:2,10<br>169:4,9 171:19 172:9<br>172:13,16 173:25<br>174:4,4,6,11,22 186:9<br>195:12 208:5 209:11<br>209:19 212:22 213:2<br>218:4 225:13 226:13<br>226:17 227:15<br>**attorneys** 32:25 33:6<br>33:13,16 35:2,2,7,7<br>39:5 40:2,10,22 41:25<br>42:1,8 46:1,2,3 71:23<br>87:6 93:21 122:2<br>133:23,25 134:13<br>163:6 171:23 174:7<br>191:22 192:3 193:10<br>193:11 214:15,18,19<br>214:21<br>**attorney's** 97:15<br>**attorney-client** 4:15,19<br>4:23 5:4 20:6 31:11<br>53:14,17 74:1,7 76:8<br>76:24 79:21 82:24<br>83:25 84:19 85:1<br>91:22 92:5 102:1<br>104:1 108:19 115:4<br>118:12 126:12 132:5<br>132:19 152:6 153:7<br>157:9 158:16 159:13<br>162:23 170:5 186:1,7<br>186:11,20 187:1<br>195:11 206:9 209:3<br>**authority** 3:6 25:10,11<br>209:25<br>**authorization** 26:19<br>**authorized** 169:21<br>**availability** 162:2<br>**Avenue** 1:24 6:7,14,15<br>6:18 227:2<br>**avocats** 178:14<br>**aware** 18:15 19:13<br>20:13 23:16 34:20,23<br>37:12,20,23 42:7,13<br>42:17 45:17,24 49:11<br>49:17 72:18,21,25<br>73:6 77:7,13,23 78:4 | 78:11,19 88:14 89:1,5<br>89:7,18,23 90:4,9<br>91:10 92:22,25 93:9<br>95:20 109:15 119:1<br>120:9,14 130:23<br>132:22 133:17 138:15<br>138:20 139:8 145:9<br>146:21 163:21,24<br>176:7 177:10,11<br>184:19,22 185:4,5<br>187:7,19,20,21<br>206:11 207:1,21,22<br>211:4,17,21 212:1<br>215:7,21 216:1,18<br>217:6,19,23 218:17<br>218:22<br>**a.m** 1:19 31:20 49:24<br>226:6<br><br>**B**<br>**B** 2:6 143:18<br>**back** 16:9 18:3 24:18<br>36:25 43:3 46:10<br>49:25 61:18 65:2<br>73:22 80:1,3 83:2,9<br>87:8,15 88:23 93:1<br>100:10 117:10 128:16<br>163:16 180:4 184:9<br>203:8 207:16,25<br>215:14,18<br>**backed** 55:19<br>**background** 53:9<br>**Baltimore** 68:17 188:3<br>188:9<br>**Bar** 212:17<br>**Barbara** 119:15,21<br>121:24 122:3 224:10<br>**bark** 189:6<br>**Barraud** 42:22<br>**base** 109:18 206:6<br>**based** 74:6,12 76:19<br>133:2 164:21 195:3<br>196:10<br>**baseless** 84:23<br>**bases** 106:15<br>**basically** 23:24 51:22<br>52:16 91:13 136:16<br>143:12 213:13<br>**basing** 53:18<br>**basis** 4:9 76:15 79:4<br>80:17,23 82:13,14<br>85:7,10,11,13,14,16<br>85:20 86:6,11,12,17<br>86:25 87:3,9,20 88:4<br>88:6,9 90:19 91:1,18<br>92:15 93:6 95:5 98:1 |