A

Page 46

1   Q   Well, did you ever sue any of the lawyers
2       representing Bio-Genesis?
3   A   At what point?
4   Q   Ever.
5   A   Yes.
6   Q   Who did you sue?
7   A   It's very complicated. Again, it gets a little
8       detailed.
9   Q   I'm just asking who you sued?
10  A   Cynthia Harf.
11  Q   And was she one of Bio-Genesis' lawyers?
12  A   One of about seven or eight. I lost count.
13  Q   Did you sue any other Bio-Genesis lawyers?
14  A   No.
15  Q   Why did you sue her?
16  A   She brought what was called -- what is called
17      today a slap suit. She brought a case that was
18      thrown out on summary judgment, one half of it.
19      And the other half, as I said, voluntarily
20      dismissed with prejudice. She brought a case
21      following a very serious FDA raid against her
22      client, where, basically, the entire company was
23      seized and shut down for many months, for
24      contaminated products. And with no connection,
25      no basis at all for me or Natren -- or, rather,

Page 47

1       I should say my company or Natren, made a lot of
2       allegations that were simply marketing on behalf
3       of her client to try and recover his reputation
4       in the marketplace after the FDA raid. And
5       today we would call that a slap suit. And that
6       strategic lawsuit against public participation,
7       which was my free speech about the FDA raid,
8       would have been dismissed and Bio-Genesis would
9       have had to have paid my attorneys fees.
10      Unfortunately, back then there was no provision
11      for slap suit for that type of litigation as
12      there is today. So, that's why I sued her.
13  Q   Which of the three lawsuits that you identified
14      earlier did she bring?
15  A   She brought the one in North County San Diego
16      Superior State Court. And she resigned from the
17      case after her client committed perjury -- his
18      second conviction for perjury -- in another case
19      she was representing him.
20  Q   And by client you mean Boyd O'Donnell?
21  A   Yes.
22  Q   When did she bring the case in San Diego State
23      Court?
24  A   It may have been '94.
25  Q   And when did you sue her?

Page 48

1   A   It may have been '95. I mean, I can't remember.
2       This has been struggling on for seven years with
3       these people.
4   Q   When you say it may have been '95, which
5       question are you answering?
6   A   When she brought the original case, the
7       underlying case.
8   Q   My question now is, when did you sue Cynthia
9       Harf?
10  A   '96, '97 -- maybe -- '96, '97.
11  Q   And what were your claims against her? Let me
12      retract that. Who sued whom in that lawsuit?
13  A   Jarrow Formulas, Inc. and Natren sued her and
14      her clients for malicious prosecution.
15  Q   Were there any other claims asserted other than
16      malicious prosecution?
17  A   No.
18  Q   Did you assert any antitrust claims against her
19      and her clients?
20  A   No.
21  Q   Did you assert any unfair competition claims
22      against them?
23  A   In which case?
24  Q   How many cases did you sue Ms. Harf in?
25  A   That one. But you said "them."

Page 49

1   Q   Them meaning Ms. Harf and her clients.
2   A   Well, I had -- I have, whatever, unfair
3       competition claims against her clients in
4       another case.
5           MR. WIECHMANN: Just in the northern
6       San Diego case.
7   BY MR. ORDER:
8   Q   We were talking about a case where you sued
9       Ms. Harf -- where Jarrow Formulas and Natren
10      sued Cynthia Harf and her clients. So, my
11      question is, did you have any other claims in
12      that case other than malicious prosecution?
13  A   I already said no. I said malicious
14      prosecution.
15  Q   Were there any counter claims in that case
16      brought by the defendants against you -- or,
17      against Jarrow Formulas or Natren?
18  A   No.
19  Q   And where was that lawsuit brought?
20  A   North County San Diego Superior Court.
21  Q   Is that case still pending?
22  A   No.
23  Q   What happened?
24  A   The judge gave a very peculiar instruction to
25      the jury. Then he changed the instruction. And

