G

JARROW FORMULAS, INC.
SUPERIOR NUTRITION
AND FORMULATION

**JARROW**
**FORMULAS™**

1824 South Robertson Boulevard
Los Angeles, CA 90035-4317
(310) 204-6936
Toll Free (800) 726-0886
———FAX (310) 204-2520



DEFENDANT'S
EXHIBIT
144

August 28, 1996


Norman H. Zivin, Esq.                    By UPS Next Day Air
COOPER & DUNHAM LLP
1185 Avenue of the Americas
New York, New York   10036


Jonathan A. Flatow, Esq.                 By UPS Next Day Air
WAKE, SEE, DIMES & BRYNICZKA
27 Imperial Ave., P.O. Box 777
Westport, CT   06881

Re:   INC vs. Horphag, etc., et al.
      1) Plaintiff's Apparent Lack of Standing to Sue

      2) Market Considerations -- Damage to Plaintiff and PSI

      3) Warning re Bad Faith

      4) OPC-85 Trademark:
         a) OPC-95 Is Non-Infringing
         b) The OPC-85 Trademark Is Not Valid
         c) OPC-95 Has Not Damaged OPC-85
         d) False Advertising, Mislabeling and Lanham Act Violations
         e) Offer to Compromise Trademark Issue

      5) 360 Patent Is Invalid and Was Obtained by Fraudulent Means

      6) Experts Support Jarrow Formulas' Position on 360 Patent

      7) Intent to File Petition to PTO for Re-Examination of Patent;
         Offer to Settle and Demand for Damages

      8) Postword:  Potential for Damage to Masquelier's Reputation


Flatow.doc                                                    D 000 514

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 – page two

Dear Mssrs. Zivin and Flatow:

Considering the generally recognized antioxidant role of polyphenols, I was stunned by the filing of the lawsuit in the above matter. It seemed inconceivable that anyone could obtain a patent on the free radical scavenging (FRS) effect of "proanthocyanidins," even in 1985/1987. After several months of meticulous, hard-labored study, I have concluded that my initial reaction was correct, and further, that you and your clients have committed fraud and are embarked on a meritless, wilfull and malicious litigation.

I have twenty years of experience in this industry. I studied literature and history, one year at Long Beach City College and two-and one-half years at UCLA. I am literate, intelligent, articulate and capable of reading, analyzing, understanding and interpreting the scientific literature touching the issues of this case. I have presented JFI's lengthy written analysis of the 360 patent to a number of world-renowned scientists: They all concur with my conclusions and have added their own unsolicited opinion that Masquelier, Schwitters and their attorneys have twisted and distorted the science in this matter to suit their own purposes.

After careful study and deliberation, Jarrow Formulas asserts the following reasons why plaintiff cannot and should not maintain its suit against JFI and offers to compromise in lieu of asserting its counterclaims:

## 1. Plaintiff's Highly Questionable Standing to Sue

I have read the papers of movants and your oppositions'. Plaintiff may or may not have bootstrapped an argument sufficient to survive the jurisdictional challenges. However, the risk to plaintiff (and his counsel) of being sued for malicious prosecution is rather evident.

It is questionable whether your client has the standing to sue anybody. Horphag owns at least half the patent: The patent states such. There is no evidence that Horphag is an expired licensee. The argument they are is more petty than ingenious. INC must prevail against Horphag in the concurrent French action in Bordeaux before JFI should have to answer any patent infringement charge. The U.S. suit is little more than an improper marketing tool, particularly considering the conduct of Schwitters and PSI at the 1996 Natural Foods Expo in Anaheim.

It is relevant to cite at this point the July 24, 1987 letter written by E. Garraud, Manager Director of SCIPA, to Charles Haimoff stating:

D 000 515

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page three

"We remind you that the U.S. patent [the 360] was taken jointly by...[SCIPA] and HORPHAG....

"Therefore, no settlement can be made with a single one of co-owners, lest (sic) the transaction risk being void.

"Please keep us informed on all of the proposals which may be made to you so that we may give over consent prior to any agreement, whatever it may be."

Jarrow Formulas knows of no rejection by Horphag of the terms of the July 24 letter. Both parties do appear to be bound. There is no reason that the term of said letter is anything other than the term of the patent itself, not even the April 29, 1985 research agreement.