Page 50

1  when he delivered the changed instruction, the
2  jury responded, "Too late. We already made up
3  our mind." So, the jury came back with no
4  liability for the defendants.
5  Q  And when was that trial?
6  A  In '97, '98. I think '98.
7  Q  Did you -- did anybody appeal that trial -- from
8     that trial?
9  A  No. I think Ms. Harf learned her lesson. And
10    the other defendants were still defendants in
11    the other matters, and still face a very
12    substantial liability.
13 Q  And do you have a lawsuit against the other
14    defendants in another case?
15 A  I already said I did.
16 Q  Who sued whom in that other case?
17 A  No. I already told you about this case. This
18    is the counter claims.
19 Q  Oh. So you were just referring to the earlier
20    cases that you had testified, to the San Diego
21    Superior Court case, and the bankruptcy case; is
22    that what you are referring to?
23 A  Well, the San Diego Superior Court case still
24    has certain matters pending. Some are
25    completed. Some are not.

Page 51

1  Q  Were you deposed in the lawsuit Jarrow Formulas
2     brought against Cynthia Harf?
3  A  I don't think so, oddly enough. I have no
4     memory of it at all.
5  Q  Did you testify at trial in that case?
6  A  Yes.
7  Q  Who was your attorney in that case?
8  A  My general counsel.
9  Q  What was his name?
10 A  Neal, N-E-A-L, T. Wiener, W-I-E-N-E-R.
11 Q  Does he work -- is he on Jarrow Formulas'
12    payroll?
13 A  No.
14 Q  So, is he outside general counsel?
15 A  Yes.
16 Q  So he has his own law practice apart from Jarrow
17    Formulas; is that correct?
18 A  Yes, it's correct.
19 Q  Do you recall who represented Ms. Harf?
20 A  No.
21        MR. ORDER: Did you want to take a
22    break, Mr. Wiechmann?
23        MR. WIECHMANN: Yes.
24        MR. ORDER: This is a good time.
25        VIDEOGRAPHER: We will go off record

Page 52

1     at 11:24.
2         VIDEOGRAPHER: We are back on the
3     record at 11:51.
4         MR. WIECHMANN: Before we begin,
5     Mr. Order, during the break, while
6     Mr. Rogovin does believe that the breach of
7     contract case, which is 11 years old, deals
8     with him personally is irrelevant, he is
9     willing to answer at least some of the
10    limited questions you propounded concerning
11    his attorney, and what was the ultimate
12    resolution of the suit.
13 BY MR. ORDER:
14 Q  Okay. So, as I recall, that class action that
15    you brought was named Jarrow Rogovin versus
16    Southwest Lease; correct?
17 A  More or less.
18 Q  And who was the attorney representing you?
19 A  Neal Wiener.
20 Q  What was the resolution of that case?
21 A  They changed their contracts. And the case was
22    ultimately dismissed.
23 Q  Was that a settlement?
24 A  No.
25 Q  Well, who won?

Page 53

1         MR. WIECHMANN: Object as to form.
2         THE WITNESS: In a sense, nobody. The
3     ultimate issue was never litigated.
4  BY MR. ORDER:
5  Q  Did you receive any money as a result of the
6     dismissal of that case?
7  A  Yes -- I think I -- I will answer that. But I
8     want to cut it off after that. I answered the
9     contracts were changed. The case was ultimately
10    dismissed. No, I didn't receive money. Again,
11    this was a personal matter, not corporate. And
12    I think this is really far afield. And I think
13    it's very inappropriate to go into a personal
14    case 11, 12 years old.
15 Q  You just said I can ask questions about --
16 A  About my automobile sir. It's enough.
17 Q  So, you had leased an automobile from Southwest
18    Lease, is that correct?
19 A  I don't think there is any more to be said.
20        MR. ORDER: Well, then I don't know
21    why we just wasted this time,
22    Mr. Wiechmann.
23        THE WITNESS: I think, actually, it's
24    implied in --
25        MR. ORDER: Let's move on.