This letter, coupled with certain allegations in the French lawsuit, militate against your lawsuit: Article L. 613-29E of the French Code of Intellectual Property specifies that the joint owner has a right of preemption (or right of first refusal) when the patent was jointly filed. Your suit is predicated on the allegation that with the expiration of the April 29, 1985 research agreement, somehow Horphag's ownership in the fruit of the contract -- the 360 patent -- also expired. Why performance of the terms of the 1985 contract did not earned Horphag co-ownership of the 360 for its entire life is not explained either. There is no evidence that ownership of the 360 and the term of the 1985 agreement are supposed to be concurrent. Further, if ownership of the 360 expired, why hasn't Masquelier registered a reassignment of the 360 with the PTO with himself as the sole assignee? Certainly, this should have been done before filing this ridiculous suit in Connecticut.

Thus, apparently, Mssrs. Zivin and Flatow have contrived this petty suit as little more than an improper means to confound in the American courts the clear threat to INC (Schwitters) and Masquelier due to the Bordeaux action. It strongly appears to Jarrow Formulas that the suit against it is as wrongly contrived as the patent suit against Traco (which was "licensed" by PSI) and the trademark suit against New Vision for using no more than "OPC."

2. Market Considerations

Your client runs a certain risk to its reputation and business in this lawsuit. The claims certainly appear to be vainglorious for the reasons stated herein. INC is suing companies that have good reputations and attendant goodwill in the marketplace. Schwitters is not going to win any points with

D 000 516

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page four

consumers or retailers with his suit. It is one thing for him to compete by marketing the "Masquelier OPC." To attack well-regarded companies, after much expenditure of energy and resources with no chance of recovery, your client is likely to be left presenting himself to the marketplace as a pretty petty sort if not a con artist considering the facts contained herein.

This is a small and sometimes folksy industry. Though the lawsuits that occur are generally ignored by the retailers, there is something about a mass suit under the present circumstances that is going to earn negative attention. I suspect that apprising retailers of the defenses to this suit could result in a loss of sales to your client. The fact that the co-owner of the patent opposes the entire suit (probably because Horphag and MW are aware of 360's inherent invalidity) further compromises the reputation of your client.

Schwitters and his associates can only hurt their companies if they pursue this matter. JFI is entitled to present its side to the retailers because of your clients' conduct at Anaheim was outrageous, along with the gossip downloaded into the internet by your cronies at V.M. Nutri/Life Plus in Arkansas. The suit has been used non-stop as a sales promotion gimmick by your client(s) while they disingenuously disclaim any desire to "make an issue of the lawsuit in the marketplace." I called this contradiction to the attention of Schwitters and LeFebvre in Anaheim as their salesgirl promoted via litigation claims: Character assassination of their competitors. They "agreed" with me but did nothing to stop it. Also, your client's MLM distributor, V.M. Nutri/Life Source, has jumped into the fray with a March 1996 letter boasting of the suit, claiming sole legitimacy to procyanidin products, and attempting to intimidate retailers with the threat of -- a lawsuit....

V.M. Nutri and PSI have sent out letters to the industry that can only be characterized as sleazy attacks against defendants including JFI. Under the circumstances and given the laws protecting competition, JFI is seriously considering sending a letter exposing Masquelier and Schwitter's defrauding of the U.S. Patent and Trademark Office (PTO) concerning *both* the "OPC-85" trademark and the 360 patent; the splenetic hatred between the patent holders that has resulted in a petty, malicious suit; and the malicious conduct of plaintiff's attorneys who *wilfully refuse* to discuss the merits of the case. Such a letter will invite retailers to consider whether they should carry any products utilizing the so-called OPC-85 Masquelier trademark; that retailers can vote their dollars on the conduct of your client(s). Certainly, this is what your own client(s) has done, but JFI's letter would be more convincing.

Your clients' conduct is defaming Jarrow Formulas and other parties: There is no legitimate patent to violate and JFI is not acting unethically, which is

D 000 517

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page five

what your clients have been telling people during and since Anaheim. JFI, in addition to the aforesaid public letter, may have grounds for an action for defamation against its proanthocyanidin product if not libel per se.

The most potent threat to your clients' business interest is the loss of both the patent and trademark: Without the patent, *no one* needs Schwitters, including PSI and V.M. Nutri. The *only* asset left will be the use of Masquelier's name. How much of a premium will that be worth when the patent is stripped -- particularly if it is found (as it should be) that Masquelier defrauded the patent office and Schwitters and Zivin defrauded the trademark office.