Jarrow Formulas vs International Nutrition

1/29/2002                                                                 Jarrow Rogovin

Page 66

1        MR. WIECHMANN: Object as to form.
2    Seeks attorney-client communications. I
3    instruct him not to answer.
4  BY MR. ORDER:
5  Q   If Mr. Zivin had told you prior to February 4th,
6      1998, as you say he did, that you should not be
7      contacting him, why did --
8  A   I didn't say that.
9        MR. WIECHMANN: Let him finish.
10 BY MR. ORDER:
11 Q   Okay. Then let's go back over that. Did
12     Mr. Zivin at any time tell you not to contact
13     him?
14 A   I already told you I don't remember that.
15 Q   Well, Mr. Rogovin, you have been involved in a
16     number of litigations, as we have learned
17     today. Did you ever learn in your experience
18     that once a party is represented, a lawyer for
19     the opposing side cannot communicate with that
20     party directly without the knowledge, or outside
21     the presence of that party's attorney?
22       MR. WIECHMANN: Object as to form.
23       THE WITNESS: That opposing counsel
24     cannot contact the party, yes. That
25     doesn't prevent the counsel from responding

Page 67

1    to party's counsel, nor the party from
2    contacting the counsel.
3  BY MR. ORDER:
4  Q   And what do you base that on?
5  A   Well, that is the law. It's the -- it's what
6      the Bar regs say. The bar regs prohibit only
7      the lawyer contacting the party.
8  Q   Well, what did you mean to accomplish by
9      sending Mr. Zivin this letter?
10       MR. WIECHMANN: Object. Asked and
11     answered. You can answer.
12       THE WITNESS: Same question. Same
13     answer. To persuade him to drop a
14     malicious lawsuit.
15 BY MR. ORDER:
16 Q   You were basically telling Mr. Zivin in this
17     letter that if he didn't drop the lawsuit that
18     you would sue both him and his client; isn't
19     that correct?
20 A   Correct.
21       MR. WIECHMANN: Object as to form.
22       THE WITNESS: Correct.
23 BY MR. ORDER:
24 Q   Other than Cynthia Harf and Attorney Zivin, are
25     there any other attorneys that you have ever

Page 68

1    sued, or have -- let's leave it that way, that
2    you personally have ever sued?
3  A   No.
4  Q   Other than Attorney Zivin and Attorney Harf, are
5      there any other attorneys that Jarrow Formulas,
6      or any of its affiliated companies ever sued?
7  A   Yes.
8  Q   Who are those?
9  A   A guy named Verick, V-E-R-I-C-K. Nicholas
10     Browning and Mark Brutzkus. And William Verick.
11 Q   Was that all in the same lawsuit, or is --
12 A   No.
13 Q   - or is it three separate --
14 A   No.
15 Q   Is it three separate lawsuits?
16 A   Correct.
17 Q   And who was the plaintiff in each of those
18     lawsuits?
19 A   Jarrow Formulas, Inc.
20 Q   Let's take the lawsuit that Jarrow Formulas
21     brought against William Verick. When was that
22     brought?
23 A   '97, '98.
24 Q   And what did Jarrow Formulas claim in that case?
25 A   Verick served what is called a Prop 65 notice on

Page 69

1    Jarrow Formulas with no evidence. And loudly
2    threatened in the press to sue us for violating
3    California Prop 65 statute and that we were
4    selling contam -- pesticide -- chemical --
5    chemically contaminated fish oils. And he had
6    performed no tests on our product at all. And
7    we did two and a half thousand dollars worth of
8    the tests, additional to the tests we had from
9    the supplier, showing there were no
10   contaminants. And asked that we would be
11   reimbursed our fees -- lab fees and a little bit
12   of legal fees. He refused. I sued in small
13   claims. The small claims court commissioner
14   ruled in Jarrow Formulas' favor, stating that
15   Mr. Verick was unprofessional, immature,
16   unethical, and that it was unconscionable that
17   he had not voluntarily reimbursed the cost he
18   had cost us. He appealed. He took it to -- in
19   effect, trial de novo municipal court. We took
20   the position that a Prop 65 notice is a
21   functional equivalent of a lawsuit. We perhaps
22   should have had an abuse of process. But,
23   anyway, the court ruled that since it was not an
24   actual lawsuit, the judge wrote on his ruling,
25   "An unfortunate result, but judgment for the