### 3. Warning re Bad faith: Liability of Plaintiffs and Their Counsel

Mr. Flatow and Mr. Zivin, read this section *carefully*. I'm not bluffing. Call my lawyers, Mr. Neal T. Wiener, 310/276-2889 or Mr. P. Scott Polisky, 212/206-7283, and see whether I bluff about such things. In the end, I'll go after you: Not just Rule 11 but a suit for malicious prosecution and abuse of process. I think lawyers who act in bad faith ought to be held liable for their conduct. It's called a *quid pro quo*. If more litigants were like me, lawyers would be a lot more careful. And don't take this as a challenge to ignore me and think you'll walk away afterwards: You won't: I'll sue *you* along with Schwitters, Masquelier and probably PSI. Mr. Zivin already hung up the phone on Mr. Polisky stating, "I won't discuss the merits of this case on the phone with you. Just answer the complaint." I really do sue lawyers who act in bad faith. The detail of this mailing should give you pause to consider that since I'm willing to personally prepare such an in-depth analysis, I certainly would not hesitate to sue both of you.

Further, the cavalier attitude and bad faith of Bert Schwitters is evident from his testimony in deposition wherein he stated he isn't the sort of person to let litigation disturb him. This coupled with his evasion of service and refusal to answer Horphag's complaint in Bordeaux betray Schwitters to be a scofflaw and a bully. If JFI sues him, he will be summoned by publication in Washington, D.C., if necessary and then after judgement I will seek assets in the form of any shipment or earned royalty in the U.S. Schwitters will not succeed in his gamesmanship with Jarrow Formulas. He will pay his bills or be driven out of business in the States.

It is hereby demanded that you respond, in writing and with specificity to JFI's corporate counsel, Mssrs. Wiener and/or Polisky, within ten (10) days of the date of this letter regarding the legal issues and scientific studies addressed herein including the 360 Addendum and its 407 Appendix. Failure to do so shall be deemed willful, deliberate, wanton and malicious conduct in that you will have

D 000 518

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 – page six

deliberately refused to do due diligence and have pursued a meritless suit for improper purposes. You are receiving hereby sufficient detail in refutation of the suit. It is now your responsibility to hire qualified experts to evaluate the 360 patent and then proceed in good faith according to the scientific data and its reasonable interpretation. "Reasonable interpretation" of scientific data is not as subjective as the two of you would like to pretend. If your response to JFI's patent refutation is recalcitrance or flimflam and pettifoggery, the legal response of JFI will be immediate and relentless.

In either event, JFI is proceeding forthwith with its own Petition in the U.S. PTO to Re-Examine the 360 and such other legal actions as we deem appropriate and necessary to terminate this legal charade. Therefore, JFI demands that you withdraw the complaint against it within ten (10) days of the date hereof.

Notwithstanding the above assertions, Jarrow Formulas turns now to the substance—or lack of it—of this suit:

4. OPC-85 Trademark

a) OPC-95 Is Non-Infringing

Jarrow Formulas' former brand name OPC-95 is different than your client's OPC-85 and no consumer or retailer would be confused between the two, the difference being obvious. In order to establish its case, INC would have to do a survey and the results would be foregone: OPC-95 is a higher strength, different potency than OPC-85 and neither name evokes an ineluctable connotation of Masquelier: OPC-95 does not confer any secondary meaning regarding Masquelier. The essential, recognized commodity in the marketplace are the terms "oligomeric proanthocyanidins" and its acronym "OPC" and, secondarily, "proanthocyanidin" without "oligomer." In commercial terms, "Masquelier" is of minor significance. Vanities aside, "Masquelier" in the retail marketplace is a virtual non-entity. Whatever cultish nonsense in the multi-level marketing (MLM) arena is being bruited about "Masquelier" should be considered only in light of its source.

b) The OPC-85 Trademark Is Not Valid

The term OPC is merely an acronym for the recognized chemical term oligoproanthocyanidins. JFI has been informed that attorney Norman Zivin had told Schwitters at a meeting that "OPC" by itself could not be trademarked. It is self-evidently ridiculous to claim infringement against everything that contains the

D 000 519

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page seven

acronym OPC. "OPC" is essentially generic and has become crowded art. Its use in the literature is rampant. Nevertheless, INC has sued New Visions for nothing more than just using "OPC." Not only will the statements of Zivin against Schwitters be held against INC in this regard, but the very act of suing New Vision in this regard compromises the supposed uniqueness of OPC-85. Indeed, on the right panel of their bottle states: Oligomeric ProanthoCyanidin which belies the claim to the PTO that the mark has no significance in the industry. In fact, scientific usage of both OPC and PCO was already in vogue.