18 (Pages 66 to 69)

Page 70

1   appellant."
2   Q   For Attorney Verick; right?
3   A   Right. But I found it interesting that the
4       judge wrote on the judgment, "An unfortunate
5       result."
6   Q   And again, how much was at stake; you said
7       $2,500?
8   A   Actually $5,000 was the total.
9   Q   That's including attorneys fees?
10  A   Yes. There was a lot of noise in the press
11      about his bringing the suit.
12  Q   Well, serving the notice; right?
13  A   Well, it caused attorneys fees.
14  Q   Okay. Let's take the suit that Jarrow Formulas
15      brought against Nicholas Browning. When was
16      that commenced?
17  A   Last year. Small claims. $5,000.
18  Q   And what small claims court is this?
19  A   In Los Angeles.
20  Q   Is there only one small claims court in Los
21      Angeles?
22  A   Maybe West LA.
23  Q   By the way, where was the small claims brought
24      in --
25  A   West LA.

Page 71

1   Q   -- the William Verick case?
2   A   Um-hum.
3   Q   Is that a yes?
4   A   Yes.
5   Q   And then it went up to the superior court in Los
6       Angeles?
7   A   What?
8   Q   The Verick case.
9   A   I already said it did.
10  Q   I'm just trying to --
11          MR. WIECHMANN: You said municipal
12      court.
13  BY MR. ORDER:
14  Q   Municipal. Okay. That's why I asked. To
15      clarify. I had it wrong. And let's get back to
16      the Browning case, the small claims matter was
17      brought last year, the year 2001?
18  A   Yes.
19  Q   Is that still pending?
20  A   No.
21  Q   What happened in that case?
22  A   They sued for patent infringement. We had been
23      their customer. They refused to tell us why
24      they sued us. We refused to answer the
25      complaint. The federal court issued an OSC race

Page 72

1       sanctions against Nutrition 21 for failure to
2       prosecute. They filed a request for dismissal
3       -- volunteer dismissal. And I demanded the
4       $5,000 in attorney fees it had cost. They
5       refused. I sued.
6   Q   Before you go on, who was the client that Mr.
7       Browning was representing?
8   A   Nutrition 21.
9   Q   And what is it that they claimed Jarrow Formulas
10      was infringing?
11  A   They have a patent.
12  Q   Regarding what?
13  A   Chromium picolinate.
14  Q   I can't hear you.
15  A   Chromium picolinate.
16  Q   And you said that Jarrow Formulas was Nutrition
17      21's customer. What did you buy from Nutrition
18      21?
19  A   Chromium picolinate.
20  Q   And what is chromium picolinate?
21  A   You know, time is ticking. It's a --
22  Q   Can you answer my question?
23  A   It's a mineral. It's a mineral form. It's a
24      mineral salt.
25  Q   Did you just resell that mineral salt, or did

Page 73

1       you use it to formulate a different product.
2           MR. WIECHMANN: It's his time.
3           THE WITNESS: You know, we --
4           MR. WIECHMANN: Just answer his
5       question.
6           THE WITNESS: We put it -- we put it
7       into various -- we put it into, as a matter
8       of fact, various products forms.
9       Basically, we sold it as a stand-alone
10      chromium picolinate product.
11  BY MR. ORDER:
12  Q   And what court was the original suit brought in
13      by Nutrition 21?
14  A   In federal court, Santa Anna.
15  Q   Do you know where Nicholas Browning's office is
16      located?
17  A   Torrance.
18  Q   California? Torrance, California?
19  A   Yes.
20  Q   Did you stop being -- did Jarrow Formulas stop
21      being Nutrition 21's customer at any time?
22  A   After they filed a suit against their own
23      customer, of course.
24  Q   Had you been buying the same product from a
25      different supplier prior to that lawsuit?