Likewise, the number "85" refers to the potency of the product -- which is another reason why the trademark is invalid. The so-called mark is completely generic: OPC stands for oligoproanthocyanidin and 85 represents the putative percentage of OPCs. The fact that the product claims to be "standardized" also leads one to assume that the 85 does signify a percentage. Further, your clients distributed in Anaheim *after* filing this lawsuit a sheet which states:

> The technology to extract practically pure flavanol compounds from plant materials was perfected by Masquelier over many years of hard work. The ability to isolate proanthocyanidins ("OPC") from a plant source can only be achieved through a precise scientific extraction process which automatically results in a standardized raw material potency of 85% or better of "OPC" and its precursors. "OPC-85™" is the current term coined by Masquelier to represent the "oligomeric proanthocyanidin (OPC)" potency standard.

The only blurring of the 85% as being "OPC and its precursors" rather than solely the amount of OPCs came well after filing for the trademark. When INC began to sell a higher OPC product than pine bark, i.e., grape seed, the explanation for the 85 became more convoluted (with number games going up to an equally inaccurate 98% polyphenols), but the 85 always related to the percentage of OPCs. The phrase "and its [OPC] precursors" was added only recently due to competitive analyses exposing your clients' fraudulent conduct -- and, apparently, to cover up conduct by your clients in conflict with this suit. (See section 3d *infra*.)

These facts are in contradiction to Zivin's claim to the US Patent & Trademark Office that the mark has no meaning within the industry where it would be used and the name was nothing more than INC's trade name. Such initials and numbers are typical of the industry. (See section 3d *infra*.) This misrepresentation was fraudulent and shall become one basis for JFI claiming costs, legal fees and other damages, and it is placing INC's licensees at risk of being sued by JFI.

D 000 520

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page eight

c) <u>Jarrow's Former Brand Name OPC-95 Has Not Damaged OPC-85 and Plaintiff Has Unclean Hands</u>

Jarrow Formulas hereby demands that you and your client assess what damage -- if any -- the brand name OPC-95 has done to your client. JFI asserts absolutely none. Without damages, your client has no basis for suit. Your client must concede that OPC-95 has a competitive advantage over "85" only because it is a higher number which is a reflection of Jarrow's superior product quality. JFI simply offers a higher potency product at a lower cost. Further, as aforestated, your client's mark has secondary meaning *only* in the form of "Masquelier's OPC-85." OPC-95 does not present itself as "Masquelier's OPC-95." The public has no perception that OPC-95 is Masquelier's product. Jarrow Formulas is in possession of a letter from PSI's Gary Senecal which cites Masquelier refusing to let his product be sold to Traco Labs simply as "OPC-85" because, the letter states, Masquelier believes OPC-85 is meaningless unless used in conjunction with his name. Therefore, your client cannot claim confusion, nor therefore, damages.

Your client also cannot prove damages if only because of its incompetent marketing and distribution practices including requiring pre-payment or COD from retailers in addition to a lack of efficient, convenient distribution and excessive pricing. On that score, INC could be suffering loss of business due to price gouging by demanding a premium ($1,300/kg.) for an inferior product.

Additionally, your clients sell in the U.S. almost exclusively through the MLM channel. To claim they have been injured by the retail channel would require substantial proofs which would not be possible. Most of the MLM business is based on extravagant hype -- like the lawsuit itself.

Your client is also barred from claiming damages due to unclean hands. In addition to the invalidity of the registration (section 3b, *supra.*), the mark is fraudulent, misleading and unfair competition (section 3d following).

d) <u>False Advertising, Mislabeling and Lanham Act Violations by Plaintiff(s)</u>

In addition to the issues contained in sections 3a), 3b), and 3c) above, during my conversation in Anaheim with Richard LeFebvre of Primary Source, Inc., (PSI) licensee of the OPC-85 trademark, he refuted—scornfully—the alleged 95% OPC claim of Indena but he admitted that his own product was less in strength than Indena's. (Indena's analysis actually states 95% polyphenols.) In fact, it is PSI's own 85% claim that is untrue. Lefebvre later admitted to me on the phone the week of April 13 that the OPC content of his product is between

D 000 521

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page nine

50-60%. Any claim by Schwitters of trademark damage is compromised. (Pine bark contains substantially less OPCs than does grape pip extract, but for the record, PSI's grape seed extract is still considerably less potent in OPCs -- and therefore of substantially lower value to the consumer -- than Indena's product.)