Page 74

1   A   No.
2   Q   When was the federal court action brought by
3       Nutrition 21?
4   A   2001 -- 2000.
5   Q   And getting back to William Verick, do you know
6       where his office is located?
7   A   Either one side or the other of the border of
8       Northern California and Oregon. As far as he
9       can get from any pollution. From which he files
10      Prop 65 lawsuits. I'm not sure if he's right in
11      Portland, or just below. Somewhere up there.
12  Q   Well, Portland is not really near the border of
13      California and Oregon, is it?
14          MR. WIECHMANN: You don't know where
15      he is.
16  BY MR. ORDER:
17  Q   Is he in Portland?
18  A   He flew down to Portland when he had to fly down
19      for the hearings. There's no airport at the
20      Northern California, basically, that's going to
21      get you to LA.
22  Q   What happened to this small claims court case
23      that you brought against Nicholas Browning?
24  A   I guess we brought two causes of action;
25      malicious prosecution and abuse of process. On

Page 75

1       malicious prosecution the court found that since
2       we had not answered, and they had filed a
3       voluntary dismissal, we had not met the element
4       of prevailing in the underlying suit.
5           On the abuse of process, the court found
6       that the ads that they had taken out -- it gets
7       a little involved here -- but, the ads that they
8       taken out to promote the lawsuit.
9   Q   Nutrition 21, you mean?
10  A   Um-hum. Coupled with the press release naming
11      my company. That I had failed to establish that
12      the press release was -- or excuse me, the press
13      report was actually a result of their press
14      release. That if I had shown where that press
15      report had come from -- that not having shown
16      where the press report had come from, albeit it
17      was -- well, anyway. That account was denied
18      also.
19  Q   So, that small claims case is over?
20  A   Um-hum.
21  Q   I'm sorry. You have to say yes or no.
22  A   Yes.
23  Q   And I'm sorry about the timing. I didn't
24      realize you were taking some water.
25  A   That's okay.

Page 76

1   Q   Now, the lawsuit against Mark Brutzkus, when --
2       how do you spell his last name?
3   A   B-R-U-T-Z-K-U-S.
4   Q   When did Jarrow Formulas bring that suit?
5   A   Maybe six months ago.
6   Q   So, sometime in mid 2001?
7   A   Yes.
8   Q   And what court did Jarrow Formulas bring that
9       suit in?
10  A   Superior court, Santa Monica.
11  Q   And how much are you claiming in that lawsuit?
12  A   According to proof.
13  Q   Is there a jurisdictional minimum to file in
14      superior court in Santa Monica?
15  A   Over $25,000.
16  Q   And had Attorney Brutzkus brought a lawsuit
17      against Jarrow Formulas?
18  A   Yes.
19  Q   Who were his clients in that lawsuit?
20  A   Sandra Hogan-LaMarche. Hogan hyphen
21      L-A-M-A-R-C-H-E.
22  Q   Was that his only client in that case?
23  A   Yes.
24  Q   And she brought a suit against Jarrow Formulas?
25  A   Yes.

Page 77

1   Q   Any other defendants in that case?
2   A   No.
3   Q   And what was the nature of the suit she brought
4       against Jarrow Formulas?
5   A   Supposedly called slander of title. In effect,
6       interference with business relation -- with a
7       business relation, or relationship.
8       Interference with a business relationship.
9   Q   Was there a particular product involved in that
10      lawsuit?
11  A   Art work.
12  Q   Art work?
13  A   Graphic arts -- well, hold on. In that lawsuit?
14      Actually, it was a videotape. She's a graphic
15      artist. But she was claiming loss of a
16      videotape deal.
17  Q   And what happened in the Sandra -- in the case
18      that Sandra Hogan-LaMarche brought against
19      Jarrow Formulas, Inc.?
20  A   The president for the company that she claimed
21      to have lost business from gave a deposition
22      stating that she never had the business. He
23      never had any interest in the business. And it
24      wasn't true in any respect; her claim that I had
25      caused her to lose business with him. We filed