Even without blending the pine bark into the grape seed extract, PSI's lesser potency products are not true to claim. The OPC-85% issue aside, your client(s) mislabels its products in other ways as well:

1. The phrase "Elemental OPC antioxidant...50 mg" is misleading. Does it mean 50mg. of net OPCs, or 50 mg. of total extract, or 50 mg. of total polyphenols?

2. The phrase "Masquelier's OPC-85™ is 90% active principles: proanthocyanidins (OPC) and a balance of OPC precursors" is misleading because it clearly implies that the product is 85% OPCs and 5% precursors which is untrue. (In another sheet, your clients state: "The extract guarantees a minimum polyphenol activity level of 98%....")

I informed LeFebvre that the OPC-85 claim is misleading to the consumer and retailer, is mislabeled, falsely advertised and should be barred from use, registered or not. I informed Mr. LeFebvre that I could—and would—sue PSI under the Lanham Act if compelled to do so. Mr. LeFebvre insisted I call his attorney, Mr. Zivin, and hung up the phone. (It was comical to hear Mr. LeFebvre defend his use of a misleading trade name by asserting its registered status. Novel idea that one: Register fraud and it's legal!). See exhibit 1 hereto, an analysis of one of "Masquelier's OPC-85" products showing a net proanthocyanidin content of only 51.2%.

Enclosed as exhibit 2 is copy of ad from PSI. Note the language:

"OPC-85/grape seed extract and OPC-85/pine bark extract are standardized at the minimum of 92% and 85% proanthocyanidin content respectively for maximum antioxidant activity."

Enclosed as exhibit 3 is copy of a February 20, 1996 analysis from Plant Bioactives of PSI's blended grape seed plus pine bark and grapeseed only products showing a proanthocyanidin content of 56.5% and 60.6% respectively. The OPC-85 mark is clearly intended to deceive the consumer. Mr. LeFebvre's subsequent letter to me asserting his born-again repudiation of the 85 as referring to a percentage is self-serving and born out of pure panic that JFI will sue his company. His claim that OPC-85 refers to "nothing" will not be borne out in discovery.

D 000 522

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page ten

As would be proven through discovery and at trial, it is the custom and trade in the industry to use numbers in product names to be representative of a milligrammage (e.g., E-400 [international units of activity]; C-1,000 [1,000 mg.]; Amino 1,000 [1 gm. tablets]; Carnitine 500 [500 mg.]; etc.), or of a percentage of the active's potency (e.g., PC-55 [55% phosphatidylcholine]; or OPC-85.... Though the former use is more prevalent, the latter form has substantial precedent. What is *not* typical of the industry are numbers without specific correlation or meaning other than a sound effect. The products in the industry typically have a scientific basis -- as Masquelier himself would agree -- and even the "fanciful" term Pycnogenol is rooted in specific Greek words to allude to the condensed molecules being so clepped. It is incredulous for plaintiff to claim that OPC-85 is "trivial," that is without any significance other than an artful descriptor. The 85 is as fraught with meaning as the well-freighted OPC. To claim OPC itself as platintiff's own is pure hubris.

Another false ad claim of your clients* is that Masquelier "discovered" or "found" OPCs.

The historical first extraction by Rosenheim in 1920 (*Biochem J*, 14:821 *et seq.*) is significant because your client's literature falsely implies, if not states, that Masquelier discovered OPCs:

> "In 1947, while working on his Ph.D. thesis, Jack Masquelier found the colorless OPCs, while studying the red pigments in peanut skins."

Apparently, Masquelier discovered Spanish peanut skins contain proantho-cyanidins — already known substances — but he certainly did not discover PACs. PSI and Life Source are falsely claiming in their advertisements that Masquelier made this discovery. Masquelier did not characterize these molecules, nor analyze their biosynthetic pathway, nor is he responsible for any of the scientific nomenclature. ("Pycnogenol" is not a recognized scientific term by IUPAC.) Masquelier did not "develop the science" of proanthocyanidins as much as he has plagarized at worst and popularized at best. Said false claims are unfair trade practices and violate the federal Lanham Act and other laws.

---

*Zivin's position that PSI is not his client is likewise questionable: There is at least an agency relationship between INC and PSI, and Zivin's latter day disavowal of PSI as a client will do little more than help fuel a malicious prosecution suit against him.

D 000 523

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page eleven

The book written by Schwitters "OPCs in Practice" also constitutes unfair trade practices. It has been widely distributed by INC and PSI without charge and the book contains false claims, particularly on behalf of Masquelier, all of which constitute unfair competition.