Page 78

1    a motion for summary judgment. It was granted.
2    And we brought an action against her and her
3    lawyer.
4  Q When did she bring the lawsuit?
5  A It may have been several years ago.
6  Q 1998, 1997?
7  A Perhaps '97.
8  Q What claims have you made in the lawsuit against
9    Mark Brutzkus?
10 A Malicious prosecution.
11 Q Is Sandra Hogan-LaMarche a defendant in that
12   lawsuit also?
13 A Yes.
14 Q Have you made any other claims besides malicious
15   prosecution in that case?
16 A No.
17 Q Is that case still pending?
18 A Yes. I will say they made a motion for
19   dismissal that was denied.
20 Q So, with respect to attorneys, you have sued
21   Cynthia Harf, William Verick -- I'm sorry, you
22   or -- let me restate the question.
23      With respect to attorneys, Jarrow Formulas,
24   Inc. has sued Cynthia Harf, William Verick,
25   Nicholas Browning, Mark Brutzkus and Norman

Page 79

1    Zivin; is that correct?
2       MR. WIECHMANN: Object as to form.
3    Confusing as to what you mean by attorneys.
4    The first ones you mentioned were acting in
5    their capacity as attorneys. The last one
6    was not. I want to make it clear on the
7    record. This case --
8       MR. ORDER: I have no clue what you
9    are talking about.
10      MR. WIECHMANN: Mr. Zivin is not being
11   sued as an attorney. He is being sued as a
12   part -- an extra attorney conduct as a part
13   of the conduct that leads to this lawsuit,
14   on the monopolization of the market.
15      MR. ORDER: Well, as far as I'm
16   concerned, the question was very clear.
17   Mr. Zivin is an attorney. That was my
18   question.
19 BY MR. ORDER:
20 Q And these are attorneys that Jarrow Formulas has
21   sued; isn't that correct?
22 A In the context of your restated question, yes.
23 Q Are there any other attorneys, people who are
24   attorneys, admitted to practice at law, that
25   Jarrow Formulas has sued that you have not

Page 80

1    already testified about?
2  A No.
3  Q Do you know where Attorney Brutzkus's office is
4    located?
5  A In Encino, I think.
6  Q Encino, California?
7  A Yes.
8  Q Do you know whether he is with a firm, or is he
9    a solo practitioner?
10 A I don't know.
11 Q Now, before Jarrow Formulas sued Cynthia Harf,
12   did you write any letters to her threatening her
13   with a lawsuit?
14 A I'm not going to go into that.
15 Q Yes you are. Can you answer it, please?
16      MR. WIECHMANN: I would like to take a
17   break at this stage.
18      MR. ORDER: There's a pending --
19      MR. WIECHMAN: And he doesn't want
20   answer. And we are taking a break.
21      MR. ORDER: I object to that.
22      THE WITNESS: Well, we can have an
23   minute.
24      (Off record at 12:31 p.m.)
25      VIDEOGRAPHER: We are back on the

Page 81

1    record at 12:40 p.m.
2       MR. WIECHMANN: There was a question
3    pending when we took a break. I would ask
4    the court reporter to read back that
5    question, please.
6       (* Question: "Before Jarrow Formulas
7    sued Cynthia Harf, did you write any
8    letters to her threatening her with a
9    lawsuit?")
10      THE WITNESS: Yes.
11 BY MR. ORDER:
12 Q Before Jarrow Formulas sued William Verick did
13   you write letters to him threatening a lawsuit?
14 A I demanded that he reimburse us. Actually, I
15   would say both letters contained demands for
16   reimbursement for attorneys fees.
17 Q And coupled with those demands for
18   reimbursements, did you also state that if your
19   demands were not met that you, or Jarrow
20   Formulas, would bring a lawsuit against those
21   attorneys?
22 A Yes.
23 Q Did you write to Nicholas Browning before
24   bringing a lawsuit against him?
25 A I can't remember.