Another example of your client's false advertising -- and Masquelier's plagarism combined with slipshod science -- is the claim that pine bark OPCs are 50 times more powerful antioxidants than Vitamin E. The study was Japanese (not Masquelier's), and the materials used were from green tea and persimmons, not pine bark. Also, only one of six OPCs studied had this effect and only against one type of free radical. (Uchida S et al., 1987 Med Sci Res, 15:831-2).

Additionally, the patent itself is fraudulent and will constitute the basis of an additional claim for unfair competition, particularly against Jack Masquelier.

The counterclaims available to JFI will negate any trademark infringement alleged by INC: There is no basis for damages in connection with your illegally labeled product. I am quite serious about filing such a counterclaim. As far as the market is concerned, JFI will be credited for solving the problem while Schwitters, PSI and Life Plus will appear malicious and dishonest. If plaintiff fails to withdraw its trademark claim against Jarrow Formulas, then JFI will be compelled to take the appropriate action.

In the meantime, Jarrow Formulas demands that your clients and their licensees, each and all of them, immediately cease and permanently desist from using, advertising, labeling or selling the OPC-85 mark as being false, misleading, deceptive and unfair competition under the Lanham Act and other applicable law.

e) Offer of Compromise re Trademark Issue

Notwithstanding the above sections 3a, 3b, 3c, and 3d, JFI is causing its labeling to be changed. See enclosed exhibit 4. JFI would have done this without the impetus of suit if counsel for INC had, as claimed in paragraph 31 of the suit, actually written to JFI. The issue is easily remedied and so petty as to be unworthy of suit, particularly when INC and its licensees cannot prove damages and are falsely advertising and mislabeling. If, however, the trademark action is not dropped JFI will proceed with legal action in addition to the present counterclaim for invalidity.

The bottom line on your trademark claim (OPC-85 vs. OPC-95) is that it is so supercilious as to be embarassing. Don't you people have better things to do than act like spoiled children? Have you no sense of shame? No perspective on

D 000 524

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page twelve

life?  Life is too short for such bathetic behavior.  Gentlemen, Yom Kippur is around the corner and this is what you're going to tell G-d?  You are redeeming the world with drivel?  The money, the time could go to tz'dakah.  It could even go to Vegas for what the trademark complaint is worth.  Please, gentlemen...get a life.  I don't want to have to countersue over such utter rot.  Talk to a rabbi, a priest, a therapist.  Anyone.  Just get a grip.

5. <u>Claim of Plaintiff re 360 Patent Is Invalid and Was Obtained by Fraudulent Means</u>

See "Patent Addendum re 360 Patent" and "Appendix re Patent No. 3,436,407," both attached hereto and made a part hereof by reference along with selected exhibits.

The substantial addendum and appendix to this letter speak for themselves.  For brevity, however, the following is redacted.

To summarize what was known about flavanols by 1985:

1. OPCs were discovered in 1920 by Rosenheim.

2. The structure of OPCs was elucidated by Weinge (Germany) by 1962.

3. By the 1960s if not before, it was understood that PACs are condensations of flavan-3-ols (catechin, epicatechin) and flavan-3,4-diols (leucoanthocyanidins), though the latter were also known to be PACs as well.

4. Masquelier's 1969 407 patent uses the term hydroxyflavan 3,4-diols to describe the entire class of flavanols from monomers and PACs through condensed tannins.  The 407 identifies the molecules of interest to be "in particular" the monomers up to the pentamers.  16 years before filing the 360, the 407 in 1969, describes flavanols as a single class with a basically common structure, particularly hydroxylated B rings.

5. The commonality of structure and function of the hydroxy-flavan 3,4-diols (from monomers through *all* polymer linkages)

D 000 525

described in the 407 in 1969 is abandoned in the 1987 360 patent when the term "proanthocyanidin" is used exclusively to deflect attention from the monomers and to avoid the well-proven activity of FRS by the monomers. This is particularly significant because the 407 describes the monomers and proanthocyanidins as having a "close chemical link."

6. The 407 patent claims a method to extract hydroxyflavan 3,4-diols and their use, particularly "PACs" to treat abnormal capillary fragility and permeability, which use was known by 1942 (Lavollay). The 1987 360 patent constitutes a fraudulent extension of the 1969 407 patent in that the 360 merely claims discovery of an already-known mechanism: free radical scavenging by PACs (and monomers) and otherwise duplicates the 407.

7. It was reiterated in 1962 (Weinge) and 1977 (Pratt) from still earlier work that hydroxylation of the B ring determines the antioxidant activity including FRS of flavans and flavanols. It was published in Russia (Medovar; 1967) that the antioxidant activity of *any* flavonoid, which nomenclature includes the flavanols, could be predicted from it molecular structure.