Page 455

1    THE VIDEOGRAPHER: This ends tape number
2  3, off record at 5:41 p.m.
3    THE VIDEOGRAPHER: Back on record at 5:50
4  p.m.
5  BY MR. ORDER:
6    Q  Mr. Rogovin, you attended, or appeared at the
7  beginning of a lecture that Dr. Masquelier was to
8  present in Baltimore on October 18th, 1996, isn't that
9  true?
10   A  Yes.
11   Q  And that was at the Hyatt, I believe?
12   A  Yes.
13   Q  How did you learn about that lecture?
14   A  It was very heavily advertised to the public.
15   Q  And what type of advertisement did you see?
16   A  It was mailed, it was in trade journals.
17   Q  Which trade journals?
18   A  Industry trade journals.
19   Q  Do you recall any particular one?
20   A  The Natural Foods Merchandiser for certain.
21   Q  Natural Foods Merchandiser?
22   A  Yeah. They were the sponsor of the trade
23  show, or the parent company is the sponsor of the trade
24  show.
25   Q  And did you receive an invitation to that

Page 456

1  lecture?
2    A  Did I receive mailings? Yes.
3    Q  Did you receive an invitation to that lecture?
4      MR. WIECHMANN: Object as to form.
5  BY MR. ORDER:
6    Q  Do you understand what the word invitation
7  means?
8    A  Well, in the context, no. Specifically or
9  generally, how do you mean invitation?
10   Q  Did you receive a card inviting you to attend
11  his lecture?
12   A  I was the addressee of an invitation.
13   Q  Do you have that invitation?
14   A  Or an announcement, I would say an
15  announcement.
16   Q  Was the announcement addressed to you, or to
17  Jarrow Formulas?
18   A  I don't see the difference, and I don't
19  remember.
20   Q  You received this announcement in the mail?
21   A  Yes.
22   Q  Did it have a RSVP?
23   A  No, not that I remember.
24   Q  Prior to October 18th, 1996, had you been
25  calling Dr. Masquelier a fraud?

Page 457

1    A  Prior to when?
2    Q  To October 18th, 1996, the date of the
3  lecture, had you been calling Dr. Masquelier a fraud?
4    A  I don't know what you mean by calling him a
5  fraud.
6    Q  Well, in conversations with anyone, in any
7  letters, had you been calling Dr. Masquelier a fraud
8  prior to October 18th, 1996?
9    A  It's too vague for me to answer. I need
10  specific language, a letter.
11   Q  The word, how about the word fraud, is that
12  specific enough?
13   A  Well, fraudulent patent, things like that.
14   Q  Did you call Dr. Masquelier himself a fraud at
15  any time?
16   A  I would have to see a particular letter, a
17  particular language, whatever.
18   Q  Have you ever accused Dr. Masquelier of
19  perpetrating a fraud?
20   A  Absolutely.
21   Q  And did you ever make that accusation prior to
22  October of 1996?
23   A  That I wouldn't remember. I think at the --
24  by the time I finished reviewing the prior art, I had
25  come to the well-founded conclusion that the patent was

Page 458

1  a fraud.
2    Q  And you had conducted that and completed that
3  research by the summer of 1996, correct?
4    A  In the summer, yes.
5    Q  In what?
6    A  In the summer.
7    Q  Right. Now, why did you attend this, why did
8  you show up for this lecture by Dr. Masquelier?
9    A  Because I intended to challenge his claim of
10  discovering that a molecule known to contain hydroxyls,
11  that proclaiming that a molecule that is known to
12  contain hydroxyl groups constitutes a discovery.
13   Q  In what way?
14   A  With the intention of asking him how he could
15  claim having discovered that a molecule that contains
16  hydroxyl groups is a free radical scavenger is a
17  discovery, since hydroxyl groups are known to be among
18  both, among nature's most powerful antioxidants, and
19  pro-oxidants.
20   Q  Did you attempt to write or communicate with
21  Dr. Masquelier prior to the lecture to convey those
22  ideas?
23   A  I sent his lawyer a copy of my paper, and I
24  have every reason to believe that Dr. Masquelier was
25  given a copy of it.