8. It was known that flavans and flavanols have a hydroxylated B ring which has FRS activity. It is also stated in Masquelier's 1969 407 patent that *all* hydroxyflavan 3,4-diols have B rings.

9. It was known that monomers were free radical scavengers due to their B rings and that the condensation of monomers *increases* hydroxylation of the B ring. Therefore, PACs were known to have multiple OH groups on their B rings and would be expected to maintain FRS activity.

10. PACs were identified as the active component in hawthorn products already on the market. Hawthorn was and is used to treat circulatory problems.

11. Nozaki (1984) specifically demonstrated FRS effects against lipoperoxides by PACs from grape seeds. The 360 references "lipid peroxidation" in relation to carcinogenesis at 5:51.

D 000 526

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page fourteen

12. The monomers and PACs were known to be bioavailable.

13. PACs were known to be cardioprotective and suspected to have anti-tumor effects.

14. Masquelier failed to disclose to the Patent Office -- if not consciously concealed -- all of the above.

Plaintiff's counsel Zivin claims in his opposition to the motions to dismiss on the grounds of lack of jurisdiction that the preceding proceeding in New York had entered a *judgment* validating the 360 patent. Zivin's claim is *patently* untrue as Judge Platt had merely approved a settlement agreement between Consac (County Life Vitamins) and MW/Horphag wherein Consac acknowledges -- for its own reasons -- the validity of the patent. Consac's acknowledgement of the 360 patent was no more than a settlement niceity necessitated by Consac's counterclaim against the patent and the truth of which counterclaim the supervising court had *no* proprietory knowledge nor any abiding interest at the time. Zivin's misrepresentation of the court's approval of a settlement as being an adjudication of and judgment on the issue would be raised in any action for abuse of process.

6. <u>Experts Support Jarrow Formulas' Position on 360 Patent</u>

We have already engaged Chithan Kandaswami, Ph.D., as an expert witness. He is a recognized authority in the field. I have also reviewed the 360 claims and a draft of the accompanying 360 Addendum and 407 Appendix with several of the world's leading authorities in the field:

Pierre Braquet, Ph.D. (Paris)
Wolf Bors, Ph.D. (Munich)
Piergiogio Pietta, Ph.D. (Milan)

All three experts agree without reservation that the claims of the 360 are utterly without merit, and further, they are all willing to be affiants, if not witnesses, against Masquelier. I visited all three gentlemen in Europe in May. Interestingly, Dr. Braquet is a former student of Masquelier -- and one of the seminal researchers in the field of radical scavenging by polyphenols. You, Masquelier and Schwitters are in no position to refute such highly esteemed scientists. Your position is hopeless. Litigation will only drag out a foregone conclusion.

You are no longer in a position to claim that you or Schwitters should be permitted to rely on Masquelier and be considered to have acted in good faith for the following reasons:

D 000 527

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page fifteen

1) The pending (anonymous) petition to re-examine the 360 has been accepted by the PTO;
2) The contents of the accompanying 360 Addendum, 407 Appendix and related exhibits;
3) The representations in this letter that Dr. Kandaswami and other experts are either engaged or willing to be so engaged; and
4) Masquelier himself stands accused of inequitable conduct in that it is herein alleged he defrauded the PTO.

For these reasons you and Schwitters should not be complacent; rather, it is your due diligence duty to engage *independent* expertise to evaluate the materials herewith as well as the pending PTO reexamination. Failure to do so shall surely constitute grounds for suit.

Masquelier, Schwitters, Zivin and PSI are deemed by Jarrow Formulas to have conspired to file a meritless and malicious suit while your clients have conspired to violate the Lanham Act if not RICO as well. Flatow's exposure, if he continues to participate in this farce, will be abuse of process.

7. Offer to Settle and Demand for Damages

Having authored "OPCs in Practice," it is impossible to believe that Schwitters is unaware of both the mislabeling issue that renders the OPC-85 mark a moot issue or the 360 patent's prior art problems. Certainly, Schwitters understands the points raised herein. He, too, in Anaheim discussed with me the actual OPC contents of his products and that they are approximately 30% lower than claim. The fact that he did so somewhat nervously is because he understands the implications of "unclean hands." The perfidy and science charlatanism of Jack Masquelier is self-evident. As for plaintiff's (singular?!) counsel, they have overly artfully bootstrapped a petty, nasty piece of business. With a shameless disregard for their duty to do due diligence; a cynical disdain for intellectual integrity; and a coarse rejection of truth, fairplay or ethics, plaintiff's counsel have ruthlessly refused to discuss the merits -- or lack thereof -- of this case.