56 (Pages 455 to 458)

Page 459

1  Q  What lawyer are you referring to?
2  A  Norman Zivin.
3  Q  And you believe that Attorney Zivin
4  represented Dr. Masquelier at that time, in 1996?
5  A  One way or the other, he conspired with him.
6  Q  At the time that you sent Attorney Zivin your
7  analysis, as you call it, did you believe that Attorney
8  Zivin represented Dr. Masquelier?
9  A  As I said, I was aware that he was a
10 coconspirator.
11 Q  That's not my question. Did you believe that
12 Attorney Zivin represented Dr. Masquelier in any legal
13 matter prior to Dr. Masquelier's lecture?
14 A  He was working with Masquelier one way or the
15 other, so what that, you know, how that gets
16 characterized.
17 Q  Well, what was the basis for your belief that
18 Attorney Zivin was working with Dr. Masquelier one way
19 or the other?
20 A  Couldn't pull off this whole scam lawsuit
21 without working with him. Too much going on.
22 Q  Well, did you have any --
23 A  Like scam assignments, you know, scam, well,
24 registration with the patent office.
25 Q  And you --

Page 460

1  A  All this scamming, there had to be
2  communications.
3  Q  And you knew about all of that prior to the
4  lecture?
5  A  How much of the conspiracy at that point was
6  clear to me I don't remember. What was very clear to me
7  at that point was that Masquelier had defrauded the
8  patent office.
9  Q  Did you show up at the lecture in order to
10 harass Dr. Masquelier?
11 A  Of course not.
12 Q  Did you show up at the lecture in order to
13 embarrass him?
14 A  I showed up at the lecture to convey the truth
15 to the dietary supplement industry in the same way at
16 any scientific symposium a scientist with not just an
17 opposing view, but contrary data, will stand up at the
18 microphone and challenge the speaker, including even, if
19 it gets to it, and I've been in the room when this has
20 occurred, identifying falsified data, and that
21 scientist, that speaker, does not get manhandled and
22 thrown out of the room.
23 Q  What happened when you showed up at the
24 lecture?
25 A  I took my seat next to a worker of mine.

Page 461

1  Q  Who was that?
2  A  Karen Palese.
3  Q  Karen what?
4  A  Palese, P-A-L-E-S-E.
5  Q  Okay. And then --
6  A  Scott may have been there, Puliski, I don't
7  remember.
8  Q  And Scott Puliski might have been there, is
9  that what you said?
10 A  He may have been, I don't remember.
11 Q  Does Karen Palese still work at Jarrow
12 Formulas?
13 A  Yes.
14 Q  Okay. And then what happened?
15 A  I was suddenly accosted from behind, while
16 seated.
17 Q  Accosted by whom?
18 A  Two security guards.
19 Q  And in what manner did they accost you?
20 A  They grabbed me, and were guiding me, shall we
21 say, out of my seat. At that point I stood up, and I
22 announced to them who I was, and that I was being
23 escorted, or thrown out of the room.
24 Q  Now, who were you addressing at this point?
25 A  The room full of people.

Page 462

1  Q  And how many people were in the room at that
2  time?
3  A  30 to 50. Maybe 30.
4  Q  And then, go ahead, I'm sorry. You announced
5  to them who you were, and then you were being escorted
6  out of the room.
7  A  No, no, no, thrown out of the room.
8  Q  Thrown out of the room. Well, did the
9  security guard say anything to you?
10 A  Yeah. They said come with me, come with us.
11 Q  Okay.
12 A  And they laid hands on me immediately.
13 Q  And then you announced to the room that you
14 were being thrown out?
15 A  Who I was, I was being thrown out because they
16 did not want me asking questions about Masquelier's
17 patent, and at that point they became quite forceful
18 with me.
19 Q  In what manner?
20 A  Including virtually all the way out the hotel.
21 And matter of fact, Greg Ris was in the foyer area,
22 outside, approaching the conference rooms, and he saw
23 how I was being manhandled. Zivin then put out a
24 declaration for no reason at all saying that I had stood
25 up on a chair and was screaming to the room, another