Though JFI would prefer to avoid further litigation, we will not shrink from taking rigorous action. The length, vigor and detail of this presentation should convince you of Jarrow Formula's earnestness in following through. Genericness and prior art as to the trademark and patent, labeling fraud, false advertising,

D 000 528

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 -- page sixteen

fraud against the U.S. PTO, double-patenting, Sherman Act and RICO violations, and other conspiracy charges are powerful defenses and *counterclaims* for your clients to overcome. Your clients would better benefit from good marketing rather than the rigors of an ugly lawsuit that they will lose.

Bear in mind that there are a number of other law firms that will follow our lead in these areas.

I look forward to a more thoughtful response. If that response is to continue the suit, I will think your clients to have been poorly counselled or their own conclusions venal and rash. JFI hopes that you and your clients will wisely reconsider further engaging JFI as a litigant and turn to a more productive enterprise.

You and your clients have wasted well in excess of 250 hours of my time at the reasonable rate of $200 per hour for a corporate CEO of my caliber. Having extensively researched the patent and documented its fraudulent nature, Jarrow Formulas hereby demands immediate dismissal of the suit against this corporation and reimbursement of all its legal fees. If JFI is not dismissed within ten (10) days of the date hereof, JFI will sue INC and its cohorts for Lanham Act violations, file motions for summary judgment to invalidate the patent and trademark, and then sue at the conclusion all parties involved -- including plaintiff's lawyers and Jack Masquelier -- for conspiracy, malicious prosecution and abuse of process. In addition, the issue of Sherman Act violations is self-evident. The fraudulent obtaining of the 360 in order to extend the temporary monopoly granted by the 407 chilled entry into the marketplace by competitors and thus damaged them, including JFI. Masquelier, Schwitters and their patent and litigation counsel could be subject to treble damages.

As it is, you have wasted in excess of $50,000 worth of my time as CEO of JFI. I will not tolerate any further nonsense.

8. Postword: Potential for Damage to Masquelier's Reputation.

Some closing thoughts: Not one single recognized expert in polyphenols other than Masquelier is likely to testify on plaintiff's behalf. The expert opinions I have obtained so far agree that Masquelier's patent misrepresents to the U.S. PTO the state of the science in 1985. The lack of scientific experts for plaintiff's position will burden his case, but it will also reflect rather poorly on Dr. Masquelier.

Masquelier is an older gentleman who might want to preserve his fame and dignity (however earned). In these cynical times, he is more likely to be

D 000 529

Norman H. Zivin, Esq.
Jonathan A. Flatow, Esq.
28 August 1996 – page seventeen

remembered as the man who failed to disclose prior art on monomers, dimers, oligomers, existing OPC-containing preparations, the state-of-the art on molecular structure and its effect on FRS -- all in favor of a red herring argument against bioflavonoids. He will be remembered as the man who scammed the U.S. Patent Office with a phony study using an expired bioflavonoid product while absenting reams of data on flavanol compounds including Nozaki's 1984 study demonstrating FRS by grapeseed PACs. He will be remembered as the man who allowed others to give him undue credit for Roseheim's work in discovering OPCs in 1920 when Masquelier had been just born and credit for the work of Weinges and others. He will be remembered as the man who let his name be used in connection with "OPC-85" when the product is not at all 85%. He will be remembered as the man who, in an act of hubris, set in motion a malicious, meritless action which brought down his own reputation.

And Mr. Schwitters will be remembered as the undoing of his own mentor.

Don't push me, gentlemen. I push back.

Sincerely,

Jarrow L. Rogovin
President

JLR:hi

cc:     Neal T. Wiener, Esq., corporate counsel for JFI,
            9100 Wilshire, 700 West, Beverly Hills, CA  90212
        P. Scott Polisky, Esq., corporate counsel for JFI,
            450 W. 24th St., #2F, New York, NY  10011
        Brian Poissant, Esq., Pennie & Edmonds
        Tom Rowan, Esq., Pennie & Edmonds
        Indena, U.S.A., Inc.; Indena, S.P.A.
        Traco Labs, Inc.
        Richard LeFebvre, Gary Senecal Primary Source, Inc.
        Life Plus/VM Nutri, Inc.
        M.W. International, Inc.
        Jack Masquelier, Ph.D.
        All defendants' counsel

D 000 